UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CASE NO. 19-cv-6473 |
| v. | : | |
| | : | |
| SBB RESEARCH GROUP, LLC, SAMUEL B. BARNETT, and MATTHEW LAWRENCE AVEN, | : | |
| | : | JURY DEMANDED |
| Defendants. | : | |
| | : | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "SEC" or "Commission") alleges as follows:

1.      This case arises out of a multi-year fraudulent scheme perpetrated by Defendants SBB Research Group, LLC ("SBB") – a registered investment adviser to several private investment funds (the "Funds") – Samuel Barnett (SBB's owner and Chief Executive Officer ("CEO")), and Matthew Aven (SBB's Chief Operations Officer ("COO")).

2.      Although Defendants executed their scheme in the back-office of SBB using a complex mathematical formula, the fraud at its core was simple. Barnett, Aven, and SBB intentionally rigged SBB's valuation model to inflate the recorded value of the Funds' securities and make the Funds' performance look much better than it actually was. Using those manipulated values, Defendants reported inflated Net Asset Values ("NAVs") to investors, and created a false track record for the Funds which Defendants marketed to

prospective investors. Then, after the SEC caught them at it, SBB, Barnett, and Aven hid their misconduct from investors.

3.     In 2010, Barnett – working out of his college dorm room – created SBB along with several Funds under SBB's management. He then hired Aven as SBB's first employee.

4.     At first, the Funds were vehicles for investing the Barnett family fortune. Barnett raised hundreds of millions of dollars from friends and relatives (and himself). But, Barnett and Aven had greater aspirations. They sought to expand the Funds by attracting outside investors. To that end, Barnett and Aven took steps to ensure that SBB became a SEC-registered investment adviser, marketed one of the Funds to outsiders, and promoted Barnett as a financial wunderkind through various media outlets, including appearances on CNBC.

5.     Barnett and Aven knew prospective investors wanted to see a track record of performance. To that end, SBB prominently displayed the Funds' "monthly fund performance" in its marking materials. All the while, that track record was an illusion based on SBB, Barnett, and Aven fraudulently manipulating the recorded value of the Funds' investments.

6.     Despite promoting itself as a wellspring of innovative, custom financial strategies, SBB invested almost all of the Funds' money in a single asset class: structured notes. Barnett, Aven, and SBB consistently represented to the Funds' investors and SBB's outside auditor ("Auditor A") that they valued those structured notes at "fair value" as required by Generally Accepted Accounting Principles ("GAAP"). In other words, SBB promised to value each of the Funds' notes at an "exit price" (the price at which the notes could be resold to another party).

2

7.      In reality, Barnett, Aven, and SBB had no intention of complying with GAAP or determining an exit price. Although Barnett and Aven had never worked for a hedge fund or created a valuation model, they thought that they knew better than the rest of the market. Starting in 2011, Barnett, Aven, and SBB rejected over 50 years of standard valuation principles, ignored expert advice, and created a home-brewed valuation model that radically departed from the norm (the "Model").

8.      Some inputs in SBB's Model acted like a financial steroid – artificially pumping up note values. Other inputs acted like a masking agent – smoothing artificial gains by spreading them over the notes' multi-year term. SBB created those critical inputs out of whole cloth. None of the Model's "innovations" reflected the assumptions of market participants or were validated by published academic research. Instead, the Model was designed to get results that dovetailed with the Defendants' subjective "intuition" regarding how the notes should be valued. Conveniently, their "intuition" led to consistently higher note values than those yielded by more traditional models.

9.      SBB's rigged Model worked as intended. It consistently inflated note values. Those artificially inflated note values, and the resulting inflated Fund performance, (a) were included in performance statements and annual financial statements provided to investors, (b) generated $1.4 million in improperly charged fees, and (b) were included in misleading marketing materials given to prospective investors.

10.     In 2014, SEC exam staff uncovered the Model's deficiencies. At that time, Barnett, Aven, and SBB could have come clean. Instead, they tried – and failed – to find experts that would validate SBB's Model, concealed the Model's deficiencies from investors, and deceived Auditor A to maintain the façade of GAAP compliance.

11. Eventually, when they finally agreed to remediate, Defendants (a) hid the SEC's exam (and its findings) from Auditor A, (b) paid a secret credit into investor accounts without disclosing to investors that they had been overcharged for fees due to SBB's flawed valuation process, and (c) failed to disclose to investors revised (and materially reduced) Fund values after SBB finally hired a third party to revalue the notes. Indeed, even after its "remediation," SBB uses two sets of books: one for its current investors (using the flawed homemade Model) and a separate set for prospective investors (calculated using a more standard approach applied by a third party consultant).

12. By engaging in a fraudulent scheme to artificially inflate the Funds' performance record – and by making material misrepresentations to investors about the value of the Funds' investments – Barnett, Aven, and SBB have violated (and/or aided and abetted violations of) Section 17(a) of the Securities Act of 1933 ("Securities Act"); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; Sections 206 and 207 of the Investment Advisers Act of 1940 ("Advisers Act") and Rules 206(4)-1, 206(4)-2, 206(4)-7, and 206(4)-8 thereunder.

## JURISDICTION AND VENUE

13. The SEC brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)], Exchange Act Sections 21(d) and (e) [15 U.S.C. §§78u(d) and 78u(e)], and Advisers Act Section 209(d) [15 U.S.C. § 80b-9(d)].

14. This Court has jurisdiction over this action pursuant to Securities Act Section 22 [15 U.S.C. § 77v], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214(a) [15 U.S.C. § 80b-14(a)].

15.     Venue is proper in this Court pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa]. Many of the acts, practices, and courses of business constituting the alleged violations occurred within the jurisdiction of the U.S. District Court for the Northern District of Illinois.

16.     Defendants directly and indirectly used the means and instrumentalities of interstate commerce in connection with the acts alleged herein.

## DEFENDANTS

17.     **SBB Research Group, LLC**, an Illinois limited liability company based in Northbrook, Illinois, is the registered investment adviser to a series of private funds. Barnett owns and controls SBB. As of December 31, 2018, SBB managed at least six private investment funds with approximately $407 million in assets raised from 64 investors.

18.     **Samuel B. Barnett**, age 30, resides in Evanston, Illinois. Barnett founded SBB in 2010. Since then, Barnett has been SBB's CEO, managing member, and sole owner. Barnett and Aven managed the Funds' portfolio of investments, helped create SBB's Model, and reviewed and approved SBB's subscription documents.

19.     **Matthew Lawrence Aven**, age 45, resides in Deerfield, Illinois. Since 2011, Aven has been SBB's COO. Aven, along with Barnett, managed the Funds' investments, helped create SBB's Model, and was SBB's primary point of contact for Auditor A.

## FACTS

**SBB and the Funds:**

20.     In 2010, Barnett created SBB and several of the Funds that SBB managed. In February 2011, Barnett hired Aven as SBB's first employee and SBB's COO. From September 2010 until June 2012, Barnett ran SBB out of his college dorm room in

5

California while Aven worked out of SBB's Northbrook, Illinois offices. The Funds were SBB's only investment advisory clients.

21.     At all times relevant to this Complaint, Barnett, Aven, and SBB acted as investment advisers to the Funds within the meaning of Advisers Act Section 202(a)(11) [15 U.S.C. § 80b-2(a)(11)].

22.     Barnett and Aven, acting on behalf of SBB, managed the Funds' portfolio of securities, which included reviewing and making investment decisions for the Funds and structuring and negotiating the terms of the investments. SBB paid Aven a salary and bonus which was tied to SBB's profitability. Barnett was entitled to any of SBB's profits, or he could direct the firm to retain them.

23.     SBB charged each of the Funds a monthly management fee based on the Fund's NAV, and an annual performance-based fee which generally was 20% of the aggregate net profits for each investor's account. SBB's performance fees were not subject to a "high watermark" – *i.e.*, SBB could charge performance fees for an annual gain even if the Fund had not yet recouped losses incurred in prior years.

24.     The Funds had a two-year lockup period during which investors were not allowed to withdraw any of their funds.

25.     Although Barnett was able to raise hundreds of millions of dollars from friends and family, he planned to expand SBB's client base to outside retail and institutional investors. In June 2014, SBB created its flagship fund, Polysight I, LLC ("Polysight"). Polysight was marketed to outside investors beginning in or around December 2014.

**SBB Invests Almost All of the Funds' Assets in Structured Notes**:

26. While SBB touted its ability to create "bespoke funds" and advertised its culture of "research and innovation," SBB's Funds – including Polysight – invested almost all of their assets in a single asset class: structured notes.

27. Structured notes – usually issued by banks or other financial institutions – are hybrid securities that have a bond component and a derivative component. Notes generally have a fixed term, at which point, the note matures and payment is due to the noteholder. The note's bond component generally provides for the return of principal at maturity. The derivative component provides some upside potential (and some risk of loss). In substance, the derivative works a lot like an option. Its performance is tied to the performance of a specified underlying asset – *e.g.*, individual stocks or stock indices. Thus, within certain limits, the payment due under a structured note typically increases when the underlying asset performs well. In general, the payment due to the note holder when the note matures resembles the payment that could be generated by combining a bond with one or more options.

28. The Funds owned their structured notes through participation agreements with an SBB affiliate which held the notes. The overwhelming majority of structured notes owned by SBB's Funds were tied to the performance of the Standard & Poor's 500 Composite Index (the "S&P 500") and/or the Russell 2000 Index (the "Russell 2000").

29. Like all securities, structured notes bear certain risks. First, structured notes generally sacrifice upside potential in exchange for principal protection. In other words, if the underlying stock index sharply increased in value, SBB's Funds would not benefit from

all of the gains. Also, although structured notes offer a measure of principal protection, noteholders can lose principal if the underlying asset performs poorly.

30.     Second, note buyers bear credit risk related to the issuer. Although the value of a structured note is tied to the performance of an underlying asset, the payment obligation belongs to the issuing bank. So, if the issuing bank becomes financially distressed, the note could become impaired or worthless even if the underlying asset is performing well.

31.     Third, structured notes do not trade on an exchange, and are, therefore, significantly less liquid than stocks, bonds, and other investments. The potential market for resale is generally limited to the financial institution that sold the note in the first place.

32.     Fourth, structured notes do not have a readily accessible market price. Instead, market participants typically value structured notes using complex mathematical valuation models. Thus, SBB's investors had to rely on SBB to fairly estimate and report the value of the structured notes.

**SBB Promises That the Funds' Structured Notes Would Be Recorded at "Fair Value"**:

33.     From 2013 through 2016, SBB consistently represented to the Funds' investors, prospective investors, and Auditor A that the Funds' financial statements were maintained in accordance with GAAP and that the Funds' investments were recorded at "fair value." This provided an air of credibility to SBB's reported valuations and resulting performance data. By making these representations, Defendants committed to follow a set of well-established principles for estimating the value of their investments. And, this representation signaled to investors that SBB would value investments in a manner (a) consistent with the assumptions and practices of other market participants, and (b) that minimized the impact of SBB's inherent conflict of interest in valuing the Funds' securities.

8

34. Under GAAP, Accounting Standards Codification ("ASC") 820 defines "fair value" as an "exit price" – the "price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." So, in valuing the Funds' structured notes, SBB was required to estimate and record prices at which the note could be resold to a potential buyer.

35. The concept of fair value expressly places limits on subjective pricing considerations and the amount of discretion in "fair value" valuations. Under ASC 820, fair value should be measured "using the assumptions that market participants would use when pricing the asset." As a result, entity-specific preferences, like "a reporting entity's intention to hold an asset," are "not relevant when measuring fair value."

36. Rather than valuing the Funds' structured notes at fair value and presenting financial statements that comply with GAAP, Defendants intentionally created and used a Model that (a) was not designed to reach an exit price, (b) used variables that lacked any justification or support in academic research or industry practice, and (c) artificially inflated the value of the Funds' structured notes.

**Industry Standard Assumptions and Practices for Valuing Options**:

37. Market participants often use option pricing theories and techniques when valuing structured notes. SBB was no different. In fact, SBB's valuation policy described the Model as an exercise in option pricing, stating that: "The [SBB valuation model] works by breaking the structured product into subcomponent options, estimating the price levels at expiration of the underlying assets, valuing the subcomponent options based on the estimated price levels of the underlying assets, and finally, aggregating the option values to determine the structured product value."

38.     SBB acknowledged in its valuation policy that the Black-Scholes-Merton model – first published in 1973 – is the "preferred model in the industry" for valuing options. Valuation models like Black-Scholes-Merton (and its progeny) take several variables into account, including the price of the underlying asset, the option's strike price, the time to expiration, interest rates, and volatility (the measure of the size and frequency of price changes in the underlying asset over time).

39.     For decades, market participants have shared several basic assumptions about option valuation that have become standard in the financial industry. Nobel prizes have been awarded based on these principles. Among other things, over the past fifty years, option valuation models employed by market participants:

(a)     Apply the "Risk Neutral Framework": When projecting the growth of the underlying security over time, models derived from Black-Scholes-Merton assume that the security will grow at the "risk free" rate of a high-quality government security (such as the U.S. Treasury yield). When the projected value of the option is later reduced to a present value, the same "risk free" rate is applied.

(b)     Use Implied Volatility to Estimate Future Volatility: Implied volatility reflects how market participants think the underlying asset will move in the future. Historical volatility looks in the opposite direction; it measures the price movement of the underlying asset in the past. Market participants generally use implied volatility in option valuation models instead of the backward-looking measure of historical volatility (consistent with the maxim that past performance is no guarantee of future results). Implied volatility for options on the S&P 500 and Russell 2000 can be determined using publicly available pricing data or using calculations published by widely available

10

sources, including the Chicago Board Options Exchange and Options Clearing Corporation.

40. Also, when valuing securities issued by a corporate entity, valuation models generally consider the issuer's credit risk. Models typically discount the value of a note to account for the chance that the issuer may be unable to pay.

41. While Aven acknowledged that the Black-Scholes-Merton model was the "industry standard for pricing options … the primary [model] that people use," Defendants deliberately or recklessly valued SBB's structured notes using a Model that radically departed from option valuation assumptions and practices used by market participants.

**SBB Creates a Custom Model That Overvalued The Funds' Structured Notes**:

42. From about December 2011 through November 2016, SBB used a custom Model to value the subcomponent options that composed the Funds' structured notes.

43. Rather than follow GAAP by estimating an exit price, Defendants designed their Model with the assumption that the market – and "industry standard" models – were wrong. This, even though Barnett and Aven had never worked for a private investment fund, valued structured notes, or created a valuation model for securities of any type.

44. Barnett, Aven, and SBB started with the unsupported assumption that the market was systematically undervaluing structured notes before maturity. Instead of trying to determine an exit price, Barnett and Aven designed SBB's Model to generate higher values than those generated by other market participants. To achieve that result, Barnett, Aven, and SBB deliberately or recklessly departed from commonly-used valuation practices in several important respects.

45.     First, in valuing the option component of the structured notes, Barnett, Aven, and SBB created a drift term – identified by the Greek letter μ ("*mu*") – that abandoned the first half of the Black-Scholes-Merton risk-neutral framework. Barnett and Aven concluded that the risk free rate was too low and that using it would yield much lower note values than they wanted. So, they replaced the risk-free rate with the average growth rate for the underlying stock index (a rate often several times higher than the risk-free rate).

46.     In practical effect, SBB's *mu* factor yielded option values that wildly differed from the prices SBB could obtain in the market and boosted the notes' values before maturity. While developing *mu*, Aven told Barnett by e-mail that the *mu* formula was "arbitrary," and was leading to "EXTREMELY inflated values."

47.     Second, Barnett, Aven, and SBB abandoned the other half of the risk-neutral framework. When discounting the option to a present value, SBB did not use the same rate that it had used to project the underlying asset's growth. Though SBB used the inflated *mu* factor to project the growth of the underlying stock index, SBB still discounted the option's value at the much lower risk-free rate. This imbalance preserved *mu*'s inflationary effect.

48.     Third, rather than use implied volatility in its Model, as is customary among market participants, SBB used the backward-looking, historical volatility input. Defendants then amplified volatility using an arbitrary multiplier – dubbed *beta*. Defendants created *beta* out of whole cloth; it had no justification or support in academic research or industry practice. In many instances *beta*, like *mu*, artificially inflated the value of the Funds' notes.

49.     Fourth, Defendants used a smoothing mechanism that spread gains and losses over the term of the structured note (which SBB referred to as "linearization"). Linearization was designed to fix a problem of SBB's creation. *Mu and beta* had such an

12

inflationary effect on the value of the structured notes that SBB was recording most of the potential gains in the first months of the notes' term. Aven warned Barnett that (a) this could lead to the notes sitting stagnant on the Funds' books for the remaining years before the note matured and (b) there would be minimal gains to record on those notes in future periods. Linearization "solved" that problem, preserved *mu*'s effect and created artificially consistent returns by spreading inflated investment gains over the full term of the note.

50.     Fifth, SBB failed to discount the note to account for the credit risk of the issuer. SBB's Model assumed that – over the multi-year term of the structured note – there was no chance that the issuing financial institution would encounter financial distress affecting its ability to pay. This, even though SBB admitted to investors that the Funds presented a "counterparty risk" that is "accentuated" when notes have long maturities.

51.     Barnett and Aven – along with SBB's principal engineer who handled computer coding – were solely responsible for creating SBB's Model. Barnett and Aven reviewed and approved all substantive decisions regarding the Model's structure and inputs, including the decision to (a) abandon the risk-neutral framework in favor of *mu*, (b) use historical volatility amplified by an arbitrary *beta* multiplier, and (c) smooth returns using linearization.

52.     Barnett, Aven, and SBB did not have any justification or support in academic or industry practice for deviating from the assumptions employed by market participants. As they refined the model, Barnett, Aven, and SBB manipulated the *mu*, *beta*, and linearization inputs to obtain the value that ostensibly confirmed their subjective assumptions regarding note values. If the value obtained was "too low" or "too high" in their subjective view,

Barnett, Aven, and SBB would simply tweak the inputs until they got the result they wanted. As Aven has admitted: "I guess you could call it a lot of intuition."

53.     Defendants made no effort to determine whether the Model inputs were consistent with the requirements of ASC 820. In fact, Aven has admitted that "we didn't consider accounting principles" when creating the Model.

**Defendants Ignore Expert Advice And Red Flags**:

54.     In one of the few instances where Barnett, Aven, and SBB sought expert advice regarding proper valuation practices, they rejected the expert's recommendations.

55.     In December 2011, while they were creating SBB's model, Barnett, Aven, and SBB hired a third party valuation consultant ("Consultant A") to create a custom model.

56.     Consultant A presented Barnett, Aven, and SBB with a model that used many of the industry standard practices discussed in ¶¶ 38-40 above. For example, Consultant A's model applied the risk-neutral framework (instead of *mu*), used implied volatility (without an arbitrary *beta* multiplier), did not use linearization, and accounted for issuer credit risk.

57.     Barnett, Aven, and SBB, against the recommendation of SBB's principal engineer, rejected Consultant A's model, and moved forward with their homemade, irregular Model.

58.     SBB's Model had the intended effect: it generated values for the notes' component options higher than those generated by option valuation techniques employed by other market participants. The inflated note values in turn accelerated SBB's recording of gains on the notes, boosted reported performance, and inflated the Funds' NAVs.

59.     Defendants acted knowingly or recklessly and simply ignored red flags reflecting that SBB's valuations were too high. For example, the SBB Model's day-one note

valuations were almost always higher than the note's nominal (or "par") value. Usually, a structured note's initial value at purchase is less than the note's par value because of transaction costs the issuer incurs creating and hedging the structured notes – costs ultimately borne by the buyer (the "Day-One Discount"). Issuers typically disclosed this reality, and Barnett and Aven knew that such costs were baked into the purchase price. But, SBB's Model consistently produced day-one valuations that were at or above par.

60.     In one extreme instance, SBB bought a note on December 28, 2012 that had a par value of $2,000,000. On the next trading day, SBB valued the note at $2,301,651 – more than 15% over par. Of the 91 non-commodity structured notes SBB bought from 2012 through 2015, 95% had day-one valuations of par or greater using the SBB Model. That SBB disregarded the Day-One Discount and at times recorded wildly unrealistic gains in the first days after purchase reflects that SBB was not generating good faith "fair values" for the Funds' notes.

61.     Another red flag was that values from SBB's Model almost always exceeded the prices that issuing banks and brokers recorded in their monthly statements to SBB (the "Bank Marks"). Because SBB's structured notes are illiquid, the issuers generally are the only readily-available market for resale of the notes. But, rather than considering the published mark-to-market value of those core market participants, Defendants dismissed the Bank Marks as "biased" while ignoring their own bias toward higher valuations.

62.     Defendants never told investors that their Model (a) was designed to inflate the note values, (b) was not designed to reach an exit price as required by GAAP, and (c) generated note values that routinely exceeded prices generated by the only market participants in position to buy the notes back.

15

**Defendants Disregard Warnings of Defects in SBB's Model:**

63.     In October 2014, during an examination of SBB, SEC exam staff (a) informed SBB of several flaws in the Model – including *mu*, *beta*, and linearization, and (b) advised SBB that its Model artificially inflated note values and did not comport with GAAP.

64.     Initially, Barnett and Aven contemplated fixing SBB's Model. On October 31, 2014, after a call with the SEC exam staff, Defendants considered changing several Model inputs to conform the Model to industry norms, including: (1) replacing *mu* with the risk-free rate; (2) replacing historical volatility with implied volatility; (3) removing the arbitrary *beta* volatility multiplier; and (4) incorporating a credit risk discount.

65.     In fact, on April 20, 2015, Aven indicated to the SEC's exam staff that it had made the changes in ¶ 64, and stated that it was "consult[ing] with third party valuation experts to ensure the new model accurately reflect[ed] a fair valuation."

66.     In reality, Defendants had not made the reported Model changes. Instead, Defendants continued using the defective Model for the next two years – rendering SBB's audited financial statements for fiscal years 2014 and 2015 materially false.

67.     And, rather than consulting third party valuation experts to evaluate changes to improve the model, Defendants contacted two valuation firms to validate the defective Model SBB was already using. When those two valuation firms reviewed SBB's Model, they each declined to validate the Model, citing the same deficiencies previously identified by the SEC's exam staff (*i.e.*, *mu*, *beta*, and linearization).

68.     In March 2016, the SEC examiners sent a deficiency letter to SBB which echoed concerns the SEC had raised in October 2014, and which formally identified several defects in SBB's Model, including SBB's (a) creation and use of the overstated *mu* drift term

and abandonment of the generally accepted risk-neutral framework, (b) use of historical volatility multiplied by SBB's arbitrary *beta* factor (rather than implied volatility), and (c) effort to smooth inflated returns using linearization. The SEC's letter warned SBB that the *mu*, *beta*, and linearization inputs had no basis in industry practice, valuation principles, or published academic research. The letter also pointed out that SBB's Model failed to adjust for illiquidity or credit risk.

69.     The SEC's letter also notified SBB that the Model improperly overstated the value of the Funds' structured notes, and, thus, SBB potentially (a) misstated performance data in marketing materials and (b) overcharged investors for fees from 2011 through 2015.

**SBB Hides the SEC's Deficiency Letter From Its Auditor and Investors**:

70.     Although Defendants received the SEC's deficiency letter more than two weeks before the 2015 Fund audits were complete, they did not share the letter with Auditor A. In fact, Defendants did not share the letter with Auditor A until December 2016 – almost eight months after the Funds' audited financial statements for 2015 were issued.

71.     Instead, SBB lied to its auditor. After SBB knew about the SEC exam staff's concerns with the Model, SBB sent Auditor A two management representation letters, falsely assuring that (a) SBB "fulfilled [its] responsibilities … for the preparation and fair presentation of the financial statements" for the Funds "in accordance with U.S. GAAP," (b) the Funds' securities were recorded at fair value, and (c) "there have been no communications from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices." SBB issued the management representation letters on April 30, 2015 (six months after the SEC exam staff first expressed concerns about the Model) and

17

April 28, 2016 (weeks after SBB received the SEC's deficiency letter). Both of those false

management representation letters were signed by Barnett and Aven on SBB's behalf.

72.     Auditor A issued opinion letters certifying that the Funds' 2014 and 2015

financial statements complied with GAAP. At the time Auditor A certified those financial

statements, Barnett, Aven, and SBB were withholding from Auditor A critical information

about (a) the SEC's detection of severe deficiencies in SBB's model, and (b) the fact that,

contrary to its management representation letters, SBB had created a results-oriented model

that was not designed to comply with GAAP.

73.     After the respective audits were complete, SBB disseminated the materially

false 2014 and 2015 financial statements to the Funds' investors.

**SBB Changes Its Model, But Does Not Update The Funds' Historical NAVs**:

74.     On May 13, 2016, Defendants responded to the SEC's deficiency letter by

submitting a "new Pricing Model" (the "May 2016 Model"), which finally addressed some

of the problems identified by the SEC exam team almost 20 months earlier.

75.     Using the May 2016 Model, Defendants recalculated SBB's structured note

values for January 2012 through May 2016 and recalculated the Funds' NAVs for

December 2011 through December 2015.

76.     Once Defendants started to retrospectively apply some industry standard

practices, NAVs decreased for all Funds for 2011 through 2015. The May 2016 Model also

revealed that SBB had overcharged the Funds about $1.1 million in fees. Aven (on SBB's

behalf) told the SEC it would refund those amounts through a credit against future fees.

77.     Aven also represented to the SEC that it would update the Funds' prior NAVs and investor statements to reflect values generated by the May 2016 Model. But, SBB never did so. And, SBB never told investors about the $1.1 million in overcharged fees.

**SBB Hires A Third Party Valuation Service, But Still Hides The Fraud From Investors**:

78.     In November 2016, SBB finally abandoned its custom Model and hired a third party valuation firm ("Valuation Firm A"), to value the Funds' structured notes. Valuation Firm A generated retrospective note valuations, on a monthly basis, for all of the Funds' structured notes held between January 2013 through November 2016.

79.     Valuation Firm A used techniques and assumptions that were more in line with market participant assumptions and practices, including applying the risk-neutral framework and using implied volatility. The values generated by Valuation Firm A's model were consistent with the available Bank Marks for the Funds' notes (described in ¶ 61).

80.     Valuation Firm A's marks, like the Bank Marks, were uniformly lower than SBB's valuations. For example, Valuation Firm A's marks for notes held by Polysight – the Fund that Barnett, Aven, and SBB were marketing to outside investors – were between 5% to 11% lower than values under SBB's Model. SBB's switch to a more standard model exposed that SBB had been artificially inflating note valuations and, in turn, materially inflating the Funds' overall annual performance. For example, using its Model, SBB reported positive annual returns for Polysight in 2014 (6.55%) and 2015 (6.10%); resulting in a two-year cumulative return of 13.04%. Because of those positive annual returns, SBB charged Polysight a 20% performance fee on its gains. And, SBB marketed those inflated performance figures to existing and prospective investors.

19

81.     By contrast, when Valuation Firm A revalued Polysight's notes using assumptions and practices that market participants actually use, it found that Polysight experienced a loss in 2014 (-2.21%) and earned only a 2.94% cumulative return in 2015. This results in a two-year cumulative return of 0.67% – 12.37% lower than the return generated by SBB's Model. Under Valuation Firm A's model, SBB was not entitled to a performance fee in 2014 and would have obtained only a modest performance fee in 2015.

82.     SBB also recalculated the Funds' NAVs for December 2011 through December 2015 using Valuation Firm A's approach. Once again, NAVs decreased across the board, with Polysight's NAV falling 5.02% in 2014 and 6.04% in 2015. The revised NAVs reflected that SBB had overcharged the Funds and their investors more than $1,400,000 in management and performance fees since 2011 and that the Funds had materially misstated their 2014 and 2015 financial statements.

83.     When the SEC exam staff highlighted this issue for SBB, SBB "repaid" investors the overcharged fees by surreptitiously crediting each investor's account against 2016 management and performance fees. But, Defendants never disclosed the underlying problem. To date, SBB has never told Fund investors that: (a) SBB did not value the Funds' notes at fair value; (b) the SBB Model artificially inflated the value of structured notes for five years; (c) SBB revised the Funds' NAVs for the time period 2011 through 2015; (d) the Funds' past monthly, year-to-date, and lifetime performance substantially decreased; (e) the Funds' prior audited financial statements included materially inflated assets and NAVs, and (f) SBB overcharged the Funds over $1,400,000 for a period of five years.

84.     SBB started using Valuation Firm A's marks in or around February 2017. After doing so, Defendants concealed information from – and made misleading statements

to – investors regarding SBB's valuation practices and historical performance. For example, until January 2017, investors' monthly statements included bar graphs that prominently displayed the Funds' monthly historical performance. In February 2017 (after the switch to Valuation Firm A and a near-uniform reduction in the Funds' historical performance), those graphs disappeared. The February 2017 statement also misled investors, assuring that "[p]revious Net Value estimates have been updated." In reality, as discussed below, SBB never revised the Funds' NAVs in the investor summaries for existing investors.

**SBB's Fraudulent Representations That It Had Complied With GAAP**:

85.     In the course of their scheme to artificially (and surreptitiously) inflate the value of the Funds' investments, Barnett, Aven, and SBB made several material misrepresentations – and omissions that rendered statements materially misleading – to investors, prospective investors, and Auditor A. Many of these misrepresentations came well after the SEC exam staff had notified SBB of how its Model had deviated from GAAP.

86.     First, the Funds' 2014 and 2015 audited financial statements that SBB provided to investors falsely represented that the Funds "record [their] investments at fair value," as defined by ASC 820. In addition, the 2014 and 2015 audited financial statements for each Fund were materially misstated, with NAVs overstated by at least 5% (for all Funds except a fund called Investors II in 2015). Aven was responsible for, and had ultimate authority over, the content of the financial statements. He reviewed and approved the financial statements and distributed them to investors through SBB's internet portal.

87.     Second, from 2014 through 2016, SBB's Forms ADV – publicly available disclosures that registered investment advisers must file annually with the SEC – falsely

stated that the Funds' "financial statements were prepared in accordance with U.S. GAAP."
Aven drafted, reviewed, and signed the Forms ADV on SBB's behalf.

88.     Third, in the management representation letters identified in ¶ 71 above,
Barnett and Aven represented to Auditor A that SBB prepared the financial statements "in
accordance with U.S. GAAP" and that "[p]ortfolio securities are stated at fair value."

89.     Fourth, the Investment Management Agreements between SBB and the
Funds stated that "Valuation of the Account shall be determined in accordance with
[GAAP]." Barnett signed each of those agreements on SBB's behalf as its managing
member.

90.     Fifth, the Funds' Operating Agreements represented that the Funds' books of
account would be maintained in accordance with GAAP. Barnett signed investor
subscription packages containing the Operating Agreement as SBB's managing member.

91.     The representations in ¶¶ 86-90 were made in the offer and sale, and in
connection with the purchase or sale, of securities. Several SBB investors made additional
investments in the Funds after receiving the Funds' audited financials, subscription
documents, and monthly statements which reflected the inflated valuations. And, the
Operating Agreements were executed as part of each sale of interests in the Funds.

**Defendants' False Marketing Materials:**

92.     Barnett, Aven, and SBB began marketing the Funds to retail and institutional
investors in or around August 2014. SBB's marketing materials included false and
misleading information about the Funds' NAVs, performance, and the terms of investment.

93. From August 2014 through October 2015, Aven and Barnett marketed the Funds to prospective investors by attending conferences, and creating and distributing "fact sheets," performance data, and written presentations.

94. In October 2015, Defendants hired an outside marketing consultant (the "Placement Agent"), to market Polysight.

95. Aven and Barnett worked closely with the Placement Agent to create the marketing materials and market SBB's funds to institutional investors. Barnett and Aven were responsible for (a) providing the Placement Agent with the information included in SBB's marketing materials, and (b) reviewing and approving all marketing materials before they were distributed to investors.

96. The marketing materials created by Barnett, Aven, and SBB contained material misrepresentations about Polysight's performance, history, and the terms of the investment. For example, fact sheets for Polysight distributed starting in November 2015 contained the following material misrepresentations and omissions that involved core terms related to fees, performance, and the right to withdraw funds:

| Representation in Polysight Fact Sheets | Actual Terms of the Polysight Fund |
|---|---|
| Lockup Period: One Year | In reality, since its inception in June 2014, Polysight had a two-year lock-up period (*i.e.*, investors could not withdraw funds during the first two years of their investment). |
| Performance fees are subject to a "high watermark" | Polysight had no high waterwark. In other words, SBB could charge performance fees for an annual gain even if the Fund had not yet recouped losses incurred in prior years. |

97. Also, Polysight's fact sheets and related marketing materials reflected the artificially inflated note and Fund values generated by the SBB Model which, in turn, impacted other performance and efficiency metrics in the fact sheet.

98. The misrepresentations regarding Polysight's purported use of a high watermark and a one-year lockup period appeared in Polysight fact sheets – and related "pitch books" for Polysight – until at least January 2017. The fact sheets included artificially inflated note and Fund values through at least March 2016.

99. Beginning in or around March 2016, SBB marketed Polysight on multiple online platforms, using the same artificially inflated note values reflected in the fact sheets. Like the fact sheets, Polysight's online marketing materials falsely stated that the Fund had a one-year lockup period and a high watermark. Polysight's online materials also stated that the Fund was created in 2011. That statement was false. Polysight was created in June 2014. The false inception date portrayed Polysight as having a long track record of performance when it did not.

100. Aven reviewed and approved Polysight's online marketing materials.

101. At the time Barnett and Aven reviewed, approved, and disseminated the Polysight marketing materials, they knew, or recklessly disregarded, the actual terms of – and performance data for – the Polysight Fund.

102. After SBB implemented the May 2016 Model, Defendants took considerable steps to conceal the revised numbers (and the change in valuation method) from existing and prospective investors and provided false and misleading information to prospective investors about why the figures had changed.

103.    On May 19, 2016, six days after SBB told the SEC that it had changed its Model and revised its marketing materials to reflect the new valuations, Defendants implemented a "two-books" approach: (1) existing investors received "old" Fund performance figures based on the SBB Model while (2) prospective investors received "new" Fund performance figures based on the May 2016 Model.

104.    SBB's "two-books" approach was intended to be temporary, but, on information and belief is still being used as of the filing of this Complaint.

105.    In June 2016, the Placement Agent advised Barnett and Aven that SBB should disclose the restated performance data to investors and explain why the data changed.

106.    Barnett and Aven rejected that idea and hid the truth from investors. Barnett instructed the Placement Agent to limit dissemination of the revised performance figures to a select few contacts and to provide them no explanation for the revised figures. He directed the Placement Agent to explain the data changes only if a prospective investor expressed specific concerns. Even then, Barnett instructed the Placement Agent not to reveal the truth. The Placement Agent was not allowed to attribute Polysight's performance revisions to a change in SBB's Model.

107.    The Placement Agent followed Barnett's instruction, and disseminated false and misleading information to hundreds of prospective investors.

**SBB's Auditor Resigns and Withdraws Its Audit Opinions**:

108.    During its audits of SBB's financial statements, Auditor A understood based on SBB's representations that SBB's Model was designed to generate fair values in accordance with ASC 820. But, after learning that Defendants ignored accounting principles

and manipulated Model inputs to back into SBB's desired result, Auditor A concluded that the SBB Model was not designed to be consistent with GAAP.

109.    In April 2019, Auditor A resigned as the Funds' auditor and withdrew its 2013 through 2017 Fund audit reports.

110.    In its April 12, 2019 resignation letter to SBB, Auditor A cited several facts reflecting that SBB's management had withheld material information and misled Auditor A during its prior audits. Among other facts cited by Auditor A:

(a)    SBB's Model was a "results-oriented model" that was not "theoretically justified" and "not designed to be consistent with the requirements of [GAAP]";

(b)    SBB was providing different sets of performance figures to investors and potential investors, which "impacts our assessment of management integrity";

(c)    SBB's management "did not fulfill the responsibilities set forth in [Auditor A's] arrangement letters";

(d)    SBB failed to notify Auditor A that "at least two different consulting firms expressed significant concerns about [SBB's Model]"; and

(e)    SBB testified to the SEC that they timely relayed the SEC exam staff's criticism of the Model to Auditor A, when, in reality, SBB failed to notify Auditor A of the deficiency letter until December 2016.

111.    Auditor A concluded that, because of SBB's deception, Auditor A could "no longer rely on management representations."

112.    In the wake of Auditor A's withdrawal of its audit reports, SBB – as of the filing of this Complaint – does not have audited financial statements for fiscal years 2013 through 2017.

## COUNT I
### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5
### (Against Defendants SBB, Barnett, and Aven)

113.    Paragraphs 1 through 112 are realleged and incorporated by reference.

114.    As more fully described in paragraphs 20 through 112, Defendants SBB, Barnett, and Aven, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

115.    As described in more detail in paragraphs 20 through 112 above, Defendants SBB, Barnett, and Aven acted with scienter as they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent devices, scheme, and artifice, identified above.

116.    By reason of the foregoing, Defendants SBB, Barnett, and Aven violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## COUNT II
### Violations of Section 17(a)(1)-(3) of the Securities Act
### (Against Defendants SBB, Barnett, and Aven)

117.    Paragraphs 1 through 112 are realleged and incorporated by reference.

118.    By engaging in the conduct described in paragraphs 20 through 112 above,

Defendants SBB, Barnett, and Aven, in the offer and sale of securities, by the use of the

means and instruments of interstate commerce, directly or indirectly have:

     a.    employed devices, schemes, and artifices to defraud;

     b.    obtained money or property by means of untrue statements of material
fact or by omitting to state material facts necessary in order to make
the statements made, in light of the circumstances under which they
were made, not misleading; and

     c.    engaged in transactions, practices, or courses of business that operated
or would operate as a fraud or deceit upon the purchasers of such
securities.

119.    SBB, Barnett, and Aven intentionally or recklessly engaged in the devices,

schemes, artifices, transactions, acts, practices and courses of business described above.

120.    Defendants SBB, Barnett, and Aven also acted, at least, negligently in

engaging in the conduct identified in ¶¶ 20 through 112 above.

121.    By reason of the foregoing, Defendants SBB, Barnett, and Aven violated

Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)].

## COUNT III
### Violations of Section 206(1) of the Advisers Act
### (Against Defendants SBB, Barnett, and Aven)

122.    Paragraphs 1 through 112 are realleged and incorporated by reference.

123.    By engaging in the conduct alleged in this Complaint, Defendants Barnett,

Aven, and SBB, directly or indirectly, singularly or in concert, by use of the mails or means

and instrumentalities of interstate commerce, while acting as investment advisers, employed

devices, schemes, or artifices to defraud any client or prospective client, with scienter.

124.    As investment advisers, Defendants Barnett, Aven, and SBB owed the Funds

a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair

disclosure to them of all material facts, as well as the duty to act in the Funds' best interests.

125.    Defendants Barnett, Aven, and SBB breached their fiduciary duties to the

Funds and engaged in fraudulent conduct that violated Section 206(1) of the Advisers Act

[15 U.S.C. § 80b-6(1)].

126.    By reason of the foregoing, Defendants Barnett, Aven, and SBB have

violated, and unless enjoined will again violate, Section 206(1) of the Advisers Act [15

U.S.C. § 80b-6(1)].

### COUNT IV
**Violations of Section 206(2) of the Advisers Act**
**(Against Defendants Barnett, Aven, and SBB)**

127.    Paragraphs 1 through 112 are realleged and incorporated by reference.

128.    By engaging in the acts and conduct alleged in this Complaint, Defendants

Barnett, Aven, and SBB, directly or indirectly, singularly or in concert, by use of the mails

or means and instrumentalities of interstate commerce, while acting as investment advisers,

engaged in transactions, practices, or courses of business which operated as a fraud or deceit

upon any client or prospective client.

129.    As investment advisers, Defendants Barnett, Aven, and SBB owed the Funds

a fiduciary duty of utmost good faith and had an affirmative duty to make full and fair

disclosure to them of all material facts, as well as the duty to act in the Funds' best interests.

130.    Defendants Barnett, Aven, and SBB breached their fiduciary duties to the Funds and engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon any client or prospective client that violated 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

131.    By reason of the foregoing, Defendants Barnett, Aven, and SBB have violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT V
**Violations of Section 206(4) of the Advisers Act and Advisers Act Rule 206(4)-8
(Against Defendants Barnett, Aven, and SBB)**

132.    Paragraphs 1 through 112 are realleged and incorporated by reference.

133.    Each of the Funds was a pooled investment vehicle within the meaning of Rule 206(4)-8(b) of the Advisers Act [17 C.F.R. § 275.206(4)-8(b)]. Each of the Funds was engaged in, held itself out as being engaged primarily, and proposed to engage itself primarily in the business of investing, reinvesting, and/or trading in securities, and thus was an investment company as defined in Section 3(a) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(a)] or would have been an investment company under that provision but for the exclusion provided from that definition under either Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act of 1940 [15 U.S.C. § 80a-3(c)(1) & (7)].

134.    By engaging in the acts and conduct alleged in this Complaint, Defendants Barnett, Aven, and SBB, while acting as investment advisers to the Funds, each of which was a pooled investment vehicle, by use of the means and instrumentalities of interstate commerce and of the mails, (1) made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under

which they were made, not misleading, to investors and prospective investors in the pooled investment vehicles; and (2) engaged in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative with respect to investors and prospective investors in pooled investment vehicles.

135.    By reason of the foregoing, Defendants Barnett, Aven, and SBB have violated, and unless enjoined will again violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

**COUNT VI**
**Violations of Section 206(4) of the Advisers Act and Advisers Act Rule 206(4)-1**
**(Against Defendant SBB)**

136.    Paragraphs 1 through 112 are realleged and incorporated by reference.

137.    As alleged in ¶¶ 92-107, SBB, while a registered investment adviser under Section 203 of the Advisers Act, directly or indirectly, published, circulated and distributed advertisements that contained untrue, false and misleading statements of material fact.

138.    By reason of the foregoing, SBB violated and, unless restrained and enjoined, will continue violating, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206(4)-1 thereunder [17 C.F.R. § 275.206(4)-1].

**COUNT VII**
**Violation of Section 206(4) of the Advisers Act and Advisers Act Rule 206(4)-2**
**(Against Defendant SBB)**

139.    Paragraphs 1 through 112 are realleged and incorporated by reference.

140.    From April 2014 to the present, SBB has been an investment adviser registered or required to be registered under Section 203 of the Advisers Act [15 U.S.C. § 80b-3].

141.     From April 2014 to the present, by using the mails or means or instrumentalities of interstate commerce, directly or indirectly, while acting as an investment adviser, SBB has had custody and control over the Funds' assets.

142.     The Funds distributed financial statements for the years 2013 through 2016 to investors that were not prepared in accordance with GAAP.

143.     By engaging in the conduct described above, SBB directly and indirectly violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R § 275.206(4)-2].

### COUNT VIII
**Violation of Section 206(4) of the Advisers Act and Advisers Act Rule 206(4)-7**
**(Against Defendant SBB)**

144.     Paragraphs 1 through 112 are realleged and incorporated by reference.

145.     By engaging in the conduct described above, SBB provided investment advice to its clients without implementing written policies and procedures reasonably designed to prevent violation, by SBB and SBB's supervised persons, of the Advisers Act and the rules promulgated under the Advisers Act.

146.     By reason of the foregoing, SBB violated, and unless enjoined will continue to violate, Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder [17 C.F.R § 275.206(4)-7].

### COUNT IX
**Aiding and Abetting Violations of Section 206(4) of the Advisers Act**
**and Advisers Act Rules 206(4)-1 and 206(4)-2**
**(Against Defendants Barnett and Aven)**

147.     Paragraphs 1 through 112 are realleged and incorporated by reference.

148.     As alleged in Counts VI and VII above, Defendant SBB, while acting as a registered investment adviser under Section 203 of the Advisers Act, directly or indirectly,

(a) published, circulated and distributed advertisements that contained untrue, false and misleading statements of material fact, and (b) maintained custody and control of the Funds' assets while distributing financial statements to their investors that were not prepared in accordance with generally accepted accounting principles. Defendant SBB thereby violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rules 206(4)-1 and 206(4)-2 [17 C.F.R §§ 275.206(4)-1, 275.206(4)-2] thereunder.

149. Through their actions alleged in paragraphs 20-112 above, Defendants Barnett and Aven knowingly and recklessly provided substantial assistance to SBB in its violation of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rules 206(4)-1 and 206(4)-2 [17 C.F.R §§ 275.206(4)-1, 275.206(4)-2] thereunder.

150. Accordingly, Defendants Barnett and Aven aided and abetted the violations described above and, pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], Defendants Barnett and Aven are liable for such violations.

## COUNT X
### Aiding and Abetting Violations of Section 206(4) of the Advisers Act
### and Advisers Act Rule 206(4)-7
### (Against Defendant Aven)

151. Paragraphs 1 through 112 are realleged and incorporated by reference.

152. As alleged in Count VIII above, from April 2014 through 2016, Defendant SBB, while acting as a registered investment adviser under Section 203 of the Advisers Act, intentionally, recklessly, and/or negligently, provided investment advice to its clients without adopting and implementing written policies and procedures reasonably designed to prevent violation, by SBB and SBB's supervised persons, of the Advisers Act and the rules promulgated under the Advisers Act. SBB thereby violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder.

153.     Through his actions alleged in ¶¶ 20-112 above, from April 2014 through 2016, Defendant Aven knowingly and recklessly provided substantial assistance to SBB in its violation of Advisers Act Section 206(4) [15 U.S.C. § 80b-6(4)] and Rule 206(4)-7 thereunder.

154.     Accordingly, Defendant Aven aided and abetted the violations described above and, pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], Defendant Aven is liable for such violations.

## COUNT XI
### Violations of Section 207 of the Advisers Act
### (Against Defendants SBB and Aven)

155.     Paragraphs 1 through 112 are realleged and incorporated by reference.

156.     Defendants Aven and SBB, by use of the mails, and the means and instrumentalities of interstate commerce, directly and indirectly, willfully made untrue statements of material fact in, and omitted to state material facts required to be stated in, reports required to be filed with Commission under Section 203 of the Advisers Act.

157.     By reason of the foregoing, Defendants Aven and SBB, directly and indirectly, have violated and, unless enjoined, may continue to violate Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendant SBB, its officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder, and Sections 206(1), 206(2), 206(4), and 207 of the Advisers Act and Rules 206(4)-1, 206(4)-2, 206(4)-7, and 206(4)-8 thereunder.

### III.

Enter an Order of Permanent Injunction restraining and enjoining Defendant Barnett, his officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder, and Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder; and from aiding and abetting violations of Section 206(4) of the Advisers Act and Rules 206(4)-1 and 206(4)-2 thereunder.

### IV.

Enter an Order of Permanent Injunction restraining and enjoining Defendant Aven, his officers, agents, servants, employees, attorneys and those persons in active concert or

participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder, and Sections 206(1), 206(2), 206(4), and 207 of the Advisers Act and Rule 206(4)-8 thereunder; and from aiding and abetting violations of Section 206(4) of the Advisers Act and Rules 206(4)-1, 206(4)-2, and 206(4)-7 thereunder.

## V.

Order Defendants Barnett, SBB, and Aven to pay appropriate civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)].

## VI.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other relief as this Court deems appropriate.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission hereby

requests a trial by jury.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: ***/s/ Timothy S. Leiman***
Timothy S. Leiman (Leimant@sec.gov)
Robert Moye (moyer@sec.gov)
Kevin A. Wisniewski (wisniewskik@sec.gov)

Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff*