## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| SBB RESEARCH GROUP, LLC, | : |
| SAMUEL B. BARNETT, and | : |
| MATTHEW LAWRENCE AVEN, | : |
| | : |
| Defendants. | : |
| | : |

CASE NO. 19-cv-6473

Hon. Sharon Johnson Coleman

## PLAINTIFF'S MEMORANDUM IN RESPONSE
## TO DEFENDANTS' MOTION TO DISMISS

Dated: January 13, 2020

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

Timothy S. Leiman
Robert M. Moye
Kevin A. Wisniewski
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for the Plaintiff*

# TABLE OF CONTENTS

DISCUSSION ......................................................................................................... 1

I.    The SEC Alleges Fraud With Particularity: ........................................................ 2

II.   The SEC's Fraud Claims Should Not Be Dismissed Based On Defendants'
      Professed "Subjective Beliefs" Regarding GAAP Compliance. ........................ 6

      A.    Defendants' Purported Subjective Beliefs Regarding Fair Value Cannot Be .........
            Inferred From the Complaint ............................................................. 7

      B.    Defendants' Fraud Is Not A Matter of Opinion ................................... 8

      C.    The SEC Has Alleged That Defendants Had No Basis to Believe That The
            Model Generated Exit Prices For the Funds' Notes ......................... 12

      D.    The SEC Pled That Defendants Misled Investors and its Auditor With Material
            Omissions ......................................................................... 13

III.  The SEC Has Properly Pled Scienter. ............................................................. 14

IV.   The Complaint Sufficiently Pleads That Defendants' Fraud Was Material ...... 15

V.    The SEC Has Pled That Barnett and Aven "Made" Material Misrepresentations
      under Exchange Act Rule 10b-5(b) ................................................................. 17

VI.   Defendants Present an Improper Fact-based Defense Regarding the SEC's
      Fraudulent Marketing Claims ........................................................................ 19

VII.  The SEC Sufficiently Pleads That Defendant Aven Willfully Filed A False Form
      ADV With the Commission ............................................................................ 20

VIII. The SEC Alleged That SBB Distributed Financial Statements That Did Not
      Comply With GAAP ..................................................................................... 21

IX.   The SEC Adequately Alleges That SBB Lacked Policies to Prevent Fraud ....... 22

X.    Defendants' Objection to the Complaint's Format Does Not Warrant Dismissal
      ............................................................................................................... 23

# TABLE OF AUTHORITIES

*Baena v. Woori Bank*, 515 F. Supp. 2d 414 (S.D.N.Y. 2007) ............................................ 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). ................................................................. 2

*Carpenters Pen. Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549 (S.D.N.Y. Oct. 20, 2014) .................................................................................................................................. 18

*City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................................................................................................... 18

*Customguide v. Careerbuilder, LLC*, 813 F. Supp. 2d 990 (N.D. Ill. 2011).....................24 n.7

*Di Leo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) ...................................................2, 15

*Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) ................................................. 10, 12

*Ganino v. Citzens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000)............................................... 16

*Janus Capital Grp. v. First Deriv. Traders*, 564 U.S. 135 (2011) .....................................17-18

*Marks v. CDW Computer Ctrs.*, 122 F.3d 363 (7th Cir. 1997).........................................15-16

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015).... 13

*Rockies Fund, Inc. v. SEC*, 428 F.3d 1088 (D.C. Cir. 2005)............................................9-10

*SEC v. Benger*, 931 F. Supp. 2d 908, (N.D. Ill. 2013) ................................................18 n.5

*SEC v. Carter*, 2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ......................................18 n.5

*SEC v. Falor*, 2010 WL 3385510 (N.D. Ill. Aug. 19, 2010)............................................... 15

*SEC v. Goldstone*, 952 F. Supp. 2d 1060 (D.N.M. 2013) ........................................ 11, 23-24

*SEC v. Holschuh*, 694 F.2d 130 (7th Cir. 1982) ................................................................. 14

*SEC v. Kameli*, 373 F. Supp. 3d 1194 (N.D. Ill. 2019)................................................24 n.7

*SEC v. Nostra Energy, Inc.*, 202 F. Supp. 3d 391 (S.D.N.Y. 2016) .............................18 n.5

*SEC v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754 (N.D. Ill. 2016) ..................................... 14

*S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010) ................................. 7

*SEC v. Sayid*, 2018 WL 357320 (S.D.N.Y. Jan. 10, 2018)............................................... 18

*SEC v. System Software Assocs., Inc.*, 145 F. Supp. 2d 954 (N.D. Ill. 2001)........................ 10

*SEC v. Ustian*, 2019 WL 7486835 (N.D. Ill. Dec. 13, 2019) ........................ 7, 12, 15, 24-25

*Walls v. Vre Chicago Eleven, LLC*, 2016 WL 5477554 (N.D. Ill. Sept. 29, 2016)............... 23

The SEC's Complaint meticulously details Defendants' multi-year scheme to inflate the assets and performance of the investment funds they managed (the "Funds"), and identifies the misrepresentations and omissions that propelled that scheme forward. The SEC describes the accounting and valuation concepts at issue, presents a well-organized chronology of Defendants' misconduct, and specifies the respective roles of Defendants Barnett and Aven in perpetuating the fraud. In sum, the Complaint alleges that Barnett, Aven, and SBB rigged SBB's valuation model (the "Model") to inflate the Funds' performance. (*Id.* ¶¶ 33-62.) As part of that fraud, Barnett, Aven, and SBB: (1) repeatedly lied to investors and SBB's auditor, falsely claiming that SBB had valued the Funds' securities according to generally accepted accounting principles ("GAAP") (*id.* ¶¶ 71-73, 85-91), and (2) lied to prospective investors in marketing materials for its flagship fund, Polysight I, LLC ("Polysight") (*id.* ¶¶ 92-107).

Faced with the well-pled factual allegations of the Complaint, Defendants stand the motion to dismiss standard on its head. Three maxims must guide evaluation of Defendants' Motion to Dismiss: (1) the SEC's allegations must be taken as true, (2) the Complaint must be read as a whole, and (3) all reasonable inferences must be taken in the SEC's favor. Defendants' brief violates all three of those maxims within the first few pages. First, Defendants (a) label the SEC's allegations as "false," "half-truths," and "exaggerations," (Def. Br. at 1-2), (b) tout "clean audits" the Funds purportedly received (*id.*) without mentioning that the auditor resigned after it discovered that the Defendants had been lying to them for years (Compl. ¶¶ 70-71, 108-111), and (c) quote isolated phrases out of context to argue that the Complaint's allegations of fraud actually "suggest" that Defendants acted in good faith. (Def. Br. at 9.)

1

Second, Defendants ask the Court to ignore the SEC's well-pled allegations regarding scienter, materiality, and attribution of misrepresentations. (*Id.* at 14-18, 20.) Third, Defendants present an improper fact-based defense regarding SBB's fraudulent marketing materials, effectively asking the Court to draw inferences in their favor. (*Id.* at 20-22.) Finally, and perhaps most disturbingly, Defendants take the position that the alleged misconduct is not actionable, arguing that the Court should find, as a matter of law, that (a) their fraudulent valuation methods were mere matters of opinion, and (b) in their heart of hearts – Barnett and Aven did not subjectively believe they were committing fraud.

But, after sifting through the 13 issues raised by the Defendants, the fact remains that the SEC's Complaint easily meets the actual pleading standard at hand. It pleads the "who, what, when, where, and how" of Defendants' fraud and pleads facts that would allow any reasonable fact-finder to find Defendants liable on each of the SEC's claims. That is all that is required. Accordingly, Defendants' motion to dismiss should be denied.

## I. <u>The SEC Alleges Fraud With Particularity</u>.

To survive a motion to dismiss, the SEC need only plead facts sufficient to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The SEC's fraud claims pass muster under Fed. R. Civ. P. 9(a) so long as the Complaint answers the so-called "newspaper questions" – *i.e.*, the "who, what, when, where and how" of the fraud. *Di Leo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The SEC's Complaint meets that standard with plenty of room to spare. It alleges the:

<u>Who</u>:  SBB, Barnett (SBB's CEO), and Aven (SBB's COO). (*Id.* ¶¶ 17-19.)

<u>Where</u>:  Barnett initially worked in California before joining Aven at SBB's headquarters in Northbrook, Illinois. (*Id.* at ¶ 20.)

2

<u>What</u>:  Barnett, Aven, and SBB created and applied a valuation model designed to inflate the performance of a series of private funds that SBB managed. (*Id.* ¶¶ 33-62.) As part of that fraud, Barnett, Aven, and SBB: (1) made material misrepresentations to investors and SBB's auditor ("Auditor A"), falsely claiming that SBB had valued the Funds' securities according to GAAP (*id.* ¶¶ 71-73, 85-91), (2) overcharged investors fees and inflated fund performance for five years (*id.* ¶¶ 74-84), and (3) made material misrepresentations in marketing materials for Polysight related to that Funds' lockup period, high water mark, and performance (*id.* ¶¶ 92-107). As described in Section V below (at pp. 17-19), the Complaint attributes each material misstatement to the appropriate Defendant(s).

<u>How</u>:  Almost all of the Funds' assets were invested in structured notes – hybrid securities with a bond component and an option component. (*Id.* ¶¶ 26-27.) Barnett, Aven, and SBB represented to investors that SBB would value those notes at "fair value" as required by GAAP.  (*Id.* ¶¶ 33-35.) Both Barnett and Aven understood that, to comply with GAAP's "fair value" requirement, they had to record the Funds' investments at an "exit price," or the price the Funds could reasonably expect to obtain if they sold their securities to other market participants.[1] (*Id.* ¶¶ 34.) To do that, Defendants were required by GAAP to use the assumptions that other market participants would use when pricing the notes. (*Id.* ¶ 35.) SBB valued the Funds' structured notes by breaking them up into their component options, valuing those options, and then aggregating the option values. (*Id.* ¶ 37.) The SEC details the industry standard practices for valuing options used by market participants. (*Id.* ¶¶ 37-40.) The identified option valuation practices – embodied in the Black Scholes Merton

---

[1] For this reason, as Defendants concede (Def. Br. at 6), the concepts of "GAAP compliance," "fair value," and "exit price" are interchangeable in this context.

model – have been industry standard for decades. (*Id.* ¶¶ 38-39.) Defendants knew, and have admitted, that the Black-Scholes Merton model is the "preferred model in the industry." (*Id.* ¶¶ 38, 41.)

Despite knowing what option valuation practices were used by market participants, Defendants intentionally (or recklessly) created a Model that rejected the core valuation principles identified in the Complaint. (*Id.* ¶¶ 42-53.) They did this for reasons antithetical to the concept of "fair value": they thought that market participants (the very parties from whom they could obtain an "exit price") were wrong. (*Id.* ¶ 43.) So, Defendants knowingly (or recklessly) designed a model to generate note values which were <u>higher</u> than what the market would dictate – *i.e.*, <u>higher</u> than a reasonable "exit price." (*Id.* ¶ 44.) Aven even admitted that the Defendants did not consider accounting principles when creating the Model and, instead, relied on their "intuition." (*Id.* ¶¶ 52-53.)  Rather than follow industry practice or academic research, Defendants created variables for the Model out of whole cloth and manipulated them to get the inflated values they wanted. (*Id.* ¶¶ 44-52.)

Defendants had every opportunity to abandon their custom Model and fulfill their promise to comply with GAAP. They consulted an expert who suggested a model more in line with industry assumptions. (*Id.* ¶¶ 55-57.) Defendants rejected that advice. (*Id.* ¶ 57.) In a significant "red flag," Defendants' Model generated absurd day-one values for the Funds' securities. (*Id.* ¶¶ 59-60.) They kept using it. The Model produced note values routinely exceeding price quotes from the issuing banks (the only market participants likely to buy back the securities at an "exit price"). (*Id.* ¶ 61.) Defendants stayed the course. In 2014, SEC exam staff warned SBB that its Model did not comply with GAAP. (*Id.* ¶ 63.) Defendants <u>still</u> did not budge. While they told the SEC they would consult with valuation experts to

4

change the Model, Defendants instead tried to hire firms to validate the Model. (*Id.* ¶¶ 65-67.) When two such firms refused to validate the Model – citing the same deficiencies identified by the SEC – Defendants hid that fact from SBB's auditor and kept using the Model. (*Id.* ¶ 110.)

Finally, after the SEC issued a formal deficiency letter in March 2016 memorializing the Model's defects – and after nearly five years of inflating the Funds' performance – Defendants began to make changes. (*Id.* at ¶¶ 74-84.) SBB's shift to a more GAAP-compliant model revealed that Defendants' effort to flout GAAP and inflate note values had worked. (*Id.* ¶¶ 79-82.) When SBB finally adopted and retroactively applied a third-party model more consistent with industry standards, the Funds' performance figures and net asset values ("NAVs") declined across the board. (*Id.* ¶¶ 80-82, 86.) These material declines reflect the extent of Defendants' fraud over the preceding years. (*Id.*) Even then, Defendants covered up their fraud by hiding the SEC's deficiency letter from Auditor A, secretly crediting investor accounts to hide overcharged fees, failing to disclose revised (and materially reduced) Fund values to investors, and keeping two sets of books with different Fund performance figures (one for existing investors using the old Model and one for prospective investors using the new one). (*Id.* ¶¶ 70-71, 77, 83-84.) In sum, each time the Defendants had the chance to tell the truth, they chose to hide it.

While the fraud involving SBB's Model was ongoing, Barnett, Aven, and SBB started marketing Polysight to outside investors. In doing so, Barnett and Aven each made material misrepresentations to prospective investors about critical aspects of that Fund, including its lockup period, the lack of a high watermark, and Polysight's historical performance. (*Id.* ¶¶ 92-107.) And when SBB's placement agent suggested Aven and

Barnett come clean about their manipulated performance figures, Barnett instructed him to keep quiet. (*Id.* ¶¶ 105-107.)

When: Defendants' fraudulent conduct started in December 2011 (when they launched the Model). (*Id.* ¶ 42.) The fraud was ongoing when the SEC filed the Complaint. As of September 2019, SBB, Barnett, and Aven still had not told investors the truth about its fraudulent valuation practices or the decline in the Funds' historical NAVs. (*Id.* ¶¶ 84, 102-106.) Defendants' misrepresentations about SBB's purported GAAP compliance were made from 2013 through 2016. (*Id.* ¶¶ 33, 85-91.) Defendants' fraudulent marketing of the Polysight Fund started in November 2015 and continued through at least January 2017. (*Id.* ¶¶ 96, 98.)

These allegations – pled with even further detail in the Complaint – are more than enough to answer the relevant "newspaper questions," and thereby plead fraud with particularity under Fed. R. Civ. P. 9(b). Nothing further is required.

## II. The SEC's Fraud Claims Should Not Be Dismissed Based On Defendants' Professed "Subjective Beliefs" Regarding GAAP Compliance.

Faced with the SEC's well-pled allegations, Defendants repeatedly ask the Court to depart from the motion to dismiss standard. For example, Defendants ask the Court to infer that they acted in good faith – *i.e.*, that they subjectively believed that their Model generated exit prices for the Funds' notes. (Def. Br. at 9.) This, even though the Complaint alleges that Defendants deliberately (or recklessly) ignored GAAP, disagreed with market participants' views on option pricing, abandoned time-tested option valuation principles, and calibrated the Model to obtain values for the notes which were higher than an exit price.

Defendants then ask the Court to find as a matter of law – at the pleading stage – that their alleged deviations from GAAP and inflation of note values merely reflect an

"expression of opinion." (Def. Br. at 7-8.) This, before any experts are heard regarding GAAP's requirements and option valuation standards, and before evidence of Defendants' flouting of GAAP is presented. In sum, Defendants argue that, the Court should find that there is no fraud because – notwithstanding the well-pled facts to the contrary – Barnett and Aven subjectively believed that their Model complied with GAAP. Needless to say, that is not the standard for dismissing fraud claims. *See, e.g., SEC v. Ustian*, 2019 WL 7486835, at *38 (N.D. Ill. Dec. 13, 2019); *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094–95 (9th Cir. 2010) (rejecting argument that defendant's subjective beliefs should preclude scienter finding, noting that "[i]f such a self-serving assertion could be viewed as controlling, there would never be a successful prosecution or claim for fraud").

Here, Defendants' application of their "subjective belief standard" has at least four fatal flaws: (1) Defendants' purported good faith appears nowhere in the Complaint, (2) the SEC has alleged that the Defendants deliberately (or recklessly) deviated from <u>objective</u> valuation standards – a matter of <u>fact</u> not opinion, (3) even if Defendants' GAAP compliance were a matter of opinion, the SEC has pled enough facts to support the inference that Defendants' purported "belief" was not genuinely held or was baseless, and (4) the SEC alleged material omissions that rendered Defendants' disclosures to investors misleading regardless of how those disclosures are characterized.

A.    <u>Defendants' Purported Subjective Beliefs Regarding Fair Value Cannot Be Inferred From the Complaint</u>:

Defendants' attempt to recast their fraud as a mere "expression of opinion" hinges on their ability to shoehorn a new fact into the SEC's Complaint: that they acted with a good faith belief that the Model would generate a "fair value" exit price. This new fact is critical to Defendants' argument. After all, if the Defendants did <u>not</u> subjectively believe

that they were complying with GAAP, their promises of GAAP compliance would constitute fraud whether deemed an opinion or a statement of fact. Obviously, the Complaint does not expressly allege that Defendants acted in good faith. So, Defendants ask the Court to infer their good faith, arguing that the Complaint "suggests" that Defendants subjectively believed their Model produced fair value estimates. (Def. Br. at 9.) They glean this "suggestion" by quoting isolated allegations out of context. For example, Defendants highlight the SEC's allegation that the Model "dovetailed with the Defendants' subjective intuition" and "confirmed their subjective assumptions." (*Id.*) But, they omit the SEC's allegation that Defendants' "intuition" and "assumptions" led them to (a) ignore GAAP, (b) abandon 50 years of industry standard valuation principles, (c) assume that the market was wrong, (d) invent model inputs lacking any support in industry practice or academic research, and (e) manipulate those inputs to generate option values exceeding those found in the market. (Compl. ¶¶ 38-53.) The SEC's Complaint cannot "suggest" that Defendants acted in good faith when it expressly alleges the opposite.

In sum, Defendants' requested inference of good faith is not only improper at this stage (where all reasonable inferences must be drawn in the SEC's favor), it would require the Court to ignore the core allegations of the Complaint.

B.  Defendants' Fraud Is Not A Matter of Opinion:

The SEC does not allege that the Defendants' fraudulent note valuations were false in the abstract. Rather, the SEC alleges that the Defendants (1) were subject to an objective valuation standard under GAAP, (2) were obligated to reach an exit price – *i.e.*, the price that they could find in the market, (3) were required to employ the assumptions and practices of market participants (which are specified in the Complaint), (4) deliberately (or

recklessly) deviated from those objective standards so they could generate higher values for the Funds' notes, and (5) successfully inflated note values (as evidenced by the decline in Fund performance and NAVs when SBB finally stopped using the fraudulent Model).[2]

Defendants' failure to comply with GAAP is not a matter of opinion in this context. Neither is GAAP's requirement that SBB to rely on the assumptions and practices of market participants. That is how the standard is written. (*Id.* ¶ 35.) That market participants valued options using certain standard assumptions and practices also is not a matter of opinion. SBB and Aven have admitted as much. (*Id.* ¶ 41.) That Aven and Barnett radically deviated from those objective standards also is not a matter of opinion; the SEC has detailed how the Model drastically deviated from industry standards and how that led to inflated note values. (*Id.* ¶¶ 37-53.) Nor is it a matter of opinion that: (a) Aven admitted that Defendants did not consider GAAP when creating the Model and proceeded on "intuition," or (b) that SBB's eventual, grudging retreat to a GAAP-compliant model resulted in a material drop in the Funds' performance and NAVs. Those are objective facts that can be proved or disproved before a trier of fact. When proved, the SEC's allegations would allow a reasonable juror to conclude that Defendants made material misstatements of <u>fact</u> when they assured investors that they valued the Funds' securities in accordance with GAAP.

When a plaintiff pleads that a defendant has violated <u>objective</u> accounting standards, courts regard the defendant's alleged GAAP violations (and representations of GAAP compliance) as matters of <u>fact</u>. *See, e.g., Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1097 (D.C.

---

[2] Defendants accuse the SEC of engaging in "fraud by hindsight" by referencing the decline in Fund performance resulting from SBB's 2016 abandonment of the Model. (Def. Br. at 12.) That is not the case. The SEC alleges that <u>from the Model's inception</u>, Barnett, Aven, and SBB abandoned GAAP and manipulated the Model to inflate note values. The decline in note values when SBB finally switched to a GAAP-compliant Model in 2016 both evidences that Defendants were successful in that effort, and provides a means of measuring the effect of Defendants' deviations from GAAP.

Cir. 2005) (holding that a fund's deviation from "standard accounting practice" in valuing restricted stock and its "slipshod" valuation practices – while promising investors in its prospectus that it would follow standard practice – supported the SEC's finding that defendant committed fraud based on the fund's reckless disregard for the accuracy of its valuations); *see also SEC v. System Software Assocs., Inc.*, 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001) (denying motion to dismiss SEC's fraud claims related to materially false financial statements, holding that the fact defendants' revenue recognition practices did not conform with GAAP presumptively reflects "a false or misleading statement of material fact under Rule 10b-5").

Defendants try to avoid liability by arguing that GAAP standards are amorphous, that a "range of treatments" are appropriate when valuing the component options of the Funds' notes, and cite cases for the proposition that courts treat valuation as matter of opinion. But, none of Defendants' cases address option valuation practices or involve credible allegations that the defendant deviated from time-tested, objective valuation practices used by market participants. One of Defendants' main cases is instructive. In *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011), the lower court dismissed plaintiff's claim that a corporate defendant failed to accurately value goodwill and loan loss reserves on its financial statements as required by GAAP. The appellate court affirmed, holding that the plaintiff's allegations regarding goodwill involved misstatements of opinion, not of fact. *Fait*, 655 F.3d at 110-111. But, in doing so, the Second Circuit based its ruling on the fact that "[]plaintiff does not point to any objective standard" that the company "should have [used] but failed to use" in determining the value of its assets or loan loss reserves. *Id.* at 110-112 (emphasis added). Here, the SEC pleads the exact details that were lacking in *Fait*:

10

the Complaint specifically identifies the objective assumptions and industry standard practices that the Defendants "should have but failed" to follow when valuing the Funds' notes. (Compl. ¶¶ 33-53.)

The court in another of Defendants' cases, *SEC v. Goldstone*, expressly rejected the very argument Defendants make here. There, the SEC alleged that the defendants made a material misstatement in their company's annual report which included an "other than temporary impairment (OTTI)" analysis of the company's assets that did not comply with GAAP. *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1228 (D.N.M. 2013). The defendants moved to dismiss, arguing – as Defendants do here – that GAAP was "far from a set of canonical rules" and that the OTTI analysis was merely a "subjective judgment" that could not form the basis of a material misrepresentation. *Id*. The *Goldstone* court rejected that argument, denied the motion to dismiss as it related to the OTTI analysis, and held that, even though some subjective judgment was involved, the SEC sufficiently alleged that the OTTI analysis should have been based on objective factors required by GAAP.[3] *Id*.

Perhaps Defendants can elicit expert testimony that the Model variables that they invented and manipulated are consistent with the standard assumptions and practices of market participants for valuing options (and thus consistent with GAAP). Or, perhaps they will be able to convince a jury that there are no standards for valuing options, that option valuation is just a matter of opinion, and Defendants' methods fit within a wide "range of reasonable treatments." But, that is not what the SEC alleges and the Court should not reach any legal conclusion in Defendants' favor on this issue at the motion to dismiss stage.

---

[3] The *Goldstone* court also held that, even if construed as a matter of opinion, the SEC pled sufficient facts to demonstrate that defendants did not believe, or were reckless in believing, that their OTTI analysis complied with GAAP. *Goldstone*, 952 F. Supp. 2d at 1238.

C. <u>The SEC Has Alleged That Defendants Had No Basis to Believe Their Model Generated Exit Prices For the Funds' Notes</u>:

As stated above, Defendants' assurances of GAAP compliance were not mere expressions of opinion. But, the Court need not resolve this issue now because, even if Defendants' valuation method and resulting note valuations could be construed as matters of opinion, the Complaint satisfies the standard for pleading fraud.

Defendants' purported "opinions" regarding GAAP compliance are actionable if the SEC pleads sufficient facts to support an inference that either (a) the Defendants did not genuinely believe that they were valuing the Funds' notes at an "exit price," or (b) Defendants' opinion was "without a basis in fact." *See, e.g., Fait*, 655 F.3d at 112. Contrary to Defendants' brief, opinions that are given recklessly – *i.e.*, opinions without a reasonable basis – are just as actionable as those made in bad faith. *See, e.g., SEC v. Ustian*, 229 F.Supp.3d 739, 767 (N.D. Ill. 2017) (denying motion to dismiss, holding that opinions made without genuine belief "or a reasonable basis" are "untrue statement(s) which, if made knowingly or recklessly" violate federal securities law).

The SEC meets the standard described in *Fait* and *Ustian*. In fact, the SEC expressly alleges that Barnett and Aven <u>had no intention of reaching an exit price</u>. (*Id*. ¶¶ 7, 43-44.) Deviating from market norms <u>was their goal</u>. Among other things, the SEC alleges that:

- Defendants knew that GAAP required them to value the Funds' notes at an "exit price" – *i.e.*, in a manner consistent with the assumptions and practices of market participants (*id*. ¶¶ 33-36);

- Defendants knew what the industry standard was for valuing options (*id*. ¶¶ 37-41);

- Despite knowing those standards, Defendants created a Model that (a) abandoned over 50 years of standard option valuation principles, and (b) included variables with no basis in industry practice or academic research (*id*. ¶¶ 42-53);

12

- Defendants did so because they thought that market assumptions and practices – the very practices required to reach an "exit price" – were wrong (*id.* ¶¶ 43-44);

- Defendant Aven admitted that Defendants did not consider GAAP when creating the Model and instead proceeded on "intuition" (id. ¶¶ 52-53);

- While creating and applying the model, Defendants ignored the valuation advice of industry experts (id. ¶¶ 54-57, 67); and

- When the SEC confronted SBB about the Model's defects under GAAP, Defendants kept using the Model for the next two years (*id.* ¶¶ 63-66).

In short, the SEC has pled more than enough facts to support a conclusion that the Defendants did not believe – or had no basis for believing – that their Model complied with GAAP.

D. <u>The SEC Pled That Defendants Misled Investors and its Auditor With Material Omissions</u>:

As Defendants tacitly acknowledge, their statements regarding GAAP compliance – whether couched as a matter of opinion or a matter of fact – are actionable if they misled investors by omitting material information. (Def. Br. at 8.) Indeed, in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015), the Supreme Court warned that "a reasonable investor may … understand an opinion statement to convey facts … about the speaker's basis for holding that view," and "if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." To escape the logic of that holding, Defendants argue that the SEC does not identify <u>any</u> material omissions. They bluntly state that the Complaint fails to "specify what information was actually omitted." (Def. Br. at 14.)

The allegations of the Complaint belie Defendants' argument. The SEC alleges that the Defendants misled investors and Auditor A by hiding critical information about SBB's valuation process. Specifically, the SEC alleges that the Defendants failed to disclose to

investors that "their Model… was designed to inflate the note values …was not designed to reach an exit price as required by GAAP, and … generated note values that routinely exceeded prices generated by the only market participants in position to buy the notes back." (*Id.* ¶ 62.) The SEC also alleges that investors were never told that: "(a) SBB did not value the Funds' notes at fair value; (b) the SBB Model artificially inflated the value of structured notes for five years; (c) SBB revised the Funds' NAVs for the time period 2011 through 2015; (d) the Funds' past monthly, year-to-date, and lifetime performance substantially decreased; (e) the Funds' prior audited financial statements included materially inflated assets and NAVs, and (f) SBB overcharged the Funds over $1,400,000 for a period of five years." (*Id.* ¶ 83.)

Finally, the SEC alleges that Defendants failed to disclose critical information to SBB's auditor, namely (1) the SEC's deficiency letter and (2) the fact that, contrary to its management representation letters, SBB had created a results-oriented model that was not designed to comply with GAAP. (*Id.* ¶¶ 71-72.)

In short, Defendants' unqualified statement that the SEC "never specifies what information was actually omitted" is simply incorrect.

### III.     The SEC Has Properly Pled Scienter.

Several of the SEC's claims do not require proof of scienter. For example, the SEC's fraud claims under Securities Act Sections 17(a)(2) and 17(a)(3), and Advisers Act Sections 206(2), and 206(4) require only a finding of negligence. *See SEC v. Holschuh*, 694 F.2d 130, 143 (7th Cir. 1982); *SEC v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 775 (N.D. Ill. 2016). Defendants' scienter arguments do not address those counts.

Although Fed. R. Civ. P. 9(b) requires that fraud be pled with particularity, "it does not require 'particularity' with respect to the defendants' mental state." *DiLeo*, 901 F.2d at 629. The SEC need only provide a "basis for believing" that Barnett and Aven acted knowingly or recklessly. *See id*. Generally, a plaintiff clears that threshold when the complaint answers the "newspaper questions." *See, e.g., SEC v. Falor*, 2010 WL 3385510, at *3 (N.D. Ill. Aug. 19, 2010). As shown in Section I above (pp. 2-6), the SEC's Complaint has done just that. As discussed above (pp. 12-13), in answering the "newspaper questions," the SEC expressly alleged facts that, if proven, would establish that Defendants knew – or recklessly disregarded – that their Model was not valuing the Funds' notes at fair value as required by GAAP.

Further, the SEC pleads that Defendants actively tried to hide their misconduct by lying to SBB's auditor, secretly refunding overcharged fees, and refusing to revalue the Funds' historical NAVs. (*Id*. ¶¶ 68-72, 77, 82-84.) The SEC's allegations of a cover-up, when proven, will constitute strong circumstantial evidence of scienter. *See, e.g.*, *Baena v. Woori Bank*, 515 F.Supp.2d 414, 421 (S.D.N.Y. 2007); *Falor*, 2010 WL 3385510, at *3.

In short, the SEC's allegations regarding Defendants' conduct – which Defendants ignore in favor of a discussion of motive (Def. Br. 14-15) – are more than enough to adequately plead scienter.

## IV. The Complaint Sufficiently Pleads That Defendants' Fraud Was Material.

Defendants' materiality arguments ignore the applicable pleading standard. Materiality is an inherently fact-specific inquiry. *See, e.g., Ustian*, 229 F. Supp. 3d at 765. For that reason, a determination of materiality "is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Ctrs.*, 122 F.3d 363, 370

(7th Cir. 1997). Fraud claims cannot be dismissed on the grounds of materiality "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citzens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (vacating district court's dismissal of complaint, finding plaintiff adequately alleged materiality of improper accounting affecting less than 2% of revenue).

Here, Defendants' misconduct involved key aspects of the investments at issue. The SEC alleges that Defendants deliberately manipulated the value of the Funds' securities, inflated the Funds' performance and NAVs (*i.e.*, the price investors paid when investing in the Funds), improperly collected fees, and then covered up of all of the above. It is difficult to believe that any reasonable investor would consider such conduct "obviously unimportant." *See Ganino*, 228 F.3d at 163 (emphasizing that materiality inquiry must include qualitative analysis as well as quantitative analysis).

But, the SEC goes much further on the issue of materiality: it provides specific examples of how SBB's rigged Model affected prices. When SBB finally adopted a model that used techniques and assumptions of market participants – as GAAP requires – Fund performance and NAVs plummeted (exposing the effect of Defendants' 5-year campaign to inflate note values). (*Id.* ¶¶ 78-82.) For example:

- The note marks for notes held by Polysight – the very fund SBB was marketing to new investors – declined by 5-11% (*Id.* ¶ 80);

- Polysight's two year cumulative return for 2014 and 2015 declined by 12.37%. Polysight went from a return of 13.04% during that period using SBB's rigged model to a .67% return using the new model. (*Id.* ¶¶ 80-81);

- Polysight's returns for 2014 went from a <u>positive</u> return (generating a management and performance fee for SBB) to a <u>negative</u> return (which would not have generated a fee) (*Id.*);

- The inflated note values produced by the rigged model were incorporated into the NAVs of all of the Funds and caused them to be materially overstated. (*Id.* ¶¶ 82, 86.) This affected Funds "across the board." (*Id.* ¶ 82.) For example, use of the new third-party model caused Polysight's NAV to decline by 5.02% in 2014 and 6.04% in 2015 (*Id.*); and

- In the 2014 and 2015 financial statements for the Funds, every Fund but one had its NAV overstated by at least 5% (*Id.* ¶ 86.)

The SEC's allegations easily surpass the low hurdle for pleading materiality. Perhaps Defendants may be able to convince a jury that reasonable investors would not care about investment returns, being overcharged fees for five years, or the manipulation of note values. But Defendants' materiality arguments should be hashed out at trial after discovery. They do not warrant dismissal of the SEC's Complaint.[4]

### V. The SEC Has Pled That Barnett and Aven "Made" Material Misrepresentations under Exchange Act Rule 10b-5(b).

Contrary to Defendants' brief, the SEC alleges facts that would allow a reasonable juror to conclude that Barnett, Aven, and SBB "made" material misrepresentations to investors and SBB's auditor within the meaning of Exchange Act Rule 10b-5(b).

Defendants argue that the SEC has not identified the "maker" of each material misrepresentation as that term is defined in the Supreme Court's decision in *Janus Capital Grp. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011). (Def. Br. at 20.) But, courts at the pleading stage have found *Janus* satisfied by a wide variety of factual allegations, including

---

[4] Defendants argue that Auditor A's resignation does not support an inference that Defendants' lies and omissions in their management representation letters were material. (Def. Br. at 17-18.) But, once again, Defendants do not accurately construe the SEC's allegations. The SEC alleges that: (1) Auditor A resigned after discovering that Defendants withheld material information and issued misleading management representation letters, and (2) Auditor A's own resignation letter highlights that it was withdrawing its audit opinions because of those misleading statements and material omissions. (Compl. ¶¶ 108-111.) The fact that Defendants hid the truth from Auditor A for over two and a half years does not diminish the relevance of Auditor A's resignation. To the contrary, it demonstrates the extent and duration of Defendants' fraud.

allegations that the defendant (a) "reviewed and approved" false press releases, (b) "approved, adopted, and collectively implemented" fraudulent share purchase agreements, and (c) "managed the content" of and "approved" fraudulent promotional material.[5] Allegations that a defendant signed the fraudulent document also suffice. *See, e.g., SEC v. Sayid*, 2018 WL 357320, at *5 (S.D.N.Y. Jan. 10, 2018). And, *Janus* does not require plaintiffs to limit themselves to one "maker" for each misstatement. *See, e.g.*, *Carpenters Pen. Trust Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 558 (S.D.N.Y. Oct. 20, 2014) ("[*Janus*] does not imply that there can be only one 'maker'" of a misstatement); *City of Pontiac Gen. Emp. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).

Here, the SEC identified material misrepresentations appearing in several documents. In each instance, the SEC satisfies the *Janus* "maker" requirement by identifying which Defendant(s) signed, reviewed, and/or approved the document:

| Document Containing Misrepresentation | Allegations Regarding Which Defendant(s) "Made" the Misrepresentation |
|---|---|
| The Funds' 2014 and 2015 Financial Statements | <u>Defendant Aven</u>: (1) "was responsible for, and had ultimate authority over the content of the financial statements;" (2) "reviewed and approved the financial statements;" and (3) "distributed [the statements] to investors through SBB's internet portal." (Compl. ¶ 86.) |
| SBB's Forms ADV | <u>Defendant Aven</u>: "drafted, reviewed, and signed the Forms ADV on SBB's behalf." (*Id.* ¶ 87.) |

---

[5] *See, e.g., SEC v. Carter*, 2011 WL 5980966, at *2 (N.D. Ill. Nov. 28, 2011) (denying motion to dismiss, holding that by alleging that defendant "reviewed and approved" fraudulent press releases, the SEC "sufficiently alleged that defendant had ultimate authority for the statements and 'made' them for purposes of *Janus*"); *SEC v. Benger*, 931 F. Supp. 2d 908, (N.D. Ill. 2013) (denying motion to dismiss, holding that the *Janus'* "maker" requirement was satisfied by the SEC's allegation that the defendants "approved, adopted, and collectively implemented" fraudulent share purchase agreements); *SEC v. Nostra Energy, Inc.*, 202 F. Supp. 3d 391, 397 (S.D.N.Y. 2016) (denying motion for summary judgment premised on *Janus*, holding that the SEC presented evidence that defendant had "authority to manage the content" of the fraudulent materials and "approved" the materials).

| | |
|---|---|
| SBB Management Representation Letters to Auditor A | "Both of [the] false management representation letters were signed by <u>Barnett and Aven</u> on SBB's behalf." (*Id.* ¶ 71 (emphasis added).) |
| SBB's Investment Management Agreements | <u>Defendant Barnett</u> "signed each of those agreements on SBB's behalf as its managing member." (*Id.* ¶ 89.) |
| The Funds' Operating Agreements | <u>Barnett</u> signed the investor subscription packages which contained the operating agreements. (*Id.* ¶ 90.) |

Likewise, with regard to SBB's fraudulent marketing materials, the SEC alleges that: <u>both</u> <u>Aven</u> and <u>Barnett</u> (1) worked closely with the Placement Agent to create the marketing materials, (2) "provid[ed] the Placement Agent with the information included in SBB's marketing materials," and (3) "were responsible for … reviewing and approving all marketing materials before they were distributed to investors." (*Id.* ¶ 95.)

Those allegations are sufficient to state a claim that Defendants "made" material misstatements under Exchange Act Rule 10b-5(b).

## VI. <u>Defendants Present an Improper Fact-based Defense Regarding the SEC's Fraudulent Marketing Claims</u>

Rather than address the SEC's allegations of Defendants' fraudulent marketing of Polysight, Barnett and Aven simply preview their defense on the merits. They claim that – contrary to the allegations of the Complaint – they weren't actually marketing the Polysight <u>Fund</u>. (Def. Br. at 20-22.) Instead, they were purportedly marketing a separate series of custom funds that were described with the term "Polysight <u>Platform</u>." (*Id.*) Defendants claim these new "Polysight Platform" funds "would have similar but not identical characteristics to" the Polysight Fund. (*Id.* 22.) As purported proof that these mystery funds

existed, Defendants attach an example of a fraudulent fact sheet that, indeed, refers to the "Polysight Platform." (Def. Ex. 5.)

But, Defendants' fact-based defense has no place in a motion to dismiss. Their story regarding the marketing materials, their purported negotiations with "sophisticated institutional investors," and the purported terms of a new group of funds cannot be found in the allegations of the Complaint (which must be taken as true) or within the four corners of their exhibit. The proffered fact sheet makes no reference to any "new funds," does not explain how the "Polysight Platform" is any different than the Polysight Fund, provides no basis for inferring that these new funds even existed, and does not establish that all of the Defendants' marketing used the term "Polysight Platform." In fact, when the time comes for a jury to resolve factual disputes, the SEC will provide examples of offending marketing materials that expressly reference the Polysight Fund and/or make no reference to the "Polysight Platform."[6] Defendants' fact-based defense cannot be resolved at this stage.

## VII. The SEC Sufficiently Pleads That Defendant Aven Willfully Filed A False Form ADV With the Commission.

The SEC has pled sufficient facts to allow a reasonable juror to conclude that Aven willfully made a material misstatement in SBB's Forms ADV regarding SBB's purported GAAP compliance. This analysis could begin and end with Aven's own admissions. The SEC alleges that Aven has admitted that Defendants "didn't consider accounting principles" when creating SBB's Model and proceeded on their "intuition." (Compl. ¶ 53.) This, even though Aven was telling the public in SBB's Forms ADV that SBB's financial statements

---

[6] In fact, one of Defendants' own exhibits proves that point. Exhibit 4 to Defendants' Motion to Dismiss is a November 2015 fact sheet for "Polysight I, LLC" – *i.e.*, the Polysight Fund. (Def. Ex. 4.) The sheet makes no mention of the Polysight Platform and contains the misrepresentations identified in the Complaint regarding the fund's lockup period high water mark, and fund performance. (*Compare* Def. Ex. 4 with Compl. ¶ 96.)

were prepared in accordance with GAAP. (Id. ¶ 87.) But, the Complaint does not stop

there. As described in detail above, the SEC alleges that Aven and Barnett both knew, or

recklessly disregarded that SBB's Model was not designed to generate exit prices for the

Funds' notes. (*supra*, pp. 3-6, 12-13.) Those facts are more than enough to support the

conclusion that Aven's misrepresentations in SBB's Forms ADV was willful.

**VIII.  The SEC Alleged That SBB Distributed Financial Statements That Did Not Comply With GAAP.**

After spending the first 22 pages of their brief discussing the SEC's allegations of

GAAP violations, financial manipulation, and the effect on SBB's financial statements,

Defendants switch tack and argue that those allegations do not exist. They urge the Court to

dismiss the SEC's claim under Advisers Act Rule 206(4)-2, arguing that the SEC "fails to

allege that SBB distributed financial statements that failed to comply with GAAP." (Def. Br.

at 23.) Once again, Defendants simply ignore the SEC's allegations. The SEC expressly

alleges that SBB's 2014 and 2015 financial statements did not comply with GAAP. (Compl.

¶¶ 66, 82, 86.)

Confronted with that reality, Defendants build a strawman. They claim that the SEC

is trying to apply Rule 206(4)-2 retroactively based on Auditor A's April 12, 2019

withdrawal of its audit opinions. (Def. Br. at 23.) That is not true. The SEC's claim is based

on SBB's failure to comply with GAAP at the time the 2014 and 2015 financial statements

were distributed. As repeatedly alleged in the Complaint, and summarized above, long

before the financial statements were issued, SBB started inflating the Funds' performance by

(a) creating a valuation model that radically deviated from GAAP, and (b) manipulating the

Model's inputs to reach artificially inflated note values. Because of those existing GAAP

violations, the Funds' financial statements for 2014 and 2015 (for all but one of the Funds)

overstated the Fund's NAV by at least 5%. (*Id.* ¶ 86.) In other words, those financial statements did not comply with GAAP <u>at the time they were created</u>.

To be sure, Auditor A's subsequent resignation and withdrawal of its audit opinions is relevant evidence of SBB's violations. It shows that, upon discovering SBB's fraud and its evasion of GAAP requirements, Auditor A could no longer rely on SBB's representations and was no longer able to certify SBB's financial statements. But, that withdrawal is not the triggering event for the SEC's claim and no fair reading of the Complaint supports Defendants' argument that the SEC is "retroactively" applying Rule 206(4)-2.

## IX.     <u>The SEC Adequately Alleges That SBB Lacked Policies to Prevent Fraud</u>:

Defendants next take the SEC to task for failing to identify something that does not exist. The SEC alleges that SBB violated Advisers Act Rule 206(4)-7 which, among other things, requires investment advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation" of the Advisers Act (*e.g.*, the violations described throughout the SEC's Complaint). (*Id.* at ¶¶ 144-46.) Curiously, Defendants argue that the SEC "fails to identify" an offending policy. (Def. Br. at 23.) But that is the point. The SEC has alleged that SBB <u>did not have</u> policies and procedures in place to prevent its officers from manipulating the value of securities, providing false information to SBB's auditor, and distributing false marketing materials. In fact, the SEC details how SBB's existing policies <u>were the problem</u>: SBB's valuation policy was implemented in a way that radically departed from GAAP standards and valuation norms (*id.* ¶¶ 33-53) while its Investment Management Agreements and Operating Agreements were never properly implemented as they falsely promised that SBB's would comply with GAAP (*Id.* ¶¶ 89-90).

22

In short, just as the Complaint alleges, SBB failed to "implement[] written policies and procedures designed to prevent violation" of the Advisers Act. (*Id.* ¶ 145.) There is no basis for dismissing the SEC's claim.

**X.     Defendants' Objection to the Complaint's Format Does Not Warrant Dismissal**:

Finally, lacking a substantive basis for dismissing the Complaint, Defendants try to argue that the Complaint should be dismissed because of its format. Nestled among the 12 other issues raised in their brief, Defendants accuse the SEC of "shotgun pleading." (Def. Br. at 18-19.) Their sole objection: that each of the SEC's fraud claims incorporates the factual allegations made in the main body of the Complaint. Significantly, Defendants do not point to any specific, *bona fide* instance where this practice creates confusion or prevents them from construing the SEC's claims. Rather, they seem to argue that the SEC's incorporation of its factual allegations into each fraud claim is inherently disqualifying.

But, adopting factual allegations by reference is not a sufficient basis for dismissing a Complaint. To the contrary, this practice is expressly allowed under Fed. R. Civ. P. 10(c). ("A statement in a pleading may be adopted by reference elsewhere in the same pleading".) Courts have recognized that "there is nothing wrong" with describing each defendant's role in the fraud "in the background section of the complaint and then referring collectively to [d]efendants in the conclusory paragraphs under the specific counts which incorporate those earlier paragraphs. In fact, this method of pleading results in a well-organized and readable complaint." *Walls v. Vre Chicago Eleven, LLC*, 2016 WL 5477554, at *10 (N.D. Ill. Sept. 29, 2016) (denying motions to dismiss). The court in one of Defendants' own cited cases, *SEC v. Goldstone*, rejected the same argument Defendants now make, denying a motion to dismiss and holding: "The Court will not dismiss the Complaint on the basis of the SEC's pleading

each count through incorporation of the previous paragraphs. If the Plaintiff had to repeat every paragraph in every count, a lengthy complaint already would become unreasonably too long, elevating form over substance." *Goldstone*, 952 F. Supp. 2d at 1222.

So it is here. The SEC's claims – unlike those in the two cases cited by the Defendants[7] – have similar elements and each stem from a single course of conduct: Defendants' creation and manipulation of SBB's valuation Model to inflate note values and their cover-up of the same. The SEC has pled that course of conduct in an organized way, has provided clear descriptions of the accounting principles involved, has identified each misstatement and omission, and specified each Defendant's role in the fraud. Without incorporating those allegations into each count, the SEC would have to duplicate large swaths of the Complaint under each count. Such an approach would be needlessly repetitive and arguably would violate the requirement that the Complaint include a "short and plain statement" of the SEC's claims. Fed. R. Civ. P. 8(a).

Defendants' "shotgun pleading" argument elevates form over substance and should be rejected. *See Ustian*, 229 F. Supp. 3d at 778 (rejecting defendant's "shotgun pleading" argument and denying motion to dismiss, holding that the SEC's incorporation of 180 fact

---

[7] The complaints in Defendants' two cases -- *Customguide v. Careerbuilder, LLC*, 813 F. Supp. 2d 990 (N.D. Ill. 2011) and *SEC v. Kameli*, 373 F. Supp. 3d 1194 (N.D. Ill. 2019) -- were <u>not</u> dismissed based solely on plaintiff's incorporation of factual allegations into each count; those two courts cited actual confusion regarding the basis for the claim. Unlike here, plaintiff in *Customguide* brought a flurry of state law charges against the defendant, each with very different elements and factual predicates. *Customguide*, 813 F. Supp. 2d at 994-995. The court nevertheless <u>addressed each count on the merits</u>. *Id.* at 996-1004. It noted plaintiff's "shotgun pleading" only in relation to a single count (misappropriation of intellectual property) due to confusion regarding the subject matter of that count. *Id.* at 1001. Similarly, the *Kameli* noted that: (a) the SEC incorporated allegations "span[ing] complex events" over eight years, involving eight separate construction projects and years of investor communications, (b) the SEC failed to identify the time, place, and content of purported misrepresentations, and (c) the court could not tell which communications were fraudulent, or which construction projects were involved. *Kameli*, 373 F. Supp. 3d at 1202-1203. In other words, neither of those two cases turned on formatting alone.

paragraphs into each count "does not prevent the Court from reviewing the sufficiency of each count" and "[t]here was no need to repeat [the] paragraphs under each count heading").

## **CONCLUSION**

For the reasons stated above, the SEC respectfully requests that the Court deny Defendants' motion to dismiss.

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

Dated: January 13, 2020      By: ***/s/ Timothy S. Leiman***
Timothy S. Leiman (Leimant@sec.gov)
Robert M. Moye
Kevin A. Wisniewski

Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff*