UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____
:
**SECURITIES AND EXCHANGE** :
**COMMISSION,** :
:
          **Plaintiff,** :
:   **CASE NO. 19-cv-6473**
        v. :
:   Hon. Sharon Johnson Coleman
**SBB RESEARCH GROUP, LLC, et al.,** :
:   Magistrate Judge Shelia Finnegan
          **Defendants.** :
_____ :

**PLAINTIFF SEC'S MOTION FOR PROTECTIVE ORDER
REGARDING UNRELATED EXAMINATIONS, SEC EMPLOYEE STATEMENTS,
AND SETTLEMENTS WITH OTHER DEFENDANTS**

Plaintiff U.S. Securities and Exchange Commission ("the SEC"), pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, respectfully requests the entry of a protective order on the subjects described below. In support of its motion, and in lieu of a supporting memorandum, the SEC states as follows:

**PRELIMINARY STATEMENT**

Under Fed. R. Civ. P. 26(b)(1), discovery is limited to matters that are both relevant to the parties' claims and defenses, and proportional to the needs of the case. Defendants' discovery requests blow through that standard by asking the SEC to: (a) scour its archives for the past 11 years for records from thousands of unrelated (and highly confidential) examinations; (b) produce communications related to the SEC's settlement of claims against SBB's auditor (including claims from a separate, unrelated enforcement matter); and (c) search for (and produce) documents and public statements of any SEC employee over the

1

past seven years on the subject of structured note valuation or the GAAP provisions identified in the SEC's Complaint.

Defendants have not articulated a proper basis for forcing the SEC to probe eleven years of unrelated exams and sift through seven years of public statements by SEC employees. Defendants do not claim that they relied on any prior SEC exams or public statements in creating or using the valuation model at the heart of their alleged fraud. Nor do they have any credible argument that a prior exam finding, or out of court statement by an SEC employee relates to the SEC's claims in this case. Instead, Defendants appear to be fishing for some inconsistency in the SEC's actions and statements over the past 11 years or for some yet undefined misconduct by the SEC in settling claims against SBB's auditor. In short, Defendants are desperately hoping to find something … anything … to make this case about the <u>SEC's</u> actions rather than their own alleged fraud.

This Court should not let the Defendants engage in such a speculative and wide-ranging fishing expedition. SBB's discovery requests take us far afield from the facts of this case. Their proposed detours into unrelated exams and confidential settlement negotiations are unrelated to the central questions of this case, which are:

- Did SBB lie to investors and its auditor when it told them its valuation model met the requirements of GAAP?

- Did SBB misrepresent Fund performance to existing and prospective investors?

- Did SBB promptly tell its auditor about the SEC's concerns regarding their model for valuing the option component of the Funds' investments?

The answers to those questions will be found by focusing the parties' time, attention and resources on the facts of this case – <u>not</u> by forcing the SEC to rummage through thousands of unrelated matters and seven years of public statements. And, even if these

fishing trips could land some marginally relevant information, the burden imposed on the SEC by SBB's facially overbroad requests is completely disproportionate to the needs of this case. Accordingly, the SEC respectfully requests that the Court enter a protective order relieving the SEC from having to respond to the discovery requests identified below.

## PROCEDURAL BACKGROUND AND LR 37.2 STATEMENT

On September 30, 2019, the SEC sued SBB – an investment adviser to several hedge funds (the "Funds) – and two of its officers, Samuel Barnett, and Matthew Aven. The SEC has alleged that the Defendants engaged in a multi-year fraudulent scheme to manipulate the net asset value of securities held the Funds. (*See* Dkt #1.) In summary, the Complaint alleges that Barnett, Aven, and SBB rigged SBB's model for valuing the option component of the Funds' structured note investments (the "Model"). (*Id.* ¶¶ 1-12.) The SEC has alleged that the Model, by design, inflated the Funds' performance, creating a false track record that SBB then marketed to prospective investors. (*Id.* ¶¶ 33-62.) As part of that fraud, Defendants: (1) misled investors and SBB's auditor, falsely claiming that SBB had valued the Funds' securities according to GAAP (when Defendants intentionally deviated from industry practice when creating the Model), (2) deceived prospective investors in marketing materials for its flagship fund, and (3) after SBB changed its valuation practices, failed to disclose to investors the revised (and materially reduced) Fund values. (*Id.* ¶¶ 1-12.)

The SEC and Defendants have exchanged written discovery requests, including requests for production and interrogatories. On matters relating to the examination and investigation of SBB, the SEC has produced the non-privileged portion of its investigative file, including over 163,000 documents it obtained during the investigation and over 5,000

pages of on-the-record investigative testimony taken by SEC staff. The SEC also has provided 56 pages of narrative responses to Defendants' contention interrogatories.

The SEC objected that SBB's requests targeting seven years of documents and public statements of the SEC's current and former employees -- and 11 years of unrelated exams -- were overbroad, unduly burdensome and disproportionate to the needs of this case.[1] (Ex. A, SEC Resp. to SBB Doc. Req.; Ex. B, SEC Resp. to SBB Interrogatories.) As required by LR 37.2, the Parties have met and conferred by teleconference on multiple occasions regarding these requests, including on July 1, 2021, and have confirmed that they are at an impasse.

## ARGUMENT

In a letter to the SEC, SBB offered a series of strained theories for how previous examinations of unrelated entities, unrelated cases against SBB's auditor, and prior statements by any of the thousands of SEC employees could be relevant to this case. (Ex. C, Discovery Letter from SBB to SEC.) For the most part, these theories do not relate to the facts of this matter, but rather amount to speculation that, over the past 11 years, someone at the SEC has said or done something inconsistent with the SEC's allegations in this case. (*See Id.* at 2-3.) But, even if such an expanded view of relevancy had any merit, "beat[ing] the drum of relevancy … [is] not good enough." *Noble Roman's Inc. v. Hattenhauer Dist. Co.*, 314 F.R.D. 304, 311 (S.D. Ind. 2016). With the 2015 amendments to FRCP 26, discovery requests must also be proportional. *See, e.g., Motorola Solutions, Inc. v. Hytera Comm. Corp.*, 365 F.Supp.3d 916, 923-24 (N.D. Ill. 2019). Fishing expeditions do not qualify. In fact,

---

[1] Defendants do not hold themselves to the same standard regarding the proper scope of discovery. While requesting that the SEC burrow through thousands of unrelated exams, Defendants have refused to search their own personal emails to find relevant communications with investors relating to this case. Defendants' failure to search their email is the subject of a motion to compel that the SEC will file shortly.

courts routinely reject efforts to probe into facially unrelated matters despite the theoretical "possibility" that discovery will unearth something relevant. *See, e.g., Buonavolanto v. LG Chem, Ltd.,* 2019 WL 8301068, *3 (N.D. Ill. Mar. 8, 2019) (granting motion for protective order, holding that defendants' subpoenas of 62 non-parties for documents related to similar injuries "fail the proportionality test"); *Naini v. King County Pub. Hosp. Dist. No. 2*, 2019 WL 6877926, *2 (W.D. Wash. Dec. 17, 2019) (in wrongful termination case, granting motion for protective order in part, holding that plaintiff's discovery requests regarding the departure of non-party employees is a "classic fishing expedition" and "the theoretical possibility" that the departures "could somehow be relevant is not enough"); *City of South Bend Ind. v. Illinois Union Ins. Co.*, 2017 WL 9856736, *2 (S.D. Ind. Dec. 8, 2017) (denying motion to compel in part, holding that requests seeking litigant's interpretation of similar policy language in unrelated matters "is the very definition of an improper discovery fishing expedition, which by definition fails to satisfy the proportionality requirements").

Here, each of the requests identified below fails the relevancy and proportionality requirements of Fed. R. Civ. P. 26(b)(1) by a wide margin.

**A.** **SBB's Request For Information About Prior Examinations Involving SEC Staff Members Who Worked On The SBB Exam (SBB Interrogatory #2):**

The defects in SBB's valuation model were first discovered when the SEC's examination staff conducted a routine exam of SBB starting in October 2014. (Dkt. #1 ¶¶ 63-64.) Like any SEC-registered investment adviser, SBB was subject to periodic compliance examinations by the SEC to ensure that it operated consistent with applicable laws and regulations. This typically involves a comprehensive review of the registered adviser's operations. Among other things, the adviser's principals are interviewed, custodial arrangements and financial statements are scrutinized, and examiners review whether

5

investors are given accurate information regarding the value and performance of their investments. Starting in October 2014, several SEC staff -- including a subject-matter specialist in valuation – examined SBB's operations. SBB's valuation practices raised a red flag because their valuation model did not appear to comply with GAAP.

In March 2016, the SEC's exam staff sent SBB a formal deficiency letter describing the various problems with SBB's valuation model. The SEC's letter warned SBB that several key aspects of SBB's model for valuing the option component of SBB's structured notes had no basis in industry practice or established option valuation principles. (*Id.* ¶ 68.) As it relates to fact discovery, the examiners' testimony is relevant to establish that: (a) the SEC raised concerns about the SBB's valuation Model; (b) the SEC's concerns were expressed as early as October 2014; (c) the nature of the concerns raised; (d) SBB failed to share the SEC's deficiency letter with its auditor until months later; (e) SBB eventually changed its valuation practices, resulting in reduced valuations and the refund of management fees to investors; and (f) SBB did not tell investors the truth about changes to valuations and the refund of fees. While some of the SEC's staff may also be able to offer opinion testimony based on their training and experience, the schedule for disclosing opinion witnesses under Fed. R. Civ. P. 26(a)(2) has not yet been set.

In their Interrogatory #2, SBB asks the SEC to identify each SEC staff member who worked on the SBB exam – and the SEC has done so. (Ex. B at Int. #2.) But, SBB <u>then</u> asks the SEC to identify each and every unrelated SEC exam those staff members have worked on in their careers and -- for each of those unrelated exams: (a) name the entity that was examined; (b) identify any deficiency memorialized in any deficiency letters; and (c) identify any resulting SEC enforcement actions. (*Id.*)  The SEC estimates that – in their combined

6

110 years of experience at the SEC – the nine staff members identified by the SEC have worked on approximately 2,400 compliance exams. None of them have anything to do with the facts of this case.

At the outset, the SEC notes that information related to these 2,400 non-public SEC exams is highly confidential. The Investment Advisers Act of 1940 (the "Advisers Act") expressly provides that – except when the SEC brings an enforcement action against the examined investment adviser, or if otherwise allowed by rule, SEC employees (1) "shall not make public … the results of or any facts ascertained during any [examination]," and (2) cannot "disclose to any person other than a member, officer, or employee of the Commission any information obtained as a result of any such examination" without the approval of the five-member Commission. 15 U.S.C. § 80b-10. This is a critical precaution. During an exam, the SEC obtains highly sensitive information from registrants, including information about investors, investment performance, fees, and trade secrets regarding internal practices and trading strategies. Undoubtedly, some of these registrants are hedge funds that compete with SBB. Defendants offer no reason for the Court to circumvent the protections of the Advisers Act and force the SEC to turn over this trove of confidential information to SBB.

In any event, the information SBB seeks is not relevant. The exam staff's findings in other, unrelated exams bear no relation to the claims and defenses of this case. That an SEC employee found a deficiency in an unrelated examination of a different investment adviser does not make any of the SEC's allegations – or SBB's defenses – any more (or less) likely. In its meet-and-confer letter to the SEC, SBB offers only one theory for the relevance of this information. They argue that prior exams are relevant because "the SEC has made the

7

examiners' "opinions a significant issue in this litigation." (Ex. C at 6.) That is not the case. During fact discovery, the exam staff's testimony is relevant only to the extent that they were percipient witnesses – *i.e.*, they can testify about what they saw, what their concerns were regarding SBB's valuation practices, why they were concerned given the facts and their experience, what they communicated to SBB, and how SBB reacted. The underlying issue of whether they were correct – *i.e.*, whether SBB's model violated GAAP – will be established through expert testimony (and SBB's repeated admissions that they did not consider GAAP in developing the model). If and when the SEC designates an examiner to provide opinion testimony, the SEC will make any required disclosures pursuant to the Federal Rules of Evidence and Fed. R. Civ. P. 26 during the expert discovery phase. In the meantime, SBB's discovery requests should stick to the facts.

Even if information from these 2,400 unrelated exams was marginally relevant, SBB's interrogatory is wildly disproportionate to the needs of this case. The burden of producing the requested information would be significant. Even using an optimistic estimate for exhuming old case files – say, 15 minutes per exam to access the case file, locate any relevant deficiency letter, review any related enforcement action, and transcribe the requested information – it would take at least <u>600</u> hours to complete the task. Put more starkly: an attorney working 24 hours a day without sleep or meal breaks would take almost a month to satisfy SBB's facially overbroad request.

If SBB is curious about the SEC's charges and settlements in unrelated enforcement actions, those are publicly available and Defendants can search them using various online databases (including SEC.gov, Westlaw and LEXIS). If SBB believes the SEC's exam staff lacks experience it can depose the SEC's examiners and ask general questions about their

academic credentials, their experience at the SEC, their experience working with GAAP, and the SEC's process of consultation and review before deficiency letters are issued. But, there is no basis for forcing the SEC to comb through 2,400 highly confidential, unrelated exam files for the information that SBB seeks.

**B.      The SEC's Settlements With SBB's Auditor (Document Request Definition #30, and Document Requests #1-5, 31)**:

SBB attempts a further detour from the SEC's claims by seeking discovery into settlements between the SEC and SBB's auditor, RSM, LLP ("RSM") – both in this case and in an entirely unrelated enforcement action. RSM – which has cooperation language in its settlements with the SEC – audited SBB's Funds from fiscal year ("FY") 2013 through FY 2017. In April 2019, RSM resigned and retracted its audit opinions. (*See* Dkt. #1 ¶¶ 108-111.) In its resignation letter, RSM indicated that SBB management had misled RSM about (a) the nature (and basis) of its valuation model, (b) its use of different performance figures for existing and prospective investors, and (c) the SEC's deficiency letter. (*Id.* ¶ 110-11.)

RSM's role in this case is narrow. SBB has advised the SEC that it may assert reliance on RSM's advice in using its valuation Model for the option portion of its structured notes. In that case, all that would matter is: (a) any advice RSM gave SBB regarding the creation and use of the Model, and (b) the information SBB disclosed to RSM about the Model and the SEC's examination (which relates to whether SBB gave RSM accurate information when requesting the purported advice). That second item also is relevant to the SEC's claim that SBB misled its auditor as part of its fraudulent scheme. Aside from those communications, RSM's other documents are not relevant. Nevertheless, in an abundance of caution, the SEC has produced <u>all</u> documents that it gathered from

RSM as part of this case – over 9,400 documents related to its audits of SBB's Funds and over 2,700 pages of testimony from 10 RSM witnesses who worked on the SBB audits.

Despite that production, SBB tries to muddy discovery in this case by asking the SEC for settlement communications with RSM, including communications from the SEC's settlement of an entirely separate matter relating to RSM's audit work for a different client: Madison Capital Energy Income Fund I, LLP (the "MadCap Case"). [2] Critically, the MadCap Case has no relation to this case. The MadCap Case involved audits (a) of a different RSM client (with no relation to SBB), (b) over a different time period, (c) conducted by different RSM audit staff, and (d) investigated by different SEC investigative staff. The investigation culminated in an enforcement action involving different factual allegations and alleged violations of different GAAP provisions. It did not involve an option valuation model or structured notes.

At the outset, the orders and consents which compose the SEC's settlement with RSM are public. If SBB wants to know the terms of the SEC's settlements with RSM – including the contours of any cooperation clause language – the terms are available for all to see. If SBB wants to explore potential bias of RSM witnesses, "the best evidence of bias in a cooperator's testimony comes from the actual agreement he struck with the SEC" not from the negotiations that led to the agreement. *See SEC v. Gupta*, 2012 WL 1592525, *1 (S.D.N.Y. May 1, 2012) (denying motion to compel documents concerning settlement negotiations between the SEC and cooperating witnesses).

---

[2] Originally, SBB's document requests asked for all documents related to the MadCap case. SBB has since withdrawn its discovery requests except as it relates to the settlement of that unrelated case.

In addition, communications related to the SEC's charging and settlement decisions are not relevant to this case. By its very nature, the SEC's settlement decisions regarding defendants in other, unrelated cases are completely irrelevant to the claims and defenses in this case. Their only purpose would be to create an inadmissible distraction.

In fact, the SEC's charging and settlement decisions in this case are irrelevant to the question whether SBB violated federal securities law. Indeed, a jury would have no role in evaluating the SEC's investigation or decisions regarding who to charge and who to settle with. *See SEC v. True N. Fin. Corp.*, 10-cv-3995, Dkt. #323, at 7 (D. Minn. 2013) (granting the SEC's *in limine* and holding that "evidence as to Plaintiff's so-called charging decision shall be presumptively inadmissible" because the evidence "does not survive the Court's Rule 104 and Rule 403 analysis"); *see also U.S. v. Armstrong*, 517 U.S. 456, 463-64 (1996) ("[t]he presumption of regularity" supports prosecutorial decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties"); *SEC v. Tiffany Indus., Inc.*, 535 F. Supp. 1167, 1168 (D. Mo. 1982) ("[A]gencies engaged in prosecutorial or enforcement activities are provided a wide discretion on when to file charges and against whom the charges should be instituted.").

Even if there were some limited evidentiary value in these settlement materials, the value of any discovery would be far outweighed by the strong public policy of encouraging full and frank discussions to settle disputes before this Court. *See Gupta*, 2012 WL 1592525 at *1 (in denying motion to compel production of settlement materials, holding that "any limited probative value these negotiations may have is substantially outweighed by the policy concern in protecting against unnecessary intrusions into the bargaining table"); *see also Washtenaw County Emp. Ret. Sys. v. Walgreen Co.*, 2019 WL 6108220 *4 (N.D. Ill. Nov.

11

15, 2019) (denying motion to compel production of settlement materials on proportionality grounds in light of the limited evidentiary value and the strong policy of encouraging out-of-court settlements embodied in Fed. R. Evid. 408).

Straining to describe the relevance of these settlement materials, Defendants suggest that the SEC's settlement of the unrelated MadCap action may have involved some sort of *quid pro quo*. (Ex. C at 2-3.) While it is unclear what the precise nature of this theory is, SBB appears to suggest that the SEC staff assigned to the MadCap Case cut a deal with RSM in exchange for RSM's resignation as SBB's auditor in this case.[3] (See *id*.) SBB's sole basis for such a serious accusation is that the RSM action settled at roughly the same time as the SEC informed RSM that it was bringing an enforcement action against it in this case. (*Id.* at p.6.) In short, Defendants hope that, if they are allowed to probe into the SEC's settlements with RSM they might find something helpful. This is exactly the sort of unfounded and speculative "fishing expedition" that courts routinely reject. *See City of South Bend*, 2017 WL 9856736 at *2 (holding that "[t]he 'you never know what you could find' argument presented by the [p]laintiffs is the very definition of an improper fishing expedition").

C.  **Other Exams Involving Valuation Issues (SBB's Document Request #32)**:

In perhaps its most audacious request, SBB asks that the SEC produce all closing letters, responses, and correspondence related to any SEC exam over the past eleven years that relate in any way to "the valuation of structured notes; and the application of ASC 820 and/or FAS 157." (Ex. A at Req. #32.) The request is incredibly broad. The SEC oversees

---

[3] Defendants' theory of collusion appears to be intentionally vague, and designed to avoid making any direct accusation that Defendants are not prepared to support.

28,000 registered entities – all subject to periodic examination (or examination for cause). It has conducted approximately 9,000 examinations in the past three years alone.[4] SBB asks that the SEC search through thousands of exams, and produce documents from the ones that the SEC believes have any relationship to the valuation of structured notes or ASC 820. This request is disproportionate for the same reasons as Interrogatory #2 (see above p. 5-9) except that this request is even more burdensome. Using the same rosy estimate for exhuming old files – 15 minutes per exam – it would take at least 2,250 attorney hours to produce the requested information for just the past three years. Assuming such efficiency, an attorney working 24 hours a day without rest or food breaks would take over three months to satisfy less than a third of SBB's request. This is facially disproportionate to the needs of this case.

D. **All SEC Documents and Public Statements Related to the Valuation of Level 3 Assets (SBB Document Request #33)**:

In its Document Request No. 33, SBB delivers another irreparably broad demand. SBB asks for all documents that the SEC possesses related to the valuation of Level 3 assets, including (but not limited to) any public statements by any of the SEC's current or former employees over the past seven years.[5] For reference, the SEC has over 4,500 current employees in its D.C. headquarters and 11 regional offices. That does not include the untold

---

[4] *See* SEC 2020 SEC Agency Financial Report, www.sec.gov/files/sec-2020-agency-financial-report_1.pdf#chairmessage, at p. 19, Nov. 12, 2020 (2,950 examinations); 2019 SEC Agency Financial Report, www.sec.gov/files/sec-2019-agency-financial-report.pdf#mission, at p. 15, Nov. 13, 2019 (3,075 examinations); 2018 SEC Agency Financial Report, www.sec.gov/files/sec-2018-agency-financial-report.pdf#mission, at p. 17 (Nov. 13, 2018) (3,150 examinations).

[5] Initially, SBB's request was even broader. SBB requested all documents and all responsive communications by SEC employees (without distinguishing between internal and external communications). (Ex. A at Req. #33.) SBB has since "limited" its request for communications to all responsive public statements by any SEC employee over the past seven years. (Ex. C at p. 5.)

number of people who have left the SEC over the past seven years. SBB effectively asks every SEC employee to (a) stop what they're doing, (b) review every matter they've worked on over the past seven years regardless of its relevance to the instant case, (c) see if they have any documents related to the valuation of Level 3 assets (or if they have made any responsive public statements), and then, presumably, (d) deliver any responsive documents to the SEC's counsel in this case so they can be reviewed and either produced or withheld as privileged. It is impossible to estimate the number of hours such a review would take or the impact on SEC operations such a broad search would have.

SBB asks the SEC to engage in this facially overbroad search even though statements from SEC employees related to the valuation of Level 3 assets are completely irrelevant to the claims and defenses of this case. Defendants have not alleged that they relied on any public statements of SEC employees when they violated the fair value provisions of GAAP. To the contrary, SBB's employees have made clear that they did not even consider GAAP when developing their valuation model. (See Ex. B at Int. #5.) And, the Defendants have not pointed to – and the SEC cannot find – any authority to support the notion that out-of-court public statements by individual SEC employees would somehow bind the five-member Commission in making legal or factual arguments in this matter.

All that said, Defendant SBB is not without resources on this subject. When the SEC issues a formal release interpreting a regulation – or a ruling on an administrative action – the document is publicly available on widely used legal research tools (such as Westlaw or Lexis). Similarly, public speeches or Congressional testimony by SEC Commissioners are publicly available on the SEC's website https://www.sec.gov/page/news. Defendants have

just as much access to those documents as counsel for the SEC. But, the SEC should not be asked to dedicate its resources to such a sideshow.

## CONCLUSION

The SEC is not on trial in this case. The Defendants are. Discovery should, therefore, focus on the parties' claims and defenses in <u>this</u> case, rather than matters the SEC has examined, investigated, charged, or settled in the past. Defendants' disproportionate discovery tactics threaten to bog down this case in ancillary disputes over the details and significance of long-resolved SEC matters. Accordingly, the SEC respectfully requests that the Court enter a protective order precluding Defendants from pursuing the aforementioned discovery, and relieving the SEC from having to respond to the discovery requests identified in this motion.

Respectfully Submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Dated: July 2, 2021

By: ***/s/ Timothy S. Leiman***
Timothy S. Leiman (Leimant@sec.gov)
Robert M. Moye
Kevin A. Wisniewski
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for Plaintiff*