UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : : |
| Plaintiff, | : : |
| v. | : Case No. 19-cv-6473 : |
| SBB RESEARCH GROUP, LLC, et al., | : Judge Sharon Johnson Coleman : : Magistrate Judge Sheila Finnegan |
| Defendants. | : : |

**PLAINTIFF SEC'S RESPONSE TO SUPPLEMENTAL MOTION TO COMPEL**

The Defendants do not attack the SEC's assertions of deliberative process privilege with a scalpel. They single out very few documents and even concede that "the bulk" of the SEC's privilege log entries describe deliberative materials. (Def. Br. at 6.) Instead, Defendants approach the deliberative process privilege with a chainsaw. They effectively argue that the privilege is a nullity when the SEC decides to bring a civil enforcement action. In their view, the SEC is trapped in a Catch-22. If the SEC's internal, deliberative materials are consistent with its decision to sue, then the materials are no longer privileged because they are not "pre-decisional." (Def. at 5.) But, if the materials are inconsistent with the decision to litigate, then the documents "necessarily must reveal some discord … among the SEC staff" and must be produced because the Defendants' need for the documents outweighs the privilege. (Def. Br. at 2.) In other words, once the SEC brings an enforcement action, the deliberative process privilege disappears.

Of course, that is not the rule. Government agencies do not surrender the deliberative process privilege by bringing suit. *See, e.g., U.S. v. Farley*, 11 F.3d 1385, 1389-90

1

(7th Cir. 1993). Nor have the Defendants fulfilled their burden of establishing a particularized need for the SEC's internal deliberative documents that would warrant overriding the privilege.

The materials from the SEC's compliance examination of SBB are <u>precisely</u> the sort of documents that are protected by the deliberative process privilege. They clearly relate to – and predate – the SEC's ultimate decision to charge SBB and its officers with securities fraud. They include, among other things: (1) drafts of a deficiency letter to SBB; (2) communications among SEC exam staff analyzing facts to determine if SBB's valuation Model complied with GAAP and/or violated federal securities law; (3) notes from internal SEC meetings discussing the examiners' findings; (4) internal analyses of valuation data; and (5) drafts of the exam staff's non-public memorandum referring the SBB matter to the Division of Enforcement for further investigation.

SEC staff must be able to conduct full and frank deliberations while pursuing potential violations of federal securities law. Staff should feel free to ask difficult questions, view the facts from different angles, and challenge other team members from time to time. Defendants' wholesale attack on the deliberative process privilege would turn every candid conversation among SEC staff into fodder for discovery, and would spark needless sideshow mini-trials of the underlying SEC exam and investigation. Defendants' extreme interpretation of the deliberative process privilege should be rejected. It runs directly afoul of Seventh Circuit precedent and the longstanding principle that candid deliberation among

agency staff enhances the quality of governmental decision-making. Defendants' Motion to Compel should be denied.[1]

I. **Background: The Role of the SEC's Compliance Examiners**

The SEC's compliance examiners are frontline inspectors tasked with determining whether registered investment advisers – like SBB – are complying with federal securities law. In that effort, they gather facts from the registrant and third parties, conduct on-site witness interviews, and analyze the registrant's financial data. If, as here, the exam staff believes that a potential violation is serious enough to warrant enforcement action, it may refer the matter to the SEC's Division of Enforcement. In short, in cases like this, the exam staff's deliberations are a critical part of the SEC's decision-making process regarding whether to bring civil enforcement actions against parties like SBB.

Defendants would have the Court believe that the SEC's case-in-chief hinges on opinion testimony from its examiners regarding SBB's Model for valuing the option component of its derivative investments. Defendants act as if the SEC already has designated its examiners as expert witnesses. That is not the case. At this stage, the SEC's exam staff are percipient fact witnesses. If called, they would testify about what they saw at SBB, heard from SBB, and said to SBB during the exam. To understand the exam staff's role in this case – and the relevance of their testimony – it is important to revisit the actual allegations in the SEC's Complaint.

The SEC's Complaint did not put "at issue" -- or even refer to – the exam staff's internal deliberations or inspection process. Rather, the Complaint refers to the SBB exam

---

[1] Defendants' original Motion to Compel (Dkt. #69) sought production of information related to: (a) factually unrelated SEC exams, and (b) the SEC's settlement of claims against SBB's auditor. To avoid duplicative briefing, the SEC refers the Court to its arguments on those subjects in the SEC's Motion for Protective Order (Dkt. #71) and related Reply Brief (Dkt. #87).

to evidence that (1) the SEC placed SBB on notice of concerns regarding specific Model inputs, and (2) SBB's extraordinary reaction to the exam staff's inquiry. (Dkt. #1 at ¶¶ 63-77.) During the exam, SBB did not challenge the exam staff's conclusions. It did not argue that it considered GAAP when creating the Model, or identify any research to support the allegedly defective Model inputs. Instead, as alleged in the Complaint, SBB told the exam staff that it would change the Model – and then failed to make the changes it promised. (Dkt. #1 at ¶¶ 64-66.) SBB also told examiners that they would retain consultants to suggest changes to the Model (while, in reality, SBB was fruitlessly seeking a consultant to validate the Model). (*Id.* at ¶¶ 65, 67.) When SBB notified the exam staff that it had overcharged investors more than $1 million in management fees due to inflated investment valuations, SBB secretly refunded that amount without disclosing to investors that the refund (a) represented overcharged fees and (b) sprung from an SEC exam of SBB's operations. (*Id.* at ¶¶ 82-83.) Finally, SBB lied to its auditor to hide the examiners' deficiency letter and avoid further scrutiny of its accounting practices. (*Id.* at ¶¶ 70-72.)

All of those facts are relevant to Defendants' scienter. Taken together, they tend to show that SBB reacted to the SEC's exam by engaging in a cover-up. All of the SEC's allegations about the compliance examination relate to what the examiners said, saw, and heard during the exam. Such fact testimony does not put the underlying exam or the exam staff's internal deliberations "at issue." Rather, the question of whether the SEC's allegations regarding the Model's deficiencies are correct is a subject for other evidence,

4

including the testimony of expert witnesses coupled with SBB's repeated admissions that it did not take GAAP into account when constructing the Model.[2]

> II. **The Deliberative Process Privilege Protects the Documents the SEC Has Withheld**

"The deliberative process privilege protects communications that are part of the decision-making process of a government agency." *Farley*, 11 F.3d at 1389. As the Supreme Court has held, the privilege is "rooted in the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The privilege is not limited to an agency's policy decisions. It extends to the decision at issue here: the SEC's decision to sue a defendant. *See, e.g., Farley*, 11 F.3d at 1389; *U.S. v. Smith*, 2020 WL 4934990, *4-*6 (N.D. Ill. Aug. 23, 2020) (deliberative process privilege applies to analysis performed by CFTC's retained expert -- and related communications -- because those documents relate to the CFTC's decision to sue the defendant).

As this Court has recognized, the deliberative process privilege covers a wide variety of materials, including recommendations, draft documents, proposals, suggestions and analysis, and other documents that reflect the opinions of the writer rather than the ultimate decision of the agency. *See SEC v. Sentinel Mgmt. Grp.*, 2010 WL 4977220, *3 (N.D. Ill. Dec. 2, 2010). Courts have held that the privilege protects precisely the types of examination and investigative materials at issue here, including: (a) statistical analyses and reports, *EEOC v. Dolgencorp, LLC*, 2015 WL 13650774, *2 (N.D. Ill. May 26, 2015); (b) internal

---

[2] As indicated previously (Dkt. #71 at 6), the SEC may also offer opinion testimony from one or more examiners under Rule 702 of the Federal Rules of Evidence. If the SEC decides to do so, it will (a) identify those witnesses on the schedule ordered by the Court or as provided in FRCP 26(a)(2)(D)(1), (b) provide the disclosures required by FRCP 26(a)(2)(C), and (c) produce the examiners for deposition pursuant to FRCP 26(b)(4).

communications and notes related to field examination work, *U.S. v. Electro-Voice, Inc.*, 879 F.Supp. 919, 923-24 (N.D. Ind. 1995); and (c) draft (and final) memoranda referring a matter for further enforcement activity, *Farley*, 11 F.3d at 1389.

### III.     The Documents At Issue

Reading Defendants' brief, one would think that the SEC asserted a blanket privilege over all of its internal exam documents. That is not the case. Instead, the SEC followed this Court's decision in *SEC v. Sentinel*. It has collected thousands of documents from the SEC's internal systems and from each member of the exam staff who worked on the SBB matter. SEC counsel then reviewed each of the thousands of documents from the exam staff's internal records for responsiveness and privilege. The SEC logged each privileged document, and produced the rest. The SEC has given each e-mail, attachment, memo, and draft its own evaluation and, when appropriate, its own log entry. Notably, the SEC has produced all source material that composes the underlying facts of the examination. Among other things, the SEC has produced:

- All communications between the SEC's exam staff and other parties, including letters notifying SBB of the deficiencies in SBB's valuation Model;

- All documents the SEC exam staff gathered from third parties, including all documents obtained from SBB's auditor;

- Over 2,000 pages of non-privileged communications among the SEC exam staff and non-privileged attachments to examiners' internal communications;

- Extensive narrative responses to SBB's contention interrogatories specifying the SEC's views regarding why SBB's Model was deficient;

- Extensive handwritten notes taken during the exam staff's field work at SBB and RSM, including all handwritten notes from the exam staff's interviews of SBB personnel; and

- Unredacted examiner notes of phone calls between SBB personnel and the exam staff (including the SEC's internal valuation specialist).

6

In short, the SEC has produced <u>all</u> of the facts that served as the basis for (1) the exam staff's preliminary findings, and (2) its referral of the SBB matter to the Division of Enforcement.

The SEC has <u>withheld</u> only deliberative materials, including (a) communications among the SEC exam staff involving analysis of facts and discussion of potential regulatory and accounting issues, (b) drafts of the SEC's deficiency letter to SBB and the internal referral memo to the Division of Enforcement, (c) internal analysis of financial data, and (d) consultations with the SEC's internal valuation specialists to evaluate whether SBB's valuation Model complied with GAAP. These are the sort of materials that the deliberative process privilege was designed to protect.[3]

### IV. <u>The Withheld Documents are "Pre-Decisional"</u>:

Unlike some cases involving the deliberative process privilege, this case does not involve the adoption of agency "policy." Rather, the SEC's privilege claims focus on its September 2019 decision to bring civil fraud charges against the Defendants. The SEC's examiners looked into SBB's conduct, found potential violations of federal securities law, and referred the matter to the Division of Enforcement for investigation. Then, based on the work performed by its staff, the SEC decided to file this civil injunctive action. The

---

[3] Defendants complain that the SEC's privilege assertion is too broad because its log lists 448 documents – while the privilege log in *Sentinel* listed only 18. (Def. Br. at 8.) However, Defendants fail to mention <u>why</u> the SEC's log is so extensive. SBB has propounded an extremely broad document request: they asked for "all documents" related in any way to the SEC's two-year examination of SBB. (Dkt. #71-1, Req. 31.) Thus far, Defendants have repeatedly confirmed that their request has no reasonable bounds. For example, they have recently complained to SEC counsel about the fact that the SEC has not searched the confidential personnel files of every compliance examiner involved in the SEC exam. This, even though they have not alleged or presented any evidence that the examiners' investigation was deficient or inappropriate in any respect.

documents on the SEC's privilege log predate – and are part of the process that led to – the SEC's decision to sue. In other words, the documents are "pre-decisional."

Defendants' attack on the deliberative process privilege starts small. They single out two documents as not being "pre-decisional." (Def. Br. at 5.) One document (entry #50) involves examiner comments on Defendant Barnett's media interviews. The other (entry #425), relates to the SEC's allocation of resources for its exams of quantitative firms and includes a one-sentence aside from an examiner opining about two minor changes to the SBB Model in 2014. Both documents are arguably non-responsive (as neither relates to the issues at the heart of this case). In any event, the SEC believes an examiner's candid comments related to a registrant's public interviews -- and an internal communication related to the SEC's process of allocating exam resources -- should remain privileged. Perhaps realizing that these two examples do not reflect larger issues with the SEC's log, Defendants candidly admit that the log entries for "[t]he bulk of the documents withheld" reflect the examiners' analysis of GAAP, SBB's valuation methods in light of GAAP, analysis of SBB's Model, and assessment of potential securities law violations. (Def. Br. 6.) In other words, even the Defendants grudgingly concede that the log describes core deliberative materials.

Faced with that reality, Defendants pivot to an extraordinary argument that would effectively eliminate the deliberative process privilege in the litigation context. They argue that because the SEC decided to sue SBB and its officers for fraud, any internal deliberative materials that are consistent with that decision must be produced. (Def. Br. at 5.) In other words, by suing SBB, the SEC effectively waived the deliberative process privilege over the vast majority of its internal deliberations. That is incorrect.

8

In the Seventh Circuit, the deliberative process privilege applies to intra-agency communications that precede litigation even when the government is the plaintiff. *See, e.g., Farley*, 11 F.3d at 1389 (holding that documents related to referral memorandum from the FTC to DOJ are privileged because "the documents were clearly part of the deliberative process leading to the decision to sue"); *U.S. v. Menominee Tribal Ent.*, 2009 WL 637188, *1 (E.D. Wisc. Mar. 10, 2009) (holding that the privilege applies to notes from intra-agency meetings relating to the "problems and concerns" that underlie the agency's civil enforcement action); *see also O'Toole v. Perez*, 2016 WL 4975203, *5 (N.D. Ill. Sept. 9, 2016) (holding that a draft final agency decision from a division of the Department of Labor is privileged even though the documents were related to a litigation decision rather than a policy decision). The Defendants do not cite any authority supporting their contention that, when the SEC sues to enforce federal securities law, it waives privilege over any documents that dovetail with that decision.[4]

V. **The SEC Has Made the Required Threshold Showing That The Documents On Its Log Are Privileged**

The SEC has supported its claims of privilege with (a) an itemized privilege log, describing the nature of each document withheld (Dkt. #82-1), and (b) the Declaration of

---

[4] The Court's holding in *Sentinel* is not to the contrary. There, this Court faced a different question: whether the privilege applies to information from an exam that (a) was <u>completed</u> before the misconduct underlying the SEC's complaint and (b) did <u>not</u> result in an enforcement referral. *Sentinel*, 2010 WL 4977220 at *5. In other words, the exam was not pre-decisional because was no direct connection between the deliberations in the exam and the SEC's decision to sue. Here, by contrast, the SEC's deliberative process did not stop with the issuance of a deficiency letter. Instead, the SEC exam staff referred the matter to enforcement for investigation and its deliberations are inextricably part of the SEC's decision to sue SBB. *See Guzman v. City of Chicago*, 2011 WL 55979, *4 (N.D. Ill. Jan. 7, 2011) (upholding assertion of deliberative process privilege and denying motion to compel testimony from agency investigator regarding his preliminary summary report because the matter was then referred to the next level of supervision, the report was rendered before the agency reached its official position, and the facts from the agency's investigative file were produced).

the Secretary of the Securities and Exchange Commission, Vanessa A. Countryman (Dkt. #82-2). In her declaration, Secretary Countryman confirms that: (1) the SEC has delegated authority to its Assistant General Counsel to review the SEC's assertions of deliberative process privilege; (2) the SEC's privilege log identifies the withheld documents; (3) the withheld documents reflect intra-agency communications and documents related to the non-public examination of SBB; (4) the withheld documents reflect the exam staff's deliberations about how to conduct the examination, compliance issues that arose during the exam, and referral of those issues to the Division of Enforcement; and (5) producing those internal communications would hamper full and frank discussions among the exam staff during the SEC's decision making process. (Dkt. #82-2 ¶¶ 3-4.)

As discussed above, even the Defendants acknowledge that "the bulk" of the SEC's privilege log describes deliberative materials. (Def. Br. at 5.) So, the Defendants turn their focus to the supporting declaration from the Office of the Secretary, complaining that Secretary Countryman is "at least one step removed" from the Assistant General Counsel who reviewed each of the documents on the SEC's privilege log. (*Id.* at 8-9.) To the extent that the Defendants suggest that the testifying department head must be the same person who reviews thousands of emails and makes the privilege determination as to each one, the Defendants do not cite – and the SEC cannot find – any authority for that proposition.[5]

---

[5] To the contrary, the declaration submitted by the SEC is identical in form and language to the one this Court deemed sufficient in *Sentinel*. *See Sentinel*, 2010 WL 4977220 at *4 (holding that a substantively identical declaration from the SEC's Office of the Secretary – relying on an identical delegation of authority to an Associate General Counsel – "substantially complies with the procedural requirements in this district … and is, therefore, sufficient to assert the [deliberative process] privilege").

10

### VI. Defendants' Purported Need For The SEC's Internal Communications Does Not Override the Deliberative Process Privilege

Because the SEC has fulfilled the threshold requirements for asserting the deliberative process privilege, it may withhold the documents on its log unless the Defendants can establish a particularized need for the documents that outweighs the SEC's need for confidentiality. *See Sentinel*, 2010 WL 4977220 at *4. Defendants have failed to fulfill that burden.

Defendants' primary argument is that they need the exam staff's internal deliberations because those deliberations are "centrally relevant to the SEC's charges." (Def. Br. at 10). Defendants claim that, by asking examiners to testify about what they saw, heard, and said during the exam, the SEC has unwittingly put the examiners non-public deliberative communications "at issue." (Def. Br. at 9-10.) Not so. As detailed above, the SEC's internal deliberations -- as opposed to the examiners actual observations -- simply are not relevant to the SEC's claims.[6] (*supra* pp. 3-5.) In fact, courts routinely hold that the internal deliberations of agency personnel are <u>not</u> relevant to the ultimate issue of whether a defendant's conduct violated the law. *See, e.g., Farley*, 11 F.3d at 1390 (holding that defendants failed to demonstrate a particularized need for documents from an underlying FTC investigation because "the suppositions of FTC staff members expressed in internal memoranda … are not pertinent to the task" of determining whether defendant's conduct

---

[6] The SEC's examination of SBB also is not relevant to the Defendants' primary "affirmative defense" – that SBB relied on the advice of professionals when it created and applied its valuation Model. That "advice of professionals defense" hinges on whether SBB (a) made a complete and truthful disclosure of relevant facts to the professional when it sought advice, (b) sought advice as to whether its Model complied with GAAP, (c) received professional advice about whether the Model complied with GAAP, and (d) relied on that advice in good faith. *See, e.g., SEC v. Ferrone*, 2016 WL 723017, *13 (N.D. Ill. Feb. 22, 2016). The inner workings of the SBB exam are completely irrelevant to the elements of that defense.

11

violated the law); *Menominee Tribal Ent.*, 2009 WL 637188 at *2 (holding that defendant's purported need for intra-agency communications regarding the issues underlying the suit do not outweigh the deliberative process privilege because such communications "are not government 'admissions' … and the impressions of the government actors are not binding or dispositive of any of the issues in this case"); *SEC v. Nacchio*, 2009 WL 211511, *12-*13 (D. Colo. Jan. 29, 2009) ("I fail to see how the personal opinions held by individual [SEC] staff members would be relevant to the claims in this case, particularly if those opinions could not be attributed to the Commission itself or were never communicated to anyone outside the confines of the Commission"); *EEOC v. St. Michael Hosp. of Franciscan Sisters*, 1997 WL 665757, *2 (E.D. Wisc. Sept. 26, 1997).

The court's holding in *St. Michael Hospital* is instructive. There, the defendants sought documents related to underlying EEOC deliberations, hoping to show that the EEOC's investigation of two of its claims was inadequate. *St. Michael Hosp.*, 1997 WL 665757 at *2. The court refused to override the privilege, noting that the EEOC's initial determination:

> "serves as notice to an employer of the EEOC's findings. It is not an adjudication of a claim … the [defendant] may not litigate, as a preliminary matter, the reasonableness of the EEOC's determination, as this would end-run the purpose of the litigation: to ascertain whether the defendant actually violated Title VII … [Defendant] is free to challenge the EEOC's contention that [defendant] violated the law – by meeting the EEOC's proof – but not by attempting to undermine the EEOC's administrative determination."

*Id.* The same is true here.

Even if the Court deems these documents relevant, "relevance alone is an insufficient reason for breaching the deliberative process privilege." *Farley*, 11 F3d at 1390. Courts also weigh the defendant's access to the underlying facts of the case. Critically, Defendants already have all of the factual source material underlying the exam. They have all

documents that the SEC exam staff obtained from third parties, all handwritten notes from the exam staff's interviews during fieldwork at SBB and RSM, and typewritten summaries of phone calls between the SEC and SBB regarding valuation issues. They even have extensive narrative interrogatory responses regarding the factual basis for the SEC's claim that SBB's valuation Model did not comply with GAAP. And, they will be able to depose the examiners about what they observed during the exam. In short, Defendants have everything they need to challenge the SEC's allegations in this case. Any incremental "need" for the SEC's internal deliberative materials does not outweigh the SEC's need to conduct frank, confidential inquiries into potential violations of federal securities law. *See, e.g., EEOC v. Continental Airlines, Inc.*, 395 F.Supp.2d 738, 741-42 (N.D. Ill. 2005) (defendants failed to demonstrate a particularized need for privileged documents related to the EEOC's underlying investigative report because the EEOC already had produced the underlying facts of the case, including its notes from witness interviews); *Rodriguez v. City of Chicago*, 2019 WL 3562683, *7 (N.D. Ill. Aug. 1, 2019) (same).

Defendants also argue that the SEC's privilege assertions must give way because the SEC's claims could affect their reputations and careers. (Def. Br. at 13.) But, a defendant in any regulatory enforcement action – indeed, in most civil fraud cases – could make the same claim. That potential reputational impact is not enough to invalidate the deliberative process privilege. If it were, the privilege would cease to exist in the litigation context.

Finally, Defendants argue that the chilling effect on internal deliberations at the SEC can be remedied through use of a protective order. But, that does not solve the problem. As the Supreme Court has recognized, agency staff are unlikely to engage in full and frank deliberations if every opinion, factual analysis, or internal communication becomes fodder

for discovery in a subsequent enforcement action. *See, e.g., U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (noting that it is "obvious" that agency officials will not communicate candidly if each remark is a potential item of discovery).

**VII.    The SEC's Assertions Of The Attorney-Client Privilege And Attorney Work Product Are Appropriate**:

The SEC exam staff includes Attorney-Advisers tasked with providing advice about legal issues that arise during an exam and to help oversee any referrals to enforcement. In this case, the Attorney-Adviser for the SEC was Erik Lillya.[7] Contrary to Defendants' brief (Def. Br. at 14), the SEC did not withhold communications on the basis of attorney-client privilege just because Mr. Lillya received a copy. Not every communication with Mr. Lillya involved legal advice and so not every communication was labelled with the attorney-client privilege. (*E.g.*, Dkt. #82-2, entries #4, 10, 50, 71, 138, 141 among others.)

As Defendant's brief suggests, the overwhelming majority of documents withheld on the basis of attorney-client privilege and attorney work-product involve an internal memorandum – and related communications -- regarding the Division of Examinations' referral of the SBB matter to the Division of Enforcement for investigation and potential enforcement action. To evaluate the privilege, it is important to understand what the referral memo is. The memo does not just <u>reflect</u> legal advice. It <u>is</u> legal advice.

The SEC's referral memo constitutes a recommendation from counsel for the Division of Examinations to counsel from the Division of Enforcement describing the legal and factual basis for their client (the SEC) to bring an enforcement action against SBB. It was drafted in close consultation with Mr. Lillya, contains counsel's opinions and

---

[7] On occasion, legal advice also was provided by the Associate Regional Director assigned to the exam, Steven Levine, who, in addition to supervising the exam, served as a point of contact for enforcement counsel during the referral process.

impressions in anticipation of enforcement action by the SEC, was circulated to various staff members for their input, and then was relayed to enforcement counsel. The final memo, drafts, and related attorney communications are classic attorney work product and attorney-client privilege material. *See, e.g., SEC v. Merkin*, 2012 WL 2568158, *2 (S.D. Fla. June 29, 2012) (holding that internal memo from SEC counsel recommending enforcement action is subject to attorney-client privilege and work product doctrine); *SEC v. Somers*, 2013 WL 4045295, *2 (W.D. Ken. Aug. 8, 2013) (same).

Defendants provide no basis for invading the SEC's attorney-client privilege. They merely repeat that they should obtain the privileged documents because they need them. (Def. Br. at 15.) As shown above, that justification is not enough because (a) Defendants already have all of the factual source material underlying the SEC's exam and subsequent enforcement investigation, and (b) counsel's deliberations and opinions regarding the referral are not relevant to the claims and defenses in this case.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Compel should be denied.

Respectfully Submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Dated: September 3, 2021  By: */s/ Timothy S. Leiman*
Timothy S. Leiman (Leimant@sec.gov)
Robert M. Moye
Kevin A. Wisniewski
Devlin N. Su
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for the Plaintiff*

*United States Securities and Exchange Commission*

## **CERTIFICATE OF SERVICE**

I hereby certify that that I have served a copy of the foregoing document on counsel of record by filing it with the Court's ECF system.

Dated: September 3, 2021                 */s/ Timothy S. Leiman*

                                                       Timothy S. Leiman