**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) ) | **No. 19 C 6473** |
| **SBB RESEARCH GROUP, LLC, et al.,** | ) ) ) | **Judge Sharon Johnson Coleman Magistrate Judge Sheila Finnegan** |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The Securities and Exchange Commission ("SEC") filed this action against SBB Research Group, LLC ("SBB"), Samuel B. Barnett, and Matthew Lawrence Aven (collectively, "Defendants"), alleging securities fraud and other claims. In responding to discovery, the SEC withheld certain documents based on the deliberative process privilege, the attorney-client privilege, and the work product doctrine. Defendants eventually filed a Motion to Compel Production of Documents and Interrogatory Responses (Doc. 69), seeking to compel most of the withheld documents, and raising other discovery disputes as well. Multiple meet-and-confer sessions followed. While the SEC ultimately produced additional documents from the privilege log, it also clawed back a small number. After further briefing, the Court held a hearing on February 10, 2022, and later examined the documents *in camera*. For reasons set forth here, the Court now orders the SEC to produce a small number of withheld documents in

redacted form but finds the remaining documents are protected by the deliberative process privilege.[1]

## BACKGROUND

As a registered investment advisor to several private investment funds (the "Funds"), SBB was subject to periodic compliance examinations by the SEC. These were conducted by examiners with the SEC's Office of Compliance Inspections and Examinations (also known as OCIE).[2] As the SEC explains it, these compliance examiners are "frontline inspectors tasked with determining whether registered investment advisers – like SBB – are complying with federal securities law." (Doc. 90, at 3). As part of the periodic exams, the compliance examiners "gather facts from the registrant and third parties, conduct on-site witness interviews, and analyze the registrant's financial data." (*Id.*). To the extent the exam staff "believes that a potential violation is serious enough to warrant enforcement action, it may refer the matter to the SEC's Division of Enforcement." (*Id.*).

That is what happened here. In October 2014, the SEC exam staff from OCIE began a compliance examination of SBB. In March 2016, SBB was issued a formal

---

[1]     On the same day the motion to compel was filed (Doc. 69), the SEC filed a Motion for Protective Order Regarding Unrelated Examinations, SEC Employee Statements, and Settlements with Other Defendants (Doc. 71). The parties' motions overlapped on some but not all issues. Following a hearing on these motions on February 10, 2022, the Court issued rulings from the bench the next day as to some issues raised in both. (Doc. 118). Those rulings resolved the SEC's motion (Doc. 71) entirely, leaving only the privilege issues in Defendants' motion (Doc. 69) for further consideration based on the Court's then ongoing *in camera* review. The briefing of the privilege issues is found in the following filings: Docs. 69, 88, 90, 92, 96, 101, 103, and 104. Record citations to these filings are drawn from the CM/ECF docket entries at the top of the filed documents unless unavailable.

[2]     The name was changed to the "Division of Examinations" on December 17, 2020. *See* https://www.sec.gov/news/public-statement/joint-statement-division-examinations (last visited July 28, 2022).

deficiency letter describing the findings.  Shortly thereafter, SBB was also referred to the Division of Enforcement for investigation and a potential enforcement action.  Following that investigation, the SEC made the decision to bring such an action, filing an eleven-count (37-page) complaint on September 30, 2019.  (Doc. 1).  In that complaint, the SEC alleges that Defendants violated a myriad of securities laws and regulations, and seeks a permanent restraining order and payment of civil monetary penalties.  (*Id.*).  Pertinent allegations are discussed later, but in summary, the SEC alleges that Defendants intentionally rigged SBB's valuation model to inflate the recorded value of the Funds' securities, allowing them to collect more in fees and create a false track record to market to prospective investors.  After this was detected during the SEC compliance examination, Defendants allegedly engaged in a cover-up by lying to exam staff, to their outside auditors ("RSM"), and to investors.

Discovery is ongoing.  According to the SEC, SBB propounded broad discovery relating to the compliance examination.  In responding, the SEC says it "collected thousands of documents from the SEC's internal systems and from each member of the exam staff who worked on the SBB matter." (Doc. 90, at 6).  After reviewing each of the documents for responsiveness and privilege, the SEC says it produced "all source material that composes the underlying facts of the examination" that resulted in the exam staff's preliminary findings and referral to the Division of Enforcement. (*Id.* at 6-7).  What the SEC withheld, it says, were only deliberative materials such as the exam staff's internal analysis, consultations with SEC internal valuation specialists, drafts of deficiency letters, and the internal referral memo to the Division of Enforcement. (*Id.* at 7).

Based on the privilege logs, the SEC has withheld approximately 465 documents (many of which are duplicates) under its assertion of the deliberative process privilege. As to a much smaller number of the documents, the SEC also invokes the attorney-client privilege and the attorney work product doctrine. Defendants seek to compel production of virtually all of the withheld documents.

## DISCUSSION

### I.    Deliberative Process Privilege

Generally, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). If a party withholds discovery based on a claim of privilege, that party bears the burden of establishing all the essential elements for the privilege. *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991); *Allendale Mut. Ins. Co. v. Bull Data Sys.*, 152 F.R.D. 132, 137 (N.D. Ill. 1993) (citations omitted). Since the SEC withheld almost all of the documents at issue based on the deliberative process privilege, the Court begins with that privilege claim.

### A.    Deliberative Process Privilege Overview

"The deliberative process privilege, as its name implies, allows an agency to withhold 'all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" *Nat'l Immigrant Just. Ctr. v. United States Dep't of Justice*, 953 F.3d 503, 508 (7th Cir. 2020) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975)). This privilege shields from disclosure "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are

4

formulated." *Sears*, 421 U.S. at 150-51; *see also United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993). The "object [of the privilege] is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001) (internal quotation marks and citations omitted). The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Id.* at 8-9.

The Seventh Circuit requires the government to make "a two-fold showing to support the withholding of a record based on the deliberative process privilege." *Nat'l Immigrant Just. Ctr.*, 953 F.3d at 508. "First, the document must be pre-decisional, meaning that it must be generated *before* the adoption of an agency policy. Second, the record in question must contain deliberative communications and therefore reflect the give-and-take of the consultative process." *Id.* (internal quotation marks and citations omitted). Even where these requirements are satisfied, the deliberative process privilege is not absolute. It "may be overcome where there is a sufficient showing of a particularized need [for disclosure] to outweigh the reasons for confidentiality." *Farley*, 11 F.3d at 1389. "If the government makes out a prima facie case for applying the privilege, then the burden shifts to the party seeking disclosure to establish a particularized need for the documents." *Holmes v. Hernandez,* 221 F. Supp. 3d 1011, 1016 (N.D. Ill. 2016) (internal quotations and citations omitted).

## B. Privilege Log and Declaration

For the government to demonstrate "the prima facie existence of the privilege, three things must happen: (1) the department head with control over the matter must

make a formal claim of privilege, after personal consideration of the problem; (2) the responsible official must demonstrate, typically by affidavit, precise and certain reasons for preserving the confidentiality of the documents in question; and (3) the official must specifically identify and describe the documents." *Id.* (*citing K.L. v. Edgar*, 964 F. Supp. 1206, 1209 (N.D. Ill. 1997)).

Here, the SEC has provided a declaration from the Secretary of the SEC, Vanessa Countryman (Doc. 82-2), along with a privilege log describing each document (Doc. 82-1).[3] Defendants find fault with both: "Because the SEC's revised log and Countryman Declaration fail to establish that the documents withheld are entirely deliberative, the documents should be produced, or at a minimum, submitted for *in camera* review." (Doc. 88, at 10). This Court need not reach arguments about the claimed insufficiency of the privilege log and declaration since an *in camera* review was undertaken. With very few exceptions, the review confirmed that the withheld documents qualify for protection under the deliberative process privilege absent a showing of a particularized need for them. In light of the Court's *in camera* review, there is no risk here that claimed inadequacies in the privilege log or declaration resulted in the SEC improperly shielding documents from discovery.[4]

---

[3]     The withheld documents are described in the latest version of the privilege log (Doc. 82-1), as well as a supplemental privilege log (Doc. 96-2).

[4]     In any event, the Court is not persuaded that either the privilege log or declaration (indicating the SEC delegated authority to assert the privilege to the Assistant General Counsel for Litigation, Administrative Practice and FOIA) is insufficient under the circumstances here. The Court did, however, detect a few apparent errors on the log (incorrect dates/author) and brought these to the attention of the parties. The SEC has now provided correct information.

### C. Predecisional and Deliberative Requirements

Defendants next argue that the SEC should be ordered to produce the withheld documents because they are not both predecisional and deliberative as required under the law.

### 1. Predecisional

Turning to the first requirement, Defendants assert that not "every so-called 'decision' or communication during the examination process [is] pre-decisional to the SEC's determination to commence an enforcement investigation merely because it temporally occurred prior to the determination."  (Doc. 88, at 6).  But as the word "predecisional" itself suggests, and the Seventh Circuit has made clear, the key question in assessing whether a document is predecisional is whether the deliberations reflected in that document occurred *before* the pertinent decision was made or policy adopted.  *Nat'l Immigrant Just. Ctr.,* 953 F.3d at 508 ("First, the document must be pre-decisional, meaning that it must be generated *before* the adoption of an agency policy."); *see also EEOC v. Cont'l Airlines, Inc.*, 395 F. Supp. 2d 738, 741 (N.D. Ill. 2005) ("The report was created before the EEOC made its decision to pursue its enforcement action against Continental, readily satisfying the predecisional prong of the deliberative process privilege test.").

In suggesting that deliberations reflected in the compliance examination documents may *not* be predecisional despite occurring prior to the SEC's decision to bring an enforcement action, Defendants quote from a clearly distinguishable case, *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 868 (D.C. Cir. 1981). There the court said "[c]haracterizing these documents as 'predecisional' simply

because they play into an ongoing audit process would be a serious warping of the meaning of the word. *No 'decision' is being made or 'policy' being considered*." *Id.* (emphasis added). In contrast, in the case at hand, the SEC made a definitive decision when it filed civil fraud charges against Defendants following the usual decision-making process that began with the compliance examination and led to the referral to the Enforcement Division. Under these facts and given the SEC process, the Court is satisfied that all of the withheld compliance examination documents qualify as predecisional, so may be withheld as long as they are also deliberative and there is not showing of a particularized need for them. *See Farley*, 11 F.3d at 1389 (holding that multiple categories of FTC investigation documents that led to Department of Justice referral were "clearly part of the deliberative process leading to the decision to sue" and "communications made prior to and as a part of an agency determination are protected from disclosure.").

Defendants next assert that even if withheld documents from the compliance exam were indeed predecisional, many of these documents (or portions of them) subsequently lost that status upon the issuance of a deficiency letter to SBB and the filing of the lawsuit, so must now be produced. More specifically, they argue:

> [O]nce the SEC adopts the position of its individual staff, it became the agency's position versus the writer's and is no longer predecisional. For example, if drafts of the examination team's March 21, 2016, July 22, 2016, or November 18, 2016 letters to SBB are consistent with the final letters sent to SBB, the drafts are no longer the examiners' pre-decision individual opinions, but rather are the agency's opinions that have been made public to SBB. [footnote omitted] Likewise once the agency adopted and publicly announced its position via the Complaint, *any prior consistent materials that reveal an individual's opinion are simply no longer protected by the deliberative process privilege.*

(Doc. 92, at 5-6) (emphasis added). Based on this theory, Defendants seek production of (among other materials), the referral letter to the Division of Enforcement, and documents (or portions of them) in draft or final form that reflect "examiners' analysis, assessment, impressions, or other opinions [that] are consistent with the agency's final conclusions." (Doc. 88, at 7).

As the SEC describes it, Defendants' position is that "because the SEC decided to sue SBB and its officers for fraud, any internal deliberative materials that are consistent with that decision must be produced." (Doc. 90, at 8). Acceptance of this "extraordinary" position, the SEC asserts, would "effectively eliminate the deliberative process privilege in the litigation context." (Doc. 90, at 8). This Court agrees and declines to order production of all deliberative compliance exam materials in any way "consistent" with the SEC's decision to sue or with its final conclusions as reflected in the 37-page complaint. Defendants provide no persuasive authority for this position, and adopting it would effectively require SEC employees to operate in a fishbowl in every compliance examination that leads to a referral and enforcement action. As the Seventh Circuit observed in *Farley* when it allowed the FTC to withhold the FTC's referral memorandum to the Department of Justice, certain draft documents, and FTC staff memoranda with recommendations and legal interpretations, these documents were "clearly part of the FTC's deliberations" and "[t]he deliberative process extends to these pre-decisional communications—if communications such as these were exposed the candor of government staff would be tempered 'with a concern for appearances * * *

to the detriment of the decisionmaking process.'"  11 F.3d at 1389 (citations omitted).
No exception was made in *Farley* for materials "consistent" with the decision to sue.[5]

Defendants were able to identify only one SEC case that they believe supports
their position: *S.E.C. v. Sentinel Management Group, Inc.,* No. 07 C 4684, 2010 WL
4977220, at *4 (N.D. Ill. Dec. 2, 2010) – a decision issued by this Court.  They argue
"the *Sentinel* court held, without qualification, that 'even if the document is predecisional
at the time it is prepared, it can lose that status if it is adopted, formally or informally, as
the agency position on an issue or is used by the agency in its dealings with the public.'
*Id.* [*Sentinel*] at *3, 5 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d
854, 866 (D.C. Cir. 1980))."  (Doc. 92, at 5).

To be sure, this Court in *Sentinel* quoted the above language from *Coastal
States* and, based on that language, directed the SEC to produce "those documents or
portions of documents that contain purely factual information or contain opinions or
recommendations that were ultimately adopted by the SEC as its final position with
respect to the 2002 examination of Sentinel."  2010 WL 4977229, at *5.  But the
defendants in *Sentinel* never advanced (and the parties never briefed) the argument
made by the SBB defendants here: that all compliance exam materials must be
produced upon the filing of an enforcement action if their content is in any way

---

[5]     During the February 10, 2022 hearing, the SEC observed that, if a referral is made to the
Division of Enforcement, one would logically expect the bulk of the investigatory deliberations
leading to that referral to be consistent with the later decision to file an enforcement action.
That is likely correct.  Of course, before a judgment could be rendered on whether entire
documents or portions of them were "consistent" with the SEC's position in the lawsuit as
reflected in the complaint's allegations, one would need to define that term (e.g., what if an
examiner's ultimate opinion is consistent but not the underlying reasons?).  Even then, some of
the judgments would be subject to debate.  And the SEC's analysis on why the valuation model
does not comply with GAAP will not be disclosed until expert discovery.

"consistent" with the SEC's position in that action. Rather, those defendants unsuccessfully argued that examination documents were not subject to the deliberative process privilege because they are not related to the process of formulating policy. *Id.* In addition, this Court never had occasion in *Sentinel* to rule on disputes over particular documents. This is because the opinion provided broad guidance on the deliberative process privilege, and a general directive for the SEC to reevaluate all the withheld documents in light of that guidance. While the parties were permitted to later raise arguments and seek rulings on particular documents if unable to reach agreement, they never did so.

For these reasons, the *Sentinel* case is lacking in detailed analysis and unhelpful in resolving the specific dispute at issue now. Instead, this Court examines the facts and analysis in the *Coastal States* case since it was the source of the key language quoted in *Sentinel* and now relied on by Defendants. There, a lower court ruled that certain "drafts, proposals and recommendations" withheld by the Department of Energy were deliberative and properly withheld. *Coastal States*, 617 F.2d at 860. But the agency *was* ordered to produce certain memoranda containing interpretations of regulations, and appealed that ruling. It asserted the memoranda were not "'formal' interpretations of the regulations" issued under a "published procedure," nor "binding" on the audit staff. *Id.* at 859. The appellate court rejected these arguments as "miss[ing] the point," remarking that "[t]he evidence strongly supports the district court's conclusion that, in fact, these opinions were routinely used by agency staff as guidance in conducting their audits, and were retained and referred to as precedent." *Id.* at 869. In light of this, the court reasoned that "the agency has promulgated a body of secret

law which it is actually applying in its dealings with the public but which it is attempting to protect behind a label. This we will not permit the agency to do." *Id.*

Significantly, it was in this narrow context that the *Coastal States* court then uttered the words that Defendants now rely on, stating, "even if [a] document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Id.* at 866. While the memoranda interpreting regulations had been predecisional when originally generated for use in particular audits, this changed over time because the memoranda were retained and applied as precedent in subsequent audits, becoming "analogous to trial court decisions" that were even "amended" or "rescinded." *Id.* at 860. As the court noted, this "would hardly be necessary if the documents contained merely informal suggestions to staff which could be disregarded." *Id*. Under these peculiar facts, the *Coastal States* court understandably found that with the passage of time, the agency had eventually (and informally) adopted the precedential positions in these memoranda as those of the agency, and so the memoranda ceased to be predecisional and needed to be produced to avoid the agency operating under a body of secret law.

In the pending case, the facts could not be more different from those in *Coastal States*. Here, the documents at issue were generated and used only in relation to the SBB compliance audit. These are not documents created years earlier in prior audits and then retained and used as precedent. And unlike the agency in *Coastal States* that never adopted any position on the topics addressed in the withheld documents (preferring to operate under a body of secret law by informally treating the memoranda

as precedent in other audits), the SEC in this case *did* adopt a public and formal position vis-à-vis Defendants when it filed the lengthy complaint with detailed allegations and claims. Thus, Defendants know exactly what the SEC's position is and need not probe for "consistent" opinions and statements of the exam staff to learn this.[6]

In conclusion, the analysis in *Coastal States* does not support Defendants' position that upon the SEC's filing of the complaint, every deliberative compliance exam document (or portion of a document) with content in any way "consistent" with the complaint allegations lost its predecisional status and so must be produced. To the extent the language in *Sentinel* can be read to support the position advanced by Defendants, this Court finds that its ruling in *Sentinel* was erroneous. Where the SEC has made the decision to file an enforcement action against a registered entity such as SBB, the SEC's position is set forth in the lawsuit. Absent a showing of a particularized need, the SEC is entitled to withhold deliberative documents from the compliance examination preceding the exam staff's referral to the Division of Enforcement and the SEC's filing of the lawsuit regardless of whether they are "consistent" with the SEC's position in the lawsuit. The Court therefore declines to order the wholesale production

---

[6]    In this regard, it is noteworthy too that the *Coastal States* court distinguished *Sears*, 421 U.S. 132, in which "memoranda directing the filing of a complaint were properly withheld [in part] by the reduced public interest in disclosure, since there would inevitably be a 'final' opinion which would set out the agency policy and law." *Coastal States*, 617 F.2d at 867. In contrast to the DOE memoranda interpreting regulations, the court said the memoranda initiating litigation in *Sears* "were not intended to guide and direct subordinates in analogous cases. That is, because they were not final agency action, they were not viewed as having precedential import and were not intended to have effect upon actions of others in the agency." *Id.*

of such materials on the ground that they lost their predecisional status and hence their protection under the deliberative process privilege.[7]

### 2. Deliberative

Defendants next argue that some of the withheld documents, even if predecisional, appear not to be deliberative, so must be produced in whole or part. As noted, the privilege is intended to protect documents that "reflect the personal opinions of the writer rather than the policy of the agency" (*Coastal States*, 617 F.2d at 866), "internal dialogue" about a proposed rule or decision (*Enviro Tech Int'l, Inc. v. EPA*, 371 F.3d at 375), and "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Sears*, 421 U.S. at 149.

In addition to drafts of the exam staff's deficiency letter to SBB, and the referral memo to the Division of Enforcement, the types of documents that the SEC withheld under the deliberative process privilege include: communications among the SEC exam staff involving analysis of facts and discussion of potential regulatory and accounting issues; internal analysis of financial data; and consultations with the SEC's internal valuation specialists to evaluate whether SBB's valuation Model complied with GAAP. (Doc. 90, at 7). Defendants acknowledge from their review of the privilege log that the "bulk" of the withheld documents reflect "the examiners' analysis, assessment, impressions, [and] other opinions" on accounting and valuation issues and potential securities fraud violations. (Doc. 88, at 7).

---

[7]     Defendants separately argue that two specific compliance exam documents appear not to be predecisional based on the privilege log descriptions. (Doc. 88, at 6, regarding log entries 50 and 425). The Court has examined both documents *in camera* and concludes that these documents were properly withheld.

Informed by its *in camera* review and the case law, the Court concludes that the documents of these types that the SEC withheld are "clearly part of the deliberative process leading to the decision to sue." *Farley*, 11 F.3d at 1389; *O'Toole v. Perez*, No. 14 C 2467, 2016 WL 4975203, at *5 (N.D. Ill. Sept. 16, 2016) (citing *Farley*, court finds draft final agency decision and associated emails related to a litigation action and implementation of an agency's law or policy are "precisely the type of documents that are protected under deliberative process privilege"); *Moye, O'Brien, O'Rourke, Hogan & Pickert v.Nat'l R.R. Passenger Corp*., 376 F.3d 1270, 1277-78 (11th Cir. 2004) (court holds agency's audit reports, internal memoranda, notes and work papers were protected under deliberative process privilege).

Defendants observe, however, that certain of the privilege log descriptions "indicate that the documents contain factual information that likely can be separated from any 'decisional' portion of the communication." (Doc. 88, at 8). It is well-settled that the deliberative process privilege does not shield purely factual material – only facts that are inextricably intertwined with deliberations. *Enviro Tech,* 371 F.3d at 374-75. Here, the SEC says it already has produced all of the facts that served as the basis for both the exam staff's preliminary findings and its referral to the Division of Enforcement. (Doc. 90 at 6-7). Sometimes this involved producing documents in redacted form where they contained both factual portions (visible) and deliberative portions (redacted), and the privilege log identified such documents. (*See, e.g.,* Doc. 82-1, log entries 40-43, 187-203, 205-13, 320-21, 338, 362-63, 365, 367-69, 371, 376, 378, and 380-81).

Nonetheless, based on the *in camera* review, the Court has determined that certain documents that were withheld in their entirety contain facts that are not

inextricably intertwined with the deliberative portions.  Therefore, the SEC must produce

these documents in redacted form with only the factual portions visible, as follows:

- Log entry 462 (3 pages entitled "SBBRG Post Exam – 11/5/2014"): This document was originally produced by the SEC but then clawed back. As discussed later, Defendants have now attached it as Exhibit D (sealed) to a filing in which they argue there is a particularized need for the deliberative portions. (Doc. 97-2; Bates number SEC_EPROD_0011702-03).  The SEC must produce the document but may redact the following portions: the entire third paragraph (starting with the words "Since the structured notes"); the last sentence of the fifth paragraph (starting with the words "While we don't find"); everything in the document that appears after the sentence in the sixth paragraph stating "They felt they would rather handle the allocations internally and have asserted there are additional benefits to do so."; and all the handwritten notes.

- Log entry 448 (3 pages):  This document is a duplicate copy of the one logged at entry 462 except the handwritten notes are different.  The document must be produced with the same redactions as entry 462 except that the SEC should not redact the handwritten notes that appear above the "Issues/Concerns" section of the document.[8]

- Log entry 403 (23 pages):  The first three pages are identical to the document logged as entry 462 so need not be addressed again. Regarding the remaining pages, the SEC must produce the pages bates numbered SEC-GilmanM-E-0000065-69 (entitled "Call with SBB Research Group to discuss their valuation model – 10/30/14 @ 1:30 cst."), as well as SEC-GilmanM-E-0000078-82, which is another version of the preceding document but with some redlined revisions.  On this version, however, the SEC may redact Comments c2 and c3 on the last page.

- Log entry 41:  If it has not done so already, the SEC must produce the email between SBB and Max Gillman on 5/20/2015 and Gillman's email to SBB on 5/12/2015.  The SEC may redact the top internal email from Gillman to Schuster on 5/20/2015.

- Log entry 138:  The SEC must produce the top half of the page bates numbered SEC-0000931 through the sentence that begins with the words "These older funds are composed…."  Words in the parenthetical after this may be redacted, as well as the entire next paragraph beginning

---

[8] There are many duplicate documents on the log, including this one, which is also logged at entry 316 and elsewhere.  In addition, the same document but without any handwritten notes is logged at entries 186 and 307.  If the SEC is ordered to produce a document, it need not produce other identical copies of that same document that are separately logged.

with the words "The structured products…." The rest of the document (starting with the words "No soft dollars") must be produced.

● Log entry 320: The SEC already has produced this 17-page document in redacted form with only factual portions visible. The Court has examined each redaction. The SEC must produce the redacted portion at the bottom of the page bates numbered SEC-0002262 beginning with the word "Need".

As for the remaining documents (or portions of them) that have been withheld, the Court concludes from the *in camera* review that they qualify as deliberative and so the SEC need not produce them absent a showing of particularized need. While each of the many log entries that Defendants have flagged (typically in cursory form based on log descriptions) will not be separately addressed, the argument related to entry 408 ("Internal communication discussing research and internal SEC guidance re fiduciary waivers") merits a brief discussion. As to that document, the Court disagrees with Defendants that the *Coastal States* case supports their argument that these email communications cannot be privileged because they "reflect or apply internal SEC guidance." (Doc. 88, at 8). *Coastal States* does not support that broad proposition. As discussed earlier, the case involved memoranda containing interpretations of regulations that were treated as precedent (akin to legal decisions) so guided agency staff in multiple audits over time and amounted to a body of secret law. The brief discussion of research and internal SEC guidance in this email is not remotely analogous.

**D.    Particularized Need**

While the Court has determined that most of the withheld documents are both predecisional and deliberative, the deliberative process privilege "may be overcome where there is a sufficient showing of a particularized need [for disclosure] to outweigh

17

the reasons for confidentiality." *Farley*, 11 F.3d at 1389. Defendants bear the burden of demonstrating a particularized need, *Holmes*, 221 F. Supp. 3d at 1016, and courts weigh multiple factors in assessing this, including: (1) the relevance of the documents; (2) the availability of other evidence; (3) the government's role in the litigation; (4) the seriousness of the litigation and the issues involved in it; and (5) the extent to which disclosure of the documents would tend to chill future deliberations. *See Tumas v. Board of Ed. of Lyons Twp. High Sch. Dist. No. 204*, 2007 WL 2228695, at *2 (N.D. Ill. July 31, 2007) (citing *Edgar*, 964 F. Supp. at 1209).

Since the SEC is the party withholding the documents as well as the party that initiated the lawsuit, factor 3 above weighs in favor of Defendants. *Holmes*, 221 F. Supp. 3d at 1021. As for factor 4, this Court agrees that Defendants face "serious allegations of fraud that could have substantial implications on [their] reputations and careers" (Doc. 83, at 8), so this factor also weighs in favor of production. The Court now turns to other factors and considerations.

### 1.    Arguments and Other Background

According to Defendants, the deliberative documents are relevant because the SEC will seek to prove scienter based on Defendants' alleged actions related to both the compliance examination and the RSM audits. They also argue that certain deliberative documents are relevant to their affirmative defense of reliance on the advice of professionals, namely, outside auditor RSM, in relation to the valuation model.[9] Before considering the specific arguments, some further background is helpful.

---

[9]    Affirmative Defense No. 8 states that "Defendants reasonably relied in good faith on the advice of third-party auditors, including by (i) making a complete disclosure to the auditors; (ii)

a. **Scienter**

The SEC has alleged that Defendants "acted with scienter as they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent devices, scheme, and artifice" described in the complaint. (Doc. 1 ¶ 115). These are key allegations since, to prevail on certain of the claims (most notably those brought under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Exchange Act Rule 10b–5 (17 C.F.R. § 240.10b–5)), the SEC has the burden of establishing that Defendants acted with scienter. *S.E.C. v. Ferrone*, 163 F. Supp. 3d 549, 568 (N.D. Ill. 2016) (citing *Aaron v. S.E.C.*, 446 U.S. 680, 691 (1980)). "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Id.* (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). As the district judge noted in this case, scienter also encompasses "reckless acts that are 'not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *S.E.C. v. SBB Res. Grp., LLC*, No. 19-CV-06473, 2020 WL 6075873, at *4 (N.D. Ill. Oct. 15, 2020) (citing *S.E.C. v. Ustian*, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017)); *see also S.E.C. v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999).

b. **Pertinent Allegations**

In October 2014, during the compliance examination, SEC exam staff allegedly informed SBB of several flaws in the valuation model, advising that the model artificially inflated note values and did not comport with GAAP. (Doc. 1 ¶ 63). While Defendants

---

requesting the auditor's advice as to the legality of the contemplated action; (iii) receiving advice that it was legal; and (iv) relying in good faith on that advice." (Doc. 51, at 45).

indicated in subsequent discussions with the examiners that they were considering changing the model to conform with industry norms—and still later that they had made changes to ensure a fair valuation—"[i]n reality, Defendants had not made the reported Model changes," and "continued using the defective Model for the next two years – rendering SBB's audited financial statements for fiscal years 2014 and 2015 materially false." (*Id.* ¶ 66). In March 2016, the SEC examiners sent a deficiency letter to SBB that formally identified several defects in SBB's valuation model, and echoed concerns raised in October 2014. (*Id.* ¶ 68). Though they received the deficiency letter more than two weeks before the 2015 Fund audits were complete, Defendants did not share the letter with RSM at that time, instead waiting until December 2016 to do so (almost eight months after the Funds' audited financial statements for 2015 were issued). (*Id.* ¶ 70).

Despite being told of the SEC examiners' concerns with the valuation model, Defendants sent RSM two management representation letters falsely assuring the auditor that "there have been no communications from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices[,]" as well as that SBB had prepared the financial statements for the Funds in accordance with GAAP and the Funds' securities were recorded at fair value. (*Id.* ¶ 71). In April 2019, RSM resigned and withdrew its 2013 through 2017 Fund audit reports, indicating that it could no longer rely on SBB management's representations. (*Id.* ¶¶ 109, 111). In the resignation letter, RSM said (among other things) that: the SBB model was not designed to be consistent with the requirements of GAAP; SBB failed to notify RSM that at least two different consulting firms had expressed significant concerns with the

model; and SBB testified to the SEC that it timely relayed the SEC exam staff's criticism of the model to RSM when in reality it had failed to notify the auditor of the deficiency letter until December 2016. (*Id.* ¶ 110).[10]

The SEC believes evidence supporting these allegations will demonstrate that Defendants were put on notice of the examiners' concerns about the valuation model as early as October 2014 and promised to make changes yet did not do so. Instead, they "reacted to the SEC's exam by engaging in a cover-up" – lying to exam staff, to RSM (to hide the examiners' deficiency letter and avoid further scrutiny of its accounting practices), and to investors by not telling them the truth about eventual changes to the valuation practices that led to a refund of management fees. (Doc. 90, at 4; Doc. 71, at 6). Defendants similarly observe that the SEC will seek to establish scienter by offering evidence that they failed to "come clean" after the SEC examiners expressed "concerns" to SBB about its valuation model, and that "SBB lied to its auditor." (Doc. 88, at 11 (quoting Doc. 1 ¶¶ 10-11, 63-73)). Where the parties diverge is on the question of whether the compliance examination documents that have been withheld on the basis of the deliberative process privilege are relevant to these issues and there is a particularized need for them.

### 2. Analysis

Evidence is "relevant" if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. Since Defendants are seeking not just ordinary discovery but rather documents protected by the deliberative process privilege,

---

[10] RSM's resignation occurred a month after it received a Wells Notice from the SEC. RSM entered into a settlement with the SEC on February 26, 2020. *See infra* n.11.

a mere showing of relevancy is insufficient to justify production.  *Farley*, 11 F.3d at 1390 ("Farley's only assertion of need was his claim that they are relevant and generally important to his affirmative defenses. Yet relevance alone is an insufficient reason for breaching the deliberative process privilege.").  In assessing the relevancy of, and particularized need for, the deliberative materials of the examiners, the Court finds it helpful to focus on the specific factual information that Defendants seek to learn from the materials, whether those facts are probative of key or disputed issues in the case, and if so, whether other evidence (non-privileged) is available on these issues.

Here, Defendants articulate multiple relevancy theories in support of their particularized need argument.  As to the first theory, the Court agrees with Defendants that the content of the examiners' alleged warnings is relevant in assessing whether (and the extent to which) Defendants "acted knowingly or 'ignored' red flags."  (Doc. 103, at 7).  But the SEC does not quarrel with this and reportedly has already produced documents reflecting these warnings, as well many other categories of documents from the compliance examinations.  (Doc. 90, at 6-7).  Notably in relation to the warnings that the examiners conveyed to Defendants about the valuation model, the SEC produced:

- All communications between the SEC's exam staff and other parties, including letters notifying SBB of the deficiencies in SBB's valuation model;

- Unredacted examiner notes of phone calls between SBB personnel and the exam staff (including the SEC's internal valuation specialist); and

- Extensive handwritten notes taken during the exam staff's field work at SBB and RSM, including all handwritten notes from the exam staff's interviews of SBB personnel.

(*Id.*).

22

Defendants do not say what is lacking in the written discovery already in hand as it relates to the content of the warnings, nor why they cannot obtain additional discovery on this topic by deposing the examiners. Further, Defendants were a party to all oral and written communications with the examiners, including those in which warnings about the valuation model were conveyed, so may also rely on their own testimony on this subject. For these reasons, while the content of the warnings is relevant, Defendants have not demonstrated a particularized need for the internal deliberative documents that they seek. Relatedly, Defendants argue that withheld documents showing how the warnings were "actually delivered" may bear on (a) "the examiners' degree of certainty on the issues when they were communicating with defendants," and (b) "how forcefully the examiners conveyed their concerns to Defendants." (Doc. 103, at 8). The Court agrees that internal documents containing descriptions of how the warnings were delivered (e.g., a notation that an examiner conveyed a warning in a "forceful" or "equivocal" manner) are relevant; however, based on the *in camera* review, the SEC has not withheld documents containing this type of information.

Defendants next contend that to "rebut" the assertion that "Defendants ignored examination staff's purported warnings to SBB about its valuation estimation model, they are entitled to "explore the basis of the staff's purported warnings," whether the warnings were "well founded," and how they were planned. (Doc. 69, at 11). They also remark that "[e]vidence about the nature and basis of the examiners' purported 'concerns' can only be obtained from the SEC." (Doc. 88, at 12). True, but Defendants fail to connect the dots by explaining how discovery of the examiners' "basis" for the warnings and whether they were "well-founded" – or even how they were planned –

would rebut testimony that "purported" warnings were conveyed to, and ignored by, Defendants. Again, Defendants have personal knowledge of whether oral warnings were conveyed to them and how they did (or did not) respond to any warnings, so can offer their own testimony to rebut the SEC allegations on this topic. And despite this personal knowledge, they have not identified any particular factual disputes relating to the examiners' alleged written and oral warnings and their response. Hence it is unclear at this juncture what allegations they are seeking to rebut, and so what specific information they hope to find in the deliberative documents that would rebut these allegations.

Equally unpersuasive is Defendants' broad and vague argument that deliberative internal discussions among the compliance examiners are relevant and necessary to provide "context" for the examiners' discussions with Defendants about the valuation model. (Doc. 92, at 6-7). Again, Defendants do not specify what they are seeking to learn from deliberative documents about the "context" of these discussions and why. All they say is that "context matters here as the SEC has alleged that Defendants' scienter is established by their reaction to the examiners' assertions that SBB did not value the complex securities in its funds in accordance with GAAP." (*Id.* at 7).

As noted, Defendants have already received SEC documents summarizing discussions between the examiners and Defendants, and they were also present for those discussions. Further, Defendants will have an opportunity to depose the examiners about the discussions. Since the examiners' *internal* and deliberative discussions about the valuation model and audit of that model were not shared with Defendants, the evidence is of questionable relevancy. And Defendants certainly have

not demonstrated a particularized need to review *all* of these deliberative internal discussions in order to explore the context for their own discussions with the examiners about the valuation model. *Cont'l Airlines, Inc.*, 395 F. Supp. 2d at 742 (since agency had produced underlying source material, court found no particularized need for investigative memo created to assist agency with charging decision, as it would "reveal nothing more than . . . deliberations and assessment of the evidence[,]" and "disclosure would hinder future agency communications").

Next, Defendants assert in a conclusory fashion that "contemporaneous internal deliberations" of the examiners are relevant since they would show whether "the information and experience the examiners relied on for their internal analysis, as well as the examiners' real-time, internal reactions and analyses of Defendants' responses, are consistent with the SEC's hindsight allegations of what happened." (Doc. 92, at 7). What Defendants fail to sufficiently explain is why it matters to any issue in the case whether an individual examiner's internal reactions and analyses at some point during the compliance examination (2014-2016) were consistent with the SEC's allegations in this 2019 lawsuit filed after the Division of Enforcement investigation. Nor do they explain the relevancy of "whether the SEC examiners' communications with SBB and/or RSM were inconsistent with their beliefs." (Doc. 103, at 8).

As the SEC argues, "[t]he underlying issue of whether [the examiners' concerns] were correct – i.e., whether SBB's model violated GAAP – will be established through expert testimony (and SBB's repeated admissions that they did not consider GAAP in developing the model)." (Doc. 71, at 8). In light of this, the SEC represents that the testimony of individual examiners will be limited: "[a]ll of the SEC's allegations about the

compliance examination relate to what the examiners said, saw, and heard during the exam" and such testimony "does not put the underlying exam or the exam staff's internal deliberations 'at issue.'"  (Doc. 90, at 4).

This Court agrees that given the limited nature of the examiners' testimony as described by the SEC, the internal reactions, analyses, and deliberations of individual examiners are not relevant, whether "consistent" with the SEC's final and public positions in the lawsuit or not.  *See S.E.C. v. Nacchio*, 2009 WL 211511, at *13 (D. Colo. Jan. 29, 2009) (explaining that despite the possibility of internal differences of opinion at the SEC regarding how accounting guidance should be applied, the court "fail[s] to see how personal opinions held by individual Commission staff members would be relevant to the claims in this case, particularly if those opinions could not be attributed to the Commission itself or were never communicated to anyone outside the confines of the Commission."); *EEOC v. St. Michael Hosp. of Franciscan Sisters*, 1997 WL 665757 at *2 (E.D. Wisc. Sept. 26, 1997) (holding defendant lacked particularized need for pre-lawsuit investigation documents since it "is free to challenge the EEOC's contention that [the defendant] violated the law—by meeting the EEOC's proof—but not by attempting to undermine the EEOC's administrative determination.").

That said, to the extent the SEC elicits expanded testimony from an examiner regarding his underlying analysis and opinions (e.g., in the context of explaining the basis for "concerns" about SBB's valuation model), then deliberative documents reflecting this information would be relevant and Defendants likely would have a particularized need for them.  In addition, and as the SEC acknowledges, if the SEC offers opinion testimony from any examiners under Rule 702, it must provide the

required disclosures under FRCP 26(a)(2)(C) and produce the examiners for deposition on their opinions under FRCP 26(b)(4).  (Doc. 90, at 5 n.2).

Defendants also argue that the "full examination record" is relevant to uncover any internal discussions among the examiners regarding their assessment of RSM. (Doc. 103, at 3).  This would include one document that the SEC produced but then clawed back, and that Defendants have now attached as "Exhibit D" in a sealed filing (Doc. 97-2).  They argue Exhibit D is "highly relevant" to Defendants' scienter and advice of professionals defense since, as the SEC has acknowledged, "'the examiners frankly, but confidentially, discuss concerns regarding SBB's conduct and RSM's audit.'" (Doc. 101, at 7).  In their view, Exhibit D "demonstrates that the full examination record is critical to this case and includes, among other things, internal discussions that the SEC examiners had about their assessment of SBB's auditor, RSM."  (Doc. 103, at 3).

Recall that Exhibit D is a 3-page document (entitled "SBBRG Post Exam – 11/5/2014") that the SEC will soon be producing in redacted form pursuant to this order, showing factual portions but not deliberative discussions that appear in the "Issues/Concerns" section of that document and elsewhere.  *See supra* at 16-17. Within that latter section of Exhibit D, there is a single and short sentence referencing non-specific concerns with the RSM audit.  Defendants believe this to be significant because twelve days later, on November 17, 2014, two SBB employees discussed the valuation model with two compliance examiners and sought guidance on possible changes.  (Doc. 96-6, at 2).  The examiners' notes of that discussion (produced by the SEC) reflect the following statement of one examiner at the end of the document: "I also

suggested they engage in conversations with their auditors about their valuation model and how to handle any changes." (*Id.*)

Based on the timing and content of the examiners' statements in the above two documents, as well as the SEC's public settlement agreement with RSM (describing RSM's deficiencies in the SBB audits), Defendants believe internal documents reflecting examiners' criticisms of RSM are relevant. Specifically, they argue these demonstrate that "the examiners were concerned that RSM did not even have the competence or capability to evaluate SBB's model" and "[y]et the SEC advised SBB to get RSM's input on the model." (Doc. 104, at 9) (citing *In the Matter of RSM US LLP*, SEC Rel. 3-19710, at 2 (Feb. 26, 2020)). This is relevant, Defendants assert, because the SEC may have thereby "altered the course of events that led to this case[,]" since they "did in fact consult with RSM and their good faith reliance on RSM is squarely at issue in the SEC's attempt to prove scienter and Defendants' reliance on auditors defense." (Doc. 96, at 3-4).

In responding to this argument, the SEC focuses on the specific requirements of the advice of professionals defense, namely, that Defendants: made a complete and truthful disclosure of relevant facts to RSM when seeking advice; sought and received RSM's advice about the conduct at issue; and relied on RSM's advice in good faith. *S.E.C. v. Enterprises Solutions, Inc.*, 142 F. Supp. 2d 561, 576 (S.D.N.Y. 2001) (citing *Markowski v. S.E.C.*, 34 F.3d 99, 105 (2nd Cir. 1994)). The SEC contends it "has produced all materials relevant to that defense, including: (1) the SEC's communications with SBB and RSM, (2) notes of interviews of SBB and RSM employees, (3) all documents produced to the SEC by RSM as part of the examination,

and (4) documents reflecting SBB's failure to provide RSM with timely and accurate information about its valuation model."  (Doc. 101, at 6) (emphasis in original).  In addition, the SEC observes that the exam staff "will be able to testify about what they actually observed during the exam."  (*Id.*).

Unlike the relevant evidence above, the SEC argues "[t]he fact that the SEC's exam staff may have had internal, confidential views on the existence or quality of RSM's 'advice' is not relevant[,]" since these do not bear on whether "(a) SBB told RSM the truth about its Model, (b) SBB sought RSM's advice regarding the Model and whether it complied with GAAP, (c) RSM's audit reports constituted 'advice' – let alone 'advice' that SBB's Model complied with GAAP, and (d) SBB actually relied on any advice from RSM."  (*Id.*).

This Court agrees that deliberative documents pre-dating November 17, 2014 (or after) that reflect internal, confidential criticisms of RSM are not probative of, or necessary for, the advice of professionals defense.  Defendants apparently seek to prove from such evidence that they sought RSM's advice about changes to the model because (1) an examiner suggested this on November 17, 2014, and (2) they were unaware of any examiner concerns about RSM when they sought advice, since the examiners failed to share these.  Assuming all this to be true (and even that Defendants received and relied on bad advice from RSM about the model), none of these facts would bear on the availability of the affirmative defense.  After all, Defendants need not demonstrate that RSM's advice about the valuation model was correct, only that after making full disclosure to RSM, Defendants sought, received, and followed that advice, whether good or bad.

Regardless, Defendants have available to them other evidence that *is* relevant to this defense, such as all the materials described by the SEC above. In addition, Defendants possess (and have already relied on) information in the public settlement agreement between the SEC and RSM, containing a long list of the SEC's criticisms of RSM. (*See* Doc. 103, at 9).[11] Lastly, Defendants can depose RSM witnesses about their discussions with the examiners, including the details of any criticisms leveled at them by the examiners.[12]

As for the relevancy to scienter, Defendants broadly argue that deliberative documents reflecting "[a]n external vote of confidence in RSM by the SEC to Defendants—and any other evidence of the examiners' role in Defendants' reliance on RSM" is "highly relevant to the Parties' having a full and complete picture of what happened in the examination and how different interactions, views, and discussions may have influenced SBB's actions and state of mind at the time." (*Id*.). This Court is not persuaded that the examiners' internal deliberations about RSM are relevant on the theory that this would allow Defendants to gain an understanding of their own state of mind. Regardless, Defendants have in no way demonstrated a particularized need for such evidence. In addition to all the documents already available to them and

---

[11]     The settlement agreement states (among other things) that "RSM lacked sufficient quality controls, policies, and procedures for staffing internal valuation specialists on audits and lacked sufficient firm oversight to provide reasonable assurance that the assigned valuation specialists possessed the necessary competence and experience to render reasonableness opinions on particular products or classes of securities at issue in the audit." *See In the Matter of RSM US LLP*, SEC Rel. 3-19710, at 3-11 (Feb. 26, 2020), https://www.sec.gov/litigation/admin/2020/34-88287.pdf (last visited July 28, 2022). The SEC generally characterizes this order as reflecting its "concern that RSM did not use audit staffing and procedures <u>sufficient to catch SBB's fraud</u>." (Doc. 101, at 8) (emphasis in original). As always, disputes over the admissibility of evidence will be decided by the district judge.

[12]     According to the SEC, Defendants already have received over 2,700 pages of testimony from 10 RSM witnesses who worked on the SBB audits. (Doc. 101, at 6).

previously described (e.g., SEC documents reflecting Defendants' communications and interactions with both the examiners and RSM), Defendants will have an opportunity to depose the examiners and RSM witnesses about their communications and interactions with Defendants. Moreover, Defendants certainly can testify (as no one else can) about the influence the examiners may have had on their subsequent actions and state of mind, and do so without knowing the details of the examiners' internal deliberations that were not shared with them.

For these reasons Defendants have failed to establish the relevancy of the deliberative documents and a particularized need for them.

### 3. Chilling Effect

In finding that Defendants have not shown a sufficient particularized need for disclosure to outweigh the reasons for confidentiality, the Court has also considered whether production would tend to chill future deliberations among SEC compliance examiners, and so have a detrimental effect on the SEC's decision-making process. On this point, the SEC argues it is important that SEC staff be able to "conduct full and frank deliberations while pursuing potential violations of federal securities law," "ask difficult questions, view the facts from different angles, and challenge other team members" in the interest of reaching better decisions. (Doc. 90, at 2). This Court agrees. Indeed, the deliberative process privilege rests on the premise that the quality of agency decisions is enhanced "by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n,* 532 U.S. at 1; *see also Farley*, 11 F.3d at 1389 (citing *Sears*, 421 U.S. at 151) ("Since frank discussion of legal and policy matters is essential to the

decisionmaking process of a governmental agency, communications made prior to and as a part of an agency determination are protected from disclosure.").

Defendants speculate that a chilling effect would be "highly unlikely" from production of the deliberative documents here since only a small number of compliance examinations are referred to Enforcement, and an even smaller number result in litigation in which compliance examiners are witnesses. (Doc. 88, at 13). But one could just as easily surmise, for these very reasons, that such cases are among the most high-profile within the SEC and so likely to be widely discussed among examiners, leading to a greater likelihood of a chilling effect. In reality, there is no viable method of measuring the chilling effect. This Court is persuaded, however, that requiring the broad disclosure of the examiners' deliberative documents as Defendants propose here would tend to have a chilling effect in future cases. As the *Coastal States* court observed, "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." 617 F.2d at 866. By allowing agencies to maintain the confidentiality of deliberative documents, their employees are more likely to "freely explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Moye*, 376 F.3d at 1277.

Defendants also complain that if the SEC's "generalized need for confidentiality were credited," those sued by the SEC "could never discover the SEC's internal communications because the potential chilling effect would always (in the SEC's view) outweigh the defendants' need." (Doc. 92, at 9). As an initial matter, this Court is not convinced that the asserted need for confidentiality articulated here is any more

generalized than in most other cases involving a claim of deliberative process privilege. Generality is understandable given the inability to precisely measure the potential chilling effect from a particular disclosure. Even so, an agency's general need for the protection of the privilege to maintain the confidentiality of employee deliberations may certainly be outweighed in some instances based on a showing of a particularized need for specific documents. That analysis is highly fact dependent. While Defendants are unable to meet their burden of showing a particularized need for the broad discovery of deliberative compliance examination documents that they seek, this in no way means the SEC would in every case be permitted to withhold deliberative documents. In fact, this Court has already indicated that certain deliberative documents from the compliance exam may need to be produced in this case if the SEC elicits opinion testimony from examiners.

In conclusion, the Court finds for all of the reasons stated that Defendants' claimed need for the SEC's internal deliberative materials does not outweigh the SEC's need to conduct frank, confidential inquiries into potential violations of federal securities law.

## II.   Other Claimed Privileges

This Court need not reach the question of whether the SEC had a basis to withhold certain documents under the attorney-client privilege and work product doctrine. With only one exception (identified at log entry 137), the documents withheld based on these privileges were also withheld under the deliberative process privilege that the Court has now upheld. Since Defendants have not sought to compel production of that one document, there is no need to address it.

The Court also notes that the SEC withheld a small number of documents based on the Bank Secrecy Act ("BSA") that are identified at log entries 8-9, 147, 326-28, and 333-34. According to Defendants' annotation of the privilege log, the parties met and conferred and "some or all of the documents contain non-BSA information but the SEC is asserting deliberative process privilege over the non-BSA portions." (Doc. 96-3, at 25 n.3). Defendants say they are "challenging only the SEC's assertion of the deliberative process privilege for these documents." (*Id.*). This Court has reviewed each of these eight documents and the SEC need not produce them. Any document that does not contain BSA information or deliberative material is irrelevant (e.g., cover emails with no substantive information).

## **CONCLUSION**

For reasons stated above, the SEC is ordered to produce in redacted form the documents identified at pages 16-17 but need not produce any other documents that have been withheld based on the deliberative process privilege.

ENTER:

Dated: July 28, 2022

SHEILA FINNEGAN
United States Magistrate Judge