**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | **No. 19 C 6473** |
| v. | ) ) | |
| | ) | **Judge Sharon Johnson Coleman** |
| **SBB RESEARCH GROUP, LLC, et al.,** | ) | **Magistrate Judge Sheila Finnegan** |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The Securities and Exchange Commission ("SEC") filed this action against SBB Research Group, LLC ("SBB"), Samuel B. Barnett, and Matthew Lawrence Aven (collectively, "Defendants"), alleging securities fraud and other claims. During discovery, non-party witness RSM US LLP ("RSM"), SBB's outside auditor, withheld four allegedly privileged documents that two of RSM's witnesses reviewed to prepare for their depositions in this case. Defendants have filed a Motion to Compel Production of Documents Used to Refresh RSM Witnesses' Recollections for Depositions (Doc. 158) opposed by both RSM and the SEC. Defendants also filed a Motion to Take More than Ten Depositions to allow an additional half-day deposition of an RSM auditor and half-day depositions of two SEC examiners (Doc. 159) that the SEC and RSM oppose. For the reasons stated below, both motions are granted.

## I.    <u>BACKGROUND</u>

### A.    **Overview and SEC Issuance of Deficiency Letter**

According to the SEC's complaint, Defendants engaged in a multi-year fraud to inflate the net asset values ("NAVs") of the private investment funds they managed (the

"Funds") when they "intentionally rigged" the valuation model (the "Model") used to calculate those NAVs. (Doc. 1 ¶¶ 1, 2, 4). They did this by not following Generally Accepted Accounting Principles ("GAAP") and standard valuation models in assigning "fair value" to the Funds' main assets, namely, structured notes. (*Id.* ¶¶ 6-9). From 2013 through 2016, SBB consistently told RSM, its outside auditor, that its financial statements complied with GAAP and its Funds were recorded at "fair value," when neither was the case. (*Id.* ¶¶ 6, 33, 36).

In October 2014, the SEC staff informed SBB that its Model contained several flaws and did not conform to GAAP. (*Id.* ¶¶ 41, 48, 63-64). On October 31, 2014, after a call with the SEC exam staff, Defendants considered changing several Model inputs to conform to industry norms, including correcting the flaws that the SEC had pointed out earlier in October. (*Id.* ¶ 64). Defendant Aven "indicated to the SEC's exam staff" that it had made certain changes (summarized in paragraph 64 of the complaint) and was "consult[ing] with third party valuation experts to ensure the new model accurately reflect[ed] a fair valuation." (*Id.* ¶ 65). In reality, however, Defendants did not make these changes, but continued to use the defective Model for two more years, rendering SBB's 2015 and 2016 financial statements materially false. (*Id.* ¶¶ 64-66).[1]

In March 2016, the SEC examiners sent a deficiency letter to SBB. The letter asserted that the Model overstated the Funds' values and performance and resulted in an overstatement of management fees. (*Id.* ¶¶ 68-69). In May 2016, Defendants responded to the SEC's deficiency letter by changing the Model, resulting in what the

---

[1]    These allegations of communications between the SEC staff and SBB management, which are part of the SEC's *scienter* case against Defendants, are detailed and specific, including alleged quoted statements of Defendant Aven.

SEC calls the May 2016 Model. (*Id.* ¶ 74). Applying these changes retroactively lowered the Funds' NAVs and revealed that SBB had overcharged the Funds about $1.1 million in fees. (*Id.* ¶¶ 75-84). Defendant Aven told the SEC that SBB would refund the excess fees to investors through a credit against future fees. He also said he would update the Funds' prior NAVs and investor statements to reflect values generated by the May 2016 Model, but never did so. (*Id.* ¶¶ 76-77).

### B. Defendants' Alleged Efforts to Deceive RSM

The SEC claims that Defendants made efforts to deceive RSM in connection with its audits of SBB's financial statements. It alleges, for example, that Defendants did not share the SEC's 2016 deficiency letter with RSM despite receiving that letter more than two weeks before RSM concluded its audit of SBB's 2015 financial statements and even though the letter contained "critical information" about "the SEC's detection of severe deficiencies in SBB"s model." (*Id.* ¶¶ 70, 72). Instead Defendants sent RSM management representation letters on April 30, 2015 (six months after the SEC first expressed concerns about the Model in October 2014) and April 28, 2016 (weeks after SBB received the SEC's deficiency letter in March 2016), falsely representing that the Fund financial statements complied with GAAP, the Fund securities were recorded at fair value, and there had been no communications with regulators concerning noncompliance with or deficiencies in financial reporting practices. (*Id.* ¶ 71). Defendants ultimately shared the deficiency letter with RSM in December 2015, eight months after RSM had completed the 2015 audit and after RSM had issued opinions "certifying" that SBB's 2014 and 2015 financial statements complied with GAAP. (*Id.* ¶ 70).

3

According to Defendants' initial brief on the instant motion, RSM eventually became a witness in "the SEC compliance examination and enforcement investigation." (Doc. 158, at 4).  Between February 28, 2017 and November 3, 2017, ten RSM employees gave testimony to the SEC about its audits of the Funds. (*Id.*).  In April 2018, the SEC met with RSM's counsel to discuss the SEC's concerns regarding RSM's 2013-2016 Fund audits. (*Id.*, at 5). "Even after this presentation, RSM issued unqualified audit opinions for fiscal years 2016 and 2017." (*Id.*).

### C. Wells Notices to RSM and Lead Auditor and RSM's Resignation and Settlement with the SEC

According to RSM, in February and March, 2019, as part of the Wells process, the SEC permitted RSM's legal counsel to view, but not obtain copies of, transcripts of witness testimony and related exhibits from the SEC investigation, including the testimony of SBB witnesses.[2]  (Doc. 165, at 2).  Upon reviewing over 2,500 pages of transcripts of testimony by SBB witnesses, "counsel for RSM drafted memoranda summarizing and discussing relevant aspects of that testimony for purposes of providing legal advice" (the "summaries"). (*Id.*).  Per Defendants, in March 2019, the SEC issued Wells notices to RSM and Lynne Weil, the RSM engagement partner for the SBB audits. (*See* Doc. 172-3, at 217:13-22).

On April 4, 2019, RSM's counsel emailed the summaries to certain RSM auditors. (Doc. 172-2, at 202:21-203:1; see Doc. 158-2, at 5 (privilege log showing email date)). After its auditors' review of and discussion about these summaries, RSM decided it could no longer rely on management's representations and should resign as SBB's auditor,

---

[2]     As explained by the SEC, it "does not permit potential defendants to retain copies of testimony exhibits, or the transcripts of witnesses they do not represent," but they may review and take notes of such materials, a courtesy extended to Defendants regarding testimony by RSM witnesses.  (Doc. 167, at 3-4).

informing Defendants of this decision in a letter dated April 12, 2019. (Doc. 1 ¶ 111; Doc. 172-3, at 225:9-15; Doc. 165, at 3-4). In that letter, RSM claimed it was resigning due to five purported inconsistencies between the SEC testimonies of various SBB witnesses and prior representations that SBB had made to RSM. (Doc. 126-2 (resignation letter); Doc. 1 ¶ 109; Doc. 165, at 4). The resignation letter recites certain testimony by SBB witnesses and explains how the statements made therein either conflict with statements made by SBB management to RSM or were never revealed to RSM. (Doc. 1 ¶ 110). Because of RSM's withdrawal of its audit reports, SBB did not have audited financial statements for its fiscal years 2013 through 2017. (*Id.* ¶ 112).

The SEC's complaint expressly alleges that Defendants deceived RSM (among others) about SBB's inflated fund NAVs and non-GAAP financial statements. Defendants, for example, made misrepresentations to RSM in management representation letters falsely stating that the SBB financial statements complied with GAAP. (*Id.* ¶¶ 71, 88). The SEC further alleges that during RSM's audits of SBB's financial statements, RSM understood, based on SBB's false representations, that the Model was designed to generate fair values in accordance with GAAP. (*Id.* ¶ 108). The SEC claims that "after learning that Defendants ignored accounting principles and manipulated Model inputs to back into SBB's desired result," RSM "concluded that the SBB Model was not designed to be consistent with GAAP." (*Id.* ¶ 108).[3]

Ultimately, RSM reached a settlement with the SEC on February 26, 2020. (Doc. 128-8). In that settlement, RSM was censured and agreed to several undertakings,

---

[3] The SEC alleges that this conduct and other conduct by Defendants violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 (and Rule 10b-5 thereunder), and Sections 206 and 207 of the Investment Advisors Act of 1940 (and rules 206(4)-1, 206(4)-2, 206(4)-7, and 206(4)-8 thereunder). (*Id.* ¶ 12).

including cooperating with the SEC in this litigation. (*Id.*, at 17-18). The SEC took no enforcement action against Ms. Weil. In a Wells submission to the SEC, Ms. Weil had argued that the SEC should "forego enforcement action against her" in part because she was "one of the primary decision-makers who decided that . . . RSM would resign as SBB's auditor." (Doc. 128-5 at 3).

### D. Use of Summaries by Certain RSM Auditors

Defendants and RSM do not dispute that on April 4, 2019, RSM's counsel shared his summaries with (among others) Richard Davisson (RSM's Regional Director for the Great Lakes Region of RSM's Professional Practice Office) and Ms. Weil. (Doc. 158, at 2). Defendants assert that RSM's resignation was "based on what RSM's counsel set forth in the summaries." (*Id.*) RSM does not dispute this fact.

Defendants explored the reasons for RSM's decision to resign when they deposed Mr. Davisson and Ms. Weil, both of whom were involved in RSM's decision to resign. (*Id.*, at 5). In his January 20, 2023 deposition, Mr. Davisson acknowledged participating in that decision and comparing information from the summaries to the relevant auditing standards. (Doc. 158-4, at 3:4-18). He gathered no other facts; was unaware of any facts that were gathered other than the summaries; and "apart from what counsel provided" him, was unaware of any research done by anyone at RSM. (*Id.*, at 194:4-10; 205:18-23). In deciding whether to resign, Mr. Davisson said that "the summaries, which we reviewed, were assessed against the representations that we had received in representation letters as well as the engagement team's understanding of verbal communications with management of SBB." (*Id.*, at 194:11-23; 211:13-22). The summaries were the source of RSM's conclusion that there were inconsistencies in what

SBB management told RSM during the engagements. (*Id.*, at 205:5-17). Mr. Davisson had "no idea" whether there was any conflict between the summaries and the actual testimonies of the SBB witnesses. (*Id.*, at 211:23-212:2).

Mr. Davisson candidly admitted during his deposition that his memory of the details that he read in the summaries from 2019 "is no longer with me" and that he could not recall enough "to go down to the details of an individual." (Doc. 165-1, at 211:1-11). He had no recollection about certain facts from the time the resignation decision was made but only from preparing for his testimony, acknowledging that his memory was refreshed "in my prep for testimony." (*Id.*, at 212:8-213:10). The summaries, which he said he reviewed to "refresh my recollection," contained both excerpts from testimony and "information other than excerpts." (*Id.*, at 221:2-222:10). Notably, during this questioning, RSM's counsel represented that the summaries contained privileged work product and attorney-client communications, but:

> to the extent the witness recalls specific factual information from those summaries that were used to support the points in the resignation letter, I will permit the witness to answer in that regard.

(*Id.*, at 206:19-23; see also 221:12-16).

Ms. Weil, the audit engagement partner, was deposed in this case four days later. She acknowledged reviewing the summaries in connection with RSM's 2019 resignation, in addition to her own testimony before the SEC, SBB's management representation letters, and the record of consultation within RSM. (Doc. 158-3, at 15:10-23; 216:15-22). While Ms. Weil said she had no reason to believe SBB management misrepresented anything about the Model at the time she gave testimony before the SEC, she questioned management's "integrity" after reading the summaries. (*Id.*, at 198:1-11). She admitted

in this case, for example, that the RSM auditors "were all surprised by the inconsistencies in the testimony versus what had been represented to us by management" and that "once integrity is impaired, you can't rely on management's representations and might need to withdraw from an engagement." (Doc. 165-2, at 200:13-19).

Ms. Weil acknowledged reviewing the summaries again in preparation for her deposition testimony in this case but answered "no" when asked if she did so to refresh her recollection, stating that she recalled what was in the summaries from the time of the [2019] decision to resign. (*Id.*, at 198:12-22). When defense counsel later asked two "yes or no" questions about whether Ms. Weil's memory was refreshed from reviewing a summary before her deposition in this case, she twice declined to answer the question that was asked, instead saying that "reviewing [the summary] was consistent with what I remember" and that when she reviewed the summary, "it was consistent with my memory." (*Id.*, at 205:6-16; see also 205:20-206:5). When pressed on whether she "independently recalled" all she had testified to before the SEC and "didn't need the summary," she said she recalled "much of it" and, again, persisted that it was "consistent" with her memory, but finally acknowledged that "maybe [the summary] gave a little more detail." (*Id.*, at 206:6-207:17).

During this questioning, RSM's counsel advised Defendants that "to the extent that there is factual information that was relied upon by Ms. Weil in terms of drafting the resignation letter and the phone conversation she describes, we'll permit her to testify to that limited extent about these privileged summaries." (*Id.*, at 201:10-15). Thus, RSM's

counsel admitted that Mr. Davisson and Ms. Weil could testify about the content of the summaries designated as privileged if they could remember what was in them.[4]

## II.   ANALYSIS OF MOTION TO COMPEL PRODUCTION OF DOCUMENTS USED TO REFRESH RSM WITNESSES' RECOLLECTIONS FOR DEPOSITIONS

### A.   Use of Writing to Refresh Memory

Defendants issued a document subpoena to RSM seeking disclosure of the summaries.  While Defendants appear to assume that the attorney-client privilege and the work product doctrine apply to the summaries, they argue that the summaries are discoverable under Federal Rule of Evidence 612 because Mr. Davisson and Ms. Weil used them to refresh their recollections prior to bring deposed.  Under Rule 612(a)(2) and (b), if a witness uses a writing to refresh his or her memory before testifying, the adverse party is "entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony" if "justice so requires."

The parties do not dispute that the test for production under Rule 612(a)(2) is that the witness must have used the writing to refresh his or her memory for the purpose of testimony and that production be necessary in the interests of justice.  *See generally Sporck v. Peil*, 759 F.2d 312, 317 (3d Cir. 1985); Doc. 158, at 7-8; Doc. 165, at 10-11.  Nor do they dispute that RSM auditors relied on counsel-prepared summaries of the SBB witnesses' testimonies—and not on those witnesses' actual testimonies—in deciding whether to recommend that RSM resign.  As described above, RSM's resignation letter

---

[4]     The line that RSM's counsel tried to draw in the depositions of Mr. Davisson and Ms. Weil is that a document used to make the decision whether RSM should resign from the engagement is immune from discovery only if the witness can no longer remember what was in the document.  RSM has not cited any case law supporting this theory.  The Court need not address the validity of this line-drawing in light of its ruling herein.

accuses Defendants of five purported inconsistencies between the SEC testimonies of various SBB witnesses (which RSM's auditors possessed only in summary form from counsel) and representations those witnesses had made to RSM during the audits. Counsel for RSM admitted that the content of those summaries was thus fair game for discovery, though only if RSM witnesses could recall that content in their depositions.

It is also undisputed that RSM's resignation, and SBB management's alleged deception of RSM, are the subject of allegations in the SEC's complaint against Defendants. (See Doc. 1 ¶¶ 10, 11(a), 33, 70-73, 85, 88, 108-112). Those allegations rely on the contents of the resignation letter, much of which was based on alleged discrepancies between Defendants' testimony before the SEC (as summarized in the documents withheld as privileged) and Defendants' representations to RSM during the audits. (*Id.* ¶ 110). Both Mr. Davisson and Ms. Weil acknowledged that they read the summaries to prepare for their depositions in this case and that their recollections were partly refreshed by their counsel's summaries. Accordingly, the requirement in Rule 612(a) that the writing at issue be used to "refresh memory" has been established.

## B. Requirements of "Justice"

Defendants point out that the provision in Rule 612(a)(2) permitting production only where "justice . . . requires" was designed to avoid unrestrained fishing expeditions into opposing counsel's trial preparation materials. *Sporck*, 759 F.2d at 318 (court should "exercise discretion to guard against 'fishing expeditions among a multitude of papers which a witness may have used preparing for trial'"). Here, there is no risk of such a result given that Defendants seek only four logged documents. (Doc.158, at 9-10). E.g., *In re FedEx Ground Package Sys.*, *Inc.*, 2007 WL 733753, at *11 (N.D. Ind. Mar. 5, 2007)

(interest of justice element shown where only one document would be produced, avoiding wholesale exploration of opponent's files).

RSM contends that Defendants incorrectly argued that the minimal burden of producing the logged documents alone required their production (Doc. 165, at 12), but Defendants never made that argument. They argued only that the minimal burden and limited number of documents sought was relevant to Rule 612(a)'s "justice" limitation. (Doc. 158, at 9-11). In this argument, as described above, Defendants are correct.

### C.      Other Considerations Relevant to Production

Both RSM and the SEC raise additional arguments against production of the summaries even assuming the satisfaction of the Rule 612 requirements. RSM contends that there is no point to producing the summaries since they contain no facts that Defendants do not already possess: "Defendants have full access to the testimony informing RSM's resignation letter, because it is their own testimony" and they possess the transcripts of that testimony. (Doc. 165, at 11-13). But the RSM auditors did not have those transcripts when they made the decision to resign, and Defendants do not possess the summaries on which the RSM auditors relied in making that decision. Defendants seek to discover evidence potentially impeaching the RSM auditors' reliance on summaries that may have been inaccurate, overstated, or incomplete.

RSM also asserts that the SEC's allegations about Defendants' deception of RSM is "just one of many facts alleged by the SEC" against Defendants. (*Id.*, at 12). The SEC similarly argues that the complaint contains 25 pages of allegations and none of its counts relied "solely or primarily" on RSM's resignation. (Doc. 167, at 3). Such attempts to minimize the SEC's allegations of Defendants' fraud on RSM do not negate the SEC's

admission that it "intends to offer evidence of Defendants' deceptive interactions with RSM, including RSM's resignation as the Funds' auditor, in support of the SEC's claims," including because it "refute[s]" Defendants' defense that it relied on its auditors. (*Id.* at 3.) Defendants are entitled to discovery on these aspects of the complaint against them.

RSM's sole case on this point, *Timm v. Mead Corp.*, 1992 WL 32280, at *6 (N.D. Ill. Feb. 7, 1992) (Doc. 165, at 13), is inapposite. It involved a witness who merely glanced at certain documents unlikely to contain admissible evidence. Here, RSM witnesses admittedly relied on the summaries in deciding whether to recommend that RSM resign. If the auditors relied on a summary that was overstated, inaccurate, or incomplete in making that decision, it might well undercut the weight of RSM's resignation as evidence of fraud and *scienter*. For this reason alone, the Court rejects the SEC's argument that discrepancies between the summaries and the transcripts are irrelevant to whether Defendants violated the securities laws. (Doc. 167, at 4-5). Defendants are entitled to challenge the allegations here by any number of means, and that includes the impeachment and cross-examination of witnesses about the resignation decision and any discrepancies between the summaries on which they relied and the actual testimony so summarized. If anything, the fact that the SEC believes it has a strong case against Defendants counsels in favor of allowing Defendants to conduct discovery of this type. Certainly Defendants are not required to rebut the SEC's allegations in order to justify taking discovery, a position that is implied by the SEC's argument that Defendants motion "does not dispute" several of the reasons for RSM's resignation. (*Id.*, at 5).

Discovery of discrepancies between the summaries and actual testimony could also conceivably relate to the integrity of RSM's resignation decision. The SEC

12

acknowledges that Defendants "appear to be searching for a way to argue that . . . RSM's grounds for resigning were a pretext," but says there is no basis for such an argument because no witness has contradicted the reasons RSM gave for resigning. (Doc. 167, at 5). RSM's resignation did, however, quickly follow the SEC's issuance of Wells notices to RSM and Ms. Weil, and Defendants may try to argue that the resignation favorably affected the SEC's settlement with RSM and decision not to bring an enforcement action against Ms. Weil. Defendants are entitled to conduct the requested discovery and argue the admissibility of the evidence before the District Judge.

RSM further argues that Defendants should have used the transcripts of their own SEC testimony to impeach Mr. Davisson and Ms. Weil (both of whom participated in RMS's decision to resign, see pages 6-8 above) on "anything Defendants might contend counters the stated reasons for RSM's resignation." (Doc. 165, at 13). This argument misses the point. Both of these auditors admitted that they did not read or rely on transcripts of Defendants' SEC testimony when they participated in deciding that RSM should resign from the SBB engagement. Defendants want to explore whether the RSM witnesses relied on summaries that did not fairly reflect what was in transcripts that those witnesses did not have. Defendants could not conduct that exam at the depositions because they did not have the summaries. Nor are Defendants required to take the SEC's or RSM's word for whether the summaries fairly, accurately, and completely portrayed the testimony or provided an accurate basis for RSM's resignation decision.[5] RSM's reliance on *Manitowoc Co., Inc. v. Kachmer*, 2016 WL 4493454, at *9 (N.D. Ill. Aug. 26, 2016), and *Stone Container Corp. v. Arkwright Mut. Ins. Co.*, 1995 WL 88902, at *4 (N.D.

---

[5] Thus, RSM's statement that there is no discrepancy (Doc. 165, at 13 n.5) begs the question since the summaries have not been revealed to Defendants.

Ill. Feb. 28, 1995), in making this argument (see Doc. 165, at 14), is misplaced. In those cases, the non-privileged documents mentioned or implicated in the privileged communications at issue had already been produced. Here, the summaries have not been produced.

RSM next argues that it is "unclear" how the SEC will use its allegations about Defendants' alleged deception of RSM in proving the SEC's case against Defendants. (*Id.*). But as already described, the SEC itself has admitted that the allegations were made to rebut any defense of reliance-on-auditors. All the other ways in which the SEC will or may use that evidence need not be identified now; what is important is that the SEC chose to rely on RSM's resignation in its complaint as part of its claim that Defendants deceived RSM.

Finally, RSM's attempt to analogize this motion to Defendants' earlier attempt in this case to obtain evidence of the SEC's deliberative process is unpersuasive. RSM points to the Court's decision that evidence of the SEC's internal deliberations about RSM would not "allow Defendants to gain an understanding of the state of their own mind'" (see Doc. 134, at 30), and claims that the same logic "applies here" because "[w]hat RSM's attorneys thought of SBB's testimony to the SEC has nothing to do with Defendants' state of mind." (Doc. 165, at 14-15). But Defendants have not argued in this motion that they need the summaries as evidence of their own state of mind or the state of mind of RSM's counsel. Defendants need the summaries because RSM auditors used them as the basis for deciding that RSM should resign.

For all of the above reasons, the summaries—documents 28-31 on the privilege log (Doc. 158-2, at 5)—must be produced under Federal Rule of Evidence 612.

### III. ANALYSIS OF MOTION TO TAKE MORE THAN TEN DEPOSITIONS

In this motion, Defendants seek to take three remote, half-day depositions: two of SEC examiners Scott Demar and Anthony Santoro and one of RSM auditor Danielle Mathe. (Doc. 159, at 2-4, 10; Doc. 173, at 10). These depositions would bring the number of Defendants' total depositions in this case to thirteen. To put this into perspective, Defendants assert the SEC took the testimony of nineteen witnesses during the investigation alone, eleven of whom were of RMS personnel.

Fed. R. Civ. P. 26(a)(2)(A)(i) requires leave of court for a party to take more than ten depositions. Such leave should be granted when consistent with Rule 26(b)(2)'s provisions on limiting discovery. Fed. R. Civ. P. 30(a)(2); *FTC v. A1 Janitorial Supply Corp.*, 2018 WL 7506108, at *1 (N.D. Ill. Sept. 26, 2018). Rule 26(b)(2)(C) allows a court to limit discovery that is unreasonably cumulative, duplicative, or disproportionate under Rule 26(b)(1). Rule 26(b)(1) allows parties to take discovery relevant to the claims or defenses that is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden of expense of the proposed discovery outweighs its likely benefit." An analysis of these factors favors allowing the depositions to proceed.

### A. Importance of the Issues at Stake in Action

As an initial matter, the consequence of this SEC enforcement action against Defendants could include substantial fines, injunctions, reputational injury, and limitations on livelihoods. From the SEC's vantage point, the consequences include protecting

investors and the integrity of the securities markets. Thus, the "importance of the issues," including the amount in controversy, favors allowing the additional depositions.

**B.    Parties' Relative Access to Information**

As for the parties' relative access to information, this factor also weighs in favor of allowing the additional depositions. The SEC had years to investigate this case and took testimony from nineteen witnesses, almost double the ten depositions that the three Defendants have taken thus far. Moreover, the SEC has ready access to RSM witnesses due to its settlement and cooperation agreement with RSM (Doc. 128-7, at 17-18) while Defendants have no such access. Finally, the SEC's complaint contains significant allegations about specific conversations between the SEC examiners and SBB management or RSM auditors. Defendants should be allowed to explore those conversations in depositions, as the SEC could have done during its investigation and can do now through its cooperation agreement with RSM.

**C.    Importance of Discovery in Resolving the Issues**

The proportionality test also requires consideration of the importance of the discovery to the issues in the case. The Court will address this factor as to the two SEC witnesses and the RSM witness in turn.

**1.  Depositions of Two SEC Examiners**

Defendants say they need to depose SEC examiner Scott Demar because he was present for five meetings between the SEC staff and SBB management in October 2014, a key period during which the SEC allegedly pointed out deficiencies in the Model and warned that the Model was flawed and non-GAAP. This, in turn, is a predicate for the SEC's allegation that Defendants made misrepresentations and omissions in

16

management representation letters sent to RSM after the October meetings. The SEC also claims that defendant Aven made promises to the SEC at this time that Defendants did not keep.

Defendants claim—and the SEC does not dispute—that Demar took eighteen pages of notes from these meetings; Defendants say these notes undermine the SEC's allegations. (Doc. 159 at 8). Defendants also cited deposition testimony of SEC examiners that failed to substantiate elements of the warnings that the SEC allegedly gave to Defendants in October/November 2014. In these citations, for example, the SEC examiners did not recall informing Defendants that the Model was flawed and non-GAAP (as alleged at paragraph 63 of the complaint). (See Doc. 173, at 1-2, 7-8).

The SEC acknowledges that Mr. Demar listened in on an "important" phone call "relevant to the issue of scienter," but claims that no one has testified that Mr. Demar said anything. (Doc. 168, at 8-9). But Mr. Demar is admittedly a witness to and took notes of this important meeting, and those notes, according to Defendants, do not support the SEC's claims. Moreover, the SEC does not address the other four meetings with SBB management that Mr. Demar attended. Under these circumstances, Mr. Demar's firsthand knowledge of events alleged in the complaint persuades the Court that the discovery sought is important to the issues of the case even if he was only a listener at these meetings. Notably, the SEC reserves the right to call Mr. Demar (and Mr. Santoro) at trial. (Doc. 168, at 10 n.2).

Defendants also seek to depose Anthony Santoro (as well as Mr. Demar) about their recollections of communications with RSM in April-May 2015 regarding RSM's review of SBB's valuations. (Doc. 159, at 9-10). The SEC and RSM witnesses had

virtually no recall about these events. (*Id.*)  At this point in the timeline, RSM still took the position that SBB's financial statements complied with GAAP.  The possibility that RSM defended both its audit and the SBB financial statements in these meetings with the SEC, and discussed communications between RSM and SBB, appears relevant to the claims and defenses here.

The SEC's response is to claim that what passed between it and RSM is irrelevant to Defendants' *scienter*.  (Doc. 168, at 9.)  But what RSM said to the SEC in 2015—when RSM was still issuing clean audit opinions on SBB's financial statements—may result in admissible evidence on several issues.  These could include the clarity and magnitude of the alleged valuation deficiencies; the existence and materiality of Defendants' alleged misrepresentations and omissions to RSM; and Defendants' reliance on RSM.  Because the SEC has alleged that Defendants deceived RSM, such discovery should be allowed.  Finally, the SEC's related argument that the Court should prohibit this discovery because it prohibited discovery into the SEC's deliberative processes (Doc. 168, at 8), is inapposite.  Defendants do not seek discovery into the SEC's deliberations here and the discovery is potentially relevant for a number of reasons.[6]

### 2.  Deposition of Additional RSM Auditor

Defendants also seek to depose Danielle Mathe, a member of RSM's engagement team for the 2013-2016 audits.  Defendants claim that she and fellow auditor Stacie Droege attended at least one of the meetings with SBB management in March and April 2016 after SBB received the SEC deficiency letter at issue here, namely, a meeting where

---

[6]    In their reply brief, Defendants offered to drop their request for Mr. Santoro's deposition if the SEC were to stipulate that "Mr. Santoro did not communicate the examiners' views of SBB's valuation model to RSM and does not recall Mr. Schuster or Mr. Demar doing so." (Doc. 173, at 8).  The Court has not been informed that the SEC provided that stipulation.

the issues and responses to the deficiency letter, and "what we were doing in the model," were discussed. (Doc. 159, at 11; Doc. 159-7, at 176-16-177:17; see also Doc. 173, at 8-9 & n.2). This fact weighs strongly in favor of allowing the deposition of Ms. Mathe, particularly given that the other attendee at that meeting (Ms. Droege) had no recollection of it (see Doc. 159 at 11; Doc. 173, at 8). In addition, because the SEC did not take testimony from Ms. Mathe, there is no record of what she might say. (Doc. 173, at 9). *See Farris v. Kohlrus*, 2020 WL 10691950, at *6 (C.D. Ill. June 12, 2020) (authorizing deposition of individual at meeting where other witnesses had no recall or testified only to typical procedures).

RSM claims that Ms. Mathe's supervisors (Ms. Weil and Ms. Droege) were deposed and that should be enough. (Doc. 166, at 3). But on audit teams, each member has a different role, with lower-level auditors frequently doing the detail work. The fact that other members of the team have been deposed does not shield Ms. Mathe from a deposition where the other witnesses were unable to testify substantively about the meeting in question. (Doc. 173, at 8). There is no basis here to find that her testimony would be merely cumulative.

Relatedly, RSM also argues that Defendants have not shown what information Ms. Mathe has that Defendants do not already have, and that her deposition would be duplicative. (Doc. 166, at 5-6). But RSM provides no examples of testimony that would duplicate what Defendants seek from Ms. Mathe. For example, Ms. Weil, the RSM engagement partner, was asked about communications with SBB management about the SEC's exam in the relevant time period, in particular as it pertained to the exam results, and had little recall of any follow up by RSM. (Doc. 166-1, at 55:22-156:5; 159:19-160:7;

see Doc. 166, at 9). RSM auditor Stacie Droege had no recollection of the meeting with management about the exam. (Doc. 166-2, at 211:8-13, 212:14-213:7; 214:23-215:8; 217:19-218:10). Here, where Defendants have shown that they seek relevant information from a witness who has not been deposed, the deposition may proceed.[7]

RSM also points out that because it is not a party here, it should be spared this extra deposition. (Doc. 166, at 4-5). But RSM was investigated by the SEC and agreed to cooperate with the SEC in this case as part of its settlement with the SEC. That agreement includes meeting with the SEC and appearing for depositions and at trial at the SEC's request. (Doc. 128-7, at 17-18; see generally Doc. 173, at 10). Moreover, the SEC has featured fraud on RSM in its complaint, and Defendants have asserted a "reliance on auditors" defense to the SEC's claims, explaining that RSM "tested and evaluated SBB's valuation model . . . and issued clean audits for SBB's funds" even after "intense questioning of multiple RSM witnesses" by the SEC. (Doc. 69, at 6). Given

---

[7] None of RSM's cases (Doc. 166, at 5-6) supports its argument on this point. In *Kosek v. Ethicon,* 2020 WL 6203310, at *2-4 (N.D. Ill. Oct. 22, 2020), the court denied plaintiff's effort to take ten depositions of witnesses who had already been deposed in a related MDL action where plaintiff could not articulate what new information they might have (but allowed a deposition of a witness not yet deposed and another witness who had been deposed on the facts of another case). Thus *Kosek* supports taking Ms. Mathe's deposition, since she has not yet been deposed in this case (or in the SEC investigation). In *Lohmeir*, 2021 WL 5005722, at *3-4, the court found, unlike in this case, that the evidence sought was irrelevant, untimely, and duplicative of admissible evidence. *Bell v. Fowler*, 99 F.3d 262, 271 (9th Cir. 1996), affirmed the lower court's disallowance of cumulative depositions; here, there is no showing that Ms. Mathe's deposition would be cumulative of other testimony. *Texas Roadhouse, Inc. v. Texas Corral Restaurants, Inc.*, 2017 WL 2459236, at *2 (N.D. Ind. 2017), disallowed a deposition of a witness who submitted an affidavit showing he had no relevant knowledge and who identified two witnesses that *did* have relevant knowledge whom plaintiff could pursue in discovery. RSM submitted no similar evidence here. Finally *LKQ Corp. v. Gen. Motors Co.*, 2021 WL 4125097, at *3, is inapposite because there, unlike here, the party seeking eight depositions over the presumptive limit of ten did not show a need for the discovery.

RSM's importance to both parties' claims and defenses, the discovery sought here is not unduly burdensome.[8]

Finally, RSM points out that the ten-limit rule in Rule 30(a)(2)(A)(1) is designed to force Defendants to think "long and hard" about who they want to depose. (Doc. 166, at 4). But Defendants did that in choosing initially to depose the engagement partner and an additional staff member, as well as two auditors involved in national consultation and two auditors involved in valuation issues. (Doc. 159, at 5). Defendants prioritized key deponents and sought Ms. Mathe's deposition only when the need to do so became apparent after questioning other deponents. Thus, this deposition may proceed.

### D. Burden and Expense of Discovery Relative to Its Benefit

In light of the discovery's potential benefits described above, the burden and expense of the requested discovery is relatively low. In a case of this magnitude, for three defendants to take a total of thirteen depositions is not unusual, particularly given the breadth of the SEC's pre-suit investigation and the fact that the three additional depositions would be remote and for half days. The depositions would exceed the default deposition limit by only three.

### E. Timeliness of Defendants' Motion

The SEC also contends that Defendants' motion, filed on February 26, 2023 before a discovery cut-off date of March 1, 2023, should be denied because it was brought too late in the fact discovery period. (Doc. 168, at 1-7). The SEC relies for this relief on

---

[8]   RMS's case law on this point (Doc. 166, at 4-5) is inapposite. *Uppal v. Rosalind Franklin Univ. of Med. & Sci.*, 124 F. Supp. 3d 811, 815 (N.D. Ill. 2015), recognized non-parties have an obligation to provide evidence upon an appropriate request but denied the requested discovery on relevance grounds. And *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998), relied primarily on the chilling effect on free speech when it prevented Microsoft from invading the interview files of non-party scholars with no connection to the litigation. Neither case is relevant to the instant issue.

*Lohmeir v. Gottlieb Mem'l Hosp.*, 2021 WL 5005722, at *3-4 (disallowing depositions partly because plaintiff knew for months that she needed the discovery but sought it two days before discovery cut-off); *The Medicines Co. v. Mylan Inc.,* 2013 WL 120245, at *3 (N.D. Ill. Jan. 9 2013) (same where proponent of discovery gave no reason for waiting nine months to seek discovery); and *LKQ Corp. v. Gen. Motors Co.*, 2021 WL 4125097, at *3 (N.D. Ill. Sept. 9, 2021) (same where eight depositions, found to be disproportionate to needs of case, were noticed in last five weeks of discovery).

Defendants rejoin by showing that (i) they requested the two examiner depositions in October/November 2022 but, at the request of the SEC, agreed to wait and see if the depositions were still necessary after deposing other examiners, and (ii) they were actively negotiating with the SEC and RSM in this same time frame about additional RSM depositions. (Doc. 173, at 3-5; Doc. 173-6; Doc. 173-7).[9] As Defendants informed the Court in a joint status report ("JSR") on November 14, 2023 (Doc. 148, at 2-3), "the parties have agreed to defer further negotiations related to the depositions of [the] two additional SEC witnesses until after the three agreed-upon SEC witnesses have been deposed" and the parties and RSM had also agreed to "defer further negotiations related to the deposition of . . . additional RSM witnesses until after other agreed-upon depositions have occurred," all to avoid burdening the Court with unnecessary motion practice. (Doc. 148, at 2-3; see Doc. 173, at 4-6). In the January 11, 2023 JSR, Defendants stated that the parties were still discussing the additional SEC and RSM depositions and a motion would be brought if necessary. (Doc. 153, at 3; Doc. 173, at 6). For this and other reasons, the

---

[9]     Defendants ultimately deposed the RSM engagement partner and an audit staff member; two RSM valuation specialists; and two RSM national office auditors that consulted on the engagement and the SEC's examination and investigation of SBB. (Doc. 159, at 5-6).

parties agreed to a one-month extension of discovery (which was granted) to work through these and other issues. (Doc. 154, at 1-2; Doc. 155). Defendants also explain that they waited until after deposing the last RSM witness on February 17, 2023 to formulate and file the instant motion (on February 26) so as to bring one motion (instead of two) on deposition issues. (Doc. 173, at 4-6).

These circumstances do nor mirror the cases about discovery delays on which the SEC relies. Defendants' approach—seeking only two additional, half-day depositions, holding off on seeking the depositions until their need was apparent from the results of other discovery, and keeping the SEC and the court informed of their negotiations and intentions—was logical and reasonable. Moreover, Defendants do not seek to extend any other deadlines but ask to take these minimal depositions in the post-cutoff period. (Doc. 173, at 5). Indeed, the SEC planned to take an additional deposition in this same time frame. (*Id.*; see JSR, Doc. 153, at 2). The motion is not untimely.

## CONCLUSION

For the reasons stated herein, Defendants' motion to compel (Doc. 158) and motion to take more than ten depositions (Doc. 159) are granted. RSM is to produce the documents listed at lines 28-31 of its privilege log by June 30, 2023.


ENTER:


Dated: June 27, 2023

_____
SHEILA FINNEGAN
United States Magistrate Judge