# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| U. S. SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) | Case No.: 1:19-cv-06473 |
| ) | |
| v. ) | Hon. Sharon Johnson Coleman |
| ) | |
| SBB RESEARCH GROUP, LLC, et al., ) ) | |
| ) | |
| Defendants. ) | |

## SECURITIES AND EXCHANGE COMMISSION'S
## _DAUBERT_ MOTION TO LIMIT THE OPINION TESTIMONY OF ARUN SEN

April 12, 2024

Timothy S. Leiman (leimant@sec.gov
Kevin A. Wisniewski (wisniewskik@sec.gov)
Robert M. Moye (moyer@sec.gov)
Devlin N. Su (suede@sec.gov)
SEC Chicago Regional Office
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

_Attorneys for Plaintiff United States Securities and Exchange Commission_

## TABLE OF CONTENTS

**BACKGROUND** ................................................................................................2

**ARGUMENT** ..................................................................................................6

    I.    Sen's Regression Analysis Is Unreliable ...............................................7

        1. Sen's Analysis Improperly Excluded
          Adverse Data from 2011 and 2012.....................................................8

        2. Sen Omitted From His Report A *Second Regression*
          Analysis That Contradicted His Ultimate Opinion ...........................11

        3. Sen's Regression Analysis Suffers From Serious
          Data Errors That, When Fixed, Contradict His Opinion...................12

    II.    Sen Cherry-Picked Studies to Support
        His Critique of McCann's Model......................................................14

    III.    Sen's "Waterfall" Analysis is Unreliable
        and Will Confuse the Jury.................................................................18

**CONCLUSION**.................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Barber v. UAL, Inc.*,
   17 Fed. Appx. 433 (7th Cir. 2001) ............................. 8

*Bricklayers & Trowel Trades Intern. Pen Fund v. Credit Suisse Secs. (USA) LLC*,
   752 F.3d 82 (1st Cir. 2014) ............................. 9

*Burst v. Shell Oil Co.*,
   2015 WL 3755953 (E.D. La. June 16, 2015) ....................... 16-17

*Cates v. Whirlpool Corp.*,
   2017 WL 1862640 (N.D. Ill. May 9, 2017) .............. 8-9

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ............................. 1, 6, 7

*Greene v. Sears Protection Co.*,
   2018 WL 4716189 (N.D. Ill. Mar. 8, 2018) .................. 19

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) ....................... 16

*In re Rezulin Products Liab. Litig.*,
   369 F. Supp. 2d 398 (S.D.N.Y. 2005) ....................... 16

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ............................. 6, 7

*LeClercq v. LockFormer Co.*,
   2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ................. 9

*Lewis v. CITGO Petroleum Corp.*,
   561 F.3d 698 (7th Cir. 2009) ....................... 6

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ................... 7

*McEwen v. Baltimore Washington Med. Ctr. Inc.*,
   404 Fed. Appx. 789 (4th Cir. 2010) .................. 16

*Smith v. Ford Motor Co.*,
   215 F.3d 713 (7th Cir. 2000) ..................... 19

*U.S. Gypsum Co. v. LaFarge N.A. Inc.*,
   670 F. Supp. 2d 748 (N.D. Ill. 2009) .................. 7

*Van v. Ford Motor Co.*,
   332 F.R.D. 249 (N.D. Ill. 2019) ................... 8

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*,
   395 F.3d 416 (7th Cir. 2005) ..................... 20

**Rules**

Fed. R. Evid. 702 ........................................................................................... 6

The SEC respectfully moves to limit the testimony of the Defendants' valuation expert, Dr. Arun Sen, under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny. Sen offered opinions purportedly rebutting those of Dr. Craig McCann, the SEC's valuation expert. McCann opined that Defendants' methods for valuing SBB's structured note investments were contrary to well-established academic research and industry practice. Sen did not opine on the reasonableness of Defendants' conduct and did not, in fact, rebut McCann's principal opinions. Notably, Sen did not dispute McCann's central conclusion (and the core of the SEC's fraud charge): that the valuation model SBB used from 2011 through 2016 to value its structured notes was riddled with deficiencies and was inconsistent with industry practice. Instead, in the main, Sen offered distractions in the form of (a) an unreliable regression analysis and (b) categorical critiques of McCann's model that have no basis. Those opinions have no place at the upcoming trial.

This Court should limit Sen's testimony in *three* respects. *First*, Sen offered an irreparably flawed regression analysis purportedly showing that there was no statistically significant difference between SBB's structured note valuations and values generated by third parties. But, that analysis should be excluded because it is (a) based on a cherry-picked data set that skewed the results, and (b) wholly contradicted by a *second* analysis Sen performed, but excluded from his report. *Second*, the Court should exclude Sen's baseless assertion that the model McCann used to value SBB's notes was "not supported by option pricing theory and research …" because Sen apparently did *not even read* the supporting authority cited by McCann and Sen effectively confirmed that there was no practical difference between his model and McCann's model. In short, Sen's critique of McCann's method provides a snappy quote, but is groundless. *Third*, the Court should exclude Sen's

"Waterfall" analysis because it contains numerous errors and is irrelevant to the facts of this case.

There are two valuation issues at the heart of this case: (1) did SBB's bespoke valuation model conform to the assumptions and practices of market participants as required by generally accepted accounting principles ("GAAP"), and (2) did SBB's model tend to overvalue its notes as compared to standard models used by market participants. On the first issue, Sen has nothing to say. On the second, Sen offers three irreparably unreliable opinions which threaten to (a) mislead the jury with flawed analysis, and (b) distract the jury with unsupported quips at McCann's expense and irrelevant demonstrative charts. This Court should exercise its gatekeeping authority under *Daubert* and shield the jury from Sen's unreliable expert testimony.

## BACKGROUND

This fraud case centers on SBB's improper valuation of structured note investments that it managed for a group of private investment funds. The SEC alleges that, beginning in 2011, Defendants fraudulently inflated the value and performance of these investments by using a home-brewed valuation model that, by design, defied fifty years of widely accepted and generally applied valuation methods. Using the manipulated note values, Defendants reported artificially inflated fund performance to investors, collected inflated fees, and created a false track record of success that they marketed to outside investors. Meanwhile, Defendants falsely assured investors and prospective investors that they had valued their structured notes according to GAAP which required them to use valuation methods consistent with the assumptions and practices of market participants.

2

Defendants portrayed Sen as a purported "rebuttal" expert in response to the opinions offered by the SEC's valuation expert, Dr. Craig McCann. McCann opined that SBB's valuation model significantly departed from – and was inconsistent with – established valuation principles, published scientific research, industry standards, and practices of market participants. McCann identified six deficiencies in SBB's valuation model:

1. SBB's valuation model violated the widely accepted and generally applied "risk neutral" approach to asset valuation.[1]

2. SBB's drift term "*mu*" – which used expected stock market returns to project out asset values, instead of the widely accepted and generally applied risk-free rate – (i) substantially inflated the value of SBB's structured notes, and (ii) had **no** support in well-accepted academic research and was not used by other market participants.

3. SBB's use of *mu* to project out asset values, while discounting those payoffs back to the present using the risk-free rate of interest, violated the widely accepted and generally applied risk neutral framework.

4. SBB's use of historical volatility multiplied by *"beta"* – a volatility multiplier that SBB created out of whole cloth – had **no** support in well-accepted academic research and was not used by other market participants.

5. SBB's use of "linearization" – which SBB also created out of whole cloth – (i) artificially smoothed the inflated returns caused by *mu* and *beta* and (ii) had no support in well-accepted academic research and was not used by other market participants.

6. SBB's failure to adjust its valuations for counterparty credit risk departed from basic industry practices.

(Ex. 3, McCann Expert Report ("McCann") ¶¶ 83-112.)

McCann opined that, because of these radical departures from standard valuation practice, SBB's model "systematically over-valued call options and undervalued put options

---

[1] Option valuation models, like the one at issue here, include: (a) a "drift term" rate used to project the value of the option over its term, and (b) a "discount rate" that later reduces the projected value of the option to a current value. As McCann and Sen have each testified, standard valuation models use the risk free rate – *i.e.*, the rate of a high-quality government security (such as a U.S. Treasury yield) – to serve both of those roles. (McCann ¶ 56; Sen Dep 26:6-23.) This is commonly referred to as the "risk-neutral framework" (a bedrock principle of options valuation for the past 50 years). (McCann ¶¶ 52-54.)

embedded in the structured notes purchased by SBB, thereby smoothing and inflating SBB's funds' investment performance." (McCann ¶ 15.) McCann supported his opinion by comparing, on a note-by-note, month-by-month basis, SBB's valuations to the valuations of three third parties who, unlike SBB, applied industry-standard approaches to valuing the structured notes held by SBB: (1) the banks that issued notes to SBB (which included note valuations in monthly account statements to SBB); (2) IHS Markit ("MarkIt") (the valuation service SBB retained in November 2016 to re-value its structured notes after it finally abandoned its defective model); and (3) McCann himself (who used an industry standard model in his report). McCann's analysis showed that SBB's model consistently inflated monthly note valuations as compared to the three industry-standard valuation methods.

Although this was the meat of McCann's report – and central to the SEC's claims – Sen offered no opinion about the reasonableness of SBB's valuation model:

> Q:     [Y]our report … provides no opinions regarding whether the valuation model used by SBB to value its structured notes from [2012] to 2016 was consistent with industry practice, correct?
>
> A:     That's correct. …
>
> ***
>
> Q:     [Y]our report contains no opinion whether the SBB model was consistent with published scientific research, correct?
>
> A:     That is correct.

(*See* Ex. 2, Sen Dep. 18:8-13, 19:21-20:4.)

And, Sen did not address ***any*** of the six deficiencies identified by McCann or the deficiencies detailed in the SEC's Complaint: not *mu* (Sen Dep. 22:1-4; 23:11-13), not SBB's use of historical volatility multiplied by *beta* (Sen Dep. 28:16-23; 29:21-24), and not linearization. (Sen Dep. 32:5-8; 32:13-20.) In fact, Sen admitted that, when developing his own model to value SBB's structured notes, he avoided SBB's deficient inputs. Sen's model:

4

(1) used risk-neutral pricing; (2) used the risk-free rate, **not** *mu*; (3) used the risk-neutral framework both to project out asset values and to discount back at present value; (4) used implied volatility, **not** historical volatility multiplied by *beta*; (5) did **not** apply linearization; (6) and applied a credit risk discount. (Sen Dep. 35:9-22; 24:13-22; 25:25-30:10; 32:21-33:4; 33:14-17; 36:6-13.) Sen admitted that he used these inputs (*i.e.*, not SBB's custom inputs), because it was "standard practice … in academic literature … which is … where I come from to use what's known as [risk-neutral] pricing," which was the "well-established practice," and that his inputs were "appropriate based on … supported literature and research." (Sen Dep. 26:6-9; 33:1-2; 36:16; 30:22-24.) In other words, Sen implicitly acknowledges that SBB's model inputs were not consistent with "well-established practice."

Some of Sen's opinions need not be addressed at the *Daubert* stage. Sen spends the majority of his report describing the "Heston model" – the approach Sen used to value SBB's structured notes. (Ex. 1, Sen Expert Report ("Sen") ¶¶ 35-36, 68-93, Appendix 2 at ¶¶ 1-17.) That discussion does not address any of the SEC's contentions in this case. After all, (a) the SEC has not claimed that McCann's model is the only appropriate one, and (b) neither the SEC nor McCann contests that the Heston Model is a potentially valid approach. Unfortunately, SBB did not use that model. Sen's discussion of the "Heston Model" only helps make the SEC's point: like all other third-party values, the vast majority of Sen's valuations are lower than SBB's inflated values. (*Id.*) Sen's "Heston Model" discussion may, therefore, be useful to the jury (albeit not in the way that Defendants may have hoped). Sen's report, however, offers **three** other opinions that fail to satisfy the rigors of *Daubert* and should be excluded from trial.

5

*First*, Sen conducted a regression analysis purportedly showing that SBB's values were not higher than third-party values to a statistically significant degree. (Sen ¶ 14.) But, Sen's calculations were based on a cherry-picked data set that skewed his analysis to support the desired outcome. *Second*, Sen boldly opined that McCann's model was not "supported by option pricing theory and research …." (Sen Heading IX.a; ¶ 65.) But, Sen fatally undermined that opinion in his deposition, candidly admitting that *he did not read* the peer-reviewed articles McCann cited in support of his valuation method. *Third*, Sen offered a "Valuation Waterfall" analysis purportedly showing that SBB's deficient inputs had an "offsetting effect" *on his model*. But this case is about SBB's deficient model, not Sen's model. Sen also confirmed that his "Waterfall" did not actually test SBB's model inputs. Those three opinions are unreliable and should be excluded.

## ARGUMENT

District courts stand as gatekeepers, protecting jurors from unreliable and irrelevant testimony that might infect their decision-making. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Courts have a "special obligation" to ensure that expert testimony is "not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). An expert may testify only if: (a) the expert's scientific, technical or specialized knowledge will help the trier of fact understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied those principles and methods to the facts of the case. *See* Fed. R. Evid. 702. Here, the burden falls on the Defendants to demonstrate that Sen's testimony satisfies that rigorous standard. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

The standard is just as stringent for non-scientific experts. *See Kumho Tire*, 526 U.S. at 152. "The requirement that expert testimony be based on rigorous and reliable methods applies even when the testimony is not of scientific nature." *See U.S. Gypsum Co. v. LaFarge N.A. Inc.*, 670 F. Supp. 2d 748, 753 (N.D. Ill. 2009). It is not enough that an expert can be cross-examined at trial, as if the parry and thrust of live testimony were sufficient to defeat defective opinions. Indeed, the whole point of Rule 702 and *Daubert* is that the adversary process is ***not*** enough to protect the jury from the effect of unreliable opinions bearing an expert's imprimatur. *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading," so district courts must stand guard "because of that risk."). If an expert does not satisfy the rigors of *Daubert*, that expert should not be examined – let alone *cross*-examined – in front of a jury. *See Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 800 (N.D. Ill. 2005).

Three of Sen's opinions fall far short of the *Daubert* standard and must be excluded: his (1) regression analysis, (2) criticism of McCann's model, and (3) the "Waterfall."

## I.      Sen's Regression Analysis is Unreliable.

Sen opines that SBB's values were "not on average significantly higher compared to those from third-party sources for the period 2013-2015." (Sen ¶ 14.) His conclusion is based on a regression analysis comparing SBB's note values to the issuing Banks' note values from 2013-2015.[2] (Sen ¶¶ 105-117.) Sen's regression analysis is unreliable because it ignores contradictory data, omits contradictory findings, and suffers from irreparable data errors.

---

[2] A linear regression analysis is a statistical approach to explaining the relationship between one dependent variable (SBB's values) and an independent variable (Banks' values).

1. **Sen's Analysis Improperly Excluded Adverse Data from 2011 and 2012.**

Sen cherry-picked a data set for his regression analysis that excluded evidence which he has since admitted may have undermined his conclusion that SBB's values were statistically "in line" with third party values. There is no dispute that: (a) the SEC's allegations address SBB's note valuations starting in 2011, and (b) Sen had access to SBB and Bank values for 2011 through 2015. Yet, without a viable explanation, Sen disregarded *all* note values from 2011 and 2012 and, instead, limited his regression analysis to the 2013 to 2015 time period. (Sen ¶¶ 14, 116.)

Sen's report hints at a possible reason for this omission. There, Sen acknowledged that the variance between SBB's values and third-party values was at its greatest (*i.e.*, most adverse to Sen's conclusion) in 2011 and 2012:

> I observe that the SBB values were ***higher*** than those from other sources on average ***by a wider margin in 2011 and 2012*** than was the case for 2013-2015 … [O]n average SBB's values were ***higher*** on a monthly basis than … the values from MarkIt by 7.8% of par for 2011-12 while the gap narrowed to 4.2% of par for 2013-2015.

(Sen ¶ 93 (emphasis added).) Rather than look at the entire period of the SEC's Complaint, Sen omitted the 2011-2012 variance data – which Sen admitted showed a ***85.7% higher*** variance – and used only the lower (*i.e.*, more favorable) variance data (from 2013-2015).

Courts routinely exclude expert opinions as unreliable when the analysis is based on cherry-picked data that "suit [the expert's] theory and ignore other portions … that did not." *See Barber v. UAL, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) (excluding testimony under *Daubert* where expert "merely accepted some of the…data that suited his theory and ignored other portions…that did not"); *Van v. Ford Motor Co.*, 332 F.R.D. 249, 269 (N.D. Ill. 2019) (excluding expert testimony based on "cherry picked" data); *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017) ("[i]gnoring relevant data is not a scientifically

valid method" and "an expert is not permitted to simply ignore evidence that is contrary to her opinion in implementing an accepted methodology") (Ex. 7); *Bricklayers & Trowel Trades Intern. Pen. Fund v. Credit Suisse Secs. (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014) (same).

For example, in *LeClercq v. LockFormer Co.*, the court excluded an expert analysis that traced contaminants flowing from defendants' facility into groundwater. 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (Ex. 8). Defendants moved to exclude the analysis as unreliable because the expert ignored multiple samples showing no subject contaminants. *Id*. The court agreed, finding the expert's "failure to discuss the import of, or even mention, these material facts in his reports amounts to 'cherry-picking' the facts he considered to render his opinion, and such selective use of facts fails to satisfy the scientific method and *Daubert*." *Id*. The expert's disregard of relevant data "undermine[d] the reliability" of his entire opinion. *Id*. So it is here. Sen failed to incorporate in his regression analysis the admittedly "higher" variance data from 2011 and 2012 that would have adversely affected his conclusion. Such "selective use of facts" renders his opinion unreliable.

At his deposition, Sen offered an excuse for excluding the 2011 and 2012 data. He claimed that exclusion was warranted because the "SBB [valuation] model was essentially in a state of flux" during that time and was only finalized in 2013. (Sen Dep. 117:23-25, 122:7-8.) The inadequacy of Sen's excuse was quickly exposed as he clarified that he didn't know that the model also changed during the 2013-2015 period he had focused on:

Q:     SBB made changes to its model after 2013, correct?

A:     I think their next major change would have been 2016, which I also don't include.

Q:     Are you aware that SBB had made changes to its model in 2013?

A:     If there were changes, my understanding is those changes are not on the scale – or, for instance, the 20 – when I say their model was in flux in '11 and '12, I

9

> believe that's when they were actually literally adding or subtracting some of these major components, but –
>
>                         ***
>
> Q:    So do you know one way or the other whether SBB made any modifications to its model in 2013? …
>
> A:    No. That I don't specifically recall.

(Sen Dep. 121:10-122:14.)

Defendants, in fact, significantly modified SBB's model in 2013. They created a list detailing the substantive changes made to SBB's model *after* 2012, including adding (and later modifying) the linearization "smoothing" mechanism (one of the central model deficiencies underlying the SEC's Complaint). (*See* Ex. 5.) Sen purportedly "relied upon" this list, but evidently disregarded it for the purposes of selecting his data set. (*See* Sen at Ex. 2, citing *Matt Aven Jan. 24, 2017 Sworn Testimony & Exhibits*.)

Sen's excuse for cherry picking data also is inconsistent with the SEC's allegations and SBB's own conduct. The SEC's Complaint makes clear that the Defendants' started using a deficient valuation model *in 2011*. (*See* Dkt. No. 1 ¶ 7; ¶ 42). And, while Sen describes the model as being "in flux" in 2011-2012, he ignores the fact that Defendants continued to use those valuations in marketing materials provided to investors.[3] (*See* Ex. Ex. 11, Polysight I February 2016 Fact Sheet.) In short, Sen's excuse does not justify his cherry-picking of data. Rather, Sen's acknowledgement in his report related to the 2011-2012 data is the most plausible explanation for its omission: Sen excluded the 2011-2012 data because it undermined his conclusion.

---

[3] Sen's selective focus on 2013 – 2015 data also is inconsistent with: (a) the time period covered in McCann's Report (*See* McCann Report at Appendix 2) and (b) *his own Report* (*See* Sen Report at Exhibit 3). Sen and McCann each used their models to re-value certain SBB structured notes for 2011 and 2012. Sen only dropped the 2011-2012 data when conducting his regression analysis.

2. **Sen Omitted From His Report A *Second Regression* Analysis That Contradicted His Ultimate Opinion.**

Sen's opinion that SBB's values were "***not*** on average statistically higher compared to those from third-party sources" was based on comparing SBB's values to those of the issuing Banks. (Sen ¶ 14 (emphasis added).) In addition to using cherry-picked data, Sen failed to disclose that he performed a ***second*** regression analysis ***that contradicted his conclusion***. It turns out that Sen also compared SBB's values to MarkIt's values, another third-party source. Contrary to Sen's stated opinion, that undisclosed analysis showed that ***SBB's values were statistically higher*** compared to MarkIt. Stated differently, Sen's undisclosed regression analysis undermined the reliability of the one he disclosed.

The Court won't find any reference in Sen's report to his adverse, MarkIt regression analysis. The SEC only learned about it at his deposition. (Sen Dep. 112:9-116:25.) After the SEC probed the topic, Sen admitted that his MarkIt regression analysis resulted in a statistically significant alpha[4] – meaning that the variance in values between SBB and MarkIt was statistically significant:

> Q: Do you recall in your [MarkIt] regression analysis whether the alpha was statistically significant?
>
> A: I'm saying for 2013 through '15, I think it may have been …
>
> Q: But for the alpha, it was statistically significant?
>
> A: I believe it – from '13 to '15, I believe it was significant and positive.

(Sen Dep. 114:22-115:8.) When asked *why* he hid the MarkIt regression analysis, Sen tried to minimize his error, claiming: "I mean, I don't think in the end, it adds anything." (Sen Dep. 116:24-25.) But, Sen's undisclosed MarkIt regression analysis "adds" a lot: it shows

---

[4] In Sen's regression anlaysis, $\beta$ ("beta") represents the "sensitivity of the SBB valuations to the third-party values,"and $\alpha_i$ ("alpha") represents "any constant residual difference in the pricing of each note," which he used to measure the amount by which SBB's value differed from the Bank's values.

that SBB's values *are* statistically higher than a third-party source, directly contradicting his opinion that "SBB's values were not on average statistically higher compared to those from third-party sources …." (Sen ¶ 14.). Sen's deliberate exclusion of his second regression analysis undermines the reliability of the opinion he plans to offer the jury.

### 3. Sen's Regression Analysis Suffers From Serious Data Errors That, When Fixed, Contradict His Opinion.

In addition to the reliability issues discussed above, Sen committed two serious data errors that irreparably skewed his regression analysis. When those errors are fixed, the outcome is reversed—showing that SBB's values *are statistically higher* than the Bank values.

*First*, Sen omitted from his regression analysis a significant number of observed note values. That omission biased his analysis toward incorrectly concluding that SBB's note values were in line with Bank values. Specifically, when conducting his analysis, Sen erroneously excluded *349* monthly note valuations (almost a third of the total data set). Here's how this critical mistake happened. Sen's regression compared month-end SBB values to month-end Bank values for 78 structured notes. His data set consisted of 763 observed month-end note values between 2013 and 2015. (Sen Dep. 215:4-9.) Sen and his team obtained the 763 observations by using software code which purportedly merged Bank values with SBB values by matching the valuation date (*e.g.*, March 31, 2015). (Sen Dep. 217:13-218:23.) But, that merger operation led to a simple, devastating error. Sometimes the month-end values Sen was comparing were reported on slightly different dates. Bank values for SBB's notes were reported with month-end dates, as is common for monthly account statements, while SBB's values were reported only on trading days. Sen's merger operation did not account for that fact. If a "month-end" date did *not* fall on a trading date – say, on a Saturday – Sen's code did not recognize the one-day difference and instead mistakenly

excluded that month's SBB and Bank values from his data set.[5] (Sen Dep. 215:10-15, 217:19-218:12.) This error was repeated hundreds of times, resulting in Sen's exclusion of *349* monthly note valuations—31.4% of the total data set. (Sen Dep. 215:18-20.)

The exclusion of nearly a third of the available data skewed Sen's results. In his Rebuttal Report, McCann found that by excluding the 349 observations from his regression analysis, Sen improperly increased the threshold against which the estimate of Sen's average alpha was judged and, therefore, biased his analysis toward incorrectly concluding that SBB's values were in line with the Bank values. (Ex. 4, McCann Rebuttal ¶ 24.) In his deposition, ***Sen agreed that including the 349 observations would have impacted his findings***. (Sen Dep. 219:16-220:12.) ("… it is correct that if you add in all those [excluded] observations, if you fix this date issue … and then re-run the regression, the P value will drop. It drops to, I believe, 10 or 11 percent. … the number changed. That is true.").[6]

Sen's *second* data error was that he included SBB Note 20—an inverse note—in his regression analysis, which artificially reduced the average variance between SBB's values and Bank values. Seventy-seven of the 78 notes (98.7%) Sen used in his regression analysis were "bullish notes," meaning the value of the note ***increased*** when the S&P 500 or Russell

---

[5] For example, the Bank's note values for August 2013 were dated August 31, 2013 (a Saturday). SBB's note values for August 2013 were dated August 30, 2013, a Friday. Rather than recognize that the values were still comparable, Sen's code excluded all data for August 2013. (Sen Dep. 216:12-218:12.)

[6] Similar to Sen's "alpha," the "p-value" in a regression analysis indicates whether your results are statistically significant. (Sen Dep. 219:21-25.) Strangely, Sen tried to blame McCann for his data-merging error. This, even though he had all the data he needed; SBB's monthly valuations and valuations in monthly Bank statements have been in SBB's possession since before this case even began. In addition, Sen conceded, as he must, that: (a) McCann's report included all 1,112 observations (a fact that Sen presumably noticed before conducting his own analysis), and (b) Sen and his associates performed the defective data merging operation that led to the exclusion of 349 note values. (Sen Dep. 216:13-218:12; 220:14-19; 221:1-3.) Sen's misguided attempt to blame McCann also is beside the point. Regardless of the source of the error, Sen concedes that correcting his error changes the result.

2000 – the assets underlying the option component of the note – increased. (228:6-15.) But, one note, Note 20, was an outlier. Note 20 was an "inverse note" that – true to its name – **decreased** when the S&P 500 or Russell increased. Because SBB's model *overstated* the value of the options embedded in the "bullish notes," SBB's values on its bullish notes were generally *greater* than third-party values. Note 20 worked the opposite way: consistent with the SEC's allegation that SBB's model exaggerated note values, SBB's values on Note 20 were generally *lower* than third-party values.

McCann opined that, by including the outlier Note 20, Sen "dramatically reduce[d]" his estimated average alpha. (McCann Rebuttal ¶ 26.) Again, while omitting the issue from his report, Sen recognized the problem in his deposition, admitting that "[c]ertainly … dropping Note 20 might affect the P-value that I talked about."[7] (Sen Dep. 228:23-25.)

When Sen's two data errors are fixed—including *all* available month-end note values and excluding Note 20—Sen's regression analysis gets turned on its head: the difference between SBB's values and Banks' values are **statistically significant**. (McCann Rebuttal ¶ 28.) In sum, Sen (1) cherry-picked a data set, which excluded relevant, adverse data, (2) failed to disclose a *second* regression analysis that contradicted his ultimate opinion, and (3) committed serious data errors, **rendering his regression analysis opinion unreliable**. Sen's flawed regression analysis can only mislead a jury and should be excluded.

## II. Sen Cherry-Picked Studies to Support His Critique of McCann's Model.

Sen opines that the model McCann used to value SBB's structured notes "is not supported by option pricing theory or research for such a purpose" and therefore cannot be

---

[7] In the context of a regression analysis, the "p-value" is the overall test for significance. Generally, a p-value of 5% or lower is considered statistically significant and vice-versa. (Sen Dep. 233:18-234:5.)

used to "evaluate the reasonableness of SBB's note values." (Sen ¶¶ 9, 65.) Sen's pithy criticism of McCann's model (Sen ¶¶ 7-10, 58-66) should be excluded as unreliable because he admittedly ignored: (a) the peer-reviewed literature cited and relied upon by McCann and (b) contradictory analysis in the literature Sen cited in his own report.

Sen's conclusion is flawed because, rather than critique the research McCann relies on, Sen puts his head in the sand. He simply ignores studies that contradict his conclusion. For example, while confidently claiming that McCann's methods lack any academic basis, Sen (a) could not recall whether he even read the peer-reviewed academic literature McCann cited in support of his report (Sen Dep. 81:6 to 82:8.), and (b) conceded that the articles probably *did* support McCann's approach:

> Q:     … The last sentence of Paragraph 41, Dr. McCann states: In addition to the literature on valuing structured notes in general, which can be easily adapted to worst of structures, there was existing literature in the 2000's for dealing with exactly the notes that SBB was purchasing. And you see Footnote 8?
>
> A:     Yes, I see that.
>
> Q:     In Footnote 8, Dr. McCann cites two sources that he states support the valuation approach he used to value dual underlying structured notes.
>
> A:     Yes, I see that.
>
> Q:     … Did you review those articles?
>
> A:     I do not recall at this point.
>
> Q:     Okay. Do you know whether those articles address valuing structured products of the two underlying assets?
>
> A:     I don't know offhand, except from the title of the two papers. It appears that they do.

(Sen 83:19-84:16.)

> Q:     … getting back to Dr. McCann's report, Paragraph 41 … Do you have any reason to believe that the authority that he cites, or the journals that he cites in Footnote 8 do not support his framework or approach to valuing structured notes with dual underlyings?
>
> A:     I have no reason to think that they contradict, against, what I'm calling his overall skeleton or framework. … [A]gain, I don't recall specifically what

15

would be in these paper[s], but I have no reason – you know, so I don't recall, but it could very well be the case that they do support that overall approach …

(Sen 86:19-87:6.)

Once cornered, Sen tried to back-peddle, claiming that his critique of McCann's model was ***not*** based upon generally available research or peer-reviewed articles, but, instead, was based simply on those few articles that Sen had selected:

- "So you know and – when one makes a statement like [mine], one is not claiming to have read every paper out there." (Sen Dep. 89:20-22.)

- "So I'm not claiming to have reviewed – I don't – I'm not claiming to have reviewed all papers out there, including [the] particular papers that [McCann] may or may not have cited. I just don't recall." (Sen Dep. 91:1-4.)

- McCann's approach, "it's not supported ***by the research that I have reviewed***. I would put it that way, yes." (Sen Dep. 80:23-24.) (emphasis added)

But by cherry-picking studies that purportedly supported Sen's opinion while ignoring studies that contradicted his opinion, Sen committed a classic *Daubert* violation. *See, e.g., In re Rezulin Products Liab. Litig.*, 369 F. Supp. 2d 398, 426 (S.D.N.Y. 2005) (excluding expert that ignored published articles and research casting doubt on expert's opinion, finding that expert "selectively chose his support from the scientific landscape" and "discussed only the evidence that they believed would advance plaintiff's position"); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert testimony where expert "cherry-pick[ed] observational studies that support his conclusion."); *McEwen v. Baltimore Washington Med. Ctr. Inc.,* 404 Fed. Appx. 789, 791–92 (4th Cir. 2010) (upholding exclusion of expert testimony where experts "failed to meaningfully account for ... literature at odds with their testimony"); *Burst v. Shell Oil Co.,* 2015 WL 3755953, *16 (E.D. La. June 16, 2015) (excluding expert testimony because expert "did not present a meaningful analysis in which he reconciled this conflicting

16

group of studies" but "simply provides a literature review, at times supplemented by his own commentary and states a conclusion") (Ex. 9).

Perhaps realizing that his criticism of McCann was overstated, Sen back-peddled even further, admitting that he was not criticizing the majority of McCann's approach, only his volatility input. In fact, Sen admitted that the "overall framework" McCann used to value SBB's notes was "very similar" to his own:

> A:   I'm criticizing a very specific aspect of Dr. McCann's methodology, which is namely how he calibrates and models volatility. … [T]he overall skeleton of his framework to be roughly in line with various papers out there, and that might very well be so.
>
> Q:   So aside from his volatility input, is there anything wrong with [McCann's] methodology or model that he used to value structured notes in this case?
>
> …
>
> A:   Not necessarily. In fact, I would point out that the primary difference between his model and mine is the treatment of volatility. The overall framework is very similar, I think, as I even state in my own report."

(Sen Dep. 84:22 to 85:19.)

Finally, Sen came full circle and admitted that McCann's approach is reasonable and that he "essentially mimic[ed] it" in valuing SBB's notes:

> Q:   So the framework that Dr. McCann used to value SBB's notes in this case was reasonable?
>
> A:   I'm saying in a sense, aside from the volatility part, which is not a minor thing, the overall sort of skeleton [of McCann's model] … [i]n that sense, his framework is not necessarily unreasonable. Indeed, I essentially mimic it.

(Sen Dep. 85:20 to 86:9.)

The death knell to Sen's opinion, however, comes not from a source in McCann's report, ***but from an article cited in Sen's own report***. That article explains that market participants (like banks) use McCann's relative pricing approach and that differences in the volatility input (Sen's sole critique) have very little impact on valuation:

17

> Most banks use a relative value approach to pricing. … Consider what would happen if a trader switched from Black-Scholes to another model … Volatility parameters and the volatility surface would change. But, if the model is used for relative pricing in the same way as Black-Scholes, *prices would change very little* and hedging would be similar.

(*See* Sen ¶¶ 61-64, citing Hull & Suo 2002, at p. 298, attached hereto as Exhibit 6 (emphasis added).) Sen may have overlooked this important fact because, as he admitted, he has no knowledge about how market participants value structured notes.[8]

Sen's terse conclusion that McCann's model "lacks support" (Sen ¶¶ 7-10, 58-66) may be a nice sound bite, but it is *not* reliable or scientifically sound, is *not* supported by a balanced review of the applicable peer-reviewed articles and academic research, is *not* "good science," and, in several respects, is contradicted by Sen's own testimony. Sen should, therefore, not be allowed to present that opinion to the jury.

## III.  Sen's "Waterfall" Analysis is Unreliable and Will Confuse the Jury.

Sen's "Waterfall" charts purportedly show that SBB's deficient model inputs had "offsetting effects" on structured note valuations. (Sen ¶¶ 15, 118-121, Figures 2-4.) But, rather than study how the defective SBB inputs actually worked in *SBB's* model, Sen showed how they purportedly impacted *his* values. Showing the impact SBB's inputs had on *Sen's* model and *Sen's* note values is not relevant to any claim or defense in this case. To state the obvious, the SEC's claims are based on the deficiencies with *SBB's* model, not *Sen's* model. Sen admitted that he was *not* using the Waterfall to opine on the reasonableness of SBB's inputs, the reasonableness of SBB's structured note values, or whether SBB's inputs

---

[8] "I'm not a market practice expert, so I couldn't really opine on that. … the Hull and Suo paper says that sometimes traders might try to do something like that. … [B]eyond what I just sort of quoted or summarized – a phrase from Hull and Suo …. Beyond that, I have no specific knowledge. Again, that's not my area of expertise." (Sen Dep. 134:1 – 135:2.)

complied with industry standards. (Sen Dep. 124:13-19, 128:13-17; 255:4-24.) Accordingly, Sen's Waterfall will not assist the trier of fact in any way.

To make matters worse, Sen's Waterfall did **not** use SBB's actual model inputs and the related Figures in his report mischaracterize his underlying data. *First*, Sen **didn't** actually use SBB's inputs in his "Waterfall." Instead, he tried – but failed – to "replicate" SBB's inputs. (Sen Dep. 274:7 to 280:23) Sen admitted that his "replicated" inputs didn't match SBB's inputs.

> Q:     Do you know why Ankura's replication of SBB's Mu input is different than the Mu input SBB gave its auditor?
>
> A:     I've already explained that we were never able to fully replicate SBB's model. So there will be components, where we're going to be a little bit different. …
>
> …
>
> Q:     But why not use SBB's actual inputs?
>
> A:     … I believe it's more internally consistent [to use Sen's replicated inputs], since we're starting with our own model, to make the changes based on calculations that we actually can see visibly, as opposed to taking a number that we might not quite be able to understand.

(Sen Dep. 278:22 to 279:3; 279:23 to 280:9.) Because Sen's replicated inputs did not match SBB's inputs, the Waterfall would provide the jury no useful information about SBB's inputs or any other issue or defense involved in this case. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("When analyzing the relevance of proposed testimony, the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case."); *Greene v. Sears Protection Co.*, 2018 WL 4716189, at *8 (N.D. Ill. Mar. 8, 2018) ("Determining whether an expert's proposed opinions will assist the trier of fact in assessing a factual issue is essentially a relevance inquiry.") (Ex. 10).

*Second*, Figures 2-4 in Sen's report, which purportedly reflect what happens to Sen's valuations (*e.g.*, increase or decrease) when replacing his inputs with SBB inputs, are

misleading. They do ***not*** accurately reflect (1) all of the inputs Sen changed and replaced or (2) the dollar amount of each change, rendering the Figures misleading. In short, Sen's Figures do not accurately reflect his own analysis. For example, the Figures in Sen's report show that he replaced 6 inputs (credit risk, treasury rate, historical volatility, beta, *mu*, linearization). But he actually replaced 7 inputs (the missing input being "correlation"). Sen's Figures do ***not*** reflect the dollar amount changes tied to the correlation input, rendering the Figures misleading. (Sen Dep. 271:3-11.)

To boot, Sen admits that no methodology, whether derived from academic journals or his personal experience, supports his Waterfall analysis or his application of his methodology to the facts of the case. (Sen Dep. 124:1-3.) Courts must consider whether an expert's conclusions are testable, subjected to peer review or publication, produced by a reliable method using some discernable technique, and the results of a generally accepted methodology or process. *See Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 2018 (7th Cir. 2005). Reliance on intuition "won't do." *Id.* Sen's "Waterfall" fails that standard on all fronts.

## CONCLUSION

To streamline this case and protect the jury from unreliable and irrelevant testimony, the SEC respectfully requests that the Court limit Sen's testimony at trial and exclude any testimony about (1) his regression analysis, (2) his criticisms of McCann's valuation model, and (3) his Waterfall analysis.

Dated:  April 12, 2024

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By:  **/s/ Kevin A. Wisniewski**
Timothy S. Leiman (leimant@sec.gov)
Kevin A. Wisniewski (wisniewskik@sec.gov)
Robert M. Moye (moyer@sec.gov)
Devlin N. Su (sude@sec.gov)
Chicago Regional Office
175 W Jackson Blvd., Suite 1450
Chicago, IL 60604

*Attorneys for Plaintiff United States Securities and
Exchange Commission*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by the Court's

ECF system upon all counsel of record.

 **/s/ Kevin A. Wisniewski**
Kevin A. Wisniewski