# EXHIBIT 7

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

KeyCite Yellow Flag - Negative Treatment

Distinguished by  Tomeo v. CitiGroup, Inc.,  N.D.Ill.,  September 27, 2018

2017 WL 1862640

United States District Court, N.D. Illinois, Eastern Division.

Beth Kljajic & Kathleen CATES, Individually and
on Behalf of All Others Similarly Situated, Plaintiffs,

v.

WHIRLPOOL CORPORATION, Defendant.

No. 15-CV-5980
|
Signed 05/09/2017

**Attorneys and Law Firms**

Katherine Van Dyck, Charles J. LaDuca, Cuneo Gilbert &
LaDuca, LLP, Washington, DC, Alex C. Davis, Jones Ward
PLC, Louisville, KY, Francis Joseph Flynn, Jr., Law Office of
Francis J. Flynn, Jr., Los Angeles, CA, Ismael Tariq Salam,
Katrina Carroll, Lite DePalma Greenberg LLC, Chicago,
IL, Michael J. Flannery, Cuneo Gilbert & LaDuca LLP, St.
Louis, MO, William W. Blair, Onder, Shelton et al, Webster
Groves, MO, Corey David Sullivan, Sullivan Law, LLC,
Bloomington, IN, for Plaintiffs.

Andrew M. Unthank, Erin F. Frohardt, Laura Joan McNabb,
Wheeler Trigg O'Donnell LLP, Denver, CO, Bradley B.
Falkof, Barnes & Thornburg, Chicago, IL, Thomas J.
Palazzolo, Wheeler Trigg O'Donnell LLP, St. Louis, MO, for
Defendant.

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, United States District Court Judge

**\*1** Plaintiffs Beth Kljajic ("Kljajic") and Kathleen Cates's
("Cates") (collectively, "Plaintiffs") have moved to certify
various classes of consumers who purchased allegedly
defective ovens manufactured by Defendant Whirlpool
Corporation ("Whirlpool"). (R. 109.) In support of their
motion for class certification, Plaintiffs rely on the expert
opinion of Albert de Richemond for proof of a common
defect in all ovens purchased by class members. Whirlpool
has moved to exclude de Richemond's opinion under the
Federal Rules of Evidence and *Daubert v. Merrell Dow*
*Pharmaceuticals., Inc.,* 509 U.S. 579 (1993). (R. 134.) On
April 17, 2017, the Court held a *Daubert* hearing in which
de Richemond testified. For the following reasons, the Court
grants Whirlpool's *Daubert* motion and denies Plaintiffs'
class-certification motion.

**LEGAL STANDARD**

"[W]hen an expert's report or testimony is critical to class
certification ... a district court must conclusively rule on any
challenge to the expert's qualifications or submissions prior
to ruling a class certification motion." *Am. Honda Motor Co.*
*v. Allen,* 600 F.3d 813, 815–16 (7th Cir. 2010) (per curiam);
*see also Mednick v. Precor, Inc.,* No. 14 C 3624, 2016 WL
3210400, at \*3 (N.D. Ill. June 10, 2016); *In re Groupon, Inc.*
*Sec. Litig.,* No. 12 C 2450, 2014 WL 2035853, at \*2 (N.D.
Ill. May 16, 2014). De Richemond's opinion regarding the
existence of a common defect is central to at least Plaintiffs'
proof of commonality and predominance. Fed. R. Civ. P.
23(a)(2), (b)(3). The Court therefore must resolve this motion
before turning to Plaintiffs' motion for class certification. [1]

**I. Rule 702 and *Daubert***

"A district court's decision to exclude expert testimony is
governed by Federal Rules of Evidence 702 and 703, as
construed by the Supreme Court in [*Daubert*]." *Brown v.*
*Burlington N. Santa Fe Ry. Co.,* 765 F.3d 765, 771 (7th Cir.
2014). "The rubric for evaluating the admissibility of expert
evidence considers whether the expert [is] qualified, whether
his methodology [is] scientifically reliable, and whether the
testimony would ... assist[ ] the trier of fact in understanding
the evidence or in determining the fact in issue." *Hartman v.*
*EBSCO Indus., Inc.,* 758 F.3d 810, 817 (7th Cir. 2014); *see*
*also Higgins v. Koch Dev. Corp.,* 794 F.3d 697, 704 (7th Cir.
2015) ("Rule 702 and *Daubert* require the district court to
determine whether proposed expert testimony is both relevant
and reliable."). Although the Seventh Circuit reviews "the
district court's application of *Daubert* ... de novo," if "the
court adhered to the *Daubert* framework, then its decision on
admissibility is reviewed for abuse of discretion." *Estate of*
*Stuller v. United States,* 811 F.3d 890, 895 (7th Cir. 2016).

**\*2** A district court's evaluation of expert testimony under
*Daubert* does not "take the place of the jury to decide
ultimate issues of credibility and accuracy." *Lapsley v. Xtek,*
*Inc.,* 689 F.3d 802, 805 (7th Cir. 2012); *see also Ortiz v.*
*City of Chicago,* 656 F.3d 523, 536 (7th Cir. 2011) ("The

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

admissibility determination is not intended to supplant the adversarial process, and so even 'shaky' testimony may be admissible."). Once it is determined that "the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596); *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000))).

A district court's inquiry under *Daubert* is a flexible one and district courts have wide latitude in performing their gate-keeping function under the Federal Rules of Evidence. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Hartman*, 758 F.3d at 818. "[T]he key to the gate is not the ultimate correctness of the expert's conclusions," rather, "it is the soundness and care with which the expert arrived at her opinion[.]" *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (second alteration in original) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). The "proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *see also United States v. Saunders*, 826 F.3d 363, 368 (7th Cir. 2016) ("[F]or expert testimony to be admissible, the proponent of the evidence must establish that the expert's testimony is reliable (and relevant) by a preponderance of the evidence.").

## II. Class Certification

To obtain class certification under Federal Rule of Civil Procedure 23, a plaintiff must satisfy each requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one subsection of Rule 23(b). *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 800 (7th Cir. 2017); *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 513 (7th Cir. 2009). Here, Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting individual members" and that a "class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 373 (7th Cir. 2015). Plaintiffs alternatively seek certification under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Chi. Teachers Union, Local No. 1 v. Bd. of Educ.*, 797 F.3d 426, 441 (7th Cir. 2015); *Porter v. Pipefitters Ass'n Local Union 597*, 208 F. Supp. 3d 894, 904 (N.D. Ill. 2016). [2] Plaintiffs carry the burden of demonstrating compliance with Rule 23 by a preponderance of the evidence. *Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 859 (7th Cir. 2017); *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 811 (7th Cir. 2012).

**\*3** The Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Mulvania*, 850 F.3d at 859 (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 629 (7th Cir. 2001)). Nevertheless, class certification is only appropriate if the Court " 'is satisfied, after a rigorous analysis, that the prerequisites' for class certification have been met." *Bell*, 800 F.3d at 373 (quoting *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 723 (7th Cir. 2011)); *Schneider v. Ecolab, Inc.*, No. 14 C 01044, 2016 WL 7840218, at \*3 (N.D. Ill. Sept. 2, 2016). In conducting its Rule 23 analysis, courts should "not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811. Where an issue affects class certification, however, "a court may not simply assume the truth of the matters as asserted by the plaintiff." *Id.* "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, "[i]f there are material factual disputes that *bear on the requirements for class certification*, the court must 'receive evidence if only by affidavit and resolve the disputes before deciding whether to certify the class.' " *Bell*, 800 F.3d at 377 (emphasis in original) (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). Thus, the class certification inquiry "[f]requently ... will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 350–51; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Schneider*, 2016 WL 7840218, at \*3.

## BACKGROUND

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

## I. Plaintiffs' Motion for Class Certification on the Basis of a Common Defect

Plaintiffs seek to certify various classes based on an alleged defect in Whirlpool's Vision II Platform Wall Ovens ("Ovens"). Specifically, Plaintiffs explain that "the core operative facts underlying [their] claims are that the Ovens suffer from the same inherent Defect that cause[s] the Ovens to become unusable when the self-cleaning function is run," (R. 167, Pls.' Reply Supp. Mot. Class Cert., 3), and that the Ovens "are prone to overheat and lock up when the self-cleaning cycle is used, leaving the[ ] Ovens locked and unusable," (R. 114, Pls.' Mem. Supp. Mot. Class Cert., 1). According to Plaintiffs, the Vision II Platform Ovens "us[e] the same chassis" as well as the "same self-cleaning feature," which functions by heating the oven to a very high temperature to break down organic components into ash. (*Id.* at 2.) Due to the high oven temperature during self-cleaning, which purportedly reaches approximately 855 degrees Fahrenheit, Plaintiffs contend that "appropriate venting of the super-heated air is critical to maintain safe operation of the Ovens." (*Id.* at 3.)

In their Second Amended Class Action Complaint, Plaintiffs seek certification under Federal Rule of Civil Procedure 23 on behalf of the following class: "Any and all individuals who purchased, at retail price and for personal use, a Whirlpool Oven with a self-cleaning mechanism." (R. 49, Second Am. Class Action Compl., ¶ 48.) They bring claims for breach of warranty, consumer fraud, and unjust enrichment. (*See* R. 114 at 24–27.)

In their brief supporting their class certification motion, Plaintiffs are more precise about the classes they seek to represent:

### Rule 23(b)(3) Classes

- All individuals residing in the States identified in Exhibit 1 who purchased a Whirlpool Oven with a self-cleaning mechanism (the "Multi-State Class"). [3]

- All individuals residing in the States identified in Exhibit 1 who purchased a Whirlpool Oven sold by IKEA with a self-cleaning mechanism (the "IKEA Multi-States Class").

(R. 114 at 9.) For these classes, Kljajic pursues claims for breach of express warranty and violation of the Magnuson-Moss Warranty Act ("MMWA"). (*Id.*) Plaintiffs also seek to certify classes of:

- All individuals who purchased a Whirlpool Oven with a self-cleaning mechanism in the state of Illinois (the "Illinois Class").

- **\*4** • All individuals who purchased a Whirlpool Oven sold by IKEA with a self-cleaning mechanism in the state of Illinois (the "IKEA Illinois Class").

(*Id.*) For these classes, Kljajic pursues claims for violation of the Illinois Consumer Fraud Act ("ICFA"), violation of the MMWA, breach of implied warranty, breach of express warranty, and unjust enrichment. (*Id.*) In addition to the above classes, Plaintiffs seek to certify a class of:

> • All individuals who purchased a Whirlpool Oven with a self-cleaning mechanism in the state of South Carolina (the "South Carolina Class").

(*Id.*) For this class, Plaintiffs pursue a claim of unjust enrichment. (*Id.*)

### Alternative Rule 23(b)(2) Classes

Plaintiffs also seek, in the alternative, to certify the following injunctive classes:

- All individuals residing in the States identified in Exhibit 1 who purchased a Whirlpool Oven with a self-cleaning mechanism (the "Injunctive Multi-State Class").

- All individuals residing in the States identified in Exhibit 1 who purchased a Whirlpool Oven sold by IKEA with a self-cleaning mechanism (the "Injunctive Multi-State IKEA Class").

(*Id.* at 9–10.) For these classes, Plaintiffs pursue breach of express warranty and MMWA claims. (*Id.* at 10.)

### Issues Classes Under Rule 23(c)(4)

In addition, Plaintiffs seek "to certify all issues subject to common proof in accordance with Rule 23(c)(4)." (*Id.*) The common issues Plaintiffs identify are "whether the Ovens contain a defect in that the Ovens are prone to fail when the self-cleaning cycle is used," "whether the

Case: 1:19-cv-06473 Document #: 210-7 Filed: 04/12/24 Page 5 of 24 PageID #:5737

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

defect existed at the time it left Defendant's control," and "whether Defendant concealed the defect from Plaintiffs and the proposed class." (*Id.* at 34; *see also id.* at 22–23.)

\* \* \*

Plaintiffs identify "[c]ommon evidence of the existence of a Defect" as a common issue for each class action claim. (*See id.* at 24–27.) Plaintiffs put forth the expert opinion of Albert de Richemond to establish the common defect in the Ovens. They cite, for example, de Richemond's opinions in describing "the defect at issue" in their opening class certification brief, (*see id.* at 3), as well as in their reply class certification brief, (*see, e.g.*, R. 167 at 1). In short, Plaintiffs point to de Richemond's opinions to tie the class action claims together by establishing an inherent defect in every Oven rather than, for example, a defect confined to some subset of Ovens. (*See, e.g.*, *id.* (discussing a defect "common to the Ovens" and citing de Richemond's reports).)

Plaintiffs have continually moved the goalpost with respect to identifying a common defect. The operative complaint in this case lists a wide variety of defect candidates. Specifically, Plaintiffs define the term "Defect(s)" in the complaint as "including but not limited to, one or more of the following":

> (a) the Ovens lack a proper thermostat that regulates the self-cleaning temperature during self-cleaning; (b) the Whirlpool Ovens lack proper insulation to prevent the excessive heat from damaging component parts during the self-cleaning process; (c) the thermoregulator does not regulate the temperature of the Ovens during the self-cleaning cycle; (d) the Ovens and their component parts cannot withstand the heat generated by the self-cleaning cycle; (e) the Ovens contain insufficient fan cooling near electronics; (f) the Ovens are built with a fuse that is insufficiently thermal tolerant; and/ or (g) the Oven's self-cleaning cycle creates temperatures that exceed the

heat necessary for an Oven to be self-cleaned.

**\*5** (R. 49 at ¶ 3.)

In their opening brief supporting their motion for class certification, Plaintiffs are somewhat coy in specifically identifying the defect in the Ovens. At times, they appear to suggest that the defect is a confluence of several design issues. (R. 114 at 3 ("Whirlpool made Ovens with several design issues that combine to cause the Ovens to fail during self cleaning." (quoting R. 115-5, de Richemond Rebuttal Report, 1)).) At other points, Plaintiffs suggest that the defect was related to air flow. (*See id.* at 4 ("Perhaps the biggest fault, which was not addressed by Whirlpool, was that air pulled into the oven-surrounding enclosure was pre-heated by the air moving upward through the door." (quoting R. 115-5 at 2)).) At other times still, Plaintiffs define the defect broadly as the Ovens being "prone to overheat and lock up when the self-cleaning cycle is used." (*Id.* at 1.) Indeed, it is this final description of the defect that Plaintiffs use to create the defined term "Defect" in their opening class certification brief. (*Id.*)

In their reply brief, however, Plaintiffs alter their description of the defect, offering a more precise picture. Tellingly, they change the defined term "Defect"—which they had already changed during the time between the filing of the second amended complaint and the filing of the motion for class certification—to "poor airflow through the oven-surrounding enclosure." (R. 167 at 1 (quoting R. 115-5 at 1); *see also id.* at 4–5 ("[A]ll Ovens share the common, inherent characteristic of having insufficient airflow to accommodate the heat generated by the self-cleaning cycle that leaves the Ovens prone to shut down and become unusable.").) Similarly, Plaintiffs contend that "[t]he central, common issue in this litigation is that Whirlpool's Ovens fail when the self-cleaning function is run because the overarching design results in 'ineffective heat flow regulation and heat removal.' " (*Id.* at 1 (quoting R. 115-4, de Richemond Report, 11).) In short, Plaintiffs' reply class certification brief embraces the notion that there is a particular, identifiable design defect —an airflow problem—"that cause[s] the Ovens to become unusable when the self-cleaning function is run." (*Id.* at 3.) In other words, according to the reply brief, failure during self-cleaning is not, itself, the defect. Rather, the defect is a single, identifiable airflow problem common to all Ovens that *causes* failure during self-cleaning.

Case: 1:19-cv-06473 Document #: 210-7 Filed: 04/12/24 Page 6 of 24 PageID #:5738

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

By the de Richemond *Daubert* hearing, however, Plaintiffs appeared to have once again changed their theory. They represented that the defect was "a total shutdown of the oven during the running of the self-cleaning feature"—though it was "affected by several factors or elements." (R. 212, de Richemond *Daubert* Hr'g Tr., 5.) This is a retreat from the far more precise formulation of the defect in Plaintiffs' reply brief for class certification. Similarly, de Richemond testified on the day of the hearing that the defect was "[t]hat the oven overheats and shuts down during the self-cleaning cycle." (*Id.* at 75.) He also testified that there were multiple possible causes of this defect. (*Id.* at 77.)

## II. The Ovens

### A. The Vision II Platform and Design Differences

**\*6** Plaintiffs' claims relate to all ovens on Whirlpool's Vision II platform. (R. 114 at 2.) Whirlpool used the Vision II platform in manufacturing ovens for three different brands—Whirlpool, KitchenAid, and IKEA—in three configurations—single, double, and combination microwave oven—in three different widths—24-, 27-, and 30-inches. (R. 136-2, Ohlsson Decl., ¶ 4.) Whirlpool began selling the Ovens in 1998 and continues to sell them to this day, although it ceased production of most IKEA Vision II ovens in 2014 and most KitchenAid and Whirlpool ovens in 2007 and 2012, respectively. (*Id.* at ¶¶ 4, 24.)[4] In total, Whirlpool has sold nearly 2,000,000 Ovens in the United States and has manufactured 322 different base models of Vision II wall ovens. (*Id.* at ¶¶ 21, 59.) Some of the Ovens have different components. (*See id.* at ¶¶ 23–24.) IKEA ovens, for example, were only manufactured in 30-inch widths, have since 2009 used a control thermal fuse[5] with an 84°C set point, while Whirlpool brand ovens used a control thermal fuse of either 93°C or 110°C since 2011. (*Id.*) The temperature limit of the electronic control system in an IKEA oven is 20°C less than in Whirlpool and KitchenAid ovens, and IKEA ovens have a control board split from the user interface while the other brand ovens do not. (*Id.*) Whirlpool has also used a variety of cooling fans in two different sizes and six different RPMs in manufacturing the Ovens. (*Id.*) Additionally, Whirlpool has used different TOD[6] set points—130°C and 120°C. (*Id.*) Based on these and other differences, Whirlpool contends that the Ovens have at least 63 materially different designs. (R. 130, Def.'s Opp'n Mot. Class Cert., 4–5.) Plaintiffs do not contest that the Ovens embody different design features.

### B. Plaintiffs' Ovens

Named Plaintiffs Kljajic and Cates owned different ovens and had different experiences with them with respect to self-cleaning. Kljajic bought an IKEA Datid oven in August 2013, (R. 117-24, IKEA Invoice), which malfunctioned during a self-clean cycle she ran two days after moving into her condominium, (R. 117-2, Kljajic Dep., 76). Kljajic received a replacement oven—also a Datid oven. (*Id.* at 179; R. 115-7, Taylor Report, fig.13.) She did not experience any problems with her new oven, but she never ran the self-cleaning function on it. (R. 117-2 at 10, 182.)

Cates bought a KitchenAid double oven in 2004. (R. 117-3, Cates Dep., 10.) Cates had her oven for approximately ten years before it malfunctioned. (*Id.* at 117.) During this ten-year period, she ran up to three self-cleaning cycles without incident (Cates testified that she ran two or three self-cleans). (*Id.* at 116–17.) After her oven malfunctioned, it was repaired. (*Id.* at 10.) Since the repair, she has not run the self-cleaning cycle and reported that her oven had a difficult time maintaining a uniform temperature while cooking, although this issue has improved. (*Id.* at 145, 251–55.)

### C. UL 858 Testing

Whirlpool tested its Ovens using Underwriters Laboratory ("UL") 858 protocols. (R. 136-2 at ¶ 6.) UL 858 is a safety standard "that requires manufacturers to meet certain temperature-management standards to ensure that ovens do not overheat to the point of posing a danger to people or property." (R. 130 at 8 (citing R. 136-2 at ¶¶ 7–12).) UL 858 calls for, among other things, a "normal temperature" test in which an oven's components are monitored while running a self-clean cycle. (R. 136-2 at ¶ 7.) During testing, Whirlpool "records the peak temperatures reached by various components ... and compares the[m] to the UL-approved temperature ratings." (*Id.*) UL 858 testing shows the temperature margins of components—the difference between the maximum temperature reached during a self-clean cycle and the set point (or maximum allowable temperature) of that component. (*Id.* at ¶ 12.) The temperature margin of the thermal fuse and TOD is the difference between their maximum temperature during a self-clean cycle and the temperature at which they "will trip and cut power to the heating elements long before other oven surfaces reach unsafe temperatures or components are damaged." (*See id.*)

**\*7** "Before Whirlpool makes changes to ovens with the UL mark[,] ... it must consult with UL representatives

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

about the proposed changes and whether additional testing is required for the oven model to obtain or maintain UL listing status." (*Id.* at ¶ 10.) If a change will potentially impact component or surface temperatures, the ovens undergo additional testing. (*Id.*)

Whirlpool has successfully conducted UL 858 tests on Vision II platform ovens. The tests show that the Ovens completed self-cleaning without tripping thermal fuses and/or TODs. (*Id.* at ¶¶ 12–18.) In 2002, for example, Whirlpool conducted "normal temperature" testing of a KitchenAid 30-inch double oven, and the temperature margins were 36°C for the TOD and 46°C for the thermal fuse. (*Id.* at ¶ 14.) In 2003, during testing of a different KitchenAid 30-inch double, the TOD and thermal fuse margins were 24°C and 42°C respectively. (*Id.* at ¶ 15.) Whirlpool reports similar results from tests in subsequent years of different ovens. (*Id.* at ¶¶ 16–17.) Testing of IKEA ovens in 2008, for example, showed TOD margins of 17°C and 18°C. (*Id.* at ¶ 17.) Testing on other IKEA models in 2008 showed TOD margins above 20°C. (*Id.*) Testing on another IKEA oven in 2009 using an in-wall installation showed a TOD margin of 23°C and a thermal-fuse margin of 21°C. (*Id.*) Testing on the same oven using an under-counter installation yielded a TOD margin of 21°C and a thermal-fuse margin of 19°C. (*Id.*) When the same oven was tested on a self-clean cycle with a cooktop running, the TOD margin was 17°C and the thermal-fuse margin was 14°C. (*Id.*) All of these 2009 tests were successful. (*Id.*) Whirlpool also has other UL 858 data showing successful self-clean cycles for KitchenAid and Whirlpool ovens. (*Id.* at Ex. 7)

### D. Technical Service Pointers and Improvement Efforts

Over the years, Whirlpool issued a number of Technical Service Pointers ("TSPs") that deal with repair recommendations related to self-cleaning. (*See* R. 167 at 1.) TSPs "provide guidance to servicers to troubleshoot specific issues that can cause a thermal-fuse or TOD to trip and to increase temperature margins to resolve the issue going forward." (R. 136-2 at ¶ 60.) The TSPs Plaintiffs identify indicate the following:

• In January 2000, Whirlpool issued a TSP for Whirlpool and KitchenAid built-in ovens to install a third piece of glass to assist with air flow within the door because high temperatures during self-clean were causing "the assembly to deform." (R. 169-5 at 1.) Whirlpool has submitted testing information that showed the extra glass

reduced TOD and oven latch temperatures, particularly when coupled with a larger fan. (R. 136-2 at ¶ 62.)

• In June 2000, Whirlpool issued a TSP for all Whirlpool and KitchenAid 24-, 27-, and 30-inch built-in single and double ovens. (R. 169-5 at 2, 4.) The TSP responded to a complaint of TOD failure due to a sealing problem on the door. (*Id.*) Later, in October 2000, Whirlpool updated this TSP for a subset of Whirlpool and KitchenAid ovens. (*Id.* at 6.)

• In April 2012, Whirlpool issued a TSP for Whirlpool brand ovens, all -6 through -12 models, to reroute the thermal fuse away from the oven's exhaust vent. (R. 169-5 at 8.) Whirlpool explains that this TSP "addressed a manufacturing issue where the control panel thermal-fuse could be misrouted by some assembly operator(s) over the oven exhaust vent, contrary to Whirlpool's design." (R. 136-2 at ¶ 66.)

**\*8** • In December 2005, Whirlpool issued a TSP for all KitchenAid and Whirlpool brand single, double, and combination built-in ovens addressing an issue where the TOD tripped because oven heat escaped from the oven door or the exhaust air flow was interrupted. (R. 169-5 at 10.) The TSP listed a series of checks and corrections repair technicians could make: check if the door opened beyond a 90 degree angle, check for damage to the door gasket, check for an obstruction in the vent or whether the vent was incorrectly assembled, check the blower fan for a misalignment, check for the correct TOD part number, check for a power interruption during use, and check that the oven is not installed in a corner. (*Id.*) If all of these checks are OK, the TSP says to replace the blower assembly. (*Id.*) Whirlpool reissued this TSP in March 2007 with minor alterations (namely, the TSP no longer recommended ensuring that the oven was not installed in a corner). (*Id.* at 11.)

• In December 2008, Whirlpool issued a TSP for certain models of Whirlpool and KitchenAid built-in single and double ovens manufactured before December 2008 and KitchenAid 24-inch built-in ovens. (*Id.* at 12–13.) The TSP recommended to perform the following checks: checking to see that the door closes completely so air from the oven does not escape, checking to see that the door does not open beyond a 90 degree angle, checking for damage to the door gasket, checking for obstructions to oven venting, and checking for a power-interruption during self-cleaning. (*Id.* at 13.) The TSP also indicated

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

that the rear oven thermostat should be replaced with the original part number found in the parts list and the blower should be replaced with a new, more powerful blower. (*Id.*) In January 2011, Whirlpool reissued this TSP with a note that Whirlpool would cover parts and labor for repairs made pursuant to the TSP. (*Id.* at 17; R. 136-2 at ¶ 76.) In March 2011, Whirlpool once again reissued this TSP. (R. 169-5 at 21–22.)

• In September 2012, Whirlpool issued a TSP for certain models of KitchenAid wall ovens to address a problem where the "Door Latch Assembly deformed during Self Clean cycle." (*Id.* at 22.) The TSP recommended replacing the glass door liner and the motorized latch assembly. (*Id.*)

• In April 2013, Whirlpool released a TSP for certain IKEA ovens because "[i]mproper installation blocks air vent and blows the oven thermal fuse." (*Id.* at 26.) In May 2013, IKEA communicated to Whirlpool the results of testing on IKEA ovens that found that "Datid" IKEA models could overheat but "Nutid" IKEA models did not. (R. 136-2 at ¶ 81.)

• In June 2013, Whirlpool conducted testing indicating that IKEA ovens run hotter in IKEA-supplied cabinets, which are made of pressboard instead of plywood. (*Id.* at ¶ 82.) In response, Whirlpool made several changes to increase the temperature margin. (*Id.* at ¶ 83.) They also developed a service kit that "allowed servicers to make similar changes for customers who experienced the issue in the field." (*Id.* at ¶ 54.) In May 2014, IKEA issued a TSP for certain IKEA ovens built before October 2012 to recommend the installation of this service kit to prevent the "[t]hermofuse sensing heat build-up behind control panel area." (R. 169-5 at 29.)

### III. Albert de Richemond's Opinions

Plaintiffs' expert, Albert de Richemond, is a professional engineer. (R. 175-4, de Richemond Resume, 1.) He holds a Bachelor of Science in Engineering Mechanics from The Pennsylvania State University and a Master of Science in Engineering Science and Mechanics from Virginia Tech University. (*Id.*) Since 2012, he has worked for Consulting Engineers and Scientists Inc. as a Consulting Engineer. (*Id.*) His responsibilities include "the evaluation of commercial, industrial and agricultural equipment design, maintenance, guarding, and safety; piping, plumbing, valves, pressure vessels; pneumatic and hydraulic systems; sprinkler systems;

heating, ventilating, and air conditioning (HVAC); dust collection and vacuum equipment; power tools; consumer products including chairs, bicycles, toys, and exercise equipment; industrial and agricultural machinery; machinery/component failure analysis; welding evaluations; material reduction handling, and conveying equipment; automatic doors; and exercise equipment." (*Id.*)

**\*9** In preparing his report, de Richemond considered the Plaintiffs' Second Amended Class Action Complaint; Whirlpool's response to Plaintiffs' first sent of interrogatories; the deposition of Valerio Hammes, "the system architect for Whirlpool"; technical bulletins regarding how to fix overheating problems in the Ovens; the deposition of Scott Ohlsson ("Ohlsson"), a "Lead Engineer" at Whirlpool; and the deposition of Jennifer Karber, the director of quality for North America Cooking at Whirlpool. (R. 115-4 at 1–8.) De Richemond also examined seven returned ovens, Kljajic's oven, and Cates's oven. (*Id.* at 8.) Customers had returned each of the seven ovens after experiencing "problems in use." (*Id.*) De Richemond observed that the outer glass on the door of all ovens but one broke, all had "chassis damage to various extents," "most of the units had plastic pockets for the electrics layout" and most of these pouches "were melted and shrunken," and "[s]ome [units] had holes in the enclosure that showed insulation stained by oven gases or stains above the holes." (*Id.*) De Richemond also indicates that "[a]ll but one of the thermal fuses were intact, and all the TODs were intact." (*Id.*) He does not know if the TODs and thermal fuses "were replaced in the field or not." (*Id.*) With respect to airflow, de Richemond notes the following:

> With the opening of the airflow channel, it was apparent that air flowed up through the oven's door and was pulled horizontally into the upper chamber. Then, the air was blown by the fan down the rear chamber and into the lower chamber. From the lower chamber, the air was exhausted out of the bottom of the oven. A plate separated the airflow into the door from the airflow from the lower chamber. A series of holes in the rear outer panel allowed air from the in-wall space to be pulled into the fan. Part of the outflow from the fan was

Case: 1:19-cv-06473 Document #: 210-7 Filed: 04/12/24 Page 9 of 24 PageID #:5741

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

ducted over the oven cavity exhaust
port and out of the front of the oven
over the door.

(*Id.* at 9.)

For Cates's oven, "[t]he airflow channel was examined and
instrumented with thermocouples at various points, including
the oven cavity, the thermal fuse and the TOD." (*Id.*) De
Richemond set the oven to a self-clean cycle, which failed
after approximately 2.5 hours. (*Id.*) Both the thermal fuse
and the TOD had opened. (*Id.*) De Richemond then replaced
the TOD, the thermal fuse, the door gasket, door hinges, and
the fan. (*Id.*) He ran another self-cleaning cycle, which failed
twenty minutes faster than the previous cycle. (*Id.*) Once
again, the thermal fuse and TOD had opened. (*Id.*)

De Richemond also examined and instrumented Kljajic's
oven. (*Id.*) He ran a self-clean cycle on the oven twice, which
resulted in failure and the opening of both the TOD and the
thermal fuse. (*Id.*) Between the first and second tests, de
Richemond replaced the thermal fuse, TOD, door gasket, and
the door hinges. (*Id.*)

De Richemond opines in his expert report—at least at times
—that the Ovens are "defective because they overheat[ ]
and bec[o]me unusable during the cleaning cycle." (*Id.* at
13.) While de Richemond notes that Whirlpool attempted to
resolve the problem with various changes, including using
a higher speed fan, replacing the door gasket, and adding
thermal shielding for electronics, he believes that no repairs
"successfully fixed the overheating problem." (*Id.* at 12.) The
reason for this, according to de Richemond, is that Whirlpool
failed to "recognize[ ] that its in-wall oven incorporated
a complex defective design resulting from its inability to
regulate and control its heat flow." (*Id.*; *see also* R. 115-5
at 2 ("Perhaps the biggest fault, which was not addressed
by Whirlpool, was that air pulled into the oven-surrounding
enclosure was pre-heated by the air moving upward through
the door.").) De Richemond explains that "[a]irflow is a factor
in removing heat." (R. 115-4 at 10.) Also, de Richemond notes
that in Whirlpool ovens, "the fan would draw air into the
enclosure from above the oven door and from the room. In this
arrangement, the room air is heated by the door air and thus is
at a higher than normal temperature when it enters the airflow
intake." (*Id.*) De Richemond contrasts this with other brand
ovens, like General Electric, where "airflow through the door

is natural and routed away from the top air intake, allowing
mostly room temperature air to enter the intake." (*Id.*)

**\*10** In his rebuttal report, de Richemond broadly reaffirms
his opinions. (R. 115-5.) De Richemond notes that "[v]arious
design problems [that] contributed to and/or caused"
self-cleaning cycle failures, which Whirlpool "addressed
piecemeal during the approximately 10 year marketing
life of the product." (*Id.* at 3.) Those design problems
included, according to de Richemond, "Electronics (e.g.,
overheating, placement)," the "thermal fuse (e.g., location,
opening temperature, what it controlled)," the TOD "(e.g.,
opening temperature, what it controlled)," the "[f]an (Blower)
(e.g., size, fan speed, thermal cut out)," as well as the door
gasket, the door hinges, and insulation. (*Id.* at 3–4.) De
Richemond also explains that the design problems included
the "[o]ven wall cavity (e.g., insufficient space, poor airflow,
poor heat conduction)" and "[a]ir flow (e.g., insufficient to
prevent thermal cut out, entrainment of hot air from door
openings, flow restrictions)." (*Id.* at 4.)

De Richemond reiterates in his rebuttal report that airflow
issues presented "[p]erhaps the biggest fault" with the Ovens
that Whirlpool never addressed. (*Id.* at 2.) He explains:

> [A]ir pulled into the oven-
> surrounding enclosure was pre-
> heated by the air moving upward
> through the door. The door has two
> perpendicular sets of holes in its top
> that both dump hot air into the oven-
> surrounding enclosure. While there
> is a baffle intended to entrain room
> temperature air, the openings in the
> top of the door allow heated air from
> the door to be entrained along with
> room air into the oven-surrounding
> enclosure. The openings in the
> top rear of the door allowed
> directed air preheated by the door
> directly into the oven-surrounding
> enclosure. Other brand ovens (e.g.,
> General Electric, Bosch) have larger
> openings and or openings that allow
> only room temperature air into
> the oven-surrounding enclosure. In
> Whirlpool ovens, because of their
> hole configuration, air entering the

oven-surrounding enclosure during self cleaning was hotter than expected and caused opening of the thermal fuse and/or the TOD.

(*Id.*)

Whirlpool took de Richemond's deposition on November 3, 2016. (R. 136-5.) He testified that he did not know what caused Cates's and Kljajic's ovens to fail during self-cleaning. (R. 136-5, de Richemond Dep., 219–20.) Additionally, he testified that he did not know whether the cause of the two ovens' failure was the same. (*Id.* at 220.)

On April 17, 2017, the Court held a *Daubert* hearing. During the hearing, at least at certain points, de Richemond reiterated that he did not know what caused the ovens to fail during self-cleaning. (R. 212 at 75 (explaining that "for whatever reason, the oven shuts down"); *Id.* at 104–05 (explaining that he does not know what caused the named plaintiffs' ovens to fail).) At other times, he testified that he has an opinion regarding what causes the ovens to fail. In response to questioning from the Court, de Richemond said that the failure stems from a "very hot" self-cleaning cycle that "puts more heat into the system that has to be removed," from pre-heated air being pulled into the oven, and from "[t]he size of their openings [ (presumably de Richemond was referring to openings in the door) ]." (*Id.* at 77.) He admitted, however, that he did not test any of his theories of causation. (*Id.* at 78–79.) At other times during the *Daubert* hearing, de Richemond posited more possible causes of overheating, such as dust, spider webs, and grease clogging air intakes, (*id.* at 82), or fan speed, (*id.* at 115).

De Richemond further testified that he believes all Ovens will fail during self-cleaning because "the Vision II is a common platform for all of these ovens, and whatever the particular cause of the defect is, it's in those ovens." (*Id.* at 81–82.) He testified, however, that he could not explain what was the same about the Ovens with any more specificity than that they share the Vision II platform. (*Id.* at 101–02 (Q: "What is the Vision II platform, sir?" A: "It's the basic design for all of these ovens." Q: "Can you be any more specific about what makes [the Ovens] all the same, in your opinion?" A: "No, I can't.").) With respect to the UL 858 testing, de Richemond made clear that he did not believe it was relevant. (*Id.* at 105.)

## ANALYSIS

### I. De Richemond's Opinions Are Inadmissible Under Rule 702 and *Daubert*

**\*11** Whirlpool does not dispute that de Richemond is qualified to provide expert testimony regarding the Ovens. (R. 134-1, Def.'s Mem. Supp. de Richemond *Daubert*, i.)[7] Instead, Whirlpool contends that (1) de Richemond's opinions do not provide proof of a common defect and therefore are not helpful to the Court in resolving Plaintiffs' class certification motion, and (2) de Richemond's opinions are unreliable.

#### A. De Richemond's Opinions Are Unhelpful

Rule 702 requires that expert testimony be helpful to "understanding the evidence or ... determining [a] fact in issue." *Hartman*, 758 F.3d at 817; *see also Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) ("An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case."). This requirement "goes primarily to relevance." *Daubert*, 509 U.S. at 591. Put differently, "the suggested testimony must 'fit' the issue to which the expert is testifying." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (quotation marks omitted); *Mcfarland v. Tricom Indus., Inc.*, No. 13 C 4576, 2015 WL 671802, at *1 (N.D. Ill. Feb. 17, 2015).

In their briefs supporting their motion for class certification, Plaintiffs use de Richemond's testimony as the glue that holds all of the class claims together. Specifically, Plaintiffs offer his opinions to establish that all of the Ovens—which comprise about 2,000,000 units using the Vision II platform that embody various differences in design and configuration, (*see* R. 136-2 at ¶¶ 24, 97)—share the same defect. As discussed above, Plaintiffs are cagey in their class certification briefs about defining the common defect. By their reply brief, however, Plaintiffs clarify their argument by defining the term "Defect" to mean "poor airflow through the oven-surrounding enclosure" and by contending that "the core operative facts underlying Plaintiffs' claim are that the Ovens suffer from the same inherent Defect that *cause*[*s*] the Ovens to become unusable when the self-cleaning function is run." (R. 167 at 1, 3 (emphasis added).)) Thus, according to Plaintiffs, Ovens shutting down during self-cleaning is the result of a defect in all Ovens related to airflow. Complicating matters, however, Plaintiffs appear to have retreated at the *Daubert* hearing from this more precise framing of the defect. At the

Case: 1:19-cv-06473 Document #: 210-7 Filed: 04/12/24 Page 11 of 24 PageID #:5743

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

hearing, Plaintiffs recast the defect as the "ovens shut[ting] down and becom[ing] unusable ... when the self-cleaning function is run." (R. 212 at 4.) Plaintiffs' ever-changing theories regarding the defect in this case have made it difficult to evaluate the parties' arguments. Nevertheless, because Plaintiffs were crystal clear in their reply brief that there is a design defect that *causes* the ovens to fail during self-cleaning, (R. 167 at 3), the Court will hold them to that theory. [8] *Cf. Quality Oil, Inc. v. Kelley Partners*, 657 F.3d 609, 614 (7th Cir. 2011) (noting that new theories presented at oral argument are waived); *Pike v. Premier Transp. & Warehousing, Inc.*, No. 13 CV 8835, 2016 WL 6599940, at *2 n.2 (N.D. Ill. Nov. 8, 2016). Thus, for de Richemond's opinions to be helpful, they must address some common aspect of the Ovens' design that causes overheating and failure during self-cleaning.

**\*12** With respect to Whirlpool's argument that de Richemond's opinions are unhelpful because they do not provide proof of a common defect, (*see* R. 134-1 at 5), the Court notes that it is difficult to identify from de Richemond's reports precisely what he believes the common defect to be that causes failure during self-cleaning. At certain times, de Richemond highlights air flow as the key, overarching problem—specifically preheated air is drawn into the oven-surrounding enclosure. He explains, for example, that "the major problem that Whirlpool overlooked was poor airflow through the oven-surrounding enclosure." (R. 115-5 at 1.) He also explains that "[p]erhaps the biggest fault, which was not addressed by Whirlpool, was that air pulled into the oven-surrounding enclosure was pre-heated by the air moving upward through the door." (*Id.* at 2; *see also* R. 115-4 at 12 (explaining that the Ovens "incorporated a complex defective design resulting from [their] inability to regulate and control [their] heat flow").) De Richemond contrasts this allegedly defective airflow with airflow in ovens from other brands, like General Electric, where "airflow through the door is natural and routed away from the top air intake, allowing mostly room temperature air to enter the intake." (R. 115-4 at 10.) Plaintiffs echo de Richemond at times in their briefs by characterizing him as having isolated airflow as the principal common defect. (*See, e.g.,* R. 175, Pls.' Opp. Mot. Exclude de Richemond, 6 ("The overarching design defect is the Ovens' ineffective heat flow regulation and heat removal." (internal quotation marks omitted); *id.* at 4 (noting preheated air entering the oven-surrounding enclosure as the key problem)).)

Despite focusing at times on airflow, Plaintiffs and de Richemond sometimes merely point to an undifferentiated mass of potential problems that they contend contribute to oven failure. (*See, e.g., id.* at 6 ("Whirlpool made ovens that had several design issues that combined to cause the ovens to fail during self-cleaning. These included design issues involving the thermal fuse, the [TOD], air circulating fan, oven insulation, and poor airflow." (internal quotation marks omitted)).) De Richemond, for example, listed in his reports and testimony other design factors that contribute to self-cleaning failure, like insulation, the fan, or dust collection. (*See, e.g.,* R. 115-5 at 3–4; R. 115-4 at 10–11; R. 212 at 82.)

De Richemond's unclear and fluctuating opinions—his assertion of a common defect that at times is targeted to a specific aspect of oven design and at times is a kitchen-sink approach—are not helpful in light of how Plaintiffs have framed their class certification argument: that there is an inherent design defect, common to all ovens, that causes overheating and failure during self-cleaning. Even assuming de Richemond specifically identifies a design feature that causes failure during self-cleaning—which he does not, as he at times identifies supposedly problematic design features that have changed over time (like oven fans) as well as problems that will vary from oven user to oven user (*e.g.,* dust)—de Richemond gives no opinion about whether that defective design feature is indeed common to all Ovens. (*See* R. 212 at 78 (Q: "Have you tested any of these issues to nail them down as the cause of the overheating?" A: "[I]t's not my job to fix the problem for Whirlpool....").) He made clear at the *Daubert* hearing that he cannot explain what design features make the Ovens the same other than merely declaring that they share the Vision II platform, and, at the hearing, de Richemond testified that he cannot describe the design of the Vision II platform with any more detail beyond labeling it the "basic design" of the Ovens. (*See id.* at 101–02 (Q: "What is the Vision II platform, sir?" A: "It's the basic design for all of these ovens." Q: "Can you be any more specific about what makes [the Ovens] all the same, in your opinion?" A: "No, I can't.").) Without identifying a specific design defect and explaining how it is present in all Ovens, de Richemond does not give an opinion that fits Plaintiffs' class-certification argument. *Chapman*, 297 F.3d at 687; *Mcfarland*, 2015 WL 671802, at *1.

Even more problematic than his vague opinions and surface-level knowledge regarding the Vision II platform, de Richemond has made clear that he does not know what causes a particular Oven to fail or if the same defect causes different

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

Ovens to fail, including the two ovens of the named Plaintiffs. (R. 136-5, de Richemond Dep., 218–20; *see also* R. 212 at 75 (explaining that "for whatever reason, the oven shuts down"); R. 212 at 104–05 (explaining that he does not know what caused the named plaintiff's ovens to fail).) Indeed, with respect to Cates' and Kljajic's ovens, de Richemond testified at his deposition that the two ovens "probably" failed for different reasons. (R. 136-5 at 220 (Q: "Do you think it's the same [thing] that caused Ms. Kljajic's oven to experience [failure during self-cleaning] on the first use two days after it was installed that also caused Ms. Cates' oven to experience this on the third self-clean cycle ten years after it was installed?" A: "As I said just before, no. They're probably two different things. There are many factors that enter into causing this common failure and they could be different. They could be the same. No one has determined that yet.").) In addition, de Richemond testified that he would "probably [have to] take both ovens apart" to learn if they failed for the same reasons. (*Id.* at 221.) De Richemond thus essentially disclaims that he has any opinion regarding a common cause of the Ovens' failure during self-cleaning, contradicting Plaintiffs' assertions that he has identified a common defect.

**\*13** Accordingly, the Court concludes that de Richemond does not offer an opinion as to a common defect. Instead, he testifies that he does not know what in particular causes an oven to fail, simply opines that there are many potential reasons the Ovens could fail during self-cleaning, and fails to explain or opine whether those many reasons are common to every Oven, (*see* R. 212 at 110–11 (failing to explain what the Vision II platform is with any specificity)). De Richemond's uncertainty and equivocating testimony do not help the Court determine whether there is a common question as to the existence of a defect that the trier of fact will be able to resolve "in one stroke." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011); *see Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1432 (2013) (explaining that a party seeking class certification must show that there are "*in fact* ... common questions of law or fact" (quotation marks omitted)); *Parko v. Shell Oil Co.,* 739 F.3d 1083, 1085–87 (7th Cir. 2014) (noting that Rule 23 "does not set forth a mere pleading standard" and that courts must evaluate evidence to determine compliance with Rule 23, including whether there is a common cause of harm (quoting *Wal-Mart,* 564 U.S. at 350)); *Robinson v. Gen. Elec. Co.,* No. 09-cv-11912, 2016 WL 1464983, at \*5 (E.D. Mich. Apr. 14, 2016) ("Simply stated, there is no evidence that a single design flaw pertaining to safety mechanisms is common across all of the models in

Option 2. Plaintiffs' failure to identify a single part, system, or even TCO temperature, defeats commonality."). In short, de Richemond's opinions fail to satisfy Rule 702 and *Daubert* because they are unhelpful. [9]

### B. De Richemond's Opinions Are Unreliable

Even more glaring than his opinions' unhelpfulness is the unreliability of de Richemond's inquiry and methods. In its role as gatekeeper, the Court must determine if expert testimony is sufficiently reliable. *See Higgins,* 794 F.3d at 704. To determine reliability, courts consider various nonexclusive factors, including "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Baugh v. Cuprum S.A. de C.V.,* 845 F.3d 838, 844 (7th Cir. 2017); *Mednick,* 2016 WL 3213400, at \*4 (citing *Daubert,* 509 U.S. at 593–94). "[N]o single factor is either required in the analysis or dispositive as to its outcome." *Baugh,* 845 F.3d at 844 (quoting *Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir. 2000)). "When a district court 'conclude[s] that there is simply too great an analytical gap between the data and opinion proffered' such that the opinion amounts to nothing more than the *ipse dixit* of the expert, it is not an abuse of discretion under *Daubert* to exclude the testimony." *C.W.,* 807 F.3d at 837 (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)).

Whirlpool argues that de Richemond's opinions are unreliable because he failed to disclose any methodology, let alone one that is reliable in his field, to substantiate his hypotheses regarding a common Oven defect. (R. 134-1 at 9–11; R. 194 at 5–10.) The Court agrees.

To provide a brief summary before considering Whirlpool's specific arguments, not only is de Richemond unclear about *what* his opinion is as to a common defect across all Ovens, he provides scant material as to *how* he reached any opinion. If de Richemond reached any specific conclusion regarding a particular common defect—which, for the reasons noted above, he did not—it was that the Ovens have an airflow problem, most notably that "air pulled into the oven-surrounding enclosure was pre-heated by the air moving upward through the door." (R. 115-4 at 10–11; R. 115-5 at 2.) De Richemond also opines that such problems do not exist in ovens made by other brands, like General Electric. (R. 115-4 at 10; R. 115-5 at 3.) De Richemond's reports leave

the Court guessing as to the basis for these determinations. The testimony at the *Daubert* hearing confirmed that de Richemond, who ran temperature tests only on Cates's and Kljajic's ovens, conducted no testing regarding the cause of Ovens overheating and failing during self-cleaning. (*See* R. 212 at 78–79; *id.* at 102–03.) Indeed, de Richemond does not know why the only two ovens he tested failed during self-cleaning. (R. 136-5 at 218–20; R. 212 at 104–05.) Additionally, de Richemond did not test any non-Whirlpool ovens—including any General Electric ovens—and admits that he gives no opinion regarding an effective alternative design. (R. 212 at 103–04; R. 136-5 at 145–48.) By (1) not testing what causes failure during self-cleaning, (2) not testing ovens from other brands, (3) not offering an opinion as to an effective alternative design, and (4) not knowing what causes a particular oven to fail, there is too large an analytical gap between de Richemond's methodology and his conclusion that all 2,000,000 Ovens suffer from a common defect. This gap necessitates the exercise of the Court's discretionary gate-keeping function—de Richemond's expert testimony fails to satisfy Rule 702 and *Daubert*.

**\*14** Whirlpool contends that de Richemond's opinions "are derived from two separate, testable hypotheses, one theorizing that the Ovens' airflow design produces abnormally high temperatures and another hypothesizing that an alternative design produces lower airflow temperatures." (R. 134-1 at 9.) While de Richemond's opinions are difficult to pin down in light of his changing testimony and Plaintiffs' shifting theories and arguments, the Court agrees with Whirlpool's characterization. Whirlpool argues that de Richemond's opinions are unreliable because he did not derive them from the scientific method, he does not explain his methodology, and he does not show that any methodology he may have used is accepted in his field. (*Id.* at 9–11.)

As noted above, de Richemond testified during his deposition that the only testing he conducted related to his airflow hypothesis was on the two ovens belonging to Plaintiffs. (R. 136-5 at 144–48.) De Richemond, however, admits that he did not test what caused the two ovens to fail, does not know why the two ovens failed, and cannot say whether they failed for the same reason.

With respect to his hypothesis that the Ovens present an airflow problem that does not exist in other ovens (*e.g.*, General Electric ovens), de Richemond testified during his deposition that he did not conduct *any* testing on ovens

from other brands because he was not asked to conduct such testing and did not believe it necessary. De Richemond admitted, however, that he could have conducted various tests to show how General Electric ovens and Whirlpool ovens "perform[ ] differently." (*Id.* at 146–48.) Rather than test, de Richemond merely asserted that his hypothesis was "obvious" based on "what [he] know[s] about engineering physics and thermodynamics, heat transfer, the way machines are made." (*Id.* at 146–47.) He explained that Whirlpool Ovens draw in preheated air while General Electric ovens do not, and that testing was unnecessary because "[y]ou don't need to go on to calculate things" once "you start out with two different temperatures of air going into the device." (*Id.* at 150.) De Richemond also testified that there was no need to test the differences between General Electric and Whirlpool ovens because there was "an indicator that one performs differently from the other"—that indicator being "that we're here today [in a deposition] because Whirlpool couldn't fix a defect with its ovens. We're not here because GE ... had a defect with their ovens." (*Id.* at 148–49.)

"A court's reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even '[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.' " *Smith*, 215 F.3d at 718 (alteration in original) (quoting *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999)); *see also Am. Honda*, 600 F.3d at 817; *Ashley v. Schneider Nat'l Carriers, Inc.*, Nos. 12-cv-8309, 13-cv-3042, 2016 WL 3125056, at *7 (N.D. Ill. June 3, 2016). Whether an expert's theory can be or has been tested is a relevant consideration. *See Baugh*, 845 F.3d at 844. Moreover, "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" is relevant as well. *See Mednick*, 2016 WL 3213400, at *4 (quoting Fed. R. Evid. 702) (Advisory Committee Note (2000 amends.)); *see also C.W.*, 807 F.3d at 837; *Brown*, 765 F.3d at 773; *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1019 (N.D. Ill. 2011).

Here, Plaintiffs have failed to satisfy their burden as to the reliability of de Richemond's methodology. De Richemond ran tests on only two ovens—the two that belonged to Plaintiffs—one of which had previously failed during self-cleaning. To reach a conclusion that 2,000,000 Ovens contain a common defect based on the testing of only two ovens leaves too large a gulf in analytical reasoning to qualify as reliable, especially given the differences in the Ovens. *See Joiner*, 522 U.S. at 146 ("A court may conclude that there

Case: 1:19-cv-06473 Document #: 210-7 Filed: 04/12/24 Page 14 of 24 PageID #:5746

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

is simply too great an analytical gap between the data the opinion proffered."); *C.W.*, 807 F.3d at 837; *United States v. Schultz*, No. 14-cr-467-3, 2016 WL 7409911, at *2 (N.D. Ill. Dec. 22, 2016). De Richemond's mere word that his testing was sufficient is not enough, particularly when he also admits that "[n]o one has determined" what causes the Ovens to malfunction during self-cleaning. (R. 136-5 at 220.) Further exhibiting the deficiencies in de Richemond's methodology, the Ovens embody different design elements, some of which —for example, the cooling fan—de Richemond admits are related to failure during self-cleaning. (*See, e.g.*, R. 212 at 115.) De Richemond's testing on only two ovens does not adequately account for design differences—not to mention one-off manufacturing defects or defects present in a certain subset of the Ovens—across all of the Ovens in the class. Furthermore, because de Richemond's testimony at the *Daubert* hearing demonstrated that he cannot explain what the Vision II platform is beyond saying that is the "basic design" of the Ovens, it is unclear how he can jump to a conclusion about 2,000,000 Ovens based on his limited testing. (*Id.* at 101–02.) In short, de Richemond simply does not have an adequate methodology in place for tying together every oven in the class. *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010) (explaining that expert testimony cannot "be based on subjective belief or speculation").

**\*15** Beyond the gap between (1) testing two Ovens and not knowing what caused their failure or precisely how they are similar to all the Ovens in the class, and (2) using that testing to make a conclusion about 2,000,000 ovens that embody different designs, de Richemond ignored relevant contradictory data. This selective blindness underscores the unreliability of de Richemond's methodology. As detailed above, UL 858 testing showed that certain Ovens have successfully completed self-cleaning cycles without incident. That testing data showed healthy temperature margins for the TOD and thermal fuse during self-cleaning. While de Richemond dismissed this data as irrelevant because UL 858 testing is geared toward safety, it is directly on point to the issue of whether the Ovens have a common defect that invariably results in failure during self-cleaning. [10] Ignoring relevant data is not a scientifically valid method. Indeed, this Court has previously explained that "an expert is not permitted to simply ignore evidence that is contrary to her opinion in implementing an accepted methodology." *See Chaudhry v. Provident Life & Accident Ins. Co.*, No. 12-cv-5838, 2015 WL 1756832, at *5 (N.D. Ill. Apr. 15, 2015); *see also Barber v. United Airlines, Inc.*, 17 Fed.Appx. 433,

437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.' "); *EEOC v. Freeman*, 778 F.3d 463, 469–70 (4th Cir. 2015) (citing a number of cases, including from the First and D.C. Circuits for the proposition that "courts have consistently excluded expert testimony that 'cherry-picks' relevant data"); *Fail-Safe L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 891 (E.D. Wis. 2010); 29 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure: Evidence* § 6268 (2d ed. 2017) (explaining that while whether a judge believes the facts or data on which an expert relies is irrelevant, judges must inquire into the sufficiency of data, including "whether the expert ignored a significant portion of seemingly important data"). While failing to account for supposedly contradictory information often is a question going to weight of the evidence rather than its admissibility, which a lawyer can address on cross examination, *see, e.g.*, *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 807 (7th Cir. 2013) ("[T]he selection of data inputs to employ in a model is a question separate from the reliability of the methodology reflected in the model itself."), in this case, de Richemond's cherry picking highlights the analytical gap between his methodology and conclusion, especially when viewed in light of the many other deficiencies in his inquiry that the Court has examined, *see id.* at 808–09 (noting that Rule 702 requires expert opinions to be supported by "sufficient facts or data"). This goes to the core of a district court's responsibility under *Daubert*. *See C.W.*, 807 F.3d at 837; *Manpower*, 732 F.3d at 808 (explaining that under Rule 702, courts may inquire as to whether an expert considered sufficient data to employ a valid methodology).

De Richemond's cherry picking also demonstrates that he has developed his opinion expressly for the purposes of testifying, has not accounted for obvious alternative explanations, and has not been as careful as an engineer would have been in his regular professional work. *See Am. Honda*, 600 F.3d at 817 (noting these considerations from the advisory notes to Rule 702 as additional guideposts for gauging expert reliability). Moreover, this is not the type of case where an expert has chosen between two "competing theories when both are supported by reliable scientific evidence." *See Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 633 (8th Cir. 2012). Rather, it is a case in which an expert had highly relevant data in front of him and effectively crossed out a large portion of it without any adequate explanation.

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

De Richemond's methodology (or lack thereof) underlying his conclusion that the Ovens' airflow design is inferior to other ovens (like those General Electric manufactures) also has fatal problems. As Plaintiffs explain, de Richemond bases this opinion on his observations and his experience as an engineer. (R. 175 at 12–13.) This basis is not enough in this case. *See Baugh*, 845 F.3d at 844 (noting that courts consider "whether the proffered theory can be and has been tested" under *Daubert*); *Chapman*, 297 F.3d at 688 ("In our opinion, the absence of any testing indicates that Petry's proffered opinions cannot fairly be characterized as scientific knowledge. Personal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert*'s most significant guidepost."); *see also Hartman*, 758 F.3d at 818–19 ("Howard's musings on the jag's superiority cannot 'substitute for scientific methodology and [are] insufficient to satisfy *Daubert*'s most significant guidepost': reliability." (quoting *Chapman,* 297 F.3d at 688)); *Zenith Elecs. Corp v. WH-TV Broad. Corp*, 395 F.3d 416, 418 (7th Cir. 2005) (rejecting an expert's reliance on "intuition" in place of reliable principles and methods).

Of particular concern, Plaintiffs have failed to explain what scientific principles de Richemond relied upon in concluding (1) that drawing in pre-heated air causes the ovens to fail during self-cleaning (indeed, de Richemond does not know what causes the Ovens to fail), or (2) that other aspects of the Ovens' design do not render the preheated air immaterial (*e.g.*, the exhaust in the bottom of the oven or the fan). Plaintiffs contend that de Richemond's "experience" is sufficient, but without any articulation of the underlying technical principles upon which he relied, let alone any testing, invoking experience is not enough. *See Zenith*, 395 F.3d at 419 ("A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term."); *Ruiz-Cortez v. City of Chicago*, No. 11 C 1420, 2016 WL 6270768, at *23 (N.D. Ill. Oct. 26, 2016); *In re Zimmer Nexgen Knee Implant Prods. Liability Litig.*, No. 12 C 6279, 2015 WL 5145546, at *8 (N.D. Ill. Aug. 31, 2015) (explaining that an expert must do more than "simply proclaim" his conclusion). The lack of explanation regarding the scientific principles at issue as well as the lack of testing are particularly problematic in this case, where testing may have provided support for de Richemond's conclusion, as de Richemond admits, (R. 136-5 at 146–48). *See Baugh*, 845 F.3d at 844; *Padilla v. Hunter Douglas Window Coverings, Inc.*, 14 F. Supp. 3d 1127, 1137–38 (N.D. Ill. 2014) ("Statler's opinions are particularly troubling

because they actually lend themselves to hands-on testing and empirical study 'such that conclusions based only on personal opinion and experience do not suffice.' " (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001))). Moreover, the fact that various oven brands, like Siemens, have a design like the Ovens in which pre-heated air is pulled through the oven door further undermines the reliability of de Richemond's methodology. (R. 136-13, Ex. 1 at WKL 0012107, WKL0012117.) Testing results showed that the Siemens ovens had cooler control and latch temperatures than ovens using a different airflow design even though the Siemens ovens had a hotter oven cavity temperature. (R. 194 at 13.) De Richemond's failure to adequately account for this data further highlights the unreliability of his methodology.

**\*16** On a final note with respect to de Richemond's opinions related to the differences between General Electric and Whirlpool ovens, de Richemond relied, at least in part, on the mere fact that Plaintiffs commenced this litigation against Whirlpool rather than GE. (R. 136-5 at 148–49.) It almost goes without saying that relying on such inappropriate considerations falls far short of the *Daubert* requirements.

Even viewing de Richemond's identification of a defect broadly—that the common defect is that all Ovens will overheat and fail during self-cleaning for reasons unknown —his methodology is unreliable. Once again, he tested only two ovens, one of which failed previously, to reach this conclusion. Because he knows neither the cause of those ovens' failure nor precisely what makes Vision II ovens the same, his testing is insufficient to extrapolate to a common defect affecting 2,000,000 Ovens. Additionally, while he testifies that *all* the Ovens will fail during self-cleaning because of a common defect, (R. 212 at 81), de Richemond does not account for the fact that UL 858 testing showed various Ovens survived self-cleaning cycles, Plaintiff Cates's oven survived self-cleaning on multiple occasions, and third-party testing "found no issues with Nutid IKEA models overheating during the self-clean cycle", (*see* R. 136-2 at ¶ 81). [11] This further highlights the inadequacy of de Richemond's methods. [12]

Accordingly, Plaintiffs have not established the requisite reliability or helpfulness of de Richemond's expert testimony. The Court therefore grants Whirlpool's *Daubert* motion.

## II. Plaintiffs Have Not Demonstrated Compliance with Rule 23

Case: 1:19-cv-06473 Document #: 210-7 Filed: 04/12/24 Page 16 of 24 PageID #:5748

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

At the *Daubert* hearing, Plaintiffs admitted that they face a "very difficult" and "uphill fight" on the road to class certification if the Court excluded de Richemond's testimony. (R. 212 at 139.) They were correct. As described in greater detail below, the key flaw in Plaintiffs' case for class certification is a failure to put forth sufficient evidence of a defect common in *all* Ovens. Without this crucial evidence, Plaintiffs lack the glue to hold their proposed classes together. In short, Plaintiffs fail to demonstrate that the most important factual question in this case—whether the Ovens have an inherent design defect—is "capable of classwide resolution." *See Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 553 (7th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 350). Under these circumstances, Plaintiffs have not demonstrated that class certification is appropriate.

### A. Plaintiffs' Claims and the Centrality of a Common Defect

Plaintiffs pursue the following class claims: breach of express warranty under the laws of 17 states, breach of implied warranty under Illinois law, violation of the MMWA, unjust enrichment under Illinois and South Carolina law, and violation of the ICFA. (R. 114 at 9–10.) To prove their claims, Plaintiffs seek to show that all Ovens' self-cleaning feature will not function as it is supposed to because all Ovens are defectively designed. (*See, e.g., id.* at 3; *id.* at 28 (explaining that all "Ovens suffer from the Defect at issue"); *id.* at 14 ("Plaintiffs allege a common course of conduct stemming from a common set of operative facts. Namely, all Ovens share the same inherent Defect...."); R. 167 at 1 ("[P]oor airflow through the oven-surrounding enclosure' is the design defect ("Defect") that is common to the Ovens." (quotation marks omitted)); R. 167 at 1 ("The central, common issue in this litigation is that Whirlpool's Ovens fail when self-cleaning is run because the overarching design results in ineffective heat flow regulation and heat removal." (quotation marks omitted)).) Thus, as Plaintiffs admit, "[c]ommon evidence of the existence a Defect" is an issue central to class certification. (*See* R. 114 at 24–26; R. 167 at 1.)

**\*17** The elements of breach of express warranty are, broadly speaking, the existence of a warranty, breach of the warranty, and damages resulting from the breach. [13] *See, e.g., Scott v. Honeywell Int'l Inc.*, No. 14-cv-00157-PAB-MJW, 2015 WL 1517527, at \*3 (D. Colo. Mar. 30, 2015) (citing *Palmer v. A.H. Robbins Co.*, 684 P.2d 187 (Colo. 1984)); *Wetzel v. Capital City Real Estate, LLC*, 73 A.3d 1000, 1005 (D.C. 2013);

*Frese v. City Segway Tours of Washington, D.C., LLC*, No. 16-2373 (JEB), 2017 WL 1379314, at \*6 (D.D.C. Apr. 14, 2017); *Scottsdale Ins. Co. v. Deere & Co.*, 115 F. Supp. 3d 1298, 1307–08 (D. Kan. 2015); *Corwin v. Conn. Valley Arms, Inc.*, 74 F. Supp. 3d 883, 892 (N.D. Ill. 2014); *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 122 (Mo. 2010) (en banc) (requiring proof that the goods did not conform from a material statement of fact as to the good's quality); *Snyder v. Farnam Cos., Inc.*, 792 F. Supp. 2d 712, 721 (D.N.J. 2011); *Prichard Enters., Inc. v. Adkins*, 858 F. Supp. 2d 576, 584 (E.D.N.C. 2012); *Kraft Foods N. Am. v. Banner Eng'g Sales, Inc.*, 446 F. Supp. 2d 551, 570–72 (E.D. Va. 2006).

To prove breach of the implied warranty of merchantability under Illinois law, a plaintiff must show that the defendant sold goods that were not merchantable at the time of sale, damages that resulted from the defective goods, and notice to the defendant. *See Corwin*, 74 F. Supp. 3d at 891. [14]

As for the MMWA, it "allows consumers to enforce written and implied warranties in federal court, borrowing state law causes of action." *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004); *Keith v. Ferring Pharm., Inc.*, No. 15 C 10381, 2016 WL 5391224, at \*8 (N.D. Ill. Sept. 27, 2016); *Bietsch v. Sergeant's Pet Care Prods., Inc.*, No.15 C 5432, 2016 WL 1011512, at \*7 (N.D. Ill. Mar. 15, 2016). The parties therefore treat the MMWA claims as coextensive with the state-law warranty claims. (R. 167 at 18; R. 130 at 26 n.20.)

The elements of an ICFA claim are a deceptive or unfair act or practice by defendant, the defendant's intent that the plaintiff rely on the deceptive or unfair act or practice, and the act or practice took place during a course of conduct involving commerce. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010); *Sultan v. M&T Bank*, No. 16-CV-08767, 2017 WL 1304103, at \*4 (N.D. Ill. Apr. 7, 2017).

An Illinois unjust enrichment claim requires a showing that the defendant "unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *McMahon v. Bumble Bee Foods LLC*, 148 F. Supp. 3d 708, 715 (N.D. Ill. 2015) (quoting *Indep. Voters v. Ill. Commerce Comm'n*, 510 N.E.2d 850, 852–58 (1987)). In South Carolina, the elements of unjust enrichment are "(1) a benefit conferred by the plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." *Roberts v. Ebay Inc.*, No. 6:14-4904-HMH-MGB, 2017 WL 525925, at \*4 (D.S.C. Feb. 9, 2017) (quoting *Regions Bank v. Wingard Props., Inc.*, 715 S.E.2d 348, 356 (S.C. Ct. App. 2011)).

### B. Plaintiffs Fail to Demonstrate Entitlement to Class Certification

#### 1. Commonality and Predominance

##### a. Legal Standards

**\*18** The Court begins with the closely related questions of commonality and predominance. Rule 23(a)(2)—the commonality provision—requires that "there are question of law or fact common to the class." Rule 23(b)(3)—the predominance provision—requires that "the questions of law or fact common to the class predominate over any questions affecting only individual members." "The question[s] of commonality and predominance [can] overlap in ways that make them difficult to analyze separately." *See Bell*, 800 F.3d at 374. Consequently, "they are often addressed together." *See Tomeo v. W&E Commc'ns, Inc.*, No. 14 C 2431, 2016 WL 8711483, at \*16 (N.D. Ill. Sept. 30, 2016).

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court noted that it "is easy to misread" the language of Rule 23(a)(2) "since [a]ny competently crafted class complaint literally raises common 'questions.'" 564 U.S. 338, 349 (2011) (alteration in original) (quotation marks omitted) (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, N.Y.U. L. Rev. 97, 131–32 (2009)). While "[e]ven a single [common] question" is sufficient, *id.* at 359 (alterations in original), "superficial common questions—like whether each class member is a[ Milwaukee Public School] student or whether each class member 'suffered a violation of the same provision of law'—are not enough," *Jamie S. v. Milwaukee Public Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350); *see also Vill. of Bedford Park v. Expedia, Inc.*, No. 13 C 5633, 2015 WL 94851, at \*2 (N.D. Ill. Jan. 6, 2015). Instead, the Supreme Court has said and the Seventh Circuit has reiterated that "[c]ommonality requires the plaintiff to demonstrate that class members have suffered the same injury at the hands of the same defendant." *McCaster*, 845 F.3d at 800 (alteration in original) (quotation marks omitted) (quoting *Wal-Mart*, 564 U.S. 349–50); *see*

*also Jamie S.*, 668 F.3d at 497. Plaintiffs must show that "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members." *McCaster*, 845 F.3d at 800 (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)). Additionally:

> What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Wal-Mart*, 564 U.S. at 350 (quoting *Nagareda*, *supra*, at 132).

Predominance is similar to commonality but "the predominance criterion is far more demanding." *McCaster*, 845 F.3d at 800 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4.49, pp. 195–96 (5th ed. 2012)). Predominance calls for a "qualitative assessment"; "it is not bean counting." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). In short, "the 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Parko*, 739 F.3d at 1085 (quoting *Amchem*, 521 U.S. at 623).

##### b. Analysis

Plaintiffs enumerate eight allegedly common factual questions and five allegedly common questions of law. (R. 114 at 22–23.) The existence of a defect in all Ovens that causes the Ovens to fail during self-cleaning is the foundation of each factual issue in Plaintiffs' list. (*See id.*) "Whether the Ovens are prone to fail when the self-cleaning feature is used," for example, turns on whether each Oven is defective; "[w]hether Whirlpool knew or should have known that the

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

Ovens are prone to fail when the self-cleaning feature is used" is similarly predicated on the existence of a defect; "[w]hether Plaintiffs and Class members [were] damaged by purchasing Ovens with a defect that makes the Ovens prone to fail when the self-cleaning feature is used" turns on the existence of a defect; and "[w]hether Whirlpool was unable to repair the Ovens consistent with Defendant Whirlpool's warranty obligations" is irrelevant if the Ovens are not defective. (*Id.*) The legal issues Plaintiffs list—for example, "[w]hether Whirlpool breached express and implied warranties" and "[w]hether Whirlpool was unjustly enriched"—are broad and generic. (*Id.*) They are akin to asking whether each class member "suffered a violation of the same provision of law" or, as was the case in *Jamie S. v. Milwaukee Public Schools*, asking whether the "[defendant] fulfill[ed] its [Individuals with Disabilities Education Act] obligations to each child." 668 F.3d at 497–98 (quoting *Wal-Mart*, 564 U.S. at 350). Such questions are the sort of "superficial common questions" that are insufficient under Rule 23(a)(2), let alone Rule 23(b)(3). *See id.*; *see also Bedford Park*, 2015 WL 94851, at *2.

**\*19** Whirlpool argues that "Plaintiffs' Motion [for Class Certification] is necessarily premised on an alleged design defect that uniformly affects all Ovens" and that Plaintiffs "offer no credible <u>evidence</u> showing that a uniform defect exists across all ovens." (R. 130 at 19–20 (emphasis in original).) The Court agrees. Plaintiffs have not shown that the critical issue of whether the Ovens are defective is susceptible to classwide proof—in other words, Plaintiffs failed to show that "a classwide proceeding will generate common answers" and that the most important question in this case can be resolved in "one stroke." *Wal-Mart*, 564 U.S. at 350.

Even with de Richemond's testimony, which the Court has already excluded, Plaintiffs have not provided evidence that shows that a classwide proceeding will yield a common answer to the question of whether the Ovens are defective. Instead, the evidence before the Court would call for individualized inquiries.

There are two key problems with Plaintiffs' evidence. First, as described in detail above, their engineering expert has admitted that he does not know what causes an Oven to fail during self-cleaning and has admitted that two Ovens may fail for different reasons. If Plaintiffs had identified a common cause—specifically, some element of defective design common to all Ovens—then a class proceeding could resolve the question of whether the Ovens were defective in one stroke. Without identifying a common cause, however,

Plaintiffs cannot tie the Ovens together in a way that facilitates the efficient resolution of the question of whether the Ovens suffer from a defect. In other words, without a common cause, it is impossible to extrapolate from a particular Oven's failure during self-cleaning to learn anything about all 2,000,000 Ovens. Consequently, the case would devolve into individualized inquiries. That Whirlpool has shown that the Ovens have different designs—including design aspects that de Richemond admitted are material (*e.g.*, fan speed)—further highlights the need for individualized inquiries. Additionally, Whirlpool's testing data, including the UL 858 testing and the testing of IKEA Nutid and Datid ovens, show that at least some Ovens completed self-cleaning cycles without incident and that at least some Ovens had healthy temperature margins during self-cleaning. A class proceeding makes little sense under the present circumstances.

Plaintiffs rely on a line of class action cases involving Whirlpool's front-loading washing machines—namely *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359 (7th Cir. 2012) (*Butler I*), [15] *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) (*Butler II*), and *In re Whirlpool Corp Front-Loading Washer Prods. Liability Litig.*, 722 F.3d 838 (6th Cir. 2013). (*See* R. 114 at 19–22 & n.8.) These cases dealt with an alleged design defect in front-loading, high-efficiency washing machines that caused mold growth and unpleasant odors. *See Butler I*, 702 F.3d at 361; *id.* at 363 (explaining that the Sixth Circuit washing-machine litigation was "identical" with respect to the mold claim).

In the front-loading washing machine cases, unlike the current case, Plaintiffs identified a specific design issue common to all washing machines in the class that caused the mold and odor problem. As the court explained in *Butler II*:

> **\*20** The claim in the mold class action is that because of the low volume and temperature of the water in the front-loading machines compared to its volume and temperature in the traditional top-loading machines, they don't clean themselves adequately and as a result mold accumulates that emits bad odors.

Case: 1:19-cv-06473 Document #: 210-7 Filed: 04/12/24 Page 19 of 24 PageID #:5751

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

727 F.3d at 798. The defendant claimed that the manufacturer "made a number of design modifications [to the washing machines purchased by putative class members], and as a result different models are differently defective." *Id.* at 798. The defendant, however, "d[id] not contend that any of the design changes eliminated the odor problem, only that they diminished it." *Id.* Thus, although damages were likely to vary across the members of the class, the common question of whether the "the machines [were] defective in permitting mold to accumulate and generate noxious odors" was susceptible to classwide proof and a class action was therefore efficient. *Id.* The finder of fact would simply need to focus on the design issue Plaintiffs identified (the use of low water volume and temperature) to generate a common answer to a critical question in the litigation.

The Sixth Circuit front-loading washing machine case exhibits the efficiency of a class action where the plaintiff identifies a particular common design defect. In that case, the court noted that "front-loading machines promote mold or mildew more readily because of the lower water levels used and the higher moisture content within the machines, combined with reduced ventilation." *Whirlpool*, 722 F.3d at 847. Plaintiffs presented expert witnesses who gave opinions focused on the specific, common design defect that caused the mold problem. *See id.* (noting the plaintiffs' experts who explained that the washing machines failed to self-clean). One expert further explained that he examined later-generation models of the washing machines and found that they still contained the defective design despite some design changes. *See id.* at 854–55. Because plaintiffs identified and provided evidence of a common design defect that caused the mold problem, the court certified the class because "proof in this case will produce a common answer about whether the alleged design defects in the [washing machines] proximately caused mold or mildew to grow in the machines." *Id.* at 855. The class was cohesive and would "prevail or fail in unison." *See id.* at 859 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1191 (2013)). [16]

Plaintiffs' failure to identify a common defect or present a coherent theory as to what causes an Oven to fail during self-cleaning (indeed, Plaintiffs' expert appears to simply shrug his shoulders at the question of causation) distinguishes the current case from the front-loading washing machine cases. Here, Plaintiffs present no evidence as to the common cause of an Oven's failure during self-cleaning. Moreover, while Plaintiffs' expert attempts to tie all Ovens together because

they share the Vision II platform, his attempt falls flat because (1) he does not know what causes failure during self-cleaning, let alone what about the Vision II platform in particular causes failure during self-cleaning, and (2) he knows what the Vision II platform is at a level of generality so high that he is effectively without knowledge of what makes the Ovens' design similar, (*see* R. 212 at 101–02 (Q: "What is the Vision II platform, sir?" A: "It's the basic design for all of these ovens." Q: "Can you be any more specific about what makes [the Ovens] all the same, in your opinion?" A: "No, I can't.")). Thus, unlike in the washing-machine cases, a class-action proceeding will not allow a factfinder to resolve the critical question of whether the Ovens are defective in one stroke. In other words, while Plaintiffs present a superficial common question of whether the Ovens are defective, they do not meet their burden to show that the question will efficiently generate a common answer that will drive the litigation forward. *See Wal-Mart*, 564 U.S. at 350. Additionally, Plaintiffs have not shown that they "suffered the same injury." *McCaster*, 845 F.3d at 800 (quotation marks omitted) (quoting *Wal-Mart*, 564 U.S. 349–50). Consequently, even with de Richemond's opinions, Plaintiffs fail to carry their burden with respect to commonality and predominance, particularly in light of their list of common questions, (*see* R. 114 at 22–23), which turn on proof of a common defect.

**\*21** A number of cases—including post-*Butler* cases—confirm the Court's reading of *Butler* and the need for the identification of a specific design defect to tie a broad swath of consumer products together in a class proceeding. In *Robinson v. General Electric Co.*, for example, the court considered various alleged common questions concerning the existence of a common defect. *See* No. 09-cv-11912, 2016 WL 1464983, at *5 (E.D. Mich. Apr., 14, 2016). The plaintiffs argued that the common defect was "inadequate safety mechanisms." *Id.* at *3, *5. The court concluded that the plaintiffs failed to satisfy the commonality requirement because, "[s]imply stated, there is no evidence that a single design flaw pertaining to safety mechanisms is common across all of the models in [the class]." *Id.* at *5. The plaintiffs had asserted a design flaw "at the highest level of generality"—too high to present a common issue susceptible to classwide proof. *See id.* at *6. The court further noted that in *Whirlpool*, "[the] plaintiffs identified specific design defects that caused the alleged propensity to malfunction." *Id.* Additionally, the *Robinson* court explained, "The *Whirlpool* plaintiffs were able to tie their generalized theory to an identified part ... that caused mold problems. Plaintiffs have not done that here." *Id.* (citation omitted).

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

In *Mednick v. Precor, Inc.*, the plaintiffs sought to certify a class of individuals who purchased a Precor exercise machine with a touch sensor heart rate monitor. No. 14 C 3624, 2016 WL 3213400, at *3 (N.D. Ill. June 10, 2016). Precor sold twenty different machines—five treadmills, eight elliptical machines, one adaptive motion trainer elliptical machine, and six stationary bicycles—with a heart rate monitor. *Id.* at *1. The heart rate monitors were manufactured by three different companies. *Id.* Plaintiffs' biomedical engineering expert tested a single subject on the two plaintiffs' personal treadmills and on one other model treadmill. *Id.* at *2. He opined that "motion artifact"—"the actual movement of the user while exercising"—could disrupt heart-rate measurements on the Precor machines. *Id.* Precor's expert tested twenty-two individuals of varying ages, heights, weights and cardio-physiologies on all twenty machines. *Id.* Precor's expert found that the heart rate monitors on all machines functioned properly, but "the rate of accuracy varied based on factors including the user's physiology, the machine being tested, the type and intensity of the motion, and the machine's incorporated heart rate system." *Id.* at *3. He also criticized the plaintiffs' expert for testing only one person on one heart rate system on only one type of machine because the twenty Precor machines at issue used three different heart-rate monitoring systems, each type of machine required different types of movement, and individual users "have varied physiology and physical attributes, and may grip hand sensors and use exercise equipment differently." *Id.*

The *Mednick* court first struck and excluded the plaintiffs' expert's testimony. *See id.* at *5–6. The court then denied the plaintiffs' motion for class certification. *Id.* at *8. The court found there was too large a gap between the existence of "motion artifact" and the conclusion that all twenty Precor machines are defective because the heart rate monitors were "unable to compensate for [motion artifact] and provide a reliable heart rate reading." *Id.* at *7. Further, the court explained that the question of whether the Precor machines were defective—at least on the plaintiffs' evidence—could not be answered "for all members of the putative class in a single adjudication, but rather would require an individualized inquiry into each user, each type of machine and each heart rate system at issue." *Id.* at *7.

The Seventh Circuit's opinion in *In re Bridgestone/Firestone, Inc.*, also shows that certification is inappropriate in product-defect cases where the plaintiff has not tied together an entire product line comprised of similar—but not identical—

products in a way that facilitates a "once-and-for-all decision" about the full line. 288 F.3d 1012, 1019 (7th Cir. 2002). In that case, the court reversed the district court's decision to certify two nationwide classes in a lawsuit involving tires where there were six trade names and "67 master tire specifications" with different safety features and "failure modes." *Id.* Plaintiffs in the current case have similarly failed to provide the glue that holds all the class claims. *See also Mednick*, 2016 WL 3213400, at *7 (relying on *Bridgestone*); *Johnson v. Harley-Davidson Motor Co. Grp.*, 285 F.R.D. 573, 579 (E.D. Cal. 2012) (finding "no common method of proof to show whether there is a design defect" because, across the class of vehicles at issue, there were "more than 130 configurations and numerous factors affecting heat").

**\*22** In short, even with de Richemond's testimony, Plaintiffs cannot satisfy the commonality or predominance requirements. "Rule 23 does not set forth a mere pleading standard"—and Plaintiffs failure to show that they have suffered the same injury or that the key questions in this case (even as Plaintiffs frame them, (*see* R. 114 at 22–23)) can be resolved with common evidence in a single stroke.

The Court further notes that Plaintiffs' evidence outside of de Richemond's testimony does little to support their case for class certification. While Plaintiffs cite their second expert, the statistician Nozer Singpurwalla, for an exceedingly vague framing of the alleged cause of the self-cleaning defect—"a non-robust design," (R. 114 at 4)—Plaintiffs explain that Singpurwalla is a rebuttal expert against Whirlpool's experts who will assist the trier of fact in showing that Whirlpool's data is irrelevant, not mathematically sound, and that it obfuscates failure rates of the Ovens. (R. 180, Pls.' Mem. Opp. Def. Mot. Exclude Singpurwalla, 1.) Plaintiffs make clear that they do not proffer Singpurwalla "to opine on the mechanical deficiencies of the Ovens" and that his report "focuses exclusively on the flaws in the statistical aspects of Whirlpool's expert reports." (*Id.* at 2.) In their briefs in support of class certification, Plaintiffs cite Singpurwalla's report a single time, but fail to explain with any detail how his report constitutes evidence that there is a single, inherent defect in the Ovens. (R. 14 at 4.) In short, Plaintiffs do not use Singpurwalla's opinion to affirmatively support their class certification argument, and the Court will not make Plaintiffs' arguments for them. Singpurwalla's rebuttal testimony, assuming it is admissible, does not cure Plaintiffs' failure to identify an aspect of design common to all Ovens.

Case: 1:19-cv-06473 Document #: 210-7 Filed: 04/12/24 Page 21 of 24 PageID #:5753

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

Plaintiffs other evidence of a common defect falls short in the absence of expert engineering evidence. In a section of their reply brief, Plaintiffs argue that there is non-expert evidence supporting the existence of a common defect. (R. 167 at 9.) They cite the anecdotal evidence of an IKEA executive who said he was hesitant to use the self-cleaning feature of the Datid oven. (R. 167 at 9.) While such evidence is perhaps bad PR for IKEA and Whirlpool, it is not enough to tie all of the Ovens in the class together. Similarly, the TSPs, particularly without adequate expert engineering testimony, are not enough to make this case like *Butler*. They cannot replace expert evidence, and the TSPs are targeted to specific issues and do not cover all Ovens. Additionally, as explained above, while issuing TSPs is consistent with the existence of a common defect, they do not by themselves provide evidence tying every oven in the class together, particularly in light of the UL 858 testing data (as well as other similar testing data) showing some Ovens successfully complete self-cleaning. Plaintiffs do not point to any other evidence in this section of their reply brief describing the non-expert evidence supporting the existence of a common defect, nor do they point to any other evidence in defining the defect at issue in their opening brief, (*see* R. 114 at 3.) They have simply failed to provide evidence to tie all of the ovens together in a way that will allow the finder of fact to determine in a single stroke if the Ovens are defective. Plaintiffs, therefore, have failed to establish commonality and predominance.

## 2. Typicality

**\*23** Under Rule 23(a)(3), Plaintiffs must show "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To meet this requirement, the class representatives' claims must "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)); *see also Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009); *Schneider*, 2016 WL 7840218, at \*7. Some factual distinctions between the class representatives' claims and those of other class members does not defeat typicality, but the representatives' claims must "have the same essential characteristics as the claims of the class at large." *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir. 2008) (quoting *Oshana*, 472 F.3d at 514). Typicality overlaps with commonality. *See Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011).

Plaintiffs fail to demonstrate they meet the typicality requirement for the same reasons they fail to show compliance with the commonality and predominance requirements. By failing to tie all the Ovens together with sufficient evidence of a common defect, Plaintiffs cannot show that their claims arise out of the same event or course of conduct as all class members. *See Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993) ("Because the [plaintiff, the Retired Chicago Police Association,] does not include individuals from all of the fund groups and there is no indication that each of these groups was treated identically by the City or by its respective fund, its claims cannot be deemed typical of the entire proposed class."); *Robinson*, 2016 WL 1464983, at \*8 ("Plaintiffs' typicality and commonality theory have the same flaw: their general hypothesis is not subject to common proof. If [a class representative] proved his own claim regarding his own model, that would not necessarily prove anyone else's claim."); *see also Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (explaining that the "essence" of typicality is that the named plaintiff's and the class members' claims rise and fall in unison). [17]

## C. Plaintiffs Are Not Entitled to Certification Under Rule 23(b)(2)

Plaintiffs Rule 23(b)(2) classes both fail for failure to satisfy Rule 23(a)'s requirements. They also fail for a number of additional reasons.

First, Plaintiffs' Rule 23(b)(2) classes are insufficiently cohesive to warrant certification under Rule 23(b)(2). The Rule requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Rule "operates under the presumption that the interests of the class members are cohesive and homogenous such that the case will not depend on adjudication of facts particular to any subset of the class." *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000); *see also Wal-Mart*, 564 U.S. at 360 ("The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.' " (quoting Nagareda, *supra*, at 132)); *Penn. Chriopractic Ass'n v. Blue Cross Blue Shield Ass'n*, 286 F.R.D. 355, 376–77 (N.D. Ill. 2012). Because, as explained above, Plaintiffs have failed to show how the Court could find all

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)
2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

of the Ovens defective based on classwide proof—the class is insufficiently cohesive and depends on the adjudication of individual issues. This is antithetical to the point of Rule 23(b)(2), under which "[t]he glue that makes a class action efficient ... is that the class members' claims are so inherently intertwined that injunctive relief as to any would be injunctive relief as to all." Rubenstein, *supra*, at § 4:34.

 **\*24** Second, injunctive relief is inappropriate for the entire class. Plaintiffs seek in the alternative to their Rule 23(b)(3) class, two Rule 23(b)(2) classes consisting of "All individuals residing in the States identified in Exhibit 1 who purchased a Whirlpool Oven with a self-cleaning mechanism" and "All individuals residing in the States identified in Exhibit 1 who purchased a Whirlpool Oven sold by IKEA with a self-cleaning mechanism." (R. 114 at 9–10.) They seek "injunctive relief [to] force Whirlpool to remedy the Defect and fully inform putative class members and the public regarding problems with the Ovens." (R. 167 at 27 (citing a case in which plaintiffs sought to remedy a false advertising campaign).) Rule 23(b)(2) classes require that the contemplated equitable relief be "appropriate respecting the class as a whole" and "final." *Karman v. State Farm Mut. Auto Ins. Co.*, 634 F.3d 883, 892 (7th Cir. 2011). Here, Plaintiffs have failed to show that they can "satisfy the test for a remedy in equity" for the class as a whole. *Id.* To be entitled to equitable relief, a plaintiff must show that he suffered irreparable harm, that monetary damages are an inadequate remedy, that an equitable remedy is warranted on the balance of the hardships, and that the public interest would be served by the injunction. *Id.* Plaintiffs have not shown and cannot show that monetary damages are inadequate. Indeed, assuming Plaintiffs are successful in this lawsuit, monetary relief would be adequate, as it would compensate Plaintiffs for the amount they overpaid for a product that cannot perform one of its functions. [18] Accordingly, certification under 23(b)(2) is not appropriate. *Id.*; *see also Mednick*, 2016 WL 3213400, at \*8 (denying certification of a Rule 23(b)(2) class because the plaintiffs could not satisfy the test for a remedy in equity).

Plaintiffs—in spite of their clear class definitions which include all individuals in a certain group of states who purchased an Oven, (R. 114 at 9–10)—appear later in their opening brief to attempt to limit their Rule 23(b)(2) class to individuals who have not yet experienced a self-cleaning failure, (R. 114 at 34–35). Once again Plaintiffs have proven a moving target. Even if the Court were to accept their more limited class definition, Plaintiffs would violate the principle that "class representative[s] must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart*, 564 U.S. at 348–49 (quotation marks omitted).

Consequently, the Court denies Plaintiffs' motion for certification under Rule 23(b)(2).

### D. Certification Under 23(c)(4) Is Not Warranted
As noted above, Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." The only common issues Plaintiffs identify in their briefs for which they seek certification under 23(c)(4) are "whether the Ovens contain a defect in that the Ovens are prone to fail when the self-cleaning cycle is used," "whether the defect existed at the time it left Defendant's control" and "whether Defendant concealed the defect from Plaintiffs and the proposed class." (R. 114 at 34.) All of these questions are predicated on the existence of a common defect. Accordingly, certifying them would be inappropriate. Plaintiffs' motion under Rule 23(c)(4) is denied.

### CONCLUSION

For the foregoing reasons, the Court grants Whirlpool's *Daubert* motion and denies Plaintiffs' motion for class certification.

### All Citations

Not Reported in Fed. Supp., 2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

**Footnotes**

Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

1　There are three other *Daubert* motions pending regarding one of Plaintiffs' experts (a rebuttal expert) and two of Whirlpool's experts. Because Plaintiffs' class certification motion fails without de Richemond's testimony regardless of the admissibility of Plaintiffs' second expert's opinion, it is unnecessary to consider the three other experts involved in this case.

2　Plaintiffs also seek, in the alternative, class certification as to particular issues. Under Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4).

3　Exhibit 1 includes a list of fifteen states and the District of Columbia.

4　De Richemond indicates that Whirlpool ceased production of all Vision II ovens by 2014. (R. 115-4 at 4.) The Court need not resolve precisely when Whirlpool ceased production of all Vision II ovens for the purposes of this opinion.

5　A thermal fuse is "a safety fuse found in some ovens typically mounted in a wire harness in the top chassis area near the oven's electronic control board, which is set to open (trip) at 84°C, 93°C, or 110°C, depending on brand and oven configuration. If the thermal-fuse trips, power to the entire oven is cut, including the heating element, so that it will cool down." (R. 136-2 at ¶ 4.)

6　A TOD is "a safety fuse found in all ovens typically mounted on the back of the oven's outer shell near the top of the cavity. (R. 136-2 at ¶ 4.) The TOD is set to open (trip) at either 120°C or 130°C, depending on the oven's configuration." (*Id.*) If the temperature of the TOD exceeds its set point, the TOD "will trip and cut power to the oven's heating element so that it will cool down." (*Id.*)

7　During the *Daubert* hearing, Whirlpool indicated that it would not stipulate that de Richemond was a product design expert, but would stipulate that he is an expert mechanical engineer. (R. 212 at 135–36.) Whirlpool's *Daubert* briefs, however, do not focus on de Richemond's qualifications as a ground for excluding his testimony. Accordingly, the Court considers only Whirlpool's arguments regarding the helpfulness of de Richemond's opinions and the reliability of his inquiry.

8　The Court notes that even if it accepts the broad framing of the common defect as simply that the ovens fail during self-cleaning, de Richemond's opinions are still unhelpful because, as detailed below, he does not tie some design component common to all Ovens to their failure. Furthermore, de Richemond's methodology was unreliable, as explained below.

9　The TSPs do not save de Richemond's testimony. First, they constitute evidence that does not require an expert opinion. Second, de Richemond's testimony is based on an engineering opinion regarding ovens he examined, not a simple review of the TSPs. Third, the TSPs are targeted to specific issues and do not cover all Ovens. Fourth, while issuing TSPs is consistent with the existence of a common defect, they do not by themselves provide evidence tying every oven in the class together. Whirlpool could issue TSPs based on a problem that occurs occasionally, but is not based on a design defect inherent in every Oven. This is likely why Plaintiffs' engaged an engineer as an expert to examine the Ovens and attempt to opine on what aspect of their design causes failure during self-cleaning.

10　De Richemond testified that he believes all Ovens will fail during self-cleaning. (R. 212 at 81.)

11　The Court notes that Kljajic's ovens were not Nutid models. (*See supra* Background, § II.B.)

12　As noted above, the TSPs cannot save de Richemond's testimony. *See supra* n.9. The Court also notes that because Plaintiffs admit that de Richemond gives no opinion regarding warranty rates, the Court does not

**Cates v. Whirlpool Corporation, Not Reported in Fed. Supp. (2017)**

2017 WL 1862640, 103 Fed. R. Evid. Serv. 428

consider if de Richemond appropriately relied on a supposedly high rate of warranty repairs. (*See* R. 175 at 15; *see also* R. 134-1 at 18; R. 194 at 14–15.)

13    The parties dispute certain elements of warranty claims, like whether presuit notice is required, whether manifestation of a defect is required, and whether privity and/or reliance is required. (*See, e.g.*, R. 130 at 40.) Because Plaintiffs' fail to tie their claims together with evidence of a common defect in all Ovens, the Court need not consider the differences in state law to which Whirlpool points, or, if such differences exist, whether the creation of subclasses is appropriate.

14    It does not appear Plaintiffs are pursuing a claim of breach of implied warranty of fitness for a particular purpose, as they enumerate the elements of only breach of implied warranty of merchantability. (*See* R. 114 at 25 & n.12; R. 167 at 6.)

15    The Supreme Court vacated this opinion and remanded it for further consideration in light of intervening Supreme Court precedent. *See Sears, Roebuck & Co. v. Butler*, 133 S. Ct. 2768 (2013). Upon remand, the Seventh Circuit reinstated its judgment from *Butler I*. *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) (*Butler II*).

16    *Pella Corp. v. Saltzman*, another case Plaintiffs cite, dealt with a single design defect in windows that allowed "water to seep behind the aluminum cladding" and cause wood rot. 606 F.3d 391, 392–93 (7th Cir. 2010) (per curiam). It is therefore similar to *Butler*.

17    Because the Court has concluded that Plaintiffs have failed to establish typicality and commonality, the Court need not consider whether Plaintiffs have satisfied numerosity (which Whirlpool does not challenge) or adequacy. The Court notes, however, that "if [a named plaintiff's] claim is atypical, he is not likely to be an adequate representative; his incentive to press issues important to the other members of the class will be impaired." *Robinson v. Sheriff of Cook Cty.*,167 F.3d 1155, 1157 (7th Cir. 1999); *see also Muro*, 580 F.3d at 493. Here, because Plaintiffs have failed to present sufficient evidence of a common defect, Plaintiffs may not be adequate representatives of all the class members, who may have Ovens that suffer from a distinct defect or none at all.

18    The Court further notes that Plaintiffs entire case is premised on the idea that neither they nor Whirlpool knows how to fix the Defect. Because of this, the Court has difficulty seeing how injunctive relief would be of much use.

---

**End of Document**                                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.