**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---

|  |  |  |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 19-cv-6473** |
| **v.** | : | |
| | : | **Judge Sharon Johnson Coleman** |
| **SBB RESEARCH GROUP, LLC, et al.,** | : | |
| | : | **Magistrate Judge Keri L. Holleb Hotaling** |
| **Defendants.** | : | |
| | : | |

---

**PLAINTIFF'S MOTION TO EXCLUDE THE MATERIALITY**
**OPINIONS OF DEFENDANTS' EXPERT GENE DEETZ**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ............................................................................................3

   Opinion of the SEC's Expert, Peter Hickey ...........................................3

   What Deetz Does Not Dispute .................................................................4

   Deetz's "10% Band of Estimation Uncertainty" and Misstatement Analysis .........5

ARGUMENT ................................................................................................8

     I.    Deetz's "Method" for Determining His 10% "Band of Estimation Uncertainty" Was Not Disclosed in His Report ...................................9

     II.   Deetz Is Not Qualified to Evaluate the Estimation Uncertainty Surrounding the MarkIt Option Valuation Algorithm ..........................10

     III.  Deetz Has Provided No Basis In Option Valuation Practice or GAAP For Assuming a + / - 5% Estimation Uncertainty Band for the MarkIt Model ...........................................................13

     IV.  Deetz's Cherry-Picking of Data Renders His Opinion Unreliable .........15

     V.   Deetz's Qualitative Materiality Opinion Usurps The Role of the Jury ...............................................................................18

CONCLUSION................................................................................................20

## TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*Barber v. UAL, Inc.*,
    17 Fed. Appx. 433 (7th Cir. 2001) ........................................................... 18

*C.W. ex rel. Wood v. Textron, Inc.*,
    807 F.3d 827 (7th Cir. 2015) ............................................................ 13-14

*Cates v. Whirlpool Corp.*,
    2017 WL 1862640 (N.D. Ill. May 9, 2017) ............................................. 18

*Complete Entm't Res., LLC v. Live Nation Entm't, Inc.*,
    2017 WL 11632203 (C.D. Cal. Oct. 25, 2017) ....................................... 10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ................................................................................ 8

*Highland Cap. Mgmt., L.P. v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) .................................................... 20

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................................ 8

*Lewis v. CITGO Petroleum Corp.*,
    561 F.3d 698 (7th Cir. 2009) .................................................................. 8

*Palmer v. Asarco, Inc.*,
    2007 WL 2298422 (N.D. Ok. Aug. 6, 2007) .......................................... 10

*Stop Staring Designs! v. Tatyana, LLC*,
    2012 WL 12877991 (C.D. Cal. Feb. 21, 2012) ...................................... 10

*Sunstar, Inc. v. Alberto-Culver Co.*,
    2006 WL 6505615 (N.D. Ill. Nov. 16, 2006) ......................................... 10

**Rules**
    Fed. R. Evid. 702 .................................................................................... 8

**Other**
    FASB ASC § 820 ............................................................................. passim

## PRELIMINARY STATEMENT

One of the central issues of this case is whether Defendant SBB Research Group, LLC's ("SBB") valuation model for the option component of its structured note investments complied with ASC § 820 – the provision of Generally Accepted Accounting Principles ("GAAP") that specifies the proper method for valuing various categories of assets. ASC § 820 requires that inputs for valuation models "reflect the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk." (ASC § 820-35-53.) Among other things, the SEC alleges that: (a) SBB told investors it would value its structured notes at "fair value," *i.e.,* consistent with the assumptions and practices of market participants; and (b) SBB instead used a bespoke valuation model that deviated sharply from the requirements of ASC § 820 by including subjective valuation criteria and inputs in *lieu* of option valuation practices that have been standard in the financial industry for over 50 years. (*See, e.g.,* Dkt. #1 at ¶¶ 33-36.)

Defendants do not argue that SBB's valuation model complied with ASC § 820. The opposing valuation experts in this case appear to agree that SBB's model inputs were <u>not</u> consistent with standard valuation practice (and SBB personnel have admitted as much in testimony). Instead, Defendants offer Gene Deetz, an accounting expert, to compare SBB's inflated note valuations to the note valuations of MarkIt, a third-party valuation firm hired by SBB after the firm abandoned its defective model in 2016. Deetz's aim was to demonstrate that SBB's overstatements were not material. However, a simple comparison of the two models shows that the net asset values ("NAVs") of SBB's funds were overstated on <u>36 out of 38 occasions</u> (often by more than 6%).

So, Deetz adopted a novel approach: applying a +/-5% "band of estimation uncertainty" to MarkIt's model. Deetz concluded, without citing any academic literature or GAAP provision, that any valuation misstatements by SBB that fall within that 10% band were reasonable and could be ignored in a materiality analysis. In other words, Deetz says that the first 5% of any overstatement by SBB simply doesn't count.

Deetz's +/-5% "band of estimation uncertainty" fails the *Daubert* test, for several reasons. <u>First</u>, Deetz did not disclose his method for calculating the extent of the band in his report. The SEC had to uncover Deetz's methodology during his deposition; and Defendants still haven't provided the SEC with any workpapers showing his calculations. <u>Second</u>, although Deetz is opining on the uncertainty surrounding MarkIt's valuation algorithm, Deetz is not an expert in valuation algorithms. Nor did he review the MarkIt algorithm. And he did not consult any valuation experts (including his colleague who serves as another excerpt for the defendants). <u>Third</u>, Deetz's math is sloppy. He calculated his 10% band of uncertainty by cherry-picking <u>3.8%</u> of the available data on SBB's note values. An examination of <u>all</u> the available data establishes that, even applying Deetz's method, his band of uncertainty is three times too broad. He reached his conclusions by excluding a large percentage of SBB's overstatements from his materiality analysis.

Deetz's consideration of qualitative factors in his materiality analysis is no better. Instead of considering the "totality of the circumstances," Deetz adopted a heavily edited factual narrative which painted SBB in the most positive light -- thus, invading the jury's domain. Deetz also excluded two significant facts: (a) SBB's personnel have admitted that SBB's deviation from standard valuation practice was <u>intentional</u>; and (b) SBB's model is

2

overwhelmingly biased toward higher note values, and <u>93%</u> of the misstatements are <u>over</u>statements of note value. (*See* Ex. A, Mintzer Reb. Rep. ¶¶ 41-42, 43.)

Accordingly, Deetz's opinions on materiality should be excluded from evidence in this case. They are unhelpful, unreliable, and improperly invade the jury's role as factfinder.

## BACKGROUND

### Opinion of the SEC's Expert, Peter Hickey:

Defendants offered Deetz as an accounting expert, purportedly to rebut opinions offered by Peter Hickey, the SEC's expert in the application of the GAAP fair value standards of ASC § 820. In his report and deposition, Hickey: (a) described the limitations that ASC § 820 places on parties like SBB when creating valuation models, (b) discussed ASC § 820's requirement that models conform to the assumptions and practices of market participants rather than providing subjective measures of valuation, (c) outlined why the requirements of ASC § 820 are important (*i.e.*, the need for a common language among market participants for valuation and the ability to compare similar investments), and (d) detailed SBB's deviation from the requirements of ASC § 820 (including SBB's (i) use of subjective criteria rather than market-corroborated inputs, (ii) deviation from market-based principles, (iii) failure to maximize the use of observable inputs in its model, and (iv) self-described use of "intuition" in creating model inputs). (*See* Ex. B, Hickey Rep. ¶¶ 31-144.)

Hickey's expert report demonstrates that under ASC § 820, <u>valuation method matters</u>. GAAP specifically describes the proper way to value investments, and those requirements are important. SBB told its investors that it would follow accounting rules, but then deviated from the requirements of ASC § 820 by abandoning the traditional practices of market participants in favor of its own custom model.

**What Deetz Does Not Dispute**:

Deetz was offered as a purported rebuttal expert. However, Deetz did <u>not</u> address the bulk of Hickey's opinions. Among other things, Deetz did not contest that: (a) ASC § 820 requires that valuation models be market-based; or (b) SBB's valuation methodology failed to comply with that GAAP requirement. (Ex. C, Deetz Tr. at 18, 22, 258.)

In his report, Deetz took one stab at addressing the requirements of ASC § 820. He proclaimed – without citation to applicable authority – that ASC § 820 does not "limit[] the use of valuation techniques to measure fair value." He also testified that, under ASC § 820 entities can use <u>any valuation technique they want</u>. (Ex. D, Deetz Rep. ¶ 34; Ex. C, Deetz Tr. at 52.) But, throughout his deposition, Deetz had to back away from that categorical opinion. At various points, Deetz acknowledged that ASC § 820 <u>indeed</u> places the following limitations on inputs that can be used in valuation models like SBB's:

- Valuation model inputs must be consistent with the assumptions and practices of industry participants. (Ex. C, Deetz Tr. at 18, 22; ASC § 820 -05-1C, 35-53.)

- Valuation models must maximize the use of observable inputs and minimize the use of unobservable inputs. (Ex. C, Deetz Tr. at 55-56; ASC § 820 -35-36.)

- The reporting entity's intent to hold an investment cannot factor into a measurement of fair value.[1] (Ex. C, Deetz Tr. at 50-51; ASC § 820-05-1C.)

- Valuation policies that use a present value technique, like SBB's, should use the risk-free rate in their modeling. (Ex. C, Deetz Tr. 57-59; ASC § 820-55-5.)

Deetz did not opine on whether SBB's model was market-based (as ASC § 820 requires). Deetz also admitted that, in his experience using option valuation models, he:

---

[1] As Hickey described in his report, SBB personnel have testified that SBB's model was an "economic model" that took into account SBB's intent to hold structured notes to maturity. (*E.g.*, Ex. B, Hickey Rep. ¶ 65.) This directly conflicts with ASC § 820's requirement that entities determine fair value <u>without</u> regard to their subjective intent to hold. (ASC§ 820—05-1C.)

- Had <u>never</u> seen a model that used 45-day historical volatility as its volatility input, as SBB did (Ex. C, Deetz Tr. at 138);

- <u>Has</u> seen models that used extrapolated implied volatility (*i.e.*, the input Hickey opined SBB should have used) (*Id.*); and

- Had <u>never</u> seen a model that deviated from the risk-neutral framework for options valuation, as SBB's did. (*Id.* at 138, 140.)

**<u>Deetz's "10% Band of Estimation Uncertainty" and Misstatement Analysis</u>**:

Rather than address the substance of Hickey's opinions, Deetz conducted an analysis of whether the SBB Funds' year-end financial statements were materially misstated. He purported to analyze that question under GAAP and GAAS provisions related to materiality in financial statements, specifically SEC Staff Accounting Bulletin ("SAB") 99, SAB 108, and FASB Concept Statements 2 and 8 ("Con 2" and "Con 8"). (Ex. D, Deetz Rep. at 112-39.) While the exhibits to Deetz's report show how SBB's model affected fund performance and the fees SBB charged investors (*e.g.*, *id.* at Ex. 3.3-3.19, INV.II E. 11-19, INV.IV Ex. 7-9, POLY.I Ex. 5-7), the body of Deetz's report focuses on a single metric: the total NAV of the fund. In doing so, Deetz compared note values from SBB to the values determined by MarkIt, the third-party valuation consultant that SBB hired after abandoning its own model in late 2016.

However, Deetz faced a problem. Even if a factfinder were to adopt Deetz's tunnel vision and focus narrowly on the NAV metric, the differences between the SBB funds' NAVs and MarkIt's NAVs appear to be material. The SEC's accounting expert, Andrew Mintzer, showed that SBB's year-end NAVs were <u>overstated</u> compared to MarkIt in <u>36 of 38</u> instances, often by more than 4.5% and by as much as 9.3%. (*See* Ex. A, Mintzer Reb. Rep. ¶¶ 61-62 and Figure 1, shown below):

**Figure 1: Percentage Over/(Under)statement in NAV**
**Comparing SBB Reported NAV to MarkIt NAV**
**(Ex. A, Mintzer Reb. Rep. at ¶ 61.)**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|
| CPS 1 - Rollover | N/A | N/A | 0.4% | 1.8% | 3.1% |
| CPS 1 - Iron Curtain | N/A | N/A | 0.4% | 2.2% | 5.4% |
| CPS X1 - Rollover | N/A | N/A | 0.3% | 1.6% | 2.8% |
| CPS X1 - Iron Curtain | N/A | N/A | 0.3% | 1.9% | 4.8% |
| Investor II - Rollover | 4.5% | 4.9% | (3.2%) | 3.5% | (2.2%) |
| Investor II - Iron Curtain | 4.5% | 9.3% | 5.8% | 8.3% | 5.5% |
| Investor III - Rollover | N/A | N/A | 1.2% | 6.1% | 0.8% |
| Investor III - Iron Curtain | N/A | N/A | 1.2% | 7.0% | 7.5% |
| Investor IV - Rollover | N/A | N/A | 1.3% | 6.2% | 0.8% |
| Investor IV - Iron Curtain | N/A | N/A | 1.3% | 7.1% | 7.7% |
| Polysight I - Rollover | N/A | N/A | N/A | 6.7% | 2.9% |
| Polysight I - Iron Curtain | N/A | N/A | N/A | 6.7% | 8.2% |

Deetz attempted to address that problem by introducing a new concept for which he provided no methodological basis or academic support. He applied a +/- 5% "estimation band" purportedly designed to determine how much of SBB's overstatement was attributable to "estimation uncertainty" built into MarkIt's model. (Ex. C, Deetz Tr. at 81, 84.) Deetz posited that MarkIt's valuation model was surrounded by a 10% uncertainty "band."[2] (*Id.* at 81-88.) In other words, Deetz assumed that any SBB valuation within +/- 5% of MarkIt's value was reasonable and he excluded it from his materiality analysis. (*Id.*) For example, if SBB's value for a note was 4.9% higher than MarkIt's, none of SBB's overstatement factored into Deetz's materiality calculation. (*Id.* at 93-94.) If SBB's valuation was 7.5% higher than MarkIt's, Deetz would: (a) attribute the first 5% of the overstatement

---

[2] Although the band receives little attention in the body of Deetz's report, his application of this "estimation band" in evident in his exhibits. (*See* Ex. D, Deetz Rep. at INV.II Exs. 6-8, INV.III Exs. 4-6, INV.IV Exs. 4-6, POLY.I Exs. 3-4.) Because SBB's values are almost always higher than MarkIt's, the "estimation band" reflected in those spreadsheets is a 5% band. At his deposition, Deetz acknowledged that his band is a +/- 5% band, or 10% total. (Ex. C, Deetz Tr. at 81.)

to "estimation uncertainty," (b) discard that valuation amount, and (c) factor in only 2.5% of SBB's overstatement into his materiality analysis.

Deetz's construction of a +/- 5% "buffer" around MarkIt's note values is the linchpin to his opinion that SBB's year-end note valuations are not materially different than MarkIt's. Deetz's uncertainty band allows him to ignore the first 5% of any overstatement, transforming a 7.5% overstatement into a 2.5% difference. By taking a large bite out of every note value overstatement, Deetz has managed to assume away over half of the actual dollar difference between SBB's values and MarkIt's. (Ex. A, Mintzer Reb. Rep. ¶ 5(b).) The summary chart in Deetz's report shows the profound impact of his +/-5% estimation band. The facially material overstatements shown by comparing SBB's values to MarkIt (in Mintzer's **Figure 1** above) simply disappear:

**Figure 2: Deetz's Calculation of % Difference
Between SBB and MarkIt After Excluding His 5% "Band of Uncertainty"
(Ex. D, Deetz Rep. at ¶ 138)**

| Amounts in Excess of Quantitative Threshold as a % of As-Adjusted NAV (Developed from Reasonable Range around Markit) | | | | | |
|---|---|---|---|---|---|
| **Fund** | **2011** | **2012** | **2013** | **2014** | **2015** |
| Inv II | 0.5% | 1.8% | - | 0.3% | - |
| Inv III | N/A | N/A | - | 0.0% | 0.3% |
| Inv IV | N/A | N/A | - | 0.1% | 0.4% |
| Polysight I | N/A | N/A | N/A | 0.2% | 1.1% |
| CPS I | N/A | N/A | - | - | 0.1% |
| CPS XI A | N/A | N/A | - | - | - |

In a world of investments where changes in returns and NAVs are measured in single percentage points (and a fund's NAV determines fees), the differences between **Figure 1** (Mintzer) and **Figure 2** (Deetz) are significant. Investors may not notice if there is a .3% overstatement in their investment (as Deetz posits for the Inv. II fund in 2014). But an 8.3% overstatement in NAV would be material. Deetz's report did not explain how he calculated that MarkIt's band of estimation uncertainty. He said only:

7

- The range of fair values around the Markit prices shown in the same series of exhibits referenced above is determined based on applying a 5% band to capture an estimated reasonable range of market-based fair values. (Ex. D, Deetz Rep. ¶ 129)

- In my opinion, the 5% range is reasonable based on the assets being valued, and my review of several years of fair value disclosures by the counterparty banks where they disclose valuation inputs and significant estimates. (*Id*. ¶ 131)

The report does not examine the MarkIt model itself (or any of its inputs), and includes no citations to GAAP provisions or academic articles supporting Deetz's calculation of his 10% "band of estimation uncertainty."

## ARGUMENT

District courts stand as gatekeepers, protecting jurors from unreliable expert testimony that might infect their decisions. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Courts have a "special obligation" to ensure that an expert's testimony is "not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). An expert may only testify if: (a) the expert's scientific, technical, or specialized knowledge will help the jury understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is based on reliable principles and methods; <u>and</u> (d) the expert reliably applied those principles and methods to the facts of the case. *See* Fed. R. Evid. 702. Here, Defendants must demonstrate that Deetz's materiality analysis, which is held together by his +/- 5% band of estimation uncertainty, satisfies that rigorous standard. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Deetz's +/- 5% estimation uncertainty band flunks the *Daubert* test because: (1) Deetz's method for calculating that band was not disclosed in his report; (2) Deetz lacks the expertise to opine on the margin of error for an option valuation model; (3) Deetz's decision to exclude the first 5% of SBB's overstatement of note value has no basis in option

8

valuation practice or GAAP; and (4) Deetz's calculation of the +/- 5% is based on cherry-picked data, and does not hold up when <u>all</u> note valuations are considered.

## I. Deetz's "Method" for Determining His 10% "Band of Estimation Uncertainty" Was Not Disclosed in His Report:

As discussed above, Deetz's determination that the MarkIt valuation model was subject to a +/- 5% band of estimation uncertainty is critical to his materiality opinion. It allows him to exclude over half of the dollar value of SBB's overstatements. He uses this band in <u>dozens</u> of materiality calculations in his report. (*See* Ex. D, Deetz Rep. ¶ 138, INV.II Exs. 6-8, INV.III Exs. 4-6, INV.IV Exs. 4-6, POLY.I Exs. 3-4.) Despite the importance of his +/- 5% Band of Estimation Uncertainty, the Court will not find any mention in Deetz's report of how he calculated it. Nor an explanation of why the uncertainty band is 5%, and not 3% or 2%? Deetz's report does not say.

The SEC had to uncover Deetz's methodology during his deposition. (Ex. C, Deetz Tr. at 94-112.) Even then, Deetz could not provide the support. He admitted that he does not have a workpaper memorializing his method for calculating the 10% band, showing his calculations underlying the band, or demonstrating how his calculations could be extrapolated and applied to <u>every</u> note held by SBB's funds. (*Id.* at 94, 100, 112-13, 157.) Deetz conceded that a reader of his report would not be able to tell: (a) what inputs he used in calculating the +/- 5% estimation band, (b) which years he used in the calculation, (c) which funds were included in his calculation, or even (d) which models he was comparing in developing the critical opinion that the MarkIt model has un uncertainty range of +/- 5%. (*E.g.*, *Id.* at 99, 113-14, 117-18, 128-29.) In sum, there was no way for the SEC – or for any reader -- to test Deetz's calculations and ensure that his methods were repeatable and the product of a sound analysis of MarkIt's valuation model.

Deetz's failure to disclose the method behind the most important aspect of his materiality opinion is ground enough for exclusion of that opinion. *See, e.g., Sunstar, Inc. v. Alberto-Culver Co.*, 2006 WL 6505615, *9 (N.D. Ill. Nov. 16, 2006) (expert cannot testify about royalty rate calculations not disclosed in report) (Ex. E); *Complete Entm't Res., LLC v. Live Nation Entm't, Inc.*, 2017 WL 11632203, *2-*3 (C.D. Cal. Oct. 25, 2017) (excluding expert's future value calculation that did not appear in report) (Ex. F); *Stop Staring Designs! v. Tatyana*, LLC, 2012 WL 12877991, *1-*2 (C.D. Cal. Feb. 21, 2012) (excluding expert's damages opinion where underlying methodology was not disclosed in report) (Ex. G). The fact that the SEC finally discovered Deetz's methodology does not remedy his failure to disclose or justify putting unreliable calculations in front of a jury. *See, e.g., Palmer v. Asarco, Inc.*, 2007 WL 2298422, *4-*5 (N.D. Ok. Aug. 6, 2007) (excluding opinions whose basis was not disclosed in the report, and rejecting argument that party's failure to disclose was remedied by disclosing the methodology at expert's deposition).  (Ex. H)

## II.    Deetz Is Not Qualified to Evaluate the Estimation Uncertainty Surrounding the MarkIT Option Valuation Algorithm:

In addition, Deetz admits he is not an expert in option valuation or valuation algorithms. Deetz even admits that he did not rely on any standard option valuation practices in determining the band of uncertainty around the MarkIt Model. (Ex. C, Deetz Tr. at 62, 106, 178.) However, Deetz's opinion falls squarely within the job description of a valuation expert. He purports to offer an opinion on the estimation uncertainty surrounding the MarkIt valuation algorithm. Whether one calls it a "band of uncertainty," a "margin of error," or a "range of fair values," Deetz was attempting to separate differences in value that can be attributed to any built-in uncertainties of MarkIt's valuation method from those that represent a "true" overvaluation.

10

In opining on the estimation uncertainty of MarkIt's model, Deetz failed to conduct a *bona fide* analysis of any input in that model.[3] In fact, Deetz does not know what inputs MarkIt used. At his deposition, Deetz admitted that he has never seen MarkIt's model, and doesn't even know what inputs MarkIt used. (*Id.* at 122, 195.) That failure alone should disqualify to Deetz's analysis.

Deetz's unfamiliarity with, and failure to analyze, the models at issue emerged when he finally revealed his previously undisclosed "method" at his deposition. To calculate the upper limit of his 10% band, Deetz compared MarkIt's valuations to the values determined by another defense expert, Arun Sen. But Deetz didn't use Sen's actual note values when comparing them to MarkIt. Instead, Deetz expanded the breadth of his estimation band, using only the "upper range" of Sen's calculation of "uncertainty" surrounding Sen's "Heston" model. (*Id.* at 103.) In other words, Deetz layers the purported margin of error for Sen's valuation model onto his own calculation of the range of "estimation uncertainty" for the MarkIt model. This approach is fatally flawed, for two reasons.

First, Deetz is evaluating MarkIt's model by using a calculation by another expert that he didn't participate in (and doesn't know how to perform); that calculation involves variables from a model (Sen's) that is different from the one he's purportedly testing (MarkIt's).[4] Deetz cites no authority to support that maneuver. Second, Deetz's method

---

[3] Deetz's method clashes with the opinion of Defendants' actual valuation expert. Defendants' valuation expert, Arun Sen, conducted a detailed – but flawed – analysis to calculate the source and extent of uncertainty surrounding his "Heston model." (Ex. I, Sen Rep. ¶¶ 94-104.) Sen opined that, to find that range of uncertainty, one should look at the impact of two model inputs: volatility and correlation. Sen conducted that analysis, computed a margin of error for the Heston Model. (*Id.* ¶ 100.) Deetz did not follow that guidance.

[4] Although Deetz layers on the uncertainty calculations that Sen performed on the "Heston Model," Deetz admits that; (a) he never communicated with Sen about the calculation of Sen's "upper

---

would lead to absurd results. If one could calculate the uncertainty around a valuation model by saddling it with the uncertainty of another model, one could expand the breadth of an "estimation band" indefinitely. Someone using Deetz's method could: (a) calculate a range of "reasonable" values around Model A by comparing it to Model B (which generates higher values), (b) then take Model B (with higher values) and layer on the range of "uncertainty" around that model (say, +5%), (c) then pick a third Model C at the high end of Model B's "uncertainty" range (say, 4.9% higher than Model B's values), (d) then "calculate" Model C's "uncertainty" range (say, an additional +5%), and (e) repeat the process *ad infinitum*.

Since Deetz is not an option valuation expert – and has no supporting academic literature or familiarity with the model he is analyzing -- one might expect that Deetz would at least consult a valuation expert before opining on the "estimation band" surrounding MarkIt's model. But, he did not. (*Id.* at 106.) Deetz did not even speak with Sen, Defendants' valuation expert. (*Id.* at 105, 156.) This is peculiar because Deetz relied on Sen's "upper bound" calculations in creating his estimation band. (*Id.* at 101, 103.) This is inexplicable because Sen not only works for the same defendants, but Sen and Deetz are colleagues. They work for the same consulting firm, and when Deetz is not working from home, they work out of the same New York office. (*Id.* at 371.)

In sum, Deetz's opinion on materiality is well outside of his accounting expertise. He purportedly analyzed the estimation uncertainty surrounding MarkIt's model without: (a)

---

bound;" (b) he assumed that Sen's "upper bound" qualifies as a measure of fair value; (c) he doesn't know if Sen's calculations are correct; (d) he did not validate any of Sen's uncertainty calculations that were incorporated into his own analysis; and (e) he does not know how to calculate uncertainty due to correlation or volatility risk (which were the two main calculations that Sen performed). (Ex. C, Deetz Tr. at 107-108, 124, 156, 167, 169, 177.) Deetz's extensive reliance on Sen is not only an improper for an expert, it is based on blind faith in Sen rather than any expertise of his own.

any experience analyzing such models, (b) reviewing the valuation model he analyzed (or

knowing its inputs), and (c) consulting another expert in the field. With such insufficient

expertise to support it, Deetz's +/-5% estimation band should not be presented to a jury.

### III.    Deetz Has Provided No Basis In Option Valuation Practice or GAAP For Assuming a +/- 5% Estimation Uncertainty Band for the MarkIt Model.

Deetz's report reflects his lack of expertise in evaluating option valuation models. He

failed to cite a GAAP provision, or academic article related to option valuation or

accounting, that supports: (a) his method for applying a +/-5% estimation band to MarkIt's

valuation model, (b) his dismissal of all of SBB's overstatements within that band before

conducting his materiality calculations, (c) the layering of Sen's "uncertainty" analysis of

the Heston Model onto Deetz's calculation of uncertainty for the MarkIt model, or (d) the

assumption that this uncertainty band applies to all notes held by SBB's Funds.[5]

As discussed above, while the +/-5% band of "estimation band" figures prominently

in his calculations, Deetz's report includes remarkably little discussion of it, aside from his

bare conclusion that the band is "reasonable." (*See* Ex. D, Deetz Rep. ¶ 131.) This is the

very definition of impermissible *ipse dixit*. Deetz opines that the +/-5% estimation band

surrounding Markit's model is reasonable, but offers no real analysis of that model, and

offers no support in literature or practice for his calculation of the extent of the band. At the

end of the day, Deetz is asking the Court (and a jury) to accept that his estimation band is

"reasonable" at +/-5% (and not 4% or 2% or 1%) because he says so. Under *Daubert*, that is

not enough. *See, e.g.*, *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015)

("When a district court conclude[s] that there is simply too great an analytical gap between

---

[5] Deetz also does not explain why, in a purported "reasonable range" of values, MarkIt's model is the proper mid-point.

the data and opinion proffered such that the opinion amounts to nothing more than the *ipse dixit* of the expert, it is not an abuse of discretion under *Daubert* to exclude that testimony").

To make matters worse, Deetz mischaracterizes how estimation uncertainty might affect a materiality assessment consistent with the Staff Accounting Bulletin 99. Deetz claims he is conducting a materiality analysis under SAB 99. (*See* Ex. D, Deetz Rep. ¶¶ 113, 124.) But a valuation model only produces an estimation of value. For this reason, SAB 99 expressly provides that estimation uncertainty is a <u>qualitative</u> factor that may be considered in the "total mix" of information (a process conducted to evaluate the results of a quantitative analysis). (Ex. J, SAB 99 at 4.) SAB 99 does <u>not</u> provide for the use of an "estimation band of uncertainty" as a way to adjust the <u>quantitative</u> estimate that is subject to a more complete materiality analysis.[6]

At his deposition Deetz suggested, for the first time, that AU-C § 540 (a GAAS provision related to auditing fair value estimates) provides a basis for his calculation of a +/- 5% band. (Ex. C, Deetz Tr. 116-117.) Like his calculation method, that purported "support" for his opinion does not appear in the report's description of the uncertainty band. And, Deetz's attempt to find support for his "band of uncertainty" in AU-C 540 ignores several key provisions of that section, including: (a) the requirement that the valuation range be satisfied by audit evidence (which Deetz does not provide), (b) that auditors must consider if specialized knowledge is required to obtain that evidence (like an expertise in option valuation which Deetz did not have), (c) that auditors must recognize that estimation uncertainty <u>increases</u> the danger of management bias in valuation (a factor that Deetz

---

[6] Accordingly, Deetz impermissibly "double dips" when considering estimation uncertainty. He uses it in his quantitative analysis in the form of his "uncertainty band," and then uses it <u>again</u> in his qualitative analysis as a factor purportedly weighing against an overall finding of a material overstatement. (Ex. D, Deetz Rep. ¶ 140.)

ignored), (d) that estimation uncertainty is low where, as here, there are models available that are "well-known" or "generally accepted," and (e) that auditors should conduct a multifactor assessment of potential risks of misstatement (which Deetz did not do). (*See*, *e.g.*, Ex. K, AU-C § 540 .03-.04, .08, .12, .15-.17, .21, .24, .28, .32, .33-.34, .A17, .A121, .A133, .A134; AU-C § 540B-.02, .07, .21, .45-.47.) Put more simply, AU-C 540 does not allow an estimation range to be created out of whole cloth or be used as a tool to disregard the lion's share of overstatements in a materiality analysis without basis. Deetz's offhand, and undeveloped, identification of AU-C § 540 cannot save his defective opinion.

In sum, there are no "reliable principles or methods" here as *Daubert* requires. No valuation literature, no applicable GAAS or GAAP provisions or Staff Accounting Bulletins, and no valuation or accounting practice that is described to back up the one calculation that holds Deetz's materiality analysis together. We are left with Deetz's assurance that the +/-5% band of estimation uncertainty surrounding the MarkIt model is "reasonable." That is not enough to allow Deetz's opinions to be offered to a jury.

**IV.** **Deetz's Cherry-Picking of Data Renders His Opinion Unreliable:**

Deetz's 10% estimation uncertainty band is not only an unsound method; it's also bad math. As stated above, Deetz formed his +/- 5% band by calculating the average difference: (1) between McCann's values vs. MarkIt (which ends up forming the lower limit of Deetz's band), and (2) between Sen's values vs. MarkIt (which ends up forming the high limit of Deetz's band). He then concluded that each "average difference" is roughly 5% -- thus, the +/- 5% band of uncertainty. (Ex. C, Deetz Tr. at 107-108.) That difference serves as Deetz's justification for excluding the first 5% of any SBB note overstatement from his materiality analysis – which makes SBB's inflation of note values appear to be less material

15

than it is. If Deetz's "band" between the McCann/MarkIt/Sen models had been narrower, say 3% or 2% , Deetz could not have justified excluding the first 5% of SBB's overstatements and his materiality calculations would be fatally undermined.

But, the actual data shows just that: Deetz's calculation of a broad +/-5% band is incorrect. Under his own flawed method, the band of uncertainty should be much narrower. Deetz admits that in calculating the "average difference" for McCann/MarkIt and Sen/Markit he used note values from: (a) only <u>one</u> fund, Polysight, when data from <u>six</u> funds are available (*id*. at 198), (b) only year-end values, when <u>monthly</u> values are available for all funds (i*d*. at 197), and (c) only two years (2014-2015), when data is available for some funds in 2011-2013 and monthly data is available for all funds through April 2016 (*id*. at 198-99). While a total of <u>1,439</u> monthly note values were available for his analysis,[7] Deetz used only <u>56</u> -- the 2014-2015 year-end note valuations for Polysight -- to derive his estimation band. In short, Deetz cherry picked a small <u>3.8%</u> slice of the available valuation data to calculate his "+/- 5% estimation band" for the MarkIt model.

This leads to an obvious question: <u>why</u> did Deetz ignore over 96% of available valuation data when he calculated the extent of his estimation band? In his deposition, Deetz offered an excuse, claiming that he focused on the year-end data for Polysight because that fund held the most investor cash. (*Id*. at 104, 114.) But, that excuse highlights Deetz's lack of a coherent methodology. The amount of money invested in a note does not provide <u>any</u> information about whether that note is overvalued. In other words, the criterion that guided Deetz's cherry-picking <u>is not related to what is being tested</u>. His excuse simply

---

[7] The total number of month-end valuations for notes held by the six funds between October 2011 and April 2016.

does not justify ignoring over 96% of the data when making the linchpin calculations that hold his materiality opinion together.

A look at the entire data set demolishes Deetz's opinion as completely unreliable. If Deetz had used all of the available note data, his calculations would have shown a <u>much</u> narrower "band of estimation uncertainty" around MarkIt's model of <u>– 2.1% to .8%</u>. Figure 3, below, is a chart containing data and calculations prepared by the SEC's valuation expert, Craig McCann of SLCG, and showing the actual differences between (a) McCann's values and Markit, and (b) Sen's <u>actual</u> note values and Markit:

**Figure 3: Average Difference Between McCann/Markit and Sen/Markit Using All Available Valuation Data[8]**

| Fund | Date Range | Average Difference McCann/MarkIt | Average Difference Sen/MarkIt |
|---|---|---|---|
| Polysight I | 6/30/14 – 4/29/16 | (4.8%) | 0.7% |
| Investors II | 10/31/11 – 4/29/16 | (1.8%) | 0.5% |
| Investors III | 6/28/13 – 4/29/16 | (1.9%) | 0.4% |
| Investors IV | 6/28/13 – 4/29/16 | (1.9%) | 0.4% |
| CPS I | 2/28/13 – 4/29/16 | (.5%) | 1.1% |
| CPS XI | 9/30/13 – 4/29/16 | (1.7%) | 2.4% |
| **All Note Values for All Funds Aggregated[9]** | | **(2.1%)** | **0.8%** |

---

[8] The SEC will provide a native Excel file with the backup to these calculations to the Defendants, and will provide a native version to the Court upon request.

[9] As each fund holds a different number of notes, one cannot reach a composite figure by finding the difference for each fund and then averaging the percentages. Instead, to reach a composite figure, it is more accurate to aggregate <u>all</u> note values – as if there were only one fund holding all notes – and find the overall average difference.

In sum, the more complete dataset completely undermines Deetz's calculation of a +/-5% band. His band is over <u>three times</u> too broad. Without Deetz's cherry-picking of data (*i.e.*, his use of only 56 of 1,439 note values) his "band" shrinks (to -2.1% to .8%). This means that – even using his own unsupported theory and calculation method – Deetz is excluding far too many of SBB's note overstatements. Under his cherry-picked calculation, Deetz is excluding the first 5% of any overstatement. At most, under his own theory, he could exclude the first .8%. Even if Deetz's "estimation band" were the accounting equivalent of "good science," Deetz's decision to exclude so much adverse data (96% of the total data) shows that his +/-5% band (and every calculation that relies on it) is unreliable and would risk misleading a jury. *See Barber v. UAL, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) (excluding testimony under *Daubert* where expert "merely accepted some of the…data that suited his theory and ignored other portions…that did not"); *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017) ("[i]gnoring relevant data is not a scientifically valid method" and "an expert is not permitted to simply ignore evidence that is contrary to her opinion in implementing an accepted methodology") (Ex. L).

**V.      Deetz's Qualitative Materiality Opinion Usurps The Role of the Jury:**

After ignoring the majority of SBB's overstatements and plugging the remaining "excess" into his quantitative analysis, Deetz purports to consider qualitative factors as part of his materiality analysis. SAB 99 provides a non-exhaustive list of factors that can render a quantitatively small misstatement material. Management and auditors are supposed to consider <u>all</u> facts in determining materiality, as it can be affected by both quantitative and qualitative factors. But instead of doing so, Deetz presented a narrative that ignores two critical qualitative facts that are supposed to figure prominently in a materiality analysis.

First, Deetz ignores the issue of management intent. SAB 99 – which purportedly guided Deetz's analysis – specifies that auditors should consider management intent when evaluating whether a misstatement is material, stating unequivocally that management intent "may provide significant evidence of materiality." (Ex. J, SAB 99 at 4.) In fact, management intent receives more discussion in SAB 99 than any other qualitative factor. As described in detail in Mintzer's rebuttal report, SBB personnel provided testimony under oath supporting the conclusion that: (a) they intentionally deviated from industry practice when developing and implementing their model, and (b) knew, in some instances, that those deviations would likely result in higher note values. (*See* Ex. A, Mintzer Reb. Rep. ¶¶ 36-41.) Despite this evidence – and the guidance of SAB 99 -- Deetz's qualitative analysis makes <u>no</u> mention of management intent.

Second, Deetz does not discuss one of the most important concepts in evaluating whether a model is "misleading": bias. The GAAP and GAAS provisions Deetz cites repeatedly direct accountants to assess whether a valuation model is biased. FASB Con 2 defines bias in accounting to "mean a tendency to be consistently too high or too low" as opposed to "equally likely to fall on either side." (Ex. M, Con 2 at 9.) Deetz pays no heed to that directive. SBB's model easily fits the definition of "biased" under Con 2. As Mintzer explained in his rebuttal report, <u>93%</u> of the misstatements Deetz identified were <u>higher</u> than the corresponding MarkIt value. (Ex. A, Mintzer Rep. ¶ 43.) <u>All</u> 65 note misstatements Deetz identified for the Polysight fund, and all 59 misstatements identified for the Investors II fund, were <u>over</u>statements. (*Id*.) Deetz's own spreadsheets confirm that the SBB model is biased, and yet (a) the word "bias" does not appear anywhere in Deetz's report and (b) there's no mention of bias in his qualitative analysis.

19

Deetz's selective factual narrative is unreliable because it omits these two critical facts. More importantly, the gathering and weighing of disputed facts is quintessentially the jury's domain. Deetz's attempt to create a curated factual narrative as part of his qualitative analysis should be excluded. *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-70 (S.D.N.Y. 2005) ("an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.") (collecting cases).

## CONCLUSION

For all of the foregoing reasons, Plaintiff Securities and Exchange Commission respectfully requests that the Court exclude Gene Deetz's unreliable and unhelpful materiality opinions from evidence in this matter.

Dated: April 12, 2024.

<div style="margin-left: 40%;">

Respectfully Submitted,

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**

By: ***/s/ Robert M. Moye***
Timothy S. Leiman (Leimant@sec.gov)
Robert M. Moye
Kevin A. Wisniewski
Devlin N. Su
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for the Plaintiff*
*United States Securities and Exchange Commission*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that that I have served a copy of the foregoing document on all counsel of record by filing it with the Court's ECF system.

*/s/ Robert M. Moye*
Robert M. Moye