# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:19-cv-06473** |
| **SBB RESEARCH GROUP, LLC, SAMUEL B. BARNETT, AND MATTHEW LAWRENCE AVEN,** | **Honorable Sharon Johnson Coleman** |
| **Defendants.** | |

## PLAINTIFF'S MOTION TO EXCLUDE OPINIONS OF DEFENDANTS' EXPERT STEVEN RICHARDS

Timothy S. Leiman
Robert Moye
Kevin A. Wisniewski
Devlin N. Su
Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390

*Attorneys for Plaintiff United States Securities and Exchange Commission*

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................1

**BACKGROUND** ...............................................................2

    I.     RSM's Resignation ......................................2

    II.    Richards's Expert Report ...............................4

**LEGAL STANDARD** ........................................................7

**ARGUMENT** ...................................................................8

    I.     Richards's Opinions Will Not Assist the Jury in Deciding the Facts ....8

        A. Richards's Opinions About RSM's Compliance with GAAS Are Irrelevant ...............................................................8

        B. Richards Is Attempting to Resolve Factual Disputes over RSM's Resignation ............................................................11

          i. Richards May Not Challenge the Credibility of Other Witnesses..11

          ii. Richards May Not Interpret Evidence that Speaks for Itself........13

    II.    Richards's Opinions Are Unreliable Because He Failed to Consider Other GAAS Standards and Contradictory Evidence .......................................15

        A. Richards Ignored Relevant GAAS Standards ............................... 16

        B. Richards Ignored Facts That He Claimed Were Relevant .................19

**CONCLUSION** ............................................................. 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Baldonado v. Wyeth*,
   2012 WL 1802066 (N.D. Ill. May 17, 2012) ......................................................... 10

*Bogathy v. Union Pac. R.R.*,
   2020 WL 419406 (N.D. Ill. Jan. 24, 2020) ............................................................ 12

*C.W. ex rel. Wood v. Textron, Inc.*,
   807 F.3d 827 (7th Cir. 2015) ................................................................................. 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .................................................................................... 1, 7, 8

*Davis v. Duran*,
   277 F.R.D. 362 (N.D. Ill. 2011) ...................................................................... 12, 15

*Fisher v. Ciba Specialty Chemicals Corp.*,
   238 F.R.D. 273 (S.D. Ala. 2006) ........................................................................... 10

*Goldberg v. 401 N. Wabash Venture LLC*,
   755 F.3d 456–62 (7th Cir. 2014) ........................................................................... 13

*Goodwin v. MTD Prod., Inc.*,
   232 F.3d 600 (7th Cir. 2000) ................................................................................. 13

*Gopalratnam v. Hewlett-Packard Co.*,
   877 F.3d 771 (7th Cir. 2017) .......................................................................... 8, 15

*Highland Cap. Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ....................................................... 13-14, 14

*In re Lipitor Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   892 F. 3d 624 (4th Cir. 2018) ................................................................................ 18

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   32 F. Supp. 3d 453 (S.D.N.Y. 2014) ..................................................................... 14

*In re Rezulin Prod. Liab. Litig.*,
   369 F. Supp. 2d 398 (S.D.N.Y. 2005) ................................................................... 16

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999) ......................................................................................... 7, 8

*Lewis v. CITGO Petroleum Corp.*,
   561 F.3d 698 (7th Cir. 2009) ................................................................................... 7

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ...................................................................... 8

*Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   892 F. 3d 624 (4th Cir. 2018) ......................................................................... 18, 19

*SEC v. True N. Fin. Corp.,*
   10-cv-3995, Dkt. 323 (D. Minn. 2013) .................................................. 11

*Sullivan v. Alcatel-Lucent USA Inc.*,
   2014 WL 3558690 (N.D. Ill. July 17, 2014) ........................................ 12

*Trahanas v. Nw. Univ.*,
   2020 WL 7641293 (N.D. Ill. Dec. 23, 2020) ....................................... 12

*U.S. Gypsum Co. v. LaFarge N.A. Inc.*,
   670 F. Supp. 2d 748 (N.D. Ill. 2009) .................................................. 8

*U.S. v. Bautista*,
   252 F.3d 141 (2d Cir. 2001) .......................................................... 10-11

*U.S. v. Cheung Kin Ping*,
   555 F.2d 1069 (2d Cir. 1977) ............................................................ 11

*U.S. v. Farrell*,
   563 F.3d 364 (8th Cir. 2009) ............................................................. 12

*United States v. Scholl*,
   166 F.3d 964 (9th Cir. 1999) ............................................................. 14

**Rules**

Fed. R. Evid. 401(b) ........................................................................... 9

Fed. R. Evid. 403 .............................................................................. 11

Fed. R. Evid. 702 ............................................................................... 7

**Other**

Compliance Examination Deficiency Letter Process (Sept. 23, 2003),
https://www.sec.gov/oig/reportspubs/aboutoigaudit364finhtm ................... 2

Order Instituting Proceedings, *In the Matter of RSM US LLP* (Feb. 6, 2020),
https://www.sec.gov/files/litigation/admin/2020/34-88287.pdf ................. 7

SEC Enforcement Manual (2017), https://www.sec.gov/
divisions/enforce/enforcementmanual.pdf ......................................... 3

## INTRODUCTION

This case involves Defendants' use of a custom valuation model, which (a) by Defendants' design, deviated from ASC 820, the accounting standard relating to fair value measurement; and (b) inflated the value of the portfolio of structured notes Defendants managed for investors. (*See* Dkt. 1, Complaint, ¶¶ 2, 6-12.) The investment funds that Defendants managed were audited by RSM US LLP ("RSM"), a third-party auditing firm. RSM withdrew its previous audit opinions for the funds' financial statements during the SEC's investigation of this case, after RSM learned that: (1) SBB had intentionally deviated from standard valuation practice when creating its valuation model; and (2) SBB had not been truthful with RSM about several facts regarding SBB's use of the model, failed attempts to validate the model, and model deficiencies that had been identified by the SEC during an examination of SBB. (*See generally* Ex. E.) Most of Steven Richards's opinions pertain to RSM's resignation.

These opinions fail the test of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the standards of Rule 702 of the Federal Rules of Evidence. First, while the fact of—and rationale for—RSM's resignation is relevant to undermine any affirmative defense that SBB relied on RSM's advice on valuation, Richards's opinion that RSM's resignation did not comply with Generally Accepted Auditing Standards ("GAAS"), is not relevant to the SEC's claims or the Defendants' affirmative defenses. RSM is not on trial; SBB is. Second, in trying to predict what RSM would have learned had it taken his preferred auditing approach, Richards offers opinions that (a) improperly speculates about fact witness credibility, and (b) unhelpfully weighs facts and materials for which expert testimony is unnecessary. And third, Richards's opinions ignore applicable auditing

standards and relevant facts, instead relying on his own *ipse dixit*. Therefore, the SEC

respectfully moves this Court to exclude the opinions expressed in paragraphs 39, 69-75,

and 91-144 of Richards's expert report. (*See* Ex. A, Richards Report.)

## BACKGROUND

### I.  RSM's Resignation

RSM was the independent auditor for the 2013 through 2017 year-end financial

statements for each of SBB's investment funds. (Ex. A ¶ 25.) During this same time period,

the SEC's Office of Compliance Inspections and Examinations (OCIE) began a compliance

examination of SBB. As early as November 2014, the SEC identified several concerns

regarding SBB's custom valuation model and its deviations from standard valuation

practice. (*Id.* ¶¶ 26-27.) Aside from piecemeal communications regarding a particular input,

SBB did not relay to RSM that the SEC had expressed a number of concerns with the

model. (*See, e.g.*, Ex. B, Lynne Weil Deposition Transcript, at 122, 131-32, 163-66, 329-30.)

The SEC's examination culminated in a March 16, 2016 deficiency letter to SBB.[1] (*Id.* ¶¶ 26-

27.) The SEC's deficiency letter identified several ways in which Defendants' valuation

model was inconsistent with ASC § 820, the fair value measurement standard. (*See* Ex. C,

SEC Deficiency Letter.) Although SBB received the deficiency letter shortly before its FY

2015 audits were complete, it did not share the letter with RSM. To the contrary, one month

after receiving the deficiency letter, SBB's management falsely represented to RSM, in

connection with the 2015 audit, that SBB had <u>not</u> received any "communications . . .

---

[1] A deficiency letter describes the potential violations of laws or rules, or internal control weaknesses, uncovered during the examination, and often requests the recipient to implement appropriate corrective actions and submit a written response describing those actions. Receiving a deficiency letter is one possible outcome of an OCIE examination. *Compliance Examination Deficiency Letter Process* (Sept. 23, 2003), https://www.sec.gov/oig/reportspubs/aboutoigaudit364finhtm.

concerning noncompliance with, or deficiencies in, financial reporting practices." (Ex. D, SBB Management Letter, ¶ 19.)

In October 2016, the SEC's Division of Enforcement launched an investigation into SBB's valuation practices. (Ex. A ¶ 32.) Two months later—over nine months after the SEC's deficiency letter was issued—SBB finally informed RSM about the enforcement investigation and provided RSM with the SEC's deficiency letter. (*Id.* ¶ 139.) After receiving this letter, RSM's lead audit partner, Lynne Weil, requested and, for the first time, received additional correspondence between the SEC examiners and SBB. (*Id.*) Weil and others from RSM held a meeting with SBB management in February 2017 to hear an explanation for SBB's failure to provide information related to the SEC's deficiency letter. (*Id.* ¶¶ 34, 129.) At that meeting, SBB management admitted that they had failed to tell RSM about SBB's deficiency-related communications with the SEC, and claimed this failure resulted from a good-faith error. (*Id.* ¶ 132; Ex. E, RSM Resignation Letter, at 1-2.)

After this meeting, RSM continued to serve as SBB's auditor. (Ex. A ¶ 35.) In addition to investigating SBB for fraudulent valuation practices, the SEC investigated RSM's auditing conduct, and sent Wells notices[2] to both RSM and Weil in March 2019. (*Id.* ¶ 36.) While preparing to respond to the SEC's Wells notices, counsel for Weil and RSM were permitted to review transcripts of SBB management's investigative testimonies, as well as exhibits used in those testimonies. (*Id.* ¶ 108; Ex. E at 1.) RSM's counsel was not allowed to make copies of the investigative transcripts, but was allowed to take extensive notes

---

[2] A Wells notice informs the recipient that SEC Enforcement staff has made a preliminary determination to recommend that the Commission file a civil action or initiate a proceeding against them, identifies the potential violation, and permits the recipient to make a submission for consideration by the Commission. *SEC Enforcement Manual* (2017) at 19-22, https://www.sec.gov/divisions/enforce/enforcementmanual.pdf.

(including typing out lengthy direct quotations from the transcript). RSM's counsel created detailed summaries of the transcripts and provided them to RSM personnel, including Lynn Weil, to aid in RSM's audit decision making. (Ex. A ¶ 108.) In April 2019, after reviewing the summaries and consulting with counsel and RSM's national office—and determining that several crucial facts disclosed by SBB in testimony were either hidden from RSM or contradicted representations SBB made to RSM—Weil and RSM determined that they lacked confidence in the integrity of SBB's management and resigned as SBB's auditors. (*Id.; see generally* Ex. E.)

In resigning, Weil sent a letter informing SBB that "RSM has concluded in our professional judgment that we cannot rely on management representations." (Ex. E at 1.) Weil's letter described the basis for this conclusion, including: "recently becom[ing] aware of multiple inconsistencies between what SBB management communicated to RSM during RSM's audit of SBB . . . and (i) documents SBB produced to the SEC, and (ii) testimony SBB management and other witnesses provided to the SEC." (*Id.*) The letter also specified five key facts discussed in the testimonies of SBB personnel that caused RSM to disclaim reliance on representations from SBB management. (*Id.* at 1-2.) In resigning as SBB's auditor, RSM also withdrew all its previous audit reports. (*Id.* at 2.)

## II.    Richards's Expert Report

In their Answer, Defendants asserted an Eighth Affirmative Defense that they relied in good faith on the advice of auditors to bless their valuation model. (Dkt. 51, Answer, at 45.) Accordingly, the SEC retained an accounting and auditing expert, Andrew Mintzer, who opined that SBB: (a) did not fulfill its obligation to create financial statements that complied with Generally Accepted Accounting Principles ("GAAP"); and (b) would have

violated the management/auditor relationship under GAAS if it improperly relied on RSM to fulfill its initial GAAP obligation. (*See generally* Ex. I, Mintzer Report, at 7-44.) Mintzer's opinions thus undercut Defendants' Eighth Affirmative Defense, in that he opines that SBB was obligated to comply with GAAP in the first instance. Defendants therefore retained Steven Richards as an expert, ostensibly to rebut Mintzer's opinions. Part of Richards's report opines that Mintzer misunderstood Defendants' written and testimonial admissions, and purports to provide "a more complete reading" and "more complete context" of the evidence. (Ex. A ¶¶ 1, 69-75.) However, the bulk of Richards's report focuses on RSM's resignation as SBB's auditor. (*See id.* ¶¶ 91-144.)

First, Richards tries to put <u>RSM's</u> auditing conduct on trial, opining that GAAS did not permit RSM to resign without first performing additional audit procedures, including following up with SBB's management about the SEC's investigative evidence. (*See id.* ¶¶ 92-94, 103.) Richards argues that, although RSM's auditors determined that they were lied to after reading the testimony SBB officers provided under oath, RSM was obligated to continue the audit and follow up with the very people who lied to them.

Second, Richards assumes the role of factfinder, opining that none of the five facts cited in Weil's resignation letter should have been a concern for RSM because of certain other purportedly favorable "facts" that Richards selected. Richards evidently scoured the record so he could tell SBB's side of the story. His report then provides the following carefully curated "facts" in response to each matter underlying RSM's resignation:

1. <u>SBB used different sets of performance figures with current investors and potential investors</u>. If Weil had asked SBB, she "would have learned that SBB temporarily used these two models while awaiting final approval from the SEC based on advice from Simon Compliance." (*Id.* ¶ 112-13.) Thus, "the existence and use of two models should not have raised concerns about SBB management's integrity." (*Id.* ¶ 114.)

2.  <u>SBB's valuation model was inconsistent with GAAP</u>. Weil failed to remember that several emails from SBB indicated that its valuation model was not supported by any academic literature, and mischaracterized other emails suggesting it was result-oriented. (*Id.* ¶¶ 118-19, 121-25.) Those materials "should have" or "would" have "refreshed her recollection" or "provided her greater comfort" with SBB. (*Id.* ¶¶ 118-19, 125.)

3.  <u>SBB did not fulfill its management responsibilities</u>. Even though Weil read the SBB witness testimony as saying that "they basically do not take ownership that their financial statements – are theirs," she should not have had any "concerns about management's integrity." (*Id.* ¶¶ 126-27.)

4.  <u>SBB failed to tell RSM about the concerns of two valuation firms</u>. SBB's prior consultations with the two consulting firms were immaterial and need not have been disclosed under the terms of RSM's engagement. (*Id.* ¶¶ 128-31.)

5.  <u>SBB did not communicate with RSM about the SEC's compliance examination</u>. Weil received multiple emails from SBB discussing the SEC's requests and inquiries beginning in November 2014. (*Id.* ¶¶ 133-39.) A review of those emails "should have decreased her concerns about the timelines of SBB's communication." (*Id.* ¶ 141.)

In other words, Richards became an advocate. He summarizes favorable facts, ignores those that don't match his narrative, posits a world where his alternative narrative carries the day, and then speculates what RSM "should" have done and learned, given that alternative narrative. Richards even points to evidence that purportedly undermines or contradicts the reasons Weil gave for resigning as SBB's auditor, casting himself as the arbiter of her credibility.

Having speculated that Weil should not have harbored (or, contrary to her testimony, did not actually harbor) doubts about SBB management integrity as described in RSM's resignation letter, Richards then suggests a potential alternative motive for RSM's resignation. Richards notes that Weil and RSM resigned after receiving Wells notices from the SEC and opines that accountants who receive Wells notices may be "subject to reputational harm and limited in their ability to function as an accountant." (*Id.* ¶¶ 108, 110.) Richards also observes that Weil's personal Wells submission mentioned her

6

resignation as SBB's auditor, and then opines that it was rare for the SEC to charge an audit firm but not charge an individual auditor.[3] (*Id.* ¶¶ 38-39.) Richards declines to make a direct accusation, but instead appears to suggest that Weil only resigned as SBB's auditor to avoid being charged by the SEC. (*See id.* ¶¶ 36-39, 108-110.) This dovetails with an unsupported theory that the Defendants repeatedly have tried to inject into this case during discovery: that RSM is lying about its reasons for resigning. After years of discovery, SBB has not found a single witness or document to support that theory. Yet Richards's report appears designed to suggest through unsupported innuendo what SBB has been unable to establish through evidence: that RSM's resignation was improper.

## LEGAL STANDARD

District courts are gatekeepers against unreliable and irrelevant expert opinion evidence that might affect a jury's decision. *See Daubert*, 509 U.S. at 597. Courts have a "special obligation" to ensure that expert testimony is "not only relevant, but reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). Accordingly, an expert may testify only if: (a) their scientific, technical or specialized knowledge will assist the trier of fact understand the evidence or determine a fact at issue; (b) their testimony is based on sufficient facts or data; (c) their testimony is the product of reliable principles and methods; and (d) the expert has reliably applied those principles and methods to the facts of the case. *See* Fed. R. Evid. 702. Defendants bear the burden of demonstrating that Richards's

---

[3] On February 26, 2020, the SEC filed a settled administrative proceeding against RSM, finding that RSM violated professional standards by failing to properly staff its audits of SBB with personnel with the necessary competence and capabilities to evaluate SBB's valuations of structured note investments. RSM agreed to undertake remedial actions, but no individual auditor was charged in connection with these violations. *In the Matter of RSM US LLP* (Feb. 6, 2020), https://www.sec.gov/files/litigation/admin/2020/34-88287.pdf.

testimony would satisfy that standard. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

This standard is equally demanding for non-scientific experts. *See Kumho Tire*, 526 U.S. at 152; *see also U.S. Gypsum Co. v. LaFarge N.A. Inc.*, 670 F. Supp. 2d 748, 753 (N.D. Ill. 2009) ("Expert testimony [must] be based on rigorous and reliable methods . . . even when the testimony is not of a scientific nature."). It is not enough that an expert can be cross-examined at trial. Indeed, Rule 702 and *Daubert* recognize that the adversary process is *not* sufficient to protect the jury from unreliable opinions bearing an expert's endorsement. *See Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading"). So an expert whose proposed testimony fails the *Daubert* test should not be examined, let alone cross-examined, in front of a jury. *See Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 800 (N.D. Ill. 2005).

Here, Richards's cherry-picked fact summaries and GAAS standards, speculations about alternate-world events, credibility determinations, and unsupported aspersions against RSM witnesses all fall short of Rule 702 and *Daubert*'s requirements.

## ARGUMENT

This Court should exclude the opinions expressed in paragraphs 39, 69-75, and 91-144 of Richards's expert report because they are both unhelpful and unreliable. Each criterion is an independent and sufficient basis for exclusion under Rule 702.

## I.    Richards's Opinions Will Not Assist the Jury in Deciding the Facts

### A.    Richards's Opinions About RSM's Compliance with GAAS Are Irrelevant

A bedrock requirement of expert testimony is that it must help the jury understand evidence or determine a fact at issue. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779

(7th Cir. 2017). Expert testimony thus must first be relevant. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591 (1993) (internal quotation marks omitted).

Paragraphs 91-144 of Richards's report analyze whether RSM's resignation complied with GAAS. But whether RSM complied with GAAS when resigning as SBB's auditor is not an issue in this case. None of the SEC's claims focus on whether RSM's actions complied with GAAS. Neither Weil nor RSM is a party in this case. And whether RSM complied with GAAS while resigning in 2019 has no effect on Defendants' potential liability for their actions in 2014-2018. To be sure, the fact that RSM (a) determined that they were being lied to, (b) withdrew as SBB's auditor, and (c) withdrew its prior audit opinions, is relevant in that it undercuts Defendants' affirmative defense that they relied in good faith on their auditor to bless their valuation model.[4] But whether RSM complied with the requirements of GAAS in resigning as an auditor is not an element of the SEC's claims in this matter, or of SBB's defense, and is therefore of no "consequence in determining the action." Fed. R. Evid. 401(b).

On the other side of the Rule 403 ledger, any residual probative value in admitting opinion evidence that RSM violated GAAS in withdrawing as SBB's auditor would be substantially outweighed by the danger of unfair prejudice and juror confusion. The only apparent reason that Defendants would try to shoehorn into this case expert testimony about the grounds for RSM's resignation is to revive their groundless narrative that RSM's stated reasons for resigning are false. But after years of discovery—including consistent

---

[4] In addition, the SEC may call witnesses from RSM to testify about statements made by SBB employees during RSM audits about SBB's valuation model.

testimony from RSM witnesses—Defendants have <u>no</u> evidence to support this allegation of misconduct by RSM. Richards's testimony would thus be prejudicial because it presents an advocacy-based narrative—that RSM resigned to avoid charges—without any factual support. *See, e.g.*, *Baldonado v. Wyeth*, 2012 WL 1802066, at *4 (N.D. Ill. May 17, 2012) (excluding expert testimony because the "proffered narratives amount to a summary and statement of the experts' advocacy-based interpretation of documents in the record" (internal quotation marks omitted)); *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006) (striking expert report because it "simply summarizes and states her advocacy-based interpretation of documents in the record" and reads as "written advocacy by a lawyer, akin to a supplemental brief on the facts presented by another attorney representing plaintiffs"). Plus, allowing Richards to testify about RSM's compliance with GAAS in withdrawing as SBB's auditor would consume (and waste) significant time in what may already be a lengthy trial, and risk juror confusion over technical auditing standards that do not bear on Defendants' liability under the securities laws.

The same is true regarding paragraph 39 of Richards's report, in which Richards discusses the charging decisions in 20 unrelated SEC and PCAOB enforcement actions against audit firms and their employees and opines that the SEC's action against RSM related to the SBB Funds is the only one in which the audit firm and no other individual was charged.[5] Richards testified he was just "describing background" in this paragraph. (Ex. F, Steven Richards Deposition Tr., at 119-20.) But "background" about the SEC's or the PCAOB's charging decisions in unrelated enforcement actions adds nothing to the evidence

---

[5] Richards's report references 19 enforcement actions, but he admitted the correct number was 20. (*Compare* Ex. A ¶ 39, *with* Ex. F, 1/23/24 Steven Richards Deposition Tr., at 117-18.)

in this case. Indeed, the SEC's charging decisions in this case (or other matters) is not admissible because a jury has no role in evaluating the propriety of charges other than the ones before it. *See U.S. v. Bautista,* 252 F.3d 141, 145 (2d Cir. 2001) (holding that defense summation "amounted to an (improper) invitation for the jury to consider the government's choice of investigative techniques"); *SEC v. True N. Fin. Corp.*, 10-cv-3995, Dkt. 323, at 7 (D. Minn. 2013) (granting the SEC's motion *in limine* and holding that "evidence as to Plaintiff's so-called charging decision shall be presumptively inadmissible" because the evidence "does not survive the Court's Rule 104 and Rule 403 analysis"); *see also U.S. v. Cheung Kin Ping*, 555 F.2d 1069, 1073 (2d Cir. 1977) (approving a jury instruction that the jury should "focus its attention on the real issue, namely, whether the government has proved the facts alleged" and not "law enforcement policy"). And any probative value of an attempt by Richards to resuscitate Defendants' narrative—through innuendo—that RSM's stated reasons for resigning were false would be substantially outweighed by the risk of confusion (and waste of time) resulting from the necessary direct and cross-examination testimony about the facts and enforcement decisions behind those 20 unrelated actions. Fed. R. Evid. 403. Richards should, therefore, be barred from injecting other entities' unrelated charging decisions into this case.

**B.** **Richards Is Attempting to Resolve Factual Disputes over RSM's Resignation**

**i.** **Richards May Not Challenge the Credibility of Other Witnesses**

In paragraphs 108-144 of his report, Richards discusses evidence, including deposition and investigative testimony transcripts, emails, letters from SBB management, and other documents, to challenge or purportedly contradict the reasons Weil gave for resigning as SBB's auditor. In doing so, he provides his own alternative interpretation of the

11

facts, repeatedly saying that if Weil and RSM had seen things his way, they "should" have or "would have" thought differently. (*See, e.g.*, Ex. A ¶¶ 112, 114, 118, 119, 141.)

In presenting his version of the facts, Richards significantly oversteps the bounds of appropriate opinion testimony and strays into quintessential fact finding reserved for the jury.[6] "An expert witness may not usurp the jury's function to weigh evidence and make credibility determinations." *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) (*quoting U.S. v. Farrell*, 563 F.3d 364, 377 (8th Cir. 2009)). Put differently, "expert witnesses are not allowed to sort out possible conflicting testimony or to argue the implication of those inconsistencies. That is the role of the lawyer, and it [is] for the jury to draw its own conclusions from the testimony it hears." *Id.* at 370. That's why courts routinely exclude expert opinions that improperly weigh and comment on evidence. *See, e.g.*, *Trahanas v. Nw. Univ.*, 2020 WL 7641293, at *8 (N.D. Ill. Dec. 23, 2020), *aff'd*, 64 F.4th 842 (7th Cir. 2023); *Bogathy v. Union Pac. R.R.*, 2020 WL 419406, at *5 (N.D. Ill. Jan. 24, 2020); *Sullivan v. Alcatel-Lucent USA Inc.*, 2014 WL 3558690, at *6-8 (N.D. Ill. July 17, 2014).

Section V(D)(2) of Richards's report is a textbook violation of this time-tested principle. There, Richards challenges the foundation or veracity of Weil's resignation letter. Richards characterizes Weil's reasons for resigning as "claims," "claimed concern[s]," and "purported fact[s]." (*See* Ex. A ¶¶ 118, 119, 121.) Richards repeatedly puts the word "inconsistency" in scare quotes when commenting on Weil's reasons for resigning. (*See id.* ¶¶ 111, 115, 126, 128, 132.) Richards also adds his personal commentary on the reputational

---

[6] This is in stark contrast to Andrew Mintzer's factual discussion. In his report, Mintzer did not purport to resolve factual disputes or present a "correct" version of facts. (*See generally* Ex. I at 44-74.) Instead, Mintzer looked in the record to see if there were sufficient facts available to RSM that would allow a reasonable auditor to resign under GAAS (*e.g.,* AU-C 580.25). He did not attempt to weigh in on the credibility of witnesses or resolve disputes as to those facts.

impact of a Wells notice with Weil's decision to resign. (*Id.* ¶ 108.) In short, Richards suggests that Weil's stated reasons are bogus. That is improper expert testimony and must be excluded. *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461–62 (7th Cir. 2014) ("An expert witness is not permitted to . . . testify that he believes the person was being truthful."); *Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("[C]redibility questions are within the province of the trier of fact . . . .").

### ii.    Richards May Not Interpret Evidence that Speaks for Itself

What's more, in attempting to discredit Weil's resignation, Richards extensively quotes transcripts, emails, and other documents—while speculating what Weil "should" or "would" have known from this evidence. Expert testimony of this kind is both inappropriate and unnecessary. For example, in citing the investigative testimony of Defendant Sam Barnett, Richards speculates that Weil "would have learned" that SBB was using two valuation models for two different sets of investors on the advice of an external compliance consultant (a fact which remains in dispute). (Ex. A ¶¶ 112-14.) Citing emails, he opines that "RSM's contemporaneous correspondence with SBB contradicts Ms. Weil's 2019 claims that she was unaware that certain elements of the model were not supported by academic literature." (*Id.* ¶ 118.) In discussing emails and related testimony excerpts, Richards even provides his own reading of an email: "*In my view*, this email presents evidence that management was working to ensure that an arbitrary or results-oriented method was not pursued." (*Id.* ¶ 125 (emphasis added).) In short, Richards creates an alternate timeline of what Ms. Weil knew about the SEC's deficiency letter, and when, that "calls into question Ms. Weil's testimony." (*Id.* ¶¶ 132-40.)

This selective interpretation of documents is improper. First, "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-70 (S.D.N.Y. 2005) (collecting cases). But that's exactly what Richards admitted to doing: "I think all I'm trying to do is for those who are reading the report, *the triers of fact*, . . . is lay out the facts that were in existence at the time the decision was made." (Ex. F at 272 (emphasis added).) "Laying out the facts" as Richards sees them, and providing "my view," are just thinly veiled euphemisms for constructing a factual narrative based upon the expert's view of the evidence. Even if the veracity of Weil's resignation letter were relevant, the jury should decide whether she was truthful, <u>not</u> Richards. The jury should decide what testimony and emails mean, based on the testimony of percipient witnesses, <u>not</u> Richards. And although Richards walked back several portions of his report—by recasting many of his "should haves" in the report to "could haves," *see id.* at 293, 329, 331—the jury should decide whether certain evidence "could have" impacted Weil's resignation, <u>not</u> Richards.

Second, the documents Richards tries to interpret should be allowed to speak for themselves. Expert testimony on what common communications mean is unnecessary and improper. *See, e.g.*, *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 462 (S.D.N.Y. 2014) ("Bell's interpretation of DTT's resignation letter is inadmissible. . . . [T]he jury can easily read and comprehend the text of the short letter without expert assistance."); *see also United States v. Scholl*, 166 F.3d 964, 973-74 (9th Cir. 1999) (affirming exclusion of an accounting expert who would have testified whether the defendant's accountant met standards of care because the text of the accounting standards themselves were already in evidence). The jury can decide for themselves what Defendants meant when they testified in

14

the SEC investigation, what the SBB-RSM emails meant, and what each of the witnesses knew and when. Richards's accounting expertise will not assist the jury with those responsibilities, making his opinion therefore unhelpful for that reason too.

The same is true of the opinions in paragraphs 39 and 69-75 of Richards's report. Even if it were relevant that there were 20 enforcement actions over the past 5 years involving audit firms and not auditors, all Richards did to reach this conclusion was review the publicly available enforcement orders. (*See* Ex. A ¶ 39; Ex. 2 thereto at 6.) If admitted as relevant, the jury can read those orders for themselves. Likewise, in paragraphs 69-75, Richards characterizes portions of testimony transcripts and SBB's response to interrogatories as supporting his view that Mintzer is wrong. The jury can likewise interpret that evidence for themselves. And for the same reasons discussed above, Richards's assertion that his reading of these materials is right and Mintzer's is wrong intrudes on the province of the jury to "sort out possible conflicting testimony or to argue the implication of those inconsistencies." *Duran*, 277 F.R.D. at 370. These opinions should be excluded too.

## II. Richards's Opinions Are Unreliable Because He Failed to Consider Other GAAS Standards and Contradictory Evidence

This Court should also exclude Richards's opinions in paragraphs 39 and 91-144 of his report as unreliable and not just unhelpful. After applying the reliability factors identified in *Gopalratnam*, this Court can readily conclude: (1) Richards's opinion on the propriety of RSM's resignation was developed specifically for this litigation, and he is <u>not</u> an expert in industry practices in applying GAAS in the resignation context; and (2) Richards has provided no proof that his interpretation of GAAS resignation standards is generally accepted in the auditing community. *See* 877 F.3d at 779-80. More importantly, the jury cannot rely on Richards's opinions because he failed to "adequately account[] for obvious

alternative explanations": (i) that other GAAS standards contradict his opinion, and (ii) that other facts demonstrate that RSM complied with Richards's reading of GAAS. *Id.* (internal quotation marks omitted).

### A.  Richards Ignored Relevant GAAS Standards

First, "if the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005). Here, Richards failed to address other provisions of GAAS that appear to refute his view that GAAS always requires auditors to take additional steps before resigning. For example, Richards ignored the following GAAS provisions that allow (or require) an auditor to do just what RSM did: resign or disclaim the audit opinion if the auditor has doubt about management integrity and/or the truth of representations made by management:

- AU-C 580.25: "The auditor should disclaim an opinion on the financial statements . . . or withdraw from the engagement if the auditor concludes that sufficient doubt exists about the integrity of management such that the written representations [of management] are not reliable." (Ex. G, AU-C 580, at 843.)

- AU-C 580.A30: "Concerns about the competence, integrity, ethical values, or diligence of management . . . may cause the auditor to conclude that the risk of management misrepresentation in the financial statements is such that an audit cannot be conducted. In such a case, the auditor may consider withdrawing from the engagement, when withdrawal is possible under applicable law or regulation, unless those charged with governance put in place appropriate corrective measures." (*Id.* at 850.)

- AU-C 580.A32: "[I]f, as described in paragraph .25a, the auditor concludes that the written representations about these matters are unreliable or if management does not provide those written representations, the auditor is unable to obtain sufficient appropriate audit evidence. . . . Section 705 requires the auditor to disclaim an opinion on the financial statements in such circumstances." (*Id.*)

16

- AU-C 260.A47: "Before communicating matters with those charged with governance, the auditor may discuss them with management unless that is inappropriate. For example, it may not be appropriate to discuss with management questions of management's competence or integrity." (Ex. H, AU-C 260, at 239.)

None of these provisions refer to, suggest, or require that an auditor perform any additional steps before resigning. To the contrary, these provisions on their face permit an auditor to resign once they have doubts about the integrity of management. And Weil repeatedly made clear that RSM had lost confidence in the integrity of SBB's management. (*See* Ex. E.) This only makes sense. Why should RSM be forced to have additional conversations with clients they have already deemed untrustworthy, when it was the under-oath testimony transcripts of SBB witnesses that led RSM to that conclusion? RSM personnel could not issue subpoenas or extract testimony under oath from their client. They finally were able to review the highest form of evidence they could hope to obtain, which showed that SBB personnel had lied to them. They could reasonably assume that following up with the people who lied to them would not be fruitful.

Other GAAS provisions also raise more specific questions that contradict Richards's conclusion that RSM was obligated to conduct further audit inquiries before resigning:

| GAAS Provisions Richards Ignored in His Report | Question Raised |
|---|---|
| AU-C 580.25 says the auditor "should" disclaim the opinion or withdraw from the engagement, and Richards agrees that "GAAS use the word 'should' to indicate a presumptively mandatory requirement." (*See* Ex. A at 35 n.191.) | Why would GAAS make withdrawal "presumptively mandatory" if an auditor is nevertheless required to pursue additional steps, as Richards claims? |
| AU-C 580.A30 permits the auditor to consider withdrawing from the engagement once they have such concerns. | What language tells the auditor to follow other GAAS provisions cited by Richards before withdrawing? |

17

| | |
|---|---|
| AU-C 580.A32 says that, *by definition*, the auditor is unable to obtain sufficient audit evidence if the auditor concludes that management's representations are unreliable. | If the auditor is, by definition, unable to obtain sufficient audit evidence, why would GAAS require the auditor to try to obtain additional evidence, as Richards suggests? |
| AU-C 260.A47 permits the auditor to not discuss matters with management if "inappropriate," defining "inappropriate" to include questions of management's integrity. | If an auditor need not discuss a resignation with management if they doubt the integrity of management, why would GAAS require RSM to first discuss its resignation with SBB, as Richards says? |

Richards failed to even consider, let alone answer, these questions. To the contrary, his report failed to cite AU-C 580.A30, 580.A32, and 260.A47. And the only time he cited AU-C 580.25, he inserted his own language within that standard. (*See* Ex. F at 231-32 ("The after evaluation of audit evidence [clause] is not in Paragraph 25 or 25(a) that's cited. It's me paraphrasing because what I'm laying out is the audit process.").) The fact that Richards "paraphrased" a standard to make it appear that the standard included other steps of his own making shows that his opinion on that standard is unreliable. *See, e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) ("Result-driven analysis, or cherry-picking . . . is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion.").

At his deposition, Richards was given a chance to explain the GAAS provisions he failed to cite. For AU-C 260.A47, he only made a "practical point [that] in small organizations that a lot of time there's no difference between those charged with governance and management." (Ex. F at 253-54.) But this only proves the point: SBB <u>was</u> a very a small organization whose management and those charged with governance were the same people (*i.e.*, Barnett and Aven). So under this standard (and Richards's logic), RSM shouldn't have needed to talk to Barnett and Aven before resigning.

In response to this (obvious) point, Richards simply stated, "[T]hey still need to do the audit procedures to make sure they understand the context of the information. You can't just resign." (*Id.* at 254.) What is the basis for that conclusion? Richards effectively asks the Court and a jury to take his word for it. Richards has cited no specific authority for saying "you can't just resign," and could only refer generally to "a series of procedures you have to do to get to that conclusion" and other unnamed "standards." (*Id.* at 239-40, 247.) Indeed, when specifically asked, "[W]hich section or sections [of GAAS] are you relying on for that conclusion?," Richards answered, "I tried to lay them out in the order by which you would execute them in my report." (*Id.* at 238-39.) But he was unable to produce any authority supporting his view of the "order by which you would execute them." Nor could he cite any accounting literature or industry practices that support his reading of GAAS.

Ultimately, there is no support for Richards's view of GAAS other than Richards himself. This is the very definition of *ipse dixit*: an inadmissible assertion without other proof. *See, e.g.*, *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 837 (7th Cir. 2015) ("When a district court conclude[s] that there is simply too great an analytical gap between the data and opinion proffered such that the opinion amounts to nothing more than the *ipse dixit* of the expert, it is not an abuse of discretion under *Daubert* to exclude that testimony." (internal quotation marks omitted)). Richard's opinion on the proper standard for resignations under GAAS should not be presented to a jury based solely on his say-so.

### B.    Richards Ignored Facts That He Claimed Were Relevant

In addition to cherry-picking the aspects of GAAS he chooses to recognize, Richards also cherry-picks his facts. He simply ignores those facts that would undermine his conclusion that RSM did not comply with Richards's interpretation of GAAS. For instance,

Richards faults RSM for not "checking with SBB" before resigning. (Ex. A ¶ 110.) But he admits that after learning about the SEC deficiency letter, RSM requested correspondence between the SEC and SBB. (*Id.* ¶ 139.) RSM even followed up on its review of that additional correspondence by requesting a meeting with SBB to discuss why it had provided that false representation to RSM. (*Id.* ¶¶ 34, 129.) Richards does not explain why RSM's requests for additional communications with the SEC, and holding a meeting with SBB to get an explanation for the false management representation letter, don't count as the "additional audit procedures" he says are required. Richards likewise faults Weil for "not checking with her team," but he ignores that she made her decision to resign after consulting "with two members of RSM's national office." (*Id.* ¶¶ 108, 110.) Richards's treatment of evidence he himself claims is relevant only confirms that his opinions are unreliable.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court exclude the opinions of Steven Richards contained in paragraphs 39, 69-75, and 91-144 of his report.

April 12, 2024

**United States Securities and Exchange Commission**

By: */s/ Devlin N. Su*
Timothy S. Leiman (leimant@sec.gov)
Robert Moye (moyer@sec.gov)
Kevin A. Wisniewski
(wisniewskik@sec.gov)
Devlin N. Su (sude@sec.gov)
Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390

*Attorneys for Plaintiff United States*
*Securities and Exchange Commission*

20

# UNPUBLISHED AUTHORITIES

2012 WL 1802066
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Jo Belle BALDONADO, Plaintiff.
v.
WYETH and its division, Wyeth
Pharmaceuticals, Inc., Defendant.

No. 04 C 4312.
|
May 17, 2012.

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge.

**\*1** Defendant Wyeth moves *in limine* to exclude the anticipated expert testimony of two of Plaintiff's designated marketing experts—Dr. Matthew F. Hollon and Dr. Adriane J. Fugh–Berman. *See* Fed.R.Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As explained below, Defendant's motion is granted in part, and denied in part.

### BACKGROUND

Plaintiff Jo Belle Baldonado was diagnosed with breast cancer while she was taking Prempro, a prescription hormone therapy ("HT") medication that Defendant Wyeth designed, manufactured, and marketed. Plaintiff's prescribing physicians were Dr. Teresita D. Avila, M.D. and Dr. Mani Akkineni, M.D. Alleging that Prempro caused her breast cancer, Plaintiff filed the present civil action against Defendant and others. Trial is scheduled for October 9, 2012.

In advance of trial, Defendant moves to exclude the testimony of Dr. Matthew Hollon and Dr. Adriane Fugh–Berman, both of whom Plaintiff has designated as experts on Wyeth's marketing practices for its hormone therapy medications. The witnesses are "general liability experts" who have not filed case-specific expert reports. (R. 131, Pl's Resp. at 1.)

### I. Expert Qualifications

Defendant does not challenge the qualifications of either Dr. Hollon or Dr. Fugh–Berman to offer expert opinions on Defendant's marketing practices. *See* Fed.R.Evid. 702(a) (stating that an expert may by qualified by "knowledge, skill, experience, training, or education"). For purposes of context, however, the Court briefly summarizes each expert's professional background.

### A. Dr. Matthew F. Hollon, M.D., MPH

Dr. Hollon is a Board-certified physician of Internal Medicine at the University of Washington in Seattle ("UW"). (R. 131, Ex. 13, Expert Report of Dr. Hollon ("Hollon Report"), at 1.) He graduated from the UW School of Medicine in 1994, and thereafter completed a medical residency and fellowship in Internal Medicine at UW. (*Id.*) During his fellowship, Dr. Hollon attended classes at the UW School of Public Health and Community Medicine and received a Masters of Public Health. (*Id.*) Currently, Dr. Hollon is the Director of Evidence–Based Medicine for the Internal Medicine Residency Program at the UW Department of Medicine and an Assistant Professor in the Division of General Internal Medicine. (*Id.*) Dr. Hollon has been an active member in numerous professional organizations, and has published extensively in the area of pharmaceutical marketing. (*Id.* at 1–2.) He has also consulted on this topic for the Canadian government. (*Id.*)

### B. Dr. Adriane J. Fugh–Berman, M.D.

Dr. Fugh–Berman is an associate professor in the Department of Physiology and Biophysics at Georgetown University Medical Center, where she teaches "graduate courses in the history of medicine and critical assessment of medical literature, including a module on clinical trial methodology and assessment of adverse events." (R. 131, Ex. 15, Expert Report of Dr. Fugh–Berman ("Fugh–Berman Report"), at 1.) She also lectures about "pharmaceutical company influence on physician prescribing practices." (*Id.*) For more than twenty-five years, Dr. Fugh–Berman has "worked in the field of women's health and corporate influence on healthcare," and has published numerous articles in that regard, including articles "on the culture of gynecology and the effect of drug company promotion on prescribing habits." (*Id.*) Dr. FughBerman previously practiced general medicine with a focus on women's health. (*Id.*) After leaving clinical practice in 2001, Dr. Fugh–Berman has, among other professional pursuits, "been a consultant, scientific reviewer, working group member, or speaker on women's health issues for the National Institutes of Health, the Federal Trade Commission,

2012 WL 1802066

the Centers for Disease Control, the Agency for Health Care Research and Quality, the Department of Defense, the National Security Agency, and the Institute of Medicine." (*Id.* at 1–2.)

## II. Anticipated Expert Testimony

**\*2** Plaintiff seeks to call either Dr. Hollon or Dr. Fugh–Berman as a general liability expert on Defendant's marketing practices.[1] If permitted to testify, according to Plaintiff, the experts would opine that Defendant's marketing of HT products including Prempro fell below the standard of care that a pharmaceutical company should exercise. (R. 131, Pl.'s Resp. at 5–6, 8.) The experts in their respective reports offer extensive detail about Defendant's marketing practices and opine on the impact of those practices on patients and physicians. (*Id.*)

Plaintiff offers the experts to establish "key elements in Plaintiff's negligence and punitive damages claims." (R. 131, Pl.'s Resp. at 3.) Plaintiff contends that the experts "will serve to educate the jury on the nature and purpose of the marketing materials seen by Mrs. Baldonado and her physicians" (*id.* at 8), thereby "provid[ing] context for Wyeth's breach of its duty to the physicians and patients...." (*Id.* at 3.)

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir.2009). "The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch,* 359 F.3d 892, 918 (7th Cir.2004) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)); *see also Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 893 (7th Cir.2011) ("It is the district courts' role to ensure that expert testimony is both relevant and reliable."). Whether to admit expert testimony rests within the discretion of the district court. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Indeed, a district court has "wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis,* 663 F.3d at 894.

Under Rule 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed.R.Evid. 702; *see also Ortiz v. City of Chicago,* 656 F.3d 523, 526 (7th Cir.2011). The inquiry under Rule 702 is "flexible." *Bielskis,* 663 F.3d at 894.

District courts employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *See Myers v. Ill. Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir.2010). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir.2007) (quoting *Kumho Tire Co.,* 526 U.S. at 152).

## ANALYSIS

**\*3** In the present motion, Defendant seeks to exclude the expert testimony of Dr. Hollon and Dr. Fugh–Berman on the ground that such testimony is irrelevant and unreliable. To the extent the Court permits the experts to testify, Defendant alternatively seeks to preclude the experts from offering "narrative histories" of hormone therapy marketing practices; opinions on Defendant's intent and/or motives; and opinions on the applicable standard of care. The Court addresses each of these issues below.

## I. Relevance

The Court first considers the threshold issue of relevance. Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed.R.Evid. 401; *see also* Fed.R.Evid. 402 ("Irrelevant evidence is not admissible."); *Daubert,* 509 U.S.

at 590–91 (observing that expert testimony must be relevant in order to "assist the trier of fact" under Rule 702).

In its motion, Defendant argues that neither Plaintiff nor her physicians relied on any of Defendant's marketing materials, and therefore evidence of Defendant's marketing materials and practices can have no bearing on Plaintiff's injuries, nor properly provide evidence relevant to the assessment of a punitive damages award. [2] (R. 116, Def.'s Mem. at 4–6.) Plaintiff responds that both she and her prescribing physicians relied on Defendant's marketing materials, and her experts "will limit their testimony in this trial to the marketing conduct of Wyeth that is relevant to this plaintiff's case." (*Id.* at 1; *see also id.* at 9 ("[T]hese doctors' testimony will be specifically tailored to the facts of this case.").)

The parties agree, at least implicitly, that the expert testimony is relevant to the extent that Plaintiff and/or her prescribing physicians relied on the marketing materials about which the experts would opine. (*See* R. 116, Def.'s Mem. at 6; R. 131, Pl.'s Resp. at 13, 17); *accord De Bouse v. Bayer AG*, 235 Ill.2d 544, 337 Ill.Dec. 186, 922 N.E.2d 309 (2009) ("If a consumer has neither seen nor heard [the marketing] statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause."). Reliance is a question of fact, and under the Federal Rules of Evidence, "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Fed.R.Evid. 104(b).

Here, although the pre-trial record contains some evidence of reliance on marketing materials, [3] a ruling on the relevance of the proffered testimony to the negligence or punitive damages claims is premature. Plaintiff has agreed to "specifically tailor[ ]" the expert testimony "to the facts of this case." (R. 131, Pl.'s Resp. at 9); *see also Barton v. Wyeth Pharm., Inc.,* No. 694/695 EDA 2012, 2012 WL 112613 (Pa.Super.Ct. Jan. 3, 2012) (applying Illinois law) (finding no abuse of discretion in the trial court's admission of evidence of Wyeth's "extensive marketing activities," where a physician's information on the drug at issue was "rooted, at least indirectly, in Wyeth's active promotion of its product"). If Plaintiff seeks to offer expert testimony on Defendant's marketing practices, Plaintiff must *first* introduce evidence that is "sufficient to support a finding" that the testimony relates to the underlying facts of this case. *See* Fed.R.Evid. 104(b) & adv. comm. notes ("The order of proof here, as generally, is subject to the control of the judge."); *see also United States v. Boling,* 648 F.3d 474, 482 (7th Cir.2011)

("A trial judge has discretion to control the mode and order of witness interrogation and evidence presentation.") (citing Fed.R.Evid. 611(a)).

**\*4** Additionally, given the breadth of the expert reports at issue, the Court orders as follows:

- By May 31, 2012, Plaintiff shall file a detailed statement of the specific expert testimony and opinions that she intends to elicit at trial *in this case* from Dr. Hollon and/or Dr. Fugh–Berman. The statement must include supporting references to the expert reports and depositions.

- The parties shall meet and confer in good faith on the relevance of the proposed testimony on or before June 8, 2012.

- If the parties are unable to reach agreement, Defendant shall file objections to the relevance of the proposed testimony by June 12, 2012. Plaintiff may reply, if at all, by June 15, 2012.

## II. Narrative Histories

Defendant next seeks to preclude the experts from offering "narrative histories" of Defendant's promotion of hormone therapy. (R. 116, Def.'s Mem. at 7.) In their respective reports, Dr. Hollon and Dr. Fugh–Berman offer lengthy narrative summaries about Defendant's promotion of hormone therapy products over approximately the last 60 years. (*See* Hollon Report at 8–88; Fugh–Berman Report at 5–31.) Defendant argues that this type of narrative testimony, based on the experts' review of documents, does "not involve any application of 'scientific, technical or other specialized knowledge' " and "will not aid the jury and will impermissibly interfere with its role as trier of fact." (Def.'s Mem. at 14 (quoting Fed.R.Evid. 702).) The Court agrees.

Under the circumstances of this case, allowing an expert to provide summary testimony "based on nothing more than [the expert's] review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself." *United States v. Vance,* No. 07–CR–351, 2011 WL 2633842, at \*5 (N.D.Ill. July 5, 2011) (citing *United States v. Hall,* 93 F.3d 1337, 1343 (7th Cir.1996) ("Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403.")). Even if the

expert may have relied upon his or her expertise to "wade through the multitude of possibly relevant documents," the "vast majority" of the experts' proffered narratives amount to a summary and statement of the experts' "advocacy-based interpretation of documents in the record concerning" HT marketing practices. *In re Viagra Prods. Liab. Litig.,* 658 F.Supp.2d 950, 967 (D.Minn.2009); *see also In re Trasylol Prods. Liab. Litig,* 709 F.Supp.2d 1323, 1346 (S.D.Fla.2010) (finding that expert's testimony "will not assist trier of fact," where testimony "mostly consists of a factual narrative of [drug's] regulatory history and summaries of [pharmaceutical defendant's] internal documents"); *In re Prempro Prods. Liab. Litig.,* 554 F.Supp.2d 871, 886 (E.D.Ark.2008) ("If an expert does nothing more than read exhibits, is there really any point in her testifying as an expert?"). For these reasons, the experts may not offer factual narrative testimony that simply summarizes documents relating to Defendant's promotion of hormone therapy.

### III. Reliability

**\*5** Defendant contends that the experts' testimony "should [ ] be excluded because it does not come close to the standard of reliability." (R. 116, Def.'s Mem. at 9.) As explained below, Defendant does not present any argument that warrants exclusion of the proffered expert testimony on the basis of reliability.

#### A. Dr. Hollon

Defendant argues that Dr. Hollon failed to undertake an "objective investigation of the facts" (*Id.* at 10), and "failed to gather relevant data." (*Id.* at 12–14.) Defendant presents these challenges as two independent arguments.

#### 1. Objective Investigation of the Facts

Defendant relies on Dr. Hollon's deposition testimony to argue that he "made no objective investigation of the facts." (R. 116, Def.'s Mem. at 10 (citing *id.,* Ex. 20, Hollon Dep. in the MDL Court ("Hollon Dep."), at 67– 68 (Mar. 27, 2006)).) According to Defendant, Dr. Hollon's deposition testimony shows that he "bases his opinions on material hand-picked for him by Plaintiff's counsel," and then " 'randomly' " delves into this limited material and, finding nothing to disprove his views, offers them as expert opinions." (*Id.* (citing Hollon Dep. at 67–68).) Defendant, however, grossly mischaracterizes Dr. Hollon's deposition testimony by offering only limited testimony ripped from its context.

Contrary to Defendant's representation, Dr. Hollon never testified that he relied exclusively on the documents that Plaintiff's counsel provided to him. In fact, he explicitly testified that "not all of it was provided by counsel." (Hollon Dep. at 77.) Dr. Hollon testified that he additionally relied on his "knowledge" and "expertise" of marketing practices (*id.* at 33), and on materials that he "found ... independently" (*id.* at 46). He further testified that he gathered a "substantial portion" of the documents he reviewed "well prior to any specific work that I did related to this case." (*Id.* at 36; *see also id.* at 28 ("most of the medical literature that I used to write this report was obtained by my own independent efforts").)

To the extent Dr. Hollon relied on documents that counsel sent to him, the record contradicts Defendant's assertion that these documents were "limited." (*Id.* at 21, 27 ("millions of pages").). As Dr. Hollon testified: "There were boxes upon boxes upon boxes of documents sent, numbering thousands upon thousands upon thousands of pages...." (*Id.* at 21 (further noting that he received an initial and then subsequent set of documents, and also 240 gigabytes of information on a hard drive).) Despite the breadth of counsel's production, Dr. Hollon also requested additional materials, which he received. (*Id.* at 24, 69.)

Furthermore, contrary to Defendant's arguments, Dr. Hollon did not simply look to counsel's documents to disprove his opinions. Once Dr. Hollon reached his tentative opinions, he "went back to look in the medical literature ... and in the popular literature, using" electronic databases, including LexisNexis, to test his opinions. (*Id.* at 67–68; *see also id.* at 33 (testifying that he relied on his own experience combined with a "comprehensive summary of the available literature on the general impact of promotion on prescribing practices of physicians, and the influence that direct to consumer marketing has on those prescribing practices in this country"); *id.* at 67 ("It's my responsibility, as a researcher and scientist, to try and triangulate and to review as much as I can to form an opinion so that my opinion is valid.").)

**\*6** For all of these reasons, the Court cannot say that Dr. Hollon failed to undertake an objective investigation of the facts such that his expert testimony lacks reliability. (*Id.* at 33 (testifying that he relied on his own experience combined with a "comprehensive summary of the available literature on the general impact of promotion on prescribing practices of physicians, and the influence that direct to consumer marketing has on those prescribing practices in this

2012 WL 1802066

country").) Defendant's challenges go to the weight of Dr. Hollon's expert testimony, not its admissibility. *See Walsh v. Chez*, 583 F.3d 990, 995 (7th Cir.2009) (holding that the "district court erred in concluding that whatever flaws existed in the expert reports ... went to their admissibility, as opposed to their weight").

### 2. Gather Relevant Data

Defendant next argues that Dr. Hollon "failed to gather relevant data." (R. 116, Def.'s Mem. at 12.) Defendant's somewhat undeveloped argument focuses on certain specific opinions.

First, Defendant argues that, with respect to "Dr. Hollon's opinion that Wyeth repeatedly ignored the FDA's directives regarding HT advertisements":

> [Dr. Hollon] did not obtain all the facts about those ads, including when they ran, where they ran, or even whether they ran at all. He is not familiar with the correspondence file between Wyeth and the FDA, and instead bases his opinion on his 'sense' of what happened.

(*Id.* at 13.) This argument, however, mischaracterizes the portions of the record upon which it relies. (*Id.* citing Hollon Dep. at 232–33, 270–74, 280–81, 284–87).) In the cited deposition testimony, Dr. Hollon offered limited testimony about certain advertisements that might not even be relevant to this case. (*See* Hollon Dep. at 270–87. *Cf. id.* at 257–60 (testifying that he created a binder of relevant promotional materials).) Dr. Hollon is not a case-specific expert, and nothing in the cited testimony establishes that Dr. Hollon is unfamiliar with Defendant's HT advertising generally, or otherwise lacks a sufficient factual basis to opine on Defendant's marketing activities. This is particularly true in light of his experience, research, and review of relevant records. Moreover, to the extent Defendant suggests that Dr. Hollon lacks familiarity with "the correspondence file between Wyeth and the FDA," Defendant offers nothing to support such a sweeping statement. Defendant relies exclusively on Dr. Hollon's testimony relating to Defendant's promotion of HT for off-label use—an issue that is irrelevant to this case. (*Id.* at 232–33.)

Second, with regard to Dr. Hollon's opinion that Defendant "exert[ed] profound control over" the medical literature on HT, Defendant argues that the opinion is unreliable because Dr. Hollon "admits that he cannot quantify the extent to which Wyeth allegedly influenced the medical literature." (R. 116, Def.'s Mem. at 13–14.) In support of its argument, Defendant relies on Dr. Hollon's deposition testimony that Defendant's funding of articles "was a piece of the overall marketing plan that influenced providers and patients together.... It's reasonable to suppose that they continued to invest in it because it was effective." (*Id.*) When read in the proper context, however, this testimony does not support Defendant's argument. Dr. Hollon's testimony was in the context of discussing the existence of thousands of articles on HT and how Defendant used these articles as "a piece of the overall marketing plan that influenced providers and patients together." (Hollon Dep. at 324; *see also id.* at 152 (discussing the effect of "comprehensive promotional efforts of Wyeth" and "integrated marketing tactics," which took place "through all these different channels").)

**\*7** Finally, Defendant argues that Dr. Hollon's opinion on ghostwriting "hinges on a single article that he admits he did not read." (R. 116, Def.'s Mem. at 14 (citing Hollon Dep. at 321).) Defendant neither discusses the content or methodological value of this "single article," nor does Defendant discuss the relevant portions of Dr. Hollon's expert report in which he references numerous sources upon which he bases his opinion on ghostwriting. (Hollon Report at 62, 72–73, 77.) Moreover, as to the specific article to which Defendant refers, Dr. Hollon never testified that "he did not read" the article, but instead testified that he only had an abstract of the article with him "here." (Hollon Dep. at 321.)

### 3. Scientific Standards

Defendant next argues that Dr. Hollon failed to adhere to scientific standards. (R. 116, Def.'s Mem. at 13.) Defendant reasons that Dr. Hollon has previously opined in the *Journal of the American Medical Association ("JAMA")* that, as a general matter, the net public benefit of direct-to-consumer advertising is unclear. (*Id.* at 15.) By now "offering a contrary [opinion] in this litigation," Defendant asserts that "Dr. Hollon is applying different standards in the courtroom than those applied in his professional practice."[4] (*Id.*) The Court again disagrees. Dr. Hollon's *JAMA* article does not discuss Defendant or HT marketing practices, and therefore is not counter to his opinions in the present litigation. In any event,

the existence of this prior publication goes to the weight, not the admissibility, of his expert testimony.

### B. Dr. Fugh–Berman

Defendant's sole challenge to Dr. Fugh–Berman's methodology is this: she failed to make an objective investigation of the facts because she "published ... a paper ..., which is critical of the 'lawful' practice of 'ghostwriting.' " (R. 116, Def.'s Mem. at 10–11.) Defendant reasons that Dr. Fugh–Berman's publication "reveals that she is simply a mouthpiece for HT plaintiffs' counsel" because she relied heavily on "plaintiffs' counsel" for the content of her article. (*Id.* at 11.) Other than offer a defense of ghostwriting, Defendant does not advance any legal argument in support of excluding Dr. Fugh–Berman's testimony under any applicable legal authority. To the extent Defendant disagrees with Dr. Fugh–Berman's opinions as to ghostwriting, Defendant may, if otherwise appropriate, explore these issues with the witness on cross-examination.

### IV. Intent and Motivation

Defendant seeks to preclude Dr. Hollon from testifying about Defendant's "internal motivations," arguing that such testimony would amount to improper speculation. (R. 116, Def.'s Mem. at 15–16 .) Plaintiff responds that "opinions as to Wyeth's ultimate motives and intent are certainly not the main thrust of Dr. Hollon's report or testimony. Where he does touch upon the subject, Dr. Hollon provides objective sources." (R. 131, Pl.'s Mem. at 22.)

**\*8** The Court agrees with Defendant. Nothing in Plaintiff's brief or the record suggests that Dr. Hollon has personal knowledge of the internal motivation for any of Defendant's actions, and furthermore, the jury is fully capable of considering the issue of intent based on the evidence presented at trial. *See DePaepe v. Gen. Motors Corp.,* 141 F.3d 715, 720 (7th Cir.1998) ( "He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive."); *Johnson v. Wyeth LLC,* No. 10–C–2690, 2012 WL 1204081, at \*3 (D.Ariz. Apr. 11, 2012) (precluding plaintiff's experts from offering "opinions concerning defendants' motive, intent, knowledge, or other state of mind"); *In re Yasmin and YAZ (Drospirenone) Mktg., Sales Practices and Prods. Liab. Litig.,* 09–md–2100, 2011 WL 6302287, at \*12 (S.D.Ill.Dec.

16, 2011); *Loewen v. Wyeth, Inc.,* No. 03–J–2166, 2011 WL 6942870, at \*4 n .3 (N.D.Ala. Nov. 14, 2011) (precluding Dr. Hollon from offering any testimony that "constitutes his personal views as to the intent, motive, and state of mind of Wyeth"); *George v. Kraft Foods Global, Inc.,* 800 F.Supp.2d 928, 932–33 (N.D.Ill.2011) (excluding expert's state of mind opinion as speculative and unhelpful); *United States Gypsum Co. v. Lafarge N. Am., Inc.,* 670 F.Supp.2d 768, 775 (N.D.Ill.2009) (citing *Dahlin v. Evangelical Child and Family Agency,* No. 01 C 1182, 2002 WL 31834881, at \*3 (N.D.Ill.Dec. 18, 2002) ("testimony that does little more than tell the jury what result to reach is unhelpful and thus inadmissible, and testimony regarding intent— essentially an inference from other facts—is even more likely to be unhelpful to the trier of fact") (internal citation omitted)); *Nat'l Jockey Club v. Ganassi,* No. 04–3741, 2009 WL 2177217, at \*8 (N.D.Ill. July 21, 2009) ("intent of the parties must be determined by the jury, and expert opinion testimony is not necessary on this point").

Accordingly, the Court grants Defendant's motion to preclude Dr. Hollon from offering opinion testimony as to Defendant's state of mind, including intent or motivation.

### V. Standard of Care

Finally, Defendant seeks to preclude Dr. Hollon from offering testimony "regarding the standard of care for pharmaceutical marketing." (R. 116, Def.'s Mem. at 16.) Defendant reasons that Dr. Hollon's opinion on the applicable standard of care amounts to his own subjective "views on marketing ethics" without any objective foundation. (*Id.*) Once again, the Court disagrees. Dr. Hollon is a physician and expert in drug marketing, and he may reliably draw on his vast experience in this area, and his expert knowledge of federal and industry regulations, to opine on the standard of care. (*See* Hollon Report at 23; Hollon Dep. at 219–21, 237–38, 264–65); *accord Loewen,* 2011 WL 6942870, at \*1 n .1 ("the court sees no reason why Dr. Hollon's testimony regarding the standard of care should be excluded" on the basis that it amounts to "personal opinions"); *In re Prempro Prods. Liab. Litig.,* No. 03–CV–1507, 2006 WL 5217764, at \*5 (E.D.Ark. Sept. 13, 2006) (rejecting Wyeth's challenge to Dr. Hollon's proposed testimony on the standard of care, reasoning that "[c]learly, Dr. Hollon has a knowledge of pharmaceutical marketing that is beyond a juror's common understanding").

**CONCLUSION**

**\*9** For the reasons explained above, the Court grants in part, and denies in part, Defendant's motion.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1802066

## Footnotes

1  Plaintiff represents that the experts would offer materially identical testimony, and that she designated both to ensure the availability of at least one of the experts for trial.

2  On the subject of negligence, see generally *Robinson v. McNeil Consumer Healthcare,* 615 F.3d 861, 871 (7th Cir.2010) (" 'proof of negligence in the air ... will not do' ") (quoting *Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99, 99 (1928)) and *Pipp v. Johnson and Johnson,* No. 09–CV–5944, 2010 WL 2365303, at *1 (N.D. Ill. June 9, 2010) (citing *Smith v. Eli Lilly & Co.,* 137 Ill.2d 222, 233, 137 Ill.2d 222, 560 N.E.2d 32, 560 N.E .2d 324 (1990) ("In a negligence action th[e] causation-in-fact requirement entails a reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.")). On the subject of punitive damages, see generally *Woodward v. Corr. Med. Servs. of Ill., Inc.,* 368 F.3d 917, 931 (7th Cir.2004) (stating, in the context of punitive damages, " '[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business' ") (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)).

3  Defendant argues that Drs. Avila and Akkineni did not rely on Defendant's marketing practices, reasoning that the doctors testified as much. (*See* R. 116, Def.'s Mem. at 3–4 (citing, e.g ., Dr. Avila Dep. (7/20/11) at 21, 256–57; Dr. Akkineni Dep. at 115–16).) Defendant presents this testimony out of context. Although the doctors may have stated that they did not rely on marketing materials, the doctors gave that testimony in the context of explaining that the decision to prescribe Prempro to Plaintiff was an exercise of independent medical judgment. This context is significant because throughout their depositions, the doctors explained that marketing activities and information from drug companies underlie and inform, at least in part, the exercise of their medical judgment. (*See, e.g.,* Dr. Avila Dep. (8/10/11) at 210 (testifying that information from a "sales rep" would go into the decision-making process; Dr. Akkineni Dep. at 15 (decisions based in part on marketing information received from drug manufacturer), 117–18 (advised patients of risk based on review of the literature).) The doctors testified about many of these influences. (*See, e.g.* Dr. Avila Dep. (7/20/11) at 15 ("whatever is out and recommendations and medical literature that is given to us"), 16 (letters from drug companies), 16–17 (textbooks), 18 (Physicians Desk Reference ("PDR")), 19–20 (lectures), 22 (journals), 24 (booklets), 27 (advertisements), 27 (materials brought in by patients), 50 (office visit by sales representatives); Dr. Avila Dep. (8/10/11) at 210 (pamphlets); Dr. Akkineni Dep. at 15 (visits by sales representatives who provide product information), 17 (text books and educational information from medical associations), 20(PDR), 24 (studies), 49 (specific document from Wyeth sales team), 54 ("Dear Doctor" letters), 58 (office visits by sakes representatives), 61 (continuing medical education); *accord* R. 132, Ex. 22 (medical records: "reading material on estrogen replacement [ ] given to the patient").)

4  Defendant also contends that "in the five years since he was retained as an expert in the HT litigation, he has never subjected his opinions (and accordingly his methodology) regarding Wyeth's advertising to peer review." (R. 116, Def.'s Mem. at 15.) This argument, comprised of one conclusory sentence without elaboration or reference to any legal authority, is waived. *See Appert v. Morgan Stanley Dean Witter, Inc.,* 673 F.3d 609, 617 n. 1 (7th Cir.2012) (holding that "perfunctory and undeveloped arguments unsupported by pertinent authority are waived"). Even if Defendant had not waived this argument, the existence of peer review

is one of myriad relevant factors under *Daubert.* Defendant makes no attempt to explain how this factor, viewed with others, warrants exclusion under *Daubert. See Daubert,* 509 U.S. 593–94 ("The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.").

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Securities and Exchange Commission,

                Plaintiff,

v.

True North Finance Corporation,
formerly known as CS Financing Corporation;
Capital Solutions Monthly Income Fund, LP,
formerly known as Hennessey Financial
Monthly Income Fund, LP; Transactional
Finance Fund Management, LLC;
Todd A. Duckson; and Owen Mark Williams,

                Defendants.

Civil No. 10-3995 (DWF/JJK)

**MEMORANDUM
OPINION AND ORDER**

_____

Benjamin J. Hanauer, Esq., Eric M. Phillips, Esq., Marlene B. Key-Patterson, Esq., and Daniel J. Hayes, Esq., US Securities and Exchange Commission, counsel for Plaintiff.

Scott R. Carlson, Esq., DC Law Chartered, counsel for Defendants Capital Solutions Monthly Income Fund, LP, formerly known as Hennessey Financial Monthly Income Fund, LP, and Transactional Finance Fund Management, LLC.

Lawrence J. Field, Esq., and Bryant D. Tchida, Esq., Leonard Street and Deinard, PA, counsel for Defendant Todd A. Duckson.

_____

      This matter came before the Court for a pretrial hearing on September 3, 2013.

Consistent with, and in addition to the Court's rulings and remarks from the bench, and

based upon the memoranda, pleadings, and arguments of counsel, and the Court having

reviewed the contents of the file in this matter and being otherwise duly advised in the premises, the Court hereby enters the following:

## ORDER

1.       Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 1 to Preclude Evidence and Argument Concerning Truth on the Market Defense (Doc. No. [220]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.       Assuming that proper foundation is laid by Defendants, to the extent the proffered evidence through brokers and investors relates primarily to the issue of reliance, such evidence is presumptively inadmissible pursuant to the Court's Article 4 analysis.

b.       However, to the extent that proper foundation is laid and the evidence relates to what Mr. Duckson told the brokers and investors, the evidence shall be presumptively admissible, assuming that it is not otherwise excluded based upon when the information was relayed by Mr. Duckson to a broker or investor, the nature of the information, or how it was communicated.  This decision of the Court assumes that part of the foundation will entail Mr. Duckson taking the witness stand first, before such testimony is elicited from a broker or investor.  This decision of the Court is made pursuant to Rule 104 and Article 4 of the Federal Rules of Evidence.

2.      Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 2 to Preclude Speculative and Hindsight Testimony About Whether Defendants' Statements Were Misleading (Doc. No. [224]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      The Court concludes that to the extent the evidence focuses on hindsight testimony or hindsight evaluation looking back at what occurred at the relevant times in question, such testimony shall be presumptively inadmissible pursuant to the Court's Article 4 analysis, absent further order of the Court.

      b.      However, assuming that proper foundation is established, including whether a particular witness has read any document in question or recalls a conversation at the time and place in question, to the extent that a witness has a lay opinion, pursuant to Rule 701, of any statements read or represented to him or her, such testimony will be presumptively admissible pursuant to Article 4.

3.      Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 3 to Preclude Hearsay and Character Evidence Concerning Defendant Todd Duckson (Doc. No. [229]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      To the extent that proper foundation is laid, including Mr. Duckson testifying prior to any witness who allegedly participated in the drafting process for the documents at issue, the evidence will be

presumptively admissible, provided that it otherwise meets the Court's

Article 4 analysis and is not otherwise excluded as hearsay evidence.

      b.     The Court, however, cautions the parties that this ruling is

predicated on the presumption that before any such testimony is elicited,

Mr. Duckson will have taken the witness stand and testified, with or

without objection, to specifically what he said or did.  The Court further

notes that, on the record presently before the Court, it is doubtful that

adequate foundation will be established in such a manner or that such

testimony will constitute habit evidence, pursuant to Rule 406.

Importantly, even if such evidence could qualify as an exception to the

hearsay rule under Rule 803(3), absent Mr. Duckson testifying first to the

specifics of anything he said as to time, place, and contact, the evidence

may well be inadmissible under Rule 102 and Article 4.

    4.     Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 4 to

Preclude Evidence and Argument Concerning the Cause of the Demise of the Capital

Solutions Monthly Income Fund or Investor Losses (Doc. No. [234]) is **GRANTED** as

follows:

      a.     The Court concludes that such evidence is presumptively

inadmissible pursuant to its Article 4 analysis.

b. Absent further order of the Court or an additional offer of proof, the Court concludes that such evidence has no direct or probative relationship to the issues to be presented to the jury.

5. Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 5 to Exclude Testimony of Kenneth McGraw (Doc. No. [239]) is **DENIED AS MOOT** as Defendants have indicated that they do not intend to call Mr. McGraw at trial.

6. Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 6 to Preclude Evidence and Argument Regarding the Supposed Wealth, Sophistication, and Lack of Diligence of Investors (Doc. No. [273]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a. To the extent that the offered evidence regarding the investors relates to lack of diligence, such evidence does not survive a Rule 403 analysis (with one exception which the Court will discuss below) and is therefore presumptively inadmissible absent further order of the Court.

b. To the extent that proper foundation is laid and the offered testimony goes to the limited issue of materiality as it relates to what Mr. Duckson informed the parties and why, including the issue of a particular investor's presumed or asserted sophistication and wealth, such evidence will be presumptively admissible, provided that it otherwise survives the Court's Article 4 analysis.

7.      Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 7 to Preclude Evidence and Argument Regarding Supposed Property Values (Doc. No. [278]) is **GRANTED** as follows:

      a.      Evidence of asserted property values shall be presumptively inadmissible, unless and until there is an additional offer of proof pursuant to Rule 104 establishing sufficient foundation for who made the appraisals, at whose direction, the timing of the appraisals, when they were received, and how they were used.  If and when the Court receives an additional offer of proof and any exhibits related to that offer of proof, the Court reserves the right to revisit the issue, whether prior to opening statements or later in the trial, if necessary.

      b.      Absent further ruling by the Court, there shall be no reference to property values in the opening statements of either Plaintiff or Defendants.

8.      Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 8 Pursuant to Federal Rule of Evidence 611 (Doc. No. [283]) is **GRANTED** as follows:

      a.      Absent further order of the Court, Plaintiff will be permitted to ask leading questions of witnesses Jon Essen and Timothy Redpath.  The Court reserves the right to hear any additional argument from defense counsel with respect to the Court's ruling in the event Defendants can establish that Mr. Essen or Mr. Redpath entered into any agreement with

Plaintiff (as part of the settlement of the claims against them in the case or any other matter) to testify in a particular manner.

      b.     Absent further order of the Court, Defendants will not be permitted to ask leading questions of either Jon Essen or Timothy Redpath. The Court reserves the right to change its ruling in the event it is established (by way of proper foundation), pursuant to Rule 611, that Mr. Essen and Mr. Redpath are truly adverse to Mr. Duckson and not the SEC.

9.     Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 9 to Preclude Evidence and Argument Regarding Plaintiff's Charging Decision (Doc. No. [287]) is **GRANTED** as follows:

      a.     Absent further order of the Court, evidence as to Plaintiff's so-called charging decision shall be presumptively inadmissible.

      b.     The evidence does not survive the Court's Rule 104 and Rule 403 analysis.

10.     Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 10 to Allow the Introduction of Portions of the Deposition of Jeffrey Gardner From a Related Case (Doc. No. [244]) is **GRANTED** as follows:

      a.     To the extent  Plaintiff seeks to introduce at trial deposition testimony of Jeffrey Gardner from the *First Commercial Bank* case, the

motion is **GRANTED**, provided that Plaintiff properly designates the portions of Mr. Gardner's testimony it intends to introduce.

b.     Plaintiff and Defendants shall meet and confer to establish a mutually agreeable schedule for any designations and counter-designations.

11.    Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 11 to Preclude the Defendants From Calling the SEC's Accounting Expert as a Witness at Trial (Doc. No. [249]) is **DENIED** as follows:

a.     The motion is **DENIED** to the extent Plaintiff seeks to prevent Defendants from calling Plaintiff's accounting expert, Gil Miller, to testify at trial.

b.     The Court reserves the right to limit the scope of Defendants' examination of Mr. Miller at trial, if necessary.

12.    Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 12 to Preclude Defendant Todd Duckson From calling His Law Partner and Co-Defendants' Attorney Scott Carlson as a Witness at Trial, or in the Alternative, to Disqualify Carlson From Representing Any Parties at Trial (Doc. No. [254]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.     To the extent Plaintiff seeks to have Scott Carlson disqualified from representing any party at trial, the motion is **GRANTED**.

b.     To the extent Plaintiff seeks to prohibit Scott Carlson from testifying at trial, the motion is **DENIED**, provided that Mr. Carlson is made available for deposition prior to trial.

c.     To the extent Plaintiff seeks to depose Scott Carlson prior to trial, the motion is **GRANTED**.  Defendants have indicated that they are willing to provide Mr. Carlson for deposition prior to trial.  Plaintiff and Defendants shall meet and confer and decide upon a mutually convenient time to conduct the deposition, prior to trial.

13.     Plaintiff Securities and Exchange Commission's Motion *in Limine* No. 13 to Exclude Reference to Bernard Madoff or Other Unrelated SEC Cases or Investigations (Doc. No. [293]) is **GRANTED** as follows:

a.     The parties shall not make reference to Bernard Madoff. Such statements shall be presumptively inadmissible.

b.     References to other SEC litigation shall be presumptively inadmissible.

c.     The Court will reserve ruling on any issues that arise during trial regarding any reference to other SEC litigation.  In the event either party feels that the other has "opened the door" during trial, or that such references to any other litigation should be admissible, counsel must approach the Court outside the presence of the jury.

14.     With respect to the issue of bifurcation, the Court rules that the liability and remedy phases of the trial of this matter shall be **BIFURCATED**.  The liability phase shall be conducted prior to, and separate from, the remedy phase.

15.     With respect to the testimony of other witnesses by way of deposition, the Court issues the following ruling:

a.     To the extent Plaintiff has requested to introduce the deposition testimony of witnesses David Woodard, Andrew Regalia, and Gary Sidder at trial, that request is **DENIED**.

b.     While witnesses who are located more than 100 miles away are considered "unavailable" pursuant to Rule 32(a)(4)(B) of the Federal Rules of Civil Procedure, the Court finds that the nation-wide subpoena power under the Dodd-Frank Act, and the requirements of Rule 804 of the Federal Rules of Evidence, necessitate that Plaintiff make a concerted effort to procure the live testimony of David Woodard, Andrew Regalia, and Gary Sidder at trial.  *See* 15 U.S.C. § 77v(a); Fed. R. Evid. 804(a)(5).

c.     The Court reserves the right to revise its ruling in the event Plaintiff is unable to procure the appearance at trial of David Woodard, Andrew Regalia, or Gary Sidder by subpoena or other reasonable means.

16. With respect to business records offered by Defendants pursuant to Rule 902(11), the Court will address any issues arising from such exhibits at such a time as may be practicable during the trial.

Dated: September 6, 2013        s/Donovan W. Frank
                               DONOVAN W. FRANK
                               United States District Judge

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

2020 WL 7641293
United States District Court, N.D. Illinois, Eastern Division.

Diane M. TRAHANAS, Plaintiff,

v.

NORTHWESTERN UNIVERSITY and
Steven J. Schwulst, M.D., Defendants.

No. 15 C 11192
|
Signed 12/23/2020

**MEMORANDUM OPINION AND ORDER**

John J. Tharp, Jr., United States District Judge

*1 In her second amended complaint, plaintiff Diane Trahanas brings claims for a Title VII hostile work environment; retaliation under the Family and Medical Leave Act and the Americans with Disabilities Act; defamation; and intentional infliction of emotional distress against defendants Northwestern University and Steven J. Schwulst, M.D. Before the Court is the defendants' motions for summary judgment and to exclude Professor Benjamin Clarke as a rebuttal expert witness. For the reasons set forth below, the defendants' motion to exclude is granted, and defendants' motion for summary judgment is granted in part and denied in part.

**BACKGROUND**

**A. Trahanas Is Hired into the Schwulst Laboratory**

On June 11, 2012, Diane Trahanas started as a Research Technologist II in the laboratory of Dr. Steven Schwulst, an Assistant Professor of Surgery in the Department of Surgery, Trauma and Critical Care at Northwestern University's Feinberg School of Medicine. Defs.' Statement of Undisputed Material Facts ("SOMF") ¶¶ 10, 3-4, ECF No. 104. Dr. Schwulst's scientific research focused on traumatic brain injuries. SOMF ¶ 12. As Dr. Schwulst's only research tech, Trahanas had responsibilities ranging from more ministerial tasks like purchasing mice for experiments to technical, research-oriented tasks such as inflicting mice with brain injuries, euthanizing them, and collecting and analyzing the mice's blood and tissue, and assisting with the preparation of research papers for publication. SOMF ¶¶ 17, 15. Trahanas

was good at her job and the Schwulst lab was productive while she worked there, though Dr. Schwulst was away from the lab for two weeks per month due to his clinic responsibilities at Northwestern University Hospital. *See* SOMF ¶¶ 20, 37; Pl.'s Statement Add'l Undisputed Material Facts ("PSAF") ¶ 1, ECF No. 108-2. While Trahanas worked at Northwestern she co-authored four research papers with Dr. Schwulst and she twice traveled out of state to attend national scientific conferences with him. SOMF ¶ 20. At one of those conferences, she presented a poster describing the Schwulst lab's research. *Id.*

**B. An Uncomfortable Laboratory Environment**

Trahanas and Dr. Schwulst worked closely together throughout her employment at Northwestern. Trahanas admits that, at times, she and Dr. Schwulst got along "very nicely" and joked together. SOMF ¶ 26. However, Trahanas alleges that beginning in the fall of 2012, just a few months after her employment began, Dr. Schwulst started making different "verbally abusive" and "demeaning" comments that negatively impacted her work environment. Pl.'s Resp. SOMF ¶ 27, ECF No. 108-1. Trahanas alleges that Dr. Schwulst would refer to her as a "typical millennial" and "Princess Diana" in situations where he wanted to illustrate a mistake she made or to dismiss requests for guidance in her work. SOMF ¶ 27, Pl.'s Resp. SOMF ¶ 27. Other comments were gender-based. On one occasion, Dr. Schwulst allegedly asked Trahanas why she did not dress like Rana Saber, Dr. Perlman's lab manager, at work; Trahanas contends that Saber wore "stilettos, short shorts and low tops" in the lab. SOMF ¶ 32. Trahanas also claims that Dr. Schwulst often made comments like "after 28, women lose their sparkle," and that he "chided" her on several occasions leading up to her twenty-eighth birthday that "[her] sparkle is beginning to fade." Pl.'s Resp. SOMF ¶¶ 27, 33.

*2 But the most egregious, and most frequent, topic of Dr. Schwulst's comments was Trahanas's perceived sexual orientation. Trahanas is a straight woman and Dr. Schwulst was aware that Trahanas dated men while she worked for him. SOMF ¶¶ 5, 25. However, Trahanas alleges that in October 2012, in the course of a conversation about Trahanas's workout routine, Dr. Schwulst commented that women who exercise too much look "manly" and "butch" and that they are lesbians. SOMF ¶ 28. He also asked, "You're a lesbian, Diane, aren't you, right? You're a lesbian." *Id.* After that initial conversation, Trahanas claims that Dr. Schwulst referred to her either as a lesbian or as a "softball player"—a euphemism for lesbian—"regular[ly] and frequently" during the weeks

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

that Dr. Schwulst was actually present in the lab. SOMF ¶ 29, Pl.'s Resp. SOMF ¶ 29. Trahanas identifies two conversations that also involved similar comments: one conversation in May or June of 2014 where Dr. Schwulst remarked that it would "make his life easier if his daughter grew up to be a lesbian like [Trahanas]," and a second conversation in December 2014, where Dr. Schwulst told Trahanas that he was considering buying his wife a charm bracelet, and that if Trahanas were to wear one, it would "have a mitt, a ball and a bat on it because that's what softball players would do." SOMF ¶ 30.

Trahanas also contends that co-worker harassment contributed to the disrespectful work environment. Dr. Schwulst's bench space was located in a laboratory shared with two other research scientists at the University, Dr. Perlman and Dr. Stehlik. SOMF ¶ 13. As a result, Trahanas often interacted with members of the Perlman and Stehlik labs. One employee in particular, Rana Saber, is the chief source of her complaints; Trahanas claims that Saber would blame her "if something went wrong in the lab"; remarked that it was the "blind...leading the blind" when Trahanas showed other lab colleagues how to do something; asked Trahanas if she was "going to play softball" ten to fifteen times; and called Trahanas a lesbian "a few" times in front of their lab coworkers. SOMF ¶ 35. Trahanas also cites one email where Saber blames Trahanas for lab equipment being left on overnight. Pl.'s Resp. SOMF ¶ 35. Finally, Trahanas believes that Saber and Alexander Misharin, another member of the Perlman lab, intentionally sabotaged Trahanas's research for over six months by providing her with an outdated protocol for cell analysis. SOMF ¶ 21. Trahanas realized she had received an outdated protocol during a Perlman lab meeting; after the discovery, Dr. Perlman instructed lab members to ensure Trahanas had the more up-to-date version. SOMF ¶ 23

The extent to which relevant individuals in the University or in the Department administration at Feinberg were aware of this conduct is contested. None of their lab colleagues were present at the initial conversation about Trahanas's sexual orientation in October 2012, SOMF ¶ 28, but Trahanas claims that Dr. Schwulst would use the word "lesbian" or "softball player" to refer to Trahanas in front of her co-workers on a regular basis. SOMF ¶ 29. In response to Dr. Schwulst's remarks, Trahanas would "turn away from Dr. Schwulst, try to deflect the comment, act as if she did not hear it, or make an uncomfortable face." Pl.'s Resp. SOMF ¶ 27. But Trahanas did not report Dr. Schwulst's comments about her sexual orientation to anyone in the University's Human Resources

department; she claims she chose not to because she feared he would retaliate. SOMF ¶ 28; Pl.'s Resp. SOMF ¶ 34. Nor did Trahanas make a complaint about Saber's harassing conduct to any of her supervisors, SOMF ¶ 35, or escalate her concerns about the alleged sabotage of her lab work beyond Dr. Perlman or Dr. Schwulst. SOMF ¶ 24.

## C. Conflict Over Trahanas's Pay Raise and Promotion

Despite her allegations about the lab environment, by the spring of 2014, Trahanas had a strong work record at Northwestern: in both 2013 and 2014, Dr. Schwulst rated her performance as "Highly Effective," and in 2014, he complimented her progress in learning the different laboratory equipment and indicated that she "should be considered for a performance based raise." SOMF ¶ 41. In March 2014, Trahanas met with Dr. Schwulst to discuss her pay and performance, and expressed her desire to be retitled and for a pay increase. *Id.* Later that day, Dr. Schwulst emailed former Department Manager of Professional Affairs, Nicole Buikema, stating that he and Trahanas had discussed a pay increase and potential retitling of her position and asking how to begin that process. SOMF ¶ 39. Buikema told him that he could propose that Trahanas receive a pay increase in her 2013 performance review; that any pay increase would be effective at the beginning of the next fiscal year, September 1, 2014; and that retitling was done through a different process and required approval through the HR compensation team. *Id.* Trahanas was included on these emails. *Id.* In June 2014, Trahanas inquired directly with the Department of Surgery Financial Manager, Rachel Rufer, for an update on the potential retitling of her position. SOMF ¶ 42. Rufer responded that it was "something that is in the works for the new fiscal year which starts September 1," *id.*, which, according to Trahanas, led her to believe that her promotion was a sure thing. Pl.'s Resp. SOMF ¶ 42.

**\*3** In August 2014, Dr. Schwulst and Heather Burke, an HR employee, exchanged emails about Trahanas's merit pay increase and potential promotion. On August 13, Burke sent Dr. Schwulst the Research Technologist II and III job descriptions for his review, and asked him to ensure Trahanas was doing an appropriate level of work at the Research Technologist III level. Burke cautioned that "[i]f she is not doing this level of work, than [sic] a promotion to the higher title may not be appropriate at this time." *Id.* Burke followed up with Dr. Schwulst on August 20 and September 2. On September 2, Dr. Schwulst responded that he had reviewed the job descriptions and concluded that "Diane is really inbetween [sic] tech 2 and 3," but that "[i]f possible I would

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

like to make her a tech 3 at the minimum salary of 20.5." SOMF Ex. C, Dep. Ex. 247. Based on his response, Burke recommended leaving Trahanas as a Research Tech II and "work[ing] to promotion next year." *Id.*

At some point in September, Trahanas received her annual salary letter, notifying her that she remained in the Research Technologist II position and that she had received a 3% merit pay increase. SOMF ¶ 43. Shortly after receiving the letter, Trahanas emailed Krissy Dulek, the Research Administration Manager in the Department of Surgery, because she believed the letter was incorrect, as it did not reflect a retitling. *Id.* Trahanas wrote that the letter "is not reflective of the promotion Dr. Schwulst issued me back in March"; that "[w]ith 2 Bachelors Degrees and a Masters Degree the increase is supposed to be at the very minimum mirroring my Research Tech 2 midline pay" and that she had been "fulfilling [her] Research Tech 3 responsibilities since March" but "[had] yet to see the reflected title and pay change." PSAF Tab E, Ex. 48B.

Dulek notified Heather Burke of the issue, and on September 24, Burke informed Dr. Schwulst that Trahanas had been advised to contact him directly with her concerns, but that the letter "reflects the 3% merit increase that was originally submitted" and kept Trahanas at the Research Tech II level, as agreed. PSAF Tab E, Ex. 49. Dr. Schwulst responded almost immediately, writing, "I hate to do this, but I can't afford to lose Diane right now. Can we make her an RT3 at $21/hr. This should placate things for the time being." *Id.* Burke told Dr. Schwulst that the Dean's Office would not approve an off-cycle retitling or pay increase because Trahanas's position was unfunded, and asked him to communicate that update to Trahanas, as she had reached out to HR personnel again about the issue sometime in late September. PSAF Tab E, Ex. 50.

On December 11, 2014, Dr. Schwulst again reached out to Heather Burke and other Department administrators, writing:

> I have a problem. Diane, my research technician, is really unhappy with her compensation and is actively looking for and has received an offer for alternate employment. Other than her compensation, she is happy with the work and the work environment. I cannot afford to have Diane leave right now for a higher paying job,

it will bring my research effort to a screeching halt. I need to get her a higher hourly wage. We need to find a way around this. Please advise.

PSAF Tab E, Ex. 54. Burke reiterated that this would be considered an off-cycle budget request, but indicated a competing job offer might help Trahanas's case. *Id.* On December 16, Dr. Schwulst emailed Trahanas and asked her to start compiling the required information for an off-cycle request while he was on service at the hospital. PSAF Tab E, Ex. 58. Trahanas expressed confusion that her promotion would be considered "off-cycle," writing to Daina Fernandez that "[t]his is something that was during the fiscal year cycle" and that she was "not understanding why Dr. Schwulst needs to submit all this unnecessary paperwork, for something that was submitted and agreed upon back in March." *Id.*

After the new year, Trahanas reached out repeatedly to HR Compensation personnel for further updates about the promotion. She emailed Fernandez again on January 7 and January 13, writing on January 13, 2015, that she felt like she was "being misinformed purposely by the department," and that she was not being properly compensated for her level of work and credentials. PSAF Tab E, Ex. 60. Her messages were relayed to Burke, who notified Dr. Schwulst that Trahanas had been contacting HR Compensation directly, and advised him that it "isn't appropriate for the employee to be making this request directly, rather the employee's supervisor/manager should be submitting the request." PSAF Tab E, Ex. 62. Dr. Schwulst forwarded Burke's email to Trahanas on January 13 and wrote: "I don't know what you've been doing but you need to stop. There is a specific protocol to get this done. We will talk on Friday when I am back from paternity leave." *Id.*

**\*4** On January 14, 2015, Dr. Schwulst emailed Trahanas informing her that they would "be conducting a mid-year performance review" in his office the next morning, January 15. She emailed back to let him know that she was having car issues and, as a result, was "unsure" if she would be able to make the meeting. PSAF Tab E, Ex. 274. He responded that he needed to go over the review with her the next day before he met with his department HR business managers, that he wanted to speak in person, and asked her to "make every effort" to be in his office the next morning. PSAF Tab E, Ex. 276. After she confirmed that night that she would not be able to meet in person, he reminded her that the performance review "was set up by the events [she] set in

motion," and that he was "extremely disappointed" in her lack of professionalism. PSAF Tab E, Ex. 278. He also told Trahanas that her "unapproved time away from the lab" had damaged his research mission, that she had exhausted her paid time off for the year, and that he felt that "the leeway" he had given her to set up her work schedule had been abused. *Id.* Dr. Schwulst and Trahanas did later meet to review the performance evaluation; the meeting was contentious, and Trahanas became upset and cried in Dr. Schwulst's office. Pl.'s Resp. SOMF ¶ 46. The raise was approved, however, and on February 4, 2015, Trahanas was notified that her pay would increase by 15% retroactive to January 2015. SOMF ¶ 47.

### D. Trahanas's Medical School Applications

Trahanas wanted to attend medical school, and Dr. Schwulst knew that Trahanas was applying to medical school while she worked in his lab. In June 2014, for example, Trahanas requested to use vacation time to study for the September 2014 MCAT administration. SOMF ¶ 68. And in the fall of 2014, Trahanas asked Dr. Schwulst to write a letter of recommendation in support of her application. SOMF ¶ 69. In October 2014, he submitted a highly positive letter on her behalf. *Id.* Trahanas also received positive letters of recommendation from Dr. Perlman and from Dr. Debra Goldstein, M.D., another Northwestern professor. SOMF ¶ 70.

Medical school applications have various components, including the application itself, an MCAT score, grades, a personal statement, and letters of recommendation. SOMF ¶ 87. Application materials are submitted through the American Medical College Application Service ("AMCAS"), a third-party service that collects and distributes applicants' materials to the medical schools. SOMF ¶ 65. The application cycle generally has two stages: an initial screening and a secondary stage. SOMF ¶ 87. If an applicant does not meet preliminary admission criteria (such as a minimum GPA or MCAT score), the school may issue a "preliminary rejection" without requesting additional materials. *Id.* If an applicant meets those preliminary criteria, however, a school may invite the applicant to submit a secondary application; after those materials are submitted, an applicant may be selected to interview. *Id.* Secondary materials are generally due in December or January of the application cycle. SOMF ¶ 90.

On paper, Trahanas was not a particularly strong candidate for medical school. She has taken the MCAT seven times, SOMF ¶ 67, and, in the 2014 cycle, applied with a composite MCAT score of 21, which put her in the 24th to 27th percentile of applicants. SOMF ¶ 71. She also struggled in several of her science courses in her undergraduate degree, and her GPA fell in the 3.0-3.19 band. *Id.* Only 4% of applicants from Trahanas's demographic with comparable MCAT scores and undergraduate GPAs were accepted to medical school for matriculation in 2015. SOMF ¶ 71.

Trahanas applied to fifteen medical schools for 2015 matriculation; she was accepted to none. SOMF ¶ 88. Of those fifteen, nine rejected her application or declined to invite her to continue in the application cycle prior to February 19, 2015. SOMF ¶ 89. The six remaining schools invited Trahanas to submit secondary application materials, but she failed to do so by the schools' respective deadlines. The subpoenaed records from five of those schools clearly indicate they considered Trahanas to have withdrawn her application prior to February 19, 2015. SOMF ¶ 90 (Florida International University, Geisinger Commonwealth School of Medicine, University of Miami, Washington University, and University of South Carolina). The remaining school, Florida Atlantic University, invited Trahanas to submit her secondary materials on December 15, 2014; there are no entries in the school's internal application log between December 18, 2014, when the school received a letter of recommendation, and April 1, 2015, the entry for which reads "Withdrew Before Accepted." SOMF ¶ 90.

**\*5** Trahanas applied to eleven schools for matriculation in 2018. SOMF ¶ 91. She only reapplied to four of the schools from the 2014 application cycle, and she was not accepted to any of those schools. *Id.* According to the defendants' expert, Jorge Girotti, AMCAS does not retain letters of recommendation from previous application cycles, and medical schools only consider letters from the application cycle in which they were written. SOMF ¶ 91. Trahanas disputes this, and contends that each medical school can retain and consider letters from previous cycles. Pl.'s Resp. SOMF ¶ 91.

### E. Trahanas's FMLA Leave

Trahanas was diagnosed with depression, anxiety, and ADHD in 2007. SOMF ¶ 48. She took medication for these conditions prior to, and throughout, her employment at Northwestern, and she was treated by a psychiatrist, Dr. Deborah Cano, on a monthly basis from March 2013 until December 2016. SOMF ¶¶ 48-50; SOMF Ex. B.2. Trahanas shared her diagnoses with Dr. Schwulst in October 2012. SOMF ¶ 49.

Trahanas's depressive and anxiety-related symptoms worsened in the months leading up to February 2015. On January 16, 2015, Dr. Cano noted that Trahanas reported that her depressive symptoms had all increased since previous visits and were "severe." SOMF Ex. B.2. Trahanas reported daily panic attacks, symptoms including decreased frustration tolerance and irritability, and cited "multiple stressors," mentioning that she was dealing with "[i]ncreased job stress," and that her "boss [was] not being supportive." In her January 27, 2015, visit with Dr. Cano, Trahanas reported that though her symptoms had minimally improved, she was still having weekly panic attacks and experiencing other symptoms including lack of motivation, avoidant tendencies, and feelings of being overwhelmed, hopelessness, and worthlessness. She again noted "persistent job stress." *Id.*

By February 11, 2015, Trahanas's symptoms had somewhat eased. She reported that both her depression- and anxiety-related symptoms had "mildly improved." Her mood was good, and she planned to try out for the Chicago Red Stars, a professional women's soccer team, on February 12. She again reported "[p]ersistent job stress," but told Dr. Cano that she was "taking time off from [her] job starting next Mon, Feb 16." *Id.*

Despite her worsening symptoms, Trahanas regularly reported to work throughout January and the beginning of February. And though by February 12 she had decided she would take time off, Trahanas did not inform Dr. Schwulst or the University of her intentions, and her lab research proceeded as usual. SOMF ¶ 54. On February 6, 2015, for example, Trahanas sent Dr. Schwulst an email that she had to wait to start the next "clod experiment"—a process in which Trahanas injected the mice with clodronate to deplete their white blood cells before applying an injury to the mice, in order to study how a compromised immune system would react to a traumatic brain injury—because the lab's clodronate supply was insufficient for what she needed. SOMF ¶¶ 73, 75. And on February 9, 2015, Trahanas told Dr. Schwulst that she planned to "do another 48 hour clod experiment next week," SOMF ¶ 76—the week of February 16.

On February 16, Trahanas did not report to work. SOMF ¶ 55. She did not alert Dr. Schwulst that she was beginning a period of FMLA leave; instead, she texted him to let him know that she was staying home sick for the day. *Id.* Trahanas stayed home again on February 17 and, later in the day, told Dr. Schwulst through email that she was on medical leave and would only communicate with Human

Resources while she was out of the lab. SOMF ¶ 56. That day, Dr. Cano faxed an "attending physician's statement of disability" for mental health claims to the University's third-party leave administrator. SOMF Ex. E.2. She cited Trahanas's recurrent major depressive and anxiety disorders, writing that Trahanas's persistent symptoms were "affecting her ability to function at work, at home, [and] socially" and impacting her "ability to deal with any level of stress," and that the expected duration of Trahanas's limitations was one to three months. *Id.* She also noted that Trahanas's condition was not related to her work environment. *Id.* The University approved Trahanas to take a full twelve weeks of FMLA leave, through May 10, 2015. SOMF ¶¶ 54, 57.

### F. Dr. Schwulst's Rescission, and Reinstatement, of his Recommendation Letter

 **\*6** After Dr. Schwulst learned that Trahanas was taking medical leave, he contacted Heather Burke and asked her to get certain information from Trahanas that he needed to keep the lab running smoothly while she was out, such as the lab computer password, the location of certain controlled substances, and the location of the mice cages in the "mouse house." SOMF ¶ 77; Pl.'s Resp. SOMF ¶ 77. Burke contacted Trahanas's work email requesting that information on February 18, and, after receiving no response, sent the same request to her personal email on February 19. SOMF ¶ 77. Trahanas responded on February 20 and informed Burke she had lost computer access. PSAF Tab E, Ex. 299.

On February 19, however, while Dr. Schwulst was waiting for Trahanas's response, he located the mice cages on his own. SOMF ¶ 79. He claims that he saw notations on the cage cards that led him to believe Trahanas had injected the mice with clodronate before her FMLA leave began. *Id.* However, there were no notations on the cage cards or in Trahanas's laboratory notebook with the date and time that the clodronate injections had been administered, *id.*, and he claims he was otherwise unable to discern where in the protocol the mice stood, especially as Trahanas had requested that he limit communications with her. SOMF ¶ 80. Dr. Schwulst alleges that he consulted with Dr. Perlman about the issue, and that Dr. Perlman recommended that he euthanize the mice. SOMF ¶ 81. He did so and, per protocol, removed the cage cards and placed them in locked drop boxes for processing and destruction by the University's Center for Comparative Medicine. *Id.*

That same day, Dr. Schwulst uploaded a second letter to Trahanas's AMCAS account. SOMF ¶ 83. Misdated February

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 50 of 78 PageID #:7171

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

9, 2015, the letter stated that Dr. Schwulst was "formally withdraw[ing] [his] prior letter of reference for [Trahanas]" and that he could "no longer support her candidacy for admission to medical school." *Id.* He alleges that he had a "huge ethical problem" with the fact that the lab mice "were not going to be used for their intended purpose" and were "unnecessarily euthanized" because of Trahanas's failure to document the clodronate injections. SOMF ¶ 82. Trahanas received an AMCAS notification that Dr. Schwulst had uploaded a new letter to her applications, and on February 20, 2015, she emailed Daina Fernandez to inquire about the letter's contents. SOMF ¶ 83.

At some point, Chris Scarpelli, the Administrator for the Department of Surgery, contacted Dr. Schwulst about the February 19, 2015, letter. SOMF ¶ 84. Scarpelli told Dr. Schwulst that he thought Dr. Schwulst's decision to withdraw the original letter could be misconstrued, and instructed him to "cease and desist" from taking further action relating to Trahanas's medical school applications. *Id.* Scarpelli and Dr. Schwulst also agreed that Dr. Schwulst would retract the February 19, 2015 letter. *Id.* On February 26, Dr. Schwulst uploaded a new AMCAS letter that said his earlier letter had been "entered in error," and that he "[stood] by the evaluation offered in the original letter of reference" he submitted in October 2014. SOMF ¶ 85.

On February 27, 2015, attorney Pamela Visvardis sent a letter to Dr. Schwulst on Trahanas's behalf, demanding that he revoke and produce copies of the letters he uploaded to AMCAS on February 19 and February 26, 2015. SOMF ¶ 86. The letter also stated that Trahanas had authorized Visvardis to bring a suit for defamation, slander, and tortious interference with contract if he did not revoke and produce the letters. *Id.*

### G. Trahanas Does Not Return from Leave and Files EEOC Charge

Trahanas's FMLA leave elapsed on May 10, 2015. SOMF ¶ 57. The University granted her an additional paid short-term disability leave through May 24, 2015. *Id.* On June 8, 2015, after her leave had expired, Trahanas instructed the University's third-party leave administrator to close her short-term disability claim. SOMF ¶ 60. On June 9, 2015, Trahanas received a letter from HR employee Victoria Sherb, which stated that Trahanas was required to either inform Sherb that she intended to resign or submit documentation from her

physician, so that the University could determine if her leave could be extended. *Id.* On June 15, 2015, Trahanas responded and stated her doctor was "not allowing [her] to return to work at Northwestern University." *Id.*; Pl.'s Resp. SOMF ¶ 60. On June 18, 2015, Trahanas received a letter from Human Resources that stated her employment was terminated retroactive to May 15, 2015, as she had not returned to work or reopened her leave claim with the third-party administrator. SOMF ¶ 63.

*7 Trahanas filed for unemployment benefits, but her application was denied. SOMF ¶ 62. She secured a return to work letter from Dr. Cano; it read "[Trahanas] was able to return to work on May 25, 2015. I do not recommend she return to her previous job, as the high stress from the work environment there would cause exacerbation of symptoms and likely lead to psychiatric decompensation." *Id.* Trahanas used the letter to contest the denial of unemployment benefits, but does not recall giving the letter to anybody in Human Resources. *Id.* She applied for other jobs within the University and received one interview in another lab, but was ultimately unsuccessful. SOMF ¶ 64.

Trahanas filed her charge of discrimination with the Equal Employment Opportunity Commission on September 24, 2015, alleging sex and disability discrimination and retaliation. SOMF ¶ 92. This lawsuit followed on December 11, 2015.

## DISCUSSION

Two motions are before the Court: the defendants' motion to exclude the expert report and testimony of Professor Benjamin Clarke, offered by Trahanas as a rebuttal expert, and the defendants' motion for summary judgment. The motion to exclude is addressed first to determine the extent of the record under review for the defendants' motion for summary judgment.

### I. Motion to Exclude Professor Benjamin Clarke's Expert Report and Testimony

In November 2018, Trahanas disclosed Professor Benjamin Clarke, an associate professor at the Duluth campus of the University of Minnesota Medical School, as a rebuttal witness to provide an opinion on "the fitness of Plaintiff for enrollment in medical school and the impact of the actions and letter sent by Dr. Schwulst on Plaintiff's professional

2020 WL 7641293, 2020 Wage & Hour Cas.2d 500,759

reputation and ability to enroll in medical school." Defs.' Mot. Exclude 1, ECF No. 113 (quoting Trahanas's Rule 26(a)(2) (D)(ii) expert disclosure). Professor Clarke was deposed and submitted an expert report, and Trahanas relies on two of his opinion in her response in opposition to summary judgment: first, that "[g]iven a chance, Ms. Trahanas would succeed in medical school if she found the appropriate medical school"; and second, that Dr. Schwulst's explanation for withdrawing his letter of recommendation is dubious, because a single incident "does not provide reason to revoke a letter of reference." *See* PSAF Tab O, Clarke Dep., ECF No. 108-18; Tab P, Clarke CV and Report, ECF No. 108-19. His report also included the opinions that there were "extreme displays of non-professional behavior that produced a hostile work environment for Ms Trahanas"; that, if Dr. Schwulst believed there was an ethical breach, "[a]n appropriate response by a supervisor would have been to have a conversation with the employee" to counsel her on the issue; that Dr. Schwulst's motivation in withdrawing the letter was "questionable"; and that the "impact of this action was direct and caused considerable damage to Ms Trahanas's professional standing and presumably her wellbeing." Defs.' Mot. Exclude Ex. C. The defendants move to exclude Professor Clarke's report and testimony as untimely and unreliable, pursuant to Federal Rules of Civil Procedure 26 and 37(c) and Federal Rule of Evidence 702. Defs.' Mot. Exclude 1.

The admissibility of expert opinion testimony is governed by Federal Rule of Evidence 702 and by *Daubert* and its progeny. *Callpod, Inc. v. GN Netcome, Inc.*, 703 F. Supp. 2d 815, 819-20 (N.D. Ill. 2010). Under Rule 702, "scientific, technical, or other specialized knowledge" is admissible through expert opinion testimony if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. *Daubert*'s three-step admissibility analysis that guides the application of Rule 702 first asks whether an expert is qualified by "knowledge, skill, experience, training, or education"; second, if the expert is qualified, whether the "reasoning or methodology underlying the testimony [is] scientifically reliable"; and finally, if the expert is qualified and their methodology is reliable, whether their testimony is relevant to understanding the evidence or a fact in issue. *Callpod, Inc.*, 703 F. Supp. 2d at 820.

 **\*8** Professor Clarke's proffered opinion testimony fails on each of the three prongs of *Daubert*'s reliability analysis. First, Professor Clarke's education and experience do not qualify him as an expert in the area of medical school admissions. Clarke is neither a physician nor a medical school

graduate; he completed the academic requirements to earn a Ph.D. in biochemistry in 1986 at the University of Texas Medical Branch in Galveston. PSAF Tab O, Clarke Dep. Tr. 13:20-15:13. Though his Ph.D. was awarded by a medical school, he did not undergo a full medical school curriculum, nor did he take the MCAT for admission to the program. *Id.* at 16:10-23. He has been a member of the faculty of the University of Minnesota Medical School in Duluth since 1994, and has been in a tenured position since 2000. PSAF Tab P at 2. From 2012 through 2014, Clarke served as a member of the medical school's admissions committee. *Id.* at 14. His service encompassed three admissions cycles. Clarke Dep. Tr. 46:16-47:2. At the University of Minnesota, there are "two levels of review": "an initial prescreener," which involves two faculty members going through the "15 or 1600-some-odd applications that may come in per year" to triage applications and determine which are worthy of further consideration, and the interview stage. Tr. 47:7-17. Clarke did not participate in the initial prescreening. *Id.* After students were selected for an interview, Clarke and other faculty committee members would "interview a portion of the students, review their admissions packets, see if they conformed to what [their] mission for [their] medical school is," and meet and vote on admissions decisions as a committee. Tr. 47:16-48:3. Clarke personally reviewed about forty-five candidates each cycle. Tr. 48:22-49:3.

None of this is enough to qualify him as an expert on the topic of the medical school admissions process generally, much less the specific prospects for admission of a particular individual or her likelihood of success as a medical school student. While his educational background and experience at the University of Minnesota may have familiarized him with certain aspects of the medical school admissions process, Professor Clarke himself admits that he "would not portray [him]self as an authority" on the theory of medical school admissions and that his familiarity with the process is limited to his three-year stint on the commission in Duluth. Tr. 42:10-17; 52:25-53:6. He has not published any peer-reviewed papers on the topic, *id.*, and he did not participate in Minnesota's prescreening process that narrows the field of applicants by about one-half or two-thirds based on different criteria, including MCAT scores and GPA. Tr. 53:16-54:15. Though he testified that he has had "well over a couple hundred students" pass through his training programs and that he has written letters of recommendation for about half of them, Tr. 53:6-11, his insight into the admissions process itself is limited.

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 52 of 78 PageID #:7173

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

Second, Clarke's opinions as Trahanas's chance of success if she were admitted to medical school, the propriety or credibility of Dr. Schwulst's explanation for the withdrawal of his letter, and the impact that the withdrawal had on Trahanas's professional reputation are "little more than h[is] personal opinion"; they are "not based on a methodology that can be tested." *Farmer v. Ramsay*, 159 F. Supp. 2d 873, 884 (D. Md. 2001) (excluding proffered medical school admissions expert testimony from a former member of Yale University School of Medicine's admissions committee because expert "lack[ed] an extensive background in medical school admissions," "reviewed a total of only five applications" in preparation for her testimony, her work "ha[d] not been subjected to any peer review," and her opinions were "not based on a methodology that can be tested"). In his testimony, Professor Clarke indicated that he had developed his opinions through reading Dr. Schwulst's and Jorge Girotti's depositions and essentially making credibility determinations. For example, he disputed Dr. Schwulst's justification for withdrawing his letter because, in Professor Clarke's opinion, to do so would be to "plac[e] a lot of emphasis on that particular incident at that particular point in her life and transition" and "just because someone makes a mistake doesn't make it unethical." Tr. 90:19-91:23; *see also* Tr. 128:4-20 ("I'm not certain exactly why he wanted to retract the letter. I understand there was an animal issue involved on the table. I do not understand how that rises to the level of wanting to retract the letter...To me, that doesn't rise to the significance. So that implies that something else was driving it."). He concluded that particular behavior was "nonprofessional" based on his experience "as a professional who works in that environment, knowing how I would want to be treated and how I would like to have people around me treated" and as a supervisor and teacher for a graduate course. Tr. 81:18-82:14. There is, moreover, no apparent basis in either his deposition testimony or his written report for the opinion that Trahanas's professional reputation was irreparably damaged by Dr. Schwulst's withdrawal and reinstatement of his initial, positive letter. Because there are no indicia of reliability in the methodology underpinning Professor Clarke's opinions, they cannot be admitted under Rule 702.

**\*9** Finally, even if Professor Clarke was qualified and had used reliable methods to form his opinions in this case, they are not helpful to a jury in determining an issue of fact or interpreting evidence in the record. A juror does not need to be an expert in animal research protocols, ethics, or the medical school admission process to make

credibility determinations and draw inferences from those determinations. *See, e.g., Bogathy v. Union Pac. R.R.*, No. 17 C 4290, 2020 WL 419406, at \*5-6 (N.D. Ill. Jan. 24, 2010) (noting that expert witnesses are "not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies"; a "critical function of the jury" is assessing witness credibility, and "assisting the jury" cannot veer into "doing the jury's job for it").

Because Professor Clarke's opinion does not meet the criteria for admissibility under *Daubert* and Federal Rule of Evidence 702, the Court need not, and does not, reach the issue of whether he was timely disclosed or properly considered a "rebuttal" expert under Federal Rules of Civil Procedure 26 and 37(c). The defendants' motion to exclude him as an expert is granted; and Professor Clarke's testimony and expert report are not considered in resolving the defendants' motion for summary judgment.

## II. Defendants' Motion for Summary Judgment

The defendants have moved for summary judgment on each of Trahanas's claims. Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the record and the inferences drawn from it in the light most favorable to the non-moving party. *Courtney v. Biosound, Inc.*, 42 F.3d 414 (7th Cir. 1994). However, if the nonmovant bears the burden of proof as to a particular element of her claim, "she may not simply rest on the pleadings; rather, the nonmovant must affirmatively set forth specific facts that show that there is a genuine issue of material fact." *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 567 (7th Cir. 1989). Rule 56(c) "mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"—"complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

### A. Title VII Hostile Work Environment

Trahanas's first claim against Northwestern University is a Title VII hostile work environment claim. To prevail on a Title VII claim, Trahanas must show that 1) her work environment was both subjectively and objectively offensive; 2) that the harassment was based on her membership in a protected class; 3) that the harassing conduct was severe or pervasive; and 4)

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 53 of 78 PageID #:7174

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

that there is a basis for employer liability. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). Whether a work environment is "hostile" depends on the totality of the plaintiff's circumstances, taking into account factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* An employer's liability for harassment "may depend on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the harasser is the victim's co-worker, there is a basis for employer liability only if the employer was "negligent in controlling working conditions." *Id.* If the harasser is a supervisor, however, "different rules apply." *Id.* If the supervisor's harassment culminates in a tangible employment action, the employer is strictly vicariously liable because "there is assurance the injury could not have been inflicted absent the agency relation." *Id.* at 429. If there is no tangible employment action, the employer will still be held vicariously liable if it is unable to establish an affirmative defense. *Id.*

**\*10** To the extent that Trahanas's complaint and response in opposition to summary judgment may be read as advancing a Title VII claim predicated on co-worker harassment,[1] that claim does not survive summary judgment. An employer is negligent in controlling working conditions—and therefore liable for coworker harassment—if the employer had actual or constructive knowledge of the harassment but failed to address the problem adequately. *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996). And, when a plaintiff claims she is suffering a hostile work environment due to the conduct of both coworkers and her supervisor, "all instances of harassment by all parties are relevant to proving that [her] environment is sufficiently severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1044-45 (7th Cir. 2000). Trahanas at least gestures at this theory in her pleadings. For example, she alleges that, with Dr. Schwulst's knowledge and encouragement, coworkers would criticize her work and made comments like, "[s]top messing things up," "[y]ou're doing everything wrong and you have no idea what you're doing," and "[d]ude, take your meds." SAC ¶¶ 44-59, *see also* Pl.'s Resp. Opp'n 2-3 (noting comments like "Diane is off her meds!" and "Diane needs psychiatric help!"). Trahanas also claims that Rana Saber called her a lesbian "a few times" and asked if Trahanas if she was "going to play softball" "ten, maybe fifteen" times in front of coworkers from the lab. SOMF ¶ 35. Finally, Trahanas alleges the single incident where she discovered that Rana Saber and Dr. Sasha Misharin had given her an incorrect and outdated

protocol for flow cytometry; she claims that Saber and Dr. Misharin were not disciplined for the incident, though both Dr. Perlman and Dr. Schwulst were made aware of it. SAC ¶¶ 60-64; Pl.'s Resp. Opp'n 3.

Most of the coworker harassment that Trahanas describes cannot support a Title VII hostile work environment claim against the University because her coworkers' comments, though perhaps rude and demeaning, were not predicated on Trahanas's "race, color, religion, sex [or] national origin." *See* 42 U.S.C. § 2000e-2(a)(1); *cf. Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 851-52 (a hostile work environment on the basis of disability may be brought under the ADA).[2] Trahanas admits as much in her complaint, characterizing coworkers' comments as harassment based on her depression, anxiety, and ADHD—not, as required for Title VII, on her sex. *See* SAC ¶¶ 45, 53 (claiming she was subjected to a hostile work environment "because of her disability," and describing "demeaning and harassing statements made to Plaintiff about her physical and mental condition and impairment"). Saber's comments calling Trahanas a lesbian or asking if she was going to play softball, by contrast, are gender-based. But Trahanas testified in her deposition that Saber made these comments in front of coworkers, not in front of Dr. Schwulst or Dr. Perlman, SOMF ¶ 35, and that she did not report the comments to either supervisor or to Human Resources. *Id.* Because an employer's "notice or knowledge of the harassment is a prerequisite for liability," and Trahanas failed to present evidence showing that she gave "[Northwestern] enough information to make a reasonable employer think there was some probability that [s]he was being...harassed," summary judgment is appropriate. *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373-74 (7th Cir. 2007).

**\*11** Trahanas's main theory of Title VII liability, however, is predicated on Dr. Schwulst's conduct, and there is substantial disagreement between the parties about the nature and extent of his harassing behavior. Trahanas alleges that Dr. Schwulst called her a lesbian (or made references to her being a "softball player," as a euphemism for lesbian), on a daily or near-daily basis during the weeks he was in the laboratory.[3] Trahanas also alleges that Dr. Schwulst told her it would "make his life easier if his daughter grew up to be a lesbian like [her]" and, in a discussion about a gift for his wife in December 2014, said that if Trahanas wore a charm bracelet it would "have a mitt, a ball and a bat on it because that's what softball players would do." SOMF ¶ 30. She claims that this started after a conversation about the "manliness" of her workout routines in October 2012 and continued for the rest

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 54 of 78 PageID #:7175

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

of the time that she worked in Dr. Schwulst's lab. Trahanas alleges that Dr. Schwulst made these comments, at times, in front of her coworkers from the Perlman and Stehlik labs, and testified at her deposition that she indicated her discomfort with those comments by falling silent when the topic came up, making uncomfortable faces, and eventually by addressing it with Dr. Schwulst, stating "I'm not a softball player, I'm not a lesbian; I don't know why we keep going back to this." SOMF ¶ 31.

The defendants contest Trahanas's account, both as to the frequency of the alleged comments and as to the impact that Dr. Schwulst's conduct had on Trahanas and the work environment more generally. They note that, at times, Trahanas and Dr. Schwulst had a friendly, even joking working relationship, and that Trahanas made significant contributions to the lab's success during her time working there. They highlight that, during her deposition testimony, Trahanas did not quantify the number of times that Dr. Schwulst made inappropriate comments to her (though she described it as "frequent"), and that she first alleged the comments were made on a daily basis in an affidavit that she signed months after her deposition testimony. Defendants also argue that Trahanas herself made joking references to softball, citing one email that Trahanas sent to her lab colleagues that RSVP'd for herself and "+1....And no it's not my softball teammate – so u instigators don't bother with that guess. :)" and citing text messages where Trahanas used softball or baseball emojis in conversation with Dr. Schwulst. SOMF Ex. D at Ex. C, ECF No. 104-5.

But these factual disputes are immaterial, because even if Dr. Schwulst's conduct was sufficiently frequent and severe to constitute a "hostile work environment" under Title VII, Northwestern is entitled to summary judgment on this claim. In situations where supervisor harassment "culminates in a tangible employment action," the employer is strictly liable. *Vance*, 570 U.S. at 424. But where no tangible employment action is taken against the plaintiff, an employer may invoke the *Faragher-Ellerth* affirmative defense,[4] if the employer can demonstrate by a preponderance of the evidence that 1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and 2) the plaintiff unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to otherwise avoid harm. *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 627-28 (7th Cir. 2019).

**\*12** The *Faragher-Ellerth* affirmative defense is available here because no tangible employment action was taken against Trahanas. A tangible employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance*, 570 U.S. at 431, *citing Ellerth*, 574 U.S. at 761. Trahanas was not hired, fired, or reassigned, nor did she experience a significant change in benefits. *See, e.g.*, SOMF ¶¶ 60-61, 63 (Trahanas's employment was terminated in June 2015, retroactive to May 2015, only after Trahanas informed University HR employee Victoria Sherb that she would not be returning to work at the University at the end of her leave). And while Trahanas's requested promotion and pay increase caused a not-insignificant level of strife in her and Dr. Schwulst's relationship, *see* SOMF ¶ 46; Pl.'s Resp. SOMF ¶ 46 (Dr. Schwulst was angry that Trahanas did not show for the mid-year performance review required for an off-cycle pay increase, and raised his voice at Trahanas, causing her to cry), there is also significant evidence in the record that Dr. Schwulst both inquired through the proper channels about retitling Trahanas's position and, when unsuccessful, secured a substantial merit raise in the hopes of keeping her as his research technician. *Id.* at ¶¶ 39, 47 (noting that Dr. Schwulst emailed Nicole Buikema about the possibility of retitling Trahanas to a higher level on March 17, 2014, the day that Trahanas first raised the topic; that Heather Burke concluded that the bulk of Trahanas's work was still consistent with the Research Tech II position; and that Dr. Schwulst was nonetheless able to secure an off-cycle pay increase of 15% on Trahanas's behalf). Because Trahanas has not alleged an action that caused "substantial detriment to the plaintiff's employment relationship," the University may invoke the affirmative defense. *Molnar v. Booth*, 229 F.3d 593, 600 (7th Cir. 2000).

"While not required as a matter of law,...the existence of an appropriate anti-harassment policy will often satisfy the first prong of the *Faragher-Ellerth* defense, given that "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms." *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999). Here, the parties agree that the University "maintains a policy prohibiting discrimination or harassment" against any individual on any lawfully protected basis, including gender and sexual orientation. SOMF ¶ 7. And the parties agree that Trahanas received the University handbook outlining that policy—and including information about how to file discrimination complaints with a variety of individuals within

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

the university, such as the Director of the University Sexual Harassment Prevention Office or the Associate Vice President for Human Resources—on her first day of employment, and that she signed an acknowledgement form confirming that she could "call anyone in the Department of Human Resources" if she had a question about the policies in the handbook. SOMF ¶ 8. [5] Whether Trahanas actually read the University handbook after receiving it is "irrelevant because it is undisputed that she received a copy of the policy and that she was required as a condition of her employment to read and comply with both the policy and the other terms contained in the Employee Handbook." *Shaw*, 180 F.3d at 811. And, as in *Shaw*, Northwestern's anti-harassment policy made it clear that "sexual harassment will not be tolerated, and provided for multiple mechanisms for the prompt resolution of complaints"—including some avenues that allowed a complaining employee to circumvent her supervisory chain of command. *Id.* at 811-12. Because the University has presented "undisputed evidence establishing that it acted reasonably to prevent" and respond to allegations of sexual harassment, when such allegations are actually made, "it has satisfied the first prong of *Ellerth*'s affirmative defense." *Id.* at 813.

To succeed on the second prong, the University must establish that Trahanas "unreasonably failed to take advantage" of preventive or corrective opportunities to mitigate the harm of the harassing work environment. *Shaw*, 180 F.3d at 813. In their statement of material facts, the defendants cite Trahanas's own deposition testimony "that [she] never reported Dr. Schwulst's comments to Human Resources or anyone else in the Department administration at the medical school." SOMF ¶ 31. In response, Trahanas argues that she feared Dr. Schwulst "would retaliate against her if she inconvenienced or spoke out against him," citing, in most relevant part, to her affidavit, though her affidavit does not say as much. Pl.'s Resp. SOMF ¶ 31; PSAF Tab A, Trahanas Aff. ¶¶ 32-41 (describing Dr. Schwulst's comments calling her "[a] [t]ypical [m]illenial," "Princess Diana," "a lesbian" and a "softball player," and reiterating that his behavior made her feel "embarrassed, demeaned and disrespected"). This argument is unpersuasive. First, the parties agree that the University has both 1) appropriate complaint mechanisms that allow an employee to report harassment outside of her chain of command and 2) a policy prohibiting retaliation against any individual for making a complaint pursuant to the University's anti-discrimination policies. SOMF ¶ 9. And second, even if Trahanas's concerns about potential repercussions were sincere and otherwise supported by evidence in the record, "an employee's subjective fears of

confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment." *Shaw*, 180 F.3d at 813.

**\*13** Trahanas also argues in her response in opposition to summary judgment that she in fact did take advantage of corrective measures available to her through the University's human resources department. She claims that "[she] sought the assistance of the Northwestern HR Compensation Team and the Human Resources Department" and that HR personnel exchanged emails "acknowledging that Dr. Schwulst had been wrong" and expressing concern she might escalate the issue. Pl.'s Resp. Opp'n 10-11. Trahanas also insinuates that it was her decision to seek assistance that prompted Dr. Schwulst to "caution[ ] her, 'I don't know what you have been doing but you need to stop.' " *Id.* at 11; PSAF ¶ 23.

But Trahanas's argument that she reported the alleged harassment to the University's HR personnel is based on a gross mischaracterization of the evidence that Trahanas, herself, submitted. Dr. Schwulst's email to Trahanas reads, for example, "I do not know what you have been doing but you need to stop. There is a specific protocol to get this done. We will talk on Friday when I am back from paternity leave." PSAF ¶ 23. The "this" Dr. Schwulst refers to is plainly Trahanas's desired off-cycle promotion or raise, and his comment was prompted by Trahanas's own email to Daina Fernandez "complaining that she has not heard anything [about the promotion] for almost a year." PSAF ¶ 20, *see* PSAF Tab E., Ex. 62 (with subject line reading "D. Trahanas promotion"). Another selectively quoted email between Heather Burke and Daina Fernandez reads, in part: "We do not process these unless there is approval via Department and Central FSM. Annette Czech in Compensation would and will process IF approved...We should not be making these types of promises to employees if we do not have the funding or approval. Please follow up as appropriate. I am concerned that the employee might escalate...." PSAF ¶ 25. Read in context, it is obvious that the HR employees are discussing the same promotion issue. *See* PSAF Tab E, Ex. 65 (subject line reading "FW: Promotion"). Finally, the email referring to HR personnel "looking into this" was sent in response to Trahanas's email alerting HR that Dr. Schwulst had submitted a new letter to the AMCAS system, and seeking their assistance in determining the contents of the letter. PSAF ¶ 39. Trahanas does not point the Court to any other evidence in the record, nor could she—her contention that she reported workplace harassment is wholly unsupported. So, though the

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 56 of 78 PageID #:7177

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

material facts regarding the frequency, severity, and impact of Dr. Schwulst's conduct are disputed, the University is shielded from liability by the *Faragher-Ellerth* defense, warranting summary judgment on Trahanas's Title VII claim.

## B. ADA and FMLA Retaliation

Second, Trahanas alleges ADA retaliation against Northwestern University and FMLA retaliation against both the University and Dr. Schwulst. "Retaliation claims under the FMLA and ADA require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). The parties do not dispute that Trahanas engaged in statutorily protected activity when she took a leave of absence from February 17, 2015, onward. SOMF ¶ 56; *see also* Defs.' Mot. Summ. J. at 18 & n.22 ("[I]t is undisputed that Plaintiff took a protected FMLA leave of absence," and though the defendants maintain that Trahanas is not "disabled" within the meaning of the ADA, "the University does not dispute that taking time off as a result of a disability may be protected activity"). Trahanas's claims of ADA and FMLA retaliation against Northwestern fail on the causation element, however, because she presents no evidence that the University took adverse action against her because of that protected activity. Trahanas's FMLA retaliation claim against Dr. Schwulst, on the other hand, survives summary judgment —a reasonable jury could find that Dr. Schwulst's withdrawal of his positive recommendation letter for Trahanas's medical school applications was an adverse action, and there is a factual question as to whether his proffered explanation is pretextual.

### 1. ADA and FMLA Retaliation against Northwestern University

**\*14** Trahanas' argument that the University retaliated against her for taking a leave of absence from the Schwulst laboratory is primarily based on the fact that she was not hired for other jobs that she applied to within the University during and after her FMLA leave. *See* Defs.' Mem. Supp. Summ. J. 18 (identifying three claimed adverse actions from Trahanas's pleadings, including failure to hire in other positions); Pl.'s Resp. Opp'n Summ. J. 16, ECF No. 108. She also alleges she was "locked out of her work computer," SAC ¶¶ 77, 79, and cites email exchanges between different Northwestern personnel that discussed releasing Trahanas's position if she

did not return from her FMLA and short-term disability leave. Pl.'s Resp. Opp'n 16; Defs.' Resp. to PSAF 29, ECF No. 116.

The discussions among University employees about potentially releasing Trahanas's position if she did not return to leave, and Trahanas's inability to access her University-affiliated account while she was on FMLA leave, are not material adverse actions. The decision to take FMLA leave does not immunize an employee "from those petty slights or minor annoyances that often take place at work"—"not everything that makes an employee unhappy is an actionable adverse action." *Cole v. Illinois*, 562 F.3d 812, 816-17 (7th Cir. 2009) (internal quotations omitted). Trahanas alleges that she was not locked out of her computer when she took FMLA leave in 2014; even if true, this does not elevate what is ultimately a "minor annoyance" into a significant harm. And while internal discussions about releasing Trahanas's position may be evidence of retaliatory intent, *see id.* at 817-18, they did not actually culminate in adverse action: the parties agree that Trahanas chose not to return to work in Dr. Schwulst's laboratory. [6]

Failure to hire, on the other, may constitute adverse action in employment discrimination cases. *See, e.g.*, *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020). And evidence in the record indicates that Trahanas applied to over twenty jobs at Northwestern from February 2015 onward without success. PSAF Tab V 15-18, ECF No. 108-25. The University is nonetheless entitled to summary judgment on Trahanas's retaliation claim because she offers no evidence whatsoever regarding causation. Nothing in the record supports her contention that the reason she was not hired for these positions is because she took FMLA leave or short-term disability leave; in fact, she does not even argue that the individuals responsible for hiring for those positions knew that she took leave from the Schwulst lab. Her FMLA and ADA [7] retaliation claims against the University therefore fail for lack of evidence on causation. *See Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009) (concluding that an unsupported inference that interviewers knew of an employee's protected activity was not enough for a retaliation claim to survive summary judgment, because "a superior cannot retaliate against an employee for a protected activity about which he has no knowledge"); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006).

### 2. FMLA Retaliation against Dr. Schwulst

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

**\*15** Trahanas's FMLA retaliation claim against Dr. Schwulst fares better. To make out a prima facie case of FMLA retaliation, Trahanas must establish that she engaged in a protected activity, that Dr. Schwulst was an employer within the meaning of the FMLA and took a material adverse action against her, and that there is a causal link between the protected activity—here, Trahanas's FMLA leave—and Dr. Schwulst's adverse action. [8] Under the FMLA, but-for causation is not required; [9] it is enough for a plaintiff to demonstrate that "the protected conduct was a substantial or motivating factor in the employer's decision." *Goelzer v. Sheboygan Cty.*, 604 F.3d 987, 995 (7th Cir. 2010). Causation may be established through both direct and circumstantial evidence, such as suspicious timing; the inquiry is whether, after all of the evidence is put "in a single pile and...evaluated as a whole," *Ortiz*, 834 F.3d at 766, Trahanas has adduced evidence that can support a reasonable jury in finding her FMLA leave was a substantial factor in Dr. Schwulst's decision to withdraw his recommendation letter. One way for her to establish causation is "by showing that the stated reasons for the firing were pretextual." *Penny v. Lincoln's Challenge Acad.*, 822 F. App'x 497, 500 (7th Cir. 2020).

There is sufficient, conflicting evidence in the record for Trahanas's claim to survive summary judgment. First, the defendants do not dispute that Dr. Schwulst, as an individual, may be liable for retaliation. Under the FMLA, an "employer" is "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). This definition is "broader than that of Title VII and encompasses some individual liability." *Eppinger v. Caterpillar Inc.*, 682 F. App'x 479, 481 (7th Cir. 2017). Just how much individual liability is not yet clear; the Seventh Circuit has not adopted a test for identifying individual "employers." *See Gibson v. Ind. State Pers. Dep't*, No. 1:17-cv-01212-JPH-TAB, 2019 WL 1099702, at \*5 (S.D. Ind. Mar. 8, 2019) ("The Seventh Circuit recently recognized that the FMLA allows claims against individuals...but has not clarified what level of responsibility is required for a claim to proceed against an individual."). Several circuits have adopted an "economic reality test," which asks whether an individual possesses "the power to control" a worker. *Eppinger*, 682 F. App'x at 481. Under this test, a court weighs several non-dispositive factors, including an individual's power to hire and fire the complaining employee, supervise and control the employee's work schedule or conditions of employment, determine the rate and method of payment, maintain employment records, and whether the employer controlled the employee's rights

under the FMLA. *Katz v. Nw. Orthopaedics & Sports Med. Ltd.*, 18 C 4515, 2020 WL 1986965, at \*9-10 (N.D. Ill. Apr. 27, 2020). In this district, courts have also used the *Riordan* test for evaluating individual liability—asking whether the allegedly liable individual had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation. *Id.* at \*9.

**\*16** Under either test, there is a clear basis for Dr. Schwulst to be held individually liable under the FMLA. The parties agree that Trahanas reported directly to, and worked closely with, Dr. Schwulst, SOMF ¶ 17, and that Dr. Schwulst played a major role in determining whether Trahanas received pay increases or promotions, SOMF ¶¶ 37, 39, 41, 44-47. As the allegations in this case make clear, Dr. Schwulst had at least some control over Trahanas's work schedule, and his conduct and their working relationship was a major determinant in her work environment. And the parties agree that Dr. Schwulst was responsible, in whole, for uploading a second letter to AMCAS withdrawing his initial, positive recommendation letter shortly after Trahanas's FMLA leave began. SOMF ¶¶ 81-83. Whether the relationship between Dr. Schwulst and Trahanas is framed as one in which Dr. Schwulst had "the power to control" Trahanas or simply as one of supervisory authority, Dr. Schwulst is properly considered an "employer" under Section 2611(4)(A)(ii)(I).

Second, contrary to the defendants' arguments, withdrawing a positive medical school recommendation letter may qualify as an adverse action for purposes of the FMLA's retaliation provisions. That Dr. Schwulst's withdrawal did not "materially affect the terms, conditions or privileges of [Trahanas's] employment at the University," Defs.' Memo. Supp. Summ. J. 19, is not dispositive, because "[t]he category of actions prohibited by the [FMLA and ADA's] anti-retaliation provisions is broader than the category of adverse employment actions prohibited by the statutes' anti-discrimination provisions." *Freelain*, 888 F.3d at 901. In the retaliation context, an act is "materially adverse" if it would "dissuade a reasonable employee from exercising his rights under the FMLA." *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) (in Title VII context, antiretaliation provision "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee...that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker" from engaging in protected activity).

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 58 of 78 PageID #:7179

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

A reasonable jury could conclude that Dr. Schwulst's withdrawal of his positive medical school recommendation letter is the type of action that would reasonably deter Trahanas from exercising her FMLA rights. The defendants do not dispute that Trahanas wanted to attend medical school. In fact, the parties agree that Trahanas expended a great deal of time and effort applying to medical school by the time she asked Dr. Schwulst to serve as a recommender: as of fall 2014, she had taken the MCAT six times, and she used her vacation time in August 2014 to concentrate on studying before the September 2014 test administration, SOMF ¶¶ 67-68, SOMF Ex. B. Dep. Ex. 44. She was also on her second round of medical school applications, SOMF ¶ 65; and she applied to fifteen medical schools for 2015 matriculation, SOMF ¶¶ 88, 69. So, even if Dr. Schwulst's decision to withdraw his positive letter was not the determinative factor in Trahanas's applications that cycle, the evidence in the record suggests that the rescission of a strong, positive reference could have reasonably dissuaded Trahanas from taking protected FMLA leave.

Finally, there remains an issue of material fact as to causation. To survive summary judgment on her FMLA retaliation claim, Trahanas must "point to evidence supporting a reasonable inference" that Dr. Schwulst withdrew his medical school recommendation letter, in substantial part, "because she took protected leave." *Tibbs v. Admin. Office of the Ill. Courts*, 860 F.3d 502, 505 (7th Cir. 2017). As in *Tibbs*, Trahanas's principal evidence that Dr. Schwulst's true intent was retaliatory is the timing of the events at issue. *Id.* Though "suspicious timing alone is rarely enough by itself" to prove that a particular action is retaliatory," *id.* at 505-06, "[o]ccasionally...an adverse action comes so close on the heels of a protected act that an inference of causation is sensible." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011); *see also Peele v. Burch*, 722 F.3d 956, 960 (7th Cir. 2013) ("[E]ven if suspicious timing *alone* is not enough to create a triable issue in a particular case, suspicious timing remains an important evidentiary ally of the plaintiff.") (internal quotations omitted). The Seventh Circuit has cautioned that there is no bright-line legal rule about when such an inference is reasonable, but noted that "[t]he closer two events are, the more likely that the first caused the second." *Loudermilk*, 636 F.3d at 315. Here, Dr. Schwulst's initial, highly positive letter of recommendation was submitted in October 2014. SOMF ¶ 69. His second letter, withdrawing the first and stating that he could no longer support Trahanas's candidacy, was submitted on February 19,

2015, just three days after Trahanas's FMLA leave began on February 16, 2015. SOMF ¶¶ 77, 83.

*17 Other evidence bolsters the inference of retaliatory intent. First, the University itself, through Chris Scarpelli, acknowledged the appearance of a retaliatory motive when Scarpelli told Dr. Schwulst to cease and desist from taking further action involving Trahanas. Schwulst Dep. Tr. 232:8-233:12, ECF No. 80 (Dr. Schwulst testified that Scarpelli told him to cease and desist because "regardless of why [Dr. Schwulst] uploaded that letter...it had the potential to be misconstrued"). Second, in light of his clinical obligations, Dr. Schwulst needed Trahanas in the lab for his research to progress. In an email from December 2014 about the off-cycle pay increase, for example, Dr. Schwulst wrote that he "[could] not afford to have Diane leave right now" because it would "bring [his] research effort to a screeching halt." PSAF ¶ 22, Tab E. Ex. 54. And in January 2015, after Trahanas had been out of the lab for just a few days, Dr. Schwulst told Trahanas that her "unapproved time away from the lab ha[d] damaged [his] research mission and [would] likely preclude submission for [that] year's annual congress on shock...." PSAF ¶ 31. This evidence could support an inference that Dr. Schwulst was angered by Trahanas taking unannounced leave for an undetermined amount of time, especially after a prolonged period of conflict over her promotion and pay raise. Trahanas also presents evidence that she was blocked from accessing her University account during her 2015 FMLA leave, though she had not been denied access during previous leave periods, PSAF Tab F, Trahanas Dep. Tr. 341:22-342:25, and that University HR employees knew that Dr. Schwulst was "anxious to do something" if Trahanas did not return when her "FMLA protected leave" expired, and that "[i]n his ideal world, [the University] would release the position after she's extended past her 12 weeks of FMLA." PSAF Tab E Ex. 128A, 128C.

To rebut the inference of retaliatory motive, Dr. Schwulst introduced evidence that he withdrew the first letter due to the "huge ethical problem" created by Trahanas's alleged failure to note when she had administered clodronate injections, leading the lab's mice to be "unnecessarily euthanized because [Dr. Schwulst] couldn't figure out where they were on experimental protocol." SOMF ¶ 82. Defendants believe summary judgment is appropriate because Trahanas "presents no evidence that Dr. Schwulst's belief" that Trahanas failed to appropriately record the clodronate injections "was not honestly held." Defs.' Memo. Supp. Summ. J. 21. Moreover, Trahanas had taken FMLA leave on at least one other

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

occasion "without any negative impact on her job"; if Dr. Schwulst "harbored animus based on [Trahanas's] use of medical leave," the defendants argue, "presumably he would have taken action against her on that previous occasion." *Id.* The first argument is factually inaccurate, however, and the second creates, at most, a weak inference in Dr. Schwulst's favor, which is not nearly enough to warrant summary judgment.

Trahanas asserts that Dr. Schwulst's justification is pretextual. And to rebut the notion that Dr. Schwulst's belief that Trahanas had administered clodronate injections was "honestly held," Trahanas points to two emails she sent to Dr. Schwulst in the week-and-a-half before her leave began and to her own laboratory notebook. In the first email, sent February 6, 2015, Trahanas told Dr. Schwulst that she had to wait to begin the next clodronate experiment because there was not enough clodronate in the lab. SOMF ¶ 75. In the second, sent February 9, 2015, Trahanas told Dr. Schwulst that she planned to "do another 48 hour clod experiment next week"—the week that Trahanas, instead, began her FMLA leave. SOMF ¶ 76. Finally, Trahanas notes, and the defendants agree, that Trahanas's lab notebook did not contain information about dates and times of clodronate injections in the week before her FMLA leave. SOMF ¶ 79; Pl.'s Resp. SOMF ¶ 79.

Dr. Schwulst contends that the emails and empty notebook are evidence of Trahanas's ethical failure, or, at the very least, are enough for him to form an honest belief that an ethical failure had occurred. Taken at face value, however, the February 6 email and empty notebook support Trahanas's contention that, instead of starting another experiment, she took FMLA leave, and that Dr. Schwulst had no genuine reason to think she had administered clodronate injections. At summary judgment, the Court must view all facts in the light most favorable to the nonmoving party, and Trahanas is entitled to have all reasonable inferences drawn in her favor; evaluated through this lens, the evidence casts sufficient doubt on Dr. Schwulst's explanation as to "make summary judgment an impermissible vehicle for the resolution of this case." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 744 (7th Cir. 2008). Ultimately, whether Dr. Schwulst's explanation is "fishy enough to support an inference that the real reason must be discriminatory" *Loudermilk*, 636 F.3d at 315, is a triable issue of fact for a jury to decide.

## C. Defamation

*18 Next, Trahanas raises an Illinois state law-based defamation claim against both Northwestern and Dr.

Schwulst, primarily based on Dr. Schwulst's February 19, 2015, two-sentence letter that reads, in its totality: "I am writing to formally withdraw my prior letter of reference for Ms. Diane Trahanas. I can no longer support her candidacy for admission to medical school." SOMF Ex. B.3 at 56, ECF No. 104-4. To prevail on a defamation claim, the plaintiff must present evidence showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and the publication caused damages." *Benton v. Little League Baseball, Inc.*, 2020 Ill. App. (1st) 190549, at *P43. Illinois recognizes both *per se* and *per quod* defamation: a statement is defamatory *per se* if the statement is so obviously injurious to the plaintiff's reputation that damages are presumed, and defamatory *per quod* if extrinsic evidence is required to demonstrate harm. *Id.* at *P42. Statements that impute a person lacks ability or otherwise prejudices a person in her profession are considered defamatory *per se*. *Dobias v. Oak Park & River Forest High Sch. Dist. 200*, 57 N.E.3d 551, 563 (Ill. App. Ct. 2016).

The most fundamental element of a defamation claim is that "the defendant made a false statement about the plaintiff." *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-cv-06500, 2014 WL 4269126, at *12 (N.D. Ill. Aug. 28, 2014), *citing Solaia Tech. LLC, v. Specialty Publ. Co.*, 852 N.E.2d 825, 839 (Ill. 2006). And under Illinois law, "[w]hether a statement is a factual assertion that could give rise to a defamation claim is a question of law for the court." *Benton*, 2020 Ill. App. (1st) 190549 at *P46. To defend her defamation claim on summary judgment, Trahanas argues that Dr. Schwulst's second letter was written "without any proof of of [sic] breach of scientific ethics by Diane" and "out of anger, spite, and actual malice"; she concludes that, taking all three of his letters together, "Dr. Schwulst sent so many mixed messages" that his involvement "in effect destroyed the goal for which she was seeking his recommendation." Pl.'s Resp. Opp'n 17. All that may be true, but it does not change the fact that Dr. Schwulst's letter withdrawing his recommendation did not contain any false statements about Trahanas.

The February 19, 2015, letter is a statement of Dr. Schwulst's opinion about Trahanas's candidacy for medical school. Statements of opinions are not per se shielded from defamation claims. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990). Opinions are extended First Amendment protection, however, so long as they "cannot be reasonably interpreted as stating actual facts about the plaintiff"; to determine whether a statement is protected as an opinion,

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 60 of 78 PageID #:7181

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

Illinois courts consider, in part, "whether the statement contains an objectively verifiable assertion." *Hopewell v. Vitullo*, 701 N.E.2d 99, 103 (Ill. App. Ct. 1998). Here, Dr. Schwulst's statement that he can no longer support Trahanas's candidacy may well suggest "undisclosed...facts that support [his] opinion." *Id.* at 104; *see id.* at 105 ("[I]n one sense all opinions imply facts, however...'[t]he vaguer and more generalized the opinion the more likely the opinion is non-actionable as a matter of law.' "). But a curious medical school admissions committee member could not, from Dr. Schwulst's letter alone, discern "which implied fact or set of facts was necessary to support [his] opinion"; his two-sentence letter is too "ambiguous and indefinite" to present an objectively verifiable statement of fact about Trahanas. *Id.* at 104-05.

Because Dr. Schwulst did not make a false statement of fact about Trahanas to the medical schools she applied to, summary judgment is appropriate. And, because there is no defamatory statement for Northwestern University to be vicariously liable for, the University's alleged "fail[ure] to take any corrective action," SAC ¶ 135, against Dr. Schwulst once the University learned he had withdrawn his positive letter of recommendation is immaterial. [10] The University is similarly entitled to summary judgment on Trahanas's defamation claim.

### D. Intentional Infliction of Emotional Distress

**\*19** Finally, Trahanas alleges Illinois state-law claims for intentional infliction of emotional distress (IIED) against both the University and Dr. Schwulst. To establish IIED, a plaintiff must prove that 1) the defendant's conduct was extreme and outrageous, 2) that the defendant intended to inflict severe emotional distress, or knew that there was at least a high probability that his conduct would cause severe emotional distress, and 3) the conduct actually did cause severe emotional distress. Everyday insults and indignities are not enough—the conduct at issue "must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Dunn v. City of Elgin*, 347 F.3d 641, 651 (7th Cir. 2003). And even if a defendant's conduct is sufficiently outrageous, an IIED plaintiff will not prevail unless she can demonstrate "distress so severe that no reasonable person could be expected to endure it." *Lifton v. Bd. of Educ. of Chi.*, 416 F.3d 571, 579-80 (7th Cir. 2005).

The defendants noted that it was "not entirely clear" which specific conduct Trahanas claims was "extreme and outrageous," especially as to her claim against the

University. Defs.' Memo. Supp. Summ. J. 15. In response, Trahanas devotes just two paragraphs to defending her IIED claims against summary judgment, and her argument largely reiterates—without record cites or additional case law—the Court's own language from the order on the defendant's motion to dismiss the first amended complaint. [11] Based on her response, the Court will consider only Trahanas's claims that she was subjected to frequent harassment, that she was forced to work twenty-four-hour shifts, that her experiment was sabotaged for six months, that she was yelled at by Dr. Schwulst, and that she was not able to defend herself against criticism.

With this conduct serving as the predicate, the defendants are correct that Trahanas's IIED claim against the University is preempted by the Illinois Human Rights Act. "The Illinois Human Rights Act preempts tort claims that are 'inextricably linked' to allegations of sexual harassment and requires that such claims be brought only before the Illinois Human Rights Commission." *Quantock v. Shared Mktg. Servs.*, 312 F.3d 899, 905 (7th Cir. 2002). Preemption extends to IIED claims that are predicated on sexual harassment allegations, *id.*; however, if an IIED claim is predicated on both sexual harassment and "conduct [that] would be actionable even aside from its character as a civil rights violation because the IHRA did not 'furnish the legal duty that the defendant was alleged to have breached," then the IHRA will not preempt it. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006). Because Trahanas did not develop a theory by which the University could be liable for the alleged sabotage of her research, her unusually long hours worked, or her interpersonal conflict with Dr. Schwulst, her IIED claim against the University is "inextricably linked" with her sexual harassment allegations and, as a result, preempted. *See, e.g.*, *Richards v. United States Steel*, 869 F.3d 557, 565 (7th Cir. 2017) (holding that an employee's sexual harassment allegations did not state an emotional-distress claim against her employer independent of the Illinois Human Rights Act); *Brownlee v. Catholic Charities of the Archdiocese of Chi.*, No. 16 C 00665, 2018 WL 1519155, at \*6 (N.D. Ill. Mar. 28, 2018) (noting that an employer is only liable for the tortious conduct of an employee "acting in the course and scope of his employment" or an employee's intentional torts that were "ratified" by the employer); *Geise v. Phoenix Co. of Chicago*, 159 Ill. 2d 507, 516-18 (1994).

**\*20** Summary judgment is also appropriate as to Trahanas's IIED claim against Dr. Schwulst because the conduct she alleges is not "extreme or outrageous," even when viewed

**Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 61 of 78 PageID #:7182**

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

in the light most favorable to her. The threshold for outrageous conduct is high, and "[l]iability for emotional distress, as a common-law tort, is even more constrained in the employment context." *Richards*, 869 F.3d at 567. "[I]f everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action." *Naeem*, 444 F.3d at 605. As a result, Illinois courts have been reluctant to find workplace behavior outrageous unless an employer or supervisor abuses the power imbalance over an employee "in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Id.* Most of the conduct that Trahanas points to as support for her IIED claim—that she worked longer hours than her peers in other labs, [12] that Dr. Schwulst raised his voice at her in a performance review, and that she felt unable to defend herself against criticism about her work— falls into this category of potentially distressing, but ultimately commonplace, workplace interactions. *See Richards*, 869 F.3d at 567 ("[P]ersonality conflicts and questioning of job performance are unavoidable aspects of employment and...frequently, they produce concern and distress.") (internal quotations and citation omitted). And because Dr. Schwulst was not even aware of, let alone involved in, Saber and Misharin's alleged sabotage of Trahanas's research, there is no basis for including that incident in an evaluation of his conduct.

That leaves Dr. Schwulst's harassing behavior, which Trahanas alleges took place on a daily or near-daily basis while he was in the lab. "A claim for intentional infliction of emotional distress...requires more than what is required for sexual harassment." *Lara v. Diamond Detective Agency*, 412 F. Supp. 2d 894, 902 (N.D. Ill. 2006); *cf. id.* at 903 (describing an Illinois case upholding an IIED claim against a defendant who not only repeatedly propositioned the plaintiff and offered her money for sex, but also "fired her when she refused her advances, threatened to kill and rape her, harassed her family and psychotherapist, threatened

to challenge custody of her child, and harassed her new employer with letters, phone calls and spurious complaints to government officials"); *Freeman v. Holy Cross Hosp.*, No. 10 C 4157, 2011 WL 1559208, at *2 (N.D. Ill. Apr. 25, 2011) (no extreme or outrageous conduct where the defendant "made comments of a sexual nature, asked [the plaintiff] out on dates, sent sexually suggestive and explicit links to her personal email account, treated her differently than other employees, failed to investigate her harassment claims, attempted to grab her buttocks, and rubbed his hands on her thighs"). In fact, Illinois courts "have limited recovery...to victims of only the most intolerable conduct." *Lara*, 412 F. Supp. 2d at 903. Dr. Schwulst's comments calling Trahanas a lesbian or a "softball player" may have been ignorant, unfunny, and unbecoming of a successful physician at a highly-regarded university, but his conduct did not rise to the level of "outrageous" or intolerable, as evidenced by the fact that Trahanas continued to work for him for more than two years after the comments began in October 2012. SOMF ¶ 28. No reasonable jury could conclude, based on the evidence in the record, that Dr. Schwulst's conduct was beyond endurance, so summary judgment is appropriate as to Trahanas's IIED claim against him.

**\*21** * * *

For the foregoing reasons, the defendants' motion to exclude is granted, and the defendants' motion for summary judgment is granted as to Trahanas's Title VII hostile work environment and ADA and FMLA retaliation claims against the University, and as to Trahanas's defamation and intentional infliction of emotional distress claims against both the University and Dr. Schwulst. Trahanas's FMLA retaliation claim against Dr. Schwulst may proceed to trial.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

---

## Footnotes

1   The defendants argue that Trahanas's "comprehensive 27-page, 146-paragraph Second Amended Complaint is wholly devoid of any reference to co-worker harassment based on sexual orientation" and that she "cannot now claim that she was subject to a Title VII hostile work environment based not only on Dr.

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 62 of 78 PageID #:7183

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

Schwulst's comments but also Saber's comments." Defs.' Memo. Supp. Summ. J. 10 n.13. Trahanas's failure to mention co-worker harassment as a theory of Title VII liability in her second amended complaint does not preclude her from arguing on that basis at summary judgment, as "plaintiffs are not required to plead legal theories." *Whitaker v. Milwaukee Cty.*, 772 F.3d 804, 808 (7th Cir. 2014). But it is also true "[a] plaintiff cannot add additional claims through arguments made in opposing summary judgment," *Messner v. Caledrone*, 407 F. App'x 972, 974 (7th Cir. 2011), and Trahanas's allegations about Saber's comments arguably create a "new factual theory of liability," as those allegations do not appear in the complaint. *Compare* SAC ¶¶ 29-39 (outlining Dr. Schwulst's comments referring to Trahanas as a lesbian, with no mention of Saber doing the same), *with, e.g.*, *id.* ¶¶ 45, 55 (describing "certain coworkers" harassing and mocking Trahanas because of her alleged disabilities). However, because there is "no material dispute" about the relevant facts, and because the alternative theory of liability did not result in "unfair surprise" to the defendants, *Whitaker*, 772 F.3d at 808, the Court addresses the coworker harassment theory on the merits.

2 Trahanas's initial complaint made an ADA hostile work environment claim, but that claim was dismissed by the Court, *see* Order Mot. Dismiss 7-8, ECF No. 38, and was not realleged in the plaintiff's second amended complaint, which is the operative complaint for evaluating the defendants' motion for summary judgment. *See* SAC ¶¶ 106-11 (Count I, claiming only a Title VII hostile work environment).

3 Trahanas is a heterosexual woman. SOMF ¶ 5. The defendants characterize Trahanas's Title VII claim as one predicated on her "perceived sexual orientation." *See, e.g.*, Defs.' Memo. Supp. Summ. J. 9-11 & nn.11, 15. Trahanas does not contest this characterization, but the complained-of conduct has more to do with Trahanas' perceived failure to conform to sex stereotypes than with her sexual orientation, which was known to everyone in the lab. *See* SOMF ¶¶ 28, 32 (noting that the first time Dr. Schwulst allegedly referred to Trahanas as a "lesbian" was after a discussion of workout routines, where Dr. Schwulst commented that women who exercise too much will start to look "manly" and "butch," and highlighting an instance where Dr. Schwulst asked Trahanas why she did not dress more like Rana Saber at work, i.e. in "stilettos, short shorts and low tops"); *id.* ¶ 25 (Trahanas "dated men when she worked for Dr. Schwulst and she shared with him in 2014 that she had a boyfriend"). *Compare Weller v. Paramedic Servs. of Ill., Inc.*, 297 F. Supp. 3d 836, 839 (N.D. Ill. 2018) ("[Plaintiff] unequivocally pleads that his declination to conform to [his employer's] gender norms ultimately resulted in his employment being terminated. Per the Seventh Circuit's inclusion of sex stereotyping under the Title VII umbrella of gender discrimination, this is enough for [the plaintiff] to state an actionable claim.").

4 *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998).

5 Trahanas's objections to this paragraph in the defendants' statement of material facts do not contest that Trahanas received the University handbook or that the relevant anti-discrimination policies were contained within it. *See* Pl. Resp. SOMF ¶ 8 ("objecting" by stating that Trahanas eventually met with Daina Fernandez, a Department of Human Resources employee, later in her employment and other non-responsive bases).

6 The defendants cite evidence that Trahanas informed HR employee Victoria Sherb that she would not be returning to the Schwulst lab after Sherb informed Trahanas she was required to let the University know whether she intended to resign or seek an extension of her leave. SOMF ¶¶ 60-61 (noting, additionally, that Trahanas's employment would be terminated if she failed to respond to Sherb's inquiries). The plaintiff does not dispute that she informed Sherb she would not be returning, but she maintains that her decision not to return to work at the Schwulst lab was made at the direction of Dr. Cano, her psychiatrist. Pl.'s Resp. SOMF ¶ 61. In either case, the University was not the cause of Trahanas's decision not to return to her job.

7 The defendants also argue that the University could not have engaged in ADA retaliation against Trahanas for taking leave because she is not "disabled" within the meaning of the ADA. *See* Defs.' Memo. Supp. Summ. J. 17. The viability of an ADA retaliation claim generally does not turn on whether an individual is disabled,

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 63 of 78 PageID #:7184

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

*Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010), because Section 12203 of the ADA protects "any individual" who has opposed an unlawful practice under the ADA or who has made a charge, testified, assisted, or otherwise participated in an investigation under the act, 42 U.S.C. § 12203(a). Because Trahanas is not disabled under the ADA, however, her leave of absence from the Schwulst lab may not constitute an ADA "protected activity"; in fact, the documents in the record relating to her leave refer only to the FMLA. *See* SOMF Ex. B.3, Dep. Ex. 38 (June 9, 2015 letter from Northwestern HR that states Trahanas "w[as] initially approved for an FMLA Leave of Absence...from 2/16/2015 – 5/24/2015"). At least some courts have concluded that FMLA leave is not a "protected activity" for ADA purposes. *See Acker v. General Motors, L.L.C.*, 853 F.3d 784, 791 (5th Cir. 2017) (holding that "a request for FMLA leave is not a request for a reasonable accommodation under the ADA," because "an employee seeking FMLA leave is by nature arguing that she *cannot* perform the functions of the job, while an employee requesting a reasonable accommodation communicates that she *can* perform the essential functions of the job"); *accord Arms v. Milwaukee Cty.*, No. 18-cv-1835, 2019 WL 1981036, at *5 (E.D. Wis. May 1, 2019) (but noting the Seventh Circuit has not decided the issue). The reasoning seems persuasive, but the Court need not decide the issue here—any ADA retaliation claim Trahanas might have fails on causation.

8    The defendants, relying on cases that distinguish between direct and indirect methods of proof in employment discrimination cases, argue that this standard is appropriate because Trahanas is not attempting to establish retaliation through the indirect method of proof. Defs.' Memo. Supp. Summ. J. 18 n.21; *see, e.g.*, *Bowden v. Kirkland & Ellis*, No. 07 C 975, 2010 WL 3526483, at *14 (N.D. Ill. Sept. 3, 2010). But the Seventh Circuit has instructed that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards"—to succeed on her retaliation claim, Trahanas may introduce whatever evidence there is that "would permit a reasonable factfinder to conclude that the plaintiff's [protected activity]" caused the challenged adverse action. *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

9    In *University of Texas Southwest Medical Center v. Nassar*, the Supreme Court held that Title VII retaliation claims require a showing of but-for causation. 570 U.S. 338, 360 (2013). The Seventh Circuit "has declined to decide whether *Nassar* raises the causation standard for FMLA retaliation claims," so this district "continues to apply the motivating factor test" to such claims. *Xula v. Chase Bank, JPMorgan Chase*, No. 15 C 4752, 2019 WL 5788074, at *10 (N.D. Ill. Nov. 6, 2019); *see also Haworth v. Round Lake Area Sch.*, No. 17 C 7038, 2019 WL 3080928, at *5 n.2 (N.D. Ill. July 15, 2019) (noting "the motivating factor test still represents 'the controlling law of the Seventh Circuit' " and, additionally, seeing "little textual reason to apply *Nassar* to a § 2615(a)(1) retaliation claim"). Defendants do not argue the issue here, and acknowledge that the "substantial factor" causation standard should apply. Defs.' Memo. Supp. Summ. J. 19-20 n.23.

10   Even if there were a defamatory statement, Trahanas's claim against Northwestern would fail. Under Illinois law, a "principal may be held vicariously liable for his agent's defamatory statements." *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1062 (N.D. Ill. 2019). However, to hold an employer liable for its employee's defamatory statement, a plaintiff "must show that [the employee]'s statements were made 'within the scope of [his] employment.' " *Id.* Conduct is "within the scope of employment" if it is of the kind the employee is employed to perform; occurred substantially within authorized time and space limits; and is performed, at least in part, with a purpose to serve the employer. *Weller v. Paramedic Servs. of Ill.*, 297 F. Supp. 3d 836, 848 (N.D. Ill. 2018). Trahanas's claim against Northwestern is premised on the University's alleged failure to take corrective action once it learned that Dr. Schwulst had withdrawn his initial, positive recommendation letter. But not only is it factually incorrect that the University did nothing in response to Dr. Schwulst's withdrawal of the recommendation letter, *see* SOMF ¶ 84 (noting that Chris Scarpelli instructed Dr. Schwulst to "cease and desist" on the basis that his withdrawal may be misconstrued, and encouraged Dr. Schwulst to reinstate his original letter), such a failure would also be legally insufficient to make Northwestern vicariously liable for a defamatory statement. Trahanas presents no evidence that writing letters of recommendation was the type of

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 64 of 78 PageID #:7185

Trahanas v. Northwestern University, Not Reported in Fed. Supp. (2020)

2020 WL 7641293, 2020 Wage & Hour Cas.2d (BNA) 500,759

work that Dr. Schwulst was employed by Northwestern to perform, or that writing these types of letters served Northwestern's interests, at least in part. With no evidence on these points, there is no basis for holding the University vicariously liable for Dr. Schwulst's individual, intentional conduct.

11 *Compare* Order Mot. Dismiss 17 ("Here, Trahanas has alleged that she was subjected to frequent harassment, was forced to work 24 hour shifts where coworkers only worked 8 hour shifts, had an experiment sabotaged for over 6 months, was yelled at by her supervisor, and was unable to defend herself when her work was criticized."), *with* Pl.'s Resp. Opp'n 18 ("Trahanas was subjected to frequent harassment, was forced to work 24 hour shifts where coworkers only worked 8 hour shifts, had an experiment sabotaged for over 6 months, was yelled at by her supervisor, and was unable to defend herself when her work was criticized." And *compare* Order Mot. Dismiss 17 ("At the motion to dismiss stage, drawing all inferences in favor of the plaintiff, the Court finds this could state 'extreme and outrageous' conduct that was 'intended to inflict severe emotional distress,' especially after Trahanas told Schwulst that she was experiencing severe anxiety."), *with* Pl.'s Resp. Opp'n 19 ("Drawing all inferences in favor of Diane Trahanas, defendant's conduct was 'extreme and outrageous' and 'intended to inflict severe emotional distress,' especially after her coworkers admitted the sabotage of her work and she told Schwulst that she was experiencing severe anxiety."). Not only is this unhelpful, but an admission by one of Trahanas's coworkers to sabotaging her work appears nowhere in the record that the Court has reviewed. *Contra* Saber Dep. Tr. 61:20-62:9 (Q: Do you remember being in attendance at a staff meeting where you and Alexander [Misharin] were laughing because Diane was working with an outdated cocktail? **A: No, I don't remember that.** Q: Do you remember Dr. Perlman telling you that you should have advised Diane Trahanas that the cocktail that she was working on for the last six months on her experiments with Dr. Schwulst's project was an outdated cocktail? **A: No, I don't remember that."**). Unsurprisingly, Trahanas does not cite to any evidence that supports her statement.

12 The notion that Trahanas was "forced" to work twenty-four-hour shifts is also unsupported by the evidence in the record. In his deposition, Dr. Schwulst clarified that when Trahanas referred to 24-hour and 72-hour experiments, she was referring to "the length of time between when the mice were injured and the time when they were sacrificed and their tissue harvested." Schwulst Dep. Tr. 105:9-20, ECF No. 80. Dr. Schwulst testified that, during a 24-hour experiment, his expectation would be for Diane to "strike the mouse, go home, and come back 24 hours later to harvest the results on the mouse's brain," not for her to remain in the lab for twenty- four consecutive hours. *Id.* 106:14-18. He estimated that Trahanas stayed at the lab late (past midnight) to process tissue "in the neighbor of five of six experiments. So five or six times during the course of her employment." *Id.* 107:4-12. Dr. Schwulst also testified, repeatedly, that he gave Trahanas "great latitude in planning her days" and that it was their typical practice for Trahanas to take time off "on days preceding and after long experiments" to ensure that she was working an appropriate number of hours per week. *See, e.g.*, *id.* 194:11-195:3; 272:3-5; 273:11-274:7. This testimony was uncontradicted; in fact, it was corroborated by Trahanas's emails to Dr. Schwulst. *See, e.g.*, *id.* 271:13-16 (introducing email from Trahanas that reads "I will take the necessary time off next week to even out the time I spent extra this week").

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Bogathy v. Union Pacific Railroad, Not Reported in Fed. Supp. (2020)

2020 WL 419406

KeyCite Yellow Flag - Negative Treatment

Distinguished by In re Allstate Corporation Securities Litigation, N.D.Ill., January 10, 2022

2020 WL 419406
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Randall BOGATHY, Plaintiff,
v.
UNION PACIFIC RAILROAD, Defendant.

Case No. 17-cv-4290
|
Signed 01/24/2020

**Attorneys and Law Firms**

Christopher Cooper, Law Office of Christopher Cooper, Inc., Ricardo Vazquez, Law Offices of Ricardo Vazquez, Chicago, IL, for Plaintiff.

Tracy Bradford Farley, Quarles & Brady LLP, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Robert M. Dow, Jr., United States District Judge

 *1  Before the Court is Defendant's motion to bar Plaintiff's proposed expert [59]. Defendant's motion is granted. This case is set for further status on February 5, 2020, at 9:00 a.m.

**I. Background**

Plaintiff Randall Bogathy is a police officer who was employed by Defendant Union Pacific Railroad from October 2001 through June 2017. Beginning in 2012, Plaintiff was assigned to commuter operations at the Ogilvie Transportation Center ("OTC"). Plaintiff was a "special agent," which is a non-union position. During the last year of his employment, Plaintiff worked the 6:00 a.m. to 6:00 p.m. shift, and his duties included monitoring cameras, answering any emergency calls, and foot patrol around the facility. When not on foot patrol, Plaintiff worked in the special agent office. In February or early March 2017, Plaintiff was asked if he had feedback about where in the special agent office cameras should be installed. Plaintiff requested that a camera be installed to monitor the gun safe. [60-2] at 12-16. In late

March 2017, Union Pacific installed two cameras in that office. One was directed at the gun safe in the office, and the other was directed at the area where personnel from a private security firm, Gomez Security, were stationed. Id. at 15-18.

In early April 2017, Brian Jarrett received a tip alleging that Plaintiff was tampering with one of the cameras in the special agent office in order to take naps during his shift. Mr. Jarrett was the Regional Deputy Chief of the Northern Region, and Plaintiff's supervisors reported to him. The tip came from Special Agent David Gonzalez, one of Plaintiff's co-workers. On April 12, 2017, Mr. Jarrett and Dan Veschak, the lieutenant through whom the tip had come to Mr. Jarrett, attempted to view the video feed of the special agent office and noticed that one of the cameras was not working properly. They went to the office, where Plaintiff was on duty, and used a laptop to try to view the video feed. While in the office, Mr. Jarrett observed Plaintiff walk to a fuse box and place a fuse back in the box, at which point the camera began functioning again.

Mr. Jarrett asked Plaintiff about his actions at the fuse box. According to Defendant, Plaintiff initially claimed he was checking for a blown fuse, but then apologized for tampering with the fuses and said he did not want to be monitored at work. Plaintiff denies that he apologized or admitted to tampering with the fuses and claims that he immediately told Mr. Jarrett that he had turned off the camera. Mr. Jarrett placed Plaintiff on paid administrative leave, and subsequent investigation showed that the times of the camera outages corresponded to Plaintiff's work schedule (but not to any other employee's schedule). Plaintiff was terminated in June 2017 for tampering with company equipment and dishonesty. After he was suspended, but before he was terminated, Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA"), which claimed that Union Pacific had illegally recorded him, used unqualified employees to handle police dispatch communications, and retaliated against him for being a whistleblower. [17-1] at 4, 6.

 *2  Plaintiff later filed a complaint in this Court against Union Pacific over his termination, which was subsequently amended. The operative second amended complaint [17-1] consists of four claims: Retaliation under the Illinois Whistleblower Act (Counts I and II); Invasion of Privacy (Count III); and "Retaliatory discharge/Violation of Public Policy" (Count IV).

Plaintiff disclosed James Paoletti as an expert witness to opine on "the complaint and disciplinary process" that Union

2020 WL 419406

Pacific and that resulted in Plaintiff's termination. [60-7] at 11-12; [60-6] at 7, 68-69. Mr. Paoletti is a retired police officer with 38 years of experience at the Chicago Police Department and 10 years of experience at the Village of Crete Police Department. On April 26, 2019, Defendant filed a motion to bar Plaintiff's proposed expert [59], which is now before the Court. Defendant argues that Mr. Paoletti's opinions should be excluded both because they do not meet the requirements of Federal Rule of Evidence 702 and also because Plaintiff failed to make all of the required disclosures under Federal Rule of Civil Procedure 26.

## II. Legal Standard

### A. Expert Testimony

Federal Rule of Evidence 702[1] and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provide the legal framework for the admissibility of expert testimony. *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). The purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine whether it has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" so as to be deemed reliable enough to present to a jury. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Rule 702 requires the district court judge to act as a gatekeeper to ensure that admitted expert testimony is relevant, reliable, and has a factual basis. *Id.* at 809; see also *Daubert*, 509 U.S. at 589. The Seventh Circuit has stressed that "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion[.]" *Textron*, 807 F.3d at 834 (citation and internal quotation marks omitted) (alteration in original).

To determine whether expert testimony is admissible, the district court must ascertain (1) whether the expert is qualified, (2) whether his methodology is scientifically reliable, and (3) whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). *Daubert* sets forth the following non-exhaustive factors for the district court to consider when assessing an expert's methodology: (1) whether the theory has been or is capable of being tested; (2) whether the theory has

been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community. *Daubert*, 509 U.S. at 593–94; see also *Bielskis*, 663 F.3d at 893. However, the test for reliability is flexible, and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142; see also *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (noting that the Seventh Circuit "gives the [district] court great latitude in determining not only *how* to measure the reliability of the proposed expert testimony but also whether the testimony is, in fact, reliable").

**\*3** In addition, the touchstone of admissibility under Rule 702 is helpfulness to the jury. *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991) *amended on unrelated grounds, 957 F.2d 301 (7th Cir. 1992)*. An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion. *Id.* "An expert witness is not permitted to parrot what some lay person has told him and testify that he believes the person was being truthful." *Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014); see also *Benson*, 941 F.2d at 604 ("[T]he jury does not need an expert to tell it whom to believe, and the expert's 'stamp of approval' on a particular witness' testimony may unduly influence the jury.").

### B. Required Disclosures

Federal Rule of Civil Procedure 26(a)(2) governs disclosure of expert witnesses who may present expert evidence under Federal Rule of Evidence 702, 703, or 705. A party is required to disclose, among other things, the facts and data considered by the proposed expert witness in forming his opinions, and a list of all other cases in the previous four years in which he has testified as an expert at trial or by deposition. Fed. R. Civ. P. 12(a)(2)(B)(ii) and (iv), respectively.

A party is not permitted to use any undisclosed information as evidence at a trial. Fed. R. Civ. P. 37(c)(1). "This sanction is 'automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless.' " *Keach v. U.S. Trust Co.*, 419 F.3d 626, 639 (7th Cir. 2005) (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)). The Seventh Circuit has established a four-factor test for evaluating whether Rule 37 sanctions are warranted: (1) prejudice or surprise to party against whom evidence is offered; (2) ability of the party to cure the prejudice; (3) likelihood of disruption to the trial; (4) the

2020 WL 419406

proffering party's bad faith or willfulness in not disclosing evidence at an earlier date. *Caterpillar, Inc.,* 324 F.3d at 857. Not all four factors need be met; preclusion of the untimely or insufficiently disclosed evidence is "automatic and mandatory" where the violation is unjustified and harms the opposing party. *Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1230 (7th Cir. 1996).

### III. Analysis

#### A. Expert Testimony

Plaintiff disclosed James Paoletti as an expert witness to opine on "the complaint and disciplinary process" that Union Pacific used and that resulted in Plaintiff's termination. [60-7] at 11-12; [60-6] at 7, 68-69. Mr. Paoletti's opinions, as expressed in his report ([60-7] at 11-53), cover two primary topics: (1) the narrative of events that led to Plaintiff' termination and (2) the application of certain Illinois laws to Plaintiff. Neither meets the requirements of *Daubert* and Rule 702. The Court will address each topic in turn.

##### i. Plaintiff's Termination

##### a. Expert Qualification

To be admissible, an expert opinion must come from a witness who is qualified to give it. "An expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Benson,* 941 F.2d at 604, (citing *United States v. Lundy,* 809 F.2d 392, 395–96 (7th Cir. 1987)). In order to determine whether an expert is qualified to opine on a particular subject, the court should "compar[e] the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Jones v. Lincoln Elec. Co.,* 188 F.3d 709, 723 (7th Cir. 1999), *quoting Carroll v. Otis Elevator Co.,* 896 F.2d 201, 212 (7th Cir. 1990).

**\*4** Plaintiff points out that a witness's experience may qualify him to give opinions under Rule 702 and argues that Mr. Paoletti's conclusions should be admissible on this basis. But the evidence before the Court shows that Mr. Paoletti's experience, though extensive, does not qualify him to testify to the opinions contained in his report.

Mr. Paoletti has 48 years of experience working in city police departments. [60-6] at 49. During that time, he has held supervisory positions in police departments and had experience disciplining employees subject to collective bargaining agreements. All of the employees Mr. Paoletti supervised while working at the City of Chicago were subject to a collective bargaining agreement. [60-6] at 20-21. While Chief of Police for the Village of Crete, Mr. Paoletti was involved in the discipline of a single employee who was not subject to a collective bargaining agreement. [60-6] at 19. In his entire career, that was the only employee he disciplined who was not subject to a collective bargaining agreement (and that employee still had a right to appeal Mr. Paoletti's decision to a mayor).

By contrast, the subject of Mr. Paoletti's proposed expert opinions is the "complaint and discipline process" that Union Pacific used and that resulted in Plaintiff's termination. Union Pacific Railroad is a private employer that, unlike government employers, is not subject to the Due Process Clause of the Fourteenth Amendment. See, *e.g.*, *Shelley v. Kraemer,* 334 U.S. 1, 13, (1948) (the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful"); *Vann v. Scott,* 467 F.2d 1235, 1240 (7th Cir. 1972) (noting that "the state, as an employer, does not have the same unfettered right to discharge employees as does a private employer"). Furthermore, unlike the police officers Mr. Paoletti has supervised, Union Pacifico's employees are not subject to a collective bargaining agreement. Mr. Paoletti does not have experience supervising or disciplining employees like Plaintiff at an employer like Union Pacific. In the face of obvious legal and practical differences between union and non-union employees,[2] Plaintiff has failed to present sufficient evidence that Mr. Paoletti's experience with union employees in government entities translates to, or is even relevant to, a non-union, private-employer context. Mr. Paoletti's experience is not sufficiently matched to the subject of the purported expert opinions in his report, and such testimony is not admissible under Rule 702 and *Daubert.*

##### b. Methodology and Application to the Case

The Court must ensure that a proposed expert's methodology is "scientifically valid" (*Daubert,* 509 U.S. at 592–93) and that his conclusions are "based on sufficient facts or data" (Fed. R. Evid. 702(b)). The proposed opinions fail both requirements.

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 68 of 78 PageID #:7189

Bogathy v. Union Pacific Railroad, Not Reported in Fed. Supp. (2020)

2020 WL 419406

The closest that Mr. Paoletti's report or deposition comes to a description of a methodology is as follows: "I asked [Plaintiff's counsel] to provide me with any of the documents that he had received from Union Pacific that would give me insight as to the allegations and the department directives that supported those allegations and procedures, those kind of things. I tried to base my decision on the facts, what the department directives say is supposed to happen, the allegations that allegedly happened, the disciplinary history of the accused officer, his term with the agency." [60-6] at 23. It is also clear that Mr. Paoletti relied heavily on his personal judgment in coming to conclusions. For example, when asked to support his conclusion that Plaintiff felt the private security officers stationed at OTC were a threat to his own position, Mr. Paoletti responded, "I think, once again, having been involved in the police science for 48 years, I have a pretty good idea how a lot of policemen think and how they perceive themselves; and I think that part of the issue when they decided to put civilian security people there is they felt that their position there was diminished and possibly his assignment there as a whole may have been in jeopardy. It's a human reaction." [60-6] at 48-49. As another example, when asked to explain his interpretation of Plaintiff's actions, which appears on pages 16 and 17 of his report ([60-7] at 26-27), Plaintiff responded, "It is my interpretation—it is my opinion of what probably occurred at the time. It was based upon my own conclusions and experience." [60-6] at 50-51.

**\*5** Plaintiff has not presented sufficient evidence that Mr. Paoletti used a reliable method or applied it to reliable facts and data. First, merely applying personal judgment (or substituting his own judgment for that of the Union Pacific employees who disciplined Plaintiff) is not a proper methodology. Mr. Paoletti's repeated reliance on his years of experience and personal thoughts [3] suggest that "he either had no method or could not describe one." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005) (affirming exclusion of proffered expert testimony based on the witness's "expertise" rather than reliable principles or methods). Thus the Court cannot even begin to review the factors listed in *Daubert* or other indicia of reliability; there is no theory to be tested, or published or peer reviewed, nor is there an error rate or level of acceptance to assess. The use of personal judgment in place of a scientifically valid method renders the proposed opinions inadmissible. *Id.*

Second, the proposed expert's speculation about the thoughts, feelings, and motivations of witnesses is not sufficient or reliable facts and data on which to form expert opinions. In fact, the Seventh Circuit has said that district courts are to "reject any subjective belief or speculation" in proffered expert conclusions. *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir. 2007) (quoting *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004)). There is much of this kind of material to reject in Mr. Paoletti's conclusions. For example, Mr. Paoletti opined on Plaintiff's medical issues:

"As [Plaintiff] disrobes to change his clothes or tend to his medical issues, he exposes his lower extremities which now show visual signs of the toll that his medical problems have had on his legs. It also exposes the bandages he must wear and having anyone else view this is a blow to his masculinity and makes him feel less virile. Thus he turns the cameras off to preserve his dignity and decides to keep his medical condition and internal feelings private, by not telling his employer."

[60-7] at 27. It is not clear where the factual assertions in the passage come from, as Mr. Paoletti neither spoke with Plaintiff regarding his medical issues ([60-6] at 59) nor reviewed his sealed deposition testimony regarding his medical issues ([60-6] at 48), nor listed any medical files as materials he relied on in the Rule 26(a) disclosures (see [60-7] at 3-4). Furthermore, Mr. Paoletti's claims about Plaintiff's feelings delve into Plaintiff's mind and are speculative. The Seventh Circuit has ruled that expert testimony may not "be based on subjective belief or speculation." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). Plaintiff has not presented sufficient evidence that the proposed expert relied on facts and data—as opposed to personal opinion and speculation—to form conclusions. Nor did he apply a reliable method. For these reasons, the proposed testimony regarding the narrative of events that led to Plaintiff's termination fails to satisfy the requirements of *Daubert* and Rule 702 and is inadmissible.

### c. Assist the Jury

Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591. In fact, "[t]he touchstone of admissibility under Rule 702 is helpfulness to the jury." *Benson*, 941 F.2d at 604. But 'assisting the jury' cannot veer into 'doing the jury's job for it,' and evidence that invades a key function of the jury is

2020 WL 419406

not admissible. For the purposes of the instant motion, the relevant "critical function of the jury" is assessing witness credibility, (see *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999)), and the Seventh Circuit has repeatedly affirmed exclusion of expert opinions that usurp that function of the jury. *E.g.*, *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007) (affirming exclusion of proffered expert testimony regarding effect of drug abuse on memory in part because such testimony "would intrude upon the jury's role in assessing witness credibility"); *Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (affirming exclusion of expert testimony because "an expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact, in this case a jury."). Expert witnesses are not allowed to "sort out possible conflicting testimony or to argue the implications of those inconsistencies," as making conclusions about what evidence to believe is a job for the jury and the jury alone. *Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011).

**\*6** Mr. Paoletti's proposed expert opinions are full of credibility determinations. For example, he challenged Special Agent Gonzalez's statement to Lieutenant Veschak that Plaintiff said he had been turning off the camera in order to sleep. [60-7] at 30. Elaborating on his decision not to credit Special Agent Gonzalez's statements, Mr. Paoletti testified that Special Agent Gonzalez "is less that[sic] truthful when giving his deposition and as such his statements are viewed with caution" ([60-7] at 24), and "I don't find him a credible, honest individual" ([60-6] at 56) and "[I] found too many discrepancies in [Gonzalez's] testimony to consider him credible and to base my decision on his comments." ([60-6] at 45-46). Mr. Paoletti also weighed testimony from Mr. Jarrett and Mr. Veschak against testimony from Plaintiff and concluded, contrary to Plaintiff's sworn deposition testimony, that Plaintiff initially lied about disabling the camera and then admitted that he had done so. [60-7] at 26; [60-6] at 47-48. Opinions about witnesses' credibility are not helpful to the trier of fact because they usurp its critical function of making credibility determinations. Mr. Paoletti's opinions on which statements should be believed are not the appropriate subject of expert testimony and are not admissible. *Benson*, 941 F.2d at 604 ("the jury does not need an expert to tell it whom to believe"). Such testimony from the proposed expert fails the requirements of *Daubert* and Rule 702 and is not admissible.

In sum, Plaintiff does not offer sufficient evidence that the proposed expert used a reliable method, based conclusions on sufficient facts or data, or would offer conclusions that assist

—rather than supplant—the trier of fact. Testimony from Plaintiff's expert would, at best, be his personal thoughts on the events at issue in the case, which risks turning into "a gratuitous interpretation of the factual record." *Cage v. City of Chicago*, 979 F. Supp. 2d 787, 834 (N.D. Ill. 2013) (citing *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996)). Such testimony does not meet the requirements of Rule 702 and *Daubert* and is not admissible.

### *ii. Application of Illinois Law to Plaintiff*

Much of Mr. Paoletti's report quotes certain Illinois laws regarding law enforcement officers, claims that they may have applied to Plaintiff in his job with Union Pacific, and then asserts that Union Pacific violated these laws. See, *e.g.*, [60-7] at 32-35 and 50-51. This subject meets none of Rule 702's requirements. Mr. Paoletti is not a lawyer, judge, law professor, or other legal expert, and nothing in his background qualifies him to opine on issues of law. There is no explanation of the methodology he used to arrive at his conclusions of law, whether it is reliable, or how he applied it to the facts of this case. Finally, and most importantly, testimony on this jury will not help the jury in any way. Legal conclusions are not an appropriate subject for expert testimony. *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) (meaning of applicable law "is not a question of fact, to be resolved by the jury after a battle of experts"); *Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 366 (7th Cir. 1990) (finding that it was impermissible for insurance company's expert witness to testify about his legal research because in doing so the judge tilted the balance of power toward the insurance company); *CDX Liquidating Tr. ex rel. CDX Liquidating Trusee v. Venrock Assocs.*, 411 B.R. 571, 585 (N.D. Ill. 2009) (noting that "under Rule 702, courts have consistently excluded experts who proffer testimony on the law governing the case"). "It is not for witnesses to instruct the jury as to applicable principles of law, but the judge." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 294 (7th Cir. 1981) (quoting *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir.), cert. denied, 434 U.S. 861 (1977)). Mr. Paoletti in fact concedes this point. At his deposition, when asked if he was offering an expert opinion on the applicability of Uniform Peace Officers' Disciplinary Act and the Railroad Police Act to Plaintiff, Mr. Paoletti said "No. That's why I say 'may,' because that's up to the attorneys to argue." [60-6] at 42. To the extent that Mr. Paoletti offers expert conclusions about the application of Illinois law, they fail to meet *Daubert* and Rule 702's requirements and are inadmissible.

**B. Required Disclosures**

Defendant argues that Plaintiff failed to make some of the required disclosures under Rule 26(a), and therefore Rule 37 requires striking some or all of Mr. Paoletti's expert opinions. Specifically, Plaintiff's disclosure under Rule 26(a)(2)(B)(ii) omitted some independent research, including a tour of OTC, and several depositions that Mr. Paoletti relied on in forming his conclusions. Defendant learned of the omissions at Mr. Paoletti's deposition. Furthermore, Plaintiff's disclosure under Rule 26(a)(2)(B)(v) asserted that he had testified as an expert in six cases over the previous four years, but at his deposition Mr. Paoletti said he had testified as an expert in between 12 and 20 cases during that period. Defendant argues that, under Rule 37, Plaintiff cannot show that its failure to disclose was justified or harmless, and therefore the exclusion is "automatic and mandatory." *Keach*, 419 F.3d at 639. Defendant also points out that Plaintiff's response brief

[61] does not address this point at all and argues that Plaintiff has therefore conceded the point.

**\*7** While it does appear that Plaintiff has waived the argument, [4] because this Court resolves the motion on the merits of the Rule 702 and *Daubert* question, it need not address whether Plaintiff waived the point, or whether Rule 37 requires exclusion of non-disclosed material, or what specific facts and opinions would be excluded.

**IV. Conclusion**

For the reasons set forth above, Defendant's motion to bar Plaintiff's proposed expert is granted. This case is set for further status on February 5, 2020, at 9:00 a.m.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 419406

---

### Footnotes

1    Federal Rule of Evidence 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or a determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

2    See, *e.g.*, *Brown v. U.S. Postal Service*, 459 U.S. 212, 220 (1983) ("[A] collective bargaining agreement is much more than traditional employment terminable at will. Rather, it is an agreement creating relationships and interests under the federal common law of labor policy.").

3    *E.g.* "I think, once again, having been involved in the police science for 48 years, I have a pretty good idea how a lot of policemen think * * *." [60-6] at 48-49 (emphasis added).

4    *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (noting that a "[f]ailure to respond to an argument * * * results in waiver" and a party's "silence" in response to an argument leads to the conclusion that a point is conceded); *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008) ("Farris failed to respond to the Government's argument in a Reply Brief, and accordingly, we find that Farris waived his sufficiency of the evidence challenge[.]").

---

**End of Document**                                         © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 71 of 78 PageID #:7192

Sullivan v. Alcatel–Lucent USA Inc., Not Reported in Fed. Supp. (2014)

2014 WL 3558690

2014 WL 3558690
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

John P. SULLIVAN, D.D.S., J.D.,
and Stephen D. Helm, Plaintiffs,
v.
ALCATEL–LUCENT USA INC., a
Delaware Corporation, Defendant.

No. 12 C 07528
|
Signed July 17, 2014

**Attorneys and Law Firms**

James Michael Wagner, Steve Helm & Associates, Mary Elizabeth Damitio, Patrick John Kelly, Stephen Douglas Helm, Helm & Wagner, Naperville, IL, John P. Sullivan, Sullivan Law Firm, Warrenville, IL, for Plaintiffs.

Gary L. Taylor, Abigail Jane Jung, Kaitlyn Anne Wild, Polina Arsentyeva, Rathje & Woodward LLC, Wheaton, IL, Gregory Wheeler Jones, Greg Jones, Attorney at Law, Chicago, IL, for Defendant.

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

**\*1** Defendant Alcatel–Lucent USA, Inc. ("Lucent" or "Defendant") has moved to strike portions of the written report of Plaintiffs' expert, Brian P. Liston, and to bar related testimony pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). For the reasons discussed below, the Court grants Lucent's motion.

**BACKGROUND**

Lucent owns commercial property in Naperville, Illinois ("Naperville Property") (R. 93, Pls.' Rule 56.1 Stmt. Facts ¶ 3) and decided, in late 2010 or early 2011, to contest the 2010 real estate tax assessment of that property. (R. 104, Def. Rule 56.1 Stmt. Add'l Facts ¶ 3). Following an unsuccessful appeal on the 2010 tax assessment, Plaintiff John Sullivan, an attorney who had assisted with the processing of Lucent's

appeal, had a discussion with the Lisle Township Assessor, John Trowbridge ("Trowbridge"), who proposed a settlement offer reducing the 2010 and 2011 tax assessment for the Naperville Property. (Def. Stmt. Add'l. Facts ¶ 7.) Sullivan recommended to Lucent's in-house counsel, Lewis Lefkowitz ("Lefkowitz"), that Lucent decline the offer and file an appeal of the 2010 assessed valuation of the Naperville Property with the state review board. (R. 104–1, Feb. 6, 2011 Email.) Sullivan wrote to Lefkowitz that "Steve Helm and I would negotiate a contingent fee agreement to represent ALU on this (similar to the Forest Preserve agreement but with the % fee based on the 1st year savings only)." (*Id.*)

Lefkowitz retained Sullivan and Plaintiff Stephen Helm to prosecute the appeal in front of the Illinois Tax Appeal Board ("PTAB"). (Pl. Stmt. Facts ¶ 8.) The parties entered into a contingent fee agreement which provided that Plaintiffs' fee "will be structured as a fee contingent on savings on the current year's taxes in these actions as follows: (a) 25% of such amount if the matter is settled or otherwise resolved prior to trial; or (b) 30% of such amount if the matter is settled or otherwise resolved after trial." (R. 89–7, Contingent Fee Agreement.)

On April 18, 2011, Plaintiffs filed before the PTAB a Commercial Appeal for Assessment Year 2010 for the Naperville Property on behalf of Lucent. (Pl. Stmt. Facts ¶ 27.) The City of Naperville and School District 203 intervened in the PTAB Appeal because they already had received funds from Lucent's 2010 real estate taxes on the Naperville Property. (Pl. Stmt. Facts ¶ 41.) On or about October 27, 2011, the Lisle Township Assessor assessed the value of the Naperville Property for the 2011 calendar year at $42,829,710, which represented an increase of the $160 over the 2010 assessed value. (*Id.* ¶¶ 29–31.) On November 21, 2011, Lucent executed a "Letter of Authority to Act in Matters of Property Taxation" that appointed Sullivan to represent Lucent as its property tax agent with respect to the Naperville Property. (R. 89–16, Letter of Authority.) Pursuant to that Letter of Authority, on November 23, 2011, Plaintiffs filed an appeal for Tax Year 2011 with the DuPage County Board of Review ("2011 Assessment Appeal"). (Pl. Stmt. Facts ¶ 35.) The parties did not execute a new agreement to address Plaintiffs' work negotiating the 2011 Assessment. (Pl. Stmt. Facts ¶ 58.)

**\*2** After filing the 2011 Assessment Appeal, Plaintiffs began negotiating with Trowbridge regarding the 2010 PTAB Appeal and the 2011 Assessment Appeal. (*Id.* ¶ 37.)

Case: 1:19-cv-06473 Document #: 212 Filed: 04/12/24 Page 72 of 78 PageID #:7193

Sullivan v. Alcatel–Lucent USA Inc., Not Reported in Fed. Supp. (2014)

2014 WL 3558690

Plaintiffs successfully negotiated a comprehensive settlement agreement ("Comprehensive Settlement") that traded reduced stipulated assessments for the Naperville Property for Assessment Years 2011, 2012, and 2013 in return for Lucent's agreement to withdraw the pending 2010 PTAB Appeal. (*Id.* ¶ 40.) The parties intended for the Comprehensive Settlement to satisfy the City of Naperville and School District 203. (*Id.* ¶ 41.)

Lucent approved the Comprehensive Settlement and accepted the 2011, 2012, and 2013 stipulations of agreed assessed value for the Naperville Property in return for its agreement to withdraw the 2010 PTAB appeal. (R. 105, Def. Resp. to Pl. Stmt. Facts ¶ 52.) Plaintiffs estimate that the Comprehensive Settlement saved Lucent $910,999.90 for the 2011 tax year and $1,100,028 for the 2012 tax year, and that it would save Lucent $1,100,028 for the 2013 tax year. (*Id.* ¶¶ 53, 54.) Additionally, the Comprehensive Settlement also provided Lucent with stipulated assessed values for the Naperville Property that were 38% lower in 2012 and 40% lower in 2013 than the most recent assessed value. (Pl. Stmt. Facts ¶ 56)

Internal discussions between Lucent employees acknowledged Plaintiffs' entitlement to 25% of Lucent's 2011 tax savings. (*See* Pl. Stmt. Facts ¶¶ 63, 69; R. 89–30, Feb. 12, 2012 Email.) Internal discussions, however, also acknowledged uncertainty with respect to Plaintiffs' entitlement to the 2012 and 2013 tax savings. (*See* R. 89–30, Feb. 12, 2012 Email; R. 89–32, May 29, 2012 Email; R. 89–31.) In July 2012, Lucent notified Plaintiffs that the 2011, 2012, and 2013 tax savings were not governed by the contingent fee structure in the original Engagement Agreement, and rejected Plaintiffs' proposed fee of $500,000. (R. 89–36, July 12, 2012 Letter)

On September 7, 2012, Plaintiffs filed their original three-count complaint in this matter. (Def. Stmt. Add'l Facts ¶ 24.) In Count I, Plaintiffs alleged a breach of contract claim for the 2011 tax savings based on the contingent fee agreement ("Agreement") with Lucent. In Count II, Plaintiffs alleged an anticipatory breach of contract claim for the 2012 and 2013 tax savings based on work they performed on Lucent's behalf pursuant to the Agreement. In the alternative, in Count III, Plaintiffs alleged an unjust enrichment claim for tax savings that Plaintiffs secured for Lucent for tax years 2011, 2012, and 2013.

Plaintiffs and Defendant filed competing motions for summary judgment on each of the three counts. On May

6, 2014, the Court granted Plaintiffs' motion for summary judgment as to Count I in the amount of $227,749.97, finding that the undisputed facts established that the parties intended for the Agreement to entitle Plaintiffs to 25% of the tax savings they negotiated for the Lucent for the 2011 tax year. (R. 149.) The Court denied summary judgment on Counts II and III because issues of fact exist. Plaintiffs subsequently moved to voluntarily dismiss Count III, and the Court granted the motion. (R. 178.)

Plaintiffs engaged Brian P. Liston as one of their two burden-of-proof experts. (R. 131–1, Liston Expert Rep.) Liston, along with attorney Gregory J. Lafakis, submitted an expert report regarding the dispute at issue here. (R. 131–1, Liston CV.) Liston is an attorney who has experience in the fields of eminent domain and property tax appeals. (R. 131–1, Liston CV.) The report consists of their summary of the dispute as well as six opinions and the underlying bases for those opinions. (*Id.* ¶ 7.) After submitting the joint expert report, Plaintiffs withdrew Mr. Lafakis as an expert. (R. 131–2, Nov. 5, 2013 email.)

## LEGAL STANDARD

**\*3** "The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides, in relevant part, that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact[,] ... a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion...." *Id. See also Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 824 (7th Cir. 2010). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis,* 561 F.3d at 705.

Under the expert-testimony framework, courts perform the gate-keeping function of determining whether the expert testimony is both relevant and reliable prior to its admission at trial. *See id.*; *United States v. Pansier,* 576 F.3d 726, 737 (7th Cir. 2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). In doing so, courts "make the following inquiries before admitting expert testimony: first, the expert must be qualified as an expert by knowledge,

Sullivan v. Alcatel–Lucent USA Inc., Not Reported in Fed. Supp. (2014)

2014 WL 3558690

skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case." *Lees v. Carthage College,* 714 F.3d 516, 521–22 (7th Cir. 2013); *see also Stollings v. Ryobi Tech., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013); *Pansier,* 576 F.3d at 737.

In assessing the admissibility of an expert's testimony, the Court's focus "must be solely on principles and methodology, not on the conclusions they generate." *Winters v. Fru–Con Inc.,* 498 F.3d 734, 742 (7th Cir. 2007) (quoting *Chapman v. Maytag Corp.,* 297 F.3d 682, 687 (7th Cir. 2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir. 2007) (quoting *Kumbo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999)). "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012).

## ANALYSIS

Defendant challenges specific statements and opinions in Mr. Liston's report on two grounds: (1) that they are unrelated to his expertise, and (2) that they are legal opinions and conclusory in nature.

### I. Brian Liston

#### A. Qualifications
Brian Liston is a licensed attorney in the state of Illinois, and has been practicing since 1991. (Liston CV.) He is currently a partner in The Law Offices of Liston & Tsantilis, P.C. in Chicago Illinois, and focuses his practice on the areas of eminent domain litigation, property tax appeals and incentives for land use. (*Id.*) Liston represents large companies and landowners in eminent domain and property tax litigation matters in suits filed by local, municipal and state agencies throughout the United States.

#### B. Opinions

**\*4** Defendant challenges the following statements as being unrelated to Liston's expertise:

**Expert Report at 2:** A review of Mr. Lefkowitz's correspondence in July 2012 to Attorney Sullivan clearly shows that it was Lucent's and Lefkowitz's position that the fee agreement did not cover any work on the 2011, 2012, and 2013 tax savings.

**Expert Report at 4:** Furthermore, Lucent's own internal documents clearly show that Lucent's control group checked Plaintiffs' figures and agreed with them. Internally, Mr. Cameron, Attorney Lefkowitz, and Mr. Morrison were all acknowledging that Sullivan's May 28, 2012 invoice in the amount of $227,749.97 should be paid.

**Expert Report at 7:** Even though internal emails of Lucent admitted full responsibility to pay the 2011 tax savings component in the amount of $227,749.97, [Lucent refused to pay the invoice, arguing that the fee agreement only covered tax savings for 2010.]

Lefkowitz's email to co-counsel Mendoza on February 9, 2012 indicts Lucent as having predetermined to negotiate down whatever fee claim the Plaintiffs might make related to the $3.0 million plus tax savings.

**Expert Report at 9:** Opinion No. l. The March 7, 2011 Engagement Letter was intended to cover all the work that Sullivan and Helm were performing related to the negotiated settlement between 'Lucent and Assessor Trowbridge.

**Expert Report at 10:** Lucent's own internal documents showed $400,000 as an accrued expense, for fees owed, and various internal documents reflected acknowledgement that the fee agreement did cover the services performed by Sullivan and Helm.

Lucent had determined internally that at least this much was owed and that the statement reflected the proper amount owed for 2011 tax savings component.

**Expert Report at 12:** Lucent's own memo regarding the establishment of a $400,000 accrual for liability to Sullivan and Helm shows recognition by Lucent that it had, in fact, obtained a significant tax savings and that at least $400,000 would be owed to Sullivan and Helm under the terms of the contingent fee agreement.

**Expert Report at 12–13:** Sullivan's and Helm's testimony clearly support the fact that Lucent received the benefit of

Sullivan v. Alcatel-Lucent USA Inc., Not Reported in Fed. Supp. (2014)

2014 WL 3558690

a substantial tax savings for tax years 2011, 2012, and 2013 that is expected expected to total in excess of $3 million which will be fully realized by Lucent in 2014.

**Expert Report at 13:** Opinion No. 5. Lucent's own internal documents and deposition testimony of Lucent personnel clearly support the conclusion that: (a) Lucent understood that it was fully obligated under the fee agreement to pay Sullivan and Helm for tax savings at 25% for tax years other than for 2010; (b) at least "$400,000 in fees had been "accrued" by Lucent for Sullivan's and Helm's services; (c) Lucent had predetermined to negotiate Sullivan's and Helm's fees down even before Lucent had even discussed the fees with either Sullivan or Helm; and (d) Lucent obtained a very clear tax benefit on tax savings for years 2011, 2012, and 2013 and made a business decision to dismiss the 2010 appeal as a quid pro quo for what it perceived as 'great news,' being the projected tax savings for 2011, 2012, and 2013.

**\*5** Defendant additionally challenges the following statements made by Liston as being improper legal opinions and conclusions:

**Expert Report at 4:** It is our opinion that there is no basis for any dispute as to either liability or the amount owed for 2011 tax savings obtained by Sullivan and Helm for Lucent. Whether based upon the written fee agreement or upon principles of unjust enrichment, Lucent received a tax savings of $910,999.90 in May 2012 on 2011 taxes as a direct result of Sullivan's and Helm's efforts.

**Expert Report at 5:** It appears to the undersigned that there is clear liability under Count I of the Complaint.

Regardless of whether the March 7, 2011 fee agreement covered the tax savings for 2011, 2012, and/or 2013, there is clear liability against Lucent under either Count II (the fee agreement) or Count III (unjust enrichment), and the amount due and owing should be the same under either Count.

**Expert Report at 5–6:** It is our opinion that there is no difference in either liability or in the amount of money that Lucent owes the Plaintiffs. If liability and recovery is to be based on principles of unjust enrichment, it is our opinion that Lucent is clearly liable to Plaintiffs under Count I and III.

**Expert Report at 10:** The May 2012 invoice from Sullivan for the 2011 tax savings component accurately sets for the amount of fees due under the Agreement.

**Expert Report at 12:** Whether the bases for the favorable tax savings of approximately $3.0 million is based upon the March 2011 Engagement Letter or upon principals of unjust enrichment, the fee entitlement for Sullivan and Helm would be the same.

**Expert Report at 13:** The 'benefit' to Lucent was a tax savings of approximately $3.0 million plus deferred through the payment date of 2014. The written agreement between Lucent and Plaintiffs showed that Lucent and Plaintiffs were in agreement on a 25 percent factor to be applied times the savings/benefit, thus, the fees are identical under Counts II and III of the Complaint.

[Lucent understood that] it was fully obligated under the fee agreement to pay Sullivan and Helm for tax savings at 25% for tax years other than for 2010.

## II. Liston Does Not Draw on Any Expertise When Reading and Interpreting Lucent's Internal Documents and Correspondences

In many of Liston's opinions, he simply reads and interprets documents. In doing so, he does not draw on any expert qualifications or experience. As such, his readings and interpretations are merely gratuitous, and would be unhelpful to a prospective jury. "[T]he crucial question is, 'On *this subject* can a jury from *this person* receive appreciable help?' " *Cage v. City of Chicago,* 979 F.Supp.2d 787, 834 (N.D.Ill.2013). "[E]xpert testimony is helpful to the jury if it concerns a matter beyond the understanding of the average person." *Davis v. Duran,* 276 F.R.D. 227, 231 (N.D.Ill.2011). Moreover, "[a]n expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion; the opinion must be an *expert* opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *United States v. Benson,* 941 F.2d 598, 604 (7th Cir. 1991), *amended on unrelated grounds,* 957 F.2d 301 (7th Cir. 1992).

**\*6** "Unless the expertise adds something, the expert is at best offering a gratuitous opinion, and at worst is exerting undue influence on the jury ..." *United States v. Hall,* 93 F.3d 1337, 1343 (7th Cir. 1996). "[E]xpert testimony does not assist the trier of fact when the jury is able to evaluate the same evidence

Sullivan v. Alcatel–Lucent USA Inc., Not Reported in Fed. Supp. (2014)

2014 WL 3558690

and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony." *Aponte v. City of Chicago,* No. 09 C 8082, 2011 WL 1838773, at *2 (N.D.Ill. May 12, 2011).

The following are examples of Liston merely reading and interpreting documents without drawing on any additional expertise:

Expert Report at 2: A review of Mr. Lefkowitz's correspondence in July 2012 to Attorney Sullivan clearly shows that it was Lucent's and Lefkowitz's position that the fee agreement did not cover any work on the 2011, 2012, and 2013 tax savings.

Expert Report at 4: Furthermore, Lucent's own internal documents clearly show that Lucent's control group checked Plaintiffs' figures and agreed with them. Internally, Mr. Cameron, Attorney Lefkowitz, and Mr. Morrison were all acknowledging that Sullivan's May 28, 2012 invoice in the amount of $227,749.97 should be paid.

Expert Report at 7: Even though internal emails of Lucent admitted full responsibility to pay the 2011 tax savings component in the amount of $227,749.97, [Lucent refused to pay the invoice, arguing that the fee agreement only covered tax savings for 2010.]

Lefkowitz's email to co-counsel Mendoza on February 9, 2012 indicts Lucent as having predetermined to negotiate down whatever fee claim the Plaintiffs might make related to the $3.0 million plus tax savings.

Expert Report at 10: Lucent's own internal documents showed $400,000 as an accrued expense, for fees owed, and various internal documents reflected acknowledgement that the fee agreement did cover the services performed by Sullivan and Helm.

Lucent had determined internally that at least this much was owed and that the statement reflected the proper amount owed for 2011 tax savings component.

Expert Report at 12: Lucent's own memo regarding the establishment of a $400,000 accrual for liability to Sullivan and Helm shows recognition by Lucent that it had, in fact, obtained a significant tax savings and that at least $400,000 would be owed to Sullivan and Helm under the terms of the contingent fee agreement."

Expert Report at 13: Opinion No. 5. Lucent's own internal documents and deposition testimony of Lucent personnel clearly support the conclusion that: (a) Lucent understood that it was fully obligated under the fee agreement to pay Sullivan and Helm for tax savings at 25% for tax years other than for 2010; (b) at least $400,000 in fees had been "accrued" by Lucent for Sullivan's and Helm's services; (c) Lucent had predetermined to negotiate Sullivan's and Helm's fees down before Lucent had even discussed the fees with either Sullivan or Helm; and (d) Lucent obtained a very clear tax benefit on tax savings for years 2011, 2012, and 2013 and made a business decision to dismiss the 2010 appeal as a quid pro quo for what it perceived as 'great news,' being the projected tax savings for 2011, 2012, and 2013.

Liston does not rely on nor does he bring any additional expertise in his reading and interpretation of these documents. Average jurors are capable of reading such documents and determining for themselves their meaning and significance. Although Liston is a purported expert in the field property tax appeals, these interpretations do not require such expertise and he does not bring any expert analysis to them. *See In re Prempro Products Liability Litig.,* 586 F.3d 547, 570 (8th Cir. 2009). He simply reads some of them. Liston invades the province of the jury by opining that various documents "show" (Expert Report at 12), "clearly show" (Expert Report at 2 and 4), "reflect acknowledgement of" (Expert Report at 10), and "clearly support" (Expert Report at 13) certain conclusions. These opinions are merely gratuitous and hence improper.

### III. Liston Improperly Comments on and Interprets Testimony

**\*7** Liston also invades the province of the jury by improperly commenting and interpreting testimony. It is a fundamental premise of the trial system that "determining the weight and credibility of witness testimony ... 'belongs to the jury who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' " *Davis* 277 F.R.D. at 370 (quoting *United States v. Scheffer,* 523 U.S. 303, 313, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998)). "[A]n expert witness may not usurp the jury's function to weigh evidence and make credibility determinations." *United States v. Farrell,* 563 F.3d 364, 377 (8th Cir. 2009). Furthermore, "expert witnesses are not allowed to sort out possible conflicting testimony or to argue the implications of those inconsistencies. That is the role of the lawyer, and it [is]

Sullivan v. Alcatel–Lucent USA Inc., Not Reported in Fed. Supp. (2014)

2014 WL 3558690

for the jury to draw its own conclusions from the testimony it hears." *Duran,* 277 F.R.D. at 370.

Examples of Liston improperly commenting on and interpreting witness testimony include:

> **Expert Report at 12–13:** Sullivan's and Helm's testimony clearly support the fact that Lucent received the benefit of a substantial tax savings for tax years 2011, 2012, and 2013 that is expected to total in excess of $3 million which will be fully realized by Lucent in 2014.

> **Expert Report at 13:** Opinion No. 5. Lucent's own internal documents and deposition testimony of Lucent personnel clearly support the conclusion that: (a) Lucent understood that it was fully obligated under the fee agreement to pay Sullivan and Helm for tax savings at 25% for tax years other than for 2010; (b) at least $400,000 in fees had been "accrued" by Lucent for Sullivan's and Helm's services; (c) Lucent had predetermined to negotiate Sullivan's and Helm's fees down before Lucent had even discussed the fees with either Sullivan or Helm; and (d) Lucent obtained a very clear tax benefit on tax savings for years 2011, 2012, and 2013 and made a business decision to dismiss the 2010 appeal as a quid pro quo for what it perceived as 'great news,' being the projected tax savings for 2011, 2012, and 2013.

An expert's testimony must "assist the trier of fact in determining a relevant fact at issue in the case." *Lees,* 714 F.3d at 521. By sorting out and opining on witness testimony, Liston attempts to usurp the traditional role of the jury to determine "the weight and credibility" of witness testimony. It is the jury's role to assess a witness's credibility and to determine what weight to give that testimony. Liston may not offer these improper opinions.

**IV. Liston Improperly Remarks on the Intentions of the Parties Involved**

Liston also improperly opines on Lucent's intentions. An expert "must refrain from giving an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." *Pansier,* 576 F.3d at 738 (citation and quotations omitted). *See also DePaepe v. Gen. Motors Corp.,* 141 F.3d 715, 720 (7th Cir. 1998) ("He could give an opinion as an engineer that reducing the padding saved a particular amount of money; he might testify as an engineer that GM's explanation for the decision was not sound (from which the

jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive."); *Johnson v. Wyeth LLC,* No. 10–C–2690, 2012 WL 1204081, at *3 (D.Ariz. Apr. 11, 2012) (precluding plaintiff's experts from offering "opinions concerning defendants' motive, intent, knowledge, or other state of mind"); *George v. Kraft Foods Global, Inc.,* 800 F.Supp.2d 928, 932–33 (N.D.Ill.2011) (excluding expert's state of mind opinion as speculative and unhelpful).

Opinion No. 1 (Expert Report at 9) purports to opine on the work that the March 7, 2011 Engagement Letter "intended" to cover. It reads as follows:

> **\*8 Expert Report at 9:** Opinion No. l. The March 7, 2011 Engagement Letter was intended to cover all the work that Sullivan and Helm were performing related to the negotiated settlement between 'Lucent and Assessor Trowbridge.

Liston has no basis to opine on the parties' intentions or motives when entering into the agreement. To state outrightly that the Engagement Letter was intended to cover all the work related to the negotiated settlement is speculative and unhelpful given the ultimate responsibility of the jury to make that determination. The witnesses at trial will testify regarding their intentions, and the jury will evaluate that evidence and draw its own conclusions.

**V. Liston Improperly Offered Legal Opinions and Conclusions**

Lastly, several of the Mr. Liston's opinions are inadmissible legal conclusions. As a general rule, an expert may not offer legal opinions. *Jiminez v. City of Chicago,* 732 F.3d 710, 721 (7th Cir. 2013). "Where the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact." *U.S. Gypsum Co. v. Lafarge North America Inc.,* 670 F.Supp.2d 748, 765 (N.D.Ill.2010) (quoting *Clark v. Tanaka Corp.,* 192 F.3d 750, 759 (7th Cir. 1999)). As such, "expert testimony that contains a legal conclusion that determines the outcome of a case is inadmissible." *RLJCS Enterprises, Inc. v. Prof'l Ben. Trust Multiple Welfare Ben. Plan & Trust,* 487 F.3d 494, 498 (7th Cir. 2007). Experts "cannot testify about legal issues on which the judge will

Sullivan v. Alcatel–Lucent USA Inc., Not Reported in Fed. Supp. (2014)

2014 WL 3558690

instruct the jury." *United States v. Sinclair,* 74 F.3d 753, 757 n. 1 (7th Cir. 1996). Courts will not admit testimony on purely legal matters and comprised solely of legal conclusions. *Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003).

The following statements and opinions have been identified as inadmissible legal conclusions and merely present Mr. Liston's beliefs as to how the fact finder should rule on the questions of liability and damages:

Expert Report at 4: It is our opinion that there is no basis for any dispute as to either liability or the amount owed for 2011 tax savings obtained by Sullivan and Helm for Lucent. Whether based upon the written fee agreement or upon principles of unjust enrichment, Lucent received a tax savings of $910,999.90 in May 2012 on 2011 taxes as a direct result of Sullivan's and Helm's efforts.

Expert Report at 5: It appears to the undersigned that there is clear liability under Count I of the Complaint.

Regardless of whether the March 7, 2011 fee agreement covered the tax savings for 2011, 2012, and/or 2013, there is clear liability against Lucent under either Count II (the fee agreement) or Count III (unjust enrichment), and the amount due and owing should be the same under either Count.

Expert Report at 5–6: It is our opinion that there is no difference in either liability or in the amount of money that Lucent owes the Plaintiffs. If liability and recovery is to be based on principles of unjust enrichment, it is our opinion that Lucent is clearly liable to Plaintiffs under Count I and III.

Expert Report at 10: The May 2012 invoice from Sullivan for the 2011 tax savings component accurately sets for the amount of fees due under the Agreement.

**\*9** Expert Report at 12: Opinion No. 4. Whether the bases for the favorable tax savings of approximately $3.0 million is based upon the March 2011 Engagement Letter or upon principals of unjust enrichment, the fee entitlement for Sullivan and Helm would be the same.

Expert Report at 13: The 'benefit' to Lucent was a tax savings of approximately $3.0 million plus deferred through the payment date of 2014. The written agreement between Lucent and Plaintiffs showed that Lucent and Plaintiffs were in agreement on a 25 percent factor to be applied times the savings/benefit, thus, the fees are identical under Counts II and III of the Complaint.

By making explicit conclusions about the various elements of the dispute between Lucent and Plaintiffs, Liston acts as an auxiliary advocate for Plaintiffs and usurps the role of the jury. It is inappropriate for Liston to opine, for example, that "there is clear liability against Lucent under either Count II (the fee agreement) or Count III (unjust enrichment)," and that "if liability and recovery is to be based on principles of unjust enrichment, it is our opinion that Lucent is clearly liable to Plaintiffs under Count I and III." (Expert Report at 5–6). In submitting these opinions, Liston has done exactly what the Seventh Circuit prohibits. Mr. Liston, therefore, cannot testify regarding these opinions.

## CONCLUSION

For the reasons discussed above, the Court grants Lucent's Motion to Strike Plaintiffs' Expert Testimony and Bar Expert Testimony. Mr. Liston may not testify regarding the opinions and statements that Lucent identified in its Motion.

**All Citations**

Not Reported in Fed. Supp., 2014 WL 3558690

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 12, 2024, I served a true and correct copy of the

foregoing filing on all counsel of record through the Court's ECF filing system.


*/s/ Devlin N. Su*
Devlin N. Su