# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **U. S. SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No.: 1:19-cv-06473** |
| **v.** | ) ) | Hon. Sharon Johnson Coleman |
| **SBB RESEARCH GROUP, LLC, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

## SECURITIES AND EXCHANGE COMMISSION'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF SEC EXPERT WITNESS DR. CRAIG MCCANN

## TABLE OF CONTENTS

I.    **Chronology of the Valuation Expert Reports**.................................................3

    A.    McCann's Initial Report........................................................3

    B.    Sen's "Rebuttal" Report ......................................................5

    C.    McCann's Rebuttal Report ..................................................5

II.    **SBB Overpriced Its Structured Note Values** ....................................5

III.    **SBB Overpriced Its Structured Note Values**
      **By A Statistically Significant Amount as Compared to Bank** .......................11

IV.    **Deetz's +/-5% Variance Band is Not Supported**
      **In Structured Products Pricing Literature or**
      **In Industry Standard Option Valuation**..........................................15

V.    **McCann's Criticism of Sen's Model** .............................................18

**CONCLUSION**..............................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Antonick v. Elec. Arts Inc.*,
   2014 WL 245018 (N.D. Cal. Jan. 22, 2014) ........................................................ 19

*Cephalon, Inc. v. Watson Pharms., Inc.*,
   769 F. Supp. 2d 761, 772 fn. (D. Del. 2011) ........................................................ 19

*Daubert v. Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 ...........................................................................................................6, 11

*Ervin v. Johnson & Johnson, Inc.*,
   492 F.3d 901 (7th Cir. 2007) ................................................................................. 6

*Gayton v. McCoy*,
   593 F.3d 610 (7th Cir. 2010) ................................................................................. 17

*In re Sulfuric Acid Antitrust Lit.*,
   235 F.R.D. 646 (N.D. Ill. 2006) ............................................................................ 18

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) .............................................................................................. 6, 7

*Manpower, Inc. v. Ins. Co. of Pa.*,
   732 F.3d 796 (7th Cir. 2013) ................................................................................. 10

*Myers v. Ill. Cent. R.R. Co.*,
   629 F.3d 639 (7th Cir. 2010) ................................................................................. 6

*Noffsinger v. Valspar Corp.*,
   2013 WL 12340338 (N.D. Ill. Jan. 4, 2012) ........................................................ 18, 19

*Schultz v. Akzo Nobel Paints, LLC*,
   721 F.3d 426 (7th Cir. 2013) ................................................................................. 7, 11

*Searcy v. United States*,
   2020 WL 4187392 (S.D. Fla. July 21, 2020) ........................................................ 19

*Smith v. Ford Motor Co.*,
   215 F.3d 713 (7th Cir. 2000) ................................................................................. 10

*Stuhlmacher v. Home Depot U.S.A., Inc.*,
   774 F.3d 405 (7th Cir. 2014) ................................................................................. 17

*U.S. v. Grintjes*,
   237 F.3d 876 (7th Cir. 2001) ................................................................................. 12

*U.S. v. Mamah*,
   332 F.3d 475 (7th Cir. 2003) ................................................................................. 7

*United States v. Pansier*,
   576 F.3d 726 (7th Cir. 2009) ................................................................................. 7

*Walsh v. Chez*,
   583 F.3d 990 (7th Cir. 2009) ................................................................................... 18

**Statutes**

ASC § 820-35-53 .......................................................................................................... 1

**Rules**

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) ........................................................ 12

Federal Rule of Civil Procedure 26(a)(2)(B) ............................................................. 18

Federal Rule of Evidence 702 ................................................................................ 6, 17

**Other**

*Joseph, Gregory P., "Expert Approaches"*,
   28 LITIGATION 20 (Summer 2002) ....................................................................... 18

This fraud case centers on SBB's improper valuation of structured note investments it managed for a group of private funds. The SEC alleges that Defendants inflated the value and performance of these investments by using a home-brewed valuation model that, by design, defied fifty years of widely accepted and generally applied valuation methods. In doing so, Defendants violated the requirements of ASC § 820, the provision of Generally Accepted Accounting Principles ("GAAP") that requires that inputs to valuation models "reflect the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk." (ASC § 820-35-53.) Defendants then reported artificially inflated fund performance to investors and prospective investors, collected inflated fees, and created a false track record of success that they marketed to outside investors. Meanwhile, Defendants falsely assured investors and prospective investors that they had valued their structured notes according to GAAP.

The SEC's expert Dr. Craig J. McCann ("McCann") issued two expert reports in this case. In his Initial Report (Dkt. 213-3, Defendants' Ex. 2 ("D Ex. _"), hereinafter "McCann"), McCann applied over 30 years of option and structured note valuation experience and opined that SBB's valuation model was inconsistent with the assumptions and practices of market participants. (McCann ¶ 15.) McCann also opined that the "direct impact" of these deficiencies was to "inflate SBB's reported [structured note] returns by overstating the value of the long call options and understating the value of the short put options embedded in its portfolio of structured notes." (*Id.* ¶ 89.) Defendants, and their valuation expert, Dr. Arun Sen, did not dispute those findings or the methodology McCann used to support his conclusion.

Nevertheless, Defendants' *Daubert* Motion asks that the Court preclude McCann from testifying that SBB's valuation methods inflated its structured note values, arguing that he did not disclose "any methodology" to support that opinion. But, that argument disregards the ***content*** of McCann's Initial Report in which he detailed the methodology he used, including back-testing SBB's values, to support his conclusion that SBB's model systematically inflated note values.

Next, Defendants try to re-litigate an argument that the Magistrate Judge already has rejected. They ask the Court to completely exclude McCann's Rebuttal Report (Dkt. 213-7, D Ex. 6, hereinafter "McCann Rebuttal"), including: (1) his rebuttal of Sen's regression analysis in which McCann fixed Sen's data errors, re-ran his analysis, and demonstrated that, using the corrected analysis, SBB's valuations ***were statistically higher*** than the Bank Values; and (2) his rebuttal of a "+/-5% Variation Band" offered by Defendants' expert Gene Deetz, which McCann opined had zero support in the applicable "literature or in standard option valuation practice."

Defendants' main gripe appears to be that those rebuttal opinions should have been disclosed in McCann's <u>initial</u> report. The Magistrate Judge, however, agreed with the SEC that Sen's new statistical analysis <u>was</u> the proper subject of a rebuttal report. (Dkt. #197.) In seeking leave, the SEC told the Magistrate Judge that it planned to rebut Sen's new analysis by (a) identifying errors in Sen's statistical analysis, (b) detailing the impact of those errors, and (c) and demonstrating that, once the errors are fixed, Sen's statistical methods support a contrary conclusion. (Dkt. 192 at p. 11.) <u>That is exactly what McCann did in his rebuttal</u>. While the Defendants don't like McCann's conclusions, *Daubert* is not an appropriate

mechanism for disagreeing with an expert's conclusion or belatedly asking the Court to reverse the Magistrate's decision that the rebuttal the SEC described was appropriate.

Finally, Defendants try to use *Daubert* to preemptively muzzle what McCann can and cannot say at trial in response to questions on topics ***raised by Defendants at McCann's deposition***. In short, Defendants opened the door on certain topics and now complain that McCann responded. While Defendants may not like McCann's responses to their questions, that is no basis to exclude McCann's answers.

Ultimately, as detailed below, the opinions expressed in McCann's Initial Report and Rebuttal Report are (1) well within McCann's expertise, (2) reliable, and (3) will assist the jury. McCann's opinions are therefore admissible.

## I.    Chronology of the Valuation Expert Reports

### A.    McCann's Initial Report

The SEC retained McCann to assess: (1) whether SBB's valuation model and model inputs were consistent with the standard assumptions and practices of market participants and (2) the directional impact any such departures may have had on SBB's note valuations. (*See generally* McCann.) McCann opined that SBB's valuation model and inputs significantly departed from – and were inconsistent with – established valuation principles, published valuation research, industry standards, and practices of market participants. (McCann ¶¶ 83-112.) He identified six deficiencies in SBB's valuation model:

1. SBB's valuation model violated the widely accepted and generally applied "risk neutral" approach to asset valuation.

2. SBB's drift term "*mu*" – which used expected stock market returns to project out asset values, instead of the widely accepted and generally applied risk-free rate – (i) inflated the value of SBB's notes, and (ii) had ***no*** support in academic research or industry practice.

3

3. SBB's use of *mu* to project out asset values, while discounting those payoffs back to the present using the risk-free rate of interest, violated the widely accepted and generally applied "risk neutral framework."

4. SBB's use of historical volatility multiplied by *"beta"* – a volatility multiplier that SBB created out of whole cloth – had **no** support in well-accepted academic research and was not used by other market participants.

5. SBB's use of "linearization" – which SBB also created out of whole cloth – (i) artificially smoothed the inflated returns caused by *mu* and *beta* and (ii) had no support in academic research or industry practice.

6. SBB's failure to adjust its valuations for counterparty credit risk departed from basic industry practices.

(McCann ¶¶ 83-112.) After analyzing the role of these defective inputs in SBB's model, McCann further opined that, because of these radical departures from standard valuation practice, SBB's model "systematically over-valued call options and undervalued put options embedded in the structured notes purchased by SBB, thereby smoothing and inflating SBB's funds' investment performance." (McCann ¶ 15.)

To further buttress his opinion on the impact that SBB's deficient model had on its valuations, McCann compared, on a note-by-note, month-by-month basis, SBB's valuations to the valuations of three third parties who, unlike SBB, used industry-standard approaches to valuing the structured notes held by SBB: (1) the banks that issued notes to SBB (*i.e.*, note valuations the banks included in monthly account statements to SBB ("Bank Values")); (2) IHS MarkIt ("MarkIt") (the valuation service SBB retained in November 2016 to re-value its structured notes after it finally abandoned its defective model); and (3) McCann himself. (McCann ¶ 117, Appendix 2.) McCann observed that SBB over-priced most of its structured notes as compared to the three models that incorporated industry-standard methods and practices (*i.e.*, he found that the values SBB generated were systematically higher than the industry standard approaches).

4

### B. Sen's "Rebuttal" Report

Defendants portrayed Sen as a "rebuttal" expert. But, Sen rebutted very little of McCann's Initial Report. Sen did not (a) address *any* of the model deficiencies McCann identified or (b) challenge McCann's opinion that the deficiencies in SBB's model resulted in SBB systematically over-valuing the call options and under-valuing the put options embedded in SBB's notes. Instead, Sen's Report (1) described and applied an entirely different valuation model, the "Heston model," which SBB did not use, and (2) performed a regression analysis purportedly showing that there was no statistically significant difference between SBB's note values and the Bank Values.[1] (Dkt. 213-6, D Ex. 5, Sen Report ("Sen") ¶¶ 35-36, 68-93, 105-117, Appendix 2 at ¶¶ 1-17.)

### C. McCann's Rebuttal Report

The Magistrate Judge granted the SEC's request for leave to rebut Sen's new statistical regression analysis. (Dkt. #197.) McCann's resulting rebuttal did exactly what the SEC told the Magistrate Judge he would do. McCann (a) analyzed Sen's new regression analysis, (b) identified numerous deficiencies, including two serious data errors, (c) fixed Sen's errors, and (d) demonstrated that, when the errors are fixed, Sen's own methodology shows that SBB's values *were statistically higher* than the Bank Values. (McCann Rebuttal ¶¶ 6-15, 22-54, Table 1.)

## II. SBB Overpriced Its Structured Note Values

Defendants ask the Court to preclude McCann from testifying that "SBB over-priced most of its structured notes" (McCann ¶ 117) because his observation was purportedly based "solely on observed higher values *without any supporting analysis*." (Dkt. 214 at 11

---

[1] Sen's Report contains other analysis and opinions that are not relevant to this Motion.

("Motion") (emphasis added).) They claim that McCann's observation is "unreliable" because he "failed to disclose any methodology" supporting his conclusion. (*Id*. at 10.) But, Defendants' argument misconstrues McCann's opinion and disregards the 119 paragraphs in McCann's Initial Report in which he details: (1) the information he considered in making his findings; (2) the methods he used to assess SBB's valuation model; and (3) how the facts and data he considered support his opinion that SBB's model "systematically over-valued call options and undervalued put options embedded in the structured notes purchased by SBB, thereby smoothing and inflating SBB's funds' investment performance." (McCann ¶ 15.) A review of the body of report demonstrates that McCann's conclusions are based on "sufficient facts [and] data," and are therefore reliable under *Daubert*. Fed. R. Evid. 702(d).

Federal Rule of Evidence 702 and *Daubert* require district courts to engage in a three-step analysis before admitting expert testimony. The court must determine (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).) Here, Defendants do not challenge McCann's qualifications and they do not dispute that his opinions will assist the trier of fact. Instead, they argue McCann's opinion is "unreliable."

In assessing reliability, the Court should evaluate whether his conclusions are based on "sufficient facts or data." Fed. R. Evid. 702(b). "[T]he test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (internal quotations omitted). "Rather, the law grants a district court the same broad latitude when it decides

6

how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. at 412 (emphasis omitted); *see also United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009) (same). The Court is the gatekeeper, and "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). In short, in evaluating reliability, there should be a "link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003).

Here, there is a <u>clear</u> link between the facts and data McCann considered and his opinion. In his Initial Report, McCann disclosed his opinions about the numerous deficiencies with SBB's valuation model and the impact those deficiencies had on SBB's structured note valuations. Specifically, he opined:

> The direct impact of SBB's [deficient] "valuation" methodology is to predictably smooth and inflate SBB's reported returns by overstating the value of long call options and understanding the value of short puts options embedded in its portfolio of structed notes.

(McCann ¶ 89, *see also* ¶ 15.)

McCann's Initial Report sets forth the methodology he used to arrive at that opinion. *First*, McCann explained the evolution of the market for structured notes. (McCann ¶¶ 21-32.) *Second*, he explained how different types of structured notes are "structured" and explained their pay-off features. (*Id*. ¶¶ 33-41.) *Third*, McCann -- based on over 30 years of structured product valuation expertise (which Defendants do not dispute) -- detailed the "standard methodologies" and valuation models and inputs that he and other market participants and academics use to value structured notes, including: applying (1) the "risk neutral" framework, (2) risk-free rate, (3) implied volatility, and (4) a present day discount

7

based on the risk-free rate and the counter-party's credit risk. (*Id.* ¶¶ 42-67.) In addition to providing the "how," McCann explained "why" these "standard methodologies" and valuation models are used by market participants and academics. (*Id.*) *Fourth*, McCann discussed the pay-off features associated with SBB's structured notes. (*Id.* ¶¶ 68-80.) *Fifth*, as detailed above, McCann analyzed SBB's valuation model and opined that the model inputs were inconsistent with established valuation principles and the practices of market participants. (*Id.* ¶¶ 83-112.) In his "rebuttal," Sen did not challenge *any* of those findings and, in fact, admitted that when he developed his own model, he avoided SBB's deficient inputs. (Ex. 1, Sen Dep. 35:9-22; 24:13-22; 25:25-30:10; 32:21-33:4; 33:14-17; 36:6-13.) At McCann's deposition, Defendants asked him virtually *no* questions about his opinion that SBB's model deviated from industry practice. (Dkt. 213-13, D Ex. 12 "McCann Dep.")

McCann then analyzed the directional impact the identified deficiencies had on SBB's structured note valuations, concluding that they caused SBB to "systematically over-value[ ] call options and undervalue[ ] put options embedded in the structured notes purchased by SBB, thereby smoothing and inflating SBB's funds' investment performance." (McCann ¶ 15.) McCann's opinion was based, in part, on his (1) analysis of SBB's custom inputs (and the formulaic impact those inputs would have), and (2) "back-test[ing]" of SBB's valuations, in which he analyzed SBB's valuation of certain call options and put options underlying SBB's structured note valuations against (a) observed market prices from Bloomberg and (b) valuations McCann generated using a standard Black-Scholes pricing model. (*Id.* at ¶¶ 99-103, Tables 2 and 3, and accompanying work papers.) McCann observed that while the Bloomberg prices and McCann prices were "both close to the mid-point of the observed market bid and ask prices" for the options, "SBB's methodology

overstates the call option value by more than 40% and the value of the put option at only a fraction of its observed market value." (*Id.* ¶¶ 100, 101.)

Again, Defendants asked McCann virtually ***no*** questions at his deposition about his back-testing, his conclusion that SBB's model inflated the call option values underlying its structured notes, or the portions of his Initial Report setting forth his methodology (including paragraphs 89, 99 – 103, or Tables 2 and 3). (*See generally* McCann Dep.)

Defendants likewise ignored the portions of McCann's Initial Report and his work-papers that detail the methodology he used to value SBB's structured notes, which are reflected in his demonstrative "scatterplots." For example, McCann's Initial Report detailed his Monte-Carlo simulation (an industry standard approach), and the industry standard inputs he used to value SBB's structured notes. And, he explained the basis, and academic support, for his approach. (McCann ¶¶ 42-67.) McCann's "scatterplot" analysis showed, consistent with his aforementioned methodology and opinions, that because SBB's model "systematically over-valued call options and undervalued [the] put options embedded in the structured notes," (*id.* ¶ 15), SBB's monthly valuations were consistently higher as compared to the three valuation models that incorporated industry-standard methods and practices. (*Id.* ¶ 117, Appendix 2.)

Defendants disagree with McCann's approach and ask the Court to preclude his opinions because he did not "conduct a regression analysis or any other type of statistical analysis" demonstrating that SBB's prices fell "outside the range of reasonable values." (Motion at 9.) In other words, Defendants insist that their way is the ***only*** acceptable way to conclude SBB overpriced its structured note values. This straw-man argument fails. McCann's conclusion that SBB "over-priced most of its structured notes," was based on (1)

his analysis of the significant deficiencies with SBB's valuation model and inputs and (2) his back-testing (which Defendants do not challenge) of SBB's valuations, which showed that SBB's model systematically overvalued the embedded call options. The "scatterplots," which Defendants spend so much time criticizing, are <u>not</u> a separate opinion, but rather further evidence for McCann's well-supported conclusion.

Faced with that reality, Defendants cherry-pick an excerpt from McCann's deposition, claiming his opinions were based solely on "eyeball[ing] scatterplot graphs." (Motion at 1) But, the <u>full</u> quote shows that his opinions were based on the data and methodology set forth in his Initial Report.

> Q: So your opinion concerning the extent to which SBB's funds were allegedly overvalued is **primarily based on the scatter plot graphs that you include in your report?**
>
> A: Yes, and the data that was produced along with the report that shows the amount by which each note … is valued almost universally in excess of the account statement values, the MarkIt values, and SLCG's values.
> …
> [I] thought at least in the initial report the primary purpose was to show – well, was to explain that SBB's valuation was nonstandard and didn't produce reliable results and that those results tended to be systematically higher than account statement values.

(McCann Dep. at 47:15-22; 48:20-49:1 (bold language reflects the limited portion of the quote identified in Defendants' Motion.)

No doubt, Defendants disagree with McCann's opinion that SBB "overpriced" its structured notes. But that disagreement should be resolved by the jury, not the Court on a *Daubert* motion. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.") (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "So long as the

principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attaching shaky but admissible evidence.'" *Schultz*, 721 F.3d at 431 (quoting *Daubert*, 509 U.S. at 596.)

In sum, as detailed above, the opinions in McCann's Initial Report were based on industry standard methodology and practices, *e.g.*, the review and analysis of established valuation principles, public scientific research, analysis of the directional impact of SBB's custom valuation inputs, industry standards and practices of market participants, and his back-testing of SBB's model. Defendants fail to identify any flaw in McCann's process or methodology. Disagreeing with the conclusion is not enough. McCann's opinion is reliable and should not be excluded.

## III. SBB Overpriced Its Structured Note Values By A Statistically Significant Amount as Compared to Bank Values.

Defendants' next argument is a veiled attempt to exclude McCann from rebutting Sen's flawed regression analysis.[2] But, the parties already litigated that issue, and the Magistrate Judge granted the SEC leave to address Sen's regression analysis via a rebuttal report. (Dkt. 197.) Defendants ignore that McCann's Rebuttal Report did <u>exactly</u> what the SEC told the Magistrate Judge he would do: he issued a classic rebuttal of Sen's regression analysis. <u>First</u>, McCann identified the numerous data errors and methodological flaws Sen committed in constructing and carrying-out his regression analysis which "biased the results

---

[2] Sen's Report claimed that his regression analysis established no statistically significant difference between SBB's values and all "third-party sources for the period 2013 – 2015." (Sen ¶ 14.) This is incorrect for two reasons. *First*, Sen's regression analysis compared only SBB values to Bank Values. (Sen ¶¶ 105-117.) So any of Sen's findings would apply only to the Bank values, not other "third-party sources" as Sen states. *Second*, as discussed in the SEC's motion to exclude some of Sen's opinions, Sen performed a second, undisclosed, regression analysis comparing SBB's values to MarkIt's values. (Sen Dep. 112:9-116:25.) Sen's second analysis showed that SBB's values were ***statistically higher*** than MarkIt's values. (Sen Dep. 114:22-115:8.)

toward [Sen's] desired conclusion." (McCann Rebuttal ¶ 15, *see also* ¶¶ 8-14, 22-54.) <u>Second</u>, McCann found that when he fixed Sen's errors and re-ran Sen's regression analysis, Sen's conclusion <u>is reversed</u>: SBB's values ***are statistically higher*** than the Bank values. (*Id*. ¶¶ 28-30, Table 1.) McCann opined:

> The Sen Report's regression implemented on the corrected sample … produces an estimate of [*alpha*] more than twice the Sen Report's original estimate and statistically significant at the 95% confidence level …

(McCann Rebuttal ¶ 28; *see also* ¶ 15 ("[C]orrecting [Sen's] errors fully reverses the Sen Report's statement that the estimated average [*alpha*] is not statistically significant and requires the conclusion that the SBB values, in fact, were not in line, statistically speaking with counterparty prices.").) McCann's Rebuttal Report did <u>not</u> stray from the rebuttal topic the SEC identified for the Magistrate Judge (*i.e.*, Sen's statistical regression analysis).

Perhaps sensing that McCann's critique of Sen's regression analysis has merit, Defendants ask the Court to cover-up Sen's mistakes by precluding McCann from testifying that SBB's values <u>were</u> higher than the Bank Values by a statistically significant amount. But, as the Magistrate Judge ruled, Defendants opened the door to this rebuttal by injecting Sen's new statistical analysis into this case. In short, the opinions in McCann's Rebuttal Report are fair game and are well within the scope of proper rebuttal that Sen set when he submitted his new statistical analysis. *U.S. v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001) ("The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party.") (internal quotations and citation omitted); Fed. R. Civ. P. 26(a)(2)(D)(ii).

Defendants also argue that McCann should be barred from testifying that SBB's values were greater than the Bank Values by a statistically significant amount because

"[n]owhere in his rebuttal report—or in his opening report for that matter—does McCann offer an opinion that SBB overvalued its notes by a statistically significant amount. He did not offer that opinion until his deposition." (Motion at 5.) That is simply incorrect. As quoted above, and as authorized by the Magistrate Judge, McCann ran a corrected regression analysis in connection with his Rebuttal Report and opined that, once Sen's errors were corrected, "the differences between SBB values and [Bank] values were statistically significantly different." (McCann Rebuttal ¶ 29.)

Strangely, Defendants acknowledge that McCann's Rebuttal Report contains these conclusions (*see* Motion at 12), yet they argue that his opinion is ***not*** "equivalent to (or suggesting that) SBB's values were overpriced by a statistically significant amount." (*Id.*). The SEC disagrees. McCann's corrected regression analysis – *i.e.*, an analysis using Sen's methods but correcting his errors – not only "suggests" that SBB's values were overpriced compared to the Bank Values, it <u>establishes</u> that SBB's values were ***in fact higher by a statically significant amount***.

Defendants next argue that McCann purportedly offered a "much broader" opinion at his deposition that "SBB overvalued its notes by a statistically significant amount." This argument fails for <u>three</u> reasons.

*First*, Defendants mischaracterize McCann's testimony. His testimony that SBB over-priced its note valuations by a "statistically significant amount" was based on the corrected regression analysis and conclusion ***in his Rebuttal Report***:

Q:     [A]re you offering an opinion in this case as to whether SBB materially overstated the value of its structured notes.

A:     It sounds like maybe a legal conclusion. I think the way I would phrase that is I am certainly offering the opinion that they overstated the value of the notes

by a statistically significant amount and someone else will decide whether that's a material fact or not.

Q:    But I thought you just said that you didn't perform a statistical analysis in your opening report, only *in response to Dr. Sen's analysis*?

A:    Correct.

(McCann Dep. at 51:23 to 52:11 (emphasis added).)

A:    [In the Rebuttal Report] we were addressing the primary conclusion in the Sen report that the SBB values were statistically in line with the [Bank] account statement values. And so that's really primarily a kind of question of the statistical analysis that Dr. Sen engaged in.

(*Id.* at 20:13-17.) Nowhere in McCann's Initial Report or Rebuttal Report, or in his deposition, did McCann offer an opinion as to whether SBB's values were overpriced by a "statistically significant amount" compared to any other third parties' valuations aside from the Bank Values. The scope of McCann's opinion at his deposition was therefore consistent with his Rebuttal Report.

*Second*, Defendants insist that the one, and only, way for McCann to conclude that SBB's valuations were overstated by a "statistically significant amount" was for him to adopt the specific method advanced by Defendants. They argue McCann should have created a "range of reasonable fair value estimates" (which Defendants do not define) and then show SBB's values were *not* statistically in line with that range. (Motion at 13.) Defendants say McCann's opinion should be excluded because he "fails to do that." But the reason McCann did not do that in his Rebuttal Report is that Sen did not perform such an analysis. Sen's regression analysis compared SBB's values to Bank Values. He did *not* perform a regression analysis "showing that the difference between the [reasonable] range

and SBB's values was statistically significant." (Motion at 13.) Defendants cannot credibly fault McCann for not rebutting an analysis that Sen did not perform.[3, 4]

      *Third*, while McCann's regression analysis was limited to comparing SBB's values to the Bank Values, Sen belatedly disclosed at his deposition that he performed a ***second*** regression analysis, comparing SBB's values to <u>MarkIt's</u> values. In that undisclosed analysis, Sen found that ***SBB's values were statistically higher*** compared to MarkIt. (Dkt. 210 at pp. 11-12; Ex. 1, Sen Dep. 112:9 to 116:23.) So, while Defendants criticize McCann for not comparing SBB's values to other purportedly "reasonable values," Sen apparently <u>did just that</u> and he found that SBB's values to be higher, by a "statistically significant amount." After Sen deliberately excluded from his report any reference to this second regression analysis – thereby ***preventing*** discussion in McCann's rebuttal report – Defendants cannot credibly take umbrage with McCann for failing to conduct a similar analysis.

## IV.   Deetz's +/-5% Variance Band is Not Supported In Structured Products Pricing Literature or In Industry Standard Option Valuation Practice

      In addition to Sen, Defendants filed an expert report by Gene Deetz ("Deetz"), an accounting expert, to opine on whether SBB's inflated structured note values were materially overstated as compared to MarkIt's valuations. (Dkt. 211-11, Deetz Report.) Deetz concluded that SBB's values were ***not*** materially overstated. (*Id.*) To do so, he created and applied a +/- 5% "band of estimation uncertainty" (the "5% Variation Band") <u>with no</u>

---

[3] Interestingly, the expert report of Defendants' accounting expert does not include a statistical analysis either. Although Gene Deetz purports to calculate a "range of reasonable fair value estimate" using a small sliver of available valuation data, he did <u>not</u> conduct a statistical analysis to determine whether his extrapolation of that calculation to the entire range of structured notes is statistically viable. In short, Defendants' stance on the appropriate method of comparing note values appears to hinge on whether the opinion is issued by the SEC's expert or their own.

[4] On reply, Defendants might point to Section XII in Sen's Report, titled "Calculating Margin of Error for the Note Valuations," to argue that Sen created a range of reasonable note values. But, Sen's report did ***not*** include a regression analysis comparing SBB's values to that "range."

15

apparent support in accounting principles or structured note valuation practices. Deetz concluded -- without citing any academic literature related to valuation or any related GAAP provision -- that any valuation misstatement by SBB that fell within this 10% band was "reasonable" and therefore could be ignored for purposes of his materiality analysis. The upshot of Deetz's opinion was that the first 5% of any overstatement did not matter.

Because Deetz cited **no** authority for this +/- 5% Variation Band, the SEC therefore had to guess: what was his source? It could not have been GAAP. The SEC's accounting expert Andrew Mintzer submitted a rebuttal report in which he opined that "there is no asserted basis in existing materiality guidance under GAAP … that specifically supports Mr. Deetz's application of the +/- 5% estimation band for purposes of quantifying a misstatement under GAAP." (Dkt. 213-8, D Ex. 7, Mintzer Rebuttal at ¶ 15 ("In short, the 5% Variation Band has no basis in valuation research or standard option valuation practice and appears to have been determined arbitrarily.").) Mintzer addressed the lack of support for Deetz's 5% Variation Band in GAAP and materiality accounting assessments.

In his Rebuttal Report, McCann addressed this same question from the valuation perspective, opining -- based on his 30+ years of asset valuation experience -- that Deetz's +/- 5% Variation Band was **not** supported "in structured products pricing literature or industry standard option valuation practice." (McCann Rebuttal ¶¶ 18, 58.) McCann further explained why applying a 5% Variation Band to structured note valuations would be unreasonable from an asset valuation perspective. (*See* McCann Rebuttal at ¶¶ 62-64 (applying a blanket 5% Variation Band would ignore (a) the fact that valuations, regardless of the model used, converge as a note approaches maturity so there should be no "variance" at that time, (b) different types of structured notes (like SBB Note 20, an inverse note) that

have different payoffs, and (c) potentially significant modeling errors (like the deficiencies in SBB's valuation model) causing the variance).)

Defendants argue that McCann is not qualified to testify on <u>accounting</u> issues so he should be precluded from testifying on this section of his Rebuttal Report. But, the SEC has no intent of asking McCann to opine on accounting principles. McCann's rebuttal of Deetz's 5% Variation Band is based not on his "accounting" experience, but on his 30+ years of asset valuation experience, specifically his expertise in valuing structured notes (which, again, Defendants do not dispute). McCann opined in his Rebuttal Report that Deetz's "5% Variation Band" (1) "has no support in structured products pricing literature or in industry standard option valuation practice," and (2) that any blanket application of the Band would be unreasonable because it would fail to account for "critical aspects of structured note" valuations; which McCann detailed. (McCann Rebuttal ¶¶ 18, 58, 20-21.) There is no dispute McCann is qualified to opine on structured note valuation methodology and applicable industry standards. (*See* McCann Dep. at 55:20 – 57:22 (detailing McCann's structured note experience), *see generally* McCann Report.)

Because McCann's opinions fall squarely within asset valuation, an area in which he has "superior knowledge, skill, experience, [and] education" *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010), he should be permitted to testify that Deetz 5% Variation Band has no support or basis in asset valuation principles. McCann is competent to testify on structured products pricing literature and on industry standard option valuation practices and his testimony will assist the jury. *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014) ("An expert's testimony qualifies as relevant under Rule 702 so long as it assists the jury in determining any fact at issue in the case.").

### V.    McCann's Criticisms of Sen's Model

Defendants next ask the Court to preclude McCann from testifying at trial about the numerous deficiencies in Sen's valuation model that McCann identified at his deposition. (Motion at 15-17.) The SEC does not dispute that some of those criticisms were not in McCann's Rebuttal Report. However, Defendants' counsel elicited these opinions from McCann at his deposition by asking catch-all questions and questions about whether McCann "agreed" with certain parts of Sen's Report.

Federal Rule of Civil Procedure 26(a)(2)(B) generally requires an expert to disclose a report containing, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them." The Federal Rules do not limit an expert's testimony to simply reading his report and an expert's report does not have to "replicate every word that the expert might say." *Noffsinger v. Valspar Corp.*, 2013 WL 12340338, at *5 (N.D. Ill. Jan. 4, 2012) (quoting *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009)) (Ex. 2). And there is precedent in this district that when opposing counsel at an expert's deposition asks "catch-all question[s]" such as "Do you have any other opinions as to this case that we haven't discussed," opposing counsel "open[s] the door to testimony that would otherwise be precluded …." *In re Sulfuric Acid Antitrust Lit.*, 235 F.R.D. 646, 660 (N.D. Ill. 2006) (citation omitted).

> If you decide to take an expert deposition, you must be careful what you ask. You may open the door to testimony that would otherwise be precluded under Rule 37(c)(1). There is, to be specific, considerable downside in asking common deposition questions designed to ensure that no unexplored opinions exist— like the traditional catch-all question, "Do you have any other opinions as to this case that we haven't discussed?" You generally don't want to know the answer to that question.

*Id.* (quoting Joseph, Gregory P., "Expert Approaches", 28 LITIGATION 20, 21 (Summer 2002).) (denying motion to exclude expert from testifying on subjects not identified in his report that were elicited by opposing counsel at expert's deposition); *Noffsinger*, 2013 WL 12340338, at *5 (same); *Searcy v. United States*, 2020 WL 4187392, at *4 (S.D. Fla. July 21, 2020) (Ex. 3.); *Cephalon, Inc. v. Watson Pharms., Inc.*, 769 F. Supp. 2d 761, 772 fn. 13 (D. Del. 2011) ("Although Bates's expert report was purely technical and did not contain an opinion on infringement ..., Watson opened the door to this opinion during Bates's deposition, at which point Bates thoroughly discussed his infringement opinion"); *Antonick v. Elec. Arts Inc.,* 2014 WL 245018, at *3 fn.3 (N.D. Cal. Jan. 22, 2014) (denying motion to strike trial testimony of expert regarding matters outside of initial and rebuttal reports, where matters were sufficiently disclosed "in his report or his deposition") (Ex. 4.)

Here, Defendants' counsel asked McCann at his deposition broad "catch-all questions" that elicited opinions they now try to exclude. Here is a sample of the questions that Defendants' counsel asked McCann, which invited his criticisms of Sen's model:

Q:     You refer to the Heston model [which Sen used in his Report]. In your opinion, is the Heston model an appropriate method by which to perform a valuation of structured notes? (McCann Dep. at 43:2-4.)

Q:     And you described several errors that you believed Dr. Sen committed in this [regression] analysis. Are there any other errors that you identified in Dr. Sen's report? (McCann Dep. at 195:7-10.)

Q:     [Counsel reads a quote from Sen Report] ... "researchers have concluded that application of the ad hoc Black-Scholes model can be inappropriate for exotic options. Indeed, it has been found that valuations of exotic options can be very model dependent." Do you agree with what Dr. Sen says in paragraph 61 [of his Report].? (McCann Dep. at 184:11-185:3.)

Q:     I think you wrote in your report that some professional judgment is required to calculate correction, is that correct?  ... What did you mean by that? (McCann Dep. at 95:18-22.)

19

Q:     For these models or approaches that you do deem appropriate, is it your opinion that each of them would produce the same valuation on a given date for the same note? (McCann Dep. 104:4-7.)

There is no doubt that Defendants disagree and do not like McCann's criticisms of

Sen's methodology and model, but their counsel opened the door to these issues and

McCann simply gave a well-informed response to these catch-all questions.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court deny

Defendants' Motion to Exclude Certain Expert Opinions And Testimony of Dr. Craig

McCann (Dkt. 214).

Dated:  May 13, 2024                                   **UNITED STATES SECURITIES**
                                                       **AND EXCHANGE COMMISSION**

                                                       By: */s/ Kevin A. Wisniewski*
                                                       Timothy S. Leiman (leimant@sec.gov)
                                                       Kevin A. Wisniewski (wisniewskik@sec.gov)
                                                       Robert M. Moye (moyer@sec.gov)
                                                       Devlin N. Su (sude@sec.gov)
                                                       Chicago Regional Office
                                                       175 W Jackson Blvd., Suite 1450
                                                       Chicago, IL 60604

                                                       *Attorneys for Plaintiff United States Securities and*
                                                       *Exchange Commission*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by the Court's

ECF system upon all counsel of record.

                                                        */s/ Kevin A. Wisniewski*