# EXHIBIT A

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| _____ | |
| : | |
| **SECURITIES AND EXCHANGE** : | |
| **COMMISSION,** : | |
| : | **CASE NO. 19-cv-6473** |
| **Plaintiff,** : | |
| **v.** : | |
| : | |
| **SBB RESEARCH GROUP, LLC,** : | |
| **SAMUEL B. BARNETT, and** : | |
| **MATTHEW LAWRENCE AVEN,** : | |
| : | |
| **Defendants.** : | |
| _____ : | |

**EXPERT REPORT OF PETER C. HICKEY**

**April 17th, 2023**

# Table of Contents

**Page**

**I.**   **Introduction and Credentials** ........................................................................ **3**

**II.**   **Summary of Opinions** ................................................................................... **5**

**III.**   **SBB Funds and Investments in Structured Notes** ..................................... **7**

   A.   SBB's Valuation Model ........................................................................ 17

**IV.**   **GAAP & Other Fair Value Guidance** ......................................................... **19**

**V.**   **SBB's Representations Regarding Fair Value Reporting and**
   **Representations Regarding Application of ASC 820 to SBB Structured Notes** ......... **22**

**VI.**   **Details of ASC 820: Fair Value as a Market-Based Measurement,**
   **Observable v. Unobservable Inputs, Historical v. Implied Volatility** ......................... **25**

**VII.**   **SBB's Failure to Appropriately Apply ASC 820 in Valuing the Component**
   **Options of its Structure Notes** ....................................................................... **34**

   A.   SBB Develops the SBB Model ............................................................. 39

**VIII.** **SBB's Lack of Knowledge of ASC 820, Fair Value and Valuation Policies**
   **and Functions, Reliance on Auditors** ........................................................... **42**

   A.   SBB Testimony Regarding Structured Notes, Valuation and ASC 820 Experience .. 43

   B.   No Valuation Policy Prior to 2014 ....................................................... 45

   C.   PWC Report on SBB's Valuation Governance and SBB's Failed Attempts to Validate
        the SBB Model ..................................................................................... 47

   D.   SBB's Reliance on Auditors to Ratify Its Valuation Model ..................... 49

**IX.**   **SBB's Failure to Follow Fair Value Guidance and ASC 820** ..................... **50**

   A.   The May 2016 Model ............................................................................ 57

   B.   The Markit Model ................................................................................. 58

**X.**   **Fair Value as Current Exit Value, Not Future Potential Value** .................. **60**

**XI.**   **Effects of SBB's Failures to Comply with ASC 820** ................................. **63**

## I.    Introduction and Credentials

1.    My name is Peter Hickey. I am a Principal at Global Economics Group, a Chicago-based firm that specializes in applying economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation.

2.    The United States Securities and Exchange Commission ("SEC") engaged me to review the valuation methods used to value several investment funds managed by investment adviser SBB Research Group, LLC ("SBB") (collectively, "the SBB Funds" or "the Funds") from 2011 to 2016. Specifically, the SEC asked me to (a) provide expert analysis of the significance of Generally Accepted Accounting Principles ("GAAP") (and specifically ASC 820) in the context of asset valuation, (b) analyze the requirements of ASC 820 in the context of valuation of the component options of the structured note assets held by the Funds, (c) analyze whether SBB properly considered and applied ASC 820, including whether SBB properly considered and applied ASC 820 in the creation and use of a valuation model ("the SBB Model") for the valuation of assets held by the SBB Funds, and (d) assess the effects and/or significance of any failures of SBB with respect to the fair valuation of its investments.

3.    I hold a bachelor's degree in Economics from Georgetown University and an MBA, with concentrations in Accounting and Finance, from the University of Chicago's Booth School of Business.

4.    I was one of the co-founders of Global Economics Group in March 2008. Prior to this, I was employed for over 10 years by another consulting firm, Chicago Partners, LLC, where I conducted analysis in matters involving, among other things, securities and fixed income offerings and the valuation and performance of financial investments. While at Chicago Partners, I was also employed by its affiliate Chicago Capital Services, LLC, which provided investment

banking advisory services to individuals and firms pursuing acquisitions, divestitures and capital raising projects.

5.      I have been engaged as a valuation and damages expert both within and outside the litigation context. I have testified as an expert in federal and state court cases as well as at arbitration proceedings across the country. I have previously been retained as an expert and consultant by the SEC, the State of Illinois Attorney General's office and the Financial Industry Regulatory Authority ("FINRA"). I am also regularly retained as an expert by counsel for private investment firms as well as individuals who are either plaintiffs or defendants in financial markets litigation and regulatory matters.

6.      As a result of my 25-year career in economic consulting and investment banking, I have significant experience analyzing the valuations of investment funds in a variety of contexts, including funds that invest in options and other derivative instruments similar to those at issue in this litigation. I have testified as an expert in several cases involving investment funds on issues related to valuation and the application of ASC 820 and other fair value guidance to those funds.

7.      My qualifications are further detailed in my Curriculum Vitae, which is attached as **Appendix A**.

8.      Global Economics Group is being compensated at an hourly rate of $550 for my work on this engagement, and my compensation is in no way dependent on the outcome of this matter. I reserve the right to amend and/or supplement this report to reflect new information that becomes available to me in light of further proceedings in this matter, including additional discovery and/or future rulings from the Court.

9.      The materials I reviewed for purposes of arriving at the opinions expressed in this report are listed in **Appendix B**.

## II.   Summary of Opinions

10.   After reviewing the documents and data provided to me, as well as information cited within this report I have arrived at the following opinions:

a.  SBB did not comply with ASC 820 and other fair value guidance in the valuation of its Funds during the relevant time period from 2011 to 2016. Because SBB did not comply with ASC 820 in valuation of the Funds, the financial statements for the SBB Funds were not prepared in accordance with GAAP.

b.  SBB's model for valuing structured notes was an option valuation exercise. By its own terms, the SBB Model breaks each note down into its component options, runs simulations for valuations of the options on the underlying indices and then aggregates the option values to get the value of a particular note.

c.  SBB's representation to investors that the SBB Funds were valued in accordance with GAAP would be considered important by a reasonable investor because it indicated to investors (and SBB's auditor) that (i) SBB used widely accepted, industry standard accounting methods for calculating the value of its investments, (ii) SBB's valuations were done in such a way that allowed investors to make comparisons to other similar investments, and (iii) SBB was not using subjective considerations to reach valuations that were inconsistent with fair value.

d.  Between 2011 and 2016, SBB had no experience with ASC 820 or fair value guidelines that pertained to its Funds' investments in structured

5

notes. SBB's valuation processes and functions during this time period were not well developed.

e. SBB did not attempt to comply with ASC 820 when they created the SBB Model. To the contrary, SBB does not seem to have been aware of ASC 820's requirements until well after the SBB Model was created and implemented.

f. SBB's utilization of the SBB Model did not comply with ASC 820 because, among other things, it did not maximize the use of observable inputs and minimize the use of unobservable inputs.

g. The SBB Model was an entity-specific model and not a market-based model and was inconsistent with achieving an indication of fair value, a value representing the current exit value or the price that SBB would receive for selling one of its structured notes at any particular valuation date.

h. SBB failed to account for the assumptions or practices of other market participants when it made significant adjustments to a more standard options valuation model and market observable inputs used to value structured notes. As such, the SBB Model was not based on market-corroborated inputs (as required by ASC 820).

i. SBB failed to utilize available and observable market-corroborated inputs, including implied volatility, from the active option markets for S&P 500 and Russell 2000 indices, the underlying indices for the vast majority of structured notes held by the SBB Funds.

6

     j.   The SBB Model valuations caused the SBB Funds to report inaccurate performance track records, risk/return metrics and NAVs during the relevant time period from 2011 to 2016. SBB's valuation methods tended to overstate the value of the component options of SBB's structured notes. Among other things, by SBB's own calculations, this caused investors to pay approximately $1.4 million in excessive fees (based on the SBB Model valuations as compared against the Markit Model valuations).

## III.  SBB Funds and Investments in Structured Notes

11.    From 2011 to 2016, SBB was owned and managed by Dr. Samuel Barnett, Ph.D. ("Defendant Barnett"). During this time Defendant Barnett was SBB's CEO and had ultimate approval authority for all its decisions and operations, including valuation. SBB was founded by Defendant Barnett in late 2010 and from 2011 to 2016 SBB managed several funds, mostly focused on investing in structured notes.[1] A structured note is a security primarily issued by a financial institution combining a debt obligation (i.e., fixed component) and an embedded derivative (i.e., variable component). This combination results in a hybrid product with the financial institution acting as a borrower and the investor's return is tied to the performance of the underlying asset, and/or index of the embedded derivative. Additionally, SBB's internal documents filed with the SEC defined a structured note as "an unsecured debt security of another issuer, most often issued by an investment bank, which uses derivatives to create a return."[2] After a few years of raising and investing capital from family and friends, SBB created its

---

[1] Barnett Inv. Test. Tr. at 34:05-12; SEC Inv. Test. Ex. 5 at 1.
[2] SEC Inv. Test. Ex. 5 at 7.

flagship fund, Polysight I, LLC ("Polysight") in 2014. SBB intended to market Polysight to outside retail and institutional investors.[3]

12.     The SBB Funds, including but not limited to Polysight, generally were structured with a two-year lockup provision, meaning investors were restricted from withdrawing their funds until the two-year anniversary of their initial contribution.[4] SBB received compensation for its investments in the Funds through management and performance fees. SBB generally charged its investors a management fee of two percent per annum based on the fund's net asset value ("NAV") and a performance-based fee in an amount equal to 20 percent of net profits. SBB's performance-based fee policy is applied to each investor in SBB's Funds.

13.     A unique feature of SBB's performance-based fee policy is the exclusion of a high-water mark clause. A high-water mark clause (i.e., a loss carryforward provision) is applied to the calculation of a firm's performance fee. More specifically, a fund manager's ability to collect a performance fee is limited to only the highest peak in a fund's value.[5] In other words, when a fund's NAV drops below its highest value, the fund manager cannot collect a performance fee until the NAV reaches its previous high value (i.e., high-water mark). Without such a clause, for example, SBB could continue collecting a performance fee when recovering from a market loss in the Funds that occurred between two profitable years. In other words, investors would potentially pay a performance fee based on the same value increase over two separate time periods.[6] For a hypothetical investor in the SBB Funds over a three year period that achieved profits of 10% in Year 1, -3% in Year 2 and 20% in Year 3, that investor would pay performance

---

[3] Navalgund Dep. Tr. at 167-8.
[4] SEC Inv. Test. Ex. 6.
[5] "In Concert: Exploring the alignment of interests between hedge fund managers and investors," *AIMA*, September 2016, p. 8, available at https://www.aima.org/resource/in_concert.html.
[6] See, for example, https://corporatefinanceinstitute.com/resources/wealth-management/high-water-mark/

fees in Year 1 on the 10% gain, no performance fee in Year 2 and performance fees in Year 3 based on the entire 20% gain that year. Under a high-water mark clause, that same hypothetical investor would pay the same performance fees in Years 1 and 2 but pay Year 3 performance fees only on the gain from the previous high-water mark from Year 1 to the new high-water mark in Year 3.

14.     According to a 2016 AIMA survey of 120 global hedge fund managers, 97% used a high-water mark when calculating their funds' performance fees.[7]

15.     SBB's investment strategy, according to SBB's Chief Operating Officer Matt Aven ("Defendant Aven"):

> "So we have a standard structure that we use. We do the worst of S&P and Russell 2000. Basically what that means is at maturity, at maturity, if both of the indexes are below a certain level, there's a loss state. Typically we define it with a principal return state, and then there's a payout state if both indexes are above of a certain level.
>
> Our mandate, our internal mandate, the thing we talk about to all of our investors and potential investors is 20 percent principle (sic) protection which means the market goes down 20 percent, we are trying to protect you from losing principle (sic) in that period. If it goes down further than that, things will change.
>
> But in that period which we deem to be the more common outcomes, we're trying to protect your principle (sic) there. So if the fund goes up 10 percent, but then the market drops into that zone, you're going to lose those gains, but your principle (sic) should be protected. That's our definition. So when we build a structure, we always try and take that into account."[8]

16.     SBB Funds were invested in structured notes with dual underlying equity indices. More specifically, SBB Funds invested in structured notes primarily with dual underlying equity indices consisting of the S&P 500 index and the Russell 2000 index.[9] This element of the

---

[7] In a survey of over 120 global hedge fund managers, 97% use a high-water mark in their fund's performance fee. *See*, "In Concert: Exploring the alignment of interests between hedge fund managers and investors," *AIMA*, September 2016, pp. 5, 8, available at: https://www.aima.org/resource/in_concert.html.
[8] Aven Inv. Test. Tr. at 84.
[9] Navalgund Dep. Tr. at 41.

structured note impacts an investor's payoff. For example, an SBB Fund investor's payoff would be tied to the underlying return of the worst performing index (i.e., "lesser performing") of either the S&P 500 or the Russell 2000 over the same period of time, typically measured at maturity.[10]

17.    A structured note like the ones held by the SBB Funds are a hybrid product with the financial institution acting as a borrower and the investor's return is tied to the performance of the underlying asset, and/or index of the embedded derivative.[11] A structured note with partial-to-full principal protection, for example, is a hybrid financial product consisting of a zero-coupon bond and a series of option contracts.[12] The embedded derivative feature of the structured note is really a combination of options depending on the terms negotiated between SBB and the issuing bank.[13] According to testimony from SBB personnel, most of the value of the structured notes held in the SBB Funds, or approximately 90%, is captured in the options.[14] Since the SBB structured notes were predominantly referencing the S&P 500 and Russell 2000, the options embedded in the structured notes were S&P 500 and Russell 2000 index options. Both the issuing banks and SBB employed models to estimate the terms of the notes and the value of the notes at the time of issuance.

18.    The assets underlying the component options of SBB's structured notes were very widely traded. The S&P 500 index is one of the most widely traded financial indices in the world

---

[10] Navalgund Dep. Tr. at 41, 79.

[11] **Exhibit 1** provides a diagram of a structured note with hypothetical payoffs at maturity.

[12] A zero-coupon bond is a relatively simple debt obligation that does not pay interest during the life of the bond, therefore, the bond trades at a deep discount to its face value. Upon maturity, the full value of the bond is received. See, "Glossary: Zero Coupon Bond," *U.S. Securities and Exchange Commission*, available at https://www.investor.gov/introduction-investing/investing-basics/glossary/zero-coupon-bond. "Structured Notes with Principal Protection: Note the Terms of Your Investment," Investor Alerts an Bulletins, *U.S. Securities Exchange Commission*, June 1, 2011, available at https://www.sec.gov/investor/alerts/structurednotes.

[13] According to SBB's own valuation policy, "SBB Research Group provides a reasonable valuation of its structured products by breaking the product into subcomponent options, estimating the price levels at expiration of the underlying assets, valuing the subcomponent option based on the estimated price levels of the underlying assets, and, finally, aggregating the option values to determine the structured product value." See, SEC Dep. Ex. 25 at 1 or Bates RSM-SBB-00132830.

[14] Navalgund Inv. Test. Tr. at 44 and Navalgund Dep. Tr. at 45-6.

and a very common index for structured products.[15] Options on the S&P 500 index are available for a multitude of strikes and approximately 5 years of expiration dates at the CME Group ("CME").[16] The Chicago Board of Options Exchange ("CBOE") also offers S&P 500 index options for a multitude of strikes and expiration dates.[17] Additionally, the CBOE offers a multitude of options at different strike prices and expiration dates for the Russell 2000 index.[18] The Russell 2000 is an index of 2,000 small-capitalization US-companies and is a widely used benchmark for funds that invest in small companies. At the CBOE and other exchanges, Russell 2000 index options are widely traded for a multitude of strike prices and with expirations of up to 5 years.[19] Similar to S&P 500 index options, the active trading markets for Russell 2000 index options provide a significant amount of market information, including prices and implied volatilities, on a daily basis. The S&P 500 index and the Russell 2000 are two of the most commonly watched indices by investors.[20]

### Structured Note Example 1: JP Morgan Note (Due September 4, 2014)

19.   For example, on May 22, 2013, SBB purchased $2,000,000 Single Review Notes Linked to the Lesser Performing of the S&P 500 Index and Russell 2000 Index due September 4, 2014 from JP Morgan.[21] As stated in the pricing supplement for this structured note, the notes were designed for investors who seek a fixed return of 13.65% if both the S&P 500 and Russell

---

[15] "Structured products are very often tied to the S&P 500, NASDAQ 100, or other broad stock index, but can also be linked to a very wide variety of other asset classes." See, Geng Deng, Tim Husson and Craig McCann, "Valuation of Structured Products," *The Journal of Alternative Investments*, Spring 2014, 16 (4) 71-87 or SEC Dep. Ex. 32 at 3 (SBBRG0302008).

[16] https://www.cmegroup.com/markets/equities/sp/e-mini-sandp500.contractSpecs.options.html#optionProductId=138.

[17] https://www.cboe.com/tradable_products/sp_500/spx_options/specifications/ and https://www.cboe.com/tradable_products/sp_500/mini_spx_options/specifications/).

[18] https://www.cboe.com/tradable_products/ftse_russell/russell_2000_index_options/rut_specifications/ and https://www.cboe.com/tradable_products/ftse_russell/mini_russell_2000_index_options/mrut_specifications/.

[19] https://www.cboe.com/tradable_products/ftse_russell/russell_2000_index_options/rut_specifications/.

[20] https://www.businessinsider.com/personal-finance/russell-2000-index.

[21] SEC Inv. Test. Ex. 36.

2000 are at or above their call levels at maturity.[22] If the ending index level of the lesser performing index is less than its initial index level by more than 14%, investors will lose more than 14% of their investment and may lose all of their principal amount at maturity. Additionally, any payment on the notes is subject to the credit risk of JP Morgan Chase & Co., the issuing bank. Other risks for structured notes include liquidity risk, interest rate risk and market risk.

20.    **Figure 1** below is taken directly from the pricing supplement for this structured note and shows hypothetical payoffs or returns to SBB with the lesser performing index closing at various levels (assuming the initial index level is 1000). As shown in Figure 1, if the lesser performing index appreciates between -4% and above, SBB receives a total return of 13.65%. If the lesser performing index appreciates between -4% and -14%, SBB receives a total return of 0%. Finally, if the lesser performing index appreciates less than -14%, SBB receives a total return equal to the total depreciation of the lesser performing index.

---

[22] For this note, the call levels are 96% of the Initial Index Level or the index price when the notes originated.

**Figure 1**

| Index Closing Level at Review Date | Appreciation/ Depreciation of Lesser Performing Index at Review Date | Total Return at Review Date |
|---|---|---|
| 1,800.00 | 80.00% | 13.65% |
| 1,700.00 | 70.00% | 13.65% |
| 1,600.00 | 60.00% | 13.65% |
| 1,500.00 | 50.00% | 13.65% |
| 1,400.00 | 40.00% | 13.65% |
| 1,300.00 | 30.00% | 13.65% |
| 1,200.00 | 20.00% | 13.65% |
| 1,100.00 | 10.00% | 13.65% |
| 1,050.00 | 5.00% | 13.65% |
| 1,010.00 | 1.00% | 13.65% |
| **1,000.00** | **0.00%** | **13.65%** |
| 990.00 | -1.00% | **13.65%** |
| 960.00 | -4.00% | **13.65%** |
| 959.90 | -4.01% | **0.00%** |
| 950.00 | -5.00% | **0.00%** |
| 900.00 | -10.00% | **0.00%** |
| 860.00 | -14.00% | **0.00%** |
| 859.90 | -14.01% | -14.01% |
| 800.00 | -20.00% | -20.00% |
| 700.00 | -30.00% | -30.00% |
| 600.00 | -40.00% | -40.00% |
| 500.00 | -50.00% | -50.00% |
| 400.00 | -60.00% | -60.00% |
| 300.00 | -70.00% | -70.00% |
| 200.00 | -80.00% | -80.00% |
| 100.00 | -90.00% | -90.00% |
| 0.00 | -100.00% | -100.00% |

## Structured Note Example 2: Credit Suisse Note (Due August 27, 2018)

21.    For a second example, on August 19, 2015, SBB purchased $3,000,000 Digital Barrier Notes due August 27, 2018 Linked to the Performance of the S&P 500 Index and the Russell 2000 Index.[23] As stated in the pricing supplement for this structured note, the notes were designed for investors who seek a fixed return of 21.50% if a knock-in event[24] does not occur for either the S&P 500 or Russell 2000 index.[25] The knock-in level for these notes is 30% from the

---

[23] SEC Inv. Test. Ex. 119.

[24] A knock-in event is a structured note feature that sets a pre-specified index level at which the note's payout return changes. See, "Investor Bulletin: Structured Notes, SEC, January 12, 2015, available at: https://www.sec.gov/oiea/investor-alerts-bulletins/ib_structurednotes.

[25] For this note, the knock-in level was 70% of the Initial Index Level or the index price when the notes were originated.

13

initial levels of the indices as of the purchase date. If the ending index level of the lesser performing index is less than its initial index level by more than 30%, investors will lose more than 30% of their investment and may lose all of their principal amount at maturity. Additionally, any payment on the notes is subject to the credit risk of Credit Suisse, the issuing bank.

22.  **Figure 2** below is taken directly from the pricing supplement for this structured note and shows hypothetical payoffs or returns to SBB with the lesser performing index closing at various levels (assuming the initial index level is 1000). As shown in Figure 2, if the lesser performing index appreciates between -30% and above, SBB receives a total return of 21.50%. If the lesser performing index appreciates less than -30%, SBB receives a total return equal to the total depreciation of the lesser performing index.

**Figure 2**

| Percentage Change from the Initial Level to the Final Level of the Lowest Performing Underlying | Underlying Return of the Lowest Performing Underlying | Redemption Amount per $1,000 Principal Amount of Securities |
|---|---|---|
| 100.00% | 21.50% | $1,215.00 |
| 90.00% | 21.50% | $1,215.00 |
| 80.00% | 21.50% | $1,215.00 |
| 70.00% | 21.50% | $1,215.00 |
| 60.00% | 21.50% | $1,215.00 |
| 50.00% | 21.50% | $1,215.00 |
| 40.00% | 21.50% | $1,215.00 |
| 30.00% | 21.50% | $1,215.00 |
| 20.00% | 21.50% | $1,215.00 |
| 10.00% | 21.50% | $1,215.00 |
| **0.00%** | **21.50%** | **$1,215.00** |
| −10.00% | 21.50% | $1,215.00 |
| −20.00% | 21.50% | $1,215.00 |
| **−30.00%** | **−30.00%** | **$700.00** |
| −40.00% | −40.00% | $600.00 |
| −50.00% | −50.00% | $500.00 |
| −60.00% | −60.00% | $400.00 |
| −70.00% | −70.00% | $300.00 |
| −80.00% | −80.00% | $200.00 |
| −90.00% | −90.00% | $100.00 |
| −100.00% | −100.00% | $0.00 |

23.     In total, SBB purchased approximately 110 structured notes similar to the two examples described above between February 2011 and August 2016.[26] **Exhibit 2** provides a recreation of Commission Exhibit 125 produced by SBB showing each of the structured notes issued to SBB during this time period. As Exhibit 2 demonstrates, the underlying indices of 87%

---

[26] SEC Inv. Test. Ex. 125 lists 110 structured notes. The numbers displayed on this exhibit match the numbers found in Polysight's 2014 financial statements. For instance, one note in Polysight's financial is "SBBRG Strategic Participation Securities 0064, $1,200,000; 100% participation; due 12/27/18." This matches note no. 64 as displayed in SEC Inv. Test. Ex. 125. A second note in Polysight's financial is "SBBRG Strategic Participation Securities 0074, $5,000,000 principal; 60% participation; due 9/30/19. Polysight's financial shows that fund owning $3,000,000 of the principal of this note or 60% of $5,000,000. SEC Inv. Test. Ex. 125 appears to be a complete set of notes owned by SBB with corresponding participation percentages split out between various funds, according to that fund's financial statements. Defendant Barnett confirmed that each fund managed by SBB may have a financial interest in the structured note through a participation agreement. See Barnett Inv. Test. Tr. at 82.

15

of the notes issued to SBB and held by the SBB Funds consisted of the S&P 500 and/or the Russell 2000.

24. **Exhibit 3** shows the SBB Funds' net asset values, cost basis of investments, SBB's reported value for the investments, gains/losses (both realized and unrealized) and fees (both management fees and performance fees) annually from 2011 to 2015. Exhibit 3 consists of six SBB Funds: SBBRG Investors II, SBBRG Investors III, SBBRG Investors IV, SBBRG CPS I, SBBRG Polysight I, and SBBRG CPS Fund XI LLC.[27]

25. **Table 1** below shows a summary of the SBB Funds from 2011 to 2015, taken from Exhibit 3 and the Funds' financial statements:

**Table 1**

| Year End | Cost Basis | SBB Reported Value | Unrealized Gain | Fees |
|---|---|---|---|---|
| 2011 | $4,000,000 | $4,413,749 | $413,749 | $249,886 |
| 2012 | $11,000,000 | $12,964,542 | $1,964,542 | $511,693 |
| 2013 | $55,648,083 | $61,318,033 | $5,669,950 | $1,125,892 |
| 2014 | $109,667,507 | $122,158,610 | $12,491,103 | $2,200,149 |
| 2015 | $119,624,497 | $133,263,159 | $13,638,662 | $2,209,769 |

26. As Table 1 above demonstrates, a significant portion of the value of each SBB Fund (and, thus, a significant portion of the fees collected by SBB) was determined by the unrealized gains and losses from SBB's reported valuations of the structured notes held by each of its funds. The unrealized gains or losses for the structured notes purchased by SBB and held in its Funds were solely based on the valuations of these structured notes calculated by SBB.[28]

---

[27] SEC Dep. Ex. 77 at RSM-SBB-00033836.
[28] Aven Dep. Tr. at 49-51.

A. **SBB's Valuation Model**

27.    To value the structured notes held by the SBB Funds, SBB considered or utilized 4 distinct models from 2011 to 2016. First, SBB considered a model developed by valuation consultant Israel "Izzy" Nelken and his firm SuperCC Consulting (the "SuperCC Model"). SBB chose not to utilize the SuperCC Model for valuing its structured notes. After rejecting the SuperCC Model, SBB utilized a custom model it developed internally to value the SBB Funds from 2011 until May 2016 and for financial statements from FY 2011 through FY 2015 (the "SBB Model"). Following receipt of a deficiency letter from the SEC on March 16, 2016 ("SEC Deficiency Letter") SBB, starting in May 2016, briefly used a revised model it developed internally in response to the SEC Deficiency Letter (the "May 2016 Model"). Finally, SBB decided in November 2016 to use a third-party model developed by Markit[29] (the "Markit Model") for valuing the SBB Funds from 2016 to present.

28.    SBB initially described its model as "running Monte Carlo simulations utilizing the Black-Scholes formula for option pricing."[30] In this description SBB referred to the Black Scholes model as the "preferred model in the industry."[31] According to SBB, the SBB Model for its structured notes values the note by "breaking the [note] into subcomponent options, estimating the price levels at expiration of the underlying [indices], valuing the subcomponent options based on the estimated price levels of the underlying [indices], and finally, aggregating the option values to determine the structured [note] value."[32]

29.    In the same document, SBB describes 3 additional factors that have been referred to as *mu*, *beta*, and *linearization* that it added to the standard Black Scholes model purportedly to

---

[29] https://news.ihsmarkit.com/.
[30] SEC Inv. Test. Ex. 15.
[31] SEC Inv. Test. Ex. 15.
[32] SEC Inv. Test. Ex. 15.

"address inadequacies of the Black-Scholes formula."[33] *Mu* effectively replaced the risk-free rate as the drift term for the model. Instead of projecting the value of assets into the future using the risk free rate of return – as is the standard for Black Scholes and similar models – SBB's *mu* input used the historical return of the underlying index.[34] During periods of low interest rates and relatively high market returns, *mu* would generally cause the SBB Model to lead to higher valuations than models using the traditional risk-free framework.[35] This effect is compounded by the fact that SBB kept the risk-free rate as its discount factor. *Beta* was a customized input developed by SBB that served as a volatility multiplier.[36] *Linearization* was – in practical effect – a smoothing mechanism designed to spread fluctuations caused by *mu* and *beta* over the term of the note.[37]

30.    It is common for funds like the SBB Funds to employ valuation models to value securities and investments of various types for financial reporting and other purposes. While no one valuation model is required in all instances, investment funds are directed by well-established fair value guidance in arriving at valuations that represent fair value or current exit value for those securities or investments held by its funds. SBB and Defendant Barnett as the investment manager of the SBB Funds were responsible for knowing, understanding, and applying that guidance to determine the fair value of the SBB Funds' investments. The Funds' financial statements, investment policy statements and other documents describe SBB's fair value responsibilities and are based on well-known guidance from the Investment Company Act, ASC 820 and SEC guidelines.

---

[33] SEC Inv. Test. Ex. 15.
[34] Navalgund Dep. Tr. at 97-98.
[35] Aven Inv. Test. Tr. at 127; Navalgund Dep. Tr. at 129.
[36] Navalgund Dep. Tr. at 138.
[37] Navalgund Dep. Tr. at 146-47.

## IV. GAAP & Other Fair Value Guidance

31. Fair value is commonly defined as "the price that would be received to sell an asset, or paid to transfer a liability, in an orderly transaction between market participants at the measurement date."[38] Fair value is based on the principle of being an "exit value" or the price you would receive as of a certain date if you sold a security or investment.

32. ASC 820 is an accounting rule that provides for a hierarchy – consisting of Level 1, 2 and 3 inputs – for fair value of assets held by companies and investment firms. This hierarchy is consistent with representations found in the various financial statements for SBB's funds.[39]

> Level 1: Unadjusted quoted prices for identical assets or liabilities in active markets that the Fund has the ability to access at the measurement date.
>
> Level 2: Inputs other than quoted prices within Level 1, that are observable for the asset or liability, either directly or indirectly, and the fair value is determined through the use of models or other valuation methodologies. These inputs may include quoted prices for identical instrument on an inactive market, prices for similar instruments, interest rates, prepayment spreads, credit risk, yield curves, default rates, and similar data. A significant adjustment to a Level 2 input could result in the Level 2 measurement becoming a Level 3 measurement.
>
> Level 3: Inputs that are unobservable for the asset or liability and include situations where there is little, if any, market activity for the asset or liability, representing the Fund's own assumptions about the assumptions that a market participant would use in valuing the asset or liability, and that would be based on the best information available.[40]

33. **Figure 3** below shows a diagram of the Level 1 to Level 3 hierarchy described above:

---

[38] FAS 157 was renamed ASC 820 as part of a recodification of U.S. accounting and reporting standards instituted by FASB as of July 1, 2009. *See* FASB Accounting Standards Update No. 2011-04, *Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS*, pp. 162-4, available at https://fasb.org/page/PageContent?pageId=/standards/accounting-standards-updates-issued.html#2011.

[39] As required by GAAP, these representations regarding the ASC 820 hierarchy are acknowledged in the SBB Funds' year-end financial results, including but not limited to the following examples: year-end 2014 financial results for SBBRG Investors II and Polysight I. SEC Inv. Test. Ex. 54 at 8 and SEC Inv. Test. Ex. 121 at 11.

[40] SBBRG Polysight I, LLC, Financial Report, December 31, 2014, Note 2. Fair Value of Financial Instruments. *See* SEC Inv. Test. Ex. 121 at 11-13.

**Figure 3**





34.    I am familiar with the Level 1-3 hierarchy for valuation under ASC 820. This hierarchy is well known and appears in most financial statements for both individual companies and investment funds that own securities on their balance sheets. I have applied the hierarchy in my previous work as an expert and have testified as an expert on how investment managers should apply this hierarchy and other fair value guidelines to their fund investments, including options and derivatives.

35.    ASC 820 and its Level 1-3 hierarchy provides a common language and framework for companies and funds to report the value of different types of assets utilizing valuation inputs with Level 1 being the most observable and Level 3 being unobservable. Companies and funds are required by ASC 820 to maximize the use of observable inputs and minimize the use of unobservable inputs in their valuations, including through the utilization of any valuation models. The aim of ASC 820, consistent with the definition of fair value, is to determine the current exit value of a security as of the valuation date. That is, the price that an investor who

20

owns that security would receive if he sold the security in the market at the current time, not some date in the future.

36.   In addition to ASC 820, investment managers and valuation boards of investment funds also follow regulations and guidelines set forth by the Investment Company Act of 1940 (the "Investment Company Act"), including guidance issued by the SEC regarding fair value of securities held in investment funds.

37.   The rules of the Investment Company Act require investment funds to value their securities using the market value of the securities when market quotations for those securities are "readily available."[41] For those securities for which market quotations are not readily available, the Investment Company Act calls upon an investment fund's board of directors (in this case SBB) to determine, "in good faith", the fair value of those securities.[42]

38.   The SEC has offered guidance on valuation of securities for which market quotations are not readily available, or what are now known under ASC 820 as Level 2 and Level 3 assets. A 1999 letter written by Douglas Scheidt, Associate Director and Chief Counsel, to Mr. Craig S. Tyle, General Counsel of the Investment Company Institute (ICI) (the "SEC 1999 Letter") states:

> [as] a general principle, the fair value of a portfolio security is the price which the fund might reasonably expect to receive upon its current sale…Fair value cannot be based on what a buyer might pay at some later time, such as when the market ultimately recognizes the security's true value as currently perceived by the portfolio manager.[43]

39.   The letter goes on to specifically describe the intent of SEC guidance:

> [We] recognize that no single standard exists for determining fair value in good faith. Instead, the Commission adopted a more flexible standard which requires fund directors to 'satisfy themselves that all appropriate factors

---

[41] 17 C.F.R. § 270.2a-4(a)(1) (2001).
[42] 17 C.F.R. § 270.2a-4(a)(1) (2001).
[43] SEC Division of Investment Management: December 1999 Letter to the ICI Regarding Valuation Issues.

relevant to the value of securities for which market quotations are not readily available have been considered and to determine the method of arriving at the fair value of each such security.'

40. A second letter from Mr. Scheidt to Mr. Tyle in 2001 (the "SEC 2001 Letter")

addresses a fund's "ongoing pricing responsibilities" and also adds more explanation to the

"good faith requirement."

> Funds should regularly evaluate whether their pricing methodologies continue to result in values that they might reasonably expect to receive upon a current sale…

> In our view, a [Fund] board acts in good faith when its fair value determination is the result of a sincere and honest assessment of the amount that the fund might reasonably expect to receive for a security upon its current sale, based upon all of the appropriate factors that are readily available to the fund. Furthermore, we believe that a board acts in good faith when it 'continuously review[s] the appropriateness of the method used' in determining the fair value of the fund's portfolio securities.

> We believe, however, that a fund board generally would not be acting in good faith if, for example, the board knows or has a reason to believe that its fair value determination does not reflect the amount that the fund might reasonably expect to receive for a security upon its current sale.[44]

## V. SBB's Representations Regarding Fair Value Reporting and Representations Regarding Application of ASC 820 to SBB Structured Notes

41. In its compliance manual, SBB briefly describes its responsibilities and policies

concerning valuation.

> [SBB] values investment opportunities on a fair and equitable basis, consistent with its fiduciary obligations, applicable investment management agreement, underlying Fund documents and Generally Accepted Account Principals (GAAP) (sic). [SBB] has adopted a valuation policy, which is available from the CCO.[45]

42. Regarding the fair value of financial instruments or investments in structured notes

held by its funds, SBB's Funds offered the following description in its financial statements:

---

[44] SEC Division of Investment Management: April 2001 Letter to the ICI Regarding Valuation Issues.
[45] SEC Inv. Test. Ex. 11.

The Fund records its investments at fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The Fund utilizes valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs. Assets and liabilities recorded at fair value are categorized within the fair value hierarchy based upon the level of judgment associated with the inputs used to measure their value. The fair value hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1) and the lowest priority to unobservable inputs (Level 3). Inputs are broadly defined as assumptions market participants would use in pricing an asset or liability.[46]

Structured products—The fair value of structured products is estimated using pricing models. Pricing models take into account the contract terms (including maturity), time value of money, volatility, and the current market and contractual prices of the underlying financial instruments. While most of the inputs into the structured product pricing model are observable (i.e. transaction prices, quotations), the model includes unobservable inputs (i.e. long dated option volatility) inputs (sic). Therefore, most structured products are categorized as Level 3.[47]

43.     In addition to these statements found in its Funds' audited financials, SBB also affirmed its investments being reported at fair value or the current exit value in several representation letters it signed and sent to its auditors during the annual audit process from 2011 to 2016.

44.     In an April 29, 2014 representation letter to auditors, SBB acknowledged:

We advise you that, to the best of our knowledge and belief:

a.     Portfolio securities for the Funds and the Company are stated at fair value as determined in accordance with the valuation methods set forth in the current governing documents and as disclosed in the notes to the financial statements. All Fund investments during the period, were made in accordance with the investment policies stated in the current governing documents…[48]

---

[46] SEC Inv. Test. Ex. 247.
[47] SBB changes from Level 2 to Level 3 in 2014 due to long-horizon volatility being unobservable. *See* SEC Inv. Test. Ex. 121 at 10.
[48] SEC Inv. Test. Ex. 229 at 3 or Bates-RSM-SBB-0001218.

45. In addition to its financial statements and compliance manual, SBB also described its valuation policies in its valuation policy statements. I have reviewed an SBB valuation policy statement issued in May 2014 (the "May 2014 Valuation Policy"). The May 2014 Valuation Policy stated:

> This valuation policy is intended to comply with Financial Accounting Standard 157 ("FAS 157") and may be modified or interpreted to incorporate and ensure compliance with such standard. All investments will be marked to fair value. Fair value is defined as the amount at which an instrument could be exchanged in a transaction at the measurement date between willing and able market participants, other than in a forced or liquidation sale. Exchange or dealer quoted market prices, in the principal market and given sufficient market liquidity, are generally viewed as the best indicator of value.[49]

46. FAS 157 was the GAAP accounting standard that preceded ASC 820.[50] SBB's May 2014 Valuation Policy goes on to say that all investments will be "marked to an independently verifiable value of the mark which may be derived using models employing such observable values and assumptions." SBB's May 2014 Valuation Policy states that the current value of its positions should be "fairly representative of the economic and market conditions."

47. SBB's representations in its compliance manual, financial statements, auditor representation letters and valuation policy statement are important in the GAAP context because these disclosures represent to investors and auditors that SBB's valuations comply with the accounting rules, including ASC 820 and that its valuations represent the fair value of the investments held by the SBB Funds. Through these representations SBB is telling its investors and auditors that its valuations, whether from the SBB Model or another valuation model or quote, represent fair value or the current exit value of the structured notes held in the SBB Funds.

---

[49] SEC Inv. Test. Ex. 7.
[50] FASB Accounting Standards Update No. 2011-04, *Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS*, pp. 162-4, available at https://fasb.org/page/PageContent?pageId=/standards/accounting-standards-updates-issued.html#2011.

It is my opinion that investors and auditors regularly rely on these representations from funds such as the SBB Funds. Investors rely on these representations for making investment decisions or whether to buy, sell or hold their current position in an investment fund. Auditors rely on these representations from funds so that they can be assured that from the fund's perspective their securities are valued at fair value consistent with the valuation methods disclosed in their operating documents and their financial statements.

## VI.   Details of ASC 820: Fair Value as a Market-Based Measurement, Observable v. Unobservable Inputs, Historical v. Implied Volatility

48.    In this current matter, the SEC alleges that SBB falsely represented to its investors and auditor that it valued its structured notes at fair value as required by GAAP.[51] The GAAP accounting rule related to fair value is ASC 820. The SEC alleges that the SBB Model used to value its structured notes was not based on market inputs or validated by published academic research and that this model consistently over-valued the structured notes held by the SBB Funds.[52] The SEC further alleges that inflated values from the SBB Model caused the NAVs of the Funds and performance and risk metrics of the Funds to be mis-stated to current and potential investors and also caused investors to pay approximately $1.4 million in excessive fees.[53]

49.    There are several important themes provided in the details of ASC 820 that direct companies and funds in their application of ASC 820 to determine the fair value of assets and liabilities, including structured notes similar to those held by the Funds. Six of the major themes can be found in ASC 820-10-05-1B-1C:

1. Fair value is market-based and not entity-specific.

---

[51] SEC Complaint, ¶ 6.
[52] SEC Complaint, ¶ 8.
[53] SEC Complaint, ¶ 9.

2. Fair value is the price at which an orderly transaction would occur in the market as of the valuation date.

3. Fair value is the current exit price at the valuation date from the perspective of market participants who hold the asset or liability.

4. When prices for identical assets are not available, fair valuation techniques should maximize the use of observable inputs and minimize the use of unobservable inputs.

5. Since fair value is market-based, it should be measured using assumptions that the market would use when pricing the asset or liability, including risk.

6. A company or fund's intention to hold an asset or sell/fulfill a liability is not relevant when measuring fair value.[54]

50.     The glossary from ASC 820 provides many useful definitions regarding fair value, the 6 themes outlined above and the relevant components of analyzing fair value under this GAAP accounting rule.

Fair value: the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.[55]

Exit price: the price that would be received to sell an asset or paid to transfer a liability.[56]

Inputs: the assumptions that market participants would using when pricing the asset or liability, including assumptions about risk, such as the following: a) the risk inherent in a particular valuation technique used to measure fair value

---

[54] ASC 820-10-05-1B: "Fair value is a market-based measurement, not an entity-specific measurement. For some assets and liabilities, observable market transactions or market information might be available. For other assets and liabilities, observable market transactions and market information might not be available. However, the objective of a fair value measurement in both cases is the same- to estimate the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions (that is, an exit price at the measurement date from the perspective of a market participant that holds the asset or owes the liability)." ASC 820-10-05-1C: "When a price for an identical asset or liability is not observable, a reporting entity measures fair value using another valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs. Because fair value is a market-based measurement, it is measured using the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk. As a result, a reporting entity's intention to hold an asset or to sell or otherwise fulfill a liability is not relevant when measuring fair value." SEC Inv. Test. Ex. 27 at 11.
[55] ASC 820-10-20 or SEC Inv. Test. Ex. 27 at 21.
[56] ASC 820-10-20 or SEC Inv. Test. Ex. 27 at 21.

(such as a pricing model), b) the risk inherent in the inputs to the valuation technique. Inputs may be observable or unobservable.[57]

Observable inputs: inputs that are developed using market data, such as publicly available information about actual events or transactions, and that reflect the assumptions that market participants would use when pricing the asset or liability.[58]

Unobservable inputs: inputs for which market data are not available and that are developed using the best information available about the assumptions that market participants would use when pricing the asset or liability.[59]

Market-corroborated inputs: inputs that are derived principally from or corroborated by observable market data by correlation or other means.[60]

51.     ASC 820 distinguishes between an entry price or the transaction price a fund pays to buy a security and fair value or the exit price a fund would receive if they sold that security as of the current valuation date. ASC 820 recognizes that funds do not necessarily sell securities at the same prices they paid to buy them.[61] For example, referring back to Example 1 of the structured note issued to SBB by J.P. Morgan, J.P. Morgan valued this note at $972.30 when the terms of the note were set with the difference between $1000 and $972.30 accounting for the "costs associated with selling, structuring and hedging the notes."[62] Similarly, with respect to Example 2 of the structured note issued to SBB by Credit Suisse, Credit Suisse valued this note at the time of issuance at $970 according to its own pricing models and borrowing rate, with the difference between $1000 and $970 accounting for "the agent's discounts or commission as well as transaction costs such as the expenses incurred to create, document and market the securities

---

[57] ASC 820-10-20 or SEC Inv. Test. Ex. 27 at 22.
[58] ASC 820-10-20 or SEC Inv. Test. Ex. 27 at 24.
[59] ASC 820-10-20 or SEC Inv. Test. Ex. 27 at 26.
[60] ASC 820-10-20 or SEC Inv. Test. Ex. 27 at 23.
[61] SEC Inv. Test. Ex. 27 at 30. ASC 820-10-30-2 "When an asset is acquired or a liability is assumed in an exchange transaction for that asset or liability, the transaction price paid to acquire the asset or received to assume the liability (an entry price). In contrast, the fair value of the asset or liability is the price that would be received to sell the asset or paid to transfer the liability (an exit price). Entities do not necessarily sell assets at the prices paid to acquire them. Similarly, entities do not necessarily transfer liabilities at the prices received to assume them."
[62] "JPMS's Estimated Value of the Notes Is Lower Than the Original Issue Price (Price to the Public) of the Notes." See SEC Inv. Test. Ex. 36 at 10-11.

and the costs of hedging [Credit Suisse's] risks…"[63] **Exhibit 4** shows a diagram of the difference in value of a structured note between the time of issuance and value in the secondary market immediately following issuance, with this difference being considered a "Day 1 Discount."

52.     ASC 820 also discusses valuation models or techniques used by companies and funds to value assets that do not have a readily accessible quoted price. ASC 820 prescribes that valuation techniques used should maximize the use of observable inputs and minimize the use of unobservable inputs.[64] ASC 820 discusses Level 2 inputs or inputs "other than quoted prices included with Level 1 that are observable for the asset or liability, either directly or indirectly." One of the inputs listed as a Level 2 input in ASC 820 is implied volatility.[65] Level 2 inputs are less observable than Level 1 but more observable than Level 3. According to ASC 820, Level 3 inputs are unobservable inputs for the asset or liability being valued.[66] ASC 820 states that "unobservable inputs shall be used to measure fair value to the extent that relevant observable inputs are not available." One of the inputs listed as a Level 3 input in ASC 820 is historical volatility.[67]

53.     Whether using Level 2 inputs or Level 3 inputs, ASC 820 makes it clear that the objective of any fair value measurement remains the same: To obtain an exit price at the valuation date from the perspective of a market participant that holds the asset or security.[68]

---

[63] SEC Inv. Test. Ex. 119 at 6.
[64] ASC 820-35-36 "Valuation techniques used to measure fair value should maximize the use of relevant observable inputs and minimize the use of unobservable inputs." SEC Inv. Test. Ex. 27 at 40.
[65] ASC 820-35-47-48 "Level 2 inputs are inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly. If the asset or liability has a specified (contractual) term, a Level 2 input must be observable for substantially the full term of the asset or liability. Level 2 inputs include the following: a) quoted prices for similar assets or liabilities in active markets, b) quoted prices for identical or similar assets or liabilities in markets that are not active, c) inputs other than quoted prices that are observable for the asset or liability, for example: 1. Interest rates and yield curves observable at commonly quoted intervals, 2. Implied volatilities…d) market-corroborated inputs." SEC Inv. Test. Ex. 27 at 42.
[66] ASC 820-35-52 or SEC Inv. Test. Ex. 27 at 42-3.
[67] ASC 820-55-22 or SEC Inv. Test. Ex. 27 at 60.
[68] ASC 820 35-53 or SEC Inv. Test. Ex. 27 at 43.

Because of this objective, ASC 820 states that unobservable inputs shall reflect all assumptions that market participants would use when pricing an asset or security, including any assumptions about risk.[69] Expanding on this point, ASC 820 offered that assumptions about risk include those risks associated with any pricing model used by market participants to value an asset or security, including the risk inherent in any of the inputs to those models. According to ASC 820, "A measurement that does not include an adjustment for risk would not represent a fair value measurement if market participants would include one when pricing the asset or the liability."[70] Reporting entities such as investment funds, when complying with ASC 820, should take into account all information about market participant assumptions that is reasonably available.[71]

54. A prime example of an adjustment for risk would be accounting for the credit risk of the issuer or the bank that issued the structured note to SBB. Payments of any coupons on the structured notes held in the SBB Funds are subject to the credit risk of the issuer (i.e., the ability of the issuer to pay). These banks, according to Exhibit 2, included Barclay's, Deutsche Banc, JP Morgan, Morgan Stanley, BNP Paribas, Societe Generale, Citigroup, HSBC and Credit Suisse.[72] As recent news of bank failures demonstrates, the credit risk of even a well-known bank can change very quickly. It is safe to say that any structured notes issued by Credit Suisse, including the type issued to SBB, suffered significant market declines recently when Credit Suisse had to be bailed out by the Swiss Banking Authority and subsequently sold to UBS.[73]

---

[69] ASC 820-35-53 or SEC Inv. Test. Ex. 27 at 43.
[70] ASC 820-35-54 or SEC Inv. Test. Ex. 27 at 43.
[71] ASC 820-35-54A or SEC Inv. Test. Ex. 27 at 43.
[72] SEC Inv. Test. Ex. 125.
[73] "A key risk to structured notes is they are based on the claims-paying-ability of the issuing bank. If the bank fails, the note fails (only principal-protected notes have FDIC insurance). We call this credit risk." "After the Recent Banking Crisis, What Can You Bank On?" *Kiplinger,* available at https://www.kiplinger.com/personal-finance/in-banking-crisis-what-can-you-bank-on. Also, see "UBS to buy Credit Suisse for more than $3B in government-brokered deal aiming to restore confidence," *Fortune,* March 19, 2023, available at https://fortune.com/2023/03/19/ubs-to-buy-credit-suisse-for-more-than-2b-in-government-brokered-deal-aiming-to-restore-confidence/. **Exhibit 5** shows a graph of Credit Suisse's CDS spread over this time period.

55.    **Table 2** below shows Credit Suisse's credit default swap (CDS) spread over the time period of early March 2023 as the news of its failure, bailout and ultimate sale to UBS was disclosed to the market.[74]

**Table 2**

| Date | Credit Suisse CDS Spread (basis points) |
|------|------------------------------------------|
| March 9, 2023 | 373.609 |
| March 10, 2023 | 417.670 |
| March 13, 2023 | 478.231 |
| March 14, 2023 | 548.624 |
| March 15, 2023 | 975.315 |
| March 16, 2023 | 1082.149 |
| March 17, 2023 | 959.247 |
| March 20, 2023 | 347.201 |

56.    In sum, the market's assessment of the credit risk associated with Credit Suisse's debt obligations fluctuated widely as a result of news related to its potential failure. That fluctuation would have affected the output of any valuation methods that took credit risk into account when valuing instruments exposed to Credit Suisse's credit risk.

57.    ASC 820 requires that all risks, including credit risk, be accounted for in the valuation of securities and assets held by investment funds. The SBB Model did not account for issuer credit risk (although Defendant Aven has testified that "it probably should have been"

---

[74] Source: Bloomberg.

included and SBB's Chief Engineer and developer of the SBB Model, Sandeep Navalgund ("Navalgund"), has testified that "it is something that we should have done").[75]

58.    ASC 820 offers examples of Level 2 inputs (observable) and Level 3 inputs (unobservable), some of which relate to options specifically. In general ASC 820 states that implied volatility is a Level 2 input while historical volatility is a Level 3 input.[76] All else being equal, ASC 820 describes a preference for using implied volatility over historical volatility when both measures are available because ASC 820 directs the maximum use of observable inputs and the minimum use of unobservable inputs.[77]

59.    With respect to historical volatility being a Level 3 input, ASC 820 warns that historical volatility "typically does not represent current market participants' expectations about future volatility, even if it is the only information available to price an option."[78]

60.    Consistent with the previously stated tenets of ASC 820, the focus of Level 2 vs. Level 3 inputs is market corroboration or using information from current market participants to value assets, wherever possible. Implied volatility is preferred over historical volatility because current option prices and the implied volatilities from those options demonstrate the expectations of real-time market participants, including funds, and the current exit value of securities held in funds, including index options on the S&P 500 and Russell 2000. Historical volatility, on the other hand, is backward looking and does not provide an observable input of the valuation assumptions of current market participants.

---

[75] Aven Inv. Test. Tr. at 255-56; Navalgund Inv. Test. Tr. at 176.
[76] ASC 820-55-21 – ASC 820-55-22 or SEC Inv. Test. Ex. 27 at 59-60.
[77] ASC 820 also provides an example of how to extrapolate implied volatilities from exchange traded options with short expirations to longer expirations under certain conditions. See, ASC 820-55-21 or SEC Inv. Test. Ex. 27 at 59.
[78] ASC 820-55-22 Examples of Level 3 inputs for particular assets and liabilities include the following: b. Three-year option on exchange-traded shares. A Level 3 input would be historical volatility, that is, the volatility for the shares derived from the shares' historical prices. Historical volatility typically does not represent current market participants' expectations about future volatility, even if it is the only information available to price an option. SEC Inv. Test. Ex. 27 at 60.

61.    The initial COVID-19 pandemic news in late February and early March 2020 provides a good example of the priority of implied volatility over historical volatility. As expected, both the S&P 500 and Russell 2000 experienced significant price movements on this developing news, both increases and decreases during these weeks as the market reacted to news of the pandemic.

62.    **Figure 4** below demonstrates the difference between implied volatility (as shown by the VIX index measuring the 30 day expected volatility of the S&P 500) and historical volatility (measured by the 30 day historical standard deviation of S&P 500's returns) during the onset of Covid-19 over the first six months of 2020.[79] The VIX line is visibly more jagged than the 30 day historical volatility line as the market's expectations about volatility are constantly changing on the news related to the pandemic. This change in the market's expectations would also be reflected in the current option prices for the S&P 500 index, with the implied volatilities from these options being observable inputs. The historical volatility line does not react as quickly to news as is shown by its smoother line and that's why historical volatility is considered an unobservable input, since it does not reflect the current and changing market expectations.

---

[79] See **Exhibits 6a-6c** for additional examples comparing implied and historical volatility.

**Figure 4**



**S&P 500 30-Day Historical Vol vs. VIX Volatility Index, 1/1/20 – 6/26/20**
**VIX measures the expected volatility of S&P 500**

63.     Despite SBB's representations that its valuations complied with ASC 820 and were consistent with fair value or the current exit value of the structured notes held by the SBB Funds, SBB failed to even consider – let alone appropriately apply – ASC 820 to the valuations of its structured notes from 2011 to 2016 and SBB's failures are the type of failures that would be materially important to reasonable investors in a private investment fund, like the SBB Funds, who rely on SBB's representations when making investment decisions and paying fees to SBB related to their investments in the SBB Funds.

64.     The SBB Model for valuing structured notes did not comply with ASC 820 because it was based not on implied volatility (an observable input) but rather historical volatility (an unobservable input). The SBB Model also did not include a factor for issuer credit risk (which is

required by ASC 820). SBB did not comply with ASC 820's requirement for funds to maximize the use of observable inputs and minimize the use of unobservable inputs. Furthermore, SBB's changes made—including its own inputs of *mu*, *beta* and *linearization*—to more standard options valuation models such as the BSM Model were not corroborated by other market participants and did not comply with ASC 820.

## VII. SBB's Failure to Appropriately Apply ASC 820 in Valuing the Component Options of its Structure Notes

65.     Contrary to the statements made by the SBB Funds in their financial statements, representation letters to auditors, and their May 2014 Valuation Policy,[80] SBB and Defendant Barnett did not value the Funds' portfolio securities or the structured notes held by each of the Funds at fair value or the current exit value it could receive for selling a structured note at a particular time. In fact, by their own admission, it was not their intention to value the structured notes at fair value.[81] For example, Defendant Aven has testified that "we weren't trying to create an accounting model, we were just focused on an economic model" which he agreed was "an SBB specific measurement of fair value."[82] He further testified that the SBB Model sought to reach the "true value" of the asset and conceded that "it would be difficult to say" that the SBB Model attempted to reach a "transacted price because we were never intending to create a model that said what we could sell an asset or trade an asset for at any time."[83] When asked whether the SBB Model was designed to comply with GAAP, Defendant Aven testified that "I don't think that was our goal."[84] Similarly, Navalgund has testified that, in developing the model, "I guess

---

[80] The SEC Deficiency Letter dated March 16, 2016 predates SBB's August 2016 Valuation Policy, which is therefore not relevant in this matter. *See* SEC Inv. Test. Ex. 9 and SEC Inv. Test. Ex. 59.
[81] Navalgund Dep. Tr. at 65-6 and Aven Dep. Tr. at 39-40.
[82] Aven Inv. Test. Tr. at 66.
[83] Aven Inv. Test. Tr. at 66.
[84] Aven Inv. Test. Tr. at 75.

we were looking at it in terms of based on our view of what the probability of a note maturing and getting at maturity. That's what we were pricing the notes at. We were not looking at it in terms of is this what a market participant would pay to actually transact with this – for this note."[85] The approach described by Defendant Aven and Navalgund directly contradicts the guiding principles of ASC 820 described above.

66.    Furthermore, SBB did not maximize the use of observable inputs and minimize the use of unobservable inputs as stated in its financial statements and as required by ASC 820. Finally, SBB's valuations of its structured notes were not consistent with current economic and market conditions.

67.    Most of the investments in the SBB Funds were structured notes with payoffs determined by the "worst of" performance of the S&P 500 and Russell 2000 indices over a period of up to 7 years. According to a catalog of structured notes I examined for SBB,[86] the weighted average expiration date from issuance for SBB structured notes with S&P 500 and Russell 2000 as the underlying indices was approximately 3 years.[87]

68.    The S&P 500 index is one of the most widely traded financial indices in the world. Options on the S&P 500 index are available for a multitude of strikes and approximately 5 years of expiration dates at the CME.[88] Additionally, S&P 500 options are also traded at the CBOE for a multitude of strikes and expiration dates.[89] In addition to traded options for the S&P 500, in

---

[85] Navalgund Inv. Test. Tr. at 69.
[86] SEC Inv. Test. Ex. 125.
[87] See **Exhibit 2a**. Weighted average expiration of S&P 500 and Russell 2000 structured notes issued from 2011 to 2016 was 3 years.
[88] https://www.cmegroup.com/markets/equities/sp/e-mini-sandp500.contractSpecs.options.html#optionProductId=138.
[89] https://www.cboe.com/tradable_products/sp_500/spx_options/specifications/ and https://www.cboe.com/tradable_products/sp_500/mini_spx_options/specifications/.

2003 the VIX was created by the CBOE.[90] Over time the VIX, aka the "fear index" has become "one of the most recognized measures of volatility – widely reported by the financial media and closely followed by a variety of market participants as a daily market indicator."[91] The VIX provides a measure of constant, 30 day volatility of the US stock market, derived from mid-quote prices of S&P 500 call and put options. Since the VIX is calculated from current option prices on S&P 500 options, it is an implied volatility input observable in the market as opposed to a backward looking historical volatility input. In addition to active markets for S&P 500 index futures options, VIX futures and options are also traded at the CBOE and other exchanges across the world.

69.    Given the active trading markets for S&P 500 index options as well as derivatives related to the VIX, there is a significant amount of market information, including prices and implied volatilities for S&P 500 index options, readily available to market participants who own and trade these options on a daily basis.

70.    Russell 2000 index options are widely traded at the CBOE and other exchanges for a multitude of strike prices and expiration dates.[92] The Russell 2000 is an index of 2,000 small-capitalization US-companies and is a widely used benchmark for funds that invest in small companies. Along with the Dow Jones index and the S&P 500 index, the Russell 2000 is one of the most commonly watched indexes by investors.[93]

---

[90] "Historical Data for Cboe VIX® Index and Other Volatility Indices." *Cboe Global Markets*, available at https://www.cboe.com/tradable_products/vix/vix_historical_data/#:~:text=In%201993%2C%20Cboe%20Global%20Markets,OEX%C2%AE%20Index)%20option%20prices.
[91] https://www.cboe.com/tradable_products/vix/.
[92] https://www.cboe.com/tradable_products/ftse_russell/russell_2000_index_options/rut_specifications/ and https://www.cboe.com/tradable_products/ftse_russell/mini_russell_2000_index_options/mrut_specifications/.
[93] Chandler, Simon. "The Russell 2000 Is a Small-Cap US Stock Market Index That Is Widely Regarded as a Bellwether for the Economy." *Business Insider*, August 15, 2022, available at https://www.businessinsider.com/personal-finance/russell-2000-index.

71.     At the CBOE and other exchanges, Russell 2000 index options are widely traded for a multiple of strike prices and with expirations of up to 5 years.[94] Similar to S&P 500 index options, the active trading markets for Russell 2000 index options provide a significant amount of market information for these options, including prices and implied volatilities, on a daily basis.

**Background of the BSM Model**

72.     There are 6 factors affecting the price of a stock option such as the component options of SBB's structured notes. These same factors are applicable to stock index options like those for the S&P 500 index options and Russell 2000 index options underlying the majority of SBB's structured notes. These factors are: 1) current price of the index, 2) strike price of the option, 3) time to expiration of the option, 4) volatility of index price, 5) risk-free interest rate, and 6) expected dividends.[95] These are the factors that are utilized by the famous Black Scholes Merton Model ("BSM Model") to calculate the price of an option.[96] Both Defendant Aven and Navalgund admitted in their testimony that the BSM Model is the "industry standard" for options valuation.[97]

73.     Given a particular price for an actively traded index option, a trader can use the BSM Model through an iterative process to solve for the implied volatility for that particular option. Furthermore, traders often use implied volatilities for actively traded options to interpolate and extrapolate implied volatilities for other options with the same underlying asset.

74.     According to a well-known and widely used options valuation textbook:

---

[94] "RUT Options Products Specifications." *Cboe Global Markets*, available at
https://www.cboe.com/tradable_products/ftse_russell/russell_2000_index_options/rut_specifications/.
[95] Hull, John C. *Options, Futures and Other Derivatives*, 6th Ed., p. 205.
[96] Hull, John C. *Options, Futures and Other Derivatives*, 6th Ed., Chapter 13, pp. 281-312.
[97] Navalgund SEC Inv. Test. Tr. at 126, 140, and 149; Aven January 24, 2017 Test. Tr. at 151.

> Implied volatilities are used to monitor the market's opinion about the volatility of a particular security. Traders like to calculate implied volatilities from actively traded options on a certain asset and interpolate between them to calculate the appropriate volatility for pricing a less actively traded option…[98]

75.     The prices for index options, like the S&P 500 and Russell 2000 indices underlying the structured notes held by the SBB Funds, can be used to solve for implied volatility under the BSM model.[99] As the Hull text states:

> [I]t can be argued that the [BSM] model is no more than a sophisticated interpolation tool used by traders for ensuring that an option is priced consistently with the market prices of other actively traded options.[100]

76.     When traders use implied volatility as an interpolation tool that is referred to as building a "volatility surface." This is a common tool used to price a variety of options for strikes or maturities that are not as actively traded as others. In this way, traders and investors regularly utilize current market information from actively traded index options (like those for the S&P 500 and Russell 2000) to price other, less actively traded index options for these same underlying indices.[101]

77.     In describing its own valuation model, the SBB Model, SBB wrote:

> [SBB] provides a reasonable valuation of its structured products by breaking the product into subcomponent options, estimating the price levels at expiration of the underlying assets, valuing the subcomponent options based on the estimated price levels of the underlying assets, and, finally aggregating the option values to determine the structured product value. The basis of the structured product valuation is running Monte Carlo simulations utilizing the Black-Scholes formula for option pricing.[102]

---

[98] Hull, John C. *Options, Futures and Other Derivatives*, 6th Ed. p. 301.
[99] Hull, John C. *Options, Futures and Other Derivatives*, 6th Ed. pp. 300-301 (implied volatility), 376 (volatility smiles, put/call parity) and 381-382 (volatility surfaces).
[100] Hull, John C. *Options, Futures and Other Derivatives*, 6th Ed. pp. 382-383.
[101] This is directly described in the SBB Fund financial statements.
[102] SEC Inv. Test. Ex. 15. SEC Inv. Test. Ex 149 is version shared with RSM in April 2015.

78.     By describing its model in these terms and since the structured products owned by the SBB Funds were mostly based on S&P 500 and Russell 2000 index options as the underlying indices, the "subcomponent options" described above would have been S&P 500 and Russell 2000 index options, both of which are widely traded on a variety of exchanges by a multitude of market participants. As such these options are readily valued using standard option valuation models and the prices (and implied volatilities) for these options are available and observable inputs.

79.     In testimony, both Aven and Navalgund have indicated that there are no other market participants to guide SBB's valuation practices (because the structured notes were individually negotiated instruments).[103] This is not accurate. To the contrary, the markets for S&P 500 options and Russell 2000 options likely include more market participants – and provide more market data – than almost any other subcomponent option SBB could have chosen. Aven and Navalgund's testimony ignores the fact that SBB described its model as merely valuing the subcomponent options of the notes, those subcomponent options were tied to the S&P 500 and Russell 2000 indices, and those indices (and options on those indices) are two of the most widely traded securities in the market, providing considerable market data (and reflecting well-established market assumptions) on which SBB's model should have been based under ASC 820.

A.   **SBB Develops the SBB Model**

80.     Prior to developing its own model to value structured notes, SBB first approached a consultant in November 2011, Izzy Nelken ("Nelken") to build a model to value its notes. SBB told Nelken "we are trying to value a structured note with 2 underlyings, with a worst-of design." Nelken responded to SBB that he had been able to model this type of security with a "bivariate

---

[103] *See, e.g.,* Aven Dep. Tr. at 41-43; Navalgund Dep. Tr. at 73.

normal distribution." Nelken later responded to SBB, after looking at a term sheet for a particular structured note held by SBB, that he could create a "non-Monte Carlo based algorithm" for the type of structured note held by the SBB Funds. The model created by Nelken for SBB (the "SuperCC Model") is a Black Scholes based model (aka BSM Model).[104]

81.    I have analyzed the documents and data produced to SBB when it was considering the SuperCC Model. The model is described by Nelken:

> We've been asked to develop a pricing model for the notes "Knock-Out Notes Linked to the S&P 500 Index and the Russell 2000 Index due January 6, 2014" issued by Deutsche Bank. We've developed a pricing model which is based on the bivariate normal distribution.[105]

82.    The SuperCC Model describes its methodology, relying on market inputs for expiration date, index current level, index initial level and index knock-out level, in addition to volatility and dividend yield for both the S&P 500 and Russell 2000. In addition to these inputs, the Super CC Model also relied on the correlation between the indices, the risk-free rate and a credit spread for the issuer, Deutsche Bank. The inclusion of a credit spread for the issuer is an important feature of the SuperCC Model and, as both the JP Morgan and Credit Suisse example note agreements provided, any payment on these structured notes was subject to the credit risk of the bank that issued the note.

83.    SBB decided not to use the SuperCC Model because, according to SBB personnel, it did not offer "an analytical solution" and relied on a "plug and play" using various forecasted index prices as "inflection points, with extrapolation in between."[106] Nelken confirmed SBB's interpretation of the SuperCC Model in which "we take the sum of the (the product of the payout

---

[104] Nelken SEC Dep. Ex. 31. Nelken Dep. Tr. at pp. 105-106.
[105] Nelken SEC Dep. Ex. 29.
[106] Nelken SEC Dep. Ex. 31.

by its probability) and discount to today." According to Nelken, this is the same type of model as the BSM Model.[107]

84.    After deciding not to use the SuperCC Model, SBB built its own valuation model for structured notes, the details of which it described in a valuation memorandum it shared with its auditors in April 2015.[108] In its model description SBB first references the aforementioned BSM Model and says SBB: a) breaks the structured note into subcomponent options, b) estimates the price levels of the underlying assets at expiration, c) values the subcomponent options based on the estimated price levels and d) aggregates the option values to determine the structured note value.[109] SBB goes on to describe its Monte Carlo simulation process through which it runs several thousand valuation iterations.

85.    SBB then proceeds to describe several modifications to the BSM model and Monte Carlo simulations for addressing its perceived "inadequacies of the Black Scholes formula."[110] These are SBB's adjustments for the drift term (or *mu*), applying a multiplicative factor to historical volatility (or *beta*) and a time-weighted present value calculation (or *linearization*).[111]

86.    The descriptions of both SBB's initial utilization of the BSM model as well as the modifications it makes using *mu*, *beta* and *linearization* are topics covered in the testimony and depositions of SBB personnel. Both Defendant Aven and Navalgund have testified that they understood that they were moving away from an industry standard approach when adopting these inputs.[112] For example, Defendant Aven has acknowledged that (1) *mu* "wasn't an industry standard input," (2) the industry standard was to use the risk-free rate of return as a drift term,

---

[107] Nelken SEC Dep. Ex. 31.
[108] SEC Inv. Test. Ex. 15. SEC Inv. Test. Ex 149.
[109] Aven SEC Inv. Test. Ex. 15.
[110] Aven SEC Inv. Test. Ex. 15.
[111] SBB's adjustments were acknowledged by the SEC as deficiencies in their letter to SBB on March 16, 2016. SEC Inv. Test. Ex. 59 at 3-4.
[112] Aven Inv. Test. Tr. at 127; Navalgund Inv. Test. Tr. at 126.

and (3) "I think we set out to build [a model] that wasn't like everyone else's."[113] Similarly, in his investigative testimony, Navalgund (1) answered "No" when asked if "he believed that the [the SBB Model] was consistent with industry standards and practices", (2) acknowledged that "when we made a change away from using the – when we decided to use mu, I knew that we were kind of going down a different path," and "when we decided instead of the risk free rate to use something else … I think that's when we kind of understood that we were moving away from a market standard model," and (3) thought the industry standard was "a poor way of valuing the notes."[114] Furthermore, both Defendant Aven and Navalgund also testified that they were not considering the accounting rule ASC 820 when developing the SBB Model.[115]

87.    In addition to SBB's *mu*, *beta*, *linearization* and other entity-specific or non-market corroborated adjustments to a traditional options valuation model, the SBB Model also differed from the proposed SuperCC Model because it excluded a credit risk factor for the issuing bank. According to Defendant Barnett, SBB felt that the credit risk of the issuing bank of a structured note was accounted for, in part, by the coupon rate of the note.[116]

## VIII.    SBB's Lack of Knowledge of ASC 820, Fair Value and Valuation Policies and Functions, Reliance on Auditors

88.    I have reviewed the testimony of the senior officers of SBB, including Defendant Barnett, Defendant Aven, Navalgund and Operations Associate Daniel Kiefer ("Kiefer") regarding their experience with structured notes, valuation models, fair value and ASC 820. I have also analyzed information and communications regarding SBB's valuation policies and procedures both before and after it received the SEC Deficiency Letter, including email

---

[113] Aven Inv. Test. Tr. 70-71.
[114] Navalgund Inv. Test. Tr. at 126-128.
[115] Aven Inv. Test. Tr. at 111-112; Navalgund Inv. Test. Tr. at 66 (he admits he hadn't reviewed ASC 820 until the SEC investigation in 2015).
[116] Barnett Inv. Test. Tr. at 202-5.

correspondence between SBB and its compliance consultant from early 2014 and a major

consulting firm's review of SBB's valuation policies and procedures in 2016. I have also read

testimony from SBB personnel regarding their reliance on auditors to validate the SBB Model.

These communications demonstrate SBB's lack of knowledge of ASC 820 and SBB's failure to

comply with ASC 820 as it related to the SBB Funds' investments in structured notes. SBB's

failures stretched from 2011 when it considered but did not use the SuperCC Model to 2016

when it started using the May 2016 Model and ultimately the Markit Model after receiving the

SEC Deficiency Letter.

### A. SBB Testimony Regarding Structured Notes, Valuation and ASC 820 Experience

89.    Defendant Barnett testified that his valuation model experience prior to SBB was in

an academic setting and not specifically related to structured notes.[117] Regarding ASC 820,

Barnett testified, "we were trying to come up with [a] fair value consistent with ASC 820,

although maybe we didn't name it or know it at the time."[118] He testified that although he

imagined that Defendant Aven and Navalgund had a "reasonable understanding" of fair value

and ASC 820, he wasn't assigning them to be accountants and he relied on his auditors for

confirming that the SBB Model complied with GAAP.[119]

90.    Defendant Barnett testified that neither Defendant Aven nor Navalgund had

experience with developing valuation models.[120] Defendant Barnett also testified that neither

Defendant Aven nor Navalgund had previous experience with structured notes.[121]

---

[117] Barnett Inv. Test. Tr. at 180-181.
[118] Barnett Inv. Test. Tr. at 187.
[119] Barnett Inv. Test. Tr. at 76, 113.
[120] Barnett Inv. Test. Tr. at 175, 179.
[121] Barnett Inv. Test. Tr. at 180.

91.     Navalgund was the person at SBB tasked with developing the SBB Model. Navalgund testified he had no experience with industry or academic standards or practice with valuation inputs.[122] He also testified that while he understands the concept of fair value, he does not know how that relates to GAAP or ASC 820.[123]

92.     Navalgund testified that SBB did not consider ASC 820 until after the SEC examination in 2014.[124] With respect to valuing structured notes, Navalgund testified that no one (including himself) at SBB had experience with valuing structured notes as of 2011.[125] Furthermore, he testified that after 2011 SBB did not hire anyone with experience valuing structured notes.[126]

93.     Defendant Aven also testified regarding his and SBB's lack of experience with ASC 820 and valuation generally. Defendant Aven testified that he did not have an understanding of what fair value meant as of 2012.[127] He also testified that neither Defendant Barnett nor Navalgund had any background in ASC 820 when they were developing the SBB Model.[128] Defendant Aven stated clearly, "none of us came to SBB with valuation experience."[129]

94.     Kiefer testified that prior to SBB he had no experience with valuation models.[130] He also testified that he had no prior knowledge of industry standards or practice which relate to valuation models.[131] In addition, Kiefer had no experience with valuing options, Black Scholes,

---

[122] Navalgund Inv. Test. Tr. at 37-38.
[123] Navalgund Inv. Test. Tr. at 67.
[124] Navalgund Inv. Test. Tr. at 67-68.
[125] Navalgund Inv. Test. Tr. at 29.
[126] Navalgund Inv. Test. Tr. at 30.
[127] Aven Inv. Test. Tr. at 37.
[128] Aven Inv. Test. Tr. at 69.
[129] Aven Inv. Test. Tr. at 150.
[130] Kiefer Inv. Test. Tr. at 58.
[131] Kiefer Inv. Test. Tr. at 58.

structured notes or Monte Carlo simulations.[132] Despite his lack of knowledge in the area of options, option valuation models, industry standards or practices, Kiefer compared the memorandum describing the SBB Model against AICPA standards and – despite the issues discussed herein -- concluded the SBB Model was consistent with the guidance.[133] Prior to Kiefer's comparison of the SBB Model to AICPA guidance he was not aware of anyone else at SBB undertaking this analysis.[134]

95.     **Table 3** below summarizes the key personnel at SBB and their previous experience with structured notes, valuation models and ASC 820:

**Table 3**

|  | **Structured Notes** | **Valuation Models** | **ASC 820** |
|---|---|---|---|
| Defendant Barnett | Limited | Some academic | NO |
| Defendant Aven | NO | NO | NO |
| Navalgund | NO | NO | NO |
| Kiefer | NO | NO | NO |

96.     Despite this complete lack of familiarity with valuation models and the applicable ASC 820 requirements for such models (i.e., GAAP requirements related to valuation of SBB's assets) SBB continually represented to investors and its auditor that SBB's financial statements valued its investments according to GAAP.

**B.  No Valuation Policy Prior to 2014**

97.     In addition to the testimony described above, SBB also demonstrated its lack of valuation experience in interactions with its compliance consultant in 2014. Between its founding in 2011 and 2014, SBB did not have a formal valuation policy. I have reviewed email

---

[132] Kiefer Inv. Test. Tr. at 58-59.
[133] Kiefer Inv. Test. Tr. at 96.
[134] Kiefer Inv. Test. Tr. at 102.

correspondence between Defendant Aven and SBB's Compliance Consultant ("Simon Compliance") from March 10, 2014 in which Defendant Aven requests templates for the following documents that SBB has "never put together before."[135] The list includes: Internal Control Documentation, Written Valuation Policy, Counterparty Risk Monitoring Policy, Code of Ethics/Conduct Policy, Disaster Recovery Plan and Conflict of Interest Agreements. In response to SBB's request, Simon Compliance responds, "Oh boy. Most of these are not documents that can be put together quickly." SBB then requests an "abbreviated version" of these documents to which Simon Compliance responds, "You can't do it abbreviated. It requires a lot of thought and planning to determine your plans."[136]

98. As of this date, SBB already owned significant investments in multiple funds, mostly through structured notes with the S&P 500 and Russell 2000 as the underlying indices, and SBB had already made several representations in its financial statements, representation letters to auditors and compliance manual regarding its fair valuation practices.

99. Between this initial email exchange in March 2014 and May 2014, SBB drafted the May 2014 Valuation Policy. Interestingly, the May 2014 Valuation Policy refers to FAS 157 even though FAS 157 had been recodified and replaced by ASC 820 starting in 2009. Demonstrating his lack of experience in the area, Defendant Aven has mistakenly testified that ASC 820 hadn't been written when SBB was developing the SBB Model.[137]

---

[135] *See* emails between Simon Compliance and SBB on March 10, 2014. Source: 2014 03.10 Documentation Request - SBB No Written Valuation Policy_Redacted.pdf.

[136] *See* emails between Simon Compliance and SBB on March 10, 2014. Source: 2014 03.10 Documentation Request - SBB No Written Valuation Policy_Redacted.pdf.

[137] FAS 157 was renamed ASC 820 as part of a recodification of U.S. accounting and reporting standards instituted by FASB as of July 1, 2009. FASB Accounting Standards Update No. 2011-04, *Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS*, pp. 162-4, available at https://fasb.org/page/PageContent?pageId=/standards/accounting-standards-updates-issued.html#2011. Aven Dep. Tr. at 39-40.

### C.  PWC Report on SBB's Valuation Governance and SBB's Failed Attempts to Validate the SBB Model

100.  SBB's lack of experience with applying ASC 820 and the lack of internal controls related to proper implementation of ASC 820 are further reflected in the examination of SBB's valuation governance by accounting firm Price Waterhouse Coopers ("PWC") which resulted in an August 2016 presentation to SBB describing several shortcomings in SBB's valuation process.

101.  Following receipt of the SEC Deficiency Letter in 2016, SBB retained PWC to conduct a review of its valuation governance and other business practices.[138] I have reviewed PWC's presentation to SBB regarding SBB's valuation functions and other topics. After reviewing the SBB Model and interviewing SBB key personnel including Defendant Aven, Kiefer and Navalgund,[139] PWC commented the following in reference to the SBB Model:

> Based on the documentation provided and the discussions held, the "model" for valuation appears exposed to existential challenges:
>
> **Design contradictions**- desire to support economic/relative value assessment may be incompatible with fair valuation for financial reporting.
>
> **Model complexities**- noted modelling limitations including inability to calibrate to implied volatilities, simplified curve construction, integration of credit considerations.
>
> **Operational expansion**- expanding future operational requirements including higher volumes, risk reporting and analysis, governance requirements including documentation, testing, validation and performance monitoring.[140]

102.  This assessment was received by SBB on August 25, 2016 after the receipt of the SEC Deficiency Letter on March 16, 2016 but prior to SBB hiring Markit on November 23, 2016.[141]

---

[138] Justin Keane SEC Dep. Ex. 37.
[139] Keane SEC Dep. Ex. 43 at 4.
[140] Keane SEC Dep. Ex. 43 at 11.
[141] Temple SEC Dep. Ex. 36.

103. In addition to hiring PWC following receipt of the SEC Deficiency Letter, SBB unsuccessfully attempted to have two separate consultants validate the SBB Model in April 2015.

104. First, SBB contacted a firm called Valuation Research Corporation ("VRC") in mid to late April 2015 to review and validate the SBB Model. Following its review, VRC told SBB it could not provide an "opinion of reasonableness (or provide legitimate support) on your modeling methodology and input derivations as of now."[142] Some of VRC's concerns with the SBB Model were that it deviated from conventional and well-accepted valuation methodologies and that various assumptions in the model were based off of historical results and not market observable quotes.[143]

105. The second consulting firm that SBB contacted in April 2015 to support the SBB Model was called Numerix. Numerix told SBB that based on its review of SBB's Model description it would take more than "20 man-days to thoroughly validate the approach(es) used in a defensible way."[144] Numerix added that validation of the mean reversion method was the most challenging aspect of the model in their opinion. Following this response from Numerix, SBB abandoned its attempt to get Numerix to validate the existing model (but rather used Numerix in connection with the potential creation of a new model).[145]

106. In sum, SBB did not incorporate the advice of industry specialists related to the SBB Model, despite the fact that, every time they attempted to get specialized expert input on SBB's valuation processes, the consulting firms expressed important reservations regarding the SBB Model and/or SBB's valuation processes.

---

[142] Aven SEC Dep. Ex. 35.
[143] Aven SEC Dep. Ex. 35.
[144] SEC Inv. Test. Ex. 111.
[145] Aven Dep. Tr. at 199.

**D. SBB's Reliance on Auditors to Ratify Its Valuation Model**

107.  Most of the senior officers and employees at SBB testified that they relied on RSM and SBB's other auditors to confirm that SBB's Model complied with GAAP and ASC 820.

108.  Defendant Barnett testified repeatedly that the auditors tested SBB's model and that he relied on the auditors as professionals to make sure that SBB was appropriately following fair value guidelines, including adherence to ASC 820.[146] Defendant Aven also testified that he relied on SBB's auditors to opine that the SBB Model complied with GAAP.[147]

109.  The testimony of SBB officers gets the management/auditor relationship backward. In my experience working as a consultant and expert on valuation issues, including the application of ASC 820 and other valuation guidance and providing expert analysis in cases related to valuation of derivative securities, it is not an auditor's responsibility to determine the fair value of an investment fund's positions. To the contrary, it is management's obligation to assess fair value and then to represent to the auditor that valuations were conducted according to GAAP (i.e., ASC 820). As mentioned previously, SBB sent regular representation letters to its auditors in advance of its audit that confirmed that its investments were being valued in accordance with GAAP valuation standards. It is my experience that investment funds like the SBB Funds have the responsibility and power to value their own investments at fair value, or the current exit value, the price they would expect to receive if they were to sell an investment at any given time. Whether they rely on a model or a third-party service to assist in their valuation methodologies, it is the fund's investment manager or valuation board who has the ultimate valuation authority. This is consistent with the SBB Funds' financial statements and other representations, as well as the previously mentioned guidance from the SEC, the Investment

---

[146] Barnett Inv. Test. Tr. at 118.
[147] Aven Dep. Tr. at 347.

Company Act and ASC 820. This is also consistent with SBB's current [ADV] which gives ultimate valuation authority for structured notes to SBB, even now when it uses the Markit Model for valuing its structured notes.

## IX. SBB's Failure to Follow Fair Value Guidance and ASC 820

110. Even though SBB's May 2014 Valuation Policy, compliance manuals and Funds' financial statements stated that SBB valued its investments at fair value, SBB's use of the SBB Model did not comply with ASC 820 because it did not take into account market information about the value of the structured notes and used inputs that were neither observable in the market nor confirmed by other market participants.

111. Navalgund testified that the SBB Model was not designed to give a fair value or a price at which someone could exit the structured note at the current valuation date, but rather a potential value or what they expected to receive for the note in the future.[148] This view expressed by the chief engineer tasked with developing the SBB Model directly contradicts both ASC 820 and guidance from the SEC. According to ASC 820, fair value is market based and not entity-specific and should represent the current exit value, not some value expected by SBB in the future. As the SEC 1999 Letter further directed, "Fair value cannot be based on what a buyer might pay at some later time, such as when the market ultimately recognizes the security's true value as currently perceived by the portfolio manager."[149]

112. Defendant Aven echoed Navalgund's view of SBB's valuations of its structured notes using the SBB Model:

> "I think the fatal flaw was looking at this from an economic standpoint and not an accounting standpoint. We were out—we set out from day one to build an

---

[148] Navalgund Test. Tr. at pp. 127-129.
[149] SEC Division of Investment Management: December 1999 Letter to the ICI Regarding Valuation Issues.

economic model, let's represent what we believe to be the value of these assets, and that's what we did, and we didn't reconcile that against accounting."[150]

113.  Not only was SBB not focused on the current exit value when developing the SBB Model, it also failed to examine the assumptions and practices of market participants in the options arena – or follow the guidance of industry experts – when making its adjustments to a more standard options valuation model, such as the BSM Model or SuperCC Model. Navalgund testified in detail that neither he nor anyone else at SBB examined the practices or assumptions of other market participants related to options valuation when adding the non-standard elements of *mu*, historical volatility, *beta* and *linearization* to the SBB Model. [151] SBB failed to examine the assumptions or practices of any market participants to see if any of the unobservable inputs it was using in its model were also used by others in the market. In other words, these key inputs to the SBB Model were neither observable inputs nor market-corroborated inputs according to ASC 820.

114.  Although ASC 820 expressly states that fair value is a market-based measurement and not an entity-specific measurement, both Defendant Aven and Navalgund have testified that SBB's development and implementation of the custom inputs to the SBB Model involved subjective assessments of value by SBB personnel. For example, when asked how SBB evaluated the effectiveness of non-industry standard changes to the BSM Model, Defendant Aven testified that "yeah, a lot of it was intuition and looking at pricing old model versus the proposed changes and if they made sense. And, you know, looking back on it now, you know, we really thought we had a lot more flexibility in what we were doing."[152] When asked how SBB assessed the reasonableness of values generated by the SBB Model, Defendant Aven responded

---

[150] Aven Inv. Test. Tr. at 105.
[151] Navalgund Dep. Tr. at 117, 128, 140 and 149.
[152] Aven Inv. Test. Tr. 131.

"I don't remember. Probably intuition" and when asked how he judged if the SBB Model had generated an inaccurate result, Defendant Aven responded that he would evaluate if the output was reasonable and "what's my standard for reasonableness? It's just my intuition, which is the same standard I've been using throughout."[153]

115. Navalgund testified that *mu* was designed, in part, to boost the value of the notes (over what would be generated using the risk-free rate as a drift term).[154] When asked how he would determine if that boost from *mu* was reasonable. He responded, "I think just judgment" and "we were shooting for something that seemed sensible; and if it ended up being higher it did."[155] SBB's reliance on subjective, entity-specific criteria is contradicted by the express guidance in ASC 820.

116. According to Navalgund, the SBB Model and its non-standard *mu* drift term, which used the historical return of the underlying index instead of the more traditional risk-free rate drift term used in the BSM Model and other standard option valuation models, caused the SBB Model to generally provide structured note values that were higher than the standard option valuation models, especially when risk-free rates were low.[156] In 2016, following receipt of the SEC Deficiency Letter, SBB employed first the May 2016 Model and then the Markit Model to value its structured notes, both of which were standard option valuation models that used the risk-free rate as the drift term. Subsequently, SBB issued a fee credit to its investors in the amount of approximately $1.03 million (using the May 2016 Model vs. the SBB Model) and ultimately $1.4 million (using the Markit Model vs. the SBB Model) to account for the excessive

---

[153] Aven Inv. Test. Tr. 138 and 198.
[154] Navalgund Inv. Test. Tr. at 145.
[155] Navalgund Inv. Test. Tr. at 144.
[156] Navalgund Inv. Test. Tr. at 129.

fees charged to investors from the SBB Funds' valuations using the SBB Model from 2011 to 2016.[157]

117. The SEC Deficiency Letter laid out the details of its findings regarding the SBB Model and its deficiencies.[158] Some of the deficiencies identified by the SEC include:

- Registrant used unobservable inputs (i.e. historical volatility along with a multiplier that amplified historical volatility) instead of utilizing observable inputs (i.e., implied volatility derived from long dated index options…

- Registrant's "linearization" modification was adopted to counteract the additional volatility introduced into the model by amplifying historical volatility…

- Registrant overstated the drift term or the asset growth rated based upon historical index returns…

- Registrant did not reduce its drift term for the dividend yield generated by the reference indices…

- Registrant did not adjust its discount rate for illiquidity and/or credit risk…[159]

118. To summarize, the SEC Deficiency Letter criticized the SBB Model for deviating from other widely accepted option valuation models, namely the BSM Model (the same type of model as the SuperCC Model). Specifically, the SEC found the SBB Model to be deficient in many respects, including: (a) not being a market based model, relying on historical volatility (unobservable input) vs. implied volatility (observable input); (b) using *mu* for its drift term as opposed to the risk free rate; (c) applying a *beta* amplifier to its measure of historical volatility; (d) applying a *linearization* method to smooth some of the valuation effects observed through the other modifications of the model and e) not applying a factor to account for credit risk.

---

[157] SEC Inv. Test. Ex. 114; and SEC Inv. Test. Ex. 223.
[158] SEC Inv. Test. Ex. 59.
[159] SEC Inv. Test. Ex. 59 at 3-4.

119.  A common theme in the SEC's noted deficiencies with the SBB Model was the lack of market corroboration with the inputs of the model. Navalgund, the main developer of the SBB Model, testified that SBB did not check with any market participants for the changes it made to a more standard option valuation model framework, including *mu*,[160] historical volatility,[161] *beta*,[162] and *linearization*.[163]

120.  These deficiencies were not new news to SBB as they are the same issues brought to their attention by the SEC's investigation in October 2014 and that SBB had previously communicated to the SEC that they would fix in early 2015.[164]

121.  Following conversations with the SEC in October 2014, SBB personnel considered making changes to the SBB Model to incorporate the SEC's questions and concerns about the SBB Model.[165] These changes included:[166] replacing *mu* with the risk-free rate, incorporating credit risk-free, using implied volatility instead of historical volatility, removing *beta* and *linearization*,[167] using correlation consistent with implied volatility, and incorporating dividend yield.

122.  Six months later, in April 2015, SBB responded to SEC inquiries with proposed changes to the SBB Model that are the same as those listed in the notes to the call SBB had with the SEC in October 2014. The changes promised by SBB personnel to the SEC in April 2015:[168]

> We have tested various modifications to our model that will make our valuation more consistent with the traditional Geometric Brownian Motion

---

[160] Navalgund Dep. Tr. at 117.
[161] Navalgund Dep. Tr. at 128.
[162] Navalgund Dep. Tr. at 140.
[163] Navalgund Dep. Tr. at 149.
[164] Aven Dep. Tr. at 176-179; Aven SEC Dep. Ex. 30; Aven SEC Dep. Ex. 40.
[165] Navalgund SEC Dep. Ex. 30.
[166] Navalgund SEC Dep. Ex. 30 at 4.
[167] Navalgund SEC Dep. Ex. 30 at 4. Reference is made to removing "Appendix B" and this refers to the SBB Valuation Memorandum (see, SEC Inv. Test. Ex. 15) in which Appendix B details the linearization function in the SBB Model.
[168] Aven SEC Dep. Ex. 40.

(GBM) model. The updated GMB (sic) model uses the traditional measure of drift: annualized risk-free rate minus annualized dividend yield….Additionally, the new model adjusts for credit risk by using a discount factor based on credit default swaps of the issuer. Furthermore, in the new valuation model we are switching to implied volatility, instead of historical volatility, as the input for the volatility of the GBM for any note that is within the time range of the longest dated option available on the market.

123.   Defendant Aven in his testimony acknowledged that while the changes implemented to the SBB Model were the same changes discussed with the SEC in October 2014[169] and promised to the SEC in responses to its inquiries in April 2015[170], in fact, none of these model changes were implemented by SBB until May 2016.[171]

124.   Furthermore, these promised changes are related to the same factors and were consistent with the SuperCC Model that SBB considered but did not implement back in 2011. The main inputs to the SuperCC Model were spot price, knock-in price, volatility, time to expiration, risk-free rate, correlation, and issuer credit rating. The SuperCC Model was described in similar terms to SBB as a version of the BSM Model by Izzy Nelken.[172]

125.   Regarding ASC 820 specifically, the SEC Deficiency Letter noted that, "The valuation model also appears to be inconsistent with the Fair Value Hierarchy under ASC 820, which requires maximizing the use of observable inputs and minimizing the use of unobservable inputs to meet the objective of a fair value measurement."[173] More specifically, in the SEC's first identified deficiency of SBB's valuation model it said:

> "Registrant used unobservable inputs (i.e., historical volatility along with a multiplier that amplified historical volatility) instead of using observable inputs (i.e., implied volatility derived from long dated index options), which is inconsistent with the Fair Value Hierarchy under ASC 820…"

---

[169] Navalgund SEC Dep. Ex. 30.
[170] Aven SEC Dep. Ex. 40.
[171] Aven Dep. Tr. at 148-179.
[172] Nelken SEC Dep. Ex. 31.
[173] SEC Inv. Test. Ex. 59 at 4.

126. As mentioned previously, most of the investments held by the SBB Funds were structured notes with the S&P 500 and Russell 2000 indices as the underlying index. As Exhibit 2 demonstrates, approximately 87% of the 110 notes issued and purchased by SBB Funds from 2011 to 2016 had the S&P 500 and/or the Russell 2000 as the underlying indices.[174] Exhibit 2a lists only those structured notes with a worst of structure with the S&P 500 and Russell 2000 indices as the underlying indices. This list represents 92 of the 110 notes (84%) issued and purchased by the SBB Funds from 2011 to 2016. Exhibit 2a shows the weighted average expiration of these notes was 3.01 years from the issuance date.

127. SBB personnel have testified that 90% of the value of the structured notes held by the SBB Funds was in the option components and that SBB's valuation method consisted of breaking down the note into its individual option components and valuing them.[175] As noted earlier, options on both the S&P 500 and Russell 2000 indices were actively traded over a variety of strikes and expiration dates over the relevant time period. It is my opinion that SBB, as directed by ASC 820 and other valuation guidance, should have utilized current information from the market for derivatives for these two indices to value its structured notes on an ongoing basis, including using observable inputs (e.g. implied volatility) instead of unobservable inputs (e.g., historical volatility). Fair value under ASC 820 is synonymous with current exit value and it is also a market-based concept. Fair value is not based on an individual's or firm's view on where the market will value some investment at a future date but rather where the market values a security or an investment today. Finally, SBB's intention to hold its structured notes to maturity is not relevant to the current exit value or fair value at any given time.

---

[174] The remaining 13% or 14 notes had underlying investments in Cotton, Crude Oil, MSCI Emerging Markets and a currency pair of USD and Malaysian Ringgit. See, SEC Inv. Test. Ex. 125.
[175] SEC Inv. Test. Ex. 15.

128. As mentioned previously both S&P 500 and Russell 2000 index options are actively traded on several exchanges. According to the CME and CBOE websites, implied volatilities and other relevant valuation information are available for S&P 500 and Russell 2000 index options for up to 5 years of expiration dates. SBB should have used this information to interpolate and extrapolate the implied volatilities to get valuations of the specific options underlying the structured notes held by the Funds.

### A. The May 2016 Model

129. On May 13, 2016, SBB responded to the SEC Deficiency Letter and specifically the deficiencies in its valuation model. In SBB's response it accepted almost all the SEC's noted deficiencies and these were all consistent with earlier reviews/criticisms of the SBB Model:

> Item 1, long dated notes: The new pricing model has been updated to remove the use of historical volatility, along with an amplifier. Implied volatility, either observed, interpolated, or extrapolated has been used in its place, depending on duration.
>
> Item 2, linearization: Linearization has been removed from the new pricing model.
>
> Item 3, drift term: the drift term has been replaced with the risk free rate
>
> Item 4 dividend yield: the drift term now includes dividend yield.
>
> Item 5 risk discount: the new model now includes a discount for issuer credit risk….[176]

130. These are the same changes noted by SBB in its discussions with the SEC in October 2014 and they are the same changes that SBB expressed to the SEC that it was making to the SBB Model in April 2015. As Defendant Aven testified, SBB did not make any of these changes until May 2016 after it received the SEC Deficiency Letter. Item 3 above relates to replacing *mu* in the SBB Model with the risk-free rate. The SBB Model used *mu* or the historical

---

[176] SEC Inv. Test. Ex. 114.

return of the underlying index as the drift term in the SBB Model. As Navalgund testified, *mu* was the main driver of value in the SBB Model and contributed to the higher values of the structured notes as compared against a more traditional model like the BSM Model and the model prescribed in the SEC Deficiency Letter, which use the risk-free rate as the drift term.[177]

131.  In its response to the SEC Deficiency Letter, SBB also provided details on fee credits (both for management fees and performance fees) derived from new valuations using the May 2016 Model vs. the SBB Model. The total amount of the credits was $1.03 million.[178]

132.  After its initial response to the SEC Deficiency Letter in which it accepted and promised to correct virtually all the SEC's findings regarding deficiencies with the SBB Model, SBB subsequently retained PWC to review its valuation governance and corporate governance.[179] After receiving and reviewing an initial report from PWC in August 2016, SBB retained the Markit Group in November 2016 as a third party to value its structured notes.[180]

### B.  The Markit Model

133.  I have reviewed the detail for Markit's structured products valuation model in a document titled, "Structured Products Valuation Service Version 1.7, October 2015."[181] In it Markit offers a detailed explanation of its data sources and how it values structured notes like the ones held in the SBB Funds.

134.  The Markit Model utilizes the Markit Group's collection of over 1.5 million prices from major dealers in a variety of markets including equity indices. For structured products specifically, the data utilized by the Markit Model includes: spot and forward prices, implied

---

[177] Navalgund Inv. Test. Tr. at 129, 146-147.
[178] SEC Inv. Test. Ex. 114.
[179] Keane SEC Dep. Ex. 37.
[180] Keane SEC Dep. Ex. 43 and Source: Master Agreement for Sbb Research Group LLC.pdf.
[181] Source: MarkitPV_Structured_Products_Valuation_Service_V1.7.pdf.

volatilities, implied correlations, dividends, yield curves, historical data and exotics.[182]

Regarding implied volatility Markit provides:

> 5.2 Implied Volatility: Volatilities implied by the markets are key inputs into our structured products valuations for almost every type of structure. Therefore in order to price these structures accurately, high quality implied volatility data is of vital importance. We have access to such data for both the equity and FX markets, the vast majority of which is sourced from major dealers and formed into a mid-market consensus mark, before being used to calibrate our pricing models.[183]

135. To source its implied volatility data, Markit utilizes three main sources of equity[184] option volatility data: Totem Equities, Markit Daily Vol Equities and Listed Option Prices. Totem Equities includes month-end consensus data for equity option prices, including puts and calls on indices with maturities up to 15 years and strikes between 40% and 200% of spot prices (depending on the underlying). Markit Daily Vol Equities is a daily dealer consensus provider that covers options on major indices with maturities up to 10 years for indices and strikes between 50% and 150% of spot prices. This data, according to Markit, "provides a very large grid of reliable market volatility information primarily used in the calibration of our daily equity volatility surfaces."[185] Lastly, Markit uses intraday and end of day exchange-traded futures and options prices for a wide range of underlying indices as a third source of data for equity index volatility data. All three sources of implied volatility data used by Markit are market-based and not entity-specific.

136. SBB describes its adoption and affirmation of the Markit Model in its ADV:

> SBBRG has engaged a third-party vendor to provide prices for investments in structured products held by the Funds, and thus this third-party vendor provides the primary valuation methodology for such assets. SBBRG believes

---

[182] See Section 5 "Market Data Sourcing and Validation." Source: MarkitPV_Structured_Products_Valuation_Service_V1.7.pdf.
[183] See Section 5.2 "Implied Volatilities." Source: MarkitPV_Structured_Products_Valuation_Service_V1.7.pdf.
[184] Markit includes indices with equities in its structured notes model documentation.
[185] Source: MarkitPV_Structured_Products_Valuation_Service_V1.7.pdf.

that the valuations from the third-party vendor were developed with fair value standards, and that consistent use of the third-party valuations mitigates potential conflicts of interest. However, SBBRG retains the right to modify such third-party valuations in the unlikely event that such valuation does not reflect other independently verifiable information.[186]

137. SBB's Form ADV does not fully and accurately describe management's responsibility to value its securities according to GAAP. Ultimately, the valuations of the SBB Funds are SBB's valuations, not Markit's or PWC's or its auditors' or the SEC's. SBB is the investment manager of the SBB Funds and it is SBB's job to determine the fair value of securities held by the Funds, including structured notes that are valued according to a model. SBB has the authority and responsibility for the valuations of the SBB Funds and SBB can decide for itself if it agrees with the Markit Model valuations or if it believes another valuation estimate is more indicative of fair value or the current exit value for one or all of its structured notes.[187] However, SBB must comply with ASC 820 in representing to its investors and its auditor that the SBB Funds' positions are being reported at fair value.

## X. Fair Value as Current Exit Value, Not Future Potential Value

138. As the SEC guidance and ASC 820 indicate, fair value is not some value you think you can earn at some point in the future when the full value of an investment will be realized. Fair value is the price that someone would pay you today for your investment, under current conditions in the market. Fair value is the current exit value, not future exit value.

139. Regardless of SBB's testimony that it generally intended to hold the structured notes until maturity and that it incorrectly operated with an understanding that interim valuations were materially unimportant to reasonable investors, ASC 820 states that an entity's intention to

---

[186] SBB Form ADV Part 2A: Firm Brochure, November 3, 2022, p. 5.
[187] SBB Form ADV Part 2A: Firm Brochure, November 3, 2022, p. 5.

hold an asset, like a structured note, is not relevant for determining fair value.[188] An entity's fair value measurement for a structured note, according to ASC 820, has to incorporate assumptions that current market participants would use when pricing the note. Similarly, the SEC 1999 Letter directed funds, like SBB, that its fair value measurement should be the price which it would expect to receive upon a current sale of an asset, not based on what it might receive at some later date in the future when the asset's true value is realized.[189] Finally, the SEC 2001 Letter reminded funds, like SBB, that their fair valuation responsibilities were ongoing and that they "should regularly evaluate whether their pricing methodologies continue to result in values that they might reasonably expect to receive upon a current sale."[190]

140.   The banks issuing the structured notes to SBB commented on their own ongoing calculations and estimations of fair value, using market inputs, both at issuance and in the secondary market. Below are excerpts from the previous structured note examples issued by J.P. Morgan and Credit Suisse related to those banks' efforts to value these notes:

> **J.P. Morgan Note**:
>
> Following issuance, JPMS follows guidance from ASC 820 to fair value these notes and other structured notes they have sold to institutional investors as liabilities on its balance sheet, maximizing observable inputs and minimizing unobservable inputs at each reporting date.
>
> JPMS's estimated value does not represent future values of the notes and may differ from others' estimates…
>
> ***JPMS's estimated value of the notes is determined by reference to JPMS's internal pricing models when the terms of the notes are set. This estimated value is based on market conditions and other relevant factors existing at that time and JPMS's assumptions about market parameters, which can include volatility, dividend rates, interest rates and other factors…***

---

[188] ASC 820-10-05-1C or SEC Inv. Test. Ex. 27 at 11.
[189] SEC Division of Investment Management: December 1999 Letter to the ICI Regarding Valuation Issues.
[190] SEC Division of Investment Management: April 2001 Letter to the ICI Regarding Valuation Issues.

> *On future dates, the value of the notes could change significantly based on, among other things, changes in market conditions, our creditworthiness, interest rate movements and other relevant factors, which may impact the price, if any, at which JPMS would be willing to buy notes from you in secondary market transactions.*[191]

> **Credit Suisse Note**:

> *The secondary market price of your securities at any time cannot be predicted and will reflect the then-current estimated value determined by reference to our pricing models and other factors. These other factors include our internal funding rate, customer bid and ask spreads and other transaction costs, changes in market conditions and any deterioration or improvement in our creditworthiness."*[192]

141. These excerpts draw out key themes related to valuation: fair value is current exit value, based on current market factors as of the valuation date. Both J.P. Morgan and Credit Suisse are willing to sell the notes to SBB at a price at origination and both J.P. Morgan and Credit Suisse describe the secondary market price or a price at which they may be willing to buy back the notes from SBB at a later date, based on internal and market factors as of that time.

142. SBB personnel acknowledged that the banks that issued the notes to SBB have an ongoing obligation to mark the structured notes at fair value on their financial statements, not just at inception but over the life of the note.[193] This is consistent with the excerpts from the J.P. Morgan and Credit Suisse pricing supplements noted above.

143. SBB's valuations, on the other hand, contradicted the bank's valuation procedures because the SBB Model did not consider observable inputs and was not market-based. The SBB Model, by relying on inputs that were not corroborated by market participants, did not provide a true fair value or current exit value for any of the structured notes held in the SBB Funds from 2011 to 2016.

---

[191] SEC Inv. Test. Ex. 36 at 10 (emphasis added).
[192] SEC Inv. Test. Ex. 119 at 6-7 (emphasis added).
[193] Aven Inv. Test. Tr. at 96.

144. The SuperCC Model, the May 2016 Model, and the Markit Model were all market-based models consistent with ASC 820. The SBB Model, on the other hand, was an entity-specific model with major deviations from a market-based model, none of which were corroborated by any market participants.[194] Most SBB personnel (besides Defendant Barnett) have admitted in their testimony that the SBB Model did not yield a fair value or a current exit value for any of the structured notes held in the SBB Funds over the relevant time period.

## XI. Effects of SBB's Failures to Comply with ASC 820

145. As most SBB personnel testified, the SBB Model for the structured notes held in the SBB Funds was not intended to give a fair value or comply with ASC 820 when it was developed. Instead, the SBB Model was designed to give an economic value or a potential value that SBB could someday realize from a particular structured note. I agree that the SBB Model did not comply with ASC 820 because of the non-observable inputs and factors utilized in the SBB Model that were not based on assumptions used by other market participants. SBB personnel also testified that of the hybrid components of the structured notes held in the SBB Funds, the option component (as opposed to the fixed income component) was the main value driver (accounting for 90% of the value of each structured note) and that *mu* was the main driver of the option value, especially during low interest rate environments when the drift term of the underlying assets would differ greatly from the more traditionally used risk-free rate. The use of the SBB Model to value the SBB structured notes, including the *mu* factor and other non-observable inputs that did not comply with ASC 820, caused the value of the SBB Funds to be over-valued. This over-valuation of the SBB Funds allowed SBB to collect higher fees and also

---

[194] **Exhibit 7** provides a simple diagram comparing the various inputs of the SBB Model as compared against the SuperCC Model, the May 2016 Model, and the Markit Model.

altered the NAVs and the resulting risk/return metrics of the Funds. It is important to investors and auditors that investment funds such as the SBB Funds be reported at fair value or the current exit value so that investors can value the fund at what they would reasonably expect to receive upon a current sale of their position in the fund.

146. Following adoption of the Markit Model, SBB credited investors for the excessive fees that they were charged under the SBB Model. The total amount of excessive fees charged to SBB's investors was $1.42 million.[195] This credit includes the $1.03 million fee credit that SBB disclosed in its response to the SEC Deficiency Letter (which was measured at that time comparing results from the May 2016 Model to the SBB Model).[196]

147. In addition to fee credits provided to investors, the performance returns and risk metrics of the SBB Funds also changed following adoption of either the May 2016 Model or the Markit Model. I have analyzed a spreadsheet that compares several performance and risk metrics for Polysight, comparing the SBB Model to the May 2016 Model as well as a comparison to these same measures using bank quotes for the structured notes, summarized in **Table 4** below:[197]

---

[195] SEC Inv. Test. Ex. 223.
[196] SEC Inv. Test. Ex. 114.
[197] See worksheet "Peer Analysis" in Source: New model results_2016.05.16v1_poly return comparison-BATES STAMPED.xls.

**Table 4**

| Key Stat | SBB Model | May 2016 Model | Bank Quotes |
|---|---|---|---|
| Sharpe Ratio | 0.308 | 0.134 | 0.146 |
| Sharpe Annualized | 1.07 | 0.46 | 0.51 |
| Annualized Return (CAGR) | 10.26% | 6.29% | 6.37% |
| Average Monthly Return | 0.85% | 0.58% | 0.58% |
| Annualized Standard Deviation | 8.79% | 13.37% | 12.09% |
| Total Return Since 2011 | 56.45% | 32.27% | 32.74% |

148. Table 4 demonstrates how the SBB Model differed from the May 2016 Model and also bank quotes or valuations that were provided to SBB by banks related to the structured notes held by the SBB Funds. The Sharpe ratios,[198] measuring risk-adjusted returns, were much lower under the May 2016 Model (and bank quotes) vs. the SBB Model. Similarly, the annualized returns were almost 400 basis points (4%) lower for the May 2016 Model (and bank quotes) vs. the SBB Model and finally, the annualized standard deviations were also much higher (denoting more variability) under the May 2016 Model (and bank quotes) vs. the SBB Model. In other words, under a market-based model that complied with ASC 820 (the May 2016 Model) the SBB Funds were both riskier and provided lower returns than the SBB Model previously indicated. The May 2016 Model was also consistent in all measures with the bank quotes that had been provided to SBB.

---

[198] According to Polysight factsheets (e.g., SEC Inv. Test. Ex. 18 at 9), SBB typically used the average monthly yield of 3-month Treasury for purposes of calculating its Sharpe Ratio. *See* https://awgmain.morningstar.com/webhelp/glossary_definitions/mutual_fund/mfglossary_Sharpe_Ratio.html.

149. Defendant Aven testified that in his opinion investors were less focused on the short-term valuation of the assets held by the SBB Funds because the longer they were invested in the Funds the less they would be affected by the short-term measurements of fair value.[199] According to Defendant Aven,

"It- it means that, because the short-term valuation of these assets, regardless of the model you use, are just estimates, the longer you're involved in the investment, the less those short-term measurements will have an effect on your performance…the longer you're invested in these assets, the less the short-term valuation has an effect on your performance."[200]

150. Defendant Aven's testimony and view of what is important to investors is not consistent with ASC 820 or the SEC guidance related to fair value from the SEC 1999 Letter and SEC 2001 Letter. As ASC 820 dictates, a company or fund's intention to hold an asset or sell/fulfill a liability is not relevant when measuring fair value.[201] The SEC 1999 Letter reminded fund managers and others that, "Fair value cannot be based on what a buyer might pay at some later time, such as when the market ultimately recognizes the security's true value as currently perceived by the portfolio manager."[202] And according to the SEC 2001 Letter SBB would not be "acting in good faith" if it knew that the SBB Model was not providing a value that SBB might reasonably expect to receive for a particular structured note as of a particular valuation date.[203]

---

[199] Aven Inv. Test. Tr. at 571-589.
[200] Aven Inv. Test. Tr. at 574.
[201] ASC 820-10-05-1B: "Fair value is a market-based measurement, not an entity-specific measurement. For some assets and liabilities, observable market transactions or market information might be available. For other assets and liabilities, observable market transactions and market information might not be available. However, the objective of a fair value measurement in both cases is the same- to estimate the price at which an orderly transaction to sell the asset or to transfer the liability would take place between market participants at the measurement date under current market conditions (that is, an exit price at the measurement date from the perspective of a market participant that holds the asset or owes the liability)." ASC 820-10-05-1C: "When a price for an identical asset or liability is not observable, a reporting entity measures fair value using another valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs. Because fair value is a market-based measurement, it is measured using the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk. As a result, a reporting entity's intention to hold an asset or to sell or otherwise fulfill a liability is not relevant when measuring fair value." SEC Inv. Test. Ex. 27 at 11.
[202] SEC Division of Investment Management: December 1999 Letter to the ICI Regarding Valuation Issues.
[203] SEC Division of Investment Management: April 2001 Letter to the ICI Regarding Valuation Issues.

151.  Contrary to Defendant Aven's testimony, it is my opinion that investors generally do care about the interim valuations of investment funds and they rely on these valuations, including the unrealized gain or loss of positions held by those funds, when they make investment decisions regarding their investments and other potential fund investments. For one, the valuation of a particular fund or the fund's NAV represents the value at which an investor is able to buy or sell a position in the fund. In addition, this NAV is also used to calculate the performance of the fund and any other relevant risk measures related to the fund (i.e., the Sharpe ratios, standard deviations and other metrics in the table above) that investors generally consider when deciding to buy, sell or hold a fund position.

Peter C. Hickey

Date: April 17th, 2023

# APPENDIX A

## PETER C. HICKEY

Global Economics Group, LLC
140 S. Dearborn, Suite 1000
Chicago, IL 60603
Office: (312) 470-6502
Cell: (773) 791-7287
E-mail: phickey@globaleconomicsgroup.com

### CURRENT EMPLOYMENT:

Global Economics Group, LLC

Principal (July 2012 to Present)
Vice President (March 2008 to July 2012)

### EDUCATION:

**M.B.A.**  THE UNIVERSITY OF CHICAGO BOOTH SCHOOL OF BUSINESS
Finance & Accounting (2003)
**A.B.**  GEORGETOWN UNIVERSITY
Economics (1997)

### EXPERIENCE:

**GLOBAL ECONOMICS GROUP, LLC (CHICAGO, IL)**
- Analyze economic and financial issues related to securities fraud cases, valuation disputes, securities and commodities trading matters and other complex commercial litigation.
- Assist and defend against financial regulatory investigations, including matters brought by the SEC, CFTC, FINRA and self-regulatory organizations.
- Review trading relationships, profit and loss analysis, insider trading allegations and suitability issues in securities and commodities litigation on behalf of individuals, brokerage firms, hedge funds, insurance companies and regulators.
- Value companies and securities issued by companies using widely accepted income, market and asset approaches.
- Analyze and opine on litigation damages related to cases involving the valuation of private and public companies, including M&A litigation, partnership disputes and shareholder lawsuits.
- Offer opinions on loss causation and economic damages in complex commercial litigation, including breach of contract matters and other disputes between individuals and corporations.
- Provide critical analytical support for a diverse national network of industry and academic experts in a variety of matters.
- Testify as an expert witness on valuation and damages issues in cases brought in federal and state courts and arbitrations across the country.

**CHICAGO PARTNERS, LLC (CHICAGO, IL)**
*Research Analyst*, (October 1997 - October 1999) (June 1995 - September 1995)

*Associate*, (October 1999 - April 2004)
*Director*, (April 2004 - January 2008)
*Vice President*, (January 2008 - March 2008)
- Provided consulting services to lawyers and clients involved in securities litigation, valuation disputes and other complex legal and regulatory matters.
- Testified as an expert witness before an NASD arbitration panel and in a federal court proceeding.

**CHICAGO CAPITAL SERVICES, LLC (CHICAGO, IL)**
*Director*, (August 2004 to March 2008)
- Provided both quantitative and qualitative assistance for the mergers and acquisitions advisory business of Chicago Partners.
- Assisted clients with projects including raising investment capital and the consideration of strategic options for their businesses.
- Targeted transactions between $25 million and $250 million in value.


**TESTIMONIAL EXPERIENCE:**

Securities and Exchange Commission v. Paul Alar and West Mountain LLC, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:19-CV-03265-JPB (Expert Report, Deposition and Trial Testimony)

Chicago Transit Authority Retiree Health Care Trust, et al., v. U.S. Bank National Association, In the United States District Court for the District of South Dakota, Southern Division, Civil Action No. 4:17-CV-04113-LLP (Expert Report)

Individuals A & B, v. Illinois Based Registered Investment Advisor, American Arbitration Association, (Expert Report)

3B Enterprises, LLC, v. National Processing Co., et al., In the Court of Common Pleas, Hamilton County, Ohio, Case No. A 1702231 (Expert Report and Deposition)

Jay Glotzer, on behalf of Himself and All Others Similarly Situated, v. O.B. Parrish, et al., In the Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2016 CH 138815, Consolidated with Case No. 2016 CH 14488 (Declaration)

Paul F. Rodney, derivatively on behalf of Patriot Bridge and Opportunity Fund LP I, and Edwin Debus, derivatively on behalf of Patriot Bridge and Opportunity Fund LP II, v. John Thomas Capital Management Group LLC, et al., In the District Court of Harris County, Texas, 189th Judicial District, Cause No. 2013-54408 (Expert Report)

Securities and Exchange Commission v. David B. Welliver and Dblaine Capital, LLC, United States District Court, District of Minnesota, Case No. 11-CV-03076 (Expert Report and Deposition)

The Jerry and Vickie Moyes Family Trust, v. Pinnacle Fitness and Recreation Management, LLC, and Marsha Forsythe-Fournier, Superior Court of the State of Arizona, County of Maricopa, Case No: CV2010-032604 (Expert Report)

Securities and Exchange Commission v. The Nutmeg Group, LLC, Randall Goulding and David Goulding, United States District Court, Northern District of Illinois, Case No. 09 CV 1755 (Expert Reports, Deposition and Trial Testimony)

Frontier Oil Corporation Shareholder Litigation, In the District Court of Harris County, Texas, 113th Judicial District, No. 2011-11451 (Affidavit)

Pinnacle Fitness and Recreation Management, LLC, v. The Jerry and Vickie Moyes Family Trust, United States District Court, Southern District of California, Case No. 08 CV 1368 H (Expert Report)

Michael Lorenzen v. OakBrook Investments, LLC; Janna Sampson; and Peter Jankovskis, DuPage County, Illinois, Case No. 07 MR 1635 (Expert Report, Deposition and Trial Testimony)

C. Clark Hodgson, Jr., Receiver for Philadelphia Alternative Asset Management Company, LLC, et al. v. Man Financial Inc., et al., United States District Court, Eastern District of Pennsylvania, 06-CV-1944 (Expert Reports and Deposition)

Dr. Mark Rosenberg, Claimant, and Anthony Silverman and Paradise Valley Securities, Respondents, NASD Arbitration No. 99-02063 (Expert Report, Deposition and Testimony before NASD Arbitration Panel)


**SELECTED EXPERIENCE:**

**VALUATION MATTERS:**

Retained by the SEC to analyze valuations of restricted securities held by investment funds and the effects of the inflated valuations in the form of excessive fees being charged by the investment advisor. SEC won federal court trial and $1.8 million judgment against advisor. https://www.sec.gov/litigation/litreleases/2019/lr24677.htm

Valued a partner's equity interest in a closely held investment management business. Partner was awarded damages at state court trial commensurate with the valuation.

Retained by a group of radio entrepreneurs to assist them with analyzing potential acquisitions and to secure financing for acquisitions of clusters of radio stations in small to mid-size markets in the Midwest.

Assisted private owners of several precast concrete businesses with an independent valuation of their business and the valuation of a potential acquisition.

Worked on a team of consultants analyzing valuation issues in a material adverse change case between two retail shoe companies following their unsuccessful merger transaction.

Analyzed the valuation of a subsidiary of a large automobile equipment manufacturer in connection with litigation surrounding the $700 million sale of that subsidiary to another company.

Tested subscription revenue model of a satellite-based digital media and business services company focused on the agricultural industry.

**Peter Hickey, Page 4**

Collaborated with a team of executives in developing the financial projections of their business plan to produce and manage temporary museum exhibits at several large museums across the country.

Reviewed valuation of credit card receivables and delinquency models for a publicly traded consumer finance company.

Analyzed business model and valuation scenarios of a potential roll-up transaction of travel businesses.

Consulted with bankruptcy attorneys on the revenue and expense model for a publicly traded airline involved in one of the largest corporate bankruptcies in United States history.

Worked with executives of a hazardous waste company in analyzing potential acquisitions of competitors and a recapitalization of their business.

Retained by partners of an advertising business focused on the Hispanic consumer market to focus on valuation and strategy as they sought client partners to buy into the partnership through business origination.

**SECURITIES & COMMODITIES TRADING CASES:**

Damages expert for Receiver of Cayman based hedge fun in case brought against brokerage firm handling trades for fund's account. Losses estimated at $200 million.

Calculated detailed profit and loss analysis of foreign currency trades (both on-exchange and OTC) at the heart of a $300 million dispute between an individual client and one of the largest investment banks in the world.

Assisted with insurance coverage investigation into $500 million commodity derivatives trading loss claim.

Analyzed economic profitability of complex cross border structured finance transactions in a tax dispute over $300 million in foreign tax credits.

Collaborated with team of consultants to study loss causation and damages for an institutional investor in an asset backed commercial paper facility that provided warehouse financing for fixed-rate conforming mortgage origination.

Offered rebuttal expert opinions regarding alleged losses claimed by a married couple against their Registered Investment Advisor (RIA). Case was dropped after submission of rebuttal report.

Worked on a team of consultants for an investment bank being sued by a hedge fund for trading losses in the S&P 500 futures market.

Completed a detailed forensic accounting of deposits and withdrawals made by a group of over 300 plaintiffs into several securities and commodity trading accounts at two investment

banks as part of an analysis of Ponzi scheme claims brought by those plaintiffs against their broker.

Analyzed minute by minute profit and loss of commodity trades used in support of a foreign based investment firm bringing breach of contract and breach of fiduciary duty claims against a US based commodity trading advisor.

Reviewed and analyzed foreign currency options trading and commissions/mark-ups and calculated break-even amounts for several hundred foreign currency transactions at issue in a case brought by regulators against a retail foreign currency trading operation.

Completed a review of S&P 500 futures trading statements and intraday trading data for an account that was potentially trading outside of its margin limits. Calculated profit and loss scenarios at different time intervals to be relied upon in consideration of a claim for damages.

Performed several profit and loss calculations for a portfolio of natural gas positions using NYMEX time and sales interval data. Analysis was used by a company to support its claim against early termination of its contracts with a trading counterparty.

Worked with the Receiver of a Caymans-based hedge fund to value the fund's positions in Russian GKO's, NDF's and several non-Russian investments in the wake of the Russian devaluation of the ruble in August 1998.

Assisted the Receiver of a foreign currency trading company to analyze commissions paid to introducing brokers. Reviewed account statements for several accounts the company held at various FCMs.

Researched the commodity trading activities of a trading merchant in a large antitrust matter. Reviewed account statements, trade confirmations and other data related to the company's accounts at a major investment bank and trading firm relevant to the period of the trading relationship.

Valued a portfolio of convertible bonds held by a hedge fund investigated for mis-marking its positions. Used the fund's account statements and a convertible bond pricing model to provide monthly valuations for each of the fund's positions.

Analyzed the daily and monthly account statements for a large commodity trading firm in the wake of massive losses suffered by an individual trader at the firm. Researched and analyzed historical rate rollovers and other structured transactions at issue in litigation against a major investment bank that was a trading counterparty of the firm.

**COMMERCIAL LITIGATION DAMAGES:**

Offered expert opinions on valuation and damages issues for one of the largest payments processing companies in the world in case involving an Independent Sales Organization (ISO) Agreement.

Rebutted economic loss opinions on behalf of an investor in a failed acquisition of several health clubs in the Southwestern U.S.

**Peter Hickey, Page 6**

Assisted with analysis and formulation of expert opinions in several distinct matters involving one of the largest glass packaging companies in the United States and its commercial partners.

**FIELDS OF SPECIALIZATION:**

| | |
|---|---|
| Financial Statement Analysis | Valuation |
| Mergers & Acquisitions | Investment Banking |
| Securities & Commodities Fraud | Financial Regulatory Investigations |
| Economic Damages | Capital Markets |

**Appendix B**

**List of Data/Documents Considered**

## Court Documents

- SEC Complaint dated September 30, 2019
- SEC Deficiency Letter dated March 16, 2016
- Memorandum of Law in Support of Defendant's Motion to Dismiss Plaintiff's Complaint, dated December 19, 2019
- Plaintiff's Memorandum in Response to Defendant's Motion to Dismiss, dated January 13, 2020
- Defendant's Reply Memorandum of Law in Further Support of Motion to Dismiss, dated January 27, 2020.
- Memorandum Opinion and Order denying the Motion to Dismiss, dated October 15, 2020.
- Plaintiff SEC's Response to Defendant SBB'S First Set of Interrogatories
- Defendant Matthew Lawrence Aven's Answers to Plaintiff Securities and Exchange Commission's First Set of Requests for Admissions
- Defendant SSB's Responses and Objections to Plaintiff's First Set of Interrogatories

## Regulations, Enforcement Actions & Other SEC Materials

- FASB Accounting Standards Update No. 2011-04, *Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRS*, pp. 162-4, available at https://fasb.org/page/PageContent?pageId=/standards/accounting-standards-updates-issued.html#2011.
- FASB ASC 820, Fair Value Measurement
- 17 C.F.R. § 270.2a-4(a)(1) (2001)
- SEC Division of Investment Management: December 1999 Letter to the ICI Regarding Valuation Issues.
- SEC Division of Investment Management: April 2001 Letter to the ICI Regarding Valuation Issues.
- "Glossary: Zero Coupon Bond," U.S. Securities and Exchange Commission, available at https://www.investor.gov/introduction-investing/investing-basics/glossary/zero-coupon-bond.
- "Structured Notes with Principal Protection: Note the Terms of Your Investment," Investor Alerts an Bulletins, U.S. Securities Exchange Commission, June 1, 2011, https://www.sec.gov/investor/alerts/structurednotes.
- "Investor Bulletin: Structured Notes, SEC, January 12, 2015, https://www.sec.gov/oiea/investor-alerts-bulletins/ib_structurednotes.

**SBB Research Group Documents and Statements**

- 2014 03.10 Documentation Request - SBB No Written Valuation Policy_Redacted.pdf
- Master Agreement for SBB Research Group LLC.pdf
- SBB Form ADV Part 2A: Firm Brochure, November 3, 2022
- MarkitPV_Structured_Products_Valuation_Service_V1.7.pdf
- SBBRG Polysight I, LLC Fund Financials for the Years Ended 2014, and 2015.
- SBBRG CPS I, LLC Fund Financials for the Years Ended 2013, 2014, and 2015.
- SBBRG CPS XI, LLC Series A Fund Financials for the Years Ended 2013, 2014, and 2015.
- SBBRG CPS XI, LLC Series B Fund Financials for the Year Ended 2015.
- SBBRG CPS XI, LLC Series C Fund Financials for the Year Ended 2015.
- SBBRG Investors Group II, LLC Fund Financials for the Years Ended 2011, 2012, 2013, 2014, and 2015.
- SBBRG Investors Group III, LLC Fund Financials for the Years Ended 2013, 2014, and 2015.
- SBBRG Investors Group IV, LLC Fund Financials for the Years Ended 2013, 2014, and 2015.

**Depositions and Testimony (including Exhibits)**

- Testimony of Samuel Benjamin Barnett, dated March 14, 2018
- Testimony of Samuel Benjamin Barnett, dated April 26, 2018
- Deposition of Sandeep Navalgund, dated November 22, 2022
- Testimony of Sandeep Navalgund, dated August 31, 2017
- Deposition of Matt Aven, dated December 15, 2022
- Testimony of Matt Aven, dated February 27, 2017
- Testimony of Matt Aven, dated February 15, 2018
- Testimony of Matt Aven, dated January 11, 2018
- Deposition of Dr. Israel H Nelken, dated July 13, 2022
- Testimony of Daniel Kiefer, dated July 27, 2017
- Deposition of Daniel Kiefer, dated January 25, 2023
- Deposition of Justin Keane, dated August 3, 2022
- Deposition of Aaron Temple, dated February 17, 2023
- Deposition of Lynne Weil, dated January 24, 2023
- Deposition of Rich Davisson, dated January 20, 2023
- Deposition of Stacie Droege, dated December 14, 2022
- Deposition of Tracy Whetstone, dated January 12, 2023

**Bates Documents**

- New model results_2016.05.16v1_poly return comparison-BATES STAMPED.xls.

**Other Articles/Research**

- "In Concert: Exploring the alignment of interests between hedge fund managers and investors," *AIMA*, September 2016, https://www.aima.org/resource/in_concert.html.
- https://corporatefinanceinstitute.com/resources/wealth-management/high-water-mark/
- Geng Deng, Tim Husson and Craig McCann, "Valuation of Structured Products," The Journal of Alternative Investments, Spring 2014, 16 (4)
- "After the Recent Banking Crisis, What Can You Bank On?" *Kiplinger*, https://www.kiplinger.com/personal-finance/in-banking-crisis-what-can-you-bank-on
- "UBS to buy Credit Suisse for more than $3B in government-brokered deal aiming to restore confidence," *Fortune*, March 19, 2023, https://fortune.com/2023/03/19/ubs-to-buy-credit-suisse-for-more-than-2b-in-government-brokered-deal-aiming-to-restore-confidence/
- "Historical Data for Cboe VIX® Index and Other Volatility Indices." *Cboe Global Markets,* https://www.cboe.com/tradable_products/vix/vix_historical_data/#:~:text=In%201993%2C%20Cboe%20Global%20Markets,OEX%C2%AE%20Index)%20option%20prices
- https://www.cboe.com/tradable_products/vix/
- Chandler, Simon. "The Russell 2000 Is a Small-Cap US Stock Market Index That Is Widely Regarded as a Bellwether for the Economy." *Business Insider*, August 15, 2022, https://www.businessinsider.com/personal-finance/russell-2000-index
- "RUT Options Products Specifications." *Cboe Global Markets*, https://www.cboe.com/tradable_products/ftse_russell/russell_2000_index_options/rut_specifications/
- "Mini Russell 2000 Options Products Specifications." *Cboe Global Markets*, https://www.cboe.com/tradable_products/ftse_russell/mini_russell_2000_index_options/mrut_specifications/
- Hull, John C. *Options, Futures and Other Derivatives*, 6th Ed.
- https://news.ihsmarkit.com/
- https://www.cmegroup.com/markets/equities/sp/e-mini-sandp500.contractSpecs.options.html#optionProductId=138
- https://www.cboe.com/tradable_products/sp_500/spx_options/specifications/
- https://www.cboe.com/tradable_products/sp_500/mini_spx_options/specifications/
- https://awgmain.morningstar.com/webhelp/glossary_definitions/mutual_fund/mfglossary_Sharpe_Ratio.html
- Capital IQ
- Bloomberg

**Exhibit 1**

### Hypothetical Investment Results of a Typical Structured Note



**Exhibit 2**
**Catalog of SBB Structured Notes 2011 to 2016**

| Number | The Name of the Note | Counterparty [1] | CUSIP | Total Principal Amount | Issue Date | Maturity/ Expiration Date | Days to Expiration (at Issuance) | Years to Expiration (at Issuance) | Underlying Indices [2] Index 1 | Index 2 | Upside Threshold (Coupon Barrier) | Downside Threshold (Principal Barrier) | Coupon Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Ur acher130102N1 | Bar | 067387BF6 | 4,000,000 | 2/18/2011 | 1/2/2013 | 684 | 1.87 | SPX | SPX | 103% | 84% | 16% |
| 2 | Rodman111123N2 | CS | 2254M0JG2 | 2,000,000 | 9/23/2011 | 12/23/2011 | 91 | 0.25 | SPX | RUT | 100% | 100% | 16% |
| 3 | Jordan131231N3 | DB | 2515A1DU2 | 2,000,000 | 10/14/2011 | 12/31/2013 | 809 | 2.22 | SPX | RUT | 100% | 81% | 50% |
| 4 | P ppen131224N4 | CS | 2254M0JT4 | 2,000,000 | 10/14/2011 | 12/24/2013 | 802 | 2.20 | SPX | RUT | 100% | 60% | 39% |
| 5 | Kerr120731N5 | CS | 2254M0LG9 | 3,000,000 | 1/31/2012 | 7/31/2012 | 182 | 0.50 | SPX | RUT | 100% | 90% | 11% |
| 6 | Harper120731N6 | CS | 2254M0LF1 | 2,000,000 | 1/31/2012 | 7/31/2012 | 182 | 0.50 | SPX | RUT | 80% | 80% | 5% |
| 7 | Kukoc120607N7 | CS | 2254M0LH7 | 2,000,000 | 1/31/2012 | 6/7/2012 | 128 | 0.35 | SPX | RUT | 100% | 85% | 12% |
| 8 | Kerr121226N8 | CS | 2254M0QG4 | 2,000,000 | 6/25/2012 | 12/26/2012 | 184 | 0.50 | SPX | RUT | 100% | 90% | 12% |
| 9 | Harper121226N9 | CS | 2254M0QH2 | 2,000,000 | 6/25/2012 | 12/26/2012 | 184 | 0.50 | SPX | RUT | 80% | 80% | 5% |
| 10 | Kerr130328N10 | CS | 2254M0S80 | 2,000,000 | 9/12/2012 | 3/28/2013 | 197 | 0.54 | SPX | RUT | 100% | 90% | 8% |
| 11 | Jordan141231N11 | CS | 2254M0SA5 | 2,000,000 | 9/12/2012 | 12/31/2014 | 840 | 2.30 | SPX | RUT | 100% | 81% | 39% |
| 12 | P ppen141231N12 | CS | 2254M0S98 | 2,000,000 | 9/12/2012 | 12/31/2014 | 840 | 2.30 | SPX | RUT | 100% | 60% | 29% |
| 13 | Harper150630N13 | CS | 2254M0V78 | 2,000,000 | 12/28/2012 | 6/30/2015 | 914 | 2.50 | SPX | RUT | 80% | 80% | 24% |
| 14 | Harper151221N14 | CS | 2254M0V60 | 2,000,000 | 12/28/2012 | 12/21/2015 | 1,088 | 2.98 | SPX | RUT | 80% | 80% | 30% |
| 15 | Harper151222N15 | CS | 2254M0VW3 | 4,000,000 | 2/15/2013 | 12/22/2015 | 1,040 | 2.85 | SPX | RUT | 80% | 80% | 24% |
| 16 | Harper151230N16 | JPM | 48126DXM6 | 4,000,000 | 2/15/2013 | 12/30/2015 | 1,048 | 2.87 | SPX | RUT | 80% | 80% | 24% |
| 17 | Harper151222N17 | Bar | 06741TPJ0 | 2,000,000 | 2/15/2013 | 12/22/2015 | 1,040 | 2.85 | SPX | RUT | 80% | 80% | 24% |
| 18 | Jordan151222N18 | CS | 2254M0VU7 | 2,000,000 | 2/15/2013 | 12/22/2015 | 1,040 | 2.85 | SPX | RUT | 100% | 81% | 37% |
| 19 | P ppen151230N19 | JPM | 48126DXL8 | 2,000,000 | 2/15/2013 | 12/30/2015 | 1,048 | 2.87 | SPX | RUT | 100% | 60% | 25% |
| 20 | Kerr nv151222N20 | CS | 2254M0VT0 | 2,000,000 | 2/15/2013 | 12/22/2015 | 1,040 | 2.85 | SPX | RUT | 100% | 110% | 23% |
| 21 | Cotton140527N21 | MSSB | 6174824S0 | 3,000,000 | 5/6/2013 | 5/27/2014 | 386 | 1.06 | SPGSCTP | | 90% | 80% | 6% |
| 22 | Cotton150526N22 | MSSB | 6174824T8 | 7,000,000 | 5/6/2013 | 5/26/2015 | 750 | 2.05 | SPGSCTP | | 90% | 80% | 14% |
| 23 | Kerr140829N23 | JPM | 48126NBM8 | 2,000,000 | 5/22/2013 | 8/29/2014 | 464 | 1.27 | SPX | RUT | 96% | 86% | 14% |
| 24 | Kerr141222N24 | MSSB | 61762E505 | 2,000,000 | 5/22/2013 | 12/22/2014 | 579 | 1.59 | SPX | RUT | 96% | 86% | 19% |
| 25 | Harper141222N25 | MSSB | 61762E570 | 1,000,000 | 6/3/2013 | 12/22/2014 | 567 | 1.55 | SPX | RUT | 80% | 80% | 14% |
| 26 | Harper180525N26 | MSSB | 61762E588 | 1,000,000 | 6/3/2013 | 5/25/2018 | 1,817 | 4.98 | SPX | RUT | 80% | 80% | 60% |
| 27 | Kerr131227N27 | BNP | 05574LKC1 | 1,000,000 | 6/3/2013 | 12/27/2013 | 207 | 0.57 | SPX | RUT | 96% | 86% | 6% |
| 28 | Kerr141222N28 | MSSB | 61762E596 | 1,000,000 | 6/3/2013 | 12/22/2014 | 567 | 1.55 | SPX | RUT | 96% | 86% | 21% |
| 29 | Jordan141222N29 | MSSB | 61762E604 | 1,000,000 | 6/3/2013 | 12/22/2014 | 567 | 1.55 | SPX | RUT | 100% | 80% | 21% |
| 30 | Jordan150526N30 | MSSB | 61762E612 | 1,000,000 | 6/3/2013 | 5/26/2015 | 722 | 1.98 | SPX | RUT | 100% | 80% | 28% |
| 31 | Jordan160525N31 | MSSB | 61762E620 | 2,000,000 | 6/3/2013 | 5/25/2016 | 1,087 | 2.98 | SPX | RUT | 100% | 80% | 45% |
| 32 | Jordan170525N32 | MSSB | 61762E638 | 1,000,000 | 6/3/2013 | 5/25/2017 | 1,452 | 3.98 | SPX | RUT | 100% | 80% | 63% |
| 33 | Jordan180525N33 | MSSB | 61762E646 | 1,000,000 | 6/3/2013 | 5/25/2018 | 1,817 | 4.98 | SPX | RUT | 100% | 80% | 82% |
| 34 | Kerr131227N34 | CS | 2254M0VR1 | 1,000,000 | 6/21/2013 | 12/27/2013 | 189 | 0.52 | SPX | RUT | 96% | 86% | 6% |
| 35 | Harper160525N35 | MSSB | 61762E810 | 1,000,000 | 6/21/2013 | 5/25/2016 | 1,069 | 2.93 | SPX | RUT | 80% | 80% | 34% |
| 36 | Harper170531N36 | MSSB | 61762E828 | 1,000,000 | 6/21/2013 | 5/31/2017 | 1,440 | 3.95 | SPX | RUT | 80% | 80% | 49% |
| 37 | Jordan140331N37 | BNP | 05574LPK8 | 3,000,000 | 8/9/2013 | 3/31/2014 | 234 | 0.64 | SPX | RUT | 107% | 87% | 17% |
| 38 | Kerr140331N38 | BNP | 05574LPL6 | 2,500,000 | 8/9/2013 | 3/31/2014 | 234 | 0.64 | SPX | RUT | 104% | 94% | 15% |
| 39 | Jordan201222N39 | MSSB | 61762P765 | 6,000,000 | 9/3/2013 | 12/22/2020 | 2,667 | 7.31 | SPX | RUT | 80% | 60% | 100% |
| 44 | Kerr141229N44 | MSSB | 61762P872 | 2,000,000 | 9/11/2013 | 12/29/2014 | 474 | 1.30 | SPX | RUT | 97% | 87% | 16% |
| 45 | Jordan171222N45 | MSSB | 61762W356 | 3,000,000 | 10/8/2013 | 12/22/2017 | 1,536 | 4.21 | SPX | RUT | 97% | 77% | 56% |
| 46 | Cotton170525N46 | MSSB | 61762GAJ3 | 5,000,000 | 10/15/2013 | 5/25/2017 | 1,318 | 3.61 | SPGSCTP | | 90% | 80% | 26% |
| 47 | Jordan161228N47 | CS | 22547W3S0 | 3,000,000 | 12/13/2013 | 12/28/2016 | 1,111 | 3.04 | SPX | RUT | 100% | 80% | 36% |
| 48 | Jordan170328N48 | CS | 22547W4RI | 4,000,000 | 1/14/2014 | 3/28/2017 | 1,169 | 3.20 | SPX | RUT | 105% | 85% | 45% |
| 49 | Jordan160630N49 | CS | 22547W4W0 | 2,000,000 | 1/27/2014 | 6/30/2016 | 885 | 2.42 | SPX | RUT | 102% | 82% | 30% |
| 50 | EEM150401N50 | Bar | 06740LAP0 | 1,000,000 | 4/7/2010 | 4/1/2015 | 1,820 | 4.99 | EEM | | 138% | 100% | 38% |
| 51 | CL1160527N51 | CS | 46632FEY7 | 3,000,000 | 5/21/2014 | 5/27/2016 | 737 | 2.02 | CL1 | | 110% | 79% | 40% |
| 52 | P ppen160929N52 | CS | 22547QNXO | 2,500,000 | 6/4/2014 | 9/29/2016 | 848 | 2.32 | SPX | RUT | 120% | 80% | 65% |
| 53 | P ppen180130N53 | CS | 22547QNT9 | 2,000,000 | 6/3/2014 | 1/30/2018 | 1,337 | 3.66 | SPX | RUT | 120% | 80% | 81% |
| 54 | P ppen181227N54 | CS | 22547QNU6 | 2,000,000 | 6/3/2014 | 12/27/2018 | 1,668 | 4.57 | SPX | RUT | 110% | 70% | 63% |
| 55 | Kerr200528N55 | Bar | 06741JS83 | 2,000,000 | 6/5/2014 | 5/28/2020 | 2,184 | 5.98 | SPX | RUT | 70% | 60% | 47% |
| 56 | Kerr201228N56 | MSSB | 61761S430 | 2,000,000 | 6/3/2014 | 12/28/2020 | 2,400 | 6.58 | SPX | RUT | 70% | 60% | 55% |
| 57 | Jordan210527N57 | CS | 22547QNS1 | 2,000,000 | 6/3/2014 | 5/27/2021 | 2,550 | 6.99 | SPX | RUT | 80% | 60% | 69% |
| 58 | Jordan-P ppen190329N58 | MSSB | 61761S448 | 2,500,000 | 6/5/2014 | 3/29/2019 | 1,758 | 4.82 | SPX | RUT | 110% | 80% | 70% |
| 59 | Jordan-P ppen160527N59 | JPM | 48127DLT3 | 2,500,000 | 6/5/2014 | 5/27/2016 | 722 | 1.98 | SPX | RUT | 110% | 80% | 53% |
| 60 | P ppen170329N60 | MSSB | 61761S471 | 2,500,000 | 6/9/2014 | 3/29/2017 | 1,024 | 2.81 | SPX | RUT | 120% | 80% | 61% |
| 61 | Jordan-P ppen170127N61 | Bar | 06741JT25 | 2,500,000 | 6/10/2014 | 1/27/2017 | 962 | 2.64 | SPX | RUT | 110% | 80% | 37% |
| 62 | CL1170517N62 | Bar | 06741UEV2 | 3,000,000 | 6/12/2014 | 5/17/2017 | 1,070 | 2.93 | CL1 | | 104% | 75% | 55% |
| 63 | Jordan210527N63 | CS | 22547WBD4 | 1,300,000 | 6/11/2014 | 5/27/2021 | 2,542 | 6.96 | SPX | RUT | 80% | 60% | 68% |
| 64 | P ppen181227N64 | CS | 22547WBE2 | 1,200,000 | 6/11/2014 | 12/27/2018 | 1,660 | 4.55 | SPX | RUT | 110% | 70% | 63% |
| 65 | Kerr160629N65 | JPM | 48127DMN5 | 3,000,000 | 6/11/2014 | 6/29/2015 | 383 | 1.05 | SPX | RUT | 94% | 84% | 10% |
| 66 | Jordan180529N66 | CS | 22547WC68 | 2,300,000 | 6/26/2014 | 5/29/2018 | 1,433 | 3.93 | SPX | RUT | 98% | 78% | 41% |

Exhibit 2
**Catalog of SBB Structured Notes 2011 to 2016**

| Number | The Name of the Note | Counterparty [1] | CUSIP | Total Principal Amount | Issue Date | Maturity/ Expiration Date | Days to Expiration (at Issuance) | Years to Expiration (at Issuance) | Underlying Indices [2] Index 1 | Index 2 | Upside Threshold (Coupon Barrier) | Downside Threshold (Principal Barrier) | Coupon Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 67 | Jordan180529N67 | Bar | 06741JU31 | 3,000,000 | 6/30/2014 | 5/29/2018 | 1,429 | 3.92 | SPX | RUT | 98% | 78% | 41% |
| 68 | Harper2x151229N68 | CS | 22547WC92 | 4,000,000 | 7/9/2014 | 12/29/2015 | 538 | 1.47 | SPX | RUT | 80% | 80% | 18% |
| 69 | Kerr151201N69 | CS | 22547WCA9 | 3,000,000 | 7/10/2014 | 12/1/2015 | 509 | 1.39 | SPX | RUT | 94% | 84% | 13% |
| 70 | Harper2x160428N70 | CS | 22547QR84 | 5,500,000 | 7/25/2014 | 4/28/2016 | 643 | 1.76 | SPX | RUT | 80% | 80% | 22% |
| 71 | Kerr2x170915N71 | CS | 22547QT97 | 6,250,000 | 9/3/2014 | 9/15/2017 | 1,108 | 3.04 | SPX | RUT | 90% | 80% | 48% |
| 72 | Cotton190917N72 | MSSB | 61762GCA0 | 5,000,000 | 9/19/2014 | 9/17/2019 | 1,824 | 5.00 | SPGSCTP | | N/A | N/A | N/A |
| 73 | Kerr2x151001N73 | CS | 22547QU80 | 4,500,000 | 9/30/2014 | 10/1/2015 | 366 | 1.00 | SPX | RUT | 90% | 80% | 17% |
| 74 | Harper2x190930N74 | CS | 22547QUH7 | 5,000,000 | 10/3/2014 | 9/30/2019 | 1,823 | 4.99 | SPX | RUT | 80% | 80% | 76% |
| 75 | Harper2x191029N75 | CS | 22547WED1 | 2,000,000 | 10/16/2014 | 10/29/2019 | 1,839 | 5.04 | SPX | RUT | 80% | 80% | 77% |
| 76 | Harper161114N76 | Bar | 06741ULXO | 2,000,000 | 11/14/2014 | 11/14/2016 | 731 | 2.00 | SPX | RUT | 80% | 80% | 16% |
| 77 | Kerr171114N77 | Bar | 06741ULY8 | 2,000,000 | 11/14/2014 | 11/14/2017 | 1,096 | 3.00 | SPX | RUT | 90% | 80% | 31% |
| 78 | WTI160323N78 | JPM | 46623FGS8 | 1,000,000 | 11/28/2014 | 3/23/2016 | 481 | 1.32 | CLK6 | | N/A | N/A | N/A |
| 79 | WTI160323N79 | MSSB | 61762GCQS | 1,000,000 | 12/1/2014 | 3/23/2016 | 478 | 1.31 | CLK6 | | N/A | N/A | N/A |
| 80 | Kerr160226N80 | CS | 22547QXP6 | 5,500,000 | 1/5/2015 | 2/26/2016 | 417 | 1.14 | SPX | RUT | 100% | 90% | 19% |
| 81 | SPGSCLP170830N81 | JPM | 48127DPX0 | 2,500,000 | 1/13/2015 | 8/30/2017 | 960 | 2.63 | SPGSCLP | | 138% | 100% | 76% |
| 82 | SPGSCLP170830N82 | MSSB | 61762GCW2 | 2,500,000 | 1/13/2015 | 8/30/2017 | 960 | 2.63 | SPGSCLP | | 138% | 100% | 76% |
| 83 | Kerr170630N83 | CS | 22547WGJ6 | 2,000,000 | 1/27/2015 | 6/30/2017 | 885 | 2.42 | SPX | RUT | 90% | 80% | 26% |
| 84 | Kerr170630N84 | JPM | 48125UAA0 | 2,000,000 | 1/27/2015 | 6/30/2017 | 885 | 2.42 | SPX | RUT | 90% | 80% | 25% |
| 85 | SPGSCLP170831N85 | BNP | 05579TCG9 | 2,000,000 | 3/5/2015 | 8/31/2017 | 910 | 2.49 | SPGSCLP | | 126% | 100% | 52% |
| 86 | SPGSCLP181128N86 | SocGen | 83368WT43 | 7,500,000 | 6/3/2015 | 11/28/2018 | 1,274 | 3.49 | SPGSCTP | | 150% | 100% | 72% |
| 87 | Harper3xHJ 180925N87 | Citi | 17298CED6 | 7,000,000 | 7/7/2015 | 9/25/2018 | 1,176 | 3.22 | SPX | RUT | 80% | 80% | 40% |
| 88 | Harper180820N88 | CS | 22546VKES | 3,000,000 | 8/19/2015 | 8/20/2018 | 1,097 | 3.01 | SPX | RUT | 70% | 70% | 22% |
| 89 | JordanCont160929N89 | Citi | 17298C2J6 | 2,000,000 | 9/15/2015 | 9/29/2016 | 380 | 1.04 | SPX | RUT | 100% | 80% | 17% |
| 90 | Jordan P ppenCont180720N90 | CS | 22547WMZ3 | 2,000,000 | 9/18/2015 | 7/20/2018 | 1,036 | 2.84 | SPX | RUT | 100% | 73% | 13% |
| 91 | JordanCont200326N91 | MSSB | 61765R719 | 3,200,000 | 10/2/2015 | 3/26/2020 | 1,637 | 4.48 | SPX | RUT | 100% | 80% | 43% |
| 92 | Kerr Cont200326N92 | Citi | 17298C3D8 | 3,200,000 | 10/2/2015 | 3/26/2020 | 1,637 | 4.48 | SPX | RUT | 100% | 90% | 56% |
| 93 | JordanP ppenDuoCont200922N93 | Citi | 17298C3L0 | 2,661,000 | 10/12/2015 | 9/22/2020 | 1,807 | 4.95 | SPX | RUT | 130% | 70% | 65% |
| 94 | JordanP ppenDuoCont200922N94 | MSSB | 61765R743 | 2,000,000 | 10/13/2015 | 9/22/2020 | 1,806 | 4.95 | SPX | RUT | 130% | 70% | 65% |
| 95 | JordanP ppnenDuoCont200922N95 | CS | 22546VNV4 | 2,661,000 | 10/13/2015 | 9/22/2020 | 1,806 | 4.95 | SPX | RUT | 130% | 70% | 65% |
| 96 | JordanP ppenDuoCont190329N96 | Citi | 1729BC4K1 | 2,000,000 | 11/5/2015 | 3/29/2019 | 1,240 | 3.40 | SPX | RUT | 140% | 70% | 43% |
| 97 | JordanP ppenDuoCont180621N97 | Citi | 17298C506 | 2,000,000 | 12/7/2015 | 6/21/2018 | 927 | 2.54 | SPX | RUT | 131% | 80% | 31% |
| 98 | JordanP ppenDuoCont181221N98 | MSSB | 61765U449 | 2,000,000 | 12/8/2015 | 12/21/2018 | 1,109 | 3.04 | SPX | RUT | 137% | 77% | 40% |
| 99 | JordanP ppenDuoCont190625N99 | Citi | 17298C5J3 | 2,000,000 | 12/17/2015 | 6/25/2019 | 1,286 | 3.52 | SPX | RUT | 120% | 80% | 43% |
| 100 | JordanContMod201229N100 | MSSB | 61765U613 | 2,000,000 | 12/30/2015 | 12/29/2020 | 1,826 | 5.00 | SPX | RUT | 97% | 80% | 51% |
| 101 | JordanContMod200626N101 | MSSB | 61765U654 | 2,000,000 | 12/30/2015 | 6/26/2020 | 1,640 | 4.49 | SPX | RUT | 96% | 79% | 42% |
| 102 | JordanContMod190621N102 | Citi | 17298C5V6 | 2,000,000 | 12/30/2015 | 6/21/2019 | 1,269 | 3.48 | SPX | RUT | 95% | 71% | 23% |
| 103 | JordanContMod190927N103 | Citi | 17298C5W4 | 2,000,000 | 12/30/2015 | 9/27/2019 | 1,367 | 3.75 | SPX | RUT | 95% | 73% | 28% |
| 104 | JovrdanContMod200326N104 | Citi | 17298C5X2 | 2,000,000 | 12/30/2015 | 3/26/2020 | 1,548 | 4.24 | SPX | RUT | 95% | 77% | 36% |
| 105 | JordanContMod191230N105 | CS | 22547WPQ0 | 2,000,000 | 1/6/2016 | 12/30/2019 | 1,454 | 3.98 | SPX | RUT | 95% | 75% | 33% |
| 106 | JordanContMod181226N106 | Citi | 17298C5Z7 | 2,478,000 | 1/6/2016 | 12/26/2018 | 1,085 | 2.97 | SPX | RUT | 94% | 70% | 19% |
| 107 | JordanContMod190327N107 | CS | 22547WPT4 | 2,000,000 | 1/8/2016 | 3/27/2019 | 1,174 | 3.22 | SPX | RUT | 94% | 70% | 21% |
| 108 | JordanContMod190929N108 | MSSB | 61765U670 | 2,000,000 | 1/7/2016 | 9/29/2020 | 1,727 | 4.73 | SPX | RUT | 96% | 80% | 50% |
| 109 | JordanContMod190625N109 | Citi | 17298C6Q6 | 2,000,000 | 1/25/2016 | 6/25/2019 | 1,247 | 3.42 | RUT | | 124% | 55% | 7% |
| 110 | JordanContMod190625N110 | Citi | 17298C6W3 | 2,000,000 | 1/26/2016 | 6/25/2019 | 1,246 | 3.41 | RUT | | 122% | 54% | 17% |
| 111 | JordanContMod190829N111 | Citi | 17298C6W3 | 2,000,000 | 1/27/2016 | 8/29/2019 | 1,310 | 3.59 | RUT | | 124% | 55% | 18% |
| 112 | JordanContMod190731N112 | HSBC | 40433ULK0 | 2,000,000 | 4/8/2016 | 7/31/2019 | 1,209 | 3.31 | SPX | RUT | 115% | 85% | 39% |
| 113 | JordanContMod190331N113 | HSBC | 40433URA6 | 4,000,000 | 6/24/2016 | 10/31/2019 | 1,224 | 3.35 | SPX | RUT | 115% | 85% | 37% |
| 114 | R ngg t200331N114 | BNP | 05579TRA6 | 10,600,000 | 8/18/2016 | 3/31/2020 | 1,321 | 3.62 | USDMYR | | N/A | N/A | N/A |
| | | | Total Principal | 287,600,000 | | Weighted Average Expiration (Yrs.) | | 3.01 | | | 93.47% | 74.91% | 34.92% |

[1] Bar = Barclay's, CS = Credit Suisse, DB = Deutsche Banc, JPM = JP Morgan, MSSB = Morgan Stanley Smith Barney, BNP = BNP Paribas, SocGen = Societe Generale, Citi = Citigroup, HSBC = HSBC

[2] There are 110 notes listed in this catalog( #40 to #43 are missing). 96 of them have the SPX and/or RUT as underlying indices (87%)

Source: Navalgund SEC Inv. Test. Ex. 125 (all columns except for "Days to Expiration" and "Years to Expiration" taken directly from source exhibit).

Exhibit 2a
**Catalog of SBB Structured Notes with Worst Of SPX and RUT as Underlying Indices**
**2011 to 2016**

| Number | The Name of the Note | Counterparty [1] | CUSIP | Total Principal Amount | Issue Date | Maturity/ Expiration Date | Days to Expiration (at Issuance) | Years to Expiration (at Issuance) | Underlying Indices [2] Index 1 | Index 2 | Upside Threshold (Coupon Barrier) | Downside Threshold (Principal Barrier) | Coupon Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Rodman111223N2 | CS | 2254M0JG2 | 2,000,000 | 9/23/2011 | 12/23/2011 | 91 | 0.25 | SPX | RUT | 100% | 100% | 16% |
| 3 | Jordan131231N3 | DB | 2515A1DU2 | 2,000,000 | 10/14/2011 | 12/31/2013 | 809 | 2.22 | SPX | RUT | 100% | 81% | 50% |
| 4 | P ppen131223N4 | CS | 2254M0JT4 | 2,000,000 | 10/14/2011 | 12/24/2013 | 802 | 2.20 | SPX | RUT | 100% | 60% | 39% |
| 5 | Kerr120731N5 | CS | 2254M0LG9 | 3,000,000 | 1/31/2012 | 7/31/2012 | 182 | 0.50 | SPX | RUT | 100% | 90% | 11% |
| 6 | Harper120731N6 | CS | 2254M0LF1 | 2,000,000 | 1/31/2012 | 7/31/2012 | 182 | 0.50 | SPX | RUT | 80% | 80% | 5% |
| 7 | Kukoc120607N7 | CS | 2254M0LH7 | 2,000,000 | 1/31/2012 | 6/7/2012 | 128 | 0.35 | SPX | RUT | 100% | 85% | 12% |
| 8 | Kerr121226N8 | CS | 2254M0QG4 | 2,000,000 | 6/25/2012 | 12/26/2012 | 184 | 0.50 | SPX | RUT | 100% | 90% | 12% |
| 9 | Harper121226N9 | CS | 2254M0QH2 | 2,000,000 | 6/25/2012 | 12/26/2012 | 184 | 0.50 | SPX | RUT | 80% | 80% | 5% |
| 10 | Kerr130328N10 | CS | 2254M0S80 | 2,000,000 | 9/12/2012 | 3/28/2013 | 197 | 0.54 | SPX | RUT | 100% | 90% | 8% |
| 11 | Jordan141231N11 | CS | 2254M0SA5 | 2,000,000 | 9/12/2012 | 12/31/2014 | 840 | 2.30 | SPX | RUT | 100% | 81% | 39% |
| 12 | P ppen141231N12 | CS | 2254M0S98 | 2,000,000 | 9/12/2012 | 12/31/2014 | 840 | 2.30 | SPX | RUT | 100% | 60% | 29% |
| 13 | Harper150630N13 | CS | 2254M0V78 | 2,000,000 | 12/28/2012 | 6/30/2015 | 914 | 2.50 | SPX | RUT | 80% | 80% | 24% |
| 14 | Harper151221N14 | CS | 2254M0V60 | 2,000,000 | 12/28/2012 | 12/21/2015 | 1,088 | 2.98 | SPX | RUT | 80% | 80% | 30% |
| 15 | Harper151222N15 | CS | 2254M0VW3 | 4,000,000 | 2/15/2013 | 12/22/2015 | 1,040 | 2.85 | SPX | RUT | 80% | 80% | 24% |
| 16 | Harper151230N16 | JPM | 48126DXM6 | 4,000,000 | 2/15/2013 | 12/30/2015 | 1,048 | 2.87 | SPX | RUT | 80% | 80% | 24% |
| 17 | Harper151222N17 | Bar | 06741TPJ0 | 2,000,000 | 2/15/2013 | 12/22/2015 | 1,040 | 2.85 | SPX | RUT | 80% | 80% | 24% |
| 18 | Jordan151222N18 | CS | 2254M0VU7 | 2,000,000 | 2/15/2013 | 12/22/2015 | 1,040 | 2.85 | SPX | RUT | 100% | 81% | 37% |
| 19 | P ppen151230N19 | JPM | 48126DXL8 | 2,000,000 | 2/15/2013 | 12/30/2015 | 1,048 | 2.87 | SPX | RUT | 100% | 60% | 25% |
| 20 | Kerr nv151222N20 | CS | 2254M0VT0 | 2,000,000 | 2/15/2013 | 12/22/2015 | 1,040 | 2.85 | SPX | RUT | 100% | 110% | 23% |
| 23 | Kerr140829N23 | JPM | 48126NBM8 | 2,000,000 | 5/22/2013 | 8/29/2014 | 464 | 1.27 | SPX | RUT | 96% | 86% | 14% |
| 24 | Kerr141222N24 | MSSB | 61762E505 | 2,000,000 | 5/22/2013 | 12/22/2014 | 579 | 1.59 | SPX | RUT | 96% | 86% | 19% |
| 25 | Harper141222N25 | MSSB | 61762E570 | 2,000,000 | 6/3/2013 | 12/22/2014 | 567 | 1.55 | SPX | RUT | 80% | 80% | 14% |
| 26 | Harper180525N26 | MSSB | 61762E588 | 1,000,000 | 6/3/2013 | 5/25/2018 | 1,817 | 4.98 | SPX | RUT | 80% | 80% | 60% |
| 27 | Kerr131227N27 | BNP | 05574LKC1 | 1,000,000 | 6/3/2013 | 12/27/2013 | 207 | 0.57 | SPX | RUT | 96% | 86% | 6% |
| 28 | Kerr141222N28 | MSSB | 61762E596 | 1,000,000 | 6/3/2013 | 12/22/2014 | 567 | 1.55 | SPX | RUT | 96% | 86% | 21% |
| 29 | Jordan141222N29 | MSSB | 61762E604 | 1,000,000 | 6/3/2013 | 12/22/2014 | 567 | 1.55 | SPX | RUT | 100% | 80% | 28% |
| 30 | Jordan150526N30 | MSSB | 61762E612 | 1,000,000 | 6/3/2013 | 5/26/2015 | 722 | 1.98 | SPX | RUT | 100% | 80% | 28% |
| 31 | Jordan160525N31 | MSSB | 61762E620 | 2,000,000 | 6/3/2013 | 5/25/2016 | 1,087 | 2.98 | SPX | RUT | 100% | 80% | 45% |
| 32 | Jordan170525N32 | MSSB | 61762E638 | 1,000,000 | 6/3/2013 | 5/25/2017 | 1,452 | 3.98 | SPX | RUT | 100% | 80% | 63% |
| 33 | Jordan180525N33 | MSSB | 61762E646 | 1,000,000 | 6/3/2013 | 5/25/2018 | 1,817 | 4.98 | SPX | RUT | 100% | 80% | 82% |
| 34 | Kerr131227N34 | CS | 2254M0VR1 | 1,000,000 | 6/21/2013 | 12/27/2013 | 189 | 0.52 | SPX | RUT | 96% | 86% | 6% |
| 35 | Harper160525N35 | MSSB | 61762E810 | 1,000,000 | 6/21/2013 | 5/25/2016 | 1,069 | 2.93 | SPX | RUT | 80% | 80% | 34% |
| 36 | Harper170531N36 | MSSB | 61762E828 | 1,000,000 | 6/21/2013 | 5/31/2017 | 1,440 | 3.95 | SPX | RUT | 80% | 80% | 49% |
| 37 | Jordan140331N37 | BNP | 05574LPK8 | 2,000,000 | 8/9/2013 | 3/31/2014 | 234 | 0.64 | SPX | RUT | 107% | 87% | 17% |
| 38 | Kerr140331N38 | BNP | 05574LPL6 | 2,500,000 | 8/9/2013 | 3/31/2014 | 234 | 0.64 | SPX | RUT | 104% | 94% | 15% |
| 39 | Jordan201222N39 | MSSB | 61762P765 | 5,000,000 | 9/3/2013 | 12/22/2020 | 2,667 | 7.31 | SPX | RUT | 80% | 60% | 100% |
| 44 | Kerr141229N44 | MSSB | 61762P872 | 2,000,000 | 9/11/2013 | 12/29/2014 | 474 | 1.30 | SPX | RUT | 97% | 87% | 16% |
| 45 | Jordan171222N45 | MSSB | 61762W356 | 3,000,000 | 10/8/2013 | 12/22/2017 | 1,536 | 4.21 | SPX | RUT | 97% | 77% | 56% |
| 47 | Jordan161228N47 | CS | 22547W3S0 | 3,000,000 | 12/13/2013 | 12/28/2016 | 1,111 | 3.04 | SPX | RUT | 100% | 80% | 36% |
| 48 | Jordan170328N48 | CS | 22547W4RI | 4,000,000 | 1/14/2014 | 3/28/2017 | 1,169 | 3.20 | SPX | RUT | 105% | 85% | 45% |
| 49 | Jordan160630N49 | CS | 22547W4W0 | 2,000,000 | 1/27/2014 | 6/30/2016 | 885 | 2.42 | SPX | RUT | 102% | 82% | 30% |
| 52 | P ppen160929N52 | CS | 22547QNXO | 2,500,000 | 6/4/2014 | 9/29/2016 | 848 | 2.32 | SPX | RUT | 120% | 80% | 65% |
| 53 | P ppen180130N53 | CS | 22547QNT9 | 2,000,000 | 6/3/2014 | 1/30/2018 | 1,337 | 3.66 | SPX | RUT | 120% | 80% | 81% |
| 54 | P ppen181227N54 | CS | 22547QNU6 | 2,000,000 | 6/3/2014 | 12/27/2018 | 1,668 | 4.57 | SPX | RUT | 110% | 70% | 63% |
| 55 | Kerr200528N55 | Bar | 06741JS83 | 2,000,000 | 6/5/2014 | 5/28/2020 | 2,184 | 5.98 | SPX | RUT | 70% | 60% | 47% |
| 56 | Kerr201228N56 | MSSB | 61761S430 | 2,000,000 | 6/3/2014 | 12/28/2020 | 2,400 | 6.58 | SPX | RUT | 70% | 60% | 55% |
| 57 | Jordan210527N57 | CS | 22547QNS1 | 2,000,000 | 6/3/2014 | 5/27/2021 | 2,550 | 6.99 | SPX | RUT | 80% | 60% | 69% |
| 58 | Jordan-P ppen190329N58 | MSSB | 61761S448 | 3,250,000 | 6/5/2014 | 3/29/2019 | 1,758 | 4.82 | SPX | RUT | 110% | 80% | 70% |
| 59 | Jordan-P ppen160527N59 | JPM | 48127DLT3 | 2,500,000 | 6/5/2014 | 5/27/2016 | 722 | 1.98 | SPX | RUT | 110% | 80% | 31% |
| 60 | P ppen170329N60 | MSSB | 61761S471 | 2,500,000 | 6/9/2014 | 3/29/2017 | 1,024 | 2.81 | SPX | RUT | 120% | 80% | 61% |
| 61 | Jordan-P ppen170127N61 | Bar | 06741JT25 | 2,500,000 | 6/10/2014 | 1/27/2017 | 962 | 2.64 | SPX | RUT | 110% | 80% | 37% |
| 63 | Jordan210527N63 | CS | 22547WBD4 | 1,300,000 | 6/11/2014 | 5/27/2021 | 2,542 | 6.96 | SPX | RUT | 80% | 60% | 68% |
| 64 | P ppen181227N64 | CS | 22547WBE2 | 1,200,000 | 6/11/2014 | 12/27/2018 | 1,660 | 4.55 | SPX | RUT | 110% | 70% | 63% |
| 65 | Kerr150629N65 | JPM | 48127DMN5 | 3,000,000 | 6/11/2014 | 6/29/2015 | 383 | 1.05 | SPX | RUT | 94% | 84% | 10% |
| 66 | Jordan180529N66 | CS | 22547WC68 | 2,300,000 | 6/26/2014 | 5/29/2018 | 1,433 | 3.93 | SPX | RUT | 98% | 78% | 41% |
| 67 | Jordan180529N67 | Bar | 06741JU31 | 3,000,000 | 6/30/2014 | 5/29/2018 | 1,429 | 3.92 | SPX | RUT | 98% | 78% | 41% |
| 68 | Harper2x151229N68 | CS | 22547WC92 | 4,000,000 | 7/9/2014 | 12/29/2015 | 538 | 1.47 | SPX | RUT | 80% | 80% | 18% |
| 69 | Kerr151201N69 | CS | 22547WCA9 | 3,000,000 | 7/10/2014 | 12/1/2015 | 509 | 1.39 | SPX | RUT | 94% | 84% | 13% |
| 70 | Harper2x160428N70 | CS | 22547QR84 | 5,500,000 | 7/25/2014 | 4/28/2016 | 643 | 1.76 | SPX | RUT | 80% | 80% | 22% |
| 71 | Kerr2x170915N71 | CS | 22547QT97 | 6,250,000 | 9/3/2014 | 9/15/2017 | 1,108 | 3.04 | SPX | RUT | 80% | 80% | 48% |
| 73 | Kerr2x151001N73 | CS | 22547QU80 | 4,500,000 | 9/30/2014 | 10/1/2015 | 366 | 1.00 | SPX | RUT | 90% | 80% | 17% |

**Exhibit 2a**

**Catalog of SBB Structured Notes with Worst Of SPX and RUT as Underlying Indices**

**2011 to 2016**

| Number | The Name of the Note | Counterparty [1] | CUSIP | Total Principal Amount | Issue Date | Maturity/ Expiration Date | Days to Expiration (at Issuance) | Years to Expiration (at Issuance) | Index 1 | Index 2 | Upside Threshold (Coupon Barrier) | Downside Threshold (Principal Barrier) | Coupon Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 74 | Harper2x190930N74 | CS | 22547QUH7 | 5,000,000 | 10/3/2014 | 9/30/2019 | 1,823 | 4.99 | SPX | RUT | 80% | 80% | 76% |
| 75 | Harper2x191029N75 | CS | 22547WED1 | 2,000,000 | 10/16/2014 | 10/29/2019 | 1,839 | 5.04 | SPX | RUT | 80% | 80% | 77% |
| 76 | Harper1611114N76 | Bar | 06741ULX0 | 2,000,000 | 11/14/2014 | 11/14/2016 | 731 | 2.00 | SPX | RUT | 80% | 80% | 16% |
| 77 | Kerr171114N77 | Bar | 06741ULY8 | 2,000,000 | 11/14/2014 | 11/14/2017 | 1,096 | 3.00 | SPX | RUT | 90% | 80% | 31% |
| 80 | Kerr160226N80 | CS | 22547QXP6 | 5,500,000 | 1/5/2015 | 2/26/2016 | 417 | 1.14 | SPX | RUT | 100% | 90% | 19% |
| 83 | Kerr170630N83 | CS | 22547WGJ6 | 2,000,000 | 1/27/2015 | 6/30/2017 | 885 | 2.42 | SPX | RUT | 90% | 80% | 26% |
| 84 | Kerr170630N84 | JPM | 48125UAA0 | 2,000,000 | 1/27/2015 | 6/30/2017 | 885 | 2.42 | SPX | RUT | 90% | 80% | 25% |
| 87 | Harper3xHJ 180925N87 | Citi | 17298CED6 | 7,000,000 | 7/7/2015 | 9/25/2018 | 1,176 | 3.22 | SPX | RUT | 80% | 80% | 40% |
| 88 | Harper180820N88 | CS | 22546VKES | 3,000,000 | 8/19/2015 | 8/20/2018 | 1,097 | 3.01 | SPX | RUT | 70% | 70% | 22% |
| 89 | JordanCont160929N89 | Citi | 17298C2J6 | 2,000,000 | 9/15/2015 | 9/29/2016 | 380 | 1.04 | SPX | RUT | 100% | 80% | 17% |
| 90 | Jordan P ppenCont180720N90 | CS | 22547WMZ3 | 2,000,000 | 9/18/2015 | 7/20/2018 | 1,036 | 2.84 | SPX | RUT | 100% | 73% | 13% |
| 91 | JordanCont200326N91 | MSSB | 61765R719 | 3,200,000 | 10/2/2015 | 3/26/2020 | 1,637 | 4.48 | SPX | RUT | 100% | 80% | 43% |
| 92 | Kerr Cont200326N92 | Citi | 17298C3D8 | 3,200,000 | 10/2/2015 | 3/26/2020 | 1,637 | 4.48 | SPX | RUT | 100% | 90% | 56% |
| 93 | JordanP ppenDuoCont200922N93 | Citi | 17298C3L0 | 2,661,000 | 10/12/2015 | 9/22/2020 | 1,807 | 4.95 | SPX | RUT | 130% | 70% | 65% |
| 94 | JordanP ppenDuoCont200922N94 | MSSB | 61765R743 | 2,000,000 | 10/13/2015 | 9/22/2020 | 1,806 | 4.95 | SPX | RUT | 130% | 70% | 65% |
| 95 | JordanP ppenDuoCont200922N95 | CS | 22546VNV4 | 2,661,000 | 10/13/2015 | 9/22/2020 | 1,806 | 4.95 | SPX | RUT | 130% | 70% | 65% |
| 96 | JordanP ppenDuoCont190329N96 | Citi | 1729BC4K1 | 2,000,000 | 11/5/2015 | 3/29/2019 | 1,240 | 3.40 | SPX | RUT | 140% | 70% | 43% |
| 97 | JordanP ppenDuoCont180621N97 | Citi | 17298C506 | 2,000,000 | 12/7/2015 | 6/21/2018 | 927 | 2.54 | SPX | RUT | 131% | 80% | 31% |
| 98 | JordanP ppenDuoCont181221N98 | MSSB | 61765U449 | 2,000,000 | 12/8/2015 | 12/21/2018 | 1,109 | 3.04 | SPX | RUT | 137% | 77% | 40% |
| 99 | JordanP penDuoCont190625N99 | Citi | 17298C5J3 | 2,000,000 | 12/17/2015 | 6/25/2019 | 1,286 | 3.52 | SPX | RUT | 120% | 80% | 43% |
| 100 | JordanContMod201229N100 | MSSB | 61765U613 | 2,000,000 | 12/30/2015 | 12/29/2020 | 1,826 | 5.00 | SPX | RUT | 97% | 80% | 51% |
| 101 | JordanContMod200626N101 | MSSB | 61765U654 | 2,000,000 | 12/30/2015 | 6/26/2020 | 1,640 | 4.49 | SPX | RUT | 96% | 79% | 42% |
| 102 | JordanContMod190621N102 | Citi | 17298C5V6 | 2,000,000 | 12/30/2015 | 6/21/2019 | 1,269 | 3.48 | SPX | RUT | 95% | 71% | 23% |
| 103 | JordanContMod190927N103 | Citi | 17298C5W4 | 2,000,000 | 12/30/2015 | 9/27/2019 | 1,367 | 3.75 | SPX | RUT | 95% | 73% | 28% |
| 104 | JovrdanContMod200326N104 | Citi | 17298C5X2 | 2,000,000 | 12/30/2015 | 3/26/2020 | 1,548 | 4.24 | SPX | RUT | 95% | 77% | 36% |
| 105 | JordanContMod191230N105 | CS | 22547WPQ0 | 2,000,000 | 1/6/2016 | 12/30/2019 | 1,454 | 3.98 | SPX | RUT | 95% | 75% | 33% |
| 106 | JordanContMod181226N106 | Citi | 17298C5Z7 | 2,478,000 | 1/6/2016 | 12/26/2018 | 1,085 | 2.97 | SPX | RUT | 94% | 70% | 19% |
| 107 | JordanContMod190327N107 | CS | 22547WPT4 | 2,000,000 | 1/8/2016 | 3/27/2019 | 1,174 | 3.22 | SPX | RUT | 94% | 70% | 21% |
| 108 | JordanContMod200929N108 | MSSB | 61765U670 | 2,000,000 | 1/7/2016 | 9/29/2020 | 1,727 | 4.73 | SPX | RUT | 96% | 80% | 50% |
| 112 | JordanContMod190731N112 | HSBC | 40433ULK0 | 2,000,000 | 4/8/2016 | 7/31/2019 | 1,209 | 3.31 | SPX | RUT | 115% | 85% | 39% |
| 113 | JordanContMod191031N113 | HSBC | 40433URA6 | 4,000,000 | 6/24/2016 | 10/31/2019 | 1,224 | 3.35 | SPX | RUT | 115% | 85% | 37% |
| | | | Total Principal | 223,500,000 | | Weighted Average Expiration (Yrs.) | | 3.01 | | | 96.35% | 79.05% | 37.17% |

[1] Bar = Barclay's, CS = Deutsche Suisse, DB = Deutsche Banc, JPM = JP Morgan, MSSB = Morgan Stanley Smith Barney, BNP = BNP Paribas, SocGen = Societe Generale, Citi = Citigroup, HSBC = HSBC.

[2] There are 110 notes listed in Navalgund SEC Inv. Test. Ex 125 ( #40 to #43 are missing). 92 of them (listed here) have a worst of SPX and RUT as underlying indices (84%).

Source: Navalgund SEC Inv. Test. Ex. 125 (all columns except for "Days to Expiration" and "Years to Expiration" taken directly from source exhibit).

**Exhibit 3**
**Summary of SBB Funds 2011 to 2015**

| Fund | Year | Number of Notes | Net Assets | Cost Basis | SBB Reported Fair Value | Unrealized Gain/(Loss) [1] | Net Change in Unrealized Gain/(Loss) | Net Realized Gain/(Loss) | Management Fees | Incentive Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| Investors II | 2011 | 2 | $10,466,185 | $4,000,000 | $4,413,749 | $413,749 | $413,748 | $300,000 | $107,137 | $142,749 |
| | | | **$10,466,185** | **$4,000,000** | **$4,413,749** | **$413,749** | **$413,748** | **$300,000** | **$107,137** | **$142,749** |
| Investors II | 2012 | 7 | $11,875,516 | $11,000,000 | $12,964,542 | $1,964,542 | $1,550,298 | $366,997 | $123,970 | $387,723 |
| | | | **$11,875,516** | **$11,000,000** | **$12,964,542** | **$1,964,542** | **$1,550,298** | **$366,997** | **$123,970** | **$387,723** |
| CPS I [2] | 2013 | 5 | $19,341,951 | $16,277,778 | $17,471,641 | $1,193,863 | $1,193,862 | $370,311 | $0 | $0 |
| CPS XI A | 2013 | 3 | $10,206,712 | $9,870,305 | $10,171,594 | $301,289 | $301,289 | $0 | $33,702 | $60,258 |
| Investors II | 2013 | 9 | $11,540,284 | $15,500,000 | $17,973,872 | $2,473,872 | $509,330 | $1,855,000 | $130,442 | $463,406 |
| Investors III | 2013 | 12 | $7,814,350 | $9,333,333 | $10,467,283 | $1,133,950 | $1,133,950 | $77,667 | $60,798 | $242,323 |
| Investors IV | 2013 | 12 | $3,469,792 | $4,666,667 | $5,233,643 | $566,976 | $566,976 | $38,833 | $60,650 | $74,313 |
| | | | **$52,373,089** | **$55,648,083** | **$61,318,033** | **$5,669,950** | **$3,705,407** | **$2,341,811** | **$285,592** | **$840,300** |
| CPS I [2] | 2014 | 11 | $21,237,479 | $16,000,000 | $18,563,947 | $2,563,947 | $1,370,084 | $525,444 | $0 | $0 |
| CPS XI A | 2014 | 5 | $10,742,140 | $9,917,507 | $10,982,498 | $1,064,991 | $763,702 | $77,202 | $105,695 | $168,181 |
| Investors II | 2014 | 11 | $14,823,704 | $18,500,000 | $21,346,748 | $2,846,748 | $372,874 | $1,547,500 | $141,582 | $355,510 |
| Investors III | 2014 | 15 | $12,100,756 | $12,833,336 | $15,069,187 | $2,235,851 | $1,101,904 | $599,133 | $115,230 | $335,813 |
| Investors IV | 2014 | 15 | $5,946,124 | $6,416,664 | $7,534,592 | $1,117,928 | $550,952 | $299,567 | $114,100 | $123,688 |
| Polysight I [3] | 2014 | 23 | $41,347,561 | $46,000,000 | $48,661,638 | $2,661,638 | $2,661,638 | $4,594 | $210,120 | $530,230 |
| | | | **$106,197,764** | **$109,667,507** | **$122,158,610** | **$12,491,103** | **$6,821,154** | **$3,053,440** | **$686,727** | **$1,513,422** |
| CPS I [2] | 2015 | 15 | $22,266,337 | $15,671,998 | $17,785,915 | $2,113,917 | ($450,032) | $1,478,890 | $0 | $0 |
| CPS XI A | 2015 | 9 | $10,976,708 | $6,550,000 | $6,975,458 | $425,458 | ($639,532) | $1,111,383 | $109,637 | $94,372 |
| CPS XI B [4] | 2015 | 2 | $1,751,028 | $2,000,000 | $1,764,764 | ($235,236) | ($235,236) | $0 | $12,885 | $0 |
| CPS XI C [4] | 2015 | 2 | $875,088 | $1,000,000 | $882,382 | ($117,618) | $117,618 | $0 | $6,442 | $0 |
| Investors II | 2015 | 13 | $15,206,730 | $14,465,000 | $16,564,531 | $2,099,531 | ($747,216) | $1,585,000 | $152,611 | $142,726 |
| Investors III | 2015 | 20 | $12,728,839 | $14,431,670 | $17,356,906 | $2,925,236 | $689,385 | $353,133 | $126,349 | $197,049 |
| Investors IV | 2015 | 20 | $6,181,867 | $7,215,829 | $8,678,449 | $1,462,620 | $344,690 | $176,566 | $123,700 | $98,302 |
| Polysight I | 2015 | 33 | $54,632,813 | $58,290,000 | $63,254,754 | $4,964,754 | $2,303,116 | $1,138,000 | $480,996 | $664,700 |
| | | | **$124,619,410** | **$119,624,497** | **$133,263,159** | **$13,638,662** | **$1,382,793** | **$5,842,972** | **$1,012,620** | **$1,197,149** |

Sources: SBB Fund financial statements for 2011 to 2015.

Notes:

(1) Unrealized Gain/(Loss) = SBB Reported Fair Value minus Cost Basis.

(2) No management fee or incentive allocation is charged to the members of CPS I.

(3) Net realized gains/(loss) includes a net realized loss on investments of ($11,422) and a net realized gain on derivative contracts of $16,016.

(4) Funds CPS XI B and CPS XI C did not charge an incentive allocation during 2015.

**Exhibit 4**



**Exhibit 5**



**Exhibit 6a**

**S&P 500 30-Day Historical Vol vs. VIX Volatility Index, 1/1/19 - 6/26/20**
**VIX measures the expected volatility of S&P 500**



Source: Bloomberg.

**Exhibit 6b**

## S&P 500 30-Day Historical Vol vs. VIX Volatility Index, 1/1/15 - 12/31/16
**VIX measures the expected volatility of S&P 500**



Source: Bloomberg.

**Exhibit 6c**



**S&P 500 30-Day Historical Vol vs. VIX Volatility Index, 1/1/05 - 6/26/20**
**VIX measures the expected volatility of S&P 500**

Source: Bloomberg.

**Exhibit 7**

**Summary of Model Inputs: Super CC Model, SBB Model, May 2016 Model & Markit Model**

|  | SBB Model | Super CC Model | May 2016 Model | Markit Model |
|---|---|---|---|---|
| Implied Volatility |  | ✔ | ✔ | ✔ |
| Credit Risk |  | ✔ | ✔ | ✔ |
| Risk free rate |  | ✔ | ✔ | ✔ |
| Historical Volatility | ✔ |  |  |  |
| Mu (Drift rate from underlying asset) | ✔ |  |  |  |
| Beta | ✔ |  |  |  |
| Linearization | ✔ |  |  |  |