# EXHIBIT B

Page 1

1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3

4

5    SECURITIES AND EXCHANGE       )
     COMMISSION,                    )
6                                   )
        Plaintiff,                  )
7                                   )
     vs.                            )  Civil No. 1:19-CV-06473
8                                   )
     SBB RESEARCH GROUP, LLC,       )
9    SAMUEL B. BARNETT, and         )
     MATTHEW LAWRENCE AVEN,         )
10                                  )
        Defendants.                 )
11

12

13

14

15           The video deposition of PETER HICKEY, taken

16    before Richard Derrick Ehrlich, Registered Merit

17    Reporter, Certified Realtime Reporter, taken

18    pursuant to the Federal Rules of Civil Procedure, at

19    Latham & Watkins LLP, 330 N. Wabash Avenue, Chicago,

20    commencing at 9:00 a.m., on the 18th day of

21    December, 2023.

22

23

24

Page 2

```
 1        A P P E A R A N C E S
 2  On behalf of the Plaintiff:
 3       Robert Moye
         UNITED STATES SECURITIES AND
 4       EXCHANGE COMMISSION
         175 W. Jackson
 5       Suite 1450
         Chicago, IL 60604
 6       312.353.5213
         moyer@sec.gov
 7
    On behalf of the Defendants:
 8
         Heather Waller
 9       Marissa Perry
         John Sikora
10       Latham & Watkins LLP
         330 North Wabash Avenue
11       Suite 2800
         Chicago, IL
12       312.876.7700
         heather.waller@lw.com
13       marissa.perry@lw.com
         john.sikora@lw.com
14
         Howard J. Rosenburg
15       KOPECKY SCHUMACHER ROSENBURG LLC
         120 N. LaSalle Street
16       Suite 2000
         Chicago, IL 60602
17       312.380.6631
         hrosenburg@ksrlaw.com
18
19  Also Present:
20  Mike Pesce, appearing telephonically, Ankura
21  Jamie Pritzker, videographer
22
23
24
```

Page 3

```
 1          I N D E X
 2                                 Page
 3  Exam by Heather Waller          5
 4
 5        E X H I B I T S
                                   Page
 6
    Exhibit No. 131 -               9
 7  Expert Report of Peter C. Hickey
 8  Exhibit No. 132 -               55
    Summary of Global Economics Group Billed Hours
 9
    Exhibit No. 133 -               126
10  Defendant Samuel B. Barnett's Responses and
    Objections to Plaintiff's First Set of
11  Interrogatories
12  Exhibit No. 134 -               139
    PDF of ASC 820-10-00
13
    Exhibit No. 135 -               211
14  PDF of ASC 105-10-05
15  Exhibit No. 136 -               217
    SEC Staff Accounting Bulletin: No. 99 -
16  Materiality
17  Exhibit No. 137 -               235
    Expert Report of Gene Deetz
18
19
20
21
22
23
24
```

Page 4

```
 1       VIDEOGRAPHER:  Good morning.  We are going
 2  on the record at 9:13 a.m. on December 18, 2023.
 3       Please note that the microphones are
 4  sensitive and may pick up whispering and private
 5  conversations.  Please mute your phones at this
 6  time.  Audio and video recording will continue
 7  to take place unless all parties agree to go off
 8  the record.
 9       This is media unit 1 of the video recorded
10  deposition of Peter Hickey taken by counsel for
11  defendant in the matter of Securities & Exchange
12  Commission vs. SBB Research Group LLC, et al.,
13  Samuel Barnett and Matthew Lawrence Aven, filed
14  in the United States District Court, Northern
15  District of Illinois, Eastern Division,
16  19-CV-06473.
17       The location of the deposition is Latham &
18  Watkins LLP, 330 North Wabash Avenue, Suite
19  2800, Chicago, Illinois.
20       My name is Jamie Pritzker representing
21  Veritext, and I am the videographer for today.
22       The court reporter is Rich Ehrlich from the
23  firm Veritext.
24       I am not authorized to administer an oath.
```

Page 5

```
 1  I am not related to any party in this action,
 2  nor am I financially interested in this outcome.
 3  If there are any objections to the proceeding,
 4  please state them at the time of your
 5  appearance.
 6       Counsel and all present will now state
 7  their appearances and affiliations for the
 8  record beginning with the noticing attorney.
 9       MS. WALLER:  Heather Waller of Latham &
10  Watkins on behalf of defendants, and I'm joined
11  by John Sikora and Marissa Perry of Latham &
12  Watkins and Howard Rosenburg of Kopecky
13  Schumacher Rosenburg.  And on the phone is
14  Mike Pesce of Ankura.
15       MR. MOYE:  Robert Moye here for the U.S.
16  Securities and Exchange Commission representing
17  the plaintiff and the witness, Peter Hickey.
18       VIDEOGRAPHER:  Thank you.
19       Will the court reporter please swear in the
20  witness, and then, Counsel, you may proceed.
21       PETER HICKEY, DEPONENT, SWORN
22              EXAMINATION
23  BY MS. WALLER:
24  Q  Good morning, Mr. Hickey.
```

2 (Pages 2 - 5)

Page 6

1 A  Good morning.
2 Q  Can you state and spell your full name for the
3    record?
4 A  Peter Coakley Hickey, H-I-C-K-E-Y.
5 Q  And have you been deposed before?
6 A  Yes.
7 Q  How many times?
8 A  Approximately 10.
9 Q  So I'll take a minute to just go through the
10   ground rules, then, that apply.  I'll ask you
11   questions.  I just ask that you wait for me to
12   finish my question, and then I'll give you time
13   to put your response on the record.
14       Does that make sense?
15 A  Yes.
16 Q  I ask you to answer audibly.  The court reporter
17   can't take down shaking of the head or any --
18   anything other than an audible answer.  Okay?
19 A  Okay.
20 Q  And if you don't understand one of my questions,
21   can you let me know so I'll try to rephrase it?
22 A  I will.
23 Q  And let me know if you need a break and we can
24   take one.  I'll just ask that if there's a

Page 7

1    question pending, that you answer the question
2    before we go off the record.  Okay?
3 A  Okay.
4 Q  Is there any reason you can't give complete and
5    accurate testimony today?
6 A  No.
7 Q  And you've been retained as an expert witness
8    for the SEC in this matter; is that right?
9 A  Yes.
10 Q  You're not a fact witness in this case?
11 A  No.
12 Q  What did you do to prepare for your deposition?
13 A  I reviewed the materials that were provided to
14   me.  I reviewed a copy of my report.  I met with
15   Mr. Moye, and that's about it.
16 Q  And the materials provided, are those the
17   materials that are identified in your list of
18   data and documents considered as part of your
19   report?
20 A  Yes, they would be.
21 Q  Did you review all of those materials in
22   connection with today?
23 A  No.
24 Q  Which ones did you review?

Page 8

1 A  I don't recall exactly.  Some of them.
2 Q  And how many times did you meet with Mr. Moye?
3 A  Twice.
4 Q  For about how long in total?
5 A  I don't recall the exact number of hours, but I
6    would approximate eight hours.
7 Q  Was there anybody present other than Mr. Moye?
8 A  No.
9 Q  Did you review any of the prior testimony that
10   you've given in other matters in preparation for
11   today?
12 A  Yes.  I think I did.  I think I reviewed what I
13   produced pursuant to the subpoena, which
14   included some testimony.
15 Q  And about how many hours outside of meeting with
16   Mr. Moye did you spend preparing for your
17   deposition?
18 A  Probably a few days.  So 15 hours.  20 hours,
19   maybe.
20 Q  As part of the materials considered, did you
21   review the reports of any other experts, either
22   the SEC's experts or defendants' experts in this
23   case?
24 A  I reviewed Mr. Deetz's report.

Page 9

1 Q  And was that just in preparation for your
2    deposition, or had you reviewed it previously?
3 A  I had reviewed it previously.
4 Q  And any other reports of experts in this matter,
5    again, SEC experts or defendants' experts that
6    you've reviewed at any point in time?
7 A  No.
8 Q  So you haven't reviewed the report of
9    Steve Richards or Arun Sen that defendants have
10   offered?
11 A  No.
12 Q  And you haven't reviewed the report of
13   Mr. Mintzer or Mr. McCann -- I guess
14   Dr. McCann -- that SEC has offered?
15 A  No, I have not.
16 Q  Let's mark Exhibit 131.
17       (Exhibit No. 131 marked.)
18 BY MS. WALLER:
19 Q  Mr. Hickey, do you recognize what's been marked
20   as Exhibit 131?
21 A  Yes.
22 Q  Is this a true and correct copy of your expert
23   report dated April 17, 2023?
24 A  Yes.

3 (Pages 6 - 9)

Page 10

1 Q   And are all of the opinions that you intend to
2     offer in this case disclosed in this report
3     that's been marked as Exhibit 131?
4 A   Yes, I believe so.  The opinions I've been asked
5     to give are -- so far are in this report.  I may
6     be asked to provide other opinions, but I don't
7     believe that I will be.
8 Q   Have you, prior to today, been asked whether you
9     can offer any opinions in this case other than
10    what's disclosed in your report?
11 A  I have not.
12 Q  Are there any mistakes in your report that
13    you're aware of, sitting here today?
14 A  Not that I know of.
15 Q  Are there any corrections that you would like to
16    make to your report, sitting here today?
17 A  No.
18 Q  Let's take a look at Appendix A in your report.
19        Is Appendix A a complete and accurate copy
20    of your CV as of the date of your report,
21    April 17, 2023?
22 A  Yes, it is.
23 Q  Does this CV that's in Appendix A contain all of
24    the relevant experience that you're relying on

Page 11

1     for purposes of your opinions in this case?
2        MR. MOYE:  Excuse me.  Are you asking if
3     there's any other engagements that he's had
4     since this report was issued, or are you asking
5     something else?  I didn't follow.
6 BY MS. WALLER:
7 Q   Is there any experience that you're relying on
8     for your opinions in this matter that are not
9     identified in Appendix A?
10 A  Yes.
11 Q  What experience?
12 A  Appendix A has a list of the testifying
13    experience.  It has a background of my positions
14    at different firms and a synopsis of my -- the
15    skills that I have and the things that I've
16    done.  And then it has, like I said, some
17    testifying experience, and then it has a section
18    of selected experience in different topic areas.
19    But I wouldn't say that Appendix A would have
20    every single case in which I've ever been a
21    consultant.
22        Does that make sense?  I don't know -- I've
23    listed the testifying experience, but there
24    might be other things that -- I just would have

Page 12

1     to look at every single description of every
2     single item on my Appendix A, but I don't want
3     to say that it encapsulates all of my
4     experience.  There might be consulting
5     experience I have from the past 25, 26 years
6     that might be up in my brain that it isn't quite
7     on the page of Appendix A.
8 Q   Are there any matters that you can identify
9     as -- in forming your opinions in this case that
10    aren't identified in Appendix A?
11 A  No, none that I can identify.  No matters.
12 Q  And is there any other experience that you can
13    identify, sitting here today, that you know
14    informed your opinions in this matter that are
15    not identified in Appendix A?
16 A  None that I can identify.
17 Q  And you graduated from Georgetown University
18    with a degree in economics in 1997; is that
19    correct?
20 A  That's correct.
21 Q  What does AB stand for on your CV here?
22 A  It's Georgetown's way of saying a bachelor's.
23    Georgetown and some of the fancy Ivy League
24    schools like to put it backwards.

Page 13

1 Q   Got it.  And you also attended the Booth School
2     of Business at University of Chicago; is that
3     right?
4 A   Yes.
5 Q   When did you begin that program?
6 A   2000.
7 Q   Did you attend full time or part time?
8 A   Part time.
9 Q   And you graduated in 2003; is that right?
10 A  Yes.
11 Q  And what prompted you to go back to business
12    school to get your MBA at that time?
13 A  At that time, I was working at a firm called
14    Chicago Partners, and I was working on a lot of
15    cases like this as a valuation consultant, and I
16    wanted to expand my education to further my
17    career in that field.  So I went to the
18    University of Chicago and studied finance and
19    accounting as an MBA student.
20 Q  And you reference finance and accounting.  I see
21    that it's referenced on your CV.  Is that a
22    particular designation reflecting classes that
23    you took, or what does that mean?
24 A  Those were the two concentrations I got.  So

4 (Pages 10 - 13)

Page 14

1 MBA, I think it's approximately 20 classes, and
2 you can pick different concentrations, and I
3 picked finance and accounting. But I took
4 classes in other areas as well.
5 Q Did you take any courses during your time at
6 either Georgetown or University of Chicago
7 specific to structured notes?
8 A Not specific to structured notes.
9 Q Did you take any classes at Georgetown or
10 University of Chicago specific to options
11 valuation?
12 A Yes. Options valuation would've been covered in
13 several classes I took, mostly at the University
14 of Chicago.
15 Q Do you remember what those courses were?
16 A They would have been corporate finance. Cases
17 in financial management. Entrepreneurial
18 finance and private equity. Several of the
19 classes in both accounting and finance covered
20 options valuations.
21 Q Are you a CPA?
22 A No.
23 Q Have you ever been a CPA?
24 A No.

Page 15

1 Q Do you have any professional licenses or
2 certifications?
3 A No.
4 Q Where are you currently employed?
5 A Global Economics Group.
6 Q Is that firm, I guess, in the process of
7 changing names or changing in any way?
8 A Yes. So it just announced last week, I and
9 three partners -- or three colleagues from
10 Global Economics Group, are starting a new
11 consulting firm called Peregrin Economics that
12 is set to go live January 1st of 2024, and
13 colleagues from Global Economics Group, the
14 number to be determined, will be joining us at
15 Peregrin Economics.
16 Q And why did you decide to make that change?
17 A We just decided it was time to move to a
18 different platform, and we've worked together
19 for a long time, and we have a lot of respect
20 for each other, and we wanted to change the
21 culture of our firm and create a new firm and
22 continue the work that we do as consultants and
23 experts from a new company.
24 Q And let's start with your CV in terms of your

Page 16

1 first experience. You reference -- or you list
2 Chicago Capital Services from August 2004 to
3 March 2008 on your CV.
4 What was Chicago Partners LLC? What type
5 of firm was it?
6 A Which one? Chicago Partners or Chicago Capital
7 Services?
8 Q I'm sorry. Chicago Capital Services.
9 A Chicago Capital Services was, as I guess you
10 would say, a segment or a part of
11 Chicago Partners that started providing some
12 investment banking advisory services to
13 individuals and private companies.
14 Q Did you do any valuation of structured notes
15 during your time at Chicago Capital Services?
16 A No, I don't think so. Not as part of my work
17 with Chicago Capital Services.
18 Q What type of work did you do during this time
19 from August 2004 to March 2008? Is there any
20 other experience at Chicago Capital Services
21 other than what's listed in your CV that formed
22 your opinion today?
23 A No.
24 Q And then for the Chicago Partners LLC, it looks

Page 17

1 like that was actually further back in time, so
2 I had my dates mixed up, but you started there
3 in October of 1997; is that right?
4 A Yes. There was a brief period in 1995 where I
5 worked at Chicago Partners as an intern, so --
6 Q Okay.
7 A Then I went back to college and started full
8 time in October of 1997, and then was there
9 until March of 2008. So I know the times are a
10 little confusing on the CV.
11 Q And what type of work did you do at Chicago
12 Partners from 1997 to 2008?
13 A How much time do you have? Sorry. I did a lot
14 of different types of work. I worked on a
15 variety of different cases, studying valuation,
16 studying financial instruments, analyzing
17 financial markets, providing consulting services
18 to other experts, providing my own expert
19 opinions in different litigation and regulatory
20 matters.
21 Q Did any of your work, while you were at Chicago
22 Partners, involve structured notes?
23 A Yes, some.
24 Q What work did you do relating to structured

5 (Pages 14 - 17)

Page 18

1 notes at that time?
2 MR. MOYE: I'm just going to object to the
3 extent you're asking him to disclose something
4 covered by an NDA. He can only answer
5 generally. He can't answer specifically.
6 But I don't know if that's either what you
7 were asking, or if that's going to be required
8 by his answer.
9 THE DEPONENT: I worked on cases -- some
10 cases involving convertible notes, notes that
11 were issued by banks that had -- similar to the
12 ones here that I've referenced to different
13 indices and different underlying assets, and I
14 worked on a lot of cases involving options and
15 exotic options that this wouldn't necessarily be
16 structured notes, but I'm thinking of Enron and
17 other cases where there were very complex
18 derivatives that were issued by companies and
19 entities that could be considered structured
20 finance.
21 BY MS. WALLER:
22 Q You mentioned exotic options. What type of
23 exotic options did you work on?
24 A I'm not recalling exactly. I just know that a

Page 19

1 lot of the cases at Chicago Partners I worked on
2 involved commodity markets, currency markets,
3 equities, like I mentioned, you know, Enron.
4 There were a lot of cases that would involve
5 what are referred to more as, like, plain
6 vanilla options and more esoteric exotic
7 options. I don't know exactly -- I can't give
8 you a list of all the cases, but there just were
9 a lot of cases involving complex derivatives.
10 Q You used the word "exotic options."
11 What's your definition of exotic options?
12 A It would be an option that has -- that is not,
13 like I said, plain vanilla. It is not -- has
14 complex structure, is not, you know, widely
15 traded. It might not have a liquid market. It
16 could be independently contracted and was not --
17 doesn't have contract specifications, Exchange
18 contract specifications.
19 Q What about -- you used the term "plain vanilla."
20 What's your definition of plain vanilla option?
21 A An option that would have clear contract
22 specifications that is widely traded that does
23 -- well-known in the market; is not
24 independently negotiated between two

Page 20

1 counterparties.
2 Q And is your view that the structured notes in
3 this case had plain vanilla options or exotic
4 options?
5 A The structured notes in this case would have
6 plain vanilla options.
7 Q Are there any particular matters -- I know --
8 let me start with this: What did you do -- you
9 mentioned Enron several times. What did you do
10 on Enron?
11 MR. MOYE: Same objection as before. If it
12 requires disclosure of confidential matters.
13 THE DEPONENT: My work on Enron involved
14 the participation of an investment bank
15 providing financing in different forms to Enron.
16 BY MS. WALLER:
17 Q Did it involve any options valuation?
18 A Yes, it would have.
19 Q What type of options?
20 A I don't -- I don't recall specifically.
21 Q Were they exotic or plain vanilla?
22 A It probably would've been both.
23 Q Did -- how did the experience that you had
24 with -- on that particular matter inform your

Page 21

1 opinions in this case?
2 A Just generally on valuation but not specifically
3 to some of the opinions that I express in this
4 case.
5 Q Are there any matters from the time when you
6 were at Chicago Partners that specifically
7 informed your opinions in this case?
8 A Yes. Yes.
9 Q Which ones?
10 A Well, my entire career has been focused on
11 valuation, so my entire career would inform the
12 opinions I'm expressing in this case.
13 Q Are there any particular matters that you worked
14 on that specifically inform your opinions?
15 A Well, the testifying experience listed on
16 Appendix A, the Hobson matter and the Rosenburg
17 matter both involved valuation, and then
18 everything else is from Global Economics Group.
19 So those would be the two testifying
20 experiences I had that would have informed -- or
21 could have informed my opinions in this case.
22 And then there are several other matters
23 listed below that in both valuation matters,
24 securities and commodity trading cases that

6 (Pages 18 - 21)

Page 22

1    would have informed my opinions in this case,
2    because they were part of my experience that led
3    me to be able to offer the opinions I'm
4    expressing in this case.
5  Q  Did any of those matters involve structured note
6    valuation?
7  A  Not structured note valuation specifically.
8  Q  When you say "specifically," what do you mean?
9  A  Well, not like the structured notes that are
10   involved in this case.
11 Q  You don't have any experience prior to this case
12   valuing or offering opinions on the type of
13   structured notes that the SBB Funds hold?
14 A  That's correct.
15 Q  And why did you leave Chicago Partners for
16   Global Economics Group?
17 A  Similar to my recent decision to move from
18   Global Economics Group. I just wanted to start
19   a new company with colleagues and offer my
20   consulting and expert services to my clients
21   from a different platform and a different firm.
22       I had the ability to start a company, which
23   is exciting to me. I was one of the original
24   members at Global Economics Group in 2008. So I

Page 23

1    wanted to -- Chicago Partners was becoming a
2    bigger firm. They were about to potentially be
3    sold to a bigger firm, and that happened. That
4    didn't really interest me. And I wanted to
5    strike out on my own with some colleagues.
6  Q  Do you consider yourself one of the founders of
7    Global Economics Group?
8  A  I wasn't a founding employee. I didn't become a
9    partner until a few years after the founding.
10   So I wasn't originally a founding principal
11   owner, but I became an owner shortly thereafter.
12 Q  Is there a reason in your report in paragraph 4
13   you said that you were one of the co-founders of
14   Global Economics Group in March 2008?
15 A  Yes. I say I started the firm. I was one of
16   the beginning members or the -- sorry -- the
17   beginning employees of the firm.
18 Q  But you weren't a co-founder; is that right?
19 A  I consider myself a co-founder because of my
20   position at the firm, but being responsible for
21   starting the firm.
22 Q  There are others who hold themselves out as the
23   founders of Global Economics Group on the firm's
24   website; right?

Page 24

1  A  Yes.
2  Q  And you don't hold yourself out as the founder
3    on the firm's website; is that right?
4  A  Not on the firm's website.
5  Q  And how many times have you been retained as an
6    expert witness at any -- at any of the firms you
7    were at?
8  A  I don't know the exact number. I don't know if
9    it will exactly match the number of cases in
10   Appendix A. Approximately 15 or 16.
11 Q  So it sounds like you haven't been deposed in
12   connection with all of those matters?
13 A  No. And it might actually -- sorry. I hate to
14   go back, but it might be more than that now that
15   I think about it because I don't -- it's tough
16   to keep track given that I haven't offered
17   opinions or -- I've offered opinions but I
18   haven't been deposed necessarily in all of those
19   matters.
20 Q  Have you ever offered an opinion on valuation of
21   structured notes like the ones in this matter
22   that SBB Funds hold?
23 A  Not in the valuation of structured notes.
24 Q  And it looks like based on your CV here, based

Page 25

1    on your time at Chicago Partners, Chicago
2    Capital Services and Global Economics Group your
3    career has been consulting based; is that fair?
4  A  That's fair.
5  Q  Have you ever worked at a firm like SBB that
6    develops its own model or does valuation?
7       MR. MOYE: Of an investment?
8  BY MS. WALLER:
9  Q  Let me rephrase the question.
10      Have you ever worked in any capacity in a
11   firm as opposed to a firm that has -- that
12   manages funds as opposed to consulting work?
13 A  No.
14 Q  About what percentage of your time as a
15   consultant has been providing expert services as
16   an expert witness versus other consulting
17   engagements?
18 A  It's really hard to say. It will depend on the
19   year. It will depend on the month. I really
20   don't know.
21 Q  How about currently? What's your current line
22   up between expert work and other consulting
23   work?
24 A  It would be approximately 80 percent expert

7 (Pages 22 - 25)

Page 26

1    work; 20 percent other consulting work. But,
2    again, that can change depending on the case,
3    depending on the month, depending on the year.
4    It really fluctuates quite a bit.
5 Q  Do you have any responsibilities at Global
6    Economics Group other than providing consulting
7    in expert services?
8 A  Yes. I manage a lot of people. I am an owner,
9    or an equity owner in the business. I have a
10   lot of responsibility for reviewing people who
11   work at the firm, helping the administrators at
12   the firm, marketing the firm, helping my
13   colleagues market their services, helping to
14   hire new employees.
15 Q  What percentage of your time do you think is,
16   I'll say, sort of firm oversight versus your
17   consulting services?
18 A  It's hard to say. It's not a large percentage.
19   Mostly consulting, but I do have to deal with
20   administrative things on a daily basis.
21 Q  I was trying not to use the word
22   "administrative," so --
23       MR. MOYE: That's okay.
24   \\\

Page 27

1 BY MS. WALLER:
2 Q  How many of the matters -- how many matters have
3    you worked on involving valuation disputes with
4    ASC 820?
5 A  Four or five.
6 Q  Which ones are those?
7       MR. MOYE: Excluding this case? Is that
8    your question?
9       MS. WALLER: Yeah.
10      THE DEPONENT: The first -- the SEC vs.
11   Alar. SEC vs. Welliver. SEC vs. Nutmeg. This
12   case.
13      So sorry. I maybe misheard your question.
14      And then I'm looking at others to see if
15   they would have had -- Lorenzen. Sorry.
16   Lorenzen vs. Oak Brook Investments. And I'm
17   trying to think of others because some would've
18   focused on valuation where ASC 820 would've been
19   referenced but might have not been the exact
20   opinions or similar to the opinions that I'm
21   offering in this case. So it's -- I want to
22   answer you truthfully and completely.
23 BY MS. WALLER:
24 Q  Sure.

Page 28

1 A  Rodney would have elements of ASC 820, and the
2    general one, the individuals versus
3    Illinois-based RIA would've touched on ASC 820
4    as well.
5 Q  And that one, in particular, I assume that's
6    your anonymizing that for confidentiality?
7 A  Correct.
8 Q  Is that an ongoing matter?
9 A  It's not. It was dismissed or dropped.
10 Q  And let's just go down the list of -- for Alar.
11      What were the opinions that you offered
12   relating to valuation in ASC 820?
13 A  Alar's settled post-trial, so I have to be
14   careful what I can say on that. But I offered
15   opinions on the process that Alar and
16   West Mountain undertook to value assets held by
17   their funds, and whether they complied with
18   ASC 820 in those valuations.
19 Q  And what were the assets that Alar had in its
20   funds?
21 A  Alar had three assets primarily. It was a fund
22   of funds that ended up, really, only owning one
23   fund. And then subsequent to that ownership, it
24   acquired direct investments in two companies

Page 29

1    that it had indirectly owned through the fund it
2    already owned.
3       So it really involved the valuations of two
4    specific companies that had owned both directly
5    and then indirectly through a previous fund
6    investment.
7 Q  Were those similar to the structured notes that
8    are at issue in this matter?
9 A  No.
10 Q  And did you offer any opinions in the Alar
11   matter as to what the appropriate valuation
12   should be?
13 A  In the Alar matter, I offered an opinion about
14   the valuation of the companies and markups that
15   Alar and West Mountain had taken on the
16   valuations of the investments of those companies
17   and how those markups were inappropriate and led
18   to inappropriate valuations of those
19   investments.
20 Q  Did you do your own calculations to opine on
21   what an appropriate valuation would be?
22 A  I did not do my own valuation.
23 Q  What was your opinion based on with respect to
24   the markups being inappropriate? What was that

8 (Pages 26 - 29)

Page 30

1    based on?

2  A  That there was no objective evidence. There was

3    no market evidence that supported those markups,

4    and that according to ASC 820 and other fair

5    value guidance, they should not have taken those

6    markups.

7  Q  And what about in the individuals A and B matter

8    that you referenced? What type of opinion did

9    you offer in that matter?

10      MR. MOYE: I'm going to object to the

11    extent that there's a confidentiality problem

12    that he can't disclose.

13      THE DEPONENT: I wrote a report in that

14    matter that covered investments that -- equity

15    and equity option investments that the

16    individuals made through their RIA, and the

17    valuation of those investments and the

18    performance of those investments.

19  BY MS. WALLER:

20  Q  Were the investments at issue similar to the

21    structured notes at issue in this matter?

22  A  No. I think they may have owned some S&P 500

23    options. So that would be the only similarity,

24    but they were not structured notes.

Page 31

1  Q  Did you offer an opinion as to what the

2    appropriate valuation should have been?

3  A  No.

4  Q  And on the Rodney matter, what opinion did you

5    offer?

6  A  In the Rodney matter, I offered an opinion on a

7    fund that invested in life settlements and then

8    also what I'll call penny stocks, and I offered

9    opinion on the valuation of the penny stocks in

10    that they were not appropriately valued by the

11    fund. There was not objective valuation support

12    for the valuations that they put on the penny

13    stocks that they owned.

14  Q  Fair to say that penny stocks are not similar to

15    the structured notes that are at issue in this

16    matter?

17  A  That's correct.

18  Q  How about the Welliver matter? What opinions

19    did you offer in that case?

20  A  I offered an opinion on whether Welliver and

21    Dblaine Capital followed ASC 820 and other fair

22    value guidance on investments held in their

23    fund.

24  Q  Let me go back real quick. In the Alar matter,

Page 32

1    you were retained by the SEC?

2  A  Yes.

3  Q  And what about in Welliver? Were you retained

4    by the defendants or the SEC?

5  A  I was retained by the SEC.

6  Q  And what investments were at issue in the

7    Welliver matter?

8  A  Welliver managed a mutual fund, and the mutual

9    fund came to own a very large concentration in a

10    restricted security, and I offered opinions on

11    how they valued that security and how that

12    security led to the overvaluation of the fund

13    over time.

14  Q  What type of security was it? Did it have any

15    options valuation that you had to opine on?

16  A  I don't believe that it did.

17      MS. WALLER: And, Rich, for the record,

18    it's W-E-L-L-I-V-E-R.

19  BY MS. WALLER:

20  Q  So were the investments at issue in the Welliver

21    similar to the structured notes that are at

22    issue in this matter?

23  A  The investments were, but the topics of the case

24    were. The investments were not. Sorry.

Page 33

1  Q  When you say "the topics of the case were," what

2    do you mean by that?

3  A  It dealt primarily with ASC 820 and fair value

4    of securities.

5  Q  And then for SEC vs. Nutmeg, were you retained

6    by the SEC or by Nutmeg?

7  A  By the SEC.

8  Q  Have you ever been retained by defendants in an

9    SEC matter?

10  A  Yes. I have to be careful. Currently, I'm

11    working on an SEC and criminal investigation

12    into front-running, and our work could be

13    adverse to the SEC.

14  Q  Other than these matters that we've gone through

15    here, have you been retained by the SEC in any

16    other matters?

17  A  No. At Chicago Partners, I worked for the SEC

18    in a matter that's not listed here but as a

19    consultant. Not as a testifying expert.

20  Q  Did that have anything to do with ASC 820 or

21    valuation?

22  A  No. I believe that was an insider trading case.

23  Q  And have you worked with any of the attorneys

24    representing the SEC in this matter -- have you

9 (Pages 30 - 33)

Page 34

1    worked with them before?
2  A  Yes.
3  Q  On which matter?
4  A  I worked with Mr. Moye on the Nutmeg matter, and
5     I worked with Mr. Moye also on a case at
6     Chicago Partners, the insider trading case I
7     just mentioned.
8  Q  Anyone else from the SEC team that you've worked
9     with before?
10 A  Not this team.
11 Q  And so in the Nutmeg matter, what was your
12    opinion?
13 A  That Mr. Goulding and Nutmeg did not follow
14    ASC 820 and other fair value guidance with
15    respect the valuation of the securities owned by
16    the Nutmeg funds and the results of those
17    overvaluations.
18 Q  What were the securities at issue?
19 A  The securities were restricted stock issued by
20    companies in financial distress -- or sorry --
21    convertible notes issued by companies in
22    financial distress.
23 Q  Were those questionable notes similar to the
24    structured notes that are at issue in this

Page 35

1     matter?
2  A  No.
3  Q  And you said the results of those
4     overvaluations.  What was your opinion with
5     respect to the results of the overvaluations?
6  A  My opinion was that those -- by failing to
7     comply with ASC 820 and other fair value
8     guidance, and not focusing on fair value and the
9     current exit value of the securities, that the
10    Nutmeg funds owned and exacerbated by the
11    concentrations of those securities in the Nutmeg
12    funds, that the Nutmeg were overvalued
13    consistently, and that the Nutmeg investment
14    manager charged the investors excessive fees and
15    misrepresented the valuation of those funds over
16    an extended period of time.
17 Q  Did you do your own analysis of the valuation of
18    what those securities should've been in the
19    Nutmeg case?
20 A  I have to think about that.
21       I think I made the opinion that they should
22    have been valued at their cost over certain
23    periods, and then I have to remember if I
24    offered an opinion on the exact amount of the

Page 36

1     excessive valuations and fees.  I don't recall
2     exactly if I did.  Sorry.
3  Q  And then you said you opine that the investment
4     manager charged excessive fees.
5        Did you do your own calculation of what the
6     fees should have been based on what you believed
7     to be an appropriate valuation?
8  A  That's what I'm not recalling specifically about
9     Nutmeg because it's just awhile back.  I know
10    I've done that in another case, and I don't
11    recall offhand if I did pro forma valuations and
12    pro forma fees in Nutmeg.  I'm just not
13    recalling.  I apologize.
14 Q  What case do you recall doing it in?
15 A  In Alar.
16 Q  So in Alar, how did you calculate pro forma
17    valuations and pro forma fees?
18 A  I backed out the effects of what I deemed to be
19    the appropriate markup, and I recalculated the
20    fees based on the pro forma valuation of that
21    fund or those investment accounts.
22 Q  And in the Lorenzen case, I think that's the
23    last one you identified.  What opinion did you
24    offer there?

Page 37

1  A  I offer an opinion about Mr. Lorenzen's equity
2     interest in investments in Oak Brook
3     Investments.  I'm just recalling that I referred
4     to FAS 157 or ASC 820.  It probably would've
5     been FAS 157 in support of my opinion about his
6     valuation.
7  Q  What type of investments were at issue in the
8     Lorenzen case?  It's L-O-R-E-N-Z-E-N.
9  A  Mr. Lorenzen's equity interest in Oak Brook
10    Investments, which was a privately held --
11    closely held investment management firm.
12 Q  So the equity interest, would those be similar
13    to the structured notes that are at issue in
14    this case?
15 A  No.
16 Q  Have you ever worked as an accountant?
17 A  No.
18 Q  Have you ever worked as an auditor?
19 A  No.
20 Q  Have you ever worked on a matter either on a
21    consulting or an expert basis where you're
22    working on the materiality of an overvaluation?
23 A  Yes, I think I would.
24 Q  What matters are those?

10 (Pages 34 - 37)

Page 38

1  A   Well, our firm does a lot of securities fraud
2      work, and so I -- in those matters involving
3      disclosures and claims of a fraud, I've worked
4      on teams that are analyzing doing event studies
5      and things of that nature studying materiality.
6  Q   So, like, stock drop cases?
7  A   Correct.
8  Q   How about with respect to valuation?  Have you
9      worked on any matters opining or consulting on
10     the materiality of an overvaluation with respect
11     to valuation of an investment?
12 A   I'm sure I've been asked.  I can't think of a
13     case specifically by name, but I'm sure I've
14     been asked whether or not a valuation difference
15     was material or significant.
16 Q   In your mind, is that -- are those words
17     synonymous, material or significant?
18 A   They can be.
19 Q   Do you consider yourself an expert in
20     materiality?
21 A   It depends on the context.
22 Q   What do you mean?
23 A   I don't -- I don't have an expertise or have not
24     offered an expert opinion before on materiality,

Page 39

1      for instance, under SAB 99, which was the topic
2      of Mr. Deetz's report, but I have been asked to
3      offer an opinion on whether or not a change in a
4      valuation methodology or change in valuation is
5      material or significant.
6  Q   What standards have you used or applied when
7      consulting on whether a change in valuation
8      methodology or a change in valuation is
9      significant?
10 A   The standards -- for instance, in this case, the
11     standards of ASC 820 and my experience applying
12     ASC 820 and other fair value guidance to
13     investments held by funds and by companies.
14 Q   Is there any other standards that you think
15     apply to whether a change in valuation
16     methodology or a change in valuation is
17     significant other than in this instance ASC 820?
18 A   No.
19 Q   And you reference SAB 99.  So are you an expert
20     in SAB 99?
21 A   I'm not.
22 Q   You never offered an opinion on SAB 99 or the
23     application of SAB 99?
24 A   I have not.

Page 40

1  Q   Have you ever created your own valuation model
2      for structured notes?
3  A   No.
4  Q   Have you ever valued structured notes for
5      purposes of a firm's financial reporting?
6  A   No.
7  Q   Prior to this engagement, did you have any
8      experience valuing worst of notes?
9  A   No.
10 Q   What's your understanding of what a worst note
11     is?
12 A   It's a note that gets its return from the worst
13     performing return of -- in this case, two
14     underlying indices:  The S&P 500 and the
15     Russell -- sorry, the options -- sorry.  The
16     performance of those two indices.  So it's a
17     structured note that has two components:  A
18     zero-coupon bond and then index options.  And it
19     derives -- its issued by a bank, and it derives
20     its return from whichever of those two indices
21     performs worse.
22 Q   So, for example, just to make sure we're on the
23     same page.  If, in a hypothetical structured
24     note, the S&P 500 was up 10 percent, and the

Page 41

1      Russell was down 20 percent, what would the
2      payoff of that note be under the worst of, like,
3      SBB's notes?
4  A   Well, it would depend on the note and what
5      the -- the specifications of the note.
6          But in that instance, it would be based off
7      of the return of the Russell 2000, and it might
8      lead to a negative outcome or a positive
9      outcome, depending on the strike levels that
10     were negotiated at the time of the issuance of
11     the note.
12 Q   Did any of your coursework at Georgetown or
13     Booth involve studying worst of structured
14     notes?
15 A   No.
16 Q   Have you had any experience with worst of
17     structured notes prior to this matter?
18 A   No, I don't think I have.
19 Q   Have you ever been subjected to any disciplinary
20     proceedings related to your work?
21 A   No.
22 Q   Has your expert opinion or expert testimony ever
23     been excluded or limited by a Court?
24 A   I believe in the Nutmeg matter, I was not

11 (Pages 38 - 41)

Page 42

1    allowed to testify about whether my opinions
2    were consistent with Crowe Horwath, but it did
3    not change the significance of my opinions in
4    that matter.
5 Q  When you were at Georgetown or Chicago Booth,
6    did you take any courses in ASC 820?
7 A  Not in ASC 820 as a topic area for the entire
8    course, but I look a lot of courses that dealt
9    with valuation.  So I think I testified
10   previously that a lot of my coursework at Booth
11   specifically dealt with valuation concepts,
12   including ASC 820, which actually back then
13   would've been -- no.  Prior to that it would
14   have been -- FAS 157 was 2006.
15       So it would have just dealt with the topics
16   that are covered by FAS 157 and ASC 820.
17 Q  How many courses do you think you took that were
18   specific to or taught you about ASC 820?
19 A  Probably half the courses I took at Booth dealt
20   with valuation in some way.  So those courses
21   would inform my experience and my knowledge of
22   valuation and fair value.
23       So 10 out of the 20.
24 Q  Did each one of those touch on ASC 820

Page 43

1    specifically?
2 A  Well, no, because I -- I graduated from Booth in
3    2003, and ASC 820 wasn't until 2009, and FAS 157
4    was 2006.  So would have been different -- that
5    are covered by ASC 820 and FAS 157 that were --
6    that have been relevant to valuation for quite
7    sometime.
8 Q  Were those -- I know you got a concentration in
9    finance and accounting.  Were any of them
10   specific to the accounting concepts that are the
11   predecessors to ASC 820?
12 A  Some of them would've been.
13 Q  About how many?
14 A  Half of a half, five.
15 Q  And other than your experience at Chicago Booth,
16   what else forms the basis of your expertise or
17   experience in being an expert on ASC 820?
18       MR. MOYE:  Objection.  Asked and answered.
19       THE DEPONENT:  My 26 years of experience as
20   a consultant and expert witness.
21 BY MS. WALLER:
22 Q  Are there any other matters that we haven't
23   specifically touched on or talked about that
24   specifically inform your experience,

Page 44

1    specifically as to ASC 820 or its predecessor
2    concepts?
3 A  Not that I can recall offhand.
4 Q  Who first contacted you about this case?
5 A  Mr. Moye.
6 Q  When was that?
7 A  I don't remember the exact date.  I think it was
8    in the spring of 2022.
9 Q  When were you first retained in the case?
10 A  I don't have a copy of the contract in front of
11   me, but I think it was June of 2022.  I'm not
12   recalling the exact date.
13 Q  And have you read the complaint in this case?
14 A  Yes.
15 Q  Did you read the complaint before you were
16   engaged or after?
17 A  Before.
18 Q  And I think just based on timing, it's fair to
19   say you didn't have any role in drafting the
20   complaint; is that right?
21 A  I did not.
22 Q  Have you reviewed any other pleadings or briefs
23   in this matter before they were filed?
24 A  No.

Page 45

1 Q  What specifically were you asked to do in this
2    case?
3       MR. MOYE:  Objection as to period of time.
4       THE DEPONENT:  I was asked by Mr. Moye
5    to -- well, after clearing conflicts -- whether
6    I could offer my independent opinion about the
7    valuation methodologies used by SBB and whether
8    they complied with ASC 820 and other fair value
9    guidance.
10 BY MS. WALLER:
11 Q  And you mentioned running a conflicts check.
12   Have you ever communicated with Scott Walster
13   about this engagement?
14 A  Yes.  He's a colleague of mine.
15 Q  And who is -- he's a colleague.
16       What's his position?
17 A  He's currently a principal at Chicago
18   Partners -- sorry -- at Global Economics Group.
19   He's a principal at Global Economics Group.
20 Q  And did you talk substantively with him about
21   this matter?
22 A  No, I don't think I did.
23 Q  What, then, just at a high level, were you
24   talking with him about this matter?

Page 46

1  A  I think I let him know that -- he was previously
2     at the SEC, and I let him know that I had been
3     contacted by the SEC in this matter.
4  Q  Are you aware that counsel for defendants,
5     Greg Baker, had contacted Mr. Walster about this
6     matter in 2020?
7  A  He told me that he had had a brief interaction
8     regarding this in 2020, and that it didn't -- it
9     didn't go anywhere.
10 Q  Did you ask him if he got any confidential
11    information from Mr. Baker?
12 A  I think I might have, but I don't think he said
13    that he did.
14 Q  Did you do anything to determine whether
15    Mr. Walster's contact with Mr. Baker created a
16    contact for your engagement?
17 A  I think I talked to him, and I determined that
18    it did not.
19 Q  Did you wall off Mr. Walster from your
20    engagement?
21 A  Mr. Walster has not worked on this engagement.
22 Q  Did you put into place any procedure so he would
23    not have any confidential information or work
24    on, in any way, the matter?

Page 47

1  A  I think -- yes.  I think Scott and I spoke to
2     each other, and he said I had been contacted on
3     this case.  It didn't go anywhere, but it's
4     probably a good idea if I wouldn't work on it.
5     I didn't plan on having him work on it in the
6     first place, so it really wasn't an issue, but
7     I'm glad he mentioned that to me.
8  Q  What years were you asked to offer an opinion on
9     in this case?
10 A  I think I offered an opinion on 2011 through
11    2016.
12 Q  Are there any issues for which you were asked to
13    provide, whether you could provide an opinion
14    but you declined to provide an opinion?
15 A  Not that I can recall.
16 Q  And if we take a look at Appendix B in your
17    report, the List of Data and Documents
18    Considered.  Does this contain a complete list
19    of the data and documents that you considered
20    for purposes of your report?
21 A  Yes.  But, again, my experience in other matters
22    and the subject area from my book, my education,
23    and my consulting experience informed my
24    opinion, and it would be really hard to list

Page 48

1     that all here, but of documents that were
2     provided to me, as well as some documents I got
3     on my own.  These were the documents that I --
4     data and documents that I considered.
5  Q  Were there any materials that you requested but
6     were not provided?
7  A  Not that I can recall.
8  Q  Who determined what material that you would
9     review for purposes of this engagement?
10    MR. MOYE:  Objection.  Foundation.
11    THE DEPONENT:  I received materials over a
12    long time period, I would say, and I would have
13    reviewed those materials, asked for others.  As
14    I was developing my opinions in different areas,
15    I would have asked for things.  I would have
16    received things, but I do remember getting
17    documents over time.  For instance, as
18    depositions were occurring, I would get the
19    depositions and the exhibits, and those happened
20    consequentially.  Those did not happen all at
21    once.
22 BY MS. WALLER:
23 Q  So, for example, in the depositions and
24    testimony, I don't see the deposition of

Page 49

1     Dr. Barnett from 2023.
2        Did you review his deposition transcript
3     after his deposition?
4  A  Yes.  That's an -- oh, yes, I did.  I did.
5  Q  Okay.  So that's an oversight in your appendix?
6  A  Yeah.  It probably would be.  I think I -- I
7     don't know if I refer to that anywhere in my
8     report.
9  Q  Let me ask you this question:  Dr. Barnett was
10    deposed after your report was submitted.  Have
11    you since read it?
12 A  Trick question.  Yes, I have read it.
13 Q  Did anything in Mr. -- -- Dr. Barnett's testimony
14    change your opinions?
15 A  No.
16 Q  Is there any part of his testimony that you
17    would rely on for purposes of your opinions in
18    this case?
19 A  Nothing in his deposition would cause me to
20    change any of the opinions that I expressed in
21    my report.
22 Q  Do you intend to supplement or update your
23    report to address Dr. Barnett's testimony?
24 A  I have not been asked to.

13 (Pages 46 - 49)

Page 50

1  Q  Do you intend to?
2  A  Not at the current time.
3  Q  And are you aware that there was other written
4     discovery served in this matter that is not
5     listed on the court documents on page 1 of your
6     Appendix B?
7  A  Yes, there could be.
8  Q  Did you ask to see all the written discovery
9     that was exchanged between the parties?
10  A  I don't think I asked to see all of it.  I think
11     I -- I got some.  I may have asked for others,
12     and I think that some of these that are listed
13     here might be directly referred to in my report,
14     but these were the ones that I've considered.
15  Q  Are you aware that Dr. Barnett responded to
16     interrogatories that the SEC served specifically
17     asking about the inputs?
18        Is that the SBB model that you opine on?
19  A  I don't know.
20  Q  And I don't see in here any of the other expert
21     reports in this matter.  You don't rely on any
22     of the other experts that are offered in this
23     matter; is that right?
24  A  That's correct.

Page 51

1  Q  Did you speak with any of the SEC's other
2     experts either before your report or after your
3     report?
4  A  No.
5  Q  Did you review any of the documents that were
6     produced by RSM in this matter?
7  A  Yes, I think I have.
8  Q  Which documents is that?
9  A  They would have been the ones that were included
10     as exhibits to some of the RSM depositions that
11     I read.
12  Q  I don't see -- did you identify here in your
13     Appendix B which exhibits those were?
14  A  They're all exhibits.  I received the
15     depositions and the testimony that are listed
16     here, including all exhibits.
17  Q  Other than the exhibits to the testimony, did
18     you review any RSM work papers or RSM email
19     correspondence?
20  A  I don't believe that I did, if they weren't an
21     exhibit.
22  Q  Why not?
23  A  I don't -- I wasn't asked to express an opinion
24     about them, and I wasn't -- they weren't part of

Page 52

1     my review.
2  Q  You're aware there are some reviewed SBB's model
3     in the inputs that you're opining on; right?
4  A  Yes.
5  Q  And you're aware -- are you aware that SEC
6     examiners were deposed in this litigation?
7  A  Yes.
8  Q  Did you review any of their deposition
9     transcripts?
10  A  I don't think I did.
11  Q  Why not?
12  A  I don't have a great answer to that, but I don't
13     think they informed my opinion about what SBB
14     did with respect to ASC 820 and the valuation of
15     the notes that were held by the SBB Funds.
16  Q  Are you aware, for example, that Leo Chan, the
17     SEC Examiners valuation specialist described the
18     options on relying -- the SBB Funds' structured
19     notes as exotic?
20  A  He could have.  I don't -- I don't recall seeing
21     that.  I don't think I read his testimony.
22  Q  You would disagree with him, though?  You think
23     that they're plain vanilla options?
24  A  I said earlier I think they're plain vanilla

Page 53

1     options in the sense that they are S&P 500
2     options and Russell 2000 options.
3  Q  Have you reviewed the testimony of Alan Handler
4     in this matter?
5  A  I don't think that I did.
6  Q  Do you know who Mr. Handler is?
7  A  Yes.  He was someone that was at SBB as -- I
8     want to say who was in charge of marketing,
9     getting new investors for Polysight, marketing
10     the Polysight fund.
11  Q  And why didn't you review the testimony of
12     Mr. Handler?
13  A  It wasn't -- my opinions really focused on the
14     people at SBB who were responsible for valuing
15     the structured notes held by the SBB Funds and
16     reporting the valuation of those funds.  So my
17     review really focused on those individuals.
18  Q  Are you aware whether Mr. Handler provided any
19     testimony about what would be important to SBB
20     investors?
21  A  I don't know.
22  Q  Is that relevant at all to your opinions in this
23     case?
24  A  I don't think what Mr. Handler thinks would be

14 (Pages 50 - 53)

Page 54

1  important to SBB investors is important to my
2  opinion in this case.  I offer an opinion on
3  what would be important to investors based on
4  ASC 820 and my experience.
5 Q  Have you talked to anybody at RSM about this
6  case?
7 A  No.
8 Q  And aside from counsel at the SEC and the
9  individuals you identified in the document
10  produced with the hours that have been spent on
11  this matter, have you spoken with anybody else
12  about the case?
13 A  No.
14 Q  In connection with your work on this case, did
15  you make any assumptions that aren't stated in
16  your expert report that's been marked as
17  Deposition Exhibit 131?
18 A  No, I don't think I have.
19 Q  Are there any assumptions that you rely on in
20  your report that counsel asked you to make?
21 A  No.
22 Q  When did you first begin to prepare your expert
23  report?
24 A  Very shortly after I was retained.

Page 55

1 Q  And who prepared the first draft?
2 A  I did.
3 Q  Did anybody help you with the drafting?
4 A  My colleagues would've helped me.  Matt Kennedy,
5  Jayda Smith, and Mary Kubec.
6  But in this case, I predominantly did -- as
7  the hours show, I did most of the drafting
8  myself.
9 Q  Let's just mark Exhibit 132.
10  (Exhibit No. 132 marked.)
11 BY MS. WALLER:
12 Q  Mr. Hickey, do you recognize what's been marked
13  Exhibit 132?
14 A  Yes.
15 Q  What is it?
16 A  It's a list of the hours and amounts that were
17  billed by me and others at Global Economics
18  Group on this matter.
19 Q  Did you prepare this summary?
20 A  I did.
21 Q  And it says the date of contract, June 13, 2022;
22  is that accurate?
23 A  I think it is.
24 Q  And just so I'm clear, is this the hours through

Page 56

1  the date of your report or through the date of a
2  different time period?
3 A  I requested Global Economics Group's FO to get
4  me a list of all the hours that have been billed
5  to date as the time that I submitted this, and I
6  probably spent a few hours since then.  But up
7  until the date that that report was produced,
8  these are the hours that have been billed.
9 Q  Let me just make sure I'm clear.  So there's
10  hours through the date of your report, and then
11  I think we requested this summary after your
12  report was submitted.
13  So does it include time spent after your
14  report?
15 A  Yes, it would.
16 Q  What work did you do after your report prior to
17  requesting this?
18 A  Probably not a lot, but I've had some calls.
19  I've received some -- Mr. Barnett's deposition.
20  I received some other documents.  I received
21  Mr. Deetz's report.  So reviewing those
22  materials that have been produced subsequent to
23  filing my report.
24 Q  Are there any other documents that you can --

Page 57

1  that you were provided other than Dr. Barnett's
2  deposition and Mr. Deetz's report that you
3  reviewed subsequent to your report?
4 A  Not that I can recall specifically.
5 Q  And I don't have the names.  Can you just remind
6  me, is it Mr. Kennedy?
7 A  Matt Kennedy.
8 Q  What was his role?
9 A  He helped me reviewing documents that have been
10  produced.  And as I was drafting my report, he
11  would have helped me with citations would've
12  helped me with some of the exhibits, the
13  demonstrative exhibits and tables that were put
14  together to support my opinion with help from
15  Jayda and Mary.
16 Q  Did you rely on any of his expertise and
17  experience in forming your opinions?
18 A  No.
19 Q  Approximately what level is he within your firm?
20 A  He's no longer at our firm.  Recently he left
21  our firm to take a position in a different
22  industry, but he was -- I think his title when
23  he left was director.
24 Q  Do you know approximately how many years of

15 (Pages 54 - 57)

Page 58

1 experience he had when you were working with
2 him?
3 A 12.
4 Q And how about -- is it Ms. Smith?
5 A Ms. Smith and Ms. Kubec.
6 Q And what role did Ms. Smith have?
7 A Both Ms. Smith and Ms. Kubec would've provided
8 assistance with, again, document review,
9 citations, and preparing demonstrative exhibits.
10 That sort of thing.
11 Q What is Ms. Smith's title?
12 A I believe Ms. Smith and Ms. Kubec are both
13 research analysts.
14 Q About how much experience do they each have?
15 A They both have two to four years of experience.
16 Q Did you rely on any of their expertise or
17 experience in forming your opinions?
18 A No.
19 Q Other than preparing for your deposition, is
20 there any other work that you've done on this
21 matter prior to producing this billing summary?
22 A No, I don't believe so.
23 Q And is that accurate in terms of the total
24 here -- I won't ask you to do math on the fly,

Page 59

1 but we did the math. It's about $358,000,
2 approximately. Is that an accurate amount of
3 what the SEC has paid Global Economics Group for
4 your work and your team's work on this
5 engagement as of the date of this summary?
6 A Yes, it would be.
7 Q Do you know about when you asked to pull this
8 summary?
9 A I don't recall specifically.
10 Q Do you remember even generally when it was?
11 A It would have been fairly recently.
12 Q Anybody other than these individuals provide
13 input to your report from Global Economics
14 Group?
15 A No.
16 Q Did you rely on anybody else at Global Economics
17 Group -- discussions, formal or informal -- for
18 forming your opinions here?
19 A No.
20 Q Are all of the opinions that you provide in your
21 report that's Exhibit 131 your own opinions?
22 A Yes, they are.
23 MR. MOYE: Whenever is convenient, can we
24 take a short break?

Page 60

1 MS. WALLER: Yeah, I think this is a good
2 time.
3 VIDEOGRAPHER: We are going off the record
4 at 10:33 a.m., and this is the end of media unit
5 1.
6 (Break.)
7 VIDEOGRAPHER: We are back on the record.
8 The time is 10:54 a.m., and this is the
9 beginning of media unit 2.
10 BY MS. WALLER:
11 Q Mr. Hickey, Chicago Capital Services, is that a
12 registered investment adviser?
13 A No.
14 Q And for the matters where you have been retained
15 as an expert by the SEC, if I remember right,
16 that's Nutmeg, Alar, Welliver, this matter, and
17 I think the insider trading matter with
18 Mr. Moye.
19 What's the total compensation that you've
20 received as part of those -- all of those
21 matters?
22 MR. MOYE: Objection. Calls for
23 speculation.
24 THE DEPONENT: I don't know.

Page 61

1 BY MS. WALLER:
2 Q Do you have even an ability to ballpark?
3 A No.
4 Q What about for Nutmeg? Can you estimate what
5 amount of fees you received for Nutmeg?
6 A No.
7 Q You have no clue?
8 A I don't.
9 Q Do you know if it was more or less than what
10 you've made to date so far?
11 A In this matter?
12 Q Yeah.
13 A Probably less.
14 Q And the Alar matter. How about in the Alar
15 matter? Do you have an estimate of how much
16 you've made from that matter?
17 A I don't know.
18 Q That went to trial; right?
19 A That did.
20 Q You offered a report you testified at a
21 deposition and you testified at trial?
22 A That's correct.
23 Q So fair to say that the amount was more than the
24 compensation you've received in this case so

16 (Pages 58 - 61)

Page 62

1   far?
2   A   I don't know.
3   Q   And how about Welliver?  Do you have any
4       estimate of the amount received in Welliver?
5   A   I don't.
6   Q   And how about the insider trader case?
7   A   I don't.
8   Q   And over the last five years, what percentage of
9       your personal production has been from these SEC
10      matters?
11  A   I don't know exactly.
12  Q   You don't have even a ballpark?
13  A   No.
14  Q   More or less 50 percent?
15  A   Less.
16  Q   Do you discount your fees when you work for the
17      SEC in their matters?
18  A   No.
19  Q   Do you know if the total amount that you've
20      received in fees from the SEC across all these
21      matters is more or less than a million in
22      revenue?
23  A   I don't know.
24  Q   And just so I'm clear based on your prior

Page 63

1       testimony, you've never testified for a
2       defendant in an SEC matter; is that right?
3   A   That's correct.
4   Q   You've never offered an opinion, an expert
5       report, for example, in an SEC matter; is that
6       right?
7   A   I don't think that I have.  I assisted with one,
8       a case several years ago against the SEC, but I
9       didn't author the opinion.  I didn't author the
10      opinion.
11  Q   What matter was that?
12  A   Be careful because I think that settled as well.
13      It was a case involving a clearing firm.
14  Q   Did it involve valuation of structured notes?
15  A   It did not.
16  Q   Involve a valuation of options?
17  A   No.
18  Q   And the front running case, that's different
19      than the front running case that you mentioned,
20      or matter?
21  A   Correct.
22  Q   And you said, I think, that it might be opposite
23      of the SEC.  Is there a current SEC
24      investigation in that matter?

Page 64

1   A   There's a current SEC investigation in that
2       matter, yes.
3   Q   But not filed litigation; is that fair?
4   A   Not filed litigation against the company who is
5       my client in that matter.
6   Q   Is there filed litigation against anybody in
7       connection with that matter?
8   A   Individuals.
9   Q   And for the RSM depositions that you reference
10      in Appendix B of your report, it looks like you
11      reviewed the depositions in 2023 of RSM
12      individuals but you didn't review any of their
13      investigative testimony.  Did you ask to review
14      any of their investigative testimony?
15  A   I don't know that I did.
16  Q   Why not?
17  A   I was focused on the valuations and -- the SBB
18      was providing, and my focus was on, as detailed
19      in my report, was focused on that testimony, how
20      they applied or how they valued the notes that
21      the funds held.
22  Q   Did you rely on any of the deposition testimony
23      of RSM that you have here listed in Appendix B?
24  A   I considered it, but I didn't rely on it, as I

Page 65

1       state in my opinion.  My focus was on SBB.
2   Q   And you didn't consider it important to also
3       review and consider their investigative
4       testimony?
5   A   No.
6   Q   Were you aware in the course of preparing your
7       report that RSM had provided investigative
8       testimony in the investigation?
9   A   I might have been, yes.
10  Q   When you say you might have been, do you know
11      one way or the other?
12  A   I don't recall exactly.  I know that there was
13      another expert that the SEC had retained to
14      analyze the auditing relationship between SBB
15      and RSM and offer opinions, and I was asked to
16      offer my opinions on ASC 820 and fair value
17      guidance of -- that the SBB Funds used.
18  Q   And you referenced earlier today the subpoena
19      that you received for documents.  Did you
20      collect all the responsive materials in
21      connection with that subpoena?
22  A   I did, yes.
23  Q   Were there any documents that you identified as
24      responsive that have not been provided to the

17 (Pages 62 - 65)

Page 66

1    defendants?
2  A   No.
3  Q   And so we've talked a little bit about how
4    you've been asked to provide an expert report
5    regarding ASC 820.  Are there any other areas of
6    GAAP that you consider yourself an expert in?
7  A   That's the main one that I've offered opinions
8    in before.  So I would have to think about that,
9    but it's the main topic of accounting that I've
10   been asked to offer an opinion about, and I
11   can't think of another accounting standard by
12   name that I've been asked to offer an opinion
13   about.
14 Q   And when you say you can't think of the name of
15   another accounting standard that you've been
16   asked to offer an opinion about, do you mean in
17   this case or in your experience, generally?
18 A   In my experience, generally.
19 Q   And when you say you can't think of the name, is
20   there even topically or the concept that you
21   would consider yourself an expert in in GAAP,
22   even if you don't remember the exact ASC
23   provision?
24 A   I just have to think about that because I've

Page 67

1    offered opinions on valuation.  I've offered
2    opinions on economic damages in a number of
3    different cases, and a lot of those cases have
4    been -- involved reviewing the financial
5    statements and the notes to financial statements
6    of various companies and funds.  So while I
7    can't think of an exact topic by name, I have
8    been asked to offer an opinion on the financial
9    statements of funds and of companies in a
10   variety of different contexts.
11 Q   Did you review ASC 820 in connection with
12   preparing your report?
13 A   Yes.
14 Q   How much time do you think you spent reviewing
15   it in connection with your opinions in this
16   case?
17 A   I don't know exactly.
18 Q   Is it fair to say that the objective of fair
19   value in ASC 820 is to obtain an exit price?
20 A   Yes.
21 Q   And would you agree that fair value under
22   ASC 820 is synonymous with current exit value?
23 A   Yes.
24 Q   And you would also agree that the output of a

Page 68

1    valuation model would be the -- the output of a
2    valuation model would be -- let me start over.
3       So the objective of ASC 820 is focused on
4    the output of a model?
5  A   That's not correct.
6  Q   What do you disagree with?
7  A   ASC 820 actually focuses a lot of the inputs to
8    valuation.
9  Q   So the -- well, the objective of fair value is
10   the exit price; is that right?
11 A   That's correct.
12 Q   So the inputs to a model would be -- the
13   objective is to get the model to output an exit
14   price; is that fair?
15 A   The objective is to analyze an output and
16   determine whether that output has relied on
17   observable or market-corroborated inputs.  So
18   while you're focusing on the output, ASC 820
19   calls on you to analyze the inputs.
20 Q   And in your report, you talk about -- or you
21   offer an opinion that the SBB model was an
22   entity-specific model and not a market-based
23   model.
24      Do you recall that in your report?

Page 69

1  A   Yes.
2  Q   What do you mean by an entity-specific model?
3  A   It was a model that was developed by SBB and it
4    did not refer to the market, and it was not
5    based on any market-corroborated inputs.
6  Q   Would you agree that SBB was required to use a
7    model that was tailored to the specific
8    structured notes that the SBB Funds held?
9  A   Yes.  I did not have an issue with their using a
10   model.  I think a model was necessary to value
11   the notes that they held.
12 Q   But that model would be tailored to the
13   specific notes that the SBB Funds held?
14 A   Tailored to the specific notes but corroborated
15   by market data.
16 Q   Would you agree that ASC 820 requires judgment?
17 A   Yes.
18 Q   Would you agree that ASC 820 allows the use of
19   unobservable inputs if observable inputs are not
20   available?
21 A   Yes.  Putting the priority on observable inputs.
22 Q   And would you agree that ASC 820 does not
23   prescribe a particular model that has to be used
24   when determining fair value?

18 (Pages 66 - 69)

Page 70

1  A   That's correct.
2  Q   Is there even a recommended model even if not
3      prescribed, a recommended model that's reflected
4      in ASC 820 for valuation?
5  A   No, because ASC 820 has to deal with a variety
6      of different assets that would be valued by both
7      companies and investment fund that hold those
8      assets.  So it would be a variety of different
9      models that could fall under ASC 820.
10 Q   And where you said earlier that the model should
11     be tailored to the specific notes that SBB held
12     but corroborated by market data, what did you do
13     to understand what other market participants
14     held structured notes like SBB held?
15 A   I don't understand the question.
16     MR. MOYE:  Object.  Complex.
17 BY MS. WALLER:
18 Q   You said that the model should be corroborated
19     by market data; right?
20 A   Correct.
21 Q   Did you do anything to determine whether there
22     were other participants in the market who hold
23     structured notes similar to the notes that SBB
24     held?

Page 71

1  A   No.  I think I said that that's what SBB should
2      have done, and that's what ASC 820 calls on a
3      fund like SBB to do.
4  Q   And I'm asking, did you do that?
5  A   I did not.
6  Q   What is your experience working with
7      Black-Scholes?
8  A   I've worked with Black-Scholes most of my career
9      in different ways.
10 Q   Did you study Black-Scholes in your coursework
11     at Georgetown and the University of Chicago?
12 A   Probably not at Georgetown but definitely at the
13     University of Chicago.
14 Q   Have you had any formal training related to
15     Black-Scholes?
16 A   Just my education, my experience as a consultant
17     and expert.
18 Q   And that's your experience.  Did you do anything
19     with Black-Scholes at Chicago Capital Services?
20 A   I worked Chicago Capital Services at the same
21     time as Chicago Partners.  So most of my
22     involvement with Black-Scholes would've been for
23     Chicago Partners and then Global Economics
24     Group.

Page 72

1  Q   And how have you used Black-Scholes in your work
2      at both Chicago Partners and Global Economics
3      Group?
4  A   In a variety of ways.  I've looked at options in
5      a variety of cases.  I've analyzed options
6      valuations in a variety of cases.  I'm familiar
7      with Black-Scholes and option pricing models in
8      a lot of different ways.
9  Q   And in your report on page 37, you refer to six
10     factors affecting the price of a stock option.
11     You cite to, it looks like an "Options, Futures
12     and other Derivatives," a book by John Hull.
13       Do you see that?
14 A   Yes.
15 Q   And it looks like you cite to the Sixth Edition.
16     Do you actually own a copy of that edition?
17 A   I believe someone has it at our firm in our
18     library.  So, yes, because I -- we all take
19     collective ownership of our academic texts.
20 Q   In the library?
21 A   In the library.
22 Q   Do you know if that's the most updated version
23     or edition?
24 A   I don't think it is.  I'm sure there's a

Page 73

1      different version that's more recent than that,
2      based on the condition of the cover of the book
3      that I have.
4  Q   Did you do anything to determine whether the
5      subsequent editions would change the information
6      that you rely upon in Mr. Hull's textbook?
7  A   No.  For the purposes that I was using the Hull
8      textbook, in my opinion, it was related to
9      Black-Scholes and options and volatility, and I
10     don't think that for what I was using it for
11     there had been any updates, but I don't know.
12 Q   How long have you worked with Hull's textbook
13     that you cite here?
14 A   Most of my career.
15 Q   Is there any aspect of the description of the
16     Black-Scholes model that you're citing to here
17     in footnote 96 from Mr. Hull's textbook that you
18     disagree with?
19 A   No, I don't think so.
20 Q   Is it fair to say that the formulas for the
21     Black-Scholes' model shown in Hull's Sixth
22     Edition that you're citing to here assume that
23     volatility is a constant?
24 A   That is a topic of Black-Scholes that has been

19 (Pages 70 - 73)

Page 74

1 analyzed and criticized by market participants
2 since the adoption of the model, I think, back
3 in the '70s. So, yes, I'm very familiar with
4 that.
5      It's based on volatility being constant,
6 and then that volatility changes the next
7 second, the next minute, the next day based on
8 the market.
9 Q  Specifically for the structured notes in the SBB
10    Funds, can you explain where most of the value
11    of those notes come from?
12 A  Yes. I relied on the testimony from the SBB
13    individuals who were responsible for the
14    valuation model, and that testimony said that
15    approximately 90 percent of the value comes from
16    the options, and that within the options from
17    their model, most of the value comes from their
18    determinate of what they call Mu.
19 Q  Did you do anything independent of reviewing the
20    SBB testimony to determine for yourself what the
21    value of the structured notes comes from, either
22    the bond or the options portion?
23 A  No. My opinion was focused more on their
24    valuation process and ASM -- ASC 820. And it's

Page 75

1 my understanding that there was another expert
2 that was looking at the detailed valuations of
3 the notes more closely and offering opinions on
4 those.
5 Q  That's Mr. McCann; is that right?
6 A  That's my understanding.
7 Q  You didn't read his report prior to submitting
8    your opinions; right?
9 A  No, I did not.
10 Q  You haven't even read it, sitting here today?
11 A  I have not.
12 Q  Do you have any understanding of what
13    Mr. McCann's opinions in his report is?
14 A  Well, I was familiar with some of Mr. McCann's
15    analysis or background. I think I cite to some
16    of his papers. So I knew he was someone who was
17    offering opinions on the detailed structured
18    note valuations.
19 Q  But do you know what particular opinions he's
20    offering about the SBB notes in this case?
21 A  I think he's offering opinion, from my
22    understanding, that the model that SBB used
23    overvalued the SBB notes.
24 Q  What is your understanding based on, if you

Page 76

1 haven't read his report and you haven't talked
2 to him?
3 A  Mr. Deetz referred to his report, and also just
4    what I know about the case, that that is what
5    the allegations of the case say, and it's also
6    what the SBB personnel testified to; that their
7    model tended to overvalue the structured notes
8    as compared to the market.
9 Q  I'm asking you, though, about Mr. McCann's
10    opinions specifically and what you know about
11    his opinion.
12      Is there any other source of information
13    that you are relying on for purposes of your
14    understanding, sitting here today, of what
15    Mr. McCann's opinions are in this case?
16 A  No.
17 Q  Do you have any understanding of Mr. McCann --
18    and Dr. McCann. Sorry. I get that wrong for
19    everybody?
20      MR. MOYE:  You can call him both mister and
21    doctor. Take your pick.
22      MS. WALLER:  I'll probably keep getting it
23    wrong.
24  \\\

Page 77

1 BY MS. WALLER:
2 Q  Dr. McCann. Do you have any understanding of
3    what he opined with respect to his view of the
4    valuations of SBB's structured notes?
5 A  I don't. I would imagine, based on what I've
6    read about his valuations of structured notes
7    and what he's written about valuation of
8    structured notes, that he uses those same
9    methodologies to value the structured notes here
10    in this case, but that's just based on my
11    reading of his -- some of his academic studies
12    and what I know about his experience.
13 Q  You don't know what valuations he actually
14    offered in terms of his opinion?
15 A  I do not.
16 Q  So sitting here today, just so I understand, do
17    you have a view or an understanding of --
18    setting aside the SBB testimony that you point
19    to, do you have any understanding of --
20    independent of that -- of what the value of the
21    structured notes, how much of that is captured
22    in the options?
23 A  No.
24 Q  Do you have any understanding of what accounts

20 (Pages 74 - 77)

1    for the increase in value of the structured
2    notes, as opposed to the standalone -- just the
3    value at any given point in time?
4  A  I think, like I said earlier, the increase is,
5    based on the testimony that I read and reviewed,
6    that it's based mostly on application of Mu and
7    the SBB model.
8  Q  You would agree there's a difference between
9    what accounts for the value of the structured
10   notes at any given point in time versus the
11   increase or change in value over time?  Those
12   are two different things?
13  A  Yes.  There would be a value of the note, and
14   then that note can increase or decrease in value
15   based on either using the market in a
16   market-based model, or using an entity-specific
17   model and inputs that weren't corroborated by
18   the market.
19  Q  And so if you look at page 10, paragraph 17 of
20   your report, in the middle of paragraph 17, the
21   sentence that has footnote 14, you say,
22   According to testimony from SBB personnel,
23   growth of the value of the structured notes held
24   in the SBB Funds where approximately 90 percent

1    is captured in the options.
2      Do you see that?
3  A  Yes.
4  Q  And you rely on testimony of SBB; right?
5  A  That's correct.
6  Q  And you reviewed the testimony that you cited in
7    paragraph 14?
8      MR. MOYE:  Footnote 14?
9      MS. WALLER:  Yes.  Footnote 14.  Thank you,
10  Rob.
11     THE DEPONENT:  Yes.
12 BY MS. WALLER:
13  Q  Do you recall, sitting here today, whether the
14   testimony related to the value of the structured
15   notes at any given point in time or the change
16   in value -- what accounts for the change in
17   value of the notes?
18  A  I see those as one in the same.
19  Q  The value -- you see the value at any given
20   point in time versus the change in value as
21   being the same?
22  A  Well, the change in value would cause the value
23   to change.  So the value -- the new value would
24   be based off of the change or what caused it to

1    change.
2  Q  Did you do any work independent of reviewing
3    testimony to understand what causes the change
4   in the value of SBB -- of the structured notes
5   held by the SBB Funds?
6  A  Yes.  I think I analyzed a lot of information,
7   including the testimony and the descriptions of
8   the various models that they used, and then
9   ultimately the model that they chose to use
10   towards the end in May of 2016, and then the
11   Markit model that they ultimately used, and to
12   my knowledge they continue to use to value the
13   notes today.
14  Q  What specifically did you do with respect to
15   understanding the change in the value of notes
16   from one given point in time to another?
17  A  My opinion would be more based on the process of
18   their valuation and the inputs they used and how
19   those inputs changed over time and led to
20   different valuations of the notes and then of
21   the funds themselves.
22  Q  You didn't actually do any calculation or
23   valuation to opine on what was driving changes
24   in value in the structured notes that the SBB

1    Funds held?
2  A  Besides describing the processes and how those
3   led to different valuations, no.
4  Q  And in paragraph 17, which we were taking a look
5   at, is it your -- your own opinion that the
6   SBB Funds' structured notes at issue were
7   composed exclusively of a zero-coupon bond, and
8   then a series of option contracts; is that
9   accurate?
10  A  That is my opinion based on the testimony, my
11   review of a few of the underlying pricing
12   supplements of the structured notes that they
13   owned, and then my review of the catalog of
14   notes that they owned as well being
15   predominantly this structure.
16  Q  How many of the pricing supplements did you
17   review?
18  A  I think I describe two, and I think I've
19   reviewed a few others that have been produced.
20   But it's my understanding from the testimony and
21   then the catalog that, you know, a great
22   percentage of -- a large percentage of the notes
23   followed this same structure with different
24   coupons, depending on the strike levels of those

Page 82

1    notes.
2 Q  And when you refer to catalog, what is that
3    specifically?
4 A  I believe it's Exhibit 3 to my report, which is
5    mostly based off of SEC investigative testimony
6    Exhibit 125.
7 Q  Is Exhibit 3 --
8 A  I'm sorry.  Exhibit 2.  I'm sorry.  Exhibit 2
9    and Exhibit 2A.  I apologize.
10 Q  Okay.  Did you put together Exhibit 2, or was
11    that a document that was provided to you?
12 A  I put together that exhibit with assistance from
13    others at Global Economics Group.
14 Q  Did you rely on anything other than Testimony
15    Exhibit 125?
16 A  I'm sorry.  For what?
17 Q  Did you rely on anything other than Testimony
18    Exhibit 125 to put this Exhibit 2 together?
19 A  I don't believe that I did, although I think we
20    may have checked Bloomberg or other sources
21    where there were questions we had about numbers
22    and things, like QCICs, but mostly relied on the
23    investigative testimony exhibit.  And then I
24    said I -- we calculated the days to expiration

Page 83

1    and the years to expiration based off of the
2    dates in that catalog.
3 Q  And other than the pricing supplements that you
4    just referenced and the catalog that you put
5    together, did you review anything else to
6    understand the nature of the notes that SBB
7    Funds were investing in?
8 A  Yes.  I think I relied and reviewed the
9    testimony and some of the exhibits to the
10    testimony.
11 Q  Anything else?
12 A  No, not that I can recall.
13 Q  Was there any literature or industry sources
14    that you reviewed that spoke specifically to the
15    type of worst of notes that SBB Funds invested
16    in?
17 A  I'm just trying to look and see.
18        I believe there's a couple things listed in
19    Appendix B under Regulations, Enforcement
20    Actions, and Other SEC Materials.
21        And then there's an article, "Valuation of
22    Structured Products," and other articles in
23    research.
24 Q  Can you just point me to -- in the other

Page 84

1    articles and research, which one that you're
2    referring to?
3 A  This third one listed.  Third bullet point.
4    It's a McCann article written with Geng Deng and
5    Tim Husson, "Valuation of Structured Products."
6 Q  Is that specific to worst of notes?
7 A  I don't think it is.  I think it's just specific
8    to structured products.
9 Q  And then -- I'm sorry.  Go ahead.
10 A  No.  I know I refer to it in my report at some
11    point.
12 Q  And then what is it in the Regulations,
13    Enforcement Actions, and Other SEC Materials
14    that you were referencing?
15 A  The last two.  And I don't know if they refer
16    specifically to worst of, but they deal with
17    structured notes with principal protection.
18 Q  Are you aware of any industry literature that
19    speaks specifically to worst of notes?
20 A  I don't recall.  I don't know.
21 Q  You can't think of any, sitting here today?
22 A  Nothing that I relied on that I can think of
23    today.
24 Q  Can you think of any -- anything out there, even

Page 85

1    if you didn't rely on it?
2 A  No.
3 Q  And for the pricing supplements, I didn't see
4    them in your Appendix B.  Do you know if they're
5    listed specifically in your Appendix B or not,
6    which ones that you reviewed?
7 A  They're listed because they're included as a
8    testimony exhibit.
9 Q  Okay.  So it would have been the ones that were
10    testimony exhibits?
11 A  That's correct.
12 Q  Did you ask to receive any other pricing
13    supplements that were not included as testimony
14    exhibits?
15 A  I don't remember if I did.  I know I reviewed,
16    as I said, these two.  There was one that was
17    reviewed, included as an exhibit in Mr. Nelkin's
18    deposition.
19        And, again, I reviewed the testimony
20    that -- from people at SBB that said that,
21    you know, a large portion followed this similar
22    structure.
23 Q  And so just to confirm, are there any other
24    financial instruments that are necessary to

22 (Pages 82 - 85)

Page 86

1    value in order to understand the value of the
2    SBB Funds' structured notes other than the
3    zero-coupon bond and the series of option
4    contracts?
5  A  I don't think so.
6  Q  And just so I understand, where you refer to the
7    testimony about, you know, the 90 percent of
8    value being in options for the structured notes,
9    how did you consider that relevant with respect
10   to the opinions that you're offering in this
11   case?
12 A  It was very significant because it came directly
13   from the person that was tasked with developing
14   the model, and that -- it says that 90 percent
15   of the value comes from the options, and the
16   options, like I opine in my report, were S&P 500
17   options and Russell 2000 options, which are
18   widely traded.
19 Q  Is it your opinion that the Black-Scholes model
20   is industry standard for pricing options?
21 A  Yes.
22 Q  What is that opinion based on?
23 A  My years of experience as an expert, and my
24   analysis of financial statements of both

Page 87

1    companies and investment funds?
2  Q  Is it your opinion that a Black-Scholes model
3    should have been used to value the structured
4    notes at issue in this case?
5  A  I don't think I offer an opinion on the
6    Black-Scholes model specifically, but I offer an
7    opinion that the model that SBB used should have
8    been based on market observable inputs, and the
9    Black-Scholes model is a model that does that.
10 Q  So let's just take a look again at page 37 of
11   your report. So here in paragraph 72, you list
12   out six factors affecting the price of a stock
13   option.
14     Do you see that?
15 A  Yes.
16 Q  Are there any other factors that impact the
17   price of the component options of SBB's
18   structured notes?
19 A  I don't think there would be, no. There could
20   be -- actually, no. There could be factors
21   based on the -- as I describe, the volatility
22   surface.
23     So the volatility, the index price. There
24   could be a lot of analysis that's done over how

Page 88

1    that volatility is projected to change over time
2    based off of the current option prices for S&P
3    500 and Russell 2000 Index Options.
4  Q  Are you familiar with correlation between
5    indices?
6  A  Yes.
7  Q  Did you consider correlation between indices as
8    a factor that needed to be considered for
9    valuation of the SBB Fund structured notes?
10 A  Yes, I've seen that referenced by the various
11   individuals that were offering insights to SBB
12   and people at SBB who were valuing these notes,
13   and that since the notes were based on S&P 500
14   Index Options and Russell 2000 Index Options,
15   the correlations between those two indices would
16   be an important factor to consider.
17 Q  And it's not listed here in your paragraph 72 as
18   one of the factors affecting the price of an
19   option; right?
20 A  The paragraph 72, I'm listing the factors that
21   would affect the price of an individual stock
22   option or index option. The valuation of SBB's
23   structured notes, since they contained both an
24   S&P -- or a collection of S&P 500 Index Options

Page 89

1    and Russell 2000 Index Options, the correlation
2    between those two indices would be an additional
3    factor.
4      But correlation is not important for the
5    valuation of one of those index options on its
6    own.
7  Q  And I didn't see anywhere in your report where
8    you discuss correlation between the indices.
9      So did you -- how did you consider
10   correlation? Because I don't see it in your
11   report.
12 A  I really didn't. I just know that it would be a
13   factor that they would consider because it would
14   be a factor that the market would determine was
15   important, and it would be a market observable
16   input that would be available to SBB and that
17   other people, including super CC, the SEC, PWC,
18   and the valuation consultants that SBB reached
19   out to all discuss correlation as being an
20   important factor to consider.
21 Q  So if all of those -- if all those people
22   discuss correlation as an important factor, why
23   didn't you discuss it in your report?
24 A  My report focused on the application of SBB's

23 (Pages 86 - 89)

Page 90

1    model and whether it complied with ASC 820.

2       I was -- the focus of my report was more on

3    SBB's valuation process and not the details of

4    each of their models but more the process they

5    used in order to value the structured notes that

6    they held. And it's -- I think it's a fairly

7    consistent opinion from all the people that

8    looked at the SBB valuation model, that since

9    these notes held both S&P 500 Index Options and

10   Russell 2000 Index Options, that the correlation

11   between those options -- or between those

12   indices would be important.

13 Q  Do you have any understanding of whether SBB's

14   model that you're criticizing in your report

15   took into account correlation?

16 A  I don't recall if it did. I know that it

17   included a lot of inputs that were not, as I

18   describe, market-corroborated inputs and were

19   not observable inputs.

20 Q  Are you offering an opinion in this case of what

21   the impact of correlation was on the valuation

22   of the SBB Funds' structured notes?

23 A  No.

24 Q  Do you have an opinion, sitting here today, on

Page 91

1    what the impact of correlation was on the

2    valuation of the component options of SBB's

3    structured notes?

4 A  No.

5 Q  Would consideration of correlation as an input

6    change your opinions at all in this case?

7      MR. MOYE: Objection. Calls for

8    speculation.

9      THE DEPONENT: No.

10 BY MS. WALLER:

11 Q  Have you ever used the Black-Scholes model to

12   value long-dated maturity products with two

13   correlated unrelying assets?

14 A  No.

15 Q  In your view, are the component options for the

16   SBB Fund notes single underlying or

17   multi-underlying options?

18 A  Can you repeat that?

19 Q  Sure. So are the component options for the SBB

20   Funds' structured notes single underlying or

21   multi-underlying options?

22 A  It's my understanding that the underlying

23   options themselves are single underlying.

24 Q  Do you have any understanding of how the worst

Page 92

1    of feature layers on top of your understanding

2    of those -- of the option component being single

3    underlying?

4 A  No.

5 Q  Can I, for example, today, after this

6    deposition, go out in the market and purchase

7    options that are worst of options with the S&P

8    and the Russell 2000?

9 A  I don't think that you could, no.

10 Q  And so when you say that the options underlying

11   the SBB structured notes are widely traded,

12   you're referring specifically to the S&P 500

13   options and Russell 2000 options individually;

14   is that right?

15 A  That's correct.

16 Q  And is there, in your view, for the S&P 500 and

17   the Russell 2000 options, is there readily

18   available options for any time period, or is

19   there a limit to the time period available?

20 A  It really varies. It varies on the market, but

21   there's -- as I said in my report, there are

22   options for both of those indices that are

23   widely traded, and from those options, prices

24   that are constantly changing, implied

Page 93

1    volatilities for further out options of options

2    with late or expirations or strike prices that

3    are far away from the money are priced off of

4    those current implied volatilities.

5 Q  And would the pricing for far away -- I think

6    those were the words you used -- would that be

7    observable or unobservable?

8 A  It would be -- it depends. It could be

9    observable; it could be unobservable. But

10   implied volatility itself is considered an

11   observable input under ASC 820 with the

12   distinction that some far out options can be

13   less observable.

14 Q  Are any of the options in this case, in your

15   view, unobservable?

16 A  They could be, yes.

17 Q  Did you do any analysis to understand whether

18   any of the options in this case are far enough

19   out that they would be unobservable?

20 A  No. My analysis, again, focused on SBB's

21   valuation process and the model that they used,

22   and whether or not that model complied with

23   ASC 820.

24 Q  Are you offering any opinion today -- let me

24 (Pages 90 - 93)

Page 94

1    start over.
2        Are you offering an opinion in this case as
3    to whether the implied volatilities specific to
4    the SBB notes that are at issue here were
5    observable or unobservable?
6 A  I'm offering opinion -- the S&P 500 options and
7    Russell 2000 options markets offer observable
8    inputs in the form of prices and implied
9    volatilities every day, and that those implied
10   volatilities should have been used by SBB, and
11   have a higher priority use than unobservable
12   inputs like the historical volatility input that
13   they used in their option volatility model.
14 Q  If SBB had used implied volatility as opposed to
15   historical volatility for the types of notes
16   that are in the SBB Funds, do you have an
17   opinion as to whether that implied volatility
18   would be observable or unobservable under
19   ASC 820?
20 A  My opinion is that that implied volatility would
21   be more observable than historical volatility,
22   and that it could be considered unobservable
23   because of the long-dated nature of that, and I
24   think that's what SBB's financial statements

Page 95

1    said at one point, but that implied volatility
2    is always preferred over historical volatility.
3 Q  So setting aside historical volatility specific
4    to implied volatility, are you offering an
5    opinion as to whether the fact -- whether the
6    implied volatility that would be used for
7    purposes of valuing SBB's notes compliant with
8    ASC 820 would be observable or unobservable?
9 A  I think I'm offering an opinion that SBB should
10   have used implied volatilities for these options
11   and that some of them could be observable, and
12   some of them could be unobservable.  But they
13   would have based their analysis and their model
14   on the implied volatilities, and I think that's
15   consistent with what the market is doing
16   currently.
17 Q  Are there any limitations on using the
18   Black-Scholes model for products like the
19   structured notes that are at issue in this case?
20 A  There could be, yes.
21 Q  What type of limitations?
22 A  I just know that there's a lot of criticisms of
23   using the Black-Scholes model, but it's a widely
24   used model, especially for valuing because -- as

Page 96

1    it's known to value options for both companies
2    and investment funds.  But a lot of people
3    criticize different components of the
4    Black-Scholes model, as we spoke about earlier,
5    because it relies on one volatility input that
6    we know is constantly changing.
7 Q  Is it your opinion that ASC 820 requires using a
8    Black-Scholes model because that's a widely used
9    model even if there are limitations?
10 A  No.  I think I said -- testified earlier that
11   ASC 820 does not prescribe any model in
12   particular, but the model has to be compliant
13   with ASC 820 in that it has to be relying on
14   market observable inputs.
15 Q  Are there any other models, other than
16   Black-Scholes, that you're aware of that can be
17   used to model structured notes like the ones
18   that are at issue in this case?
19 A  Not that I know of.
20 Q  Have you ever heard of the Heston model?
21 A  The Heston model would be a model to -- it
22   wasn't a focus of my opinion, but my
23   understanding is the Heston model is used by
24   market and would be used by others to project

Page 97

1    the volatilities or create a volatility surface
2    to be used by, you know, a Black-Scholes
3    model -- or to be used in concert with the
4    Black-Scholes model.
5        But that was not a focus of my opinion.  I
6    think that was probably more of a topic that
7    would be in, like, a McCann report, but I don't
8    know.
9 Q  Do you have a view of whether the Heston model
10   would be appropriate for use of the SBB notes?
11       MR. MOYE:  Objection.  Foundation.
12       THE DEPONENT:  I don't have an opinion
13   about it.  I wasn't asked to offer an opinion
14   about the Heston model, but -- so I'm not going
15   to offer an opinion about that.
16 BY MS. WALLER:
17 Q  Is the Super CC model that you referenced
18   earlier, is that a Black-Scholes-based model?
19 A  I think it was described by Mr. Nelcan as -- in
20   his correspondence with SBB as being based off
21   of the same theories as the Black-Scholes model.
22   So I think it's a variation of a Black-Scholes
23   model.
24 Q  And I think -- is it your opinion that the

25 (Pages 94 - 97)

Page 98

1    Super CC model was compliant with ASC 820?
2 A  Yes.
3 Q  So a variation of a Black-Scholes model can
4    still be consistent with ASC 820?
5 A  Yes.
6 Q  Can Black-Scholes models be used to value exotic
7    options?
8 A  I think they can be, yes.
9 Q  If we go to page -- we're on page 37, if you
10   still have that open.
11       Do you see paragraph 73 where it says,
12   Given a particular price for an actively traded
13   index option, a trader can use Black-Scholes
14   model.
15       That what BSM means; right?
16 A  Correct.  Yes.  People leave out Merton.  Poor
17   Merton gets left out all the time.
18 Q  It's like the poor guy in Howard's firm I left
19   out.
20 A  He's not poor.
21 Q  Let me start over.
22 A  Sorry.
23 Q  I've gotten us off track.
24       Here in paragraph 73, where you say that a

Page 99

1    trader can use the Black-Scholes model through
2    an iterative process to solve for implied
3    volatility for a particular option, is that
4    possible for multi-underlying worst of options
5    like in the SBB notes?
6 A  That would be for a given index -- traded index
7    option.
8 Q  So not for the worst of, like SBB notes?
9 A  Not for the note itself, but for the index
10   options underlying the notes.
11 Q  And then you would have to consider the worst of
12   feature on top of that; is that right?
13 A  To value the note, yes, based off of the price,
14   or the implied volatility from the market for
15   the underlying option.
16 Q  You can't just add those two together; correct?
17 A  I don't believe so, no.
18       MS. WALLER:  Rob, do you want to go off the
19   record for just a second?
20       MR. MOYE:  Sure.
21       VIDEOGRAPHER:  We are going off the record.
22   The time is 11:52 a.m.
23       (Break.)
24       VIDEOGRAPHER:  We are back on the record.

Page 100

1    The time is 12:56 p.m.
2 BY MS. WALLER:
3 Q  Mr. Hickey, before lunch, we were talking a
4    little bit about -- and you had referenced some
5    criticisms of the Black-Scholes model.
6       Do you remember that?
7 A  Yes.
8 Q  Do you have any opinion on the validity of those
9    criticisms?
10 A  No.
11 Q  You don't agree or disagree with them?
12 A  I wasn't asked to offer an opinion on those for
13   this case.
14 Q  Do you have a view of those criticisms and
15   whether you think they're valid or not, based on
16   all of your experience?
17 A  No.  I have an opinion that the Black-Scholes
18   model is widely used, and that it's based on
19   market observable inputs and compliant with
20   ASC 820.  And while there's variations or
21   modifications that can be made to it, that it's
22   a fairly standard model that's used by funds and
23   financial companies in their financial
24   statements.

Page 101

1 Q  And we were talking also about correlation.  And
2    I just want to make sure that I have this right.
3    Is it your view that correlation is observable
4    or unobservable?
5 A  Observable.
6 Q  And so where, for example, would I go to get
7    correlation input to use in a model for purposes
8    of valuing SBB's notes?
9 A  You could look at the volatilities for -- you
10   could look at the historical returns.  You could
11   look at forecasted returns.  You could look at
12   prices for those indices and develop correlation
13   estimates from those metrics.
14 Q  Do you have any understanding of how, for
15   example, the Super CC model, what it used for
16   the correlation input?
17 A  I don't recall specifically.
18 Q  And how about the Markit model?  Do you have any
19   understanding of what the correlation input was
20   used -- or is used for the Markit model?
21 A  I don't recall if I discussed that in the Markit
22   model section of my report.  I don't recall.
23 Q  Would it surprise you to learn that the Hull
24   textbook that you cite to in your report

26 (Pages 98 - 101)

Page 102

1    observes that correlation is highly -- that
2    correlation is unobservable?
3  A  I don't think that would surprise me.
4  Q  Why not?
5  A  Well, if you say that it's in the Hull textbook,
6    I don't think it's -- it wouldn't surprise me
7    that it was in there.
8  Q  Do you disagree with Hull, then, that
9    correlation is unobservable?
10 A  No.
11 Q  So in your view, correlation is unobservable or
12   not?
13 A  I don't know exactly where Hull says it's
14   unobservable.  I was giving an answer to the
15   question that the correlations between return
16   series for the two indices could be observable.
17   In that instance, I was saying that you could
18   analyze how those returns were -- correlate with
19   one another.
20 Q  Do you have an opinion with respect to whether
21   the structured notes at issue here are Level 2
22   or Level 3?
23 A  I didn't make an opinion on whether they were
24   Level 2 or Level 3.  I think they were

Page 103

1    considered by SBB in their financial statements
2    to be Level 3 as of 2014.  I did not offer an
3    opinion on whether they were Level 2 or Level 3.
4  Q  Based on your understanding of how the
5    structured notes work, do you have a view one
6    way or the other of whether they're Level 2 or
7    Level 3?
8  A  I think since they're based on long-dated
9    options, they could be considered Level 3.  But
10   I think my opinion was that they should be
11   based -- the valuation should be based on as
12   many observable inputs as possible, which would
13   include the implied volatilities for the index
14   options.
15 Q  So maximizing all of the observable inputs, in
16   your view, would that result in the structured
17   notes being Level 2 or Level 3?
18 A  I think it could be Level 3, because normally,
19   what the companies and funds do is they
20   categorize the notes or the securities they own
21   by the lowest input that they're using for
22   valuation.  And so in that instance, the fund's
23   financial statement said that they were Level 3,
24   based on that lowest level of input that they

Page 104

1    used.
2  Q  And you don't disagree with that disclosure in
3    SBB's financial statements; is that corrects?
4  A  No.  Not the disclosure in their financial
5    statements, no.
6  Q  And the Markit model that SBB currently uses, do
7    you have a view on whether that's a Level 2 or a
8    Level 3 model?
9  A  It's my understanding that the SBB Funds are
10   still claiming that the notes are Level 3, and I
11   don't dispute that classification.
12 Q  And how does correlation, in particular, impact
13   your view of whether a particular asset is a
14   Level 2 or a Level 3 asset?
15 A  I don't think I formed an opinion on that.
16 Q  Do you have an understanding or a view on how
17   correlation would impact a determination of
18   whether an asset was a Level 2 or a Level 3?
19 A  No.
20 Q  Did you come to a determination in this case
21   that market participants only use the risk-free
22   rate when modeling assets similar to SBB's
23   structured notes?
24 A  I don't think I offered that opinion

Page 105

1    specifically.  I think I offered an opinion on
2    Black-Scholes model, the Black-Scholes model
3    being based on the risk-free rate in that way,
4    and that that was consistent with my
5    understanding of the model.  And then also the
6    criticisms that SBB heard from both the SEC and
7    other consultants that looked at the model, that
8    it should have been based on the risk-free rate
9    and not Mu as it was based.
10 Q  Are you relying at all for your opinion on SBB's
11   interactions or what they heard from the
12   examiners?
13 A  Yes.  I think I -- I describe the chronology of
14   SBB's communications with the examiners, and
15   then also with others along the time that the --
16   that SBB held the structured notes in the funds,
17   and that those criticisms were consistent with
18   each other.
19 Q  You didn't think it was important to review the
20   testimony of the SEC examiners themselves in
21   coming to that opinion?
22 A  I relied on the SBB personnel's testimonies and
23   the exhibits that supported those testimonies as
24   I detail in my report.

27 (Pages 102 - 105)

Page 106

1  Q   Are there any circumstances that you're aware of
2      when the use of something other than the
3      risk-free rate would be appropriate in modeling
4      an asset like the SBB structured notes?
5  A   No, that's not my opinion.
6  Q   I'm not asking what your opinion is. I'm just
7      asking: Are you aware of any circumstances when
8      it would be appropriate to use something other
9      than the risk-free rate?
10        MR. MOYE: Objection. Calls for
11     speculation.
12        THE DEPONENT: Not with respect to the
13     notes that SBB held.
14 BY MS. WALLER:
15 Q   And why not?
16 A   Because it's consistent with the criticisms that
17     they heard from -- like I detail in my report --
18     multiple parties over the course of the time
19     that they held the notes, that the model that
20     they used was not the right model in that it
21     used the Mu term that was not a
22     market-corroborated input and not an input that
23     was relied on by other market participants, and
24     that the Black-Scholes model uses the risk-free

Page 107

1      rate for the drift term and not Mu.
2  Q   Other than what you referred to as the other
3      parties who communicated with SBB about their
4      model, are you relying on anything else with
5      respect to your understanding of whether
6      anything other than a risk-free rate would be an
7      appropriate rate to use when valuing assets like
8      the SBB notes?
9  A   Can you repeat that?
10 Q   Sure. You referred to other parties who you say
11     communicated with SBB about their model; right?
12     Do you remember that?
13 A   Correct.
14 Q   Other than relying on what you believe they
15     communicated to SBB, did you do anything else to
16     come to an understanding of whether something
17     other than a risk-free rate would be an
18     appropriate rate to use when valuing assets like
19     the SBB notes?
20 A   Yes. I discuss in my report how SBB should have
21     relied on the implied volatilities from the S&P
22     500 and Russell 2000 notes that rely on the
23     risk-free rate, and that's consistent with what
24     they heard during the exam from the SEC. It's

Page 108

1      consistent with what they heard from VRC. It's
2      consistent with what they heard from PWC, and
3      it's consistent with how the Markit model is
4      calibrated using implied volatilities from those
5      index options.
6  Q   Do you understand that I'm asking -- I
7      understand you read the record in this case;
8      right?
9  A   That's correct.
10 Q   Other than what you've read in the record in
11     this case, what work did you do, independent of
12     what's in the record, to understand what market
13     participants use with respect to a risk-free
14     rate or some other rate?
15 A   I offered my opinion on what was in the record,
16     in my independent review of what was in the
17     record, which was consistent with my experience
18     and my analysis of their model and index options
19     for the S&P 500 and the Russell 2000, and the
20     criticisms that they heard of their model, and I
21     reviewed that independently and offered my
22     opinion about that topic specifically.
23 Q   And what experience, specifically, are you --
24     were you referencing there in reference to your

Page 109

1      experience?
2  A   My experience with ASC 820 and how it should be
3      implied to valuations of securities that are
4      held by investment funds.
5  Q   Did you do anything to understand what other
6      market participants have used other than just a
7      risk-free rate?
8  A   Well, I think the -- well, in the pricing
9      supplements that I reviewed, it discusses with
10     JPMorgan and Credit Suisse the models that they
11     used at the time that the notes were issued and
12     the valuations of those notes directly after the
13     issuance.
14        And then I also analyzed the inputs or the
15     results of the model from the May 2016
16     adjustments versus bank quotes that SBB had for
17     some of the notes that they held, and those were
18     consistent with one another. And it's just my
19     understanding of how index options are valued
20     and the underlying details of the Black-Scholes
21     model.
22 Q   Other than the banks that are offering these
23     structured notes, since you referenced the bank
24     quotes, are you aware of any other market

28 (Pages 106 - 109)

Page 110

1    participants that engage in this market for
2    structured notes like the ones that SBB Funds
3    hold?
4  A  No, I don't know. I know there is a market for
5    them, but I don't know who is in the market
6    specifically besides the banks that issued the
7    notes to SBB, and SBB -- it's a large market, so
8    there's other -- other participants involved in
9    the market.
10 Q  You didn't do anything to understand who those
11   other participants are, how they value the
12   structured notes?
13 A  No. My analysis was on the SBB valuations and
14   whether or not they comply with ASC 820.
15 Q  But your opinion is based on what market inputs
16   are; right?
17 A  Yes.
18 Q  And what did you do to understand what is market
19   for the inputs that you were opining on?
20      MR. MOYE: Objection. Asked and answered.
21      THE DEPONENT: My opinion is that SBB did
22   not use market inputs.
23 BY MS. WALLER:
24 Q  I understand. I'm asking you what you did to --

Page 111

1    what is that based on?
2  A  Their admissions mostly and the details of their
3    model, their testimony, and my review of the
4    valuation procedures that they used to value the
5    notes.
6  Q  But you didn't go and survey the market or
7    understand what other market participants use
8    for purposes of the inputs that you're
9    challenging; is that fair?
10     MR. MOYE: Objection. Compound.
11     THE DEPONENT: Besides the information that
12   was in the record, no.
13 BY MS. WALLER:
14 Q  And specifically with respect to the Mu input,
15   have you analyzed the impact that Mu
16   specifically had on the valuation of SBB's
17   structured notes?
18 A  No. I reviewed Mr. Navalgund and Mr. Aven's
19   testimony that related to that input
20   specifically, and I also relied on the fact that
21   they did not corroborate the use of that input
22   with the market.
23 Q  Do you have any opinion on whether the -- on how
24   the use of Mu impacted the valuation in the SBB

Page 112

1    model?
2  A  I think Mr. Navalgund said that it was the
3    factor that caused the notes to be valued higher
4    than the current -- what would be considered
5    current market value.
6  Q  Other than reviewing his testimony, did you do
7    anything else to come to your own conclusion as
8    to the impact that Mu had on the SBB valuation?
9  A  No. I think I came to my conclusion that in
10   analyzing the valuation procedure, including Mu,
11   that it was not corroborated with the market,
12   that that factor was one of many factors that
13   caused the model to not be compliant with
14   ASC 820.
15 Q  And how about historical volatility? What did
16   you do to determine that market participants
17   would not use historical volatility with respect
18   to the particular types of structured notes that
19   SBB had in its funds?
20 A  Again, I was focused on the description of SBB's
21   model, that it broke down the note into the
22   component options, and ASC 820 says that implied
23   volatility is a Level 2, historical volatility
24   is Level 3, and I think I detail in my report

Page 113

1    how implied volatility is preferred -- or why
2    it's preferred over historical volatility.
3  Q  Did you do anything to determine, though, what
4    other market participants use?
5  A  Well, I know that other market participants use
6    implied volatilities for index options.
7  Q  How do you know that?
8  A  That's well-known in the market. That's how
9    options get quoted, according to implied
10   volatilities. That's how the VIX gets
11   calculated, according to the implied
12   volatilities.
13     The input to -- I guess you could call it
14   an out -- and iterative output in a way, and
15   from the Black-Scholes model is implied
16   volatility. The options markets are based on
17   implied volatility.
18 Q  And what about specifically here with respect to
19   the fact that there's worst of? How do you --
20   did you do anything to determine what market
21   participants, specifically with notes similar to
22   the SBB notes with the worst of characteristic,
23   what volatility that they use?
24 A  Yes. I reviewed the record, and the procedures

29 (Pages 110 - 113)

Page 114

1    that SBB used and their criticisms that SBB
2    heard about their model, from both the SEC and
3    other market participants, that implied
4    volatility is -- that their model was not able
5    to be calibrated to implied volatility, and that
6    was one of the major criticisms of their model
7    over time.
8  Q   What other market participants did you identify
9    in the record as telling SBB anything about the
10    volatility that they were using?
11  A   PWC, the consultants that they contacted, VRC
12    and Numerex, and ultimately Markit.
13  Q   Anyone else?
14  A   Well, I think the testimony was that they didn't
15    reach out to the market.
16  Q   And to be clear, you haven't either; right?
17  A   I have not reached out to the market.
18  Q   Are you offering an opinion in this case as to
19    the impact that historical volatility had on
20    SBB's valuation of its structured notes?
21  A   No.  I'm offering an opinion that it was not by
22    use of historical volatility over implied
23    volatility that made the SBB model not be
24    compliant with ASC 820.

Page 115

1  Q   Have you done any work to determine whether the
2    use of historical volatility instead of implied
3    volatility -- what impact that has on the value
4    of the note?
5  A   No.  I think it would depend.  And I think I --
6    I analyze that and offer an example to
7    demonstrate that in a picture in my report to
8    show how the difference could be small, or it
9    could be large.  And that's the point.  You
10    don't know.
11        Historical volatility is not an observable
12    input.  An implied volatility is an observable
13    input based on the current market price of an
14    option.
15  Q   But you didn't actually input implied volatility
16    that you think would've been an appropriate
17    input into the SBB model and quantify the
18    difference?
19  A   No, I did not.
20  Q   And how about with respect to beta?  Did you
21    come to a determination that beta was something
22    that market participants would not use in
23    valuing structured notes similar to the ones
24    that SBB Funds held?

Page 116

1  A   Yes.  I think, again, I reviewed the record, and
2    I think I state the admission of the testimony
3    of the person who developed the model at SBB,
4    that beta was not a market-corroborated input,
5    and that their use of that input in their model,
6    they did not discuss with other market
7    participants.
8  Q   Have you discussed with other market
9    participants the -- whether they would use beta
10    in a model to value a product like the SBB
11    structured notes?
12  A   No.
13  Q   Have you done any work, independent of reviewing
14    the testimony in this case, to determine what
15    market participants for structured notes like
16    the SBB Fund notes would use -- whether they
17    would use beta?
18  A   Other than the fact that I know they're not part
19    of a Black-Scholes model for valuing index
20    options, no.
21  Q   Have you done any work to quantify the impact
22    that beta had on the valuation of the SBB notes?
23  A   No.  I think that would -- that would, again,
24    like the difference between historical

Page 117

1    volatility and implied volatility, beta was
2    something that SBB inserted into their model
3    without checking with the market, and the effect
4    of that input, in and of itself, would be
5    changing over time, but it was not consistent
6    with how the market would value those index
7    options.
8  Q   And how about linearization?  Did you determine
9    that market participants would not use
10    linearization in valuing notes like those that
11    are held in SBB Funds?
12  A   I think similar to the responses that I made
13    with the other inputs, I think SBB testified
14    that linearization was not a market-corroborated
15    input.  It was not an observable input, and it
16    was something that they created and inserted
17    into their model.  I think the testimony
18    supports that they did this in order to smooth
19    out some of the effects of the other
20    nonmarket-corroborated inputs that they had in
21    their model, and that those were not --
22    inclusion of those inputs was not compliant with
23    ASC 820.
24  Q   Other than reviewing the testimony in this case,

30 (Pages 114 - 117)

Page 118

1  did you do anything to determine what market
2  participants -- whether market participants have
3  used anything like the concept of linearization
4  in their valuation of products like the
5  structured notes here?
6      MR. MOYE:  Objection.  Vague as to the term
7  "concept of linearization."
8      THE DEPONENT:  I know that linearization is
9  not used by a Black-Scholes model to analyze
10  index options, and I know that SBB testified
11  that they did not corroborate with the market in
12  using their linearization input into the model.
13  BY MS. WALLER:
14  Q   When you say you know that linearization is not
15      used by a Black-Scholes model, what is that
16      based on?
17  A   My understanding of how a Black-Scholes model
18      values an index option.
19  Q   And when you are talking about an index option,
20      are you talking about a single S&P 500 or
21      Russell?
22  A   S&P 500 or Russell 2000 Index Options.
23  Q   Do you have any understanding of what market
24      participants who have worst-of features use in

Page 119

1  their valuation, whether they use any
2  linearization-type concepts?
3  A   If they do, I don't know of it.  But, again, if
4      they do, they should check with the market to
5      make sure that other market participants are
6      doing it in case -- if they want their model to
7      be compliant with ASC 820.
8  Q   Is it your testimony that, in order to be
9      compliant with ASC 820, you have to do a market
10      check for others in the market to ensure they're
11      doing the same thing?
12  A   Well, you have to -- if your model is compliant
13      with ASC 820 -- again, ASC 820 gives you a
14      framework, and it -- underlying that framework
15      is the idea that your model might differ from
16      someone else's model.  But if you're maximizing
17      the use of observable inputs and minimizing the
18      use of unobservable inputs, and your models are
19      both ASC 820 compliant, they should be able to
20      be compared with one another.
21      MS. WALLER:  Why don't we go off the record
22      real quick to change media.
23      VIDEOGRAPHER:  We are going off the record.
24      The time is 1:23 p.m., and this is the end of

Page 120

1  media unit 2.
2      (Break.)
3      VIDEOGRAPHER:  We are back on the record.
4      The time is 1:24 p.m., and this is the beginning
5      of media unit 3.
6  BY MS. WALLER:
7  Q   Mr. Hickey, who specifically should SBB have
8      gone to to check whether their model was
9      compliant with ASC 820?  What other market
10      participants should they have gone to?
11  A   I don't think I have an opinion about who
12      specifically they have to go to, but they have
13      to value the notes that they own according to
14      fair value or the current exit value.
15      So how they get information from other
16      market participants could be up to them, but I
17      think my point is that they have to attempt to
18      get that information from other market
19      participants.
20  Q   Can you identify another market participant that
21      they could have gone to?
22  A   One could be the banks who issued them the
23      notes.  Other people that are involved in the
24      market trading these notes.  It could have gone

Page 121

1  to the options market for the underlying notes.
2  There's a lot of different sources of
3  information.  They could have gone to Totem.
4  Totem was available.  That's what they're using
5  now.  Other pricing sources.  There are a lot of
6  places they could have gone for market
7  information on the notes that underlie the
8  structured notes that they held in their funds.
9  Q   What information does Totem provide?
10  A   Totem provides a lot of information, but Totem
11      provides a survey of implied volatilities for a
12      variety of different market, including the index
13      options here.  I think Totem -- it's my
14      understanding that Totem provides information to
15      SBB currently, starting in 2016 to today.
16  Q   You reference other parts that are involved in
17      the market, trading these notes.
18      Can you name any other firm or person
19      that's in the market trading these notes?
20  A   The firms would be the issuing banks, but I
21      don't know of other market participants.  But I
22      know it was based on the size of the market and
23      testimony about the market, that other people
24      trade these notes.

31 (Pages 118 - 121)

1 Q  What's your understanding of the size of the

2     market for the types of structured notes that

3     SBB holds?

4 A   I believe -- I don't have it in my report, but I

5     believe that Mr. Barnett testified that the size

6     of the market was quite large.

7 Q   Did you do anything to come to your own

8     understanding of the size of the market other

9     than --

10 A  I did not analyze the size of the market.  I'm

11    sorry.

12 Q  Let me just get that clearly.  Sorry.

13 A  I talked over you.  I'm sorry.

14 Q  That's okay.

15     Did you do anything to come to your own

16    understanding of the size of the market for the

17    notes that SBB holds?

18 A  No, that wasn't part of my analysis.

19 Q  Are you aware, sitting here today, of any other

20    firm that you've worked with or heard of that

21    traded in these types of structured notes?

22 A  Not specifically.

23 Q  Generally?

24 A  No.  I just know that there's other people that

1     trade in this market.

2 Q   And specifically with respect to historical

3     volatility which we were talking about earlier,

4     have you done anything to quantify the impact

5     that historical volatility had on the SBB

6     valuations?

7 A   No.  I think I -- consistent with my opinion

8     about the other factors, it would really depend.

9     But I do show -- I do know that ASC 820 says

10    implied volatility is preferred over historical

11    volatility, and I show why in my report.

12 Q   And I'm sorry.  I meant to say "linearization."

13     Did you do anything to analyze the impact

14    that linearization had on SBB's notes?

15     MR. MOYE:  Objection.  Asked and answered.

16     THE DEPONENT:  No.

17     MS. WALLER:  I asked that one already?  All

18    right.

19 BY MS. WALLER:

20 Q   And how about with respect to credit risk?  Did

21    you do anything to impact -- to analyze the

22    impact of credit risk on the valuation of SBB

23    notes?

24 A  Not the specific effect, but, again, that could

1     change.  And I talk in my report about how that

2     risk was something that SBB was told about from

3     2011 when it received information from Super CC.

4     It was in the SEC exam.  It was discussed in the

5     pricing supplements of the notes that SBB

6     purchased, that the returns on those notes was

7     determined by -- was dependent on the credit

8     risk of the issuing bank.  And then I -- in my

9     report, I show an example of why that would be

10    an important factor to consider.

11 Q  But, again, just my question is:  You didn't do

12    anything to quantify the impact of credit risk

13    on the valuation?

14 A  No.  I was not analyzing the impact of the

15    factors on the model.  And the credit risk

16    factor individually, the effect of that would

17    change over time.

18 Q  And in your report -- I think if you turn to

19    page 29 to 30 -- you talk about Credit Suisse's

20    credit default swap spread.

21     Do you see that?

22 A  Yes.

23 Q  And you show the changes in the CDS spreads for

24    Credit Suisse during certain days in March of

1     2023, is that right, for table 2?

2 A  Yes.

3 Q   Are any of the structured notes at issue in this

4     matter impacted by the CDS spreads?

5 A  I don't know exactly if they still have a

6     Credit Suisse note, but if they had one, it

7     would be affected by the change -- it would have

8     been affected by the change in that spread over

9     those dates.

10 Q  But you don't know one way or the other because

11    you haven't done that analysis?

12 A  Sorry.  I didn't mean to speak over you.

13     I was describing and demonstrating why that

14    could be an important factor and how that factor

15    was not included in the SBB model, and that it

16    had been consistently told that it should be in

17    their model, and I'm describing there an example

18    of how that could have had a big effect on their

19    valuations.

20 Q  But you didn't actually calculate the effect

21    that it, in fact, had?  You were showing an

22    example of how it could have an effect?

23 A  Correct.

24     MS. WALLER:  I'm going to mark Exhibit 133.

32 (Pages 122 - 125)

Page 126

1    (Exhibit No. 133 marked.)
2  BY MS. WALLER:
3  Q  Mr. Hickey, have you ever seen Exhibit 133
4    before?
5  A  I don't know.
6  Q  It's not on Appendix B, your list of documents
7    considered.  So is it fair to say you didn't
8    consider these written responses in your
9    opinions?
10 A  If it's not on my Appendix B, and it's not cited
11    in my report, I probably did not rely on it for
12    offering my opinion.
13 Q  Do you know one way or the other, sitting here
14    today, whether you relied on this document for
15    your opinion?
16 A  I don't think that I did.  I think the
17    information I relied on for my opinion I'm
18    pretty well -- I'm familiar with, and this is
19    not entirely familiar to me.
20 Q  Do you know if you've ever seen this document
21    that's Exhibit 133 prior to today?
22 A  I don't know.
23 Q  Did you think it was important to understand
24    Dr. Barnett's perspective in these

Page 127

1    interrogatories as to his explanation for
2    certain changes and the inputs that you were
3    opining on?
4  A  I actually relied more on Mr. Barnett's
5    colleagues and their testimony on the SBB model
6    that was consistent with the model, and they
7    were consistent with one another, and they were
8    consistent with the criticisms that SBB heard on
9    their model over time, and not as much
10    Mr. Barnett's, or -- sorry -- Dr. Barnett's
11    testimony, which was inconsistent with that
12    testimony and those contemporaneous criticisms.
13 Q  Did you, for purposes of coming to your opinion,
14    weigh the credibility of testimony of
15    Dr. Barnett versus others at SBB?
16 A  Like I just said, the testimony of others at SBB
17    were consistent with each other, and they were
18    also consistent with the record at the time.  So
19    they were consistent with the SEC exam.  They
20    were consistent with promises that SBB made that
21    they were -- they had shared.  They were making
22    changes to the model, and, like I detail in my
23    report, I really relied on Mr. Navalgund and
24    Mr. Aven's testimony as it was consistent with

Page 128

1    the record and those criticisms and somewhat
2    inconsistent in certain respects with
3    Dr. Barnett's testimony as he was not the one
4    developing the model or communicating with the
5    regulators at that time.
6  Q  But you don't know if his interrogatory
7    responses are consistent or not because it
8    sounds like you don't know if you reviewed it?
9  A  I don't know if I reviewed it.  And if I didn't
10    rely on it in my report -- or if I didn't state
11    it in my report, I probably did not rely on it.
12 Q  If you take a look at Interrogatory Number 6,
13    which is on page 6, do you see in the middle of
14    that response, there's a citation to a
15    introduction to the economics and mathematics of
16    financial markets source.
17    Did you review that as part of your work in
18  this matter?
19    MR. MOYE:  Can you give him a minute to
20  review?
21    THE DEPONENT:  No, I did not.
22 BY MS. WALLER:
23 Q  Take a look at the response -- or take a look at
24    Interrogatory Number 8.  It's on page 7.  And

Page 129

1    the interrogatory itself references a source by
2    Robert C. Merton.
3    Do you see that in the request itself?
4  A  Yes.
5  Q  Did you review this article by Mr. Merton?
6  A  No, I don't think I did.  I think I reviewed
7    SBB's model and the factors that they include in
8    their model and the criticisms that they heard
9    regarding their model and the changes that they
10    ultimately decided to make to their model and --
11    as I've detailed in my report.
12 Q  And on the next page, on page 8 in the response,
13    there is a reference to a 1973 Black & Scholes
14    source.  Did you review that?
15    It's seven lines down on page 8.  Very
16  front of the line.
17 A  Yeah.  I think I mention reliance on the
18    Black-Scholes model, and that that's, as the SBB
19    individuals testified about the model, that
20    that's the referred model used in the industry.
21 Q  But you didn't read the Merton article that
22    Dr. Barnett references here discussing the Black
23    & Scholes model that you are relying on?
24 A  No.

33 (Pages 126 - 129)

Page 130

1 Q  If you take a look on page 9, Interrogatory
2    Number 9, there's a JPMorgan 2012 source.
3        Do you see that?
4 A  Yes.
5 Q  Did you take -- did you review that source as
6    part of your work on this matter?
7 A  No, I don't think I did.
8 Q  And if you turn to page 10, the top of page 10,
9    the end of the discussion of Interrogatory
10   Number 9, there's a Campbell & Hinshaw
11   reference.
12       Do you see that?
13 A  Yes.
14 Q  Did you review the Campbell & Hinshaw source
15   that is cited here?
16 A  No, but I would agree with the statement that's
17   here, that extreme stock market movements are
18   more common than would be expected.  And that
19   would be what would be shown by implied
20   volatility changes.
21 Q  Did you review -- I believe it's the same
22   source.  In Interrogatory Number 11, did you
23   review this Campbell & Hinshaw article, or
24   Mr. Barnett's explanation of it, with respect to

Page 131

1    how it informed SBB's use of beta?
2 A  No.  But I do -- I would note that -- because I
3    describe in my report the individuals that were
4    responsible for the model didn't cite to these
5    or any other support for the inputs to the
6    model.
7 Q  Is it your view that Dr. Barnett was not
8    responsible for the model or developing it?
9 A  That's not my opinion, but my opinion was that
10   the people that did testify on what they were
11   doing with the model or what they were trying to
12   achieve with the model is not necessarily
13   consistent with these interrogatories as we've
14   gone through them.
15 Q  So --
16 A  In that the inputs that they used in the model
17   were not corroborated by the market.
18 Q  And you're crediting or relying on the testimony
19   of certain SBB witnesses and not relying on
20   Dr. Barnett's testimony in these
21   interrogatories?
22 A  Yes, I'm relying on their testimony, which, as I
23   said before, was consistent with one another and
24   also consistent with the criticisms that they

Page 132

1    were hearing at the time and over time regarding
2    the model.
3 Q  Let's turn in your report to page 63, paragraph
4    145.
5        At the bottom of page 63, your report says,
6    The use of the SBB model to value the SBB
7    structured notes, including the Mu factor and
8    other non-observable inputs, did not comply with
9    ASC 820.  It caused the value of SBB Funds to be
10   overvalued.
11       What is the basis for your conclusion in
12   this sentence that the SBB model, including the
13   Mu factor and other non-observable inputs,
14   caused the value of the SBB Funds to be
15   overvalued?
16 A  The testimony that I've heard that admits this
17   from Mr. Navalgund and Mr. Aven.
18 Q  Did you do any analysis on your own of whether
19   the SBB model caused the value of the SBB Funds
20   to be overvalued?
21 A  No.  I think that was admitted.
22 Q  Did you do any analysis to determine whether --
23   what the impact of adding just beta and
24   linearization would be to the value of the

Page 133

1    structured notes?
2 A  No.
3 Q  Do you have any understanding of what the impact
4    of just those two inputs would be?
5 A  Well, beta, I know, was something that,
6    according to the testimony of those that were
7    responsible for developing the model, was used
8    to amplify the historical volatility, and then
9    linearization was used to counteract that and
10   then also some of the effects of Mu that
11   overvalued the notes so that the linearization
12   was used to smooth the -- those effects over
13   time.  And like I said before and like I've
14   detailed in my report, none of those factors
15   were corroborated by the market.
16 Q  But other than the testimony that you just
17   referenced, you didn't do any of your own
18   analysis as to what the impact of those two
19   inputs were on the valuation?
20 A  No.  I did not calculate the impacts of those --
21   I wasn't asked to calculate the impacts of those
22   factors on the valuation of the notes.
23 Q  And just to be clear, you weren't asked to opine
24   on what would be a fair value for any particular

34 (Pages 130 - 133)

Page 134

1   SBB note?
2 A  No.  My opinion is more focused on ASC 820 and
3   whether SBB complied with ASC 820 as opposed to
4   any individual note valuation at any point in
5   time.
6 Q  Is it your opinion that the valuation of the SBB
7   notes is not relevant to whether SBB complied
8   with ASC 820?
9 A  I think the process is important, and my opinion
10   focused on the process, and whether SBB employed
11   a model that was compliant with ASC 820, that
12   was my opinion, and my opinion was that they did
13   not.
14      The amount of that was not something that I
15   was asked to determine, and it was not an
16   important part of my opinion.
17 Q  So in your -- in your opinion, it's not
18   important what the actual valuation was.  It's
19   just about the process; is that fair?
20 A  Well, the process was failed, as I outline in my
21   report, and then I also describe what the
22   results of those failures were.  So those -- the
23   results are important as well, but the process
24   failure was what I focused on.

Page 135

1 Q  Is it your opinion that it's a violation of
2   ASC 820 if the process is wrong, regardless of
3   what the output of the model is?
4 A  Yes.  It could be determined that if the process
5   is all wrong, I don't think that there would
6   probably be a lot of cases brought on those --
7   on those issues if the results were not
8   significant, but process failures are very, very
9   important, including the -- as the process is
10   being represented to investors and to auditors
11   that we are complying with fair value and with
12   ASC 820.
13      If the process is determined to not comply,
14   those process failures are very important in and
15   of themselves.
16 Q  What standard are you relying on to determine
17   that the process is very, very important?  I
18   think those were the words that you used.
19 A  I didn't mean to put two "verys" in.
20      My experience and my application of
21   ASC 820, and my knowledge of fair value,
22   generally, and how companies and funds are
23   supposed to comply with fair value accounting
24   rules and fair value guidance.

Page 136

1 Q  And when you say it's important, important to
2   who?
3 A  Important to investors; important to the market;
4   important to auditors; important to anyone who
5   is relying on those representations made by the
6   fund.
7 Q  Are there standards that would help someone
8   determine what would be important to investors,
9   for example?
10 A  Yeah, ASC 820 and representing to investors who
11   are reading your financial statements or getting
12   a statement or some representation from you that
13   your valuation procedures complied with fair
14   value.  Those are important.
15 Q  Let me just ask you, Mr. Hickey, when we get the
16   next exhibit, you read the testimony and the
17   exhibits from the -- at least the deposition
18   testimony of RSM witnesses; right?
19 A  Yes.  I believe I read some of them.  I think
20   I've listed those in my report.
21 Q  Are you offering any opinions with respect to
22   RSM's work in this matter?
23 A  No.
24 Q  Are you aware whether the inputs that you

Page 137

1   criticize in your report were disclosed to RSM?
2 A  I believe that some of them were.  I also saw --
3   and I think I describe in my report that the
4   model changes that SBB told the SEC it was
5   making in April 2015.  They also told RSM about
6   those changes.  But, really, as I say in my
7   report, my focus was on SBB's actions and their
8   financial statements, as they were the ones that
9   controlled the valuation of the fund and their
10   own financial statements.
11 Q  Are you aware of whether RSM was aware -- well,
12   let me ask this differently.
13      RSM was aware that SBB was using Mu in its
14   model; correct?
15 A  I don't know.  That's not part of my opinion.
16 Q  Are you aware whether RSM knew that SBB was
17   using linearization?
18 A  I don't know.
19 Q  You don't have any idea from reading the
20   testimony of RSM in this case?
21 A  It wasn't part of my opinion.  Again, my opinion
22   was focused on what SBB was doing relative to
23   the market and what is called for by ASC 820.
24 Q  I understand that's your opinion, but I'm asking

35 (Pages 134 - 137)

Page 138

1    what you know, sitting here today.
2  A  I don't know.
3  Q  You don't know from any of your review of the
4    RSM materials that are in your report?
5  A  I don't recall.
6  Q  Do you have any understanding of whether RSM
7    conducted any analysis of whether the inputs
8    that are now being criticized were material to
9    investors when they switched to the Markit
10    model?
11      MR. MOYE:  Objection.  Compound.
12    Foundation.
13      THE DEPONENT:  Again, it was not part of my
14    analysis, so I don't know.
15  BY MS. WALLER:
16  Q  Do you have any understanding of what RSM --
17    whether RSM did any calculations or analysis
18    between the SBB model that you are criticizing
19    and the Markit model that you believe is
20    compliant with ASC 820?
21  A  I don't know if they did or not.
22      MS. WALLER:  We're going to mark Exhibit
23    134.
24      (Exhibit No. 134 marked.)

Page 139

1  BY MS. WALLER:
2  Q  Are you familiar with what's been marked as
3    Exhibit 134?
4  A  Yes.  It looks like ASC 820.
5  Q  And I believe when I asked you earlier:  Are
6    there standards that would help someone
7    determine what would be important to investors,
8    for example?
9      You said, Yes -- or, Yeah, ASC 820.
10      So where in ASC 820 -- what are you relying
11    on in ASC 820 to tell you what's important to
12    investors?
13  A  I think ASC 820 is important because it
14    describes how a fund or a company is supposed to
15    report the securities they own at fair value, or
16    the current exit value of securities they own.
17    So the price that they could be received -- that
18    they would receive if they were to sell one of
19    those securities as of the current date, not
20    some date in the future.
21      And ASC 820 describes the process and the
22    hierarchy and things that should be relied on by
23    a fund in that situation, and those
24    representations that are made to investors are

Page 140

1    based on ASC 820 and other fair value guidance.
2  Q  But where in ASC 820 does it tell you what would
3    be important to investors in -- in fair value
4    accounting?
5      MR. MOYE:  Objection.  Argumentative.  It
6    assumes facts not in evidence.
7      THE DEPONENT:  ASC 820, as I describe in my
8    report, offers a framework, and that framework,
9    if followed by a fund, allows an investor to
10    compare that fund to a similar fund and also
11    tells an investor that that fund is complying
12    with the accounting rule that governs fair
13    value, and that, again, that fund is not making
14    their own subjective assessments of the
15    valuation of their funds, that they're actually
16    based on objective evidence or observable inputs
17    or referred to as market-corroborated inputs.
18    And that's -- a lot of what's in ASC 820 talks
19    about those concepts in fairly great detail.
20  BY MS. WALLER:
21  Q  So ASC 820 talks about the concepts for how to
22    get to a fair value; is that --
23  A  Correct.
24  Q  Where does it tell you, though, if you don't

Page 141

1    follow ASC 820, here's what's important to
2    investors?
3  A  I think investors want to know that the price --
4    or the NAV, or the value of whatever it is they
5    own, is being correctly represented to them, and
6    that the returns from those NAVs and the risk
7    metrics that come from those NAVs and the fees
8    that come from those NAVs are all important to
9    investors who own different types of funds.
10  Q  Does it say that in ASC 820?
11  A  I don't know if it would say that specifically
12    in ASC 820 because ASC 820 is governing fair
13    value just generally, not just for investment
14    funds, but for companies that hold different
15    types of securities on their balance sheets.
16  Q  So you would consider the NAV something that's
17    important to investors?
18  A  Yes.
19  Q  Based on what?
20  A  My experience as an investor.  My experience as
21    an expert working on cases like this, and what I
22    know about fair value reporting and fair value
23    accounting.
24  Q  Do you think you're an expert in what's

36 (Pages 138 - 141)

Page 142

1    important to investors?
2  A  Yes.
3  Q  And is that based on your experience?
4  A  Yes.
5  Q  Anything else?
6  A  My experience in working cases like this and my
7    experience as an investor.
8  Q  And are there any standards that you would apply
9    for purposes of doing an evaluation of what's
10    important to investors?
11  A  Other than describing what is -- what's needed
12    or what processes need to be followed to arrive
13    at fair value, I think it goes without saying,
14    in a way, that the results of those fair value
15    determinations are important to anyone who
16    relies on a financial statement either from an
17    investment fund or a company.
18  Q  Are you offering an opinion in this case that
19    SBB's alleged failures in not complying with
20    ASC 820 were material to reasonable investors?
21  A  I think I offer an opinion that they would be
22    important to investors, and I describe why,
23    because they would rely on the price being
24    right, their fees being right, the risk metrics

Page 143

1    being right.  They're getting information from
2    the fund, and they are relying on that
3    information being correct.
4  Q  And in your view, is there any difference in
5    what's important to an investor versus what is
6    material to an investor?
7  A  No.
8  Q  Are you offering any opinion on the materiality
9    of the potential misstatements in SBB Funds'
10    performance metrics, the Sharpe ratio, the
11    Sortino ratio, their fees, historical
12    performance representations?
13  A  Not other than the opinions I've expressed in my
14    report.
15  Q  So let's take a look at page 5 of your report.
16    So in paragraph 10C, you say SBB's
17    representations to investors that the SBB Funds
18    were valued in accordance with GAAP would be
19    considered important by a reasonable investor.
20    Do you see that?
21  A  Yes.
22  Q  Can you just explain what you mean -- what
23    opinion you're offering in that paragraph?
24  A  I think it flows from the opinion prior to that,

Page 144

1    that since SBB did not comply with ASC 820, that
2    their financial statements were not prepared in
3    accordance with GAAP.  And I think any investor
4    who is relying or reading SBB's financial
5    statements is doing so with the understanding
6    that they're being correctly represented,
7    calculated according to their representations,
8    and that that's important to investors.
9    And, as I say, SBB's auditor, and as I've
10    talked about earlier, it's the framework of
11    ASC 820 that is important so that funds can be
12    compared against one another and that investors
13    can know that SBB is not relying on just their
14    own subjective considerations; that they're
15    using factors and models that are corroborated
16    by the market.
17  Q  Did you consult any standards in coming to this
18    particular conclusion and opinion in paragraph
19    10C?
20  A  It would be based on my experience as both an
21    expert and an investor and anyone who relies on
22    financial statements.
23  Q  Anything else?
24  A  No.

Page 145

1  Q  And then this is your summary of opinions.
2    Where in your report do you discuss this
3    particular opinion that you're summarizing here
4    in 10C?
5  A  I think it's an opinion that is laced within my
6    every -- kind of page of my report in a way.
7  Q  What do you mean by that?
8  A  Well, SBB was not using why they accepted
9    industry standard accounting methods for
10    calculating the value in their investments.
11    SBB valuations were not done in a way that
12    would allow investors to make comparisons to
13    other similar investments, and SBB was using
14    subjective considerations to reach valuations
15    that were inconsistent with fair value.
16    And all those things, as I say, would be
17    important.  And I describe throughout how those
18    factors were not considered and utilized by SBB,
19    and I describe those in detail, and then the
20    results of those SBB failures.
21  Q  Is there a particular part of the report where
22    you discuss the portion of this paragraph in 10C
23    as to what's considered important by a
24    reasonable investor?

37 (Pages 142 - 145)

Page 146

1 A  I think it comes in maybe more at the end, along
2     with -- I'm trying to think.  The opinion in
3     subpoint J and C are -- but it's also just
4     getting it with the whole "why" of this; right?
5     Why does ASC 820 matter?
6         Well, like, here's why it matters, and
7     that's my opinion.
8 Q  When you reference J, are you talking about
9     paragraph 10J on page 7?
10 A  Yes.  That's some of the effects of SBB models'
11     valuations where those metrics were not reported
12     correctly, and as SBB personnel testified, the
13     valuations were higher than they would have
14     been.  And as pretty well known, SBB offered a
15     fee credit based off of those higher valuations
16     to investors.
17 Q  Did you do any of your own calculations to
18     determine what the appropriate amount of excess
19     fees were based on, what an ASC 820 compliant
20     model would have resulted in?
21 A  No.  They did that for me.  SBB did that for me.
22 Q  Let's take a look at paragraph 47 on page 24 of
23     your report.
24         So here you talk about SBB's

Page 147

1     representations, and you go on to say they are
2     important in the GAAP context.
3         Do you see that?
4 A  Yes.
5 Q  And I won't read the entire paragraph into the
6     record, but explain what you mean in this
7     paragraph.
8 A  Similar to what I just, I guess, was trying to
9     testify to.  There's a reason why SBB represents
10     in its financial statements, in its auditor
11     representation letters and in their valuation
12     policy statement that they are complying with
13     fair value or valuing the notes that they own
14     according to fair value and what that means.
15     And then we represent in their financial
16     statements that they're doing so, that's
17     important to investors and their auditor that
18     their models -- because SBB is ultimately
19     responsible for valuation and for their
20     financial statements, and when they're
21     representing to their investors and their
22     auditor that their valuations are consistent
23     with fair value, those representations are
24     important.

Page 148

1 Q  And your conclusion that those representations
2     are important, is that based on your experience?
3 A  My experience as both an expert and also as an
4     investor.
5 Q  Anything else?
6 A  No.
7 Q  Are you applying any standards here with respect
8     to what's in paragraph 47 to reach your
9     conclusion?
10 A  Well, I would add that -- and it's described in
11     my report.  It's not just ASC 820; right?
12     There's the Investment Company Act talks about
13     fair value and good faith efforts.  The SEC has
14     offered its own commentary on fair value.  So
15     it's not just ASC 820 in a vacuum.  These are
16     fairly well-known concepts that are going into
17     the representations that SBB is making in its
18     financial statements.
19 Q  Is it your opinion that SBB was obligated to
20     comply with the requirements of the Investment
21     Company Act?
22 A  SBB, as I know it, was not a '40 Act Fund, so
23     they might not need to comply with the
24     Investment Company Act of 1940.  But the

Page 149

1     Investment Company Act of 1940, and what it says
2     about good faith efforts of valuing securities
3     for which market quotations are not readily
4     available, is consistent with what's said in
5     ASC 820.  And it's also consistent with what the
6     SEC has commented on regarding fair value.
7 Q  And when you say, The SEC has offered its own
8     commentary on fair value, what are you referring
9     to there?
10 A  I think I outline in my report a couple letters
11     that are pretty widely known in the industry.
12     Where the SEC has offered the market its view of
13     what it takes for a fund or for a company to
14     comply with fair value and the good faith
15     requirements that are called for under the
16     Investment Company Act.
17 Q  And if we look at Appendix B of your report --
18     I'll give you a minute to get there.
19 A  Yeah.
20 Q  Under the regulations enforcement actions and
21     other SEC materials, is that the SEC division of
22     investment management December 1999 and
23     April 2001 letters?
24 A  Yes.

38 (Pages 146 - 149)

Page 150

1 Q  Anything else?
2 A  Those are what I relied on for this report as
3     they describe and provide a little bit more
4     color into what good faith requirements are.
5 Q  Are you offering an opinion in this case with
6     respect to whether anyone at SBB did not act in
7     good faith regarding the SBB model?
8 A  I don't think I make an opinion about whether or
9     not they acted in good faith, but I do make an
10    opinion that their model did not comply with
11    ASC 820 and other fair value guidance.
12 Q  In the two letters that we just talked about and
13    the Investment Company Act materials that you
14    talked about, that's specific to how to get to a
15    fair value; is that accurate?
16 A  Yes.  And what it means to -- what a fund is
17    called on to do regarding fair value -- or
18    especially fair value of securities for which
19    there's not a readily accessible quoted price,
20    that they need to use good faith efforts, again,
21    to come up with fair value or the current exit
22    value.  Not some value they think they can get
23    in the future, but the value that they could get
24    for what they own as of today.

Page 151

1 Q  Do any of those sources that you just
2     referenced, the two letters and the Investment
3     Company Act materials, do any of them provide
4     guidance on what's important to investors?
5 A  I think everything that the SEC says is
6     important to investors in a way.  So they
7     don't -- I would have to look and see the quotes
8     that I use, but I think the SEC is always trying
9     to look at what's important to investors and to
10    the investing community.
11 Q  Let's take a look at page 33 of your report,
12    paragraph 63.
13       Do you see in the sentence in paragraph 63,
14    sort of in the middle of that paragraph, there's
15    a second -- I'll call it a clause that starts,
16    SBB's failures -- or the type of failures that
17    would be materially important to reasonable
18    investors in a private fund like the SBB Funds.
19       Do you see that there?
20 A  Yes.
21 Q  And can you just explain what you mean in that
22    paragraph?
23 A  What I've just said previously, that SBB, by
24    representing to their investors in their

Page 152

1     financial statements, that their funds and the
2     securities that they own are being valued
3     according to fair value would be important
4     because it would tell investors that this is the
5     price at which we could sell the fund if we were
6     going to try to sell the fund today, based on
7     the current market.
8        And we're compliant with ASC 820 and other
9     fair value guidance, and that those -- it's my
10    opinion that SBB failed.  And a lot of that
11    failure is based on their own testimony and
12    their own admissions, and that those failures
13    caused the funds to be overvalued, and the NAVs
14    to be incorrect, and the fees to be incorrect,
15    and the risk return metrics to be incorrect, and
16    that those -- that type of information is
17    important to investors.
18 Q  And you used the term "materially important"
19    here.  I think before you just said "important."
20       Is there any difference in your mind
21    between materially important and important?
22 A  Not with respect to the opinion I'm making.
23 Q  Sort of a redundant term, "materially
24    important"?

Page 153

1        MR. MOYE:  Maybe more for emphasis.
2        THE DEPONENT:  Adverbs are always an issue.
3        No, there's no distinction for me in the
4     opinion I'm making.
5 BY MS. WALLER:
6 Q  And here in the sentence, you say, Materially
7     important to reasonable investors in a private
8     investment fund like the SBB Funds.
9        Is it important, to your opinion, to
10    understand who the investors are in the SBB
11    Funds?
12 A  No.
13 Q  Why not?
14 A  Because I think that SBB's -- well, sorry.  SBB
15    was not a private -- it was not a family office,
16    but they had outside investors, and they are
17    representing to the investors in their financial
18    statements that they're valuing their securities
19    according to fair value accounting rules and
20    fair value guidance, and, therefore, those
21    representations would be important to those
22    investors.  That wouldn't -- my opinion there
23    does not depend on who those investors are, as
24    long as they're outside investors.

39 (Pages 150 - 153)

Page 154

1 Q  Are there -- are you familiar with the types of
2     individuals who invest in private investment
3     funds?
4 A  Yes.
5 Q  Is there a wealth requirement?
6 A  Yes.  That's not something I analyze in this
7     case, and I know that there are different
8     suitability rules and things and disclosures
9     that were made to investors, but my opinions
10    don't differ in that case versus this case.
11 Q  What do you mean by that?
12 A  I'm sorry.  In those cases versus this case.
13        My opinion is just based on what SBB's
14    requirements were related to ASC 820 and how
15    they were representing the values of their
16    funds, and it does not -- my opinions do not
17    matter on the types of investors in those funds.
18 Q  So from your standpoint, the failures that you
19    believe were -- let me start over.
20        SBB's failures, with respect to ASC 820,
21    would be materially important to any investor,
22    retail investor, or investor that qualifies for
23    a private investment fund like the SBB Funds?
24 A  Anybody who is relying on their financial

Page 155

1     statements would -- it's my opinion that those
2     representations that SBB is making about their
3     process and the value of their funds would be
4     important to those investors.
5 Q  Are there any circumstances where you would take
6     into account the types of individuals who are
7     capable or qualified to invest in the particular
8     product when making an opinion on whether
9     something would be important to those investors?
10 A  No, I didn't do that in this case, and I don't
11    know -- it would depend on the case.  But, no,
12    that's not a difference that I would make.
13 Q  Have you ever, in a prior case, I guess -- let
14    me ask this question:  In any other private
15    cases, have you opined on what's important to
16    investors?
17 A  Yes.
18 Q  In what other cases?
19 A  I think I've made that opinion in a number of
20    different cases, but definitely in the other SEC
21    cases I've worked on that deal with ASC 820, as
22    that's kind of an underpinning of why ASC 820 is
23    important.
24 Q  Any cases other than the ones you've worked on

Page 156

1     with the SEC?
2 A  I think whether or not a valuation is done using
3     the market and using the current exit value,
4     whether it be using a DCF model or using Markit
5     models -- there's a lot of valuation I do in the
6     context of my work, and it's always important to
7     know what the value of something is today.
8     That's basically what I'm called on to do in
9     most of my work as an expert.
10 Q  My question was just a little bit different.
11        Other than the cases you've worked on with
12    the SEC, are there any cases where you've
13    offered an expert opinion on what was important
14    to investors?
15 A  Yes, I'm sure there is.  I just can't think
16    specifically of what those cases are, but I
17    think any case involving an investor and a fund
18    or a brokerage firm or an FCM, representations
19    about value are prevalent in all of those cases.
20 Q  And in all of those cases, you think you've
21    offered -- you offered an opinion on the
22    importance of those representations to
23    investors?
24 A  I don't know if I've offered that specific

Page 157

1     opinion, but it's my opinion that those
2     representations are important to investors.
3 Q  In every case that you've worked on?
4 A  I can't think of a case that I've worked on
5     where I say, You know what?  A representation to
6     an investor is not important.
7 Q  And you note in your report that investors in
8     the SBB Funds were restricted from withdrawing
9     their funds until the two-year anniversary of
10    their initial contribution.
11        Do you recall that?
12 A  Yes.
13    MR. MOYE:  Where are you reading from?
14    MS. WALLER:  Paragraph 12.
15    MR. MOYE:  Thank you.
16 BY MS. WALLER:
17 Q  There's a two-year lock-up.  Is that the faster
18    way to say that?
19 A  Yes.
20 Q  Did you take into account the two-year lock-up
21    in your conclusions about what was important to
22    investors in the SBB Funds?
23 A  That's not important in my opinion.
24 Q  Why not?

40 (Pages 154 - 157)

Page 158

1 A  Because regardless of whether or not there's a
2    two-year lock-up, it's my opinion that SBB was
3    obligated to value their funds at fair value or
4    current exit value as of today, regardless of
5    the lock-up provision.
6 Q  And is it your opinion that, regardless of what
7    the deviation from fair value was, it would be
8    important to investors?
9 A  Yes.
10 Q  Is it relevant to your opinion as to what's
11    important to investors that many of the
12    investors in the SBB Funds were Dr. Barnett
13    himself and his family and close friends?
14 A  No.
15 Q  Were you aware of that fact?
16 A  Yes, I was.
17 Q  Do you have any understanding of how much of the
18    amount that got returned to investors actually
19    went to Dr. Barnett himself?
20 A  I think it was probably a lot, based on my
21    knowledge of his family and his family being a
22    large investor in the funds.
23 Q  That didn't have any impact on your opinion one
24    way or the other?

Page 159

1 A  No.
2 Q  So take a look at page 33 of your report.
3       All right.
4       We've already been here.  We're going to
5    move on.
6       Page 63.  Do you see in paragraph 145 --
7    I'm going to point you specifically to the
8    portion on page -- on the second page, page 64,
9    but I'll give you a chance to read the full
10    paragraph.
11       Do you see in the last sentence of that
12    paragraph 145, you say, It's important to
13    investors and auditors that investment funds
14    such as the SBB Funds be reported at fair value
15    or the current exit value.
16       Do you see that?
17 A  I do.
18 Q  And is that opinion based on your experience as
19    an expert and as an investor?
20 A  Yes.
21 Q  Anything else?
22 A  No.
23 Q  Did you consult any standards in reaching this
24    particular opinion in paragraph 145?

Page 160

1 A  Other than ones that I've mentioned previously,
2    including the ASC 820, the good faith
3    requirements to the Investment Company Act, the
4    SEC letters, other things that I've stated with
5    kind of in detail in my report, this is
6    consistent with my expert opinions and other
7    matters and my experience as an investor.
8 Q  And then take a look at page 67.
9 A  Yes.
10 Q  And on page 67, in paragraph 151, you say, It is
11    my opinion that investors generally do care
12    about the interim valuations of investment
13    funds.
14       Do you see that?
15 A  Yes.
16 Q  Is that based on your experience as an investor
17    and an expert?
18 A  Yes.
19 Q  Anything else?
20 A  Other than the things I've also relied on and
21    detailed in my report, ASC 820, the Investment
22    Company Act, the SEC guidance, and my experience
23    as an expert as an investor.
24 Q  Anything else?

Page 161

1 A  No.
2 Q  And there's a reference to Mr. Aven's testimony
3    in paragraph 151.  Am I reading your report
4    right, that you're referring there to the
5    testimony that you quote in paragraph 149?
6 A  Yes.
7 Q  And, so, if you could just read paragraph 149
8    quickly for me?
9 A  Yes.
10 Q  Okay.  So in paragraph 149, the portion of
11    Mr. Aven's testimony that you're quoting here,
12    Mr. Aven is talking about the fact that
13    investors in SBB Funds are longer term
14    investors; is that right?
15 A  Correct.
16 Q  That's referencing, for example, the lock-up?
17 A  Correct.
18 Q  And then in the next paragraph, 150, you say,
19    Defendant Aven's testimony in view of what is
20    important to investors is not consistent with
21    ASC 820 or the SEC guidance related to fair
22    value from the SEC 1999 letter and the SEC 2001
23    letter.
24       That's the letters that we talked about a

41 (Pages 158 - 161)

Page 162

1   few minutes ago?
2   A   Correct.
3   Q   And you say, As ASC dictates -- ASC 820
4       dictates, a company or a fund's intention to
5       hold an asset or sell/fulfill a liability is not
6       relevant when measuring fair value.
7           Do you see that?
8   A   Yes.
9   Q   So here you're making a commentary on the fund's
10      intention to hold the structured notes for a
11      longer period of time; is that right?
12  A   I don't think I understand your question.
13  Q   I'm just trying to understand the sentence that
14      you have in your report here in 150 that starts
15      with, "As ASC 820 dictates."
16  A   Yes.
17  Q   If I understand what you're saying here, this
18      sentence is talking about where you say, A
19      company or a fund's intention.
20          So that would be the SBB Funds' intention
21      to hold its structured notes, and you're saying
22      the intention to hold the structured notes in
23      the fund is not relevant when measuring fair
24      value; right?

Page 163

1   A   That's my opinion, yes.
2   Q   And that's different than what Mr. Aven was
3       saying where he was talking about the lock-up
4       feature for SBB investors in the fund?
5   A   I think it's related.  Because I think Mr. Aven
6       was saying in his testimony -- we're going to
7       get to the same place anyways.  These notes are
8       going to mature, and they're going to be worth
9       what they're worth.  And the interim valuation
10      changes are not important to investors, and the
11      longer you're in the fund, the less those
12      changes are going to be important.  And I think
13      that testimony is directly contradicted by
14      ASC 820, and that's my opinion.
15  Q   When taking -- or when offering your opinion on
16      what's important to investors, did you take into
17      account any of the other disclosures that SBB
18      made to investors in its subscription package?
19  A   No.
20  Q   Do you know what was included in SBB's
21      subscription package?
22  A   I don't think I focus on that, no.
23  Q   Do you know if you reviewed any of them?
24  A   I may have after -- I may have at one point, but

Page 164

1   it wasn't a focus in my opinion.
2   Q   It wasn't something you relied on?
3   A   No.
4   Q   Do you have any understanding of what other
5       disclosures SBB made to its investors?
6   A   Not other than the ones that I've disclosed in
7       my report.  I know they disclosed a fee credit
8       but didn't give, really, a lot of detail on the
9       basis of the fee credit.  And I know -- I know
10      they made some disclosures about the change to
11      their model, and that their current ADV says
12      that they rely on market, but that they're also
13      still responsibility -- they're still
14      responsible for valuation of the fund's
15      investments, and that they can value their funds
16      at a value that's different than Markit if they
17      think that -- M-A-R-K-I-T -- and I think I
18      describe some other disclosures.
19  Q   So other than the disclosures that are
20      referenced in your report, you didn't consider
21      any of the other disclosures that SBB made when
22      offering your opinion on what's important to
23      investors?
24  A   No.  The ones that were important to my opinion,

Page 165

1   I disclose in my report.
2   Q   Do you agree that a reasonable investor would
3       consider the exit price valuation to be
4       important?
5   A   Yes.  That's what I -- the exit price valuation
6       is a principle of fair value, and by valuing the
7       notes at a certain price and representing that
8       valuation to investors, SBB is representing that
9       that be the exit price.
10          MS. WALLER:  I think we've been going about
11      an hour-and-a-half.  Do you want to take a quick
12      break?
13          MR. MOYE:  Sure.
14          MS. WALLER:  Okay.
15          VIDEOGRAPHER:  We are going off the record.
16      The time is 2:30 p.m., and this is the end of
17      media unit 3.
18          (Break.)
19          VIDEOGRAPHER:  We are back on the record.
20      The time is 2:58 p.m.  This is the beginning of
21      media unit 4.
22  BY MS. WALLER:
23  Q   Mr. Hickey, earlier today, you've talked a few
24      times about evidence in the record that you

42 (Pages 162 - 165)

Page 166

1  characterize as consistent in criticizing inputs
2  in SBB's model.
3      Do you remember that?
4  A  Yes.
5  Q  Did you consider that RSM reviewed SBB's model
6  inputs and provided a clean audit opinion?
7  A  I know that they had offered a clean audit
8  opinion at one point, and then they disclaimed
9  that audit opinion later on.
10 Q  Do you know if -- well, how did you take into
11 account that RSM had reviewed the model inputs
12 in contrast to what you described as consistent
13 criticism of the inputs?
14 A  I knew there had been a back and forth with RSM.
15 I saw testimony and exhibits related to that.
16 And as I said before, my focus had been on SBB's
17 valuations and their financial statements, and
18 not on, you know, RSM's view of those.
19     But I did know that, to your question, RSM
20 had offered clean audit opinions of SBB's
21 financial statements that it has since
22 disclaimed.
23 Q  At the time of those audit opinions -- so at the
24 time they issued those audit opinions, that

Page 167

1  would be evidence inconsistent with what you're
2  relying on, which is the criticisms of the
3  input; right?
4  A  I don't think I understand your question.
5  Q  Sure.  So RSM's review of the model inputs and
6  clean audit opinions at the time they issued
7  them, that evidence is contrary to or contrast
8  the evidence that you're accrediting where the
9  inputs are criticized?
10     MR. MOYE:  Objection.  Relevance.
11     THE DEPONENT:  That's correct.  My --
12 again, a focus of mine was on SBB's valuation
13 model.  I know there was another expert that is
14 testifying about RSM, but my recollection is
15 that once RSM became knowledgeable about all of
16 the criticisms and also received the testimony
17 from SBB's individuals, that it disclaimed their
18 audit opinions for, I think, the years 2013
19 through 2017; although that was not a topic of
20 my report, as I think I mentioned earlier.
21 BY MS. WALLER:
22 Q  But you do rely on the record evidence in this
23 case that you characterize as criticizing the
24 inputs; right?

Page 168

1  A  From -- yes, from a variety of individuals that
2  I detail in my report and a chronology that I
3  describe in my report.
4  Q  Is it your opinion that any deviation from
5  ASC 820 is important to investors?
6  A  It can be.  I think -- again, when a fund is
7  representing that its investments are being
8  marked at fair value, it is saying that their
9  financial statements and the valuations of their
10 funds comply with ASC 820, and that that's
11 important type to investors.
12 Q  What type of deviations from ASC 820 would not
13 be important to investors?
14     MR. MOYE:  Objection.  Beyond the scope.
15     THE DEPONENT:  That would depend on the
16 situation.
17 BY MS. WALLER:
18 Q  Can you think of any, sitting here today?
19 A  Not specifically.
20 Q  Have you offered an opinion in any of the work
21 that you've done, consulting or expert
22 testimony, where you looked at a disclosure and
23 said it wasn't important to investors?
24 A  Not that I can think of today.

Page 169

1  Q  How do you determine whether a deviation is
2  significant enough from ASC 820 to consider it
3  important to investors?
4  A  Well, my opinion is the process; right?  And
5  ASC 820 prescribes a process, and it's my
6  opinion that SBB, as I say in my report, didn't
7  -- their fair valuations --
8      (Reporter clarification.)
9  A  SBB's valuations did not comply with ASC 820.
10 So I think it's more of a process failure as
11 opposed to whether there's an individual item
12 that may or may not comply.
13 Q  Would any process failure, in terms of what
14 ASC 820 prescribes, would that be important to
15 investors?
16 A  It should be, again, going back to the
17 underpinning of ASC 820, that following ASC 820,
18 a fund -- if a fund is following ASC 820, it's
19 saying that its valuations comply with that
20 accounting rule and that its valuations are fair
21 value for the securities that the fund holds as
22 of a given point in time, and any deviation from
23 that could be considered important.  I think it
24 would depend on the facts and circumstances of

43 (Pages 166 - 169)

Page 170

1   each individual case.
2 Q  What facts and circumstances would you need to
3     consider?
4 A   It would depend on the case.
5 Q  In this case, what facts and circumstances did
6     you consider?
7 A   I think everything that I considered and
8     detailed in my report.
9 Q  Anything else?
10 A  Like I said, the testimony, the process, the --
11     what ASC 820 calls for, how that's consistent
12     with what -- the Investment Company Act and the
13     SEC have said was important for fair value, and
14     the criticisms that people who reviewed the
15     model at different points in time told to SBB.
16 Q  Were any of those facts and circumstances you
17     just listed more important than others, in your
18     opinion?
19 A  No, I don't think so.  I think they were all
20     important, and I think they all -- let me think
21     about this.
22     It's my opinion that SBB did not comply
23     with ASC 820 because of all the things that it
24     did.  And I describe what those things were and

Page 171

1   how they were consistent over time, and it
2     wasn't one factor that was more important than
3     another, but it was that their process was
4     flawed, which is my opinion.
5 Q  Is there anything that tells you what facts and
6     circumstances you should consider when
7     determining what's important to investors?
8 A  For purposes of what?
9 Q  For purposes of determining what's important to
10     investors with respect to ASC 820.
11 A  Well, like I said before, the fund's disclosures
12     and the fund's disclosures about the fair value
13     of their funds and the valuation of the
14     securities that they own is determined by
15     ASC 820, or should be, because if the fund is
16     complying with ASC 820, it's saying that the
17     securities that we hold in our fund could be
18     sold at those values as of today, and that that
19     representation is important to investors.
20 Q  Is there any standard that you're relying on for
21     purposes of telling you what to look at for
22     what's important to investors for your opinion
23     here?
24     MR. MOYE:  Objection.  Asked and answered.

Page 172

1       THE DEPONENT:  I think I've answered
2     previously that the factors I list in my report,
3     the financial statements of the fund that list
4     the NAVs.  As I say, some of the results of
5     SBB's failures caused their NAVs to be
6     misstated, their risk return metrics to be
7     misstated, their fees charged to investors to be
8     excessive, and the representations they were
9     making to investors were wrong.
10 BY MS. WALLER:
11 Q  Your opinion is not that just that they were
12     wrong.  You're saying that they were materially
13     wrong; right?
14 A  I didn't offer a distinction there.
15 Q  You don't think there's any distinction between
16     whether the representations were incorrect and
17     materially incorrect?
18 A  I think that's going to be up to someone else to
19     decide.  I said that they were incorrect, and I
20     offered my opinion on why they were incorrect
21     and what the results of those failures were.
22 Q  We just went through, prior to the break, where
23     we saw lots of places in your report where you
24     said that those failures were important to

Page 173

1   investors; right?
2 A  Correct.
3 Q  And so it's not -- are you offering an opinion
4     as to whether those particular failures were
5     material to investors or not?
6 A  I'm not offering an opinion on the difference
7     between important and materially important in
8     this matter, no, I'm not.
9 Q  But you are offering an opinion in terms of
10     what's important to investors?
11 A  Correct.
12 Q  And you would agree with me that what's
13     important to investors is the same thing as
14     saying what's material to investors?
15 A  Yes.
16 Q  How -- have you conducted any surveys to
17     understand what's important to investors?
18 A  No.
19 Q  What have you done to understand what's
20     important to investors?
21 A  Again, analyze the record in this case, and
22     using my experience and the guidelines and the
23     accounting rules that I mention in my report.  I
24     describe how the valuations that the SBB Funds

44 (Pages 170 - 173)

Page 174

1  placed on the structured notes they held in the
2  funds -- their funds were not done according to
3  fair value, and how that's important to
4  investors because it tells you that the
5  financial statements and the NAVs of the funds
6  are being misrepresented.
7 Q  Has any of your prior experience involved
8  speaking to investors about what's important to
9  them?
10 A  No.
11 Q  How does your prior experience inform what's
12  important to investors?
13 A  My prior experience in cases like this and,
14  again, my experience as an investor and reliance
15  on financial statements, generally, and
16  specifically for investment funds, informs my
17  opinions expressed in this case.
18 Q  You've never talked to investors or done
19  anything to understand, in that experience, what
20  matters to them?
21 A  No.
22 Q  Your experience has been in how to comply with
23  ASC 820 and valuation; is that right?
24 A  That's correct.

Page 175

1 Q  And you've referenced your own investments.
2  What do you invest in?
3 A  I invest in a number of things.  I mostly invest
4  in funds, mutual funds.  I've invested in some
5  private companies.  I've invested in my own
6  company.  I used to invest in penny stocks.  I
7  don't anymore.  Those sorts of things.
8 Q  You mentioned mutual funds.  Any other type of
9  funds?
10 A  No.
11 Q  Have you ever invested in structured notes?
12 A  No.
13 Q  How does your personal investments inform your
14  opinions in this case?
15 A  It's consistent with my opinions in this case in
16  that whenever I'm looking at an investment that
17  has a valuation, I'm relying on that valuation
18  being correct or being representative of fair
19  value or the value that the fund that I own
20  would get if I called up and said, I want to
21  sell this fund as of today.
22 Q  Is the NAV important to you for the funds that
23  you invest in?
24 A  Yes.

Page 176

1 Q  Is there a particular amount that the NAV would
2  matter to you, one penny difference?
3 A  No.  I'm just -- I'm relying on it being
4  correct.  I'm relying on it being a correct
5  representation of where I could buy or sell that
6  fund or add to my position in that fund as of
7  that time.
8 Q  So one penny difference in a NAV would be
9  important to you as an investor?
10 A  It could be, yeah.
11 Q  Well, when you say "it could be," is there
12  different circumstances?
13 A  I'm relying on the fund that I'm investing in
14  correctly applying fair value guidance and the
15  fair value rules to value that NAV correctly.
16 Q  So if they --
17 A  Any deviation from that would be significant to
18  me.
19 Q  Let's take a look at your opinion, paragraph 10A
20  on page 5.
21     Do you see in 10A, you say, The financial
22  statements for the SBB Funds were not prepared
23  in accordance with GAAP.
24     Do you see that?

Page 177

1 A  Yes.
2 Q  What is that based on?
3 A  That they did not comply -- SBB did not comply
4  with ASC 820 in the valuation of the structured
5  notes in its funds.
6 Q  And is it your opinion that any deviation from
7  ASC 820 in the valuation of structured notes
8  would render financial statements not prepared
9  in accordance with GAAP?
10     MR. MOYE:  Objection.  Asked and answered.
11     THE DEPONENT:  It could.
12 BY MS. WALLER:
13 Q  What do you mean by "it could"?
14 A  It depends if they were deemed to be in
15  compliance.  And if they weren't in compliance,
16  what the nature of that failure was and how it
17  was corrected and when it was corrected.  It
18  would really depend on the facts and
19  circumstances of a case.  I can't say with
20  certainty that all deviations from ASC 820,
21  regardless of how big or how long they occurred,
22  would cause a financial statement to not be
23  prepared in accordance with GAAP.
24     But here I'm making the opinion that SBB

45 (Pages 174 - 177)

Page 178

1    did not comply with ASC 820 and other fair value
2    guidance in the valuation of the funds during
3    this time period, and that their financial
4    statements, because of those failures, were not
5    prepared in accordance with GAAP.
6 Q    If SBB used just one of the inputs that you're
7    criticizing in your report, would that be enough
8    to be a -- to say that SBB did not comply with
9    ASC 820?
10 A    It could.
11 Q    You aren't able to say, sitting here today,
12    whether it is or not?
13 A    No.
14 Q    You didn't evaluate the impact of any individual
15    input; is that right?
16 A    No. No.
17 Q    And same with respect to whether the financial
18    statements for the funds were prepared in
19    accordance with GAAP.  Did you do anything to
20    evaluate whether any one single input that
21    you're criticizing would, in itself, render the
22    financial statements not prepared in accordance
23    with GAAP?
24 A    It's my opinion that SBB did not comply with

Page 179

1    ASC 820 in their process, their valuation
2    process, over this time period.  That's
3    consistent with -- that's my own independent
4    opinion.  It's consistent with the allegations
5    in this complaint.  Whether or not one failure
6    or using one input versus another was what drove
7    them into noncompliance, I don't have an opinion
8    about that.  I have an opinion about their
9    process not meeting ASC 820 throughout the
10    entire time period, and that that caused their
11    financial statements to not be prepared in
12    accordance with GAAP.
13 Q    When you use the word "process," do you mean
14    their model or something else?
15 A    Their model.
16 Q    And you only evaluated, in terms of the model,
17    which particular input or combination of inputs
18    rendered it not in compliance with GAAP?
19 A    There were a number of inputs.  I think I list
20    them in my report.  And SBB personnel have
21    testified that none of them were corroborated by
22    the market, and they used historical volatility,
23    which is an unobservable input under ASC 820,
24    and not preferred over implied volatility, and

Page 180

1    that those factors and the application of those
2    factors in the SBB model caused the SBB
3    valuations to not be compliant with ASC 820.
4 Q    Is your opinion here that the financial
5    statements for the SBB Funds were not prepared
6    in accordance with GAAP, does that rely at all
7    on the amounts that were actually recorded in
8    SBB's Funds' financial statements?
9 A    It would be reliant on those amounts not being
10    representative of fair value as they were being
11    reported at that time.
12 Q    But you didn't do any calculations to
13    determine -- let me start over.
14        You're not offering an opinion with respect
15    to what fair value was for each of the notes;
16    right?
17 A    No.
18 Q    You're not offering an opinion with respect to
19    when you take the different notes that went on
20    to each of the different financial statements
21    for the funds, what the combination of those
22    deviations from fair value, what the amount of
23    misstatement was on the financial statements;
24    right?

Page 181

1 A    Other than the fact that SBB then revalued all
2    the notes using Markit, M-A-R-K-I-T, and offered
3    a fee credit to investors based off of those
4    Markit valuations, it's my opinion that those
5    valuations, the Markit valuations, were
6    compliant with ASC 820, as compared against the
7    earlier SBB model valuations that were not
8    compliant with ASC 820.
9 Q    So you -- did you review the actual Markit model
10    that Markit uses for valuing SBB's structured
11    notes?
12 A    I reviewed a description of the Markit model and
13    some of the inputs that the Markit model -- that
14    Markit uses to value structured notes or
15    structured products and then options, generally.
16 Q    And is it your opinion that the Markit model is
17    a market-based model?
18 A    Yes.
19 Q    Is it your opinion that the Markit model was
20    consistent with ASC 820?
21 A    Yes.
22 Q    And you reviewed SBB's May 2016 model; is that
23    right?
24 A    I reviewed the results from the May 2016 model

46 (Pages 178 - 181)

1    that SBB represented to the SEC after it adopted
2    those changes from the deficiency letter that
3    the SEC had included, and that the results of
4    the May 2016 model led to, I think, a one
5    million dollar fee credit.
6  Q   Did you do an independent evaluation, though, of
7    the SBB's May 2016 model to come to a conclusion
8    with respect to whether that particular model
9    was consistent with ASC 820?
10 A   No, other than the fact that if their
11   application of the model is consistent with how
12   they were representing to the SEC, they were
13   changing the SBB model, it was -- it is my
14   opinion that the May 2016 model is compliant
15   with ASC 820.
16 Q   But you didn't actually look at the May 2016
17   model to check that?
18 A   Just the description of it.  And, actually, I
19   think I summarized some results that I saw in
20   the record from the application of the May 2016
21   model versus the earlier SBB model.
22 Q   Did you do any calculations to determine for
23   yourself that SBB's calculations of the credit,
24   based on the 2016 model, was accurate?

1  A   No.  I just relied on SBB's representations that
2    it was making to the SEC in response to the
3    deficiency letter.
4  Q   Did you review the Super CC model?
5  A   I did.
6  Q   And is it your opinion that the Super CC model
7    is a market-based model?
8  A   Yes.
9  Q   Is it your opinion that the Super CC model was
10   consistent with ASC 820?
11 A   Yes.
12 Q   And let's take a look at paragraph 146 of your
13   report.  So here's where you talk about the
14   amount of excess -- excessive fees.
15      Do you see that?
16 A   Yes.
17 Q   And so the first credit that we were talking
18   about previously, which is the May 2016 model to
19   the SBB model, that's 1.03 million; right?
20 A   Yes.
21 Q   And that -- you did not review the 2016 model or
22   recalculate that 1.03 million to confirm if
23   that's an accurate amount or not; right?
24 A   No.

1  Q   But you believe the May 2016 model is ASC
2    compliant; right?
3  A   If the model was run according to the
4    representations made to the SEC in response to
5    the deficiency letter, then it would be ASC 820
6    compliant.  I'm not sure whether or not it was.
7  Q   And there's also a reference to a 1.42 million
8    number.
9       What's that?
10 A   That's using the Markit model.  That's the
11   ultimate fee credit that SBB gave to investors
12   based on its adoption of the Markit model, as
13   compared against the fees that those investors
14   had been charged previously under the SBB model.
15 Q   And it looks like you cite an investigative
16   testimony exhibit for footnote 195.  Is that
17   your support for the 1.42 million?
18 A   I believe that it is.
19 Q   Did you do anything to verify the accuracy of
20   the calculation of the 1.42 million?
21 A   No.
22 Q   Are you offering an opinion in this case as to
23   whether the 1.42 million or the 1.03 million
24   credit is more appropriate?

1  A   I think it would be my opinion that it was --
2    1.42 million would be more appropriate because
3    that is the valuation that is used using the
4    Markit model, M-A-R-K-I-T, and that's the same
5    model that SBB has continued to use.  And it's
6    my opinion that that model, based on my analysis
7    of this description of that model, is
8    ASC 820-compliant.
9  Q   Do you know if any of the difference between the
10   1.42 million and the 1.03 million is a timing
11   issue?
12 A   I do not know.
13 Q   Do you know what time period the 1.03 million
14   credit covers?
15 A   I don't know.
16 Q   Do you know what time period the 1.42 million
17   covers?
18 A   I believe the 1.42 million credit covers 2011
19   through 2016.
20 Q   And if SBB had decided to adopt the May 2016
21   model as opposed to the Markit model, do you
22   think it would be more appropriate for the fee
23   credit to be 1.03 million?
24 A   I think that depends on what model they

Page 186

1 ultimately chose to adopt and if it could be
2 verified that the May 2016 model was actually
3 ASC 820-compliant, as they were representing to
4 the SEC at that time.
5     I do know that the SBB decided to, after
6 consultation with PWC, to adopt a third party
7 model and not use their own internal May 2016
8 model.
9 Q  Well, at least you would agree that at least one
10 of the reasons why the 1.03 million is different
11 than the 1.42 million, one of the reasons for
12 that is because the May 2016 model provides
13 different for -- values than the Markit model;
14 is that accurate?
15     MR. MOYE: Objection.  Foundation.
16     THE DEPONENT:  It could.  I don't know the
17 details of the initial credit.  I know how SBB
18 represented to the SEC that it was utilizing the
19 May 2016 model, and the results that came from
20 its utilization of the May 2016 model, including
21 the metrics described in table 4, and also the
22 fee credits that they issued that were
23 ultimately superseded by the fee credits that
24 they issued pursuant to the Markit model.

Page 187

1 BY MS. WALLER:
2 Q  Different models -- well, let me start over.
3     Two models, both of which are compliant
4 with ASC 820, could yield different fair values
5 for the same structured note; is that right?
6 A  That's correct.
7 Q  Both of them would still be a fair value?
8 A  Yes.
9 Q  Would you agree there's a range of fair values
10 that could result from an ASC 820
11 compliant-model?
12     MR. MOYE: Objection.  Calls for
13 speculation.
14     THE DEPONENT:  I wouldn't agree with the
15 range.  I would agree that a fund can apply
16 ASC 820, including using a model.  And as long
17 as it's compliant with ASC 820 -- all the
18 reasons I list in my report -- maximizing the
19 use of the observable inputs; minimizing the use
20 of unobservable inputs; making sure the inputs
21 to the model are Markit corroborated -- it can
22 come up with its determination of fair value
23 that could be different than another market
24 participant's same application of a model under

Page 188

1 similar situations, and -- but usually a fund
2 will -- and the SBB Fund being one of them --
3 they don't offer a reasonable range of
4 valuation.  They offer one number for their NAV
5 and the value of their individual funds.
6 BY MS. WALLER:
7 Q  And I'm not asking about what SBB or any
8 particular fund offers in terms of an individual
9 valuation.  I'm saying in terms of fair value,
10 would you agree that if there are multiple
11 different models, each of which comply with
12 ASC 820 but result in different fair values, you
13 could end up with, when you're trying to
14 evaluate what a fair value is, many different
15 fair values within a particular range?
16     MR. MOYE: Calls for speculation.
17     THE DEPONENT:  I'm not sure who the "you"
18 is in your question.  But, like I said, there
19 could be two different models that come up with
20 two different valuations, but it's my experience
21 that funds don't issue a reasonable range of
22 NAVs.  They offer one NAV.  They don't offer a
23 reasonable range of a note value in a fund.
24 They offer one value of a note they hold in the

Page 189

1 fund, and it's that value that should be
2 determinative of fair value as of a given date.
3 BY MS. WALLER:
4 Q  Have you ever offered expert testimony on what
5 the fair value of a particular asset is in a
6 fund?
7 A  Yes.
8 Q  And do you offer one single value as what the
9 one fair value is, or have you ever offered a
10 range of fair values?
11 A  I usually offer one opinion on fair value.  I've
12 offered a value of an equity interest in a
13 company in a range.  But I'm just saying funds
14 in their financial statements usually offer one
15 value for the fund they're valuing, and the
16 security is within that fund.
17 Q  I understand that.  I'm not asking you about
18 what a fund does in their financial statements.
19 A  Sure.
20 Q  I'm asking about if you are looking at the
21 question of what fair value is; right?
22 A  Yes.
23 Q  You're holding yourself out as an expert in
24 ASC 820; right?

48 (Pages 186 - 189)

Page 190

1  A   Yes.
2  Q   ASC 820 is to get to a fair value; right?
3  A   Yes.
4  Q   Can you get to a range of values that would be a
5      fair value based on using models that are
6      compliant with ASC 820?
7      MR. MOYE:  Objection.  Asked and answered.
8      THE DEPONENT:  You could, and you could say
9  if it's determined that fair value was between
10  30 percent and 50 percent of the actual
11  valuations that were placed in the fund, that
12  would then result in a range.  And I'm sure I've
13  offered opinions in previous cases of the
14  results of those valuations and the range that
15  would be the result of those calculations.
16  BY MS. WALLER:
17  Q   And when a firm is making judgments about the
18      inputs that they're selecting for purposes of a
19      valuation model, you would agree that requires
20      judgment as to what inputs to select?
21  A   Judgment with reference to the market and
22      market-corroborated inputs.
23  Q   Are you familiar with the term "an accounting
24      estimate"?

Page 191

1  A   Yes.
2  Q   Is fair value, for purposes of valuing these
3      structured notes, an accounting estimate?
4  A   It could be, but I think fair value, like I say
5      in my report, is a value that is -- the value a
6      fund could receive upon a current sale of the
7      security that they own or the current exit
8      value.  And whether or not that's defined to be
9      an accounting estimate, it's usually not my
10      experience that that's how a fund like the SBB
11      Fund would characterize their values in their
12      financial statements.
13  Q   Would the process of valuing notes, like the
14      structured notes here at issue, be an
15      approximation of the amount that a market
16      participant would get for the current exit
17      price?
18  A   Correct.  You might not get that price.  Just
19      like you might not get the price that Vanguard
20      values, you know, 50 million shares of Microsoft
21      stock (OTT) in a Vanguard Fund, but ASC 820
22      says, regardless, you got to value those
23      50 million shares of Microsoft at the current
24      market price, knowing full well you're not going

Page 192

1      to get that value for all 50 million shares.
2      Similarly, you have to utilize a process
3      for Level 2 and Level 3 assets that comes up
4      with an estimate of the value that you could get
5      as of the certain date using the processes laid
6      out in my report that very well might not be the
7      value that you get if you actually did go and
8      sell a note in the market at that time.
9  Q   Would you agree there's no precise way to
10      measure the value -- the fair value of the
11      structured notes like SBB Funds have?
12  A   I think I could agree with that, as long as the
13      process is being followed.  The precision of the
14      valuation is not as important.  It's more of the
15      process that's important.
16  Q   What is that view based on?
17  A   My experience, other opinions I've offered in
18      cases, and my knowledge of what fair value means
19      in the answer I gave you to the previous
20      question, I think.
21  Q   Any other cases experience that you're relying
22      on other than the matters you've worked on with
23      the SEC?
24  A   I think I said earlier that most of my career

Page 193

1      has been focused on valuation.  So I think that
2      most of my career has been relevant to the
3      opinions that I'm expressing in this case.
4  Q   Did you conduct any analysis in this matter to
5      identify which specific notes in the SBB Funds
6      are overvalued?
7  A   I think it's been discussed by SBB personnel
8      that most of the notes would be overvalued.  And
9      I think Mr. Deetz's report that I analyze -- and
10      the tables to Mr. Deetz's report shows that very
11      conclusion, that all the individual notes, or
12      most of the individual notes, based on the SBB
13      model as compared against the Markit model were
14      over value.
15  Q   But did you do any work yourself to identify
16      which notes were overvalued in comparison to the
17      market?
18  A   No.  Again, my opinion was focused on ASC 820
19      and SBB's procedures and whether or not their
20      model complied with ASC 820.
21  Q   In your prior work as an expert or in your
22      consulting work, have you prepared valuations of
23      securities?
24  A   Yes.

49 (Pages 190 - 193)

Page 194

1 Q   And how have you gone about valuing the
2     securities?  Do you do your own model?
3 A   It depends on the case.
4 Q   Do you calculate your own independent valuation,
5     though, of those securities in your experience?
6 A   I have.
7 Q   That's not what you did here, though; right?
8 A   I wasn't asked to conduct valuations of the
9     securities in this case.
10 Q  And the basis for your opinion that the
11    structured notes were overvalued was based on
12    SBB's own calculations?
13 A  That's correct.
14 Q  I'm going to take a look at pages 64 to 65 of
15    your report.
16       So in paragraph 147, you refer to a
17    spreadsheet that compares several performance
18    and risk metrics for Polysight.
19       Do you see that?
20 A  Yes.
21 Q  And what's Polysight?
22 A  Polysight was the fund that SBB was marketing to
23    outside investors.
24 Q  Did SBB have other funds?

Page 195

1 A   Yes.
2 Q   Did you do anything to review the performance
3     and risk metrics for the other SBB Fund?
4 A   No.
5 Q   And where did you get the spreadsheet that you
6     reference here in paragraph 147?
7 A   In documents that were produced to me.
8 Q   From the SEC?
9 A   Yes.
10 Q  Did you ask -- or do you have any understanding
11    of where that spreadsheet came from?
12 A  I believe reviewing the documents that were
13    produced to me and then also after reviewing
14    Mr. Deetz's report and his reference to this
15    same document, that it was produced pursuant to
16    a subpoena by SEC -- by SBB to the SEC.
17 Q  When you -- before reviewing Mr. Deetz's report,
18    when you were doing your own work prior to
19    issuing your report, did you do anything to
20    evaluate the reliability of the information in
21    table 4?
22 A  No.  I looked at the table 4 and the document
23    that was produced to me, and it was making the
24    point that I'm making with respect to the

Page 196

1     differences in the May 2016 model versus SBB's
2     model and also that those, as represented by
3     SBB, were also -- the May 2016 model was giving
4     similar indications to bank quotes that they had
5     received for the valuation of their notes.
6 Q   You reference -- and you've referenced a few
7     times today the bank notes.
8        Did you do anything to evaluate that the
9     bank notes for the structured notes at issue in
10    this case were, in fact, fair value?
11 A  No, other than the fact that -- I think the
12    point I'm making here is that they're fairly
13    consistent with the results that SBB was getting
14    from the May 2016 model, that it was
15    representing to the SEC, was reflecting the
16    changes that the SEC laid out in the deficiency
17    letter, and that these results are consistent
18    with the bank quotes.  And that's the point I'm
19    making in table 4.
20 Q  Have you reviewed the models that any of the
21    banks use to result in those bank quotes that
22    you're relying on here?
23 A  No.
24 Q  Are the valuation models proprietary that the

Page 197

1     banks use?
2 A   I'm sure they are.
3 Q   Have you ever seen one ever in your experience?
4 A   I've seen reference to multiple models in
5     multiple bank financial statements, and usually
6     banks make most of their models proprietary.
7 Q   So when you say you've seen reference to them,
8     what does that mean?
9 A   I've seen reference to -- in the pricing
10    supplements, in this case, I've seen reference
11    to the banks running their own models to come up
12    with fair value of the notes under current
13    market conditions.  And as I outlined in my
14    report, those fair values, the banks in a
15    secondary transaction could be different and
16    will be different than the valuations they were
17    placing on the notes at issuance.
18 Q  In your opinion, does the pricing supplements
19    provide sufficient information to a market
20    participant to understand the models the banks
21    use to come to a conclusion with respect to
22    whether those models are compliant with ASC 820?
23 A  Well, I think a bank would be complying with
24    ASC 820 in its model of any asset that it holds

50 (Pages 194 - 197)

Page 198

1  or any liability that it holds on its balance
2  sheet, because most banks make similar
3  representations that SBB is making, that its
4  valuations are compliant with ASC 820.
5      To your earlier part of your question, the
6  details of the model were not described in
7  detail in the pricing supplements, but I think
8  it's assumed that the bank is using a model that
9  would be compliant with ASC 820 because it has
10  to mark the notes on their balance sheets at
11  fair value.
12 Q  Other than an assumption based on the bank's
13  disclosure that it's reflecting fair value, is
14  there anything else that would give a market
15  participant an understanding of whether those
16  disclosures were, in fact, true?
17 A  Well, I think that was consistent with the SBB
18  personnel's testimony related to the bank quotes
19  or the bank values that the issuing banks were
20  placing on the notes they were issuing to SBB
21  and how the banks had a continuous obligation to
22  mark those notes at fair value.
23 Q  Is there anything that someone looking at the
24  bank's disclosures would be able to do their own

Page 199

1  independent verification that the bank models
2  comply with ASC 820?
3      MR. MOYE:  Objection.  Calls for
4  speculation.
5      THE DEPONENT:  Besides relying on the
6  bank's representations, no.
7 BY MS. WALLER:
8 Q  And earlier today we were talking about
9  determining what a market input would be.  Have
10  you ever heard of a firm going to another firm
11  in the market to ask for what their model inputs
12  are?
13 A  Yes.
14 Q  When have you heard of that?
15 A  I worked on a case a number of years ago
16  involving natural gas options, and an electric
17  company owned significant positions in a
18  portfolio of natural gas options, and they
19  regularly surveyed the market and took a survey
20  of brokers and then compared those quotes
21  against a service like Markit, or Totem is
22  another one that's referred to.
23      So it's something that's commonly done.
24 Q  And other than this example, the electric

Page 200

1  company -- let me just ask:  Is the electric
2  company, is that a public utility?
3 A  Yes.
4 Q  Other than this one example, do you have any
5  other experience in firms going out and
6  surveying other firms that trade in similar
7  assets?
8 A  Yes.
9 Q  What other experience?
10 A  I've worked on another natural gas case that
11  involved that exercise.  I've worked on a lot of
12  cases over the years involving commodity
13  positions and different positions that are
14  valued by funds, and that part of the experience
15  of those funds, especially where Markit
16  quotations were not readily accessible or maybe
17  to compare valuations against readily accessible
18  Markit quotes or their models, they went out and
19  surveyed the market to get quotes from market
20  participants as to at what value they would buy
21  those positions from the funds.  So it's
22  commonly done.
23 Q  Is it your opinion that SBB could have gone and
24  done that here in this case?

Page 201

1 A  I don't know if I offer that opinion
2  specifically, but I think that they could
3  have -- they definitely could've checked with
4  the market on their model and tried to get
5  quotes from market participants on the
6  valuations that other market participants would
7  buy the notes that SBB held.
8      So it's possible, yes.
9 Q  You didn't do that, though, for your work;
10  right?
11 A  No, I did not.
12 Q  If you were going to do it for your work, what
13  market participants would you go to?
14 A  I don't know.  The banks who issued the notes
15  potentially.  Other market participants that I
16  could try to find who owned similar notes.
17 Q  Do you have any understanding of who that would
18  be?
19 A  No.
20 Q  Whether they would be competitors of SBB?
21 A  They could be, or it would be other people in
22  the market, or, like I said earlier, I think,
23  what they ultimately did, which was go to Totem,
24  and that's -- sorry -- Totem.  Markit.  And

51 (Pages 198 - 201)

Page 202

1    that's what Markit is doing.
2        If you look at where Markit gets its data,
3    it's getting its data through a survey process.
4  Q  Other than Markit, anybody else?
5  A  There are similar services to Markit.  Markit is
6    not the only third party out there available to
7    get options pricing.
8  Q  You mentioned survey to get options pricing, but
9    what about specific to the type of structured
10    notes?  What other market participants would you
11    go to for -- specifically for the types of
12    structured notes here?
13  A  Well, as SBB describes their model, it's -- they
14    break the model down -- they break the note down
15    into its component options and value those
16    options.  So the main input for those option
17    valuations would be the implied volatilities for
18    those options.
19  Q  Did you study the SBB model itself to come to
20    your own understanding of what the component --
21    components of the SBB model are and what the
22    main input -- or what the main inputs for the
23    valuation would be?
24  A  That was a topic that was covered, in my

Page 203

1    understanding, by Mr. McCann.  But as I outline
2    in my report, I analyzed SBB's own description
3    of its model and what it relied on, and I
4    offered my opinion after reviewing that model
5    and the testimony of the SBB personnel, who were
6    responsible, was building that model and running
7    that model, that the input they relied on were
8    not market-corroborated inputs, and that the
9    model did not comply with ASC 820.
10  Q  And just to be clear, did you review the model
11    itself, or did you review the description -- a
12    description of the model?
13  A  Both.
14  Q  If we could just go back to table 4 here.
15        When was table 4 -- well, table 4 is based
16    on the document that's in footnote 197; right?
17  A  Correct.
18  Q  When was the document in footnote 197 created?
19  A  It has a title that indicates 2016, 0516.
20  Q  Other than the date that's in the title, do you
21    have any understanding of when it was created?
22  A  I don't.
23  Q  Do you know if that date -- when it was last
24    modified?

Page 204

1  A  I don't.
2  Q  Do you know if -- it says, V1.
3        Do you know if there were other versions?
4  A  I don't.
5  Q  Did you ask whether there were other versions or
6    if this was the final version before you relied
7    on it?
8  A  No.
9  Q  What years did the data in table 4 relate to?
10  A  Well, given the description of it, I think some
11    of the underlying data within this spreadsheet
12    was not in this table.  I believe it's 2011
13    through 2016; although it could be 2015.  I'm
14    just not sure offhand.
15        It was really just showing the results of
16    the model versus -- the SBB model, which is the
17    point that I was trying to make in including
18    this table in my report.
19  Q  Do you know if the information in the document
20    in footnote 197 was ever provided to investors
21    in the SBB Fund?
22  A  I don't know.
23  Q  Do you know if the information that's in the
24    document in footnote 197 was ever provided to

Page 205

1    prospective investors?
2  A  I don't.  I saw some testimony that said that
3    there were -- some new investors were getting an
4    updated track record.  Old investors were not
5    getting an updated track record.  They were
6    getting a fee credit.  There was not really a
7    disclosure of the source of the fee credit or
8    details of it.  So the disclosures to investors
9    were somewhat confusing, as I recall.
10  Q  You don't know whether this particular
11    information here that you're including as part
12    of your opinion was actually shared with
13    investors?
14  A  I don't know that it was.
15  Q  And are you offering an opinion today with
16    respect to whether the information in table 4
17    was important to investors?
18  A  I think I offer the opinion that all information
19    is important to investors, as testified about
20    earlier.  I think this was showing the results
21    of using the May 2016 model.  And as I indicate,
22    using these results that were produced by SBB to
23    the SEC, it shows that the May 2016 model was
24    more in line with the valuations from the bank

52 (Pages 202 - 205)

Page 206

1    quotes and different from the indications that
2    were provided previously by the SBB model.
3  Q   What do you mean "all information is important
4    to investors"?
5  A   Well, investors rely on information that's
6    reported to them in the financial statements for
7    funds that they own.
8  Q   But you don't know whether this information was
9    actually provided to investors or not?
10 A   I don't know how this information, if at all,
11   was provided to investors.  As I said earlier, I
12   think -- I recall testimony that some of the
13   marketing materials to new investors reflected
14   an updated track record, and that old investors
15   did not necessarily get an updated track record
16   based on the different models that SBB
17   ultimately applied to the notes.
18 Q   And is it your opinion that this particular set
19   of information in table 4 is important to
20   investors or something different than that?
21 A   I don't know if I offered an opinion that this
22   table, in and of itself, was important to
23   investors.  But, again, it's showing the risk
24   metrics of the fund, the return of the fund, the

Page 207

1    total return, the standard deviation.  All of
2    those things, it's my opinion, are important to
3    investors.
4  Q   If you turn to page 67 of your report, you talk
5    about the NAV and other relevant risk measures.
6        Do you see that?
7  A   Yes.
8  Q   And are you offering an opinion specifically
9    with respect to whether the NAV and these other
10   measures that SBB, in fact, reported to
11   investors was important to them?
12 A   I think I offer an opinion that they are
13   important to them.
14 Q   And what is that based on?
15 A   It's based on compliance with ASC 820, fair
16   value guidance from the SEC and the Investment
17   Company Act, my experience working as an expert
18   in cases similar to this one.  And as I said
19   earlier, my general valuation experience, and my
20   experience relying on financial statements, and
21   my experience also as an investor relying on the
22   NAV of funds that I own in my own investment
23   portfolios.
24 Q   And where in your report do you disclose what

Page 208

1    NAV and what performance and risk-related
2    measures were, in fact, disclosed to SBB
3    investors?
4  A   I think the NAV is reported on the financial
5    statements, and then I believe that the
6    investors received statements at different
7    points in time showing what the NAV was of the
8    individual fund that they own.
9  Q   And are you offering an opinion with respect to
10   each one of the NAVs in the SBB Funds' financial
11   statements?
12 A   I think I offer the opinion that since the SBB
13   Funds were not complying with ASC 820, their
14   financial statements, including their NAVs, were
15   not prepared according to GAAP, and that those
16   representations that SBB was making to investors
17   related to fair value of the notes held in the
18   SBB Funds were misrepresented to investors and
19   to its auditor.
20 Q   But I don't see the actual NAVs that you're
21   saying were misrepresented to investors in your
22   report.  Are you just saying all NAVs were
23   misrepresented?
24 A   I think the SBB financial statements were

Page 209

1    misrepresented.  The NAV is part of that
2    financial statement.
3  Q   And what is that opinion based on?  Any
4    calculations or analysis that you did?
5  A   That SBB failed to apply ASC 820 to the notes
6    that they held in their funds.
7  Q   So they failed in the process?
8  A   Correct.
9  Q   You didn't evaluate whether -- you didn't do any
10   evaluation of the actual numbers that were
11   reported?
12 A   No.
13       MS. WALLER:  I think we've been going for
14   an hour-and-a-half.  Do you want to take a quick
15   break?
16       MR. MOYE:  Sure.
17       MS. WALLER:  And we'll try to wrap up in
18   the next -- why don't we go off the record.
19       VIDEOGRAPHER:  We are going off the record.
20   The time is 3:58 p.m.
21       (Break.)
22       VIDEOGRAPHER:  We are going back on the
23   record.  The time is 4:13 p.m.
24   \\\

53 (Pages 206 - 209)

Page 210

1 BY MS. WALLER:
2 Q  Mr. Hickey, with respect to the opinions that
3    we've talked about today that you're offering on
4    what was important to investors, is that based
5    on accounting materiality?
6 A  ASC 820 doesn't call for materiality analysis.
7 Q  I'm not sure that quite answers my question,
8    though.
9       So your opinions with respect to what's
10    important to investors, is that based on
11    accounting materiality or not?
12 A  It's my -- sorry for the "maybe not" answer, but
13    my opinion is based on the fund's application of
14    ASC 820, and my opinion is that ASC 820 does not
15    call for materiality analysis; therefore, I
16    don't think that the SBB Funds' representations
17    that its fund values were compliant with ASC 820
18    or fair value. Any deviation from those or
19    failure to apply ASC 820 would be important to
20    investors.
21 Q  So if ASC 820 doesn't call for a materiality
22    analysis, how do you know, under ASC 820, what's
23    important to investors?
24 A  Because investors rely on financial statements

Page 211

1    being accurate.
2 Q  Are you relying on any other -- anything other
3    than your experience for that?
4 A  My experience -- again, my ASC 820 fair value
5    guidance from the Investment Company Act, the
6    SEC guidance that I cite in my report, and the
7    representations that SBB made to both its
8    investors and its auditor that its financial
9    statements were compliant with GAAP and
10    reflected the fair value of the notes that were
11    held in the SBB Funds during the relevant time
12    period.
13 Q  So when you say "ASC 820 doesn't call for a
14    materiality analysis," would you agree that
15    ASC 820 doesn't tell you what's important to
16    investors or not?
17 A  ASC 820 is telling funds and companies how to
18    fair value the securities they own in their
19    funds, and that my -- it's my opinion that fair
20    value is important to investors.
21 Q  Let's take a look at an exhibit we'll mark as
22    135.
23       (Exhibit No. 135 marked.)
24  \\\

Page 212

1 BY MS. WALLER:
2 Q  Mr. Hickey, are you familiar with what I've
3    marked as Exhibit 135?
4 A  Yes.
5 Q  What is it?
6 A  It appears to be topic 105.
7 Q  ASC 820 --
8 A  Generally Accepted Accounting Principles, 105.
9 Q  So ASC105?
10 A  Correct.
11 Q  Did you review this as part of the materials you
12    reviewed in preparing your report in this
13    matter?
14 A  I don't think that I did.
15 Q  Have you ever relied on ASC 105 in your prior
16    work as an expert or a consultant?
17 A  I don't know that I have.
18 Q  You can't remember an instance where you relied
19    on it?
20 A  I can't remember an instance, no.
21 Q  Have you reviewed it previously?
22 A  I don't recall.
23 Q  If you turn to page 2, I'm going to read from
24    ASC 105. I believe it's 10-5 subpart 6.

Page 213

1 A  Okay.
2 Q  "The provisions of the codification need not be
3    applied to immaterial items."
4       Do you see that?
5 A  Yes.
6 Q  What is your understanding of what that means?
7 A  I don't have an understanding of what that
8    means. I don't know what's referred to as the
9    codification. It's speaking, generally, to FASB
10    Accounting Standards.
11 Q  Do you have any understanding of how this
12    particular part of ASC 105 applies when
13    considering whether a disclosure complies with
14    GAAP or not?
15 A  I don't think that it would apply. I think
16    the -- like I said before, the disclosure that I
17    focused on was a disclosure about fair value,
18    and that was based on ASC 820. And it's my
19    opinion that the SBB testimony, and then also
20    their model, their application of the model, did
21    not comply with ASC 820.
22 Q  You didn't take into consideration that the
23    provisions of ASC 820, which is -- let me start
24    with this: You would agree with me that ASC 820

54 (Pages 210 - 213)

Page 214

1    is one of the provisions of the codification?
2        MR. MOYE: Objection. Foundation. Calls
3    for speculation. Argumentative.
4        THE DEPONENT: ASC 820 is an accounting
5    rule, as I've described it in my report, that
6    deals with fair value, and I don't agree, I
7    guess, that this one provision in 105-5-6 says
8    that ASC 820 includes a materiality analysis.
9        So I don't agree with the application of
10   this codification to ASC 820.
11 BY MS. WALLER:
12 Q  Let me go back to my original question. I asked
13   you whether ASC 820 is one of the provisions of
14   the codification.
15       Do you have any understanding of whether
16   that statement is true, setting aside Exhibit
17   135?
18 A  Yes, it is.
19 Q  Your counsel made objection to foundation, so do
20   you have any experience or understanding of
21   ASC 105?
22 A  I don't think -- again, I've applied ASC 820 and
23   other fair value guidance. ASC 820 is an
24   accounting rule and fair value guidance. In my

Page 215

1    work in this case, I did not refer to this 105.
2  Q  I understand you didn't here, but do you have
3    any experience or understanding of ASC 105?
4  A  No. I think this is just describing the
5    standards just generally.
6  Q  Do you have any experience with ASC 105? That's
7    my specific question.
8  A  Not that I can recall.
9  Q  In your opinion, in your report, one of the
10   opinions that you offer is the financial
11   statements -- and I'm reading from page 5,
12   Summary of Opinions 10A, The financial
13   statements for the SBB Funds were not prepared
14   in accordance with GAAP.
15       Do you see that?
16 A  That's correct.
17 Q  Do you consider yourself an expert in GAAP?
18 A  With respect to ASC 820, yes.
19 Q  With respect to any other provision of GAAP?
20 A  It would depend on the case. But for this case,
21   I can only think of ASC 820 as the provision
22   that is relevant to my opinions here.
23 Q  Would you agree with me that all -- all
24   provisions of the codification would be part of

Page 216

1    GAAP?
2  A  Yes.
3  Q  Are there any -- in your understanding, are
4    there any other parts of GAAP that you relied on
5    for purposes of your opinion here that the SBB
6    Funds' financial statements were not prepared in
7    accordance with GAAP?
8  A  Only ASC 820.
9  Q  You didn't take into account any other parts of
10   the ASC in that 10A opinion?
11 A  That's correct.
12 Q  You don't have any view in terms of how ASC 105,
13   this provision, subpart 6, would matter for
14   purposes of what's important to an investor?
15 A  I don't offer an opinion about 105.
16 Q  You offer opinions on what's important to
17   investors; right?
18 A  According to ASC 820 and the financial
19   statements that were prepared by the fund.
20 Q  And in your view, ASC 820 doesn't tell you
21   anything about what's important to investors?
22 A  ASC 820 doesn't have a materiality analysis.
23   ASC 820 describes a process that has to be
24   followed by funds and financial companies and

Page 217

1    companies that hold different assets in their
2    portfolios, and I describe in detail how SBB
3    failed to comply with ASC 820.
4  Q  But ASC 820 doesn't tell you what parts of it is
5    and isn't, or even that all parts of it are
6    important to investors, does it?
7  A  ASC 820 prescribes a process that funds have to
8    follow in order for their valuations to be
9    considered fair values, and it's my opinion that
10   fair values and funds' representations of fair
11   values are important to investors.
12 Q  But ASC 820 doesn't tell you that. That's your
13   opinion based on your experience; right?
14 A  My experience and my work in other matters and
15   the application of ASC 820 in similar cases to
16   this, and the application of ASC 820 to
17   financial statements for investment funds but
18   then also most companies -- public companies out
19   there.
20       MS. WALLER: Let's mark Exhibit 136.
21       (Exhibit No. 136 marked.)
22 BY MS. WALLER:
23 Q  Mr. Hickey, are you familiar with what's been
24   marked as Defendants' Exhibit 136?

55 (Pages 214 - 217)

Page 218

1  A  Yes.  It appears to be SEC Staff Accounting
2     Bulletin: 99 - Materiality.
3  Q  And did you review this SAB 99 in connection
4     with preparing your report?
5  A  No.
6  Q  Have you reviewed it prior to today?
7  A  I don't recall.  I don't think so.
8  Q  Have you ever offered an opinion on materiality,
9     applying SAB 99?
10 A  I don't think that I have.
11 Q  Have you ever worked in a consulting role,
12    evaluating importance to investors applying
13    SAB 99?
14 A  As I previously testified, I've worked on
15    securities fraud cases that involved the
16    restatement of financial statements from public
17    companies, and those restatements have been
18    done, I think, pursuant to SAB 99.
19 Q  So in those instances, you applied SAB 99 in
20    your analysis?
21 A  I didn't apply it, but I'm familiar with its
22    application or others' application of it.
23 Q  Have you ever consulted in a matter where you
24    had to apply SAB 99?

Page 219

1  A  I don't believe so.
2  Q  Did you evaluate or review, in this case, RSM's
3     analysis of SAB 99 with respect to the
4     structured notes in this case?
5  A  I did not.  That was the topic another expert
6     analyzed.
7  Q  And what other expert is that?
8  A  I don't recall.  I know that there's an
9     accounting expert.  His name is escaping me
10    right now.
11 Q  When did you become aware that he was offering
12    that opinion?
13 A  I don't recall exactly.
14 Q  Was it before you offered your opinion, or was
15    it after you offered your opinion?
16 A  I think I was -- I think I knew that there was
17    an accounting expert, and that there was, like,
18    a model calculation, or Mr. McCann.  And there's
19    two other experts that were doing their own
20    independent analysis of other topics in the
21    case, like I did my own independent analysis of
22    ASC 820.  I forget exactly when I came to that
23    knowledge of the accounting expert being
24    retained.

Page 220

1  Q  But specifically with respect to being retained
2     to provide an opinion with respect to SAB 99,
3     did you have an understanding of whether any
4     other SEC expert was going to provide an opinion
5     on applying SAB 99 before or after reviewing
6     Mr. Deetz's report?
7  A  I don't know.
8  Q  You don't have any recollection?
9  A  I recall that there was a rebuttal expert to
10    Mr. Deetz.  I don't recall -- I did not see that
11    expert report.  I don't know the topics that
12    were covered by that expert.  I would imagine
13    that it might relate to SAB 99, but I don't
14    know.
15 Q  If you turn to page 2 of Exhibit 136, do you see
16    the second full paragraph from the bottom.  It
17    starts with, The use of a percentage.
18       Do you see that?
19 A  Yes.
20 Q  And, sort of, call it three-fourths of the way
21    down, one-half to three-fourths of the way down
22    the paragraph, there's a sentence that starts,
23    Materiality concerns.
24       Do you see that?

Page 221

1  A  I do.
2  Q  It says, Materiality concerns the significance
3     of an item to users of a registrant's financial
4     statements.
5        Do you agree with that statement?
6  A  Say that again.  Sorry.
7  Q  Materiality concerns the significance of an item
8     to users of a registrant's financial statements.
9  A  I guess I agree with that statement.  It wasn't
10    a part of my opinion in this case, but I don't
11    have a problem with that sentence.
12 Q  And the next sentence says, A matter is, in
13    quotes, "material" if there is a substantial
14    likelihood that a reasonable person would
15    consider it important.
16       Do you see that?
17 A  Yes.
18 Q  And do you agree with that statement?
19 A  I think this is all premised on there being a
20    misstatement.  And it's, again, focused on
21    auditors and what would constitute a material
22    misstatement, given that there was a
23    misstatement.
24       My opinion was focused on ASC 820.  Like I

56 (Pages 218 - 221)

Page 222

1    said, it doesn't focus on materiality or discuss
2    materiality, and so I -- I don't really have a
3    lot of opinions about this document.
4         I'm sorry. I'm not trying to be difficult,
5    but I don't --
6  Q  In the prior cases that you referenced, the
7    securities cases that you referenced, that you
8    mentioned, these SAB 99 came up, did those
9    involve an auditor's determination of a
10   registrant's determination of materiality?
11  A  Well, a company, as I say in my report, is
12   always responsible for their own financial
13   statements. So it would be a company's
14   restatement discussed in conjunction with their
15   auditor. But, again, those would've been on
16   security fraud class action cases that result
17   from companies restating their financials and
18   whether or not those restatements were related
19   to fraud allegations. That's been my work with
20   respect to this topic. But it was not relevant
21   to my topic in this case.
22  Q  Is it your opinion that SAB 99 is relevant only
23   to numbers in a financial statement and not
24   other disclosures?

Page 223

1  A  I don't offer an opinion about that.
2  Q  Do you have a view or an understanding one way
3    or the other?
4  A  I don't have a view on that.
5  Q  You don't have any understanding whether SAB 99
6    applies to evaluate materiality of both the
7    numbers and the financial statements and other
8    disclosures?
9  A  I know that from reading this and from reading
10   Mr. Deetz's report, that there's quantitative
11   and qualitative factors under SAB 99.
12  Q  Did you have any understanding, prior to reading
13   Mr. Deetz's report, that there's quantitative
14   and qualitative aspects of materiality?
15  A  I've seen that referred to before, but, again,
16   that wasn't a consideration or something that I
17   thought was important of the opinions that I'm
18   expressing in this case.
19  Q  Because you didn't do any evaluation of
20   quantitative misstatements in this case; is that
21   right?
22  A  No, I did an analysis of SBB's valuation and
23   relate -- with respect to ASC 820 and whether or
24   not their valuations were compliant with

Page 224

1    ASC 820, and the importance of those
2    representations. And I offered a lot of
3    opinions about that topic and the results of
4    their noncompliance with ASC 820.
5         So this SAB 99 is not something that I
6    looked at and not something that I thought was
7    relevant to my opinion.
8  Q  In offering an opinion on the importance of
9    SBB's representations, did you consider any of
10   the qualitative factors that are identified in
11   SAB 99?
12  A  What are you referring to exactly?
13  Q  Do you have any understanding what I mean when I
14   say "qualitative factors"?
15  A  I'm wondering where you are specifically. I
16   know that there's some quantitative factors,
17   like these thresholds, and then qualitative
18   factors. But, again, this was not something
19   that I relied upon for purposes of my opinion,
20   and it wasn't my view that I had to rely upon
21   this.
22  Q  I'm going to point you to some of the footnotes
23   in SAB 99. Take a look at footnote 2 to SAB 99
24   on page 9 of 14.

Page 225

1         Do you see that?
2  A  Yes.
3  Q  And it says, As used in this SAB 99,
4    misstatement or omission refers to a financial
5    statement assertion that would not be in
6    conformity with GAAP.
7         Do you see that?
8  A  Yes.
9  Q  Do you consider the representations that you're
10   opining on in this case to be a financial
11   statement assertion that is being referenced
12   here in footnote 2?
13  A  No. I think -- not necessarily. I think it's a
14   little broader than that. I think that my
15   assertion is that SBB was disclosing in its
16   financial statements that it marked its notes at
17   fair value, according to the current exit value,
18   that it determined those notes to be worth at
19   the valuation date. And it's my opinion that
20   they did not comply with ASC 820, and because of
21   that noncompliance, their financial statements
22   were not prepared in accordance with GAAP.
23         So I did not refer to this -- it says, As
24   used in this SAB 99.

57 (Pages 222 - 225)

Page 226

1    I didn't use this SAB 99 in my opinion.
2 Q  Do you have any understanding of whether your
3    opinions with respect to noncompliance with GAAP
4    would be a misstatement or omission that is
5    being referenced here in SAB 99?
6 A  I don't think it's as simple as that.  I think
7    it's, again, noncompliance with ASC 820 that was
8    the focus of my report and not this materiality
9    bulletin.
10 Q  You didn't evaluate whether the representations
11    that you opine are inaccurate in the financial
12    statements that you opine were not prepared in
13    accordance with GAAP, whether those were
14    misstatements or omissions that are addressed by
15    SAB 99?
16 A  No, and I don't think that I had to.
17 Q  Why not?
18 A  Because ASC 820 does not call for materiality
19    analysis.
20    MS. WALLER:  Why don't we just change tapes
21    real quick.
22    (Break.)
23    VIDEOGRAPHER:  We are going off the record.
24    The time is 4:38, and this is the end of media

Page 227

1    unit 4.
2    (Break.)
3    VIDEOGRAPHER:  We are going back on the
4    record.  The time is 4:39 p.m., and this is the
5    beginning of media unit 5.
6 BY MS. WALLER:
7 Q  Do you have any understanding of whether SAB 99
8    distinguishes between process noncompliance with
9    a particular GAAP standard or the presentation
10    of financial statements that result from it?
11 A  I'm just looking at the front page.  It says
12    right here, Misstatements are not immaterial
13    simply because they fall beneath a numerical
14    threshold.
15    So to me, that would be -- a process
16    failure could fall under that statement, and I
17    don't -- I don't believe that SAB 99 was
18    relevant to the opinions that I expressed in my
19    report and the opinions that I'm testifying to
20    today.  I don't think ASC 820 calls for
21    materiality analysis.  And as I detail in my
22    report, the SBB Fund failed to comply with
23    ASC 820 for all the reasons that I list over an
24    extended time period, and that when those

Page 228

1    failures were determined by its auditors, they
2    disclosed their audit opinion for the years that
3    covered my analysis.  So they considered it
4    significant.
5 Q  Is it your view that --
6 A  Am I disclaimed?  Sorry.
7 Q  Is it your view that your opinions with respect
8    to what is important to investors does not
9    require application of SAB 99?
10 A  That's correct.
11 Q  Are you offering a legal opinion with respect
12    to -- from a legal perspective, what's important
13    to investors?
14 A  I'm not offering any legal opinions.
15 Q  Have you ever seen any financial statements that
16    state or represent that their financial
17    statements are free from all misstatements?
18 A  I don't know.
19 Q  Have you ever seen that before?
20 A  I don't know.  I don't recall.  That would be --
21    I think that would be a bold assertion to make,
22    but I don't -- I don't recall.
23 Q  Why is that?
24 A  Well, there could be a misstatement, sure.

Page 229

1    That's a possibility.  Again, if it's determined
2    a misstatement, it is determined to be
3    immaterial.  Like here, maybe it doesn't need to
4    be -- a company's financial statements don't
5    need to be restated, but I don't -- I don't
6    really offer any opinions about that type of
7    statement.
8 Q  And when you have seen analysis of whether
9    financial statements need to be restated, you
10    saw that SAB 99 was used to make that
11    determination?
12 A  I've seen applications of SAB 99 for companies
13    restating their financial statements; that's
14    correct.
15 Q  Are you familiar with FASB Concept Statement
16    Number 2?
17 A  I don't know offhand.
18 Q  Is that something that you considered in your
19    analysis?
20 A  No.
21 Q  Is that something that you consider yourself an
22    expert in?
23 A  No.
24 Q  And what about SEC Staff Accounting Bulletin:

58 (Pages 226 - 229)

Page 230

1    108?  Did you consider SAB 108 as part of your
2    opinions in this case?
3  A  No.
4  Q  Do you consider yourself an expert in SAB 108?
5  A  No.  Maybe parts of it; but, no.  I've not
6    applied it in my expert work.
7  Q  You have applied it?
8  A  I have not in my expert opinions, as I can
9    recall.
10 Q  Thanks.
11     I want to go back to talk a little bit
12   about applied volatility.  Prior to finalizing
13   your report, did you confirm whether the Chicago
14   Board Options Exchange lists five year S&P 500
15   Index Options expirations during the time period
16   at issue in this case?
17 A  No.  I think my point was that up to five years
18   of expirations can be listed.  I know that's
19   probably not the case that they're always
20   listed, but that the point that I was trying to
21   make there is that observable inputs for both
22   the Russell 2000 Index Options and the S&P 500
23   Index Options, it underlied that SBB notes were
24   available.

Page 231

1  Q  They were available for less than five-year
2    periods; right?
3  A  They could be available for different types of
4    periods from which market participants would
5    then interpolate and extrapolate to get the
6    implied volatility for the option that they
7    owned.
8  Q  And if they had to extrapolate and interpolate,
9    does that make it observable or non-observable?
10 A  Less observable, but based off of an observable
11   input.  And I think my opinion was that the
12   starting point of implied volatility is very
13   important to me, and also with respect to
14   ASC 820.  Because the implied volatility of an
15   S&P 500 Index Option and a Russell 2000 Index
16   Option is giving the current market's view of
17   the volatility of that option, and the
18   historical volatility is not.
19 Q  I don't know that I've seen the term "less
20   observable" in ASC 820.
21     Does ASC 820 distinguish between more or
22   less observable, or are there black and white
23   categories of observable and non-observable?
24 A  I don't think it's necessarily black and white.

Page 232

1    I think ASC 820 maximizes the use of observable
2    inputs and minimizes the use of unobservable
3    inputs, noting that certain observable inputs,
4    for instance, implied volatility, could be more
5    observable for near-term maturities and
6    expirations than later-term maturities and
7    expirations.
8  Q  And other than going to the websites that you
9    identify in your report, did you do anything to
10   actually verify that the -- that the expirations
11   at issue were relevant to the SBB notes were
12   actually available during 2011 to 2015?
13 A  No.  I think my opinion is that those implied
14   volatilities, and as I describe a volatility
15   surface based on the implied volatilities for
16   those index options would be available, and
17   that's exactly what Markit is providing, and
18   that's what SBB could've gotten during the
19   entire time period they owned the notes.
20 Q  Were you aware at the time you issued your
21   report that the CBOE does not list five-year
22   Russell 2000 Index Options expirations today?
23 A  That could be the case.  I think my opinion was
24   that the CBOE and the CME offered implied

Page 233

1    volatilities or options on these indices for up
2    to five years, and that's what the contract
3    specifications that I've reviewed showed.  It
4    wasn't my opinion that they were definitely
5    going to be options listed for all five years
6    necessarily at all points in time.
7  Q  So when you say that the options are widely
8    traded in your report, is that more generally
9    speaking, or are you speaking about all of the
10   options that underlie the SBB notes that are at
11   issue here?
12 A  No.  I think I'm saying that options on S&P
13   500S&P Index -- on the S&P 500 Index and the
14   Russell 2000 are widely traded every day by
15   market participants all over the world, and
16   those provide observable inputs for the implied
17   volatilities of those options.
18 Q  But are those the options that are specific to
19   the SBB notes here?
20 A  Not necessarily, no.
21 Q  Did you review Mr. Deetz's report with respect
22   to implied volatility and whether it was
23   observable or unobservable?
24 A  Yes.  I reviewed Mr. Deetz's report.

59 (Pages 230 - 233)

Page 234

1  Q   Did you have -- do you intend to offer any
2      opinions in this report specific to responding
3      to Mr. Deetz's report on implied volatility?
4  A   I have not been asked to offer a rebuttal
5      opinion to Mr. Deetz's report.
6  Q   Do you have a view on whether Mr. Deetz is right
7      or wrong with respect to implied volatility for
8      the SBB notes is observable or unobservable?
9  A   I believe he's wrong.  I believe that, you know,
10     he didn't -- first of all, he didn't respond to
11     most of my opinions.
12         So my opinions, as I've expressed in my
13     report, were unrebutted by Mr. Deetz's report.
14     But, again, as I mentioned -- I thought I
15     mentioned previously, and as I state in my
16     report, implied volatility is always preferred
17     over historical volatility, knowing that the
18     implied volatility of an S&P 500 Index Option, a
19     Russell 2000 Index Option that's closer to
20     maturity, that's closer to at the money, is
21     going to have more observable implied
22     volatilities than ones that are further out on
23     the volatility surface.
24         But that implied volatilities should be --

Page 235

1      for those further-out options, should be based
2      using the current market volatility, which is
3      from the implied volatility measure.
4  Q   And, again, I'm asking you specifically about
5      Mr. Deetz's opinion with respect to implied
6      volatility.
7          Anything else that you thought Mr. Deetz
8      got wrong?
9  A   I don't -- do you want to show me Mr. Deetz's
10     report?  I don't really recall the details
11     offhand of what he says in that section right
12     now.  Sorry.
13         VIDEOGRAPHER:  We are going off the record.
14     The time is 4:51 p.m.
15         (Break.)
16         (Exhibit No. 137 marked.)
17         VIDEOGRAPHER:  We are back on the record.
18     The time is 4:54 p.m.
19  BY MS. WALLER:
20  Q   Mr. Hickey, I've marked for the record Exhibit
21     137, which is Mr. Deetz's report.
22         Are there any other criticisms of
23     Mr. Deetz's opinion with respect to implied
24     volatility that you haven't already referenced?

Page 236

1  A   I don't believe so.  I haven't offered a
2      rebuttal opinion.
3          I'm not understanding your question, I
4      guess.
5  Q   Is there anything else, when you reviewed
6      Mr. Deetz's report, that you thought he got
7      wrong in this particular section on Implied
8      Volatility?
9  A   If this is the section -- the only section that
10     discusses implied volatility, then, no, this
11     will be the section that I thought he got wrong.
12  Q   And did you think he got it wrong for any other
13     reasons other than what you've already told me?
14  A   Well, I think refreshing -- this refreshes my
15     memory.  In paragraph 54, he says, Hickey is
16     incorrect to suggest that implied volatility for
17     all the SBB notes for all periods is observable.
18         I never made that opinion.  I never had
19     that opinion.  And I said that SBB should've
20     maximized the use of observable inputs of which
21     implied volatility would be one for its model as
22     called for by ASC 820, and that implied
23     volatilities for S&P 500 Index Options and
24     Russell 2000 Index Options are widely available,

Page 237

1      and those are the volatilities that SBB is
2      getting from Markit currently.
3          And I think Mr. Deetz's table in paragraph
4      62 shows a volatility surface that would be used
5      by looking at observable prices and then
6      interpolating from observable prices to
7      determine the implied volatilities for options
8      further out on the curve, especially --
9      according to this Bloomberg screen, there's some
10     volatilities that are being projected from the
11     observable 10 years in the future.  And that's
12     what Markit does using the current implied
13     volatilities which come from the current prices
14     of S&P 500 Index Options and Russell 2000 Index
15     Options.
16         And so in paragraph 61, when he shows the
17     CBOE Russell 2000 Index, and shows trades with
18     expirations of a year or less and trades with
19     expirations of greater than a year over the time
20     period, that's in no way profound.  That's very
21     well known.
22         Options with expirations within a year are
23     more observable and have more volume than
24     options further out.  But options with

60 (Pages 234 - 237)

Page 238

1    expirations within a year that are being traded
2    that should be calibrated to get the
3    volatilities for the options that are further
4    out.  And that's what ASC 820 calls for, and
5    that's what Markit does, and that's what market
6    participants do when they value options.  They
7    don't use historical volatility, they use
8    implied volatility and then interpolate from and
9    extrapolate from those volatilities to get
10   volatilities for whatever maturity they own.
11 Q   Where in ASC 820 does it say some inputs are
12     more or less observable?
13 A   I think it says that Level 2 are more observable
14     than Level 3, and Level 1 are more observable
15     than Level 2, and they discuss a continuum, but
16     they're not exactly closed boxes, if you will.
17 Q   Closed boxes between Level 1, Level 2, and Level
18     3?
19 A   Correct.
20 Q   And for long-dated volatility inputs, do you
21     agree that would be Level 3, or would that be
22     somewhere in between Level 2 and Level 1, or in
23     Level 2?
24 A   It would depend on the market, and it would

Page 239

1    depend on the view of someone that was trading
2    in that market and potentially someone that was
3    investing in this market, but you can't say with
4    a bright line what is -- which maturity would be
5    Level 2 versus Level 3.
6 Q   And for the Markit model, IT Markit model that
7     SBB is currently using, SBB discloses that
8     long-dated volatility is unobservable.  Do you
9     disagree with that?
10 A   I don't disagree with that.
11 Q   Have you done any analysis of -- from the period
12     2011 to 2016 for the time period of your report
13     whether the volatility that would be appropriate
14     under ASC 820 for an ASC 820-compliant model was
15     observable or unobservable?
16 A   I don't understand your question.  I'm sorry.
17 Q   Have you done any analysis specific to the notes
18     that are at issue in this case and whether the
19     appropriate volatility, based on complying with
20     ASC 820, would be observable or unobservable?
21 A   I think I've made the opinion that using
22     historical volatility is unobservable in all
23     instances and that implied volatility for these
24     index options were observable for some options

Page 240

1    that are traded for these indexes, and that the
2    longer-dated options, although less observable,
3    would still be based off of those observable
4    volatilities as I describe in my report.
5 Q   You didn't identify which options were, in fact,
6     observable specific to the notes that we're
7     talking about here?
8 A   It's going to change over time; right?  Because
9     as I show in my report, there's a table that
10    catalogs Exhibit 2, catalogs the notes that
11    they're holding with a weighted average
12    maturity, or weighted average expiration of
13    three years, that's from the date that they buy
14    the notes.  But that three years becomes two
15    years, and then one year, and then half a year,
16    and then a few days, and those values are going
17    to converge over time to a more observable
18    option series.  But that's not to say that the
19    current option prices are irrelevant or
20    unobservable for purposes of valuing the options
21    that the SBB notes hold.
22 Q   Let's take a look at paragraph 10 of your
23    opinion on page 5.
24 A   Yeah.

Page 241

1 Q   For paragraph 10B, SBB's model for valuing
2    structured notes was an option valuation
3    exercise.
4       For that particular subpart of your
5    opinion, are you relying on the record evidence
6    in this case?
7 A   Yes.
8 Q   Are you relying on anything else?
9 A   I'm relying on the record evidence, their
10    testimony, but my own review of that record
11    evidence and my agreement that they're running
12    an options valuation model from my review of
13    that evidence.  So my experience is part of what
14    I'm relying on.
15 Q   Anything else?
16 A   No.
17 Q   And on page -- bottom of page 5, there's 10D,
18    Between 2011 and 2016, SBB had no experience
19    with ASC 820 or fair value guidelines.
20       Do you see that?  And it spills over into
21    page 6.
22 A   Yes.
23 Q   What are you relying on -- what's the basis of
24    your opinion for 10B?

61 (Pages 238 - 241)

Page 242

1  A  Again, that's my review of the record, but my
2     opinion is based on my experience and reading
3     the record and the testimony that was provided
4     and also the supporting documents that I
5     describe in that section of my report that shows
6     that no one at SBB had any real valuation
7     experience.
8  Q  What experience did you need to understand the
9     evidentiary record to conclude that SBB had no
10    experience with ASC 820 or fair value
11    guidelines?
12 A  Well, my previous experience with ASC 820 and
13    its application to funds, its application by
14    companies, and my experience reading testimony
15    and reviewing documents in other matters as well
16    that would describe the valuation abilities that
17    other fund managers have.
18 Q  What other fund managers did you compare SBB to
19    to come to this conclusion?
20 A  Any fund manager I've ever analyzed in a case.
21 Q  Can you name any examples?
22 A  The other SEC matters I've worked on.
23 Q  Anything else?
24 A  Not that I can recall offhand.

Page 243

1  Q  Did you review, as part of your work in this
2     case -- and I didn't see it in your Appendix B,
3     so I'll just tell you that -- did you review the
4     testimony or the deposition of an individual
5     named Lindsay Simon?
6  A  I don't recall if I reviewed her deposition, but
7     I am familiar with who she is.
8  Q  How are you familiar with who she is?
9  A  I refer to Simon Compliance in my report in the
10    section that describes the lack of a valuation
11    function at SBB.  And that prior to May of 2014,
12    they didn't have a valuation policy statement,
13    and that they reached out to her in order to get
14    one, and they wanted an abbreviated version of
15    one, or something that they could utilize, and
16    she said that's significant.  You can't just do
17    an abbreviated.  So I refer to her and her
18    company's involvement with SBB related to their
19    valuation.
20 Q  You didn't think it was relevant to read her
21    testimony, her deposition testimony in this
22    case?
23 A  Again, I don't remember if I reviewed it.  But
24    if I don't list it in Appendix B, I probably did

Page 244

1     not.  Again, I focused on SBB and their
2     valuations of the structured notes that were
3     held in their funds, and it was my -- it's my
4     opinion that they had the responsibility and the
5     authority, as they state, to value those
6     securities at fair value and report those
7     valuations accordingly.
8  Q  But did you rely on Ms. Simon's statements that
9     you just referred to in your prior answer.  She
10    said that's significant.
11       Where are you getting that from?
12 A  Sorry.  Maybe misspoke.  If we go to my report,
13    I --
14 Q  Go to page 46.
15 A  Okay.  Yeah.  In the section that I'm talking
16    about, the lack of knowledge of valuation at SBB
17    and that -- its interactions with its compliance
18    consultant in which they had not put together a
19    valuation policy statement prior to this was
20    evidence to me that they didn't have a developed
21    valuation function at the firm.
22 Q  So how did you decide when you rely on emails
23    from somebody who is not at SBB versus their
24    testimony?

Page 245

1  A  I think I reviewed that in conjunction with some
2     of the other opinions I was offering in this
3     case, and it was -- this contemporaneous email
4     was consistent with my independent review of the
5     testimony from, again, that I focused on from
6     the SBB individuals that were charged with
7     valuation at the fund, and that this is
8     indicative of support of that opinion that I'm
9     making.
10 Q  So you focused on the SBB testimony.  But when
11    you saw other evidence that supported it, you
12    relied on that too; is that fair?
13 A  I think this is consistent with that testimony.
14 Q  I understand.
15 A  Yeah.
16 Q  I'm asking you -- you keep saying that you're
17    focused on SBB; right?
18 A  I was, yes.
19 Q  But you understood SBB through the testimony of
20    other people outside of SBB; correct?
21 A  In some instances, but I think most of my
22    opinion related to their valuation processes is
23    focused on their own testimony and my review of
24    their policies and procedures, and that this --

62 (Pages 242 - 245)

Page 246

1   again, this is support for the opinion I'm
2   making, that they don't have a valuation policy
3   prior to this even though they made significant
4   investments in structured notes and represented
5   the valuations of those structured notes to
6   its -- their investors. And that as of this
7   date, they don't even have a valuation policy
8   statement.
9 Q   How did you make a determination of when to
10   focus on SBB's testimony versus somebody else's
11   testimony?
12 A   I don't really think that there's an either/or
13   there. I looked at the entire record and looked
14   at -- again, I did focus on the SBB testimony
15   and the SBB testimony related to valuation
16   because that was the topic that was the focus of
17   my report. So I didn't make a determination of,
18   Oh, I need to look at this versus that.
19      This is something that I looked at that was
20   consistent with the opinion that I was making,
21   and consistent with the testimony that I
22   outlined earlier to this point in this same
23   section of my report.
24 Q   Let me just make sure the record is clear.

Page 247

1      You said in your prior answer, "I looked at
2   the entire record."
3      You looked at the documents that are
4   referenced in Appendix B; right?
5 A   That's correct.
6 Q   You understand that there were other
7   testimony --
8 A   That's correct.
9 Q   -- written discovery and documents produced that
10   you didn't look at; right?
11 A   That's correct.
12 Q   So when you say you looked at the entire record,
13   you mean the entire record of what's reflected
14   in Appendix B?
15 A   I relied on what's reflected in Appendix B,
16   that's correct.
17 Q   And you made determinations of, I'm going to
18   look at, for example, Mr. Keen's testimony from
19   PWC, but I'm not going to look at Ms. Simon's
20   testimony from Simon Compliance?
21 A   I don't think I made a determination one way or
22   the other there. I think of whether what was --
23   whether one was more relevant than the other.
24      Again, my focus was on the SBB testimony

Page 248

1   and the exhibits that supported that testimony
2   and my experience -- and ASC 820, and my
3   experience with valuation and application of ASC
4   820. And I, you know, offered my independent
5   review of the record that I reviewed and offered
6   the support for the opinions that I was making.
7 Q   So, for example, on page 45, you see table 3?
8 A   Yes.
9 Q   Where did table 3 come from?
10 A   I created table 3.
11 Q   Based on what?
12 A   My review of the testimony.
13 Q   And anything other than that?
14 A   The exhibits to the testimony, the chronology of
15   the communications with the SEC and others, but
16   mostly I think table 3 is a summary of
17   paragraphs 89 to 94 more or less.
18 Q   And paragraphs 89 to 94 cite to Dr. Barnett's
19   testimony, Mr. Navalgund's testimony, Mr. Aven's
20   testimony, and Mr. Kiefer's testimony; right?
21 A   Correct.
22 Q   That's what you relied on in putting together
23   table 3?
24 A   Correct.

Page 249

1 Q   Did you consult with any opinion -- I'm sorry --
2   did you consult with any standards to reach your
3   opinions here in paragraphs 89 to 96?
4 A   ASC 820. Other fair value guidance that I
5   describe in my report, and my experience working
6   on matters similar to this, and the application
7   of ASC 820 by fund managers and people involved
8   in funds.
9 Q   In going back to paragraph 10 of your report,
10   for subpart E where you say, SBB did not attempt
11   to comply with ASC 820 when they created the SBB
12   model.
13      Are you offering an opinion on what SBB and
14   the individuals at SBB were thinking at the
15   time?
16 A   They testified they didn't know what ASC 820
17   was. So I don't know how they would comply with
18   it if they didn't know what it was.
19 Q   Are you offering an opinion, though, as to what
20   they were thinking at the time?
21 A   I think I offer an opinion later in the report
22   that their valuation methodologies were focused
23   on more of an economic model, and that Mr. Aven
24   and Mr. Navalgund say we didn't reconcile that

63 (Pages 246 - 249)

Page 250

1 against the accounting. I think I detail a lot
2 of support for this statement that I make -- or
3 this opinion that I'm making.
4 Q And is the support for it the record evidence
5 that you reviewed?
6 A That's correct.
7 Q Anything else?
8 A No. Whatever my support for this opinion is
9 listed in my report.
10 Q It's in the footnotes of your report?
11 A Correct.
12 MS. WALLER: Can we go off the record, and
13 I'll just see if we have anything else.
14 VIDEOGRAPHER: We are going off the record.
15 The time is 5:16 p.m.
16 (Break.)
17 VIDEOGRAPHER: We are back on the record.
18 The time is 5:32 p.m.
19 MS. WALLER: Mr. Hickey, I don't have any
20 questions -- any further questions. Thank you
21 for your time today.
22 THE DEPONENT: Thank you.
23 MR. MOYE: Nothing from the SEC.
24 VIDEOGRAPHER: We are off the record at

Page 251

1 5:32 p.m., and this concludes today's testimony
2 given by Peter Hickey.
3 The total number of media units used was
4 five and will be retained by Veritext.
5 Thank you everyone.
6 (Signature reserved.)
7 (Video deposition concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 252

1 CERTIFICATE
2
  I, Richard D. Ehrlich, a Certified Shorthand
3
  Reporter of the State of Illinois, CSR License No.
4
  084-2019, do hereby certify that I stenographically
5
  reported the proceedings had at the video deposition,
6
  as aforesaid, and that the foregoing transcript is a
7
  true and accurate record of the proceedings had
8
  therein.
9
    IN WITNESS WHEREOF, I do set my hand at
10
  Chicago, Illinois, this 3rd day of January, 2024.
11
12
13  Richard D. Ehrlich
    Certified Shorthand Reporter
    License No. 084.004018
14
15
16
17
18
19
20
21
22
23
24

Page 253

1        Veritext Legal Solutions
          1100 Superior Ave
2            Suite 1820
          Cleveland, Ohio 44114
3         Phone: 216-523-1313
4 January 3, 2024
5 To: Robert Moye
6 Case Name: Securities And Exchange Commission v. SBB Research Group,
  LLC, Et Al.
7
  Veritext Reference Number: 6352243
8
  Witness: Peter Hickey Deposition Date: 12/18/2023
9
  Dear Sir/Madam:
10
  The deposition transcript taken in the above-referenced
11
  matter, with the reading and signing having not been
12
  expressly waived, has been completed and is available
13
  for review and signature. Please call our office to
14
  make arrangements for a convenient location to
15
  accomplish this or if you prefer a certified transcript
16
  can be purchased.
17
  If the errata is not returned within 28 days of your
18
  receipt of this letter, the reading and signing will be
19
  deemed waived.
20
21 Sincerely,
22 Production Department
23
24 NO NOTARY REQUIRED IN CA

64 (Pages 250 - 253)

Page 254

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 6352243
3        CASE NAME: Securities And Exchange Commission v. SBB
      Research Group, LLC,
      Et Al.
         DATE OF DEPOSITION: 12/18/2023
4        WITNESS' NAME: Peter  Hickey
5        In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6     my testimony or it has been read to me.
7        I have made no changes to the testimony
      as transcribed by the court reporter.
8

9     Date           Peter  Hickey
10       Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
            Statement; and
14       Their execution of this Statement is of
            their free act and deed.
15
         I have affixed my name and official seal
16
      this ____ day of_____, 20____.
17

18       Notary Public
19
         Commission Expiration Date
20
21
22
23
24
25
```

Page 255

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 6352243
3        CASE NAME: Securities And Exchange Commission v. SBB
      Research Group, LLC,
      Et Al.
         DATE OF DEPOSITION: 12/18/2023
4        WITNESS' NAME: Peter  Hickey
5        In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
6     my testimony or it has been read to me.
7        I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
8     well as the reason(s) for the change(s).
9        I request that these changes be entered
      as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13
      Date           Peter  Hickey
14
         Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18          in the appended Errata Sheet;
         They signed the foregoing Sworn
19          Statement; and
         Their execution of this Statement is of
20          their free act and deed.
21       I have affixed my name and official seal
22    this _____ day of_____, 20____.
23
         Notary Public
24
         Commission Expiration Date
25
```

Page 256

```
1           ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 12/18/2023
3     PAGE/LINE(S) /      CHANGE    /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
      _____
20    Date           Peter  Hickey
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23
         Notary Public
24
         Commission Expiration Date
25
```

Veritext Legal Solutions

www.veritext.com                                                    888-391-3376