# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:19-cv-06473 |
| v. | The Honorable Sharon Johnson Coleman, United States District Judge |
| SBB RESEARCH GROUP, LLC, SAMUEL B. BARNETT, and MATTHEW LAWRENCE AVEN, | |
| Defendants. | The Honorable Keri L. Holleb Hotaling, United States Magistrate Judge |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENDANTS' EXPERT GENE DEETZ

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................1

II. BACKGROUND .....................................................................................2

III. LEGAL STANDARD ..............................................................................5

IV. ARGUMENT ...........................................................................................6

    A.  Deetz Is Qualified to Offer His Quantitative Materiality Opinions.......................6

    B.  Deetz's 5% Band Is Based on a Reliable Methodology ........................................7

        1.  Deetz Provided Support for the 5% Band....................................................8

        2.  RSM's Materiality Guidance Supports the Reliability of the 5% Band ...........................................................................................11

        3.  The 5% Band's Reliance on Sen's Model Estimates Is Appropriate.........12

        4.  The 5% Band Is Not Based on Cherry-Picked Data .................................14

        5.  The 5% Band Is Not a New Opinion .........................................................16

        6.  The SEC Does Not Challenge Deetz's McCann-Sen Range or Alternative Analyses ..............................................................................18

    C.  Deetz's Qualitative Materiality Opinions are Appropriate ....................................18

V.  CONCLUSION.....................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Africano v. Atrium Med. Corp.*,
561 F. Supp. 3d 772 (N.D. Ill. 2021) ....................................................................... 16

*Al Qari v. Am. Steamship Co.*,
2023 WL 5202311 (E.D. Mich. Aug. 14, 2023) ....................................................... 20

*Arlington S. Hills, LLC v. Am. Ins.*,
51 F. Supp. 3d 681 (N.D. Tex. 2014) ....................................................................... 18

*Artis v. Santos*,
95 F.4th 518 (7th Cir. 2024) ..................................................................................... 11

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir. 2001) ............................................................................... 15

*Cates v. Whirlpool Corp.*,
2017 WL 1862640 (N.D. Ill. May 9, 2017) ............................................................. 15

*Companhia Energetica Potiguar v. Caterpillar Inc.*,
2016 WL 3102225 (S.D. Fla. June 2, 2016) ............................................................. 16

*Complete Ent. Res., LLC v. Live Nation Ent., Inc.*,
2017 WL 11632203 (C.D. Cal. Oct. 25, 2017)......................................................... 18

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993).......................................................................................... 1, 7, 14

*Equal Emp. Opportunity Comm'n & Bailey v. DHL Express (USA), Inc.*,
2016 WL 5796890 (N.D. Ill. Sept. 30, 2016) .......................................................... 14

*Ernst v. City of Chicago*,
39 F. Supp. 3d 1005 (N.D. Ill. 2014) .............................................................. 2, 8, 11

*Goodpaster v. City of Indianapolis*,
736 F.3d 1060 (7th Cir. 2013) ..................................................................................... 8

*Hall v. Flannery*,
840 F.3d 922 (7th Cir. 2016) ....................................................................................... 7

*Huntington Chase Condo. Ass'n v. Mid-Century Ins.*,
379 F. Supp. 3d 687 (N.D. Ill. 2019) ................................................................. 15, 17

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
    2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ........................................................ 13

*In re Opana ER Antitrust Litig.*,
    2021 WL 2291067 (N.D. Ill. June 4, 2021) .......................................................... 14

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................................................ 8

*Manpower, Inc. v. Ins. Co. of Pa.*,
    732 F.3d 796 (7th Cir. 2013) ............................................................................... 11

*Palmer v. Asarco Inc.*,
    2007 WL 2298422 (N.D. Okla. Aug. 6, 2007) ................................................... 18

*Phillips v. Raymond Corp.*,
    364 F. Supp. 2d 730 (N.D. Ill. 2005) ................................................................. 14

*Ploss v. Kraft Foods Grp., Inc.*,
    637 F. Supp. 3d 561 (N.D. Ill. 2022) ................................................................. 14

*SCCI Hosps. of Am., LLC v. Home-Owners Ins.*,
    571 F. Supp. 3d 942 (N.D. Ind. 2021) ............................................................... 12

*Schultz v. Akzo Nobel Paints, LLC*,
    721 F.3d 426 (7th Cir. 2013) ................................................................................. 6

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000) ............................................................................ 6, 8

*Stop Staring! Designs v. Tatyana, LLC*,
    2012 WL 12877991 (C.D. Cal. Feb. 21, 2012) .................................................. 18

*Sunstar, Inc. v. Alberto Culver Co.*,
    2006 WL 6505615 (N.D. Ill. Nov. 16, 2006) ..................................................... 18

*Thompson v. Doane Pet Care Co.*,
    470 F.3d 1201 (6th Cir. 2006) ............................................................................ 17

*United States v. Parkhurst*,
    865 F.3d 509 (7th Cir. 2017) .............................................................................. 13

*Van v. Ford Motor Co.*,
    332 F.R.D. 249 (N.D. Ill. 2019) ......................................................................... 13

*Walsh v. Chez*,
    583 F.3d 990 (7th Cir. 2009) .............................................................................. 17

*Wipf v. Kowalski*,
   519 F.3d 380 (7th Cir. 2008) ................................................................................................. 6

*Zarinebaf v. Champion Petfoods USA Inc.*,
   2022 WL 910638 (N.D. Ill. Mar. 29, 2022) ............................................................................ 7

## RULES

Fed. R. Evid. 703 ................................................................................................................. 14

I.    **PRELIMINARY STATEMENT**

The SEC's fraud claims require it to prove that Defendants made false or misleading statements of material facts in SBB's disclosures regarding the estimated value of the structured notes in SBB's funds.  The SEC served an opening expert report from Peter Hickey, who opined—without any supporting analysis—that SBB's alleged overvaluations and deviations from GAAP would be "materially important to reasonable investors."  Ex. 1 ¶ 63.  Defendants submitted a rebuttal report from Gene Deetz, who conducted a quantitative and qualitative materiality analysis consistent with the accounting and materiality guidance.  Deetz's conclusion that any alleged deviations would be immaterial to a reasonable investor relied, in part, on the fact that SBB's funds' structured notes "would have a reasonable range of estimated fair values" and not "one single estimate."  Deetz Rep. ¶ 46.[1]  Another SEC expert, Andrew Mintzer, then submitted a sur-rebuttal report to Deetz's materiality opinions.

The SEC's own experts agree there is a reasonable range of fair values for the structured notes.  Ex. 15 at 106:5-18; Ex. 14 at 190:4-15.  The SEC's challenge to Deetz's opinions relates instead to the accounting judgment he applied in assessing whether any alleged deviations were material.  But the SEC cannot back up any of its attacks on Deetz's methodology or credentials.  His analysis was based on: (1) relevant accounting guidance; (2) his substantial experience analyzing the materiality of structured financial products; (3) observable data; and (4) other evidence in the record—all of which he discussed in his Report.  Deetz considered the relevant record evidence, consistent with the accounting standards, and detailed the observable data supporting his judgment in 38 exhibits to his Report.  Deetz's materiality opinions and judgments

---

[1] Deetz's Report and Deetz's Deposition Transcript are included in the Omnibus Exhibit Index to Defendants' Oppositions to Plaintiff's *Daubert* Motions ("Omnibus Exhibit Index") (Dkt. 219-1) at Exs. 5 and 18, respectively.  All other exhibits referenced in this Motion include the relevant citation to their numbered location in the Omnibus Exhibit Index.

are core functions of accountants, and the SEC cannot dispute that he is eminently qualified to offer accounting opinions. The SEC's criticism of Deetz's qualitative analysis fares no better. The SEC faults Deetz for purportedly failing to consider evidence of management intent and bias—but Deetz did consider this evidence. Accordingly, the SEC's complaints all go "to the weight of" Deetz's "testimony rather than its admissibility," *Ernst v. City of Chicago*, 39 F. Supp. 3d 1005, 1011 (N.D. Ill. 2014), which means that its *Daubert* motion should be denied.

## II.  BACKGROUND

SBB managed funds (the "Funds") that invested primarily in structured notes, which are financial instruments that have features of fixed income but also are derivatives with payoffs linked to the value of other underlying assets. ASC 820 is the accounting standard for recording structured notes on a balance sheet at fair value. Generally, an actual transaction or quoted price in an active market on the measurement date provides the best indication of fair value under GAAP. But the Funds' structured notes were not traded on an active market, so SBB developed and used a proprietary model (permitted by GAAP) to estimate the fair value of those notes.

Deetz is a CPA with over 20 years of public accounting experience. He has spent the last 20 years applying his auditing experience as an expert consultant. His work includes opining whether a company's financial statements were presented fairly, in all material respects, in accordance with GAAP. Deetz regularly conducts materiality assessments pursuant to SEC Staff Accounting Bulletin No. 99 ("SAB 99"), including assessments involving the impact of potential errors stemming from fair value estimates on financial reporting and revenue recognition. Deetz Rep. ¶¶ 2-3. These long-term comprehensive assessments include matters involving publicly traded and privately held companies. Deetz has also opined over ten times on whether a model used to value complex structured financial products complied with GAAP, including on whether a debt underlying structured note model was consistent with GAAP. Deetz Tr. 60:5-66:11.

Defendants retained Deetz to review and respond to certain opinions in Hickey's report, including Hickey's conclusions about implied volatility for the Funds' structured notes and the basis for his materiality and valuation opinions. Deetz Rep. ¶ 12. The SEC does not seek to exclude those opinions. Deetz also assessed whether the alleged deviations identified in Hickey's report were "material to reasonable investors, like the investors in the SBB Funds."[2] *Id*. His Report explains that, under AU-C Section 540A of the Generally Accepted Auditing Standards ("GAAS")—the guidance for auditing fair value accounting estimates—one way "to assess whether the [] Funds were over-valued" is "to develop a range of reasonable prices in order to determine whether there is overvaluation and the magnitude of the over-valuation." *Id*. ¶ 72; *see also id*. ¶¶ 77-78, 100, 119; Ex. 19 at A.93-A.99 (auditor may develop a range of reasonable values to evaluate the reasonableness of management's estimate). Deetz opines that the alleged deviations Hickey identified were not material to reasonable investors, relying on four quantitative materiality analyses—two of which used a range of reasonable prices.

*First*, Deetz used his accounting expertise and experience with materiality guidance, his understanding of the Funds' structured notes, his extensive "fair value and auditing experience," and the data observed in this case—including structured notes that were sold before maturity and observed data from Markit (a third-party firm SBB hired to value the Funds' assets), SEC expert Craig McCann, and Defendants' expert Arun Sen—to conclude that there was a reasonable range of fair values for the Funds' structured notes that was 5% above and below the Markit prices for the structured notes ("5% Band"). Deetz Rep. ¶¶ 114-116, 119, 128-33; *id*. at A-106 to A-110, A-

---

[2] The SEC suggests that Deetz failed to "address the substance of Hickey's opinions" by conducting a materiality analysis (Mot. 5), but Hickey confirmed at his deposition that he intends to opine SBB's alleged deviations would be important or material to investors and that he viewed "material" and "important" as synonymous. Ex. 14 at 142:18-143:7. For a summary of Hickey's opinions, see Dkt. 215 at 3-4.

132 to A-134, A-148 to A-150, A-164 to A-166, A-180 to A-182, A-196 to A-197, A-207 to A-211, A-233 to A-235, A-249 to A-251, A-265 to A-267, A-281 to A-283, A-297 to A-298 (the "Observable Data Exs."); Deetz Tr. 94:3-108:23.  Deetz further observed that the 5% Band was "consistent with" his "experience valuing Level 3 structured financial products, where" he "observed the use of similar ranges of reasonable fair values."  Deetz Rep. ¶ 131.

To be clear, unlike Sen and McCann, Deetz was not determining model estimates to ascribe a value for the notes.  Rather, he used the differing estimates in the record and his substantial experience to make a judgment about what a reasonable range of estimates would be for purposes of his materiality analysis.  *Id.* ¶¶ 120, 128-34.  If SBB's fair value estimate for a note was more than 5% higher or lower than the Markit estimate, Deetz aggregated those amounts for each note and determined whether the amounts above the 5% Band were greater than "2% of adjusted NAV," Deetz's quantitative materiality threshold, in order to determine if those individual note valuation differences would be quantitatively material to the Fund overall.  *Id.* ¶¶ 134-35, 137.  If the aggregate amount over the 5% Band for a Fund was greater than the 2% quantitative threshold, he analyzed the impact of the error on the Funds' financial statements.  *Id.* ¶ 137.  Consistent with SAB 99, Deetz also performed a qualitative assessment, which included a consideration of the impact of all quantitative misstatements on qualitative factors—including whether the misstatement masked a change in earnings or affected compliance with loan covenants (Ex. 20 at 4)—without regard to the 2% threshold.  Deetz Rep. ¶¶ 140-47.  He set forth his analysis in detail in 82 exhibits covering each structured note invested in by the Funds.  *Id.* A-106 to A-206.

*Second*, Deetz conducted a separate quantitative materiality analysis that relied on a comparison of SBB's as-reported fair values to a range of fair values informed by the reports of McCann and Sen.  *Id.* ¶¶ 151-69, A-207 to A-307.  McCann and Sen used models to value the

Funds' structured notes. Sen opined that "a range of reasonable estimated note values exists," which is consistent with the three sets of fair values based on his modeling: Ankura Values, Upper Bound without Correlation Risk, and Upper Bound with Correlation Risk. Ex. 6 ¶¶ 94-104; Ex. 17 at 105:23-106:9. Deetz used Sen's Upper Bound with Correlation Risk and McCann's estimates to create a range of fair values ("McCann-Sen Range"), with McCann's estimates generally demarcating the low end of the range and Sen's estimates the high end. Similar to the 5% Band analysis, Deetz aggregated any amounts where SBB's fair value for a structured note fell outside the McCann-Sen Range and considered whether or not they exceeded the "2% of adjusted NAV" threshold, in order to determine if those individual note overvaluations would be quantitatively material to the Fund overall. If the gross aggregate amounts exceeded that threshold, he analyzed the impact on the Funds' financial statements. Deetz Rep. ¶¶ 159, 162. His second quantitative materiality analysis also included a qualitative assessment, both of which were discussed in detail in the exhibit set. *Id.* A-207 to A-307.

*Finally*, Deetz conducted two alternative assessments using Markit values and the Sen Report's Ankura Value without applying the 5% Band or the McCann-Sen Range (the "Alternative Assessments"). *Id.* n. 221, 235. The results of his Alternative Assessments did not alter Deetz's conclusion that the fair values reported for SBB's funds' structured notes "were not materially misstated," based on the size of the quantitative misstatements without considering a reasonable range and the qualitative considerations outlined in his Report. *Id.* ¶¶ 148(b), 167(b), n. 221, 235. Deetz produced the workpapers documenting the Alternative Assessments with his Report. *See* Ex. 34. The SEC did not ask Deetz about these analyses in his deposition.

## III.  LEGAL STANDARD

In determining the admissibility of expert testimony, a court is "limited to determining whether expert testimony is" relevant "and whether the methodology underlying that testimony is

sound." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). If the expert's "principles and methodology reflect reliable scientific practice, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)). It is "the trier of fact, not the reviewing court" who "decide[s] how to weigh the competing expert testimony." *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008).

## IV.    ARGUMENT

### A.    Deetz Is Qualified to Offer His Quantitative Materiality Opinions

In an attempt to challenge Deetz's qualifications, the SEC claims that his materiality "opinion falls squarely within the job description of a valuation expert" and faults him for not relying "on any standard option valuation practices." Mot. 10. But Deetz's opinions are based on his assessments of the materiality of alleged deviations from fair value—a core function of accountants. Deetz Rep. ¶¶ 12, 15, 16; *see also* Ex. 20 at 2 (guidance for "independent auditor[s]" for assessing materiality of misstatements); Ex. 19 at .01 (guidance for auditors "related to misstatements of … accounting estimates").

Nothing in the accounting standards or materiality guidance, including AU-C 540A and SAB 99, requires auditors or accountants to perform their own independent valuations to assess materiality. Rather, the guidance directs auditors and accountants to use judgment and consider available "audit evidence" when developing a range of fair values. *See* Ex. 19 at .A117; Ex. 20 at 2-5. That's precisely what Deetz did here. He observed significant variances in the fair value estimates based on the McCann, Markit, and Sen models, as well as the variances between Markit's estimates and actual sales of the structured notes. *See* Deetz Rep. ¶¶ 128-33, Observable Data Exs.; Deetz Tr. 94:3-108:23; *see also* Deetz Rep. ¶ 131 (Deetz "observed the use of similar ranges

6

of reasonable fair values" in his "experience valuing Level 3 structured financial products"). No regression analysis or independent valuation was required. The SEC does not and cannot point to any accounting standard or materiality guidance that requires "a bona fide analysis of any input in that model" to assess materiality. Mot. 11.

Deetz has substantial experience as an auditor and analyzing materiality in his practice as both a consultant and expert. Deetz Rep. ¶¶ 2-3, 6-9. For over 15 years, "a significant part of" that practice has involved "valuation of structured financial products" and considering "whether valuations ascribed to these complex, illiquid securities complied with fair value standards," *id.* ¶ 6, including developing "an estimation band of uncertainty for structured notes," Deetz Tr. 125:20-126:24. The SEC also misstates Deetz's valuation experience. He understands the framework and inputs of models—including the Heston Model that Sen used to value structured notes and the Black-Scholes Model—and uses that expertise in reaching his accounting conclusions. *Id.* 64:13-65:7, 65:22-66:11. Under *Daubert*, that is enough. *Zarinebaf v. Champion Petfoods USA Inc.*, 2022 WL 910638, at *6 (N.D. Ill. Mar. 29, 2022) (expert's "lack of experience with premium dog food" did "not render his opinions [on materiality of dog food messaging] unreliable," as he "was familiar with how and why advertising is crafted, and how consumers review … packaging"); *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("[T]hat an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility."). The SEC is free "on cross-examination" to probe Deetz's "choice not to" conduct an analysis of the inputs in Markit's model or consult a valuation expert. *Zarinebaf*, 2022 WL 910638, at *6; *see* Mot. 11-12.

## B. Deetz's 5% Band Is Based on a Reliable Methodology

The SEC levels several challenges to Deetz's methodology for selecting the 5% Band in his materiality analysis. Mot. 11-18. These challenges go "to the weight of his testimony rather

than its admissibility," and thus do not warrant exclusion. *Ernst*, 39 F. Supp. 3d at 1011. "It is up to the trier of fact" to evaluate whether "the factual underpinnings of" Deetz's analysis are sound and his "conclusions based on that analysis" are correct. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013).

### 1. Deetz Provided Support for the 5% Band

The SEC claims that Deetz's Report provided "[n]o [b]asis" to support his 5% Band and that he suggested "for the first time" in his deposition that AU-C 540A supports the 5% Band. Mot. 13-14. Not so. The SEC ignores that Deetz cited AU-C 540A throughout his Report, which is the GAAS provision that addresses developing a range to test the reasonableness of an accounting estimate like the valuation of the SBB funds' notes. Deetz Rep. nn. 107, 117-19, 123-24, 142, 174. In his Report, Deetz explained that, consistent with AU-C 540A, one way to conduct a quantitative materiality assessment "is to quantify the difference between ranges of fair values available from independent third parties or transactions, compared to" SBB's estimates. *Id.* ¶ 100; *see also id.* ¶¶ 72, 77-78, 119. Deetz's 5% Band is based on the guidance in AU-C 540A, as he constructed "a reasonable range of estimated prices around Markit's prices." *Id.* ¶ 113.

The SEC also ignores Deetz's extensive fair value and auditing experience under GAAS, including AU-C 540A and predecessor guidance, *i.e.*, AU 328 (Auditing Fair Value Measurements and Disclosures) and AU 342 (Auditing Accounting Estimates). *Id.* ¶¶ 3, 5-6, 8-9; Deetz Tr. 191:1-17. An expert may "draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999). The Court can and "should" consider Deetz's "full range of practical experience," *Smith*, 215 F.3d at 718, including: 20 years in public accounting; 20 years of applying his auditing experience as a consultant (*i.e.*, a combined 40 years of experience with GAAS, including AU-C 540A and its predecessors); preparation of comprehensive materiality analyses; and development of a

reasonable range of fair values "for a significant number of products," including a band for structured notes (Deetz Tr. 125:10-126:24). To be sure, AU-C 540A does not specify precisely *how* a "range to evaluate management's point estimate[s]" can or should be calculated.[3] Ex. 19 at .A93. Instead, AU-C 540A requires judgment, acknowledging that a range may be developed "*in a number of ways*" and must "encompass *all reasonable outcomes*, rather than all possible outcomes," which "may be achieved by" removing "from the range" extreme outcomes "*judged by the auditor* to be unlikely to occur" and narrowing "the range, *based on audit evidence available*, until the auditor concludes that all outcomes within the range are considered reasonable." *Id.* at .A97, .A99, .A101 (emphasis added).

Consistent with AU-C 540A, Deetz exercised that judgment, considering the evidence in the record to evaluate whether there was a reasonable range of fair values for the Funds' structured notes. His Report discusses two key factors supporting the existence of a reasonable range. First, the structured notes were not traded in active markets, so a valuation model was necessary to estimate their fair value. Deetz Rep. ¶¶ 38-46. Where assets do not trade in active markets, judgment is required "in selecting inputs and making estimates," meaning that the "outputs" (*i.e.*, estimates of fair value) "can vary from one market participant to another." *Id*. ¶ 45. Second, Deetz reviewed disclosures from counterparty banks discussing the significant estimates associated with structured notes, which indicated that there was a "wide range of uncertainty" for the structured

---

[3] The SEC claims that SAB 99 prohibits consideration of estimation uncertainty in a quantitative materiality analysis. Mot. 14. But SAB 99 does not provide guidance on how to calculate the amount of a quantitative misstatement. Rather, it *assumes* a quantitative misstatement and provides guidance on assessing qualitative materiality considerations. Ex. 20 at 2-5. The SEC cannot point to any provision to support its submissions that SAB 99 prohibits the use of a range of reasonable values in a quantitative assessment of materiality or that the use of a range "impermissibly 'double dips.'" Mot. 14; *id.* 14 n.6.

notes. *Id.* ¶ 131; Deetz Tr. 132:19-25. Deetz noted that these counterparty bank disclosures further indicated that the range of reasonable fair values would not be trivial. Deetz Tr. 141:13-20.

Next, Deetz relied on "observable fair value data" to identify the reasonable range of fair values. *Id.* 135:5-9. Such data included reviewing sales of the Funds' structured notes and comparing (a) the prices at which those notes were sold to (b) the Markit estimates of fair value on or about the date of the sales. The transaction price varied as much as 2.8% from Markit's estimate. Deetz Rep. ¶¶ 131-32. Deetz observed that these transactions all occurred within nine months of maturity. *Id.* ¶ 133. That is significant because fair value estimates for the Funds' structured notes tend to converge as the securities approach maturity. Deetz Tr. 104:6-20; Ex. 15 at 48:9-12. That the weighted average remaining life of each structured note was consistently longer than this sample supported the reasonableness of a 5% range. Deetz Tr. 94:3-96:24; Deetz Rep. ¶ 133.

Deetz also compared the fair values estimated by models from Markit, McCann, and Sen, which he presented in his Report exhibits. Deetz observed that for the Polysight Fund, which was the largest fund with 40% of the Funds' investments in 2014 and 48% in 2015, fair values based on McCann's model estimates were approximately 5% below Markit's estimates and Sen's estimates were approximately 5% above Markit's estimates. Deetz Rep. A-196 to A-197, A-297 to A-298; Deetz Tr. 107:10-108:23. The Report's exhibits also demonstrated a wide variance in valuations for all Funds as a result of using estimates based on models from Markit, McCann, and Sen. *See* Deetz Rep. Observable Data Exs. Based on all this evidence and his fair value and auditing experience, Deetz concluded that a 5% range was reasonable.

The 5% Band is not "impermissible ipse dixit," as the SEC argues. Mot. 13. Nor did Deetz "pluck" this opinion "out of thin air." *Artis v. Santos*, 95 F.4th 518, 526 (7th Cir. 2024). Rather,

10

he considered the characteristics of the structured notes, observed fair value data, and other evidence in the record, and "then leaned on his extensive" fair value and auditing experience (including using a reasonable range) to conclude that the 5% range is reasonable.[4]  *Id.*; Deetz Rep. ¶¶ 112-133, Observable Data Exs; Deetz Tr. 191:10-192:12.  The accounting standards are not prescriptive: making a judgment about a range is within the accountant's judgment. Ex. 19 at .13, .A124.  It "is perfectly permissible" for Deetz to link his opinions "to what he has seen and experienced in his work in the field over the years."  *Ernst*, 39 F. Supp. 3d 1005 at 1011.

### 2.    RSM's Materiality Guidance Supports the Reliability of the 5% Band

The reliability of Deetz's approach is further supported by the testing approach of SBB's former auditor, RSM.  *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 807 (7th Cir. 2013) (reversing district court's exclusion of testimony where expert "utilize[d] the methods of the relevant discipline"); Deetz Tr. 105:16-23; 172:10-173:11; Deetz Rep. n.120, A-6.  RSM's National Office instructed audit teams to use one of three methods to test a security's fair value that was "determined based on a model."  One method involved "developing a point estimate *or range* to evaluate management's point estimate."  Ex. 30 ¶ 16 (emphasis added).

RSM established "acceptable differences in fair value estimates" based on the type of security.  The acceptable variance for structured notes was 5% for all securities within a particular type of security and 10% for an individual security. Ex. 28 at -8409.  The percentage variance was not based on a precise mathematical calculation, but rather the RSM National Office's *judgment* of the range of fair values given the characteristics of structured notes.  And the range was not

---

[4] The SEC is therefore wrong that Deetz ignored key provisions of AU-C 540A.  Mot. 14.  Deetz documented the evidence he considered in his Report's 164 materiality exhibits.  *See* Deetz Rep. A-6 to A-13, A-106-A-307; *see also* Deetz Tr. 106:16-24.  Deetz *did* recognize that estimation uncertainty increases the danger of management bias, *see infra* pp. 19-20, and while he did not assess the potential risks of misstatement, that is because he assumed a misstatement for purpose of his analysis.  Deetz Tr. 22:13-16.

developed specifically for the structured notes owned by the Funds; rather, it applied across *all* types of structured notes owned by *all* of RSM's clients. The SEC discussed the RSM National Office's materiality method in its settlement order with RSM and did not identify that method as improper. Ex. 30 ¶ 16.

RSM then evaluated whether SBB's estimated fair valuations fell within 5% of Markit's estimates for all notes in a Fund and, if they did not, whether SBB's estimate for a single structured note fell within 10% of Markit's estimate for that same note. If either was true, RSM concluded that SBB's "fair value estimates for that" note was "reasonable" (Ex. 33 at 5) and did not include those variances in the calculation of cumulative misstatements (Ex. 11 at 706:7-712:22, 723:4-725:2). Deetz' methodology is a similar accounting materiality assessment.[5] Both methods require judgment. The SEC cannot sincerely argue that Deetz's method were "outside those customarily" used by accountants in his field. *SCCI Hosps. of Am., LLC v. Home-Owners Ins.*, 571 F. Supp. 3d 942, 951 (N.D. Ind. 2021) (opinion "based on sufficient" facts where expert relied on evidence customarily considered in his field).

### 3. The 5% Band's Reliance on Sen's Model Estimates Is Appropriate

The SEC also takes issue with Deetz's use of fair value estimates based on Sen's model,[6] claiming that "Deetz <u>didn't use Sen's actual note values</u>." Mot. 11. The SEC does not explain what it means by "<u>actual note values</u>," so we are left to guess.[7] To be sure, Deetz used one of the

---

[5] In this way, Deetz's 5% Band is a more conservative methodology than RSM's: a structured note with a 9.9% variance between SBB's and Markit's estimates would be included in Deetz's cumulative misstatements analysis, but not RSM's. Ex. 10 at 296:14-297:8 (testifying that a 9.99% difference "does not affect the quantitative analysis").

[6] Deetz uses fair value estimates based on Sen's model to develop both the 5% Band and the McCann-Sen Range. The SEC has challenged the methodology only of the 5% Band.

[7] The SEC appears to be asserting that Sen's Ankura Values are the "<u>actual note values</u>," and Deetz should have used the Ankura Values to compare against Markit. But Sen does not opine that any one of the three sets of fair value estimates based on his model is more appropriate than the others. On the contrary, he

three sets of fair value estimates based on Sen's model—the Upper Bound with Correlation Risk estimates (Deetz Rep. A-207 to A-211, A-233 to A-235, A-249 to A-251, A-265 to A-267, A-281 to A-283, A-297 to A-298; Deetz Tr. 106:16-24, 164:6-16)—and Sen opines that these estimates are "reasonable." Ex. 17 at 101:20-107:2; Ex. 6 ¶¶ 94-104. The SEC has not sought to exclude Sen's opinions related to his Upper Bound with Correlation Risk fair value estimates. Dkt. 210. Nor does the SEC attempt to explain what is implicit in their criticism: that these estimates are based on an unreliable methodology that does not comply with ASC 820. Instead, the SEC assumes they are not fair value and in doing so, underhandedly asks the Court to accept the same assumption. Since the SEC failed to develop this argument, it is waived. *See, e.g.*, *United States v. Parkhurst*, 865 F.3d 509, 524 (7th Cir. 2017) (undeveloped arguments are waived); *see also Van v. Ford Motor Co.*, 332 F.R.D. 249, 278 (N.D. Ill. 2019) ("It is not the obligation of [the] court to research and construct the legal arguments open to parties, especially when they are represented by counsel." (quoting *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 408-09 (7th Cir. 1988))). Putting that aside, the SEC is "asking the [C]ourt to determine which" set of fair value estimates based on Sen's model "is *most* accurate, which is ultimately a merits decision" for the jury. *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *22 (N.D. Ill. Mar. 31, 2017).

The SEC also blusters that "Deetz's method would lead to absurd results," declaring that "[s]omeone using Deetz's method" could "expand the breadth of an 'estimation band' indefinitely." Mot. 11-12. Not so. The Sen Upper Bound with Correlation Risk valuations (which

---

states that if a valuation fell within the range of his Upper Bound with Correlation Risk, then the estimate was "reasonable." Ex. 17 at 105:23-106:9. Moreover, these Level 3 assets do not trade on an active market, and therefore, as the SEC acknowledges, the valuations of the assets are an estimate subject to significant valuation uncertainty.

Deetz assumed to be GAAP compliant) are the highest fair value estimates in the data Deetz observed in the record. The guidance Deetz followed to develop his reasonable range of fair values "requires th[e] range to encompass all *reasonable* outcomes." Ex. 19 at .A99 (emphasis added). It does not allow "expand[ing] the breadth" of the range by adding a band around the Sen Upper Bound with Correlation Risk because Deetz did not observe any reasonable fair value estimates above that number. An "indefinite[]" expansion of the estimation band is not remotely contemplated by Deetz's methodology. Mot 12.

The SEC also faults Deetz for relying on Sen's work. Mot. 11. But "it is common in technical fields for an expert to base an opinion in part on" another expert's analysis. *EEOC v. DHL Express (USA), Inc.*, 2016 WL 5796890, at *5 (N.D. Ill. Sept. 30, 2016); *Phillips v. Raymond Corp.*, 364 F. Supp. 2d 730, 743 (N.D. Ill. 2005) ("[A]nalyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology."). This is particularly so where, as here, Deetz understands the inputs underlying Sen's calculations and model and uses the estimates of fair value based on Sen's work in his own "independent analysis." *See Ploss v. Kraft Foods Grp., Inc.*, 637 F. Supp. 3d 561, 580 (N.D. Ill. 2022) (allowing expert opinion where expert applied another expert's estimates in his independent analysis); *cf. In re Opana ER Antitrust Litig.*, 2021 WL 2291067, at *16 (N.D. Ill. June 4, 2021) (expert "permitted to assume that the jury will accept the testimony of another witness"); Fed. R. Evid. 703. *Daubert* does not require Deetz to consult Sen in order to rely on his work. *See Phillips*, 364 F. Supp. 2d at 743 (upholding expert's "review of other" experts' testing notes as "valid methodology" to support opinions).

### 4. The 5% Band Is Not Based on Cherry-Picked Data

The SEC is wrong to assert that Deetz considered only 3.8% of the relevant data. Mot. 16. The Report's 38 exhibits list the year-end fair value estimates based on models by SBB, Markit,

McCann, and Sen for every structured note in every Fund for all pertinent years. *See* Deetz Rep. Observable Data Exs. Deetz testified he "observed variances" in the fair value estimates for "all of" these notes and "considered those variances" to develop the 5% Band. Deetz Tr. 198:3-23.

The SEC also faults Deetz for focusing on year-end valuations instead of monthly values. Mot. 16. But the SEC fails to identify any accounting or materiality guidance to support its claim that Deetz's method was improper.[8] Notably, RSM's restatement analysis considered only year-end valuations. *See* Ex. 33 at Ex. A (considering year-end valuations for 2013-15). Hickey did not conduct *any* analysis to support his materiality opinions, and Mintzer similarly evaluated only the purported deviations in the Funds' annual values. Ex. 8 ¶ 13. Accordingly, the SEC's complaints here go to the "strength of [Deetz]'s conclusions," not their admissibility. *See Huntington Chase Condo. Ass'n v. Mid-Century Ins.*, 379 F. Supp. 3d 687, 704 (N.D. Ill. 2019) (denying motion to exclude based on objections to "a specific analytical move … made in the process of following a generally acceptable method").

To support its claim that Deetz's alleged cherry-picking caused the 5% Band to be "three times too broad," the SEC tries to sneak in a *new* analysis from McCann. McCann purportedly calculated the average differences of monthly values between (1) McCann's and Markit's estimates and (2) Sen's Ankura Value and Markit's estimate for all funds, and concluded that the reasonable range of fair values around Markit was approximately 2.1% below and 0.8% above Markit's estimates. Mot. 17. The SEC served sur-rebuttal reports from McCann and Mintzer over

---

[8] The SEC's cited authorities do not reflect that this methodology is unreliable. Mot. 18. *Barber v. United Airlines, Inc.*, which is non-citable under Seventh Circuit Rule 32.1(d), concluded it was appropriate to exclude an expert who "accepted some of the testimony and weather data that suited his theory and ignored other portions of it that did not" without "explain[ing] why he ignored certain facts and data" and "accept[ed] others." 17 F. App'x 433, 437 (7th Cir. 2001). And in *Cates v. Whirlpool Corp.*, the excluded expert tested *two* ovens to support his opinion that *two million* ovens were defective in a class action suit involving "at least 63 materially different" oven designs and ignored "directly on point" reliable, contradictory data. 2017 WL 1862640, at *6, *14-15 (N.D. Ill. May 9, 2017).

five months ago.[9]  The SEC did not seek leave to supplement those reports, and instead offered to "provide a native version" of the new analysis "to the Court upon request."  *Id.* 17, n.8.  That is improper, and this analysis should be stricken.  *See Companhia Energetica Potiguar v. Caterpillar Inc.*, 2016 WL 3102225, at *4, *7 (S.D. Fla. June 2, 2016) (striking expert declaration attached to opposition to *Daubert* motion as an "untimely-provided supplemental expert report").

Nor can the SEC back up its assertion that the 5% Band "is <u>three times</u> too broad."  Mot. 18.  The SEC suggests that McCann's "much narrower" -2.1% to .8% band was simply the result of using "the entire data set"—*i.e.*, the monthly values for all structured notes in all Funds.  *Id.* 17.  Not so.  The native Excel file reveals that McCann used Sen's Ankura Values instead of the Upper Bound with Correlation, the fair value estimates Deetz used for the 5% Band.  But Sen opines— and Deetz assumes—that the Ankura Value used in McCann's new analysis and the Upper Bound with Correlation Risk used by Deetz *both* result in estimates based on a GAAP compliant model.  Ex. 6 ¶¶ 94-104; Ex. 17 at 105:23-106:9; Deetz Tr. 106:16-107:3.  The SEC does not argue otherwise.  Consequently, while the SEC "remains free to vigorously cross-examine" Deetz about his use of the Upper Bound "and argue why the trier of fact should not accord [his] opinions any weight," its (untimely and undisclosed) criticisms are not a basis to exclude his opinions.  *Africano v. Atrium Med. Corp.*, 561 F. Supp. 3d 772, 778 (N.D. Ill. 2021).

5.  **The 5% Band Is Not a New Opinion**

The SEC also argues Deetz did not disclose until his deposition the methodology underlying his 5% Band analysis.  Mot. 9.  That is wrong, as Deetz's Report and exhibits explain that he selected and applied the 5% Band based on the characteristics of the Funds' structured notes, disclosures from counterparty banks, variances that he observed between actual sales of the

---

[9] Defendants deposed McCann before the SEC submitted this new analysis in their *Daubert* motion, and therefore were unable to question McCann about this new analysis, which is riddled with errors.

16

structured notes and fair value estimates based on Markit's model, and variances that he observed in the fair value estimates for the Funds' structured notes based on models by Markit, McCann, and Sen. *See* Deetz Rep. ¶¶ 41-46, 113, 119-20, 128-34, Observable Data Exs.; *supra* pp. 8-11.

The SEC's argument appears premised on its position that the 5% Band could be a reliable method for testing the reasonableness of SBB's fair value estimates only if it were a mathematical calculation. Mot. 9. The problem for the SEC is Deetz is not opining that the 5% Band was based on an equation. Deetz Tr. 122:2-13 (not "plugging" in a number "into a mathematical formula").[10] Rather, the 5% Band was based on all of Deetz's analysis and considerations described above, including his application of professional judgment. The 5% Band was also based on observed data in the record, including, but not limited to, Deetz's observation that McCann's estimates for Polysight were approximately 5% below Markit's valuations and Sen's Upper Bound with Correlation Risk estimates were approximately 5% above Markit.

Deetz of course elaborated during his deposition on his observations of the data. That is par for the course, as an expert's report "need not cover every detail of what" the expert "might say in his … forthcoming testimony." *Huntington Chase*, 379 F. Supp. 3d at 704. "The purpose of" an expert report "is not to replicate every word that the expert might say on the stand," but rather "to convey the substance of the expert's opinion … so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009). Civil Rule 26(a)(2)(B) does not "limit an expert's testimony simply to reading his report." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006).

---

[10] The SEC certainly assumed a calculation must exist and questioned Deetz repeatedly "Where can I find the calculation?" *E.g.*, Deetz Tr. 95:6-8 ("where do I find your calculation related to the plus or minus 5 percent estimation band[?]"), 96:19 ("Where can I find that calculation?"), 97:19-20 ("What are the inputs into your calculation of the plus or minus 5 percent?"). To the extent Deetz described certain parts of his overall methodology for estimating the 5% Band as a "calculation," he was adopting the SEC's language.

The SEC's cited authority, *Palmer v. Asarco Inc.*, 2007 WL 2298422 (N.D. Okla. Aug. 6, 2007), reflects these principles. While *Palmer* did not permit the expert "to testify about matters not disclosed in his expert report," the court "referr[ed] to [the expert's] deposition testimony to the extent it clarifies the opinions and data disclosed in his expert report." *Id.* at *5. That is precisely what occurred here: Deetz disclosed his bases for selecting the 5% Band in his Report and further elaborated during his deposition on how those bases informed his judgment.[11]

### 6. The SEC Does Not Challenge Deetz's McCann-Sen Range or Alternative Analyses

The SEC's issues with Deetz's quantitative materiality analysis focus solely on the 5% Band. But Deetz's materiality opinion was supported by three other independent quantitative materiality analyses: the McCann-Sen Range and the two Alternative Analyses. *See supra* pp. 4-5. The SEC does not contend that these analyses are inadmissible under Rule 702. Thus, even if the Court agrees with the SEC that Deetz's 5% Band is not an admissible expert opinion, Deetz would still be entitled to opine—based on his McCann-Sen Range and Alternative Analyses—that any alleged deviations would not be material to reasonable investors. *See Arlington S. Hills, LLC v. Am. Ins.*, 51 F. Supp. 3d 681, 688 (N.D. Tex. 2014) (denying motion to exclude opinion supported by "another reliable method").

### C. Deetz's Qualitative Materiality Opinions are Appropriate

---

[11] The SEC's other cases are inapposite. *Sunstar, Inc. v. Alberto Culver Co.*, 2006 WL 6505615, at *8-9 (N.D. Ill. Nov. 16, 2006), *denied* a motion to exclude, reasoning that the expert adequately "explain[ed] the assumptions underlying his calculations," and held only that the expert could not testify about calculations "not disclosed in his report." In *Stop Staring Designs! v. Tatyana, LLC*, 2012 WL 12877991, at *1 (C.D. Cal. Feb. 21, 2012), the expert report contained an unfounded assumption; the expert "attempted to support" the assumption at trial, using a methodology "not disclosed" in his report, that he was unqualified to offer. In *Complete Entertainment Resources, LLC v. Live Nation Entertainment, Inc.*, 2017 WL 11632203, at *3 (C.D. Cal. Oct. 25, 2017), the court admitted expert testimony on an implied valuation at the time of a merger since the report discussed the valuation, which was a starting point for his analysis. The court held only that the expert could not "extrapolate a hypothetical future value from that merger valuation" because that hypothetical value "was not disclosed in his reports." *Id.*

Deetz performed a qualitative materiality analysis for each Fund for each year, evaluating the nine considerations enumerated in SAB 99. *See* Deetz Rep. ¶¶ 140, 165; Ex. 20 at 4. His assessments acknowledge factors that could weigh in favor of concluding the alleged misstatements were material, including that the structured notes "are the most significant item in each of the SBB Fund financial statements" and that the overstatements increased management's compensation. Deetz Rep. ¶¶ 140(e), (h), 165(e), (h). Consistent with SAB 99's recognition that its list of bulleted considerations "is not [] exhaustive" (Ex. 20 at 4), Deetz also considered other relevant circumstances, including Hickey's allegations "that SBB failed to consider and apply ASC 820" and the results of Deetz's turnover analysis—which showed that after the Funds' investors learned about the SEC's allegations, "a substantial majority of" them "remained in the" Funds. *See* Deetz Rep. ¶¶ 143-44, A-206. The SEC does not dispute that these factors are relevant to qualitative materiality. Instead, the SEC argues that Deetz's consideration of qualitative factors is incomplete and unreliable because he fails to list two factors—management intent and bias. Mot. 18-19. But the SEC is wrong: Deetz considered both factors in his analysis.

Deetz's first additional factor did not utter the words "management intent," but he considered Hickey's allegations "that SBB failed to consider and apply ASC 820 in the valuation of its structured notes." *See, e.g.*, Deetz Rep. A-206. That is all the SEC means when it says "management's intent." There is no smoking gun email or testimony in which an SBB employee indicates that their use of the SBB model was a way to charge Dr. Barnett and his family and friends more fees or entice prospective investors. Deetz's qualitative analysis also considered the allegations in the Complaint (*id.* ¶¶ 140(f), 165(f)), including that Defendants "intentionally rigged SBB's valuation model to inflate the recorded value of the Funds' securities and make the Funds' performance look much better than it actually was" (Dkt. 1 ¶ 2). Deetz observed that, even after

the Funds' investors become aware of the SEC's allegations, "a substantial majority … remained in the SBB Funds." Deetz Rep. ¶¶ 143-44. He further confirmed he reviewed all of the documents and testimony in the record that the SEC cited as evidence of management intent and bias and considered this evidence in forming his materiality opinions. *Id.* A-6 to A-13 (citing the evidence that the SEC claims Deetz failed to consider); Deetz Tr. 233:1-4, 237:1-238:3, 242:10-20, 243:10-17; *Al Qari v. Am. Steamship Co.*, 2023 WL 5202311, at *7 (E.D. Mich. Aug. 14, 2023) (expert did not "cherry pick[]" data where he "testified that he did review all" relevant testimony, even though—unlike Deetz, who reviewed and cited the full record—the expert "only cited to a select few passages" of testimony in report).

As an after-thought, the SEC asserts that Deetz "create[d] a curated factual narrative as part of his qualitative analysis." Mot. 20. The SEC does not identify what part of Deetz's Report it claims "construct[s] a factual narrative based upon record evidence" (*id.*), but experts are certainly entitled to discuss facts in support of their opinions. That is precisely what Deetz has done here.

## V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny the SEC's motion to exclude certain of Deetz's expert opinions.

Dated: May 13, 2024                         Respectfully submitted,

By: /s/ *John J. Sikora, Jr.*
John J. Sikora, Jr. (6217330)
Heather A. Waller (6302537)
Marissa K. Perry (6337268)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel. (312) 876-7700
john.sikora@lw.com
heather.waller@lw.com

marissa.perry@lw.com

Howard J. Rosenburg (6256596)
KOPECKY SCHUMACHER
ROSENBURG LLC
120 N. LaSalle, Street, Suite 2000
Chicago, IL 60602
Tel. (312) 380-6631
hrosenburg@ksrlaw.com

H. Gregory Baker (*pro hac vice*)
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Tel. (212) 336-2871
hbaker@pbwt.com

*Attorneys for Defendants
SBB Research Group, LLC, Samuel Barnett,
and Matthew Aven*