UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| U. S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) Case No.: 1:19-cv-06473 ) |
| v. | ) Hon. Sharon Johnson Coleman ) |
| SBB RESEARCH GROUP, LLC, et al., | ) ) ) |
| Defendants. | ) ) ) |

SECURITIES AND EXCHANGE COMMISSION'S
REPLY IN SUPPORT OF ITS
*DAUBERT* MOTION TO LIMIT THE OPINION TESTIMONY OF ARUN SEN

May 28, 2024

Timothy S. Leiman (leimant@sec.gov)
Kevin A. Wisniewski (wisniewskik@sec.gov)
Robert M. Moye (moyer@sec.gov)
Devlin N. Su (suede@sec.gov)
SEC Chicago Regional Office
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

*Attorneys for Plaintiff United States Securities and Exchange Commission*

Defendants' valuation "rebuttal" expert Dr. Arun Sen offered *no* opinions on the two core valuations issues in this case: (1) the reasonableness of SBB's structured note valuation model or (2) the numerous deficient model inputs and methodology identified in the SEC's Complaint. The report issued by the SEC's valuation expert, Dr. Craig McCann, addressed these issues head-on. Sen's "rebuttal" report had nothing to say on these issues.

Instead of opining on the undisputed deficiencies underlying ***SBB's model*** and ***SBB's methodology***, Sen commits the same error as Defendants by concentrating solely on SBB's model *outputs* and claiming that they were in-line with "third-party sources." The SEC's *Daubert* Motion exposes Sen's regression analysis as unreliable because he cherry-picked his data, ran a <u>second</u>, undisclosed, regression analysis that contradicted his conclusion, and committed data errors that, if fixed, also contradict his conclusion. Defendants' try every tactic to salvage Sen's flawed regression analysis. They mischaracterize the SEC's complaint, misstate key facts, and try to re-write Sen's opinions and deposition testimony. In the end, Sen's regression analysis is a text-book example of an expert applying a potentially valid methodology in an unreliable fashion. It should be excluded from this case.

Defendants' attempt to walk-back Sen's sweeping, unequivocal statement that McCann had absolutely *zero* support for the model he used to value SBB's notes. That is clearly false. Knowing this, Defendants claim that what Sen really meant is that *certain articles* discuss drawbacks with the approach McCann used to model volatility. That, however, is not Sen's opinion and the academic literature Sen cites discussing the pros and cons of the different approaches to modeling volatility is a far cry from his opinion that McCann's approach is baseless. The Court should exclude this opinion too.

Finally, Sen's Waterfall is fatuous and offered for no reason other than to confuse the jury. Rather than opine on **SBB's model** or **SBB's model inputs**, Sen's Waterfall shows the impact his "replicated" SBB inputs (*e.g.*, not the real ones) had on *his* model and valuations. Because the Waterfall does not analyze SBB's model, SBB's values, or SBB's model inputs, it would not assist the jury in understanding any facts related to the actual claims or defense in this case. Accordingly, the Court should exclude Sen's Waterfall analysis.

I.      **Sen's Cherry-Picked Data Set Renders His Regression Analysis Unreliable**

Sen's wholesale exclusion of 2011 and 2012 data from his regression analysis ignores the time period actually at issue in this case. The SEC's Complaint alleges that "**[s]tarting in 2011**, [Defendants] rejected over 50 years of standard valuation principles" by "creat[ing] a home-brewed valuation model that radially departed from the norm" and that artificially inflated their structured note valuations. (Dkt. No. 1 ¶¶ 7, 9, 42.) The Complaint further alleges that those artificially inflated note values, which *started in 2011*, "resulted in inflated [SBB] Fund performance, [ ] were included in performance statements and annual financial statements provided to investors, [ ] generated $1.4 million in improperly charged fees, and [ ] were included in misleading marketing materials given to prospective investors." (*Id.* ¶ 9.)

There is no dispute in this case that Defendants marketed their artificially inflated note values to prospective investors up through 2016; including the 2011 and 2012 note values ignored by Sen. For example, the following "Historical Performance" table for the SBB Polysight I Fund was front-and-center in the fact sheets Defendants distributed to prospective investors. (*See* Dkt. 210-11, Ex. 11, Polysight I Feb. 2016 Fact Sheet):

2

| Historical Performance[1] | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
| 2016 | -7.48% | 1.71% | | | | | | | | | | | -5.91% |
| 2015 | 0.26% | 2.28% | 0.47% | 1.18% | 0.72% | -0.53% | 2.15% | -5.50% | -1.84% | 6.33% | 0.89% | -1.46% | 4.62% |
| 2014 | 0.05% | 1.37% | 0.66% | 0.04% | 0.56% | 0.41% | 0.48% | 0.92% | 0.19% | 1.15% | 1.31% | 0.52% | 7.91% |
| 2013 | 5.27% | 0.21% | 0.74% | 0.85% | 1.50% | -0.81% | 1.84% | -0.91% | 1.60% | 1.83% | 0.90% | 0.59% | 14.33% |
| 2012 | 5.05% | 4.76% | 0.36% | -1.43% | -2.94% | 2.78% | -1.53% | 4.01% | 2.23% | -3.07% | 1.12% | 1.87% | 13.55% |
| 2011 | | | | | | | | | -0.99% | 3.54% | -0.36% | 2.39% | 4.58% |

Return Analysis

Defendants know this. Sen knows this. Nevertheless, Defendants Response claims that Sen made a "rational decision" to wholly disregard **16 months** of inflated note values – values which Sen acknowledges were *particularly* inflated – because the "core time period covered by the SEC's allegations" was really 2013-2015. (Resp. 2.) Defendants' argument mischaracterizes the allegations in the SEC's Complaint. Neither Sen nor Defendants get to choose the "core time period" in this lawsuit; it is established by the SEC's Complaint. Defendants' attempt to recast Sen's cherry-picking as somehow driven by the "core" allegations in the SEC's complaint is without merit.

The simple fact is that Sen ***deliberately*** chose to exclude note values he ***knew*** were severely inflated and would fundamentally alter his conclusion.

> I observe that the SBB's values were ***higher*** than those from other sources on average ***by a wider margin in 2011 and 2012*** than was the case for 2013-2105 … [O]n average SBB's values were ***higher*** on a monthly basis than … values from MarkIt by 7.8% of par for 2011-12 while the gap narrowed to 4.2% of par for 2013-2015.

(Dkt. 201-1, Sen Report ¶ 93 (emphasis added).) But using data that suits Sen's opinion (*e.g.*, 2013-2015 note values) while ignoring data that does not (*e.g.*, 2011-2012) is the very definition of cherry-picking, which "undermine[s] the reliability" of Sen's regression analysis and renders his opinion unreliable. *See LeClercq v. LockFormer Co.*, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (Dkt. 210-8, Ex. 8.); *Barber v. UAL, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001); *Van v. Ford Motor Co.*, 332 F.R.D. 249, 269 (N.D. Ill. 2019).

3

Defendants offer four baseless justifications for Sen's cherry-picking.

***First,*** Defendants claim that Sen's cherry-picking was "rational" because SBB had more structured notes in 2013-2015 than it did in 2011-2012. (Resp. 5-6.) While true, the fact that Defendants fraud involved more notes in 2013-2015 does not negate the fact that SBB's model artificially inflated note values in 2011 and 2012 too. With respect to the SEC's fraud claims, Defendants' 2011 and 2012 note values are no more or less significant than values for notes included in the 2013-2015 data used by Sen.

***Second***, Defendants argue Sen's cherry-picking was "not arbitrary" because SBB's model was in a "state of flux" in 2011 and 2012. (Resp. 6-7.) Sen and Defendants claim that SBB's model was "settled" starting in 2013. (*Id.*) Their position is belied by the fact that SBB's model changed in 2013 too. Indeed, Defendants ***admit*** they changed SBB's model in 2013 by implementing and then later modifying Linearization (a core deficiency identified in the Complaint). They ignore this contradiction when justifying Sen's decision to exclude the 2011 and 2012 data, but include the 2013 data. The actual difference between those years?: the 2013 data (which Sen included) was ***not*** as harmful to his conclusion as the 2011 and 2012 data (which he omitted). In any event, the specific date on which SBB's Model became "settled" is not relevant to this case (or to Sen's pretextual argument) because the Complaint alleges that Defendants' model was deficient in 2011 and 2012 and that they marketed these inflated 2011 and 2012 note values to current and prospective investors up through 2016. Defendants never re-valued or re-stated their 2011 and 2012 note values using the purportedly "settled" model; so the values Sen excluded are clearly at issue in this case.

Defendants' ***third*** argument is circular. They argue that their extremely inflated 2011 and 2012 note values were "not material" ***to Sen's opinion*** because his regression analysis

4

covered only 2013-2015, not 2011-2015. (Resp. 7.) But that's the SEC's point: Sen selectively used data supporting his conclusion, while disregarding data that would have undermined it. Sen's "selective use of facts" *is* determinative for purposes of *Daubert* since it renders his opinion unreliable. *See LeClercq*, 2005 WL 1162979, at *4.

*Fourth*, Defendants argue that cherry-picking data is not a proper basis for excluding expert opinions unless there is also a problem with the expert's methodology. (Resp. at 8-9.) Defendants misinterpret *Daubert* and the SEC's argument. Sen's cherry-picking is the reason his regression analysis is unreliable. His analysis is not just "unpersuasive" (which arguably could go to a jury), it is misleading, wholly "unreliable" and excludable under *Daubert* because, as several courts have found, an expert opinion based on cherry-picked facts is simply not good science and is an unreliable method. *See Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) (courts assess the methodology underlying the expert's testimony, not its persuasiveness); *see also Ford Motor Co.*, 332 F.R.D. at 269 ("Experts who engage in cherry-picking of the evidence fail to *satisfy* the scientific method and *Daubert*."); *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017) (same) (Dkt. 201-7, Ex. 7). As the Seventh Circuit explained in *Barber*, "selective use of facts fails to satisfy the scientific method and *Daubert*" and therefore "fails to 'assist the trier of fact.'" *Barber*, 17 Fed. Appx. at 437; *see also In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Prod. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) ("Results-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion. Courts have consistently excluded expert testimony that 'cherry-picks' relevant data."). It's not Sen's use of a regression analysis that renders his opinion unreliable. It's the fact that he applied the

5

regression analysis in an unreliable fashion. Sen's analysis is unreliable because of how he discarded data that he knew undermined his underlying conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence. Either way, Sen's regression analysis is unreliable and should be excluded from this case.

**II.    Sen's *Undisclosed* Second Regression Analysis Renders His Disclosed Regression Analysis Unreliable**

Defendants do not dispute (1) that Sen conducted a second, ***undisclosed*** regression analysis comparing SBB values to MarkIt values and (2) that Sen's MarkIt regression analysis showed ***SBB values were statistically higher*** compared to MarkIt. (Resp. 9-11.) The results of Sen's MarkIt regression analysis are significant because they contradict the opinion Sen offers in his Report that SBB's values were ***not*** significantly higher compared to those from ***"third-party sources."*** Note that in his Report, Sen used the plural "third-party sources." MarkIt is a third-party source. Hiding unfavorable test results comparing SBB's values to Markit, a "third-party source," standing alone, is sufficient grounds to exclude Sen's regression analysis as unreliable.

Defendants nevertheless argue that the MarkIt's regression analysis "does not contradict" Sen's Bank Value regression analysis because that analysis shows only that SBB's values are statistically "in line" ***with bank estimates***; not that they are statistically "in line" with all third-party sources. (Resp. 10 (emphasis in original)). Defendants misstate Sen's opinion. Here is what Sen actually said:

> I performed a statistical analysis comparing SBB's note values to the prices obtained from the ***third-party sources*** and find that SBB's values were not on average significantly higher compared to those from ***third-party sources*** for the period 2013-2015.

6

(Sen ¶ 14 (emphasis added).) Sen did exactly what Defendants tell this Court he did not do: use his Bank Value regression analysis as a springboard for a much broader, across-the-board conclusion that SBB's values were statistically in-line with "*third-party sources*." The problem is (1) Sen did not actually do that analysis and (2) Sen's MarkIt regression analysis contradicts his conclusion; which could explain why Sen excluded it from his Report.

Finally, Defendants argue that disclosure of Sen's MarkIt regression analysis was not required under the Federal Rules. (Resp. 11) That is a non-sequitur. Federal Rule of Evidence 702 and *Daubert* require district courts to determine "whether the expert's methodology is scientifically reliable." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). This requires a "link between the facts or data the expert has worked with and the conclusions the expert's testimony is intended to support." *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Here, Sen's conclusion – that "SBB's values were not on average significantly higher compared to those from *third-party sources* for the period 2013-2015" – is not supported by the facts and the data because his MarkIt regression analysis showed SBB's values *are statistically higher* compared to MarkIt. This disconnect renders his opinion unreliable.[1]

### III. Note 20 Irreparably Skewed Sen's Regression Analysis

Defendants and Sen do not dispute that of the 78 structured notes used by Sen in his regression analysis, Note 20 is the one and only inverse note. They do not dispute that Sen knew that Note 20 had characteristics and "behave[d]" differently from all other notes and

---

[1] The one case Defendants cite, *Chi Tchrs. Union, Loc. 1 v. Bd. Of Educ. Of Chi.*, 2020 WL 914882, at *10 (N.D. Ill. Feb. 25, 2020), does not support their argument that "Sen was under no obligation" to discuss his MarkIt regression analysis. In that case, the Court held that the expert was not required to disclose test "results relat[ing] to analyses that the [expert] does *not* put forth in support of this opinion." *Id*. (emphasis added). Here, Sen's opined that SBB's values were in-line with the values from "third-party sources." His MarkIt regression analysis therefore squarely falls within the analyses set forth in his Report.

7

that SBB's model valued Note 20 differently than all other notes. (Dkt. 210-10, Ex. 2, Sen Dep. 227:19-228:18.) They likewise do not dispute that because of its unique structure amongst SBB's 78 notes, Note 20 reduced the average difference between SBB's values and Bank values in Sen's regression analysis. And they do not dispute that Note 20 *skewed* Sen's regression analysis by such a significant degree that when Note 20 is removed from any of Sen's numerous data sets (whether the regression analysis discussed in the body of his Report or two additional analyses referenced in footnote 91), his conclusion is turned on its head: the difference between SBB's values and Bank values are ***statistically significant***. (Sen Dep. 231:25-232:22 ("So, yes, I checked what [McCann's] saying about Note 20 in a couple of different ways, and I don't disagree generally with what he's saying happens if you drop Note 20.").) By any measure, Note 20 is an obvious outlier that biased Sen's regression analysis and makes the analysis unreliable.

  Defendants ask the Court to overlook that bias and argue that Sen was "correct" to include Note 20 in his regression analysis because the Complaint alleges that SBB's model artificially inflated <u>all</u> note values, and the SEC did not "exempt Note 20" from those allegations. (Resp. 12-13.) While it is ironic that Defendants cherry-pick allegations from the Complaint when it suits their argument (here) while ignoring them when it doesn't (excluding 2011 and 2012 data), their iron-clad adherence to the SEC's allegations in this instance overlooks the simple and undisputed characteristics of Note 20, the economic reality of how the SBB model worked, and the clear bias Note 20 had on Sen's regression analysis. For 100% (77 out of 77) of SBB's "bullish notes," SBB's model generally *inflated* values. For SBB's 1 inverse note, the model generally *understated* values (exactly what SBB's manipulated inputs intended). In other words, Sen is using a misvalued note to make it

appear that SBB's other notes are not misvalued. Sen admits that including Note 20's values in his regression analysis had a dramatic impact on his analysis. (Sen Dep. 229:15-17 ("And that I do remember, that, yes, dropping Note 20 would reduce the P value. [McCann] is correct about that.").)

By including Note 20, Sen skewed the results of his regression analysis, producing an observed association where none exists and created a bias that renders his regression analysis unreliable. *See Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (statistical expert evidence excluded where expert, among other things, demonstrated impermissible bias and mistakenly stated that statistical analysis could identify cause of numerical disparities).

### IV. Sen's Critique of McCann's Model Is Unreliable

Defendants next attempt to re-write Sen's criticism of McCann's model. Their Response argues that Sen's criticism was limited to the fact that McCann "assumes that volatility is constant." (Resp. 13-16.) But that is not what Sen's Report says. Sen unequivocally stated that McCann's model is "not supported by option pricing theory and research …." (Sen ¶ 65.) He opined that because the options underlying SBB's structured notes contained "multiple underlying assets" (Sen at p. 20) – which Sen characterized as "exotic options" – McCann's "ad-hoc Black-Scholes model" was "insufficiently robust to reflect market dynamics" and was an inappropriate tool to value SBB's structured notes (Sen ¶¶ 10, 59.) Sen opined that there was *zero* support for what McCann did.

Sen's sweeping conclusion, however, is contradicted by the two peer-reviewed articles cited by McCann in his report. (Dkt. 210-3, Ex. 3 McCann Report ¶ 41 n. 8.) When the SEC directed Sen to those articles at his deposition and asked whether they supported

9

McCann's approach, Sen replied that he had not read them and conceded that they probably "do support [McCann's] overall approach." (Sen Dep. at 83:19-84:16; 86:19-87:6.)

Defendants' do not dispute these facts. Instead, they once again offer hollow excuses for Sen's baseless critique of McCann's model.

Defendants fault the SEC for "fail[ing] to identify *any* … studies" that support McCann's valuation approach. (Resp. 15.) Untrue: the two peer reviewed journals McCann cites in his Report do just that. Both articles, published years before Defendants purchased their structured notes, discuss techniques for valuing options with multiple underlying assets (like SBB's) using the Black-Scholes valuation model or variations to the Black-Scholes model. They therefore support McCann's approach and directly contract Sen's opinion that McCann's approach is "not supported by option pricing theory and research …." While the articles discuss certain challenges inherent in valuing dual-underlying options, including volatility, they also discuss techniques for dealing with these issues when using the Black-Scholes framework like McCann did. (*Id*.) Neither article, as Defendants claim, "undermine" McCann's approach. (Resp. 14)

Defendants also make the astonishing argument that "[t]here is no requirement that a[ ] [rebuttal] expert personally read every single source cited by an opposing expert" or "read *every* source on a given topic." (Resp. 14, 15 (emphasis in original).) But Sen did not criticize McCann for failing to use a *preferred* approach in the literature or the *majority* approach. Sen boldly asserted that there was absolutely *"no[ ] support[ ]"* for McCann's approach. (Sen ¶ 65.) The SEC is not arguing that Sen had to review "*every* source" on option valuation. But surely before issuing such a sweeping opinion, Sen should have, at minimum, reviewed the ***two*** articles cited by McCann ***in his Report*** to see if those articles

10

supported McCann's approach (they do) before issuing his unfounded opinion. By failing to do so, Sen's critique is merely a baseless jibe, not a credible expert opinion.

Additionally, Sen's deposition testimony establishes that he ignored the articles cited by McCann and selectively chose an article that he believed supported his conclusion.[2] In other words, Sen impermissibly cherry-picked the studies and sources supporting his conclusion, further undercutting the reliability of his methodology. *See In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert where he "cherry-pick[ed] observational studies that supported his conclusion and reject[ed] or ignore[ed] the great weight of the evidence that contradict[ed] his conclusion."); *Daniels-Feasel v. Forest Pharm., Inc.*, 2021 WL 4037820, at *5 (S.D.N.Y. Sep. 3, 2021) (finding expert's opinion "unreliable because he repeatedly cherry-picks favorable studies to support his conclusions, fails to explain the weight he attributed to the studies he reviewed, and also ignores entire categories of relevant studies in his report."), Reply Ex. 1.

> Q: … So one of the opinions in your report is that the valuation used by Dr. McCann to value SBB's structured notes was not supported by option pricing theory or research, correct?
>
> A: I think I make clear … that I think the research indicates there are potentially issues or problems with it. That's how I would characterize it.
>
> Q: Ok. But you specifically opine that his -- the model he used was not supported by option pricing theory or research?
>
> A: ***It's not supported by the research that I have reviewed***. I would put it that way yes.
>
> Q: Is it supported by the research [McCann] cited in his report?

---

[2] While Defendants concede that Sen rendered his opinion without reading or reviewing the articles cited by McCann, they nevertheless argue that Sen's recklessness was OK because someone on Sen's team must have reviewed them. (Resp. 13.) But that unnamed individual must not have alerted the actual expert. Whatever his staff did, Sen's Report ignores the articles cited by McCann and fails to address the fact that the cited option pricing theory and research support McCann's valuation model.

11

| | | |
|---|---|---|
| A: | | I don't believe there's any research he has cited in his … report that would contradict the research that I have cited. Let's put it that way. |
| Q: | | Did you review the research that he cited in his report? |
| A: | | … I don't recall if I necessary did so, but I don't believe they would contradict what – the research I am citing. |
| Q: | | So you don't know, one way or the other, whether the research Dr. McCann cited supports his approach to valuing structured notes? |
| A: | | I don't recall specifically what --- the papers he has cited at this point would have said. |

(Sen Dep. 80:11-81:16 (emphasis added).)

And Sen has made clear that, unlike McCann, he has no expertise in how market participants value multi-asset options – a topic he claimed was outside the scope of his report and on which he admitted he was *unqualified* to opine. Instead, Sen admitted that his opinion was based solely on what he had read in a journal. Sen's critique of McCann's "ad hoc Black-Scholes" valuation approach is therefore baseless and unreliable. (Sen Dep. 131:13-15, 133:5-20, 134:1-135:18.)

And while the *one* article Sen cites in his Report identified certain "difficult[ies]" with using Black-Scholes assumptions, including stochastic volatility, it did not endorse Sen's blanket conclusion that Black-Scholes or a variation of Black-Scholes is wholly "[in]appropriate" for valuing multi-asset options. (Sen ¶ 9.) In fact, the article expressly states that when doing relative pricing, which McCann did, a Black-Scholes model works well. (See Dkt. 210-6, SEC Ex. 6, Hull & Suo 2002, at p. 298.)

**V.     Sen's Waterfall Is Unreliable and Will Confuse the Jury**

Sen has offered no opinion in this case rebutting the significant model deficiencies alleged in the SEC's Complaint or the six specific deficiencies identified by McCann. (Sen Dep. 22:21-23:2 ("Q: No opinion, as to whether *mu* inflated call options underlying SBB structured notes? A: No. Q: No opinion, as to whether *mu* deflated put options underlying

12

SBB structured notes? A: No."); 23:11-13 ("Q: Your report contains no opinion in rebuttal to Mr. McCann's criticism of *mu*; correct? A. That is correct."); 29:21-24 (same, volatility); 32:17-20 (same, Linearization); 35:4-8 (same, "*mu* drift, risk-free rate discount approach").)

Defendants once again ignore the content of Sen's report and his deposition testimony and argue that Sen's Waterfall "demonstrates the impact" that Defendants' six deficient inputs had "on SBB's values" and "how the defective SBB inputs actually worked in ***SBB's*** model." (Resp. at 17, 19 (emphasis in original).) As explained in the SEC's Motion, Sen's Waterfall does no such thing. Sen's Waterfall shows how SBB's deficient inputs impacted ***Sen's model*** and ***Sen's valuations***, ***not SBB's Model*** or ***valuations***.

Showing the impact SBB's inputs had on Sen's model and values – which Defendants characterize as a "'reasonable alternative model'" – is not relevant to any claim or defense in this case. This case is about SBB's deficient model and inflated values, not about how SBB's deficient inputs impacted a "reasonable alternative model." *Daubert* asks District courts to act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Federal Rule of Evidence 702 and *Daubert* therefore require district courts to make a threshold determination as to whether an expert's proposed testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers*, 629 F.3d at 644. Sen's Waterfall analysis should be excluded because it will tell the jury nothing about ***SBB's model*** or the impact that SBB's numerous deficient inputs had on ***SBB's model*** or ***SBB's valuations***. In short, Sen's Waterfall will not help the jury understand or determine any fact at issue in this case. *See SEC v. Lipson*, 46 F. Supp. 2d 758, 765 (N.D. Ill. 1998).

13

Even if the Court were to find that analyzing the impact that SBB's deficient inputs had on Sen's model was somehow relevant to this case, Sen's Waterfall would still not assist the jury because Sen *did not use SBB's actual inputs*. Instead, Sen used "replicated" inputs, which Defendants claim were "very close," but concede did not match the inputs Defendants actually used in the SBB model. (Resp. 19.) Defendants argue that Sen had to re-create and replicate SBB's inputs because Sen "did not have access to the original code that SBB used for its model." (*Id*.) The upshot of Defendants' argument is that they don't have access to their own code or their own model inputs. That is nonsense.

Defendants' argument is also misleading, because they *have in their possession* documents identifying the specific inputs they used to value their structured notes at year-end. In fact, the SEC showed Sen one of these documents at his deposition. (Sen Dep. 277:3-21 (marking Deposition Ex. 10, 3002-A, Note Input Testing 2014-All Funds (Except Medline), attached hereto as Reply Ex. 2.) This exhibit, which SBB provided to its auditor in connection with the year-end audits, contains the inputs SBB used to value each note, including (1) *mu*, (2) volatility, (3) interest rate, and (4) correlation inputs; the very same inputs Sen *replicated* in his Waterfall. (Sen ¶ 120.) When the SEC asked Sen why he did not use the inputs in the exhibit, Sen responded that he believed it was more "internally consistent" to use inputs he created since he was analyzing the impact the inputs had on his model. (Sen Dep. 278:22-279:3, 279:23-280:9.) Sen's inability to "understand" SBB's deficient inputs did not give him license to ignore them. Sen's Waterfall should be excluded for the additional reason that it fails to use the inputs SBB actually used in its model.

Finally, Defendants Response confirms that Figures 2-4 in Sen's report are materially misleading and should not be shown to the jury because they do *not* accurately reflect Sen's

14

Waterfall analysis. These Figures reflect that Sen replaced 6 inputs, when he really replaced 7: the Figures *omit* "correlation." Defendants agree that Sen replaced 7 inputs but argue that the "notes" below the Figures explain that the "Add Drift (mu)" bar graph "incorporates" both (1) mu and (2) the correlation input. (Resp. 19.) While true, the Figures are nonetheless misleading because they do *not accurately depict* the dollar amount change tied to each of (1) correlation and (2) *Mu*. The data underlying the Figures show that note values generally *decreased* when Sen replaced the correlation input. (*See* Sen WP – Waterfall Graph Underlying Data, "2014" Tab.) And then *increased* when he replaced the drift input. (*Id.*) That *decrease* and subsequent *increase*, however, is *not* depicted in Figures 2-4 and therefore renders them misleading. (Sen Dep. 271:3-11; *see also* Sen WP – 2014 Waterfall Graph Underlying Data, Reply Ex. 3 (highlight added).)

| Valuation Date | Note | Ankura Model | Remove Credit Risk | Use Treasury Rate | Use Historical Vol | Add Beta | Use 6M Correlation | Add Drift (Mu) | Add Linearization/SBB Value |
|---|---|---|---|---|---|---|---|---|---|
| | | | | 2014 Waterfall Graph Underlying Data | | | | | |
| 12/31/2014 | 33 | 1,273,531.38 | 1,298,052.25 | 1,321,587.00 | 1,540,874.75 | 1,210,828.61 | 1,166,927.72 | 1,562,255.14 | 1,355,829.35 |
| 12/31/2014 | 35 | 1,215,180.52 | 1,218,477.69 | 1,236,439.46 | 1,331,959.98 | 1,300,523.32 | 1,300,526.77 | 1,327,983.25 | 1,254,188.97 |
| 12/31/2014 | 36 | 1,267,541.22 | 1,281,337.91 | 1,294,838.31 | 1,481,600.33 | 1,295,168.42 | 1,279,995.64 | 1,436,376.66 | 1,285,516.23 |
| 12/31/2014 | 39 | 6,279,998.24 | 6,617,761.42 | 6,984,397.57 | 8,812,811.28 | 6,098,074.70 | 5,823,412.89 | 8,650,314.38 | 6,409,384.96 |
| 12/31/2014 | 45 | 3,488,142.51 | 3,546,301.67 | 3,599,523.80 | 4,127,151.01 | 3,369,000.30 | 3,281,865.61 | 4,154,167.01 | 3,685,980.20 |
| 12/31/2014 | 47 | 3,255,884.77 | 3,260,550.02 | 3,285,809.64 | 3,644,741.26 | 3,241,931.73 | 3,190,089.55 | 3,759,681.87 | 3,504,873.65 |
| 12/31/2014 | 48 | 4,203,717.73 | 4,223,023.13 | 4,230,118.48 | 4,492,770.42 | 4,070,100.52 | 3,962,592.29 | 4,989,551.87 | 4,601,665.50 |
| 12/31/2014 | 49 | 2,138,428.85 | 2,138,836.56 | 2,158,944.01 | 2,330,827.39 | 2,169,248.12 | 2,147,668.65 | 2,438,515.56 | 2,311,521.66 |
| 12/31/2014 | 52 | 2,628,071.11 | 2,634,656.60 | 2,616,823.53 | 2,570,372.04 | 2,609,050.23 | 2,540,875.84 | 3,278,593.64 | 2,694,014.76 |

## CONCLUSION

The SEC respectfully requests that the Court limit Sen's testimony at trial and exclude any testimony about (1) his regression analysis, (2) his criticisms of McCann's valuation model, and (3) his Waterfall analysis.

Dated: May 28, 2024

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION

By: **/s/ Kevin A. Wisniewski**
Timothy S. Leiman (leimant@sec.gov)
Kevin A. Wisniewski (wisniewskik@sec.gov)
Robert M. Moye (moyer@sec.gov)

15

Devlin N. Su (sude@sec.gov)
Chicago Regional Office
175 W Jackson Blvd., Suite 1450
Chicago, IL 60604

*Attorneys for Plaintiff United States Securities and Exchange Commission*

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served by the Court's ECF system upon all counsel of record.

　　　　　　　　　　　　　　　　　　　　**/s/ Kevin A. Wisniewski**
　　　　　　　　　　　　　　　　　　　　Kevin A. Wisniewski

16