UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : : : Plaintiff, : : v. : : SBB RESEARCH GROUP, LLC, et al., : : Defendants. : : | Case No. 19-cv-6473 Judge Sharon Johnson Coleman Magistrate Judge Keri L. Holleb Hotaling |

PLAINTIFF SEC'S REPLY BRIEF IN SUPPORT OF MOTION TO EXCLUDE
MATERIALITY OPINIONS OF GENE DEETZ

Gene Deetz's opinion that MarkIt's valuation model is surrounded by a +/-5% "band of estimation uncertainty" is unsalvageable. As described in the SEC's initial brief, Deetz's conclusion regarding the uncertainty presented by MarkIt's model is the linchpin of his materiality opinion; it is the pretext that allows him to improperly disregard the first 5% of SBB's overstatements of note values. Deetz's report and deposition testimony confirm that: (a) he does <u>not</u> have the specific expertise necessary to evaluate an option valuation algorithm like MarkIt's, (b) Deetz's method for determining the breadth of his +/-5% band hinged largely on undocumented calculations comparing three different valuation models, (c) he did not disclose those calculations in his report, and (d) his calculations are drastically skewed by his cherry-picking of only 3.8% of available valuation data in his analysis.

Faced with that reality, Defendants try to (1) reframe Deetz's report after the fact and (2) convince the Court that he didn't mean what he said at his deposition. First and foremost, Defendants try to reframe the very nature of Deetz's work. They describe Deetz's application of the +/-5% band of estimation uncertainty as a "core function of accountants" to try to shoehorn Deetz's analysis of MarkIt's model into his actual field of expertise. (Dkt. #220 at 2.) Yet, while claiming Deetz's methods were a "core function of accountants," Defendants <u>still</u> cannot cite a GAAP or GAAS provision that includes his methods. The GAAS provision they <u>do</u> cite, AU-C § 540A, <u>undermines</u> their argument as it requires a method supported by audit evidence (which Deetz did not supply) and contemplates the need for expertise in the method of valuation (which Deetz does not have).

Next, they try to run away from Deetz's own deposition testimony. Although Deetz described the previously undisclosed calculations underlying his opinion <u>at least five times</u> at his deposition, Defendants whistle past the graveyard, arguing that Deetz's opinion "was

1

not based on an equation." (*Id*. at 17.) Deetz's testimony is to the contrary. Even worse: if Defendants take away Deetz's flawed calculations, he is left with no methodology for determining the estimation uncertainty of MarkIt's model.

Despite Defendants' *post hoc* efforts to reframe Deetz's report and deposition testimony, Deetz's +/-5% band of estimation uncertainty remains the accounting equivalent of "junk science." He purports to determine the margin of estimation uncertainty presented by MarkIt's valuation algorithm when: (a) he has never reviewed the model in question, (b) has no expertise in evaluating such algorithms, (c) did not consult a valuation expert about his approach to gauging the estimation uncertainty for that algorithm (including his own colleague), (d) the only related calculation he can identify is based on a skewed sliver of available data, and (e) Deetz still has not cited any accounting or valuation principle that supports his calculation that the band is +/-5% (as opposed to 4%, or 2%). Without any reliable, coherent method (beyond his flawed, belatedly disclosed calculations), the SEC and the Court are left with a theme that pervades Defendants' brief: the +/-5% band of uncertainty is reasonable because (1) Deetz is an expert, (2) he used his "judgment," and (3) Deetz says so. That is not good enough. Deetz's band of uncertainty – the linchpin to his materiality opinion – is unmoored from any sound method, valuation principle, or GAAP provision. It can only serve to mislead the jury and should be excluded.

### ARGUMENT

**I.  Deetz's +/- 5% Band of Estimation Uncertainty Is Not An Accounting Opinion and Deetz Is Not Qualified to Deliver It.**

Defendants start their effort to rehabilitate Deetz's "band of uncertainty" opinion by recharacterizing the nature of his assignment as mere "accounting." (Dkt. #220 at 2.) That is incorrect. While his methods do not conform to accepted valuation practice, his goal – to

2

quantify the estimation uncertainty presented by an option valuation model – is squarely within the niche expertise of option valuation algorithms. Deetz opined – without any support in valuation principles – that the first 5% of any deviation by SBB from MarkIt's values can be attributed to "estimation uncertainty" in MarkIt's model (presumably distinct from any difference caused by the manipulated inputs of SBB's model, model bias, or any other factor). (Dkt. #211-10, Deetz Tr. at 94-112.) That assessment requires detailed analysis of the inputs of the models themselves (and their effect on valuations). There is nothing in Deetz's background (or methods) to suggest that he is qualified to analyze MarkIt's algorithm in that way. Defendants do not contest that Deetz: (1) has never performed a quantitative comparison of option valuation models (*id.* at 62), (2) never calculated an estimation band of uncertainty for an option valuation model (*id.* at 125), (3) never calculated the margin of error for an option valuation model (*id.* at 126-27), (4) has never reviewed MarkIt's model (*id.* at 122), (5) doesn't know the inputs to MarkIt's model (*id.* at 122), and (6) did not identify any valuation research or practices to support his conclusion that MarkIt's model has a +/-5% band of estimation uncertainty (*id.* at 178).

      Faced with that reality, the Defendants argue that Deetz's determination of the estimation uncertainty surrounding MarkIt's model is a "core function of accountants" (and that, presumably, Deetz doesn't need valuation expertise). (Dkt. #220 at 2.) If Deetz's assignment is a "core accounting function," one would expect his methods to be included in generally accepted accounting principles ("GAAP"). Defendants offer the Court AU-C § 540A, a GAAS provision related to fair value estimates. (*Id.* at 3, 6, 8-9.) Their argument boils down to: Deetz was determining a "range of fair values" around MarkIt's model, AU-C § 540A allows an auditor to do that, and, so his efforts must constitute "accounting." (*Id.*)

But the actual text of AU-C § 540A offers Deetz's opinion no shelter; it demonstrates that (a) Deetz did not follow the accounting principle he's relying on, and (b) GAAP itself recognizes that a <u>different</u> form of expertise may be necessary when evaluating models like MarkIt's. AU-C § 540A does <u>not</u> allow an auditor to develop a "range of fair values" out of whole cloth. Nor does it support Deetz's specific method for calculating the band of uncertainty purportedly surrounding MarkIt's model. To the contrary, AU-C § 540A specifies a number of measures that an auditor should take when determining a "range of fair values," <u>none</u> of which are reflected in Deetz's report. For example, AU-C § 540A required Deetz to identify and account for management bias (which, as discussed in Section V below, Deetz did not do). (Dkt. #219-20, AU-C- § 540A.A9-A10.) An analysis of bias assists an auditor in distinguishing misstatements attributable to estimation uncertainty from misstatements attributable to model bias (such as the overwhelming bias toward higher values evident in SBB's model described in the SEC's initial brief (Dkt. #211 at 19)).

Under Section 540A, in analyzing the "range of fair values" around MarkIt's model, Deetz also was required to understand the "assumptions and methods" underlying MarkIt's model. (Dkt. #219-20 at .A98.) Deetz did not do that. In fact, he admitted that he never reviewed the MarkIt model he analyzed (let alone understood its inputs and assumptions). (Dkt. #211-10 at 122.) Most significantly, Section 540A <u>expressly recognizes that expertise other than accounting expertise may be required in developing a "range of fair values."</u> It requires the auditor to evaluate whether specialized expertise is needed to evaluate a valuation method and expressly warns that specialized expertise may be necessary when, as here, valuations involve complex financial instruments and specialized valuation models. (Dkt. #219-20 at .A102-.A103.) Deetz did not heed that warning. He failed to consult a

valuation specialist when evaluating MarkIt's model. (Dkt. #211-10 at 105-06.) This, even though <u>his own colleague is Defendants' valuation expert</u>. AU-C § 540A also identifies four methods an auditor may use in developing a "point estimate or range" – including retaining a modeling expert. (Dkt. #219-20 at .A97.) Deetz did not use <u>any</u> of the identified methods.

In short, Section 540A does not magically convert Deetz's model analysis into an "accounting" exercise. To the contrary, that GAAS provision specifically requires a method supported by audit evidence (which Deetz did not supply) and contemplates the need for expertise in the method of valuation (which Deetz does not have). While Deetz is, no doubt, an experienced accountant, he should not be allowed to moonlight as a valuation expert and opine that MarkIt's valuation algorithm has an estimation uncertainty of +/-5%.

II. **Deetz Admitted That The Calculations He Performed to Determine The Scope of His 10% "Band of Estimation Uncertainty" Were Not Disclosed in His Report:**

At his deposition, Deetz – for the first time – explained how he determined that his band of uncertainty was +/-5% (as opposed to 4% or 2%). He repeatedly described a calculation which helped him determine the +/-5% breadth of his band. (Dkt. #211-10 at 94-112.) Defendants do not contest that Deetz's report failed to disclose <u>any</u> mathematical calculation that led him to the +/-5% figure. Instead, they try to convince the Court that Deetz didn't mean what he said at his deposition. Incredibly, they argue that Deetz's method was not "based on an equation." (Dkt. #220 at 17.)

This is, at best, revisionist history. Deetz's testimony is not ambiguous: he performed calculations to support the +/-5% figure <u>but did not disclose them</u>. At his deposition, the SEC asked Deetz whether he performed a calculation "to develop your plus or minus 5 % estimation uncertainty band." (Dkt. #211-10 at 94.) Deetz admitted: "I did a calculation; I just don't have a work paper that reflects the calculation." (*Id.*) To avoid any confusion, the

5

SEC asked again: "did you run a calculation?" (*Id.* at 99.) Deetz, again, responded that he did. (*Id.* at 100.) Deetz then (a) walked the SEC through the calculation, (b) described the inputs (*i.e.*, the note values he was comparing), and (c) described his calculation as determining the average difference between MarkIt's year-end note values and Sen's "upper bound" (on the one hand) and the "average difference" between MarkIt's year-end values and McCann's values (on the other hand). (*Id.* at 102.) For clarification, the SEC asked Deetz to describe the calculation a <u>second</u> time. (*Id.* at 103.) Deetz obliged:

> **Q.** Let's start -- you don't have to find the data. I'm just asking what's your formula here? What is your calculation?
>
> **A.** I compare … you take the 12/31/14 Markit values -- Mark I-T values for Poly 1, and take the difference between that and Dr. Sen's upper bound with correlation risk. And then you can measure how far above market Dr. Sen is. Then you can take Markit's number for Poly 1 14 and measure them against Dr. McCann's values for those same notes at the same time period, and you can measure how far below Markit Dr. McCann's values are. That's the calculation.

(*Id.* at 103.) SEC counsel explained "I want to make sure I'm getting the math right" and Deetz, patiently, described his previously undisclosed calculation for a <u>third</u> time. (*Id.* at 105). Deetz again, unambiguously testified that he gauged his +/-5% band by calculating the average difference between MarkIt and "Sen's upper bound" and between MarkIt and McCann's valuations (adding that he limited his inquiry to the Polysight fund):

> **Q.** I want to make sure I get the math equation right.
> …
> **Q.** You took Dr. McCann's -- let's do the math equation here. You compared Dr. McCann's values to market?
> **A.** That's correct.
> **Q.** Okay. And then what do you do with that result?
> **A.** That's just the result. It tells me it's approximately 5 percent below market.
> **Q.** So you think Dr. McCann's values are approximately 5 percent below market?
> **A.** Using Poly 1 as an example, they are.
> **Q.** Okay. And so that's how you get the 5 percent band, is comparing Dr. McCann's values to Markit's values?
> **A.** Yes, and then Dr. Sen's values to Markit as well.
> **Q.** You then compare Dr. Sen's values -- that's the Ankura value, right?
> **A.** No. Upper bound with correlation risk.
> **Q.** Upper bound with correlation risk to Markit?
> **A.** Right.

6

**Q.** And that's where you get -- and that's where you get 5 percent as well?
**A.** Right. And then … They frame -- if you frame Markit with Dr. Sen and Dr. -- Dr. Sen upper bound correlation risk and Dr. McCann, you get a 10 percent range.

(*Id*. at 107-108.) Deetz then described the undisclosed analysis for a <u>fourth</u> time, confirming, <u>once again</u>, that he reached a +/- 5% figure by "comparing Dr. McCann to Markit, which is approximately that number…That gives me the lower bound, because it's lower. And I'm comparing Dr. Sen (sic) upper bound correlation risk to Markit, and that gives me the upper bound because it is consistently higher." (*Id*. at 110-111.) At the risk of beating a dead horse, the SEC walked Sen through the calculation a <u>fifth</u> time:

**Q.** Again, you say the comparison of Dr.McCann's values to Markit's values is roughly 5 percent for Polysight?
**A.** Right.
**Q.** And that the comparison of Dr. Sen's upper bound with correlation and Markit is 5 percent?
**A.** Correct.

(*Id.* at 112.) In sum, Defendants' *post hoc* effort to convince the Court that Deetz did not rely on an undisclosed (and flawed) calculation in creating his "band of uncertainty" is completely contradicted by Deetz's repeated, unambiguous testimony under oath.

There also is no debate that Deetz's calculation method was <u>not</u> disclosed in his report. Deetz admitted that: (a) he didn't "specifically describe" the calculation in his report (*id.* at 100), (b) he didn't discuss the calculation in the text of the report (admitting "I don't have a particular reason for that") (*id.* at 113), and (c) a reader of his report would not know which models he was comparing to come up with his +/-5% calculation (*id*. at 114).

Faced with Deetz's unambiguous testimony, Defendants resort to a familiar tactic: they blame the SEC. Defendants suggest that the SEC somehow bamboozled Deetz into describing his method as a "calculation," claiming that Deetz was simply "adopting the SEC's language." (Dkt. #220 at n.10.) That argument is nonsense. Deetz is no neophyte; he is a professional expert witness who has been deposed <u>between 50 and 100 times</u> and served

7

as an expert consultant for more than 30 years. (Dkt. #211-10, at 6-7.) Deetz did not mention his method in passing or refer to his process offhandedly as a "calculation." He described his method – a method that can only be described as a mathematical comparison of valuation models – more than five times in his deposition.[1] (*Id.* at 94-112.) He described his calculation step-by-step, including: (a) the inputs (*i.e.*, the year-end values generated by the models he was comparing for the Polysight fund), (b) the mathematical function (the average difference between the values), and (c) the outputs ("approximately" +/-5%). He was not fooled or "mirroring the SEC's language." Defendants' attempt to disown Deetz's unambiguous testimony – and to blame the SEC in the bargain – holds no water.

### III. Without His Undisclosed Calculations, Deetz's +/-5% Band of Estimation Uncertainty Is Pure *Ipse Dixit*:

Defendants' effort to disown Deetz's sworn testimony – and forge distance from his belatedly disclosed calculations – leaves the SEC and the Court with a critical question: if Deetz's +/-5 % band of uncertainty was not based on a calculation, then what was it based on? Defendants do not offer a sound methodological substitute. For all of the disqualifying flaws described in the SEC's initial brief, at least Deetz's belatedly disclosed calculations constituted a method of sorts; an unreliable method, but a method nonetheless. In running away from that defective calculation, Defendants have left no method to point to.

Instead, Defendants offer a hodge-podge of vague, easily debunked "bases" for Deetz's opinion, none of which constitutes a reliable, testable, repeatable method for calculating the breadth of his band of estimation uncertainty:

---

[1] In any event, whether you call Deetz's testimony a description of a "calculation," "method," or some other word is beside the point. Deetz described his method five times on the record. That method, by his own admission, was not disclosed in his report.

- <u>AU-C § 540A (cited as basis for Deetz's band at p.8)</u>: As discussed above, AU-C § 540A does <u>not</u> provide a method for calculating a "range of fair values." Rather, it details a series of rules for auditors in determining a range – <u>none of which Deetz actually followed</u>. Among other things, Deetz should have, but didn't, (a) consider model bias, (b) understand the assumptions and methods behind the MarkIt model he was purportedly analyzing, or (c) consider retaining an expert in option valuation models to assist in his evaluation of MarkIt's model. (pp. 4-5 *supra*.) In short, Deetz did not follow the requirements of the GAAS provision he now claims to have based his opinion on.

- <u>Disclosures from counterparty banks (cited as a basis for Deetz's band at pp. 9-10)</u>: This refers to a series of Form 10-K annual financial disclosures filed with the SEC by the banks who issued structured notes. Deetz has not identified a single "disclosure" from a counterparty bank that provides for a +/-5% band of estimation uncertainty around that bank's option or note valuations. In fact, at his deposition, Deetz admitted that <u>none</u> of the financial disclosures he referred to actually <u>quantified</u> estimation uncertainty for the bank's structured products. (Dkt. #211-10 at 132.) Worse, Deetz admitted that the bank disclosures he purportedly relied on do not identify: (a) the type of structured financial products reflected in the bank's disclosures, (b) whether the disclosures relate to the same sort of structured notes at issue here, (c) what percentage of the bank's structured products consist of structured notes similar to the assets at issue, (d) the model the bank used to value those structured products, or (e) what asset or index of assets underlies the bank's structured products. (*Id.* at 133-37.) In short, Deetz admits that the bank disclosures (1) don't include a

9

defined band of estimation uncertainty or a method for calculating such a band, and (2) may not even involve the same type of assets or valuation model at issue here.[2]

- Note Sales (cited as a basis for Deetz's band at p.10): At the threshold, Deetz identifies only 6 note sales over a five-year period. (Dkt. #211-11 at ¶ 132.) Deetz offers no explanation in his report for how a data set with only six valuation points – all measured at the end of a note's life-cycle – could reliably be extrapolated to all 1,439 note values in all six SBB funds over a multi-year period. In short, Deetz identifies a data set (six note sales) without identifying a reliable method for using it. In addition, that six-point data set is an even less reliable basis for Deetz's opinion than the calculations that Defendants now try to disown. As the SEC showed in its initial brief, Deetz's defective calculation was skewed because it was based on a sample of only 3.8% of available note data (a total of 56 data points out of 1,439 available). The sale valuations Deetz "observed" constitute an even smaller – and, therefore, statistically less reliable – .41% sample of the available note data.

- RSM's Auditing Guidance (cited as support on p. 11): Defendants pluck a document from its context to claim that "materiality guidance" from SBB's auditor RSM supports Deetz's +/- 5% band. This is, once again, an attempt to rewrite Deetz's report after the fact. Deetz's report does not discuss RSM's "guidance" or claim that that "guidance" was a basis for his opinion. Second, Defendants misconstrue the document. RSM's audit guidance does not relate to the determination of the materiality of misstatements in financial statements. Rather, it relates to RSM's initial assessment of audit risk presented by the client for purposes of developing audit procedures. (Ex. A, Mintzer Tr. at 438-44.) As the SEC's

---

[2] Deetz claimed – and Defendants repeat – that the bank disclosures somehow support a "wide" band of estimation uncertainty. Notably, they do not say where that comes from. Deetz admitted under oath that the bank disclosures did not, in fact, quantify a band of uncertainty, and none of the disclosures used the term "wide" to describe estimation uncertainty. (*Id.* at 132-33.)

audit expert has testified, Defendants' attempt to depict this document as relating to a misstatement analysis is comparing "apples to oranges." (*Id.* at 442-44) Defendants offer <u>no</u> insight into what RSM's risk assessment method was or why it can reliably be borrowed for a materiality analysis. <u>Finally</u>, RSM witnesses have provided extensive testimony about their views of materiality for a restatement analysis, testifying that they would not have performed a restatement analysis (and would have <u>immediately</u> resigned) had SBB told RSM the truth about SBB's misconduct and deviation from standard option valuation practices. (*E.g.*, Ex. B, Davisson Tr. at 254-59.) Curiously, while Defendants purport to rely on RSM's "guidance," RSM's resignation and determination that it could not rely on SBB management's representations is not mentioned in Deetz's analysis.

- <u>Deetz's "extensive fair value and auditing experience" (cited as a basis for Deetz's opinion at pp. 8-9)</u>: As discussed above, Deetz's "fair value and auditing experience" does <u>not</u> include experience with evaluating estimation uncertainty for option valuation algorithms like MarkIt's. And, the "judgment" needed in this context relates to an algorithm <u>Deetz did not review</u>. <u>Second</u>, an expert's "experience" and "judgment" is not the equivalent of a testable, reliable <u>method</u>. Such an argument boils down to: Deetz is an experienced expert who applied his judgment and, therefore, his opinion is reasonable. Absent actual, reliable support, that is the very definition of impermissible *ipse dixit*.

IV.  **The Math Debunks Deetz's +/- 5% Band of Estimation Uncertainty:**

Without support in GAAP, or anything substantive other than Deetz's say-so, the Court is left with Deetz's belatedly disclosed calculation. As the SEC demonstrated – using all available note values – the math debunks Deetz's conclusion. (Dkt. #211 at 15-18.) While they offer several excuses, Defendants do not contest that: (a) Deetz's calculations

11

were based on a 3.8% sliver of available note values, or (b) consideration of all note values generated by the models at issue changes the outcome of Deetz's calculation.

Instead, they argue that the SEC should have repeated one of Deetz's central mistakes. They argue that in correcting Deetz's flawed calculations, the SEC should not have used Sen's actual note valuations (*i.e.*, the point estimate that Sen determined using the Heston model), but rather should have used the upper extreme of the margin of error that Sen calculated for the Heston model (which Deetz calls the "upper bound"). (Dkt. #220 at 16.) Defendants express confusion and argue that Sen calculated multiple values for each note. But, that is not what he did. As Sen described in his report, he used a model called the Heston Model to value SBB's notes. (Dkt. #211-16 at ¶¶ 80-81, 84, 92-93.) The model generated a single point estimate for each note valued. (*Id.*) That is Sen's "actual valuation." He then calculated the purported margin of error for his model by calculating variances caused by two of the variables in his Heston model. (*Id.* at ¶¶ 94-101.) Critically, the "upper bound" of Sen's margin of error (which Deetz borrowed) is (a) not Sen's actual point estimate for note values, and (b) is based on the inputs of Sen's Heston model; it has nothing to do with the variables of MarkIt's model which Deetz was supposedly analyzing.

When calculating the lower extreme of his band, Deetz used McCann's actual year-end note values and compared them to MarkIt's. But, without citing any basis in valuation principles, Deetz artificially inflated the upper side of his band by ignoring Sen's actual fair value estimate for the notes and instead borrowing Sen's "upper bound" (*i.e.*, the high extremity of Sen's margin of error calculation). That is how Deetz expanded his band for MarkIt's model to +/-5%. In other words, Deetz borrowed the error calculation of an expert he did not talk to (Dkt. #211-10 at 163), related to variables from a model (the Heston

12

model) that Deetz did not analyze, using calculations that Deetz cannot replicate and did not verify (*Id.* at 167, 169, 177). Then, without citing any supporting valuation literature – and without consulting a valuation expert – Deetz took Sen's error range (from a model Deetz did not analyze) and injected it into his analysis of the estimation band surrounding a <u>second</u> model <u>that Deetz never reviewed</u> (MarkIt's model). Defendants offer no sound methodological basis for such a radical maneuver. The SEC's calculation avoids that mistake and uses Sen's <u>actual</u> fair value estimate that he obtained using the Heston model.

Faced with the methodological gap in Deetz's calculation, Defendants, again, resort to blaming the SEC. Without a hint of irony, Defendants blame the SEC for not submitting a supplemental report after the report deadline <u>to critique an analysis that Deetz did not disclose in his report</u>. (Dkt. #15-16, n.8-n.9.) Worse, they now suggest that the SEC should have supplemented reports <u>that Defendants are currently (albeit incorrectly) arguing should be stricken as untimely</u>. To repeat: Defendants argue that the SEC's mathematical chart (Dkt. #211 at 17) should be ignored because it wasn't in a report, even though the chart addresses a calculation <u>that wasn't in a report</u>. Defendants' logic-pretzel cannot distract from the fact that: (a) the SEC did not have the opportunity to rebut Deetz's calculation because he did not disclose it before the rebuttal report deadline, and (b) Deetz's math is demonstrably skewed by his cherry-picking of 3.8% of available note data.[3]

### V. Defendants' Argument That Deetz Considered Model Bias and Management Intent Does Not Reflect His Actual Analysis:

Defendants do not contest that, to conduct a proper qualitative analysis of SBB's defective model, Deetz should have examined two critical factors: model bias and

---

[3] Defendants casually claim that the underlying math behind the SEC's chart is "riddled with errors." (Dkt. #220 at n.9.) Unfortunately, they do not provide any hint to the SEC or the Court as to what those purported "errors" are.

management intent. Nor could they. SAB 99 expressly directs auditors to consider management intent, specifying that intent "may provide significant evidence of materiality." (Dkt. #211-17, SAB 99 at 4.) GAAP also requires auditors to consider model bias which Con 2 defines as "a tendency to be consistently too high or too low" as opposed to "equally likely to fall on either side." (Dkt. #211-20, Con 2 at 9.) But, those two factors are not substantively discussed in Deetz's analysis. That alone should be disqualifying.

      Defendants gamely try to retroactively shoehorn these factors into Deetz's report and cite Deetz's statement at his deposition that he did consider bias and management intent. (Dkt. #220 at 19-20.) But, Defendants' argument ignores the content of the report. There is, in fact, no indication in Deetz's report that those two critical factors played a substantive role in Deetz's analysis. This, even though Deetz exhaustively described the factors that did play a substantive role. (Dkt. #211-11 at ¶¶ 140-41.) In his report, Deetz provided an extensive four-page list of the factors he considered for qualitative materiality. (*Id.*) In those four pages he identified and listed 33 factors he considered. (*Id.*) He identified nine factors from SAB 99 (*i.e.*, all the qualitative factors identified in SAB 99 except for management intent). (*compare id.* ¶ 140 *with* Dkt. #211-17 at 4-5.) Then, for good measure, Deetz listed 24 "additional qualitative factors" he considered that – unlike bias and management intent – are not expressly mentioned in SAB 99. (Dkt. #211-11 ¶ 141.) These 24 additional factors, not coincidently, are just a curated sample of facts that Deetz weighed in SBB's favor. (*Id.*) Adverse facts were conspicuously left out. Meanwhile, the two factors that GAAP specifically identifies as being critical appear nowhere in Deetz's extensive list of factors he considered. As if that weren't enough, Deetz includes 49 pages of exhibits in which he

14

discussed how he weighed those factors for each fund.[4] None of those 49 pages of exhibits mentions – let alone construes – the two critical factors of bias and management intent.

Deetz's omission of management intent and risk is more incredible given the facts that Deetz purportedly reviewed. One would think that model bias is worth discussing given the evidence that SBB's model was overwhelmingly biased toward higher values. As Mintzer explained in his rebuttal report, 93% of the misstatements Deetz identified were higher than the corresponding MarkIt value. (Dkt. #211-2, Mintzer Rep. ¶ 43.) All 65 note misstatements Deetz identified for the Polysight fund, and all 59 misstatements identified for the Investors II fund, were overstatements. (*Id*.) Yet, the word "bias" does not appear anywhere in the 367 pages of Deetz's report. One also would hope that an expert with 30 years of experience would discuss management intent given that SBB witnesses testified that SBB's departure from standard valuation practice was deliberate. (*See id*. ¶¶ 36-41.)

Whether Deetz failed to consider bias and intent, or merely thought about them in passing and discarded them out of hand, Deetz's qualitative materiality narrative is untethered from the requirements of GAAP and facially unreliable. His qualitative analysis does nothing more that gather and weigh his selection of cherry-picked facts. That approach is both unreliable and invades the fact-finding mission of the jury.

## CONCLUSION

For the foregoing reasons, and the reasons identified in its initial brief (Dkt. #211), the SEC respectfully requests that the Court exclude Gene Deetz's materiality opinion.

Respectfully Submitted,

**UNITED STATES SECURITIES**

---

[4] *See* Dkt. #211-11, Deetz Rpt. at 46-50, 187-192 (INV.II Ex. 21), 205-08 (CPS.I Ex. 13), 221-24 (INV.III Ex. 13), 237-40 (INV.IV Ex. 13), 253-56 (CPS.XI Ex. 13), 265-67 (POLY.I Ex. 9), 288-93 (INV.II Ex. 21), 306-09 (CPS.IB Ex. 13), 322-25 (INV.IIIB Ex. 13), 338-41 (INV.IVB Ex. 13), 354-57 (CPS.XIB Ex. 13), 366-68 (POLYI.B Ex. 9).

AND EXCHANGE COMMISSION

Dated: May 28, 2024  By: ***/s/ Timothy S. Leiman***
Timothy S. Leiman (Leimant@sec.gov)
Robert M. Moye
Kevin A. Wisniewski
Devlin N. Su
Chicago Regional Office
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390

*Attorneys for the Plaintiff*
*United States Securities and Exchange Commission*

## CERTIFICATE OF SERVICE

I hereby certify that that I have served a copy of the foregoing document on counsel of record by filing it with the Court's ECF system.

Dated: May 28, 2024  ***/s/ Timothy S. Leiman***