Page 1

1  UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ILLINOIS
2  EASTERN DIVISION

3

   SECURITIES AND EXCHANGE        )
4  COMMISSION,                    )
                                  )
5    Plaintiff,                   )
                                  )
6  vs.                            ) Civil No. 1:19-CV-06473
                                  )
7  SBB RESEARCH GROUP, LLC,       )
8  SAMUEL B. BARNETT, and         )
9  MATTHEW LAWRENCE AVEN,         )
10                                )
11   Defendants.                  )
12
13
14
15
16         The video deposition of RICH DAVISSON, taken
17   before Richard Derrick Ehrlich, Registered Merit
18   Reporter, Certified Realtime Reporter, taken
19   pursuant to the Federal Rules of Civil Procedure, at
20   Latham & Watkins LLP, 330 N. Wabash Avenue, Chicago,
21   commencing at 9:00 a.m., on the 20th day of January,
22   2023.
23
24
25

Page 2

1  A P P E A R A N C E S
   On behalf of the Plaintiff:
2       Timothy Leiman
        UNITED STATES SECURITIES AND
3       EXCHANGE COMMISSION
        175 W. Jackson
4       Suite 1450
        Chicago, IL 60604
5       312.353.5213
        leimant@sec.gov
6  
   On behalf of the Defendants:
7  
        John Sikora
8       Marissa K. Perry
        Latham & Watkins LLP
9       330 North Wabash Avenue
        Suite 2800
10      Chicago, IL
        312.876.7700
11      john.sikora@lw.com
        marissa.perry@lw.com
12  
        Howard J. Rosenburg
13      KOPECKY SCHUMACHER ROSENBURG LLC
        120 N. LaSalle Street
14      Suite 2000
        Chicago, IL 60602
15      312.380.6631
        hrosenburg@ksrlaw.com
16  
   On behalf of the Rich Davisson:
17  
        Christopher C. Kearney
18      KEKER, VAN NEST & PETERS
        633 Battery Street
19      
20      San Francisco, CA 94111
21      415.676.2372
22      ckearney@keker.com
23  
24 Videographer: Scot Ziarko
25

Page 3

1           I N D E X
                                  Page
2  Exam by John Sikora              5
      Exam by Tim Leiman          251
3  Exam by John Sikora            267

4           E X H I B I T S
                                  Page
5  
   Exhibit No. 119 -              11
6  
   Exhibit No. 120 -              52
7  
   Exhibit No. 121 -              56
8  
   Exhibit No. 122 -              59
9  
10 Exhibit No. 81 -                76
11 previously marked
12 Exhibit No. 123 -               94
13 Exhibit No. 67 -               106
14 previously marked
15 
16 Exhibit No. 124 -              200
17 
18 Exhibit No. 41 -               203
19 previously marked
20 Exhibit No. 125 -              235
21 Exhibit No. 126 -              248
22
23
24
25

Page 4

1      VIDEOGRAPHER: Good morning. We are now on
2  the record. My name is Scot Ziarko. I'm the
3  videographer representing Veritext Legal
4  Solutions.
5      Today's date is January 20th, 2023. The
6  time is now approximately 9:13 a.m.
7      This deposition is being held at 330 North
8  Wabash Avenue, Chicago, Illinois, in the matter
9  of Securities & Exchange
10 Commission vs. SBB Research Group LLC, et al.
11     The name of the witness is Rich Davisson.
12 Our court reporter today is Rich Ehrlich, who is
13 also with Veritext Legal Solutions.
14     Will counsel please identify yourselves for
15 the record and will the court reporter please
16 swear in the witness?
17     MR. SIKORA: Yes. John Sikora and Marissa
18 Perry from the law firm of Latham & Watkins on
19 behalf of the defendants.
20     MR. ROSENBURG: Howard Rosenburg from the
21 law firm of Kopecky Schumacher Rosenburg, also
22 on behalf of the defendants.
23     MR. LEIMAN: Tim Leiman for the
24 Securities & Exchange Commission.
25

Page 5

1      MR. KEARNEY: And Chris Kearney from Keker,
2  Van Nest & Peters on behalf of the witness and
3  RSM.
4      RICH DAVISSON, DEPONENT, SWORN
5      VIDEOGRAPHER: You may begin.
6           EXAMINATION
7  BY MR. SIKORA:
8  Q  Could you please state and spell your full name
9     for the record?
10 A  Yes. My full name is Richard, R-I-C-H-A-R-D,
11    Davisson, D-A-V-I-S-S-O-N.
12 Q  And, Mr. Davisson, have you ever been deposed
13    before?
14 A  Yes, I have.
15 Q  How many times have you been deposed?
16 A  I've been deposed two times previously.
17 Q  And for those two times, are you referring to an
18    SEC investigation?
19 A  Yes.
20 Q  And was it the SEC's investigation of SBB?
21 A  Yes.
22 Q  Okay. So we're going to use the term "SBB"
23    throughout the deposition today. You understand
24    that SBB was an audit client of RSM; is that
25

Page 6

1 right?
2 A Yes.
3 Q Okay. So apart from those two testimonies you
4 provided to the SEC in their investigation of
5 this matter, have you been deposed in any other
6 matter?
7 A No.
8 Q I'm going to just run through a few ground rules
9 just so that we can stay in sync with the court
10 reporter and the videographer here.
11 So, one, is I would ask that you answer
12 audibly. You seem like you're doing a pretty
13 good job with that so far, but not to use
14 nonverbals or the garbled unh-unh, which is
15 ambiguous. Nobody knows what it means.
16 We're going to end up with a transcript
17 with everything that is said, both questions I
18 ask and answers you give. And for the
19 transcript to be clear, you need to answer
20 audibly and clearly. Is that understood?
21 A That's understood.
22 Q The other thing we'll have to do is to take
23 turns. So oftentimes people will talk over each
24 other. That can be a problem for the transcript
25

Page 7

1 here.
2 So I would ask that you wait for me to
3 finish my question before you begin your answer,
4 and, likewise, I'll do my best to wait for you
5 to finish your answer before I begin my next
6 question.
7 Is that understood as well?
8 A Yes.
9 Q There may be questions that I ask you where you
10 don't actually know what I'm asking, and so if
11 that comes up, I would ask that you let me know
12 that and ask me to rephrase the question so it's
13 intelligible to you. Is that likewise
14 understood?
15 A Yes.
16 Q Okay. We may -- we will take some breaks during
17 your deposition here today. If you have a need
18 for a break, please let us know. Generally
19 speaking, if a question is pending, you'll have
20 to answer the question before we take a break.
21 But I just wanted to let you know that if you do
22 need a break, it's okay to say so and we'll do
23 whatever we can to accommodate.
24 A Thank you. Understood.
25

Page 8

1 Q There may be times where I ask questions and
2 there are objections, whether from your counsel
3 or SEC counsel. You are still obligated to
4 answer the question that I'm asking unless your
5 counsel instructs you not to answer a question.
6 Do you also understand that?
7 A Yes.
8 Q And after your deposition has been concluded, a
9 transcript will be prepared and you'll have an
10 opportunity to review that transcript and make
11 any changes you think are appropriate. Do you
12 understand that as well?
13 A Yes.
14 Q One thing just to make you aware of, if you do
15 make changes to your transcript, those are
16 changes that we can comment on in later
17 proceedings, whether at a trial or at a later
18 proceeding in this matter; likewise, I want to
19 make sure you understand that.
20 A Understood.
21 Q Mr. Davisson, have you taken any medication
22 today that would impair your ability to give
23 truthful and complete answers to my questions?
24 A No, I have not.
25

Page 9

1 Q Is there any other reason why you cannot answer
2 my questions today truthfully and completely?
3 A No.
4 Q Mr. Davisson, did you do anything to prepare for
5 your deposition today?
6 A Yes, I did.
7 Q What did you do?
8 A I reviewed the previous SEC transcripts that
9 were -- from my depositions as well as looked at
10 information provided to me by counsel.
11 Q When you say information provided to you by
12 counsel, were you looking at documents?
13 A Yes.
14 Q Can you describe, just generally speaking, what
15 kinds of documents you looked at?
16 A Primarily exhibits from the SEC as well as
17 information from our work papers that were given
18 to the SEC previously of which I was a signer.
19 Q Anything else?
20 A I do not believe so.
21 Q And about how long do you think you spent
22 preparing for your deposition?
23 A I would say 12 hours, not including -- 16 hours.
24 16 hours.
25

Page 250

1 reask the question because I have confusion in
2 what you're asking for.
3 Q  Sure.  So before the resignation in April of
4 2019, what I want to understand is: Had you
5 ever been involved in a situation where either
6 RSM or any of its partners or employees had
7 received a Wells notice from the SEC?
8      MR. KEARNEY:  And, again, I'm going to
9 object and instruct the witness not to answer if
10 it calls for revealing information received
11 through counsel.  If you have information
12 outside of that, you can answer.
13      THE DEPONENT:  I'm trying to recall.  I'm
14 not trying to avoid an answer.  I'm thinking
15 through this.  I don't believe so.
16      MR. SIKORA:  All right.
17      So, Mr. Davisson, that concludes the
18 questions I have for you for this segment of
19 your deposition.  I may have further questions
20 depending on the questions that Mr. Leiman asks,
21 but I'll pass you over to Mr. Leiman for,
22 you know, whatever questions he has for you.
23      THE DEPONENT:  Okay.  Thank you.
24
25

Page 251

1           EXAMINATION
2 BY MR. LEIMAN:
3 Q  Hello, Mr. Davisson.
4      Do you remember you were asked questions
5 about the use of non-observable versus
6 observable inputs in relation to the
7 requirements of the ASC 820?
8 A  Yes.
9 Q  Are you familiar with ASC 820's requirements as
10 to whether market participant assumptions should
11 be taken into account in -- if someone is
12 valuing a security with non-observable inputs?
13 A  Yes, I would be.
14 Q  And in general, does ASC 820 provide that when
15 someone valuing a security is using a
16 non-observable input, that they should take into
17 account the assumptions and practices of other
18 market participants?
19 A  Yes.
20 Q  And did you or, to your knowledge, anyone else
21 at RSM evaluate whether SBB conformed its
22 non-observable inputs to the practices of other
23 market participants?
24 A  I did not do that myself, so to answer the first
25

Page 252

1 part of your question.
2 Q  I'll represent to you that there's testimony in
3 this case from Mr. Aven and from Mr. Navalgund
4 that the assumptions and practices of other
5 market participants were not taken into account
6 when they created the model.
7      Was that something that you were aware of
8 at the time of the restatement analysis in
9 Exhibit 123?
10      MR. SIKORA:  Objection.  Form.
11      THE DEPONENT:  It is not something I would
12 have been aware of in regards to when I
13 performed the restatement analysis.
14 BY MR. LEIMAN:
15 Q  And is that fact, the fact that they did not
16 take into account the assumptions and practices
17 of other market participants -- is that
18 something that would have been important to you
19 in conducting the analysis in Exhibit 123?
20 A  It would have been important in regards to all
21 information that would enter into the estimate
22 would be important.  It would be a part of the
23 body of evidence that I would look at, and it
24 would be considered along with all the other
25

Page 253

1 evidence that we have, audit evidence.
2 Q  And I think this is sort of embedded in some of
3 your earlier answers, but I just want to sort of
4 clarify.
5      Did you have an understanding when you were
6 conducting the restatement analysis in
7 Exhibit 123 about how SBB had created its
8 proprietary inputs for the valuation model?
9 A  The detail in regards to the proprietary inputs
10 I would have relied on my valuation specialist
11 to understand and understand whether they were
12 part of general valuation techniques.  I would
13 not have gone into the detail level of
14 understanding those particular inputs.
15 Q  If those inputs were created by someone with no
16 experience with ASC 820 or with structured
17 notes, would that have been important
18 information for you?
19 A  That would have been important information.
20 Q  I want to ask you a couple of general questions
21 about RSM's retention.
22      Was RSM retained by SBB to provide advice
23 regarding the composition of SBB's valuation
24 model?
25

Page 254

1 A   Not that I'm aware of.
2 Q   And to your knowledge, was RSM retained to
3     determine whether the valuation model complied
4     with ASC 820?
5 A   Not that I'm aware of.  RSM was engaged to do an
6     audit, and when we perform an audit, we are
7     determining if the financial statements as a
8     whole are in compliant with GAAP.  We would not
9     go down to the level of opining on an individual
10    balance or telling someone that an individual
11    balance or model would be compliant with the
12    standards.
13 Q  So you testified that after the restatement
14    analysis in Exhibit 123, you obtained certain
15    information that ultimately resulted in RSM's
16    resignation, correct?  Do you remember that
17    testimony?
18 A  Yes.
19 Q  Based on your experience in auditing and your
20    experience with restatement analyses, if you had
21    had that information at the time of the
22    restatement analysis, do you believe that that
23    would have affected the analysis?
24        MR. SIKORA:  Objection.  Form.
25

Page 255

1         THE DEPONENT:  I believe that if I had had
2     that information at the time of the analysis,
3     that the analysis never would've taken place
4     because the conclusion to resign based on that
5     information and to essentially have the opinions
6     rescinded with no reliance would've happened at
7     that time and I would have not taken the time to
8     understand if it needed to be a restatement
9     because I would have rescinded the opinion based
10    on the professional judgment around the lack of
11    reliability of management representations.
12 BY MR. LEIMAN:
13 Q  Apart from the fact that they led to RSM's
14    ultimate decision to resign, is it fair to say
15    that the information that's included in the
16    resignation letter that RSM sent out also
17    impacts an analysis of materiality?
18 A  Could you repeat that, please?  I'm sorry.
19 Q  Yeah.  Let me phrase it better.
20        So when you were looking at the restatement
21    analysis, we talked about there's a qualitative
22    and a quantitative materiality analysis,
23    correct?
24 A  Yes.
25

Page 256

1 Q   And in the resignation letter, there's a listing
2     of information that you didn't have at the time
3     of the restatement analysis.
4         Is it fair to say that had the analysis
5     taken place with that information -- and I
6     understand you say it wouldn't taken place, but
7     had it taken place, that that information
8     would've been relevant to qualitative
9     materiality?
10        MR. SIKORA:  Objection to form.
11        THE DEPONENT:  It is fair to say.
12 BY MR. LEIMAN:
13 Q  For example, there is testimony in this case
14    from Mr. Aven and Mr. Navalgund that they did
15    not consider ASC 820 when the model was created.
16        Would that information have been relevant
17    to a determination of qualitative materiality in
18    a restatement analysis?
19        MR. SIKORA:  Objection.  Form.
20        THE DEPONENT:  I'm not sure if that would
21    have entered into qualitative materiality
22    because the materiality is how the investor
23    would look at it.  I believe that it would be
24    part of all the considerations.
25

Page 257

1         And upon further looking at it,
2     understanding what I'm saying, not looking at it
3     but introspection as I answer this, I think that
4     certainly knowing that they were not considering
5     a market participant would have been because the
6     market participant thinks about -- materiality
7     is what a market participant would think about,
8     I would say, yes, it would have been important
9     to the assessment.
10 BY MR. LEIMAN:
11 Q  And looking at the analysis that was conducted,
12    Exhibit 123 talks about a comparison of
13    estimates of fair value -- you've got the SBB
14    model and you've got the Markit, M-A-R-K-I-T,
15    model -- and that it's a comparison of two fair
16    value estimates.  Is that a fair summary of what
17    you were comparing?
18 A  Yes, that is fair.
19 Q  Is there an assumption embedded in that that you
20    are actually comparing to bona fide efforts to
21    try to get at a fair value estimate?
22        MR. SIKORA:  Objection.  Form.
23        THE DEPONENT:  At that point, when we had
24    made the decision that we would treat it as an
25

Page 258

1 error -- I don't know that I was considering SBB
2 having made a bona fide effort -- that we were
3 considering it as if it were an error and,
4 therefore, Markit was just replacing it.
5 BY MR. LEIMAN:
6 Q  Right.  There are a number of instances in
7    Exhibit 123 where it talks about estimation
8    uncertainty.
9 A  Yes.
10 Q  There's testimony in this case that Mr. Aven was
11    aware at the time that the model was created
12    that it was creating values that were greater
13    than Markit standard models.
14        If you had known that at the time of the
15    restatement analysis, would that have been
16    important to you?
17        MR. SIKORA:  Objection.  Form.
18        THE DEPONENT:  Yes, it would have been
19    important to me in regards to we had discussions
20    previously around management bias, and if
21    management's bias was to value at a value higher
22    than what other participants may have considered
23    proper, that bias should have been built into
24    the evaluation of the model.
25

Page 259

1 BY MR. LEIMAN:
2 Q  And so just by logical extension, does that
3    impact the question of whether differences are
4    attributable to a difference in estimate or were
5    intentional from the client?
6 A  Yes, it does.
7        MR. SIKORA:  Objection.  Form.
8 BY MR. LEIMAN:
9 Q  Did you have any understanding at the time of
10    the restatement analysis as to whether the funds
11    that SBB was managing were open-end or
12    closed-end?
13 A  So at the time, I did not consider the open-end
14    or closed-end question.  I was looking at --
15    that particular question did not come to mind.
16    I was looking at the information in the
17    qualitative factors in regards to their lack of
18    marketing, friends and family, and those types
19    of things.
20 Q  Is it fair to say when evaluating materiality
21    from the perspective of investors, you were
22    looking at existing investors as opposed to
23    people who were considering putting more money
24    into the funds?
25

Page 260

1 A  Yes.
2 Q  I would like to look at page 2.
3 A  Of Exhibit 123?
4 Q  Of Exhibit 123.
5        Actually, you know what?  Forget those
6    questions.
7        Let's take a look.  We're making progress
8    here.
9        Let's look at a fund called Polysight I.
10    And if we can look ...
11 A  Page 40?
12 Q  Correct.  Sorry.  I'm trying to rectify two
13    different versions of the document, so bear with
14    me for one moment.
15        Let's look at page 43.  We looked at a
16    version of this table for a different fund.  I
17    just want to confirm that this is a
18    materiality -- quantitative materiality analysis
19    related to Polysight for 2015 year-end; is that
20    correct?
21 A  That's correct.
22 Q  And am I correct that at least the initial
23    determination is that the difference in this
24    case is above the quantitative limit and so
25

Page 261

1    further materiality analysis was required?
2 A  Yes.
3 Q  And, in essence, the further analysis would have
4    been to look at the qualitative analysis for
5    Polysight.  Is that fair to say?
6 A  That's correct.
7 Q  Did you see any of the marketing materials for
8    Polysight I?
9        MR. KEARNEY:  In connection with the work
10    on the restatement?
11        MR. LEIMAN:  Sorry.
12 BY MR. LEIMAN:
13 Q  In connection with work on the restatement
14    analysis.
15 A  I did not.
16 BY MR. LEIMAN:
17 Q  As to the valuation factors, there is evidence
18    in this case that SBB approached a valuation
19    firm called VRC, who responded that they could
20    not provide any support for the model used by
21    SBB.
22        Is that a factor that would have been
23    important in the restatement analysis?
24        MR. SIKORA:  Objection.  Form.
25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.