# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-06473 |
| SBB RESEARCH GROUP, LLC, SAMUEL B. BARNETT, AND MATTHEW LAWRENCE AVEN, | Hon. Sharon Johnson Coleman |
| Defendants. | |

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Timothy S. Leiman (leimant@sec.gov)
Robert Moye (moyer@sec.gov)
Kevin A. Wisniewski (wisniewskik@sec.gov)
Devlin N. Su (sude@sec.gov)
Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390

*Attorneys for Plaintiff*
*Securities and Exchange Commission*

1

Pursuant to Local Rule 56.1(b)(3), Plaintiff Securities and Exchange Commission ("SEC") submits the following statement of additional facts in response to Defendants' statement of material facts in support of their Motion for Summary Judgment ("SEC's Statement of Additional Facts"). (*See* Dkt. #262.)

Citations to **"DSF Ex. __"** are to exhibits Defendants filed in support of their Statement of Material Facts. (*See* Dkt. #262-1 to 265-58.) Citations to **"PSF Ex. ___"** are to exhibits filed in connection with the SEC's Undisputed Facts Pursuant to Local Rules 56.1(a)(2) and 56.1(d). (*See* Dkt. #260-1 to 260-55.) Citations to **"PR Ex. __"** are to exhibits filed in connection with the SEC's contemporaneously filed Responses to Defendants' Statement of Material Facts. Citations to **"PAF Ex. __"** are to exhibits cited in this Statement of Additional Facts which (1) were ***not*** previously filed by Defendants or by the SEC in connection with their respective motions for summary judgment and (2) are ***not*** filed by the SEC in connection with its Responses to Defendants' Statement of Material Facts.

**SBB's Representations Regarding Compliance with GAAP Fair Value Procedures**:

1.      On multiple occasions – and in several different documents – SBB represented to Fund investors (and prospective investors) that it was valuing the Funds' structured notes at "fair value" pursuant to GAAP.[1] (Dkt. #51, Answer ¶ 6; *see also, e.*g., PAF Ex. 1, SBB Resp. to RFAs ¶¶ 22, 25; DSF Ex. 14, 2014 Fund Financial Statements at 12, 29, 43, 57, 71, 84; PAF Ex. 2, 2015 Polysight I, LLC Financial Statement, RSM-SBB-00140203 at 140207-08, 140213-14; PAF Ex. 3, 2015 Investors III, LLC Financial Statement, RSM-SBB-00135168, at 135172, 135177-78.)

---

[1] Defined terms have the same meaning as in the SEC's accompanying response brief.

2.      Accounting Standards Codification ("ASC") 820 – the GAAP provision that defines "fair value" – states that "fair value" is an "exit price" (*i.e.*, the "price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date"). Under ASC 820, fair value should be measured "using the assumptions that market participants would use when pricing the asset." Entity-specific preferences, like "a reporting entity's intention to hold an asset," are "not relevant when measuring fair value" under ASC 820. (DSF Ex. 206, ASC § 820-10-05-01B, 05-1C, 35-36, 35-53; Dkt. #51, Answer ¶¶ 34-35; PAF Ex. 4, Keane Dep. 14-15.)

**Defendants Admit They Did Not Consider GAAP or Adhere to Industry Standard Valuation Practices**:

3.      Both Sandeep Navalgund and Matt Aven have testified that Defendants: (a) did not consider GAAP (or the fair value requirements of ASC § 820 or its predecessor provision FAS § 157) when developing SBB's model for valuing structured notes, which SBB used from 2011 through May 2016 (the "Model"); (b) were not aware of GAAP's "fair value" requirements under ASC § 820 until after phone calls with the SEC's exam staff in October and November 2014; and (c) the Model was intended to be an "economic model" rather than an "accounting model" and, therefore, was not designed to reach an "exit price" or "market price." (DSF Ex. 225, Navalgund SEC Testimony Transcript (hereinafter "Tr.") 67-72, 81, 89, 160, 210-11; DSF Ex. 210, Aven SEC Tr. (Jan. 11, 2018) 73-75, 82-84, 97-98, 102, 104, 108, 127-128, 263; DSF Ex. 209, Aven SEC Tr. (Jan. 24, 2017) 104-06, 128, 232-33; DSF Ex. 211, Aven SEC Tr. (Feb. 15, 2018) 571.)

4.      Aven and Navalgund also have testified that – when creating and implementing the Model – the Defendants: (a) did not consider the assumptions or practices of market participants; (b) by abandoning the risk-neutral framework of valuation in favor of

3

the *mu* drift term, knew SBB was deviating from industry standard valuation principles; and (c) knew at the time they created their Model, that the Model was not following industry standard valuation practices. (DSF Ex. 225, Navalgund SEC Tr. 126-129, 133-35, 140-41, 145-46, 152-56, 227-28; DSF Ex. 210, Aven SEC Tr. (Jan. 11, 2018) 70-71, 84, 96-97, 108, 127-130, 254, 263; DSF Ex. 209, Aven SEC Tr. (Jan. 24, 2017) 104-06.)

5.      Navalgund has testified that he knew that using *mu* as a drift term would generally lead to higher note values than using the risk-free rate. In testifying about the creation of *mu*, Navalgund agreed that: (a) he changed the drift term in the Model from the risk-free rate to *mu* because Barnett and Aven "had expressed to [Navalgund] that the value of the notes … were too low"; (b) the change from the risk-free rate to *mu* was designed, in part, "to raise the value of those notes"; and (c) he understood at the time *mu* was created that adopting *mu* would generate higher note values. (DSF Ex. 225, Navalgund SEC Tr. 129, 141-42, 145-46.)

6.      Both Navalgund and Aven have testified that – in developing the Model – they designed the Model: (a) to reflect SBB's subjective assessment, "intuition," and "feeling" of what a structured note was worth; and (b) based on the subjective assumption that SBB would hold the Funds' structured notes to maturity. (DSF Ex. 225, Navalgund SEC Tr. 69-73, 83, 85, 89, 132-35, 231-32; DSF Ex. 210, Aven SEC Tr. (Jan. 11, 2018) 73-74, 83-84, 86, 131, 138, 210.)

7.      Before helping to create SBB's Model, Navalgund and Aven had no experience: (a) valuing options, structured notes or other derivative securities; (b) creating or implementing a valuation model; or (c) applying the "fair value" requirements of GAAP. Navalgund testified that SBB had nobody experienced in valuation on staff. (DSF Ex. 225,

Navalgund SEC Tr. 18-19, 27-30, 33, 37-38, 132, 165, 194-95; DSF Ex. 210, Aven SEC Tr.
(Jan. 11, 2018) 69, 82, 95-96.)

8.     SEC valuation expert Craig McCann testified that structured notes are, in
general, not a good investment for retail investors because a common note structure:
(a) essentially combines two relatively liquid investments (a bond from the issuing bank, and
an option on an underlying asset), and puts them in an "illiquid wrapper" (*i.e.*, creates a new
investment vehicle that is less marketable than its constituent parts); and (b) requires
payment of margin (*i.e.*, a fee) to the issuing institution. Instead, an investor could create the
same investment opportunity by taking a direct position through a combination of bonds
and/or options which would (1) be a more marketable investment, and (2) would not cost as
much in fees. (DSF Ex. 224, McCann Dep. 62-63.)

**SBB's Model Deviates from Industry Standard Valuation Practice**:

9.     Before creating their custom Model themselves, Defendants hired a third-
party valuation professional, Israel Nelkin, in 2011 to create a model for valuing SBB's
structured notes. Nelkin submitted a proposed model that used several of the industry-
standard characteristics described in ¶¶ 12-13 below. Specifically, Nelkin's Model: (a) used
the risk-neutral framework (*i.e.*, it used risk-free rate as a drift term and discount rate); and
(b) accounted for the credit risk of the issuer. Defendants did not implement Nelkin's model
and instead created their own Model, using the inputs described in ¶ 14 below. (PAF Ex. 5,
Nelkin Dep. 80-82; DSF Ex. 209, Aven SEC Tr. (Jan. 24, 2017) 134-39, 145-46, 159-60.)

10.     SEC valuation expert Craig McCann testified that the type of structured notes
purchased by SBB are common in the industry. Specifically, McCann has testified or opined
that: (a) structured notes such as those held by the Funds are available to retail investors

5

through their brokers; (b) the "worst of" structure has been more common in the last 10-15 years (with over $8.6 billion issued between 2010 and 2015); (c) "billions of dollars of these … structured notes, with the same basic structure as the ones SBB bought, sold to retail investors"; (d) the notes purchased by SBB are not "exotic"; and (e) the structure of SBB's notes does not require (or warrant) deviation from basic option valuation principles, industry practice regarding option valuation, or published scientific research regarding proper option valuation. (DSF Ex. 224, McCann Dep. 57-60, 68, 70-71, 76; PR Ex. 8, McCann Report at 13, 17.)

11. McCann further opined that: (a) the overwhelming majority of SBB's structured notes were tied to the performance of either or both of the S&P 500 and Russell 2000 stock indices – two of the most heavily traded stock indices in the world; (b) valuation of SBB's structured notes therefore, "revolves around valuation of S&P 500 and Russell 2000 index options"; (c) such index options have "extensive numbers of market participants," and "plenty of available market data for the underlying assets"; and (d) there are "well-established valuation principles widely accepted by the market for valuing options such as the ones underlying SBB's notes." (PR Ex. 8, McCann Report at 30.)

12. McCann and others have testified that standard methodologies have developed regarding option valuation and valuation of derivative securities with option-like components that – as McCann opined – "allow straightforward, reliable valuation of … structured notes using valuation methods that have been widely adopted by market participants." Although some models may differ in other limited ways, industry standard valuation models that follow standard option valuation theory share several core characteristics. Specifically, since the 1970's, market standard models, like the Black-Scholes

6

model, use the "risk-neutral framework" -- *i.e.*, they use a risk-free rate in projecting value into the future (and in discounting future value to a present-day value). The risk-neutral framework is used to minimize subjective pricing considerations that come from the fact that there is no universally accepted prediction for future stock market growth. The risk-free rate is universally accepted by market participants as the correct rate to use in valuing derivatives. (PR Ex. 8, McCann Report at 21-22, 35; DSF Ex. 224, McCann Dep. 94-95, 101-02, 117, 122, 132-33, 137; DSF Ex. 216, Chan Dep. 42-43, 120-123, 163-65; PAF Ex. 4, Keane Dep. 87-90, 116, 141, 143.)

13.     In addition, in standard valuation practice, option valuation models: (a) use available implied volatility data (and available interpolated or extrapolated implied volatility data where appropriate) as the volatility input; (b) discount maturity payments using the risk-free rate; and (c) discount maturity payments to account for issuer credit risk. (PR Ex. 8, McCann Report at 23-26; DSF Ex. 224, McCann Dep. 94-95, 109, 125, 127-28, 132-33, 144-149; DSF Ex. 216, Chan Dep. 42-43, 120-123, 163-65; PAF Ex. 4, Keane Dep. 115-16.)

14.     McCann further testified that SBB's valuation model included several custom inputs that are "inconsistent with basic valuation principles, industry practice, and published scientific research" and represent a "severe and unwarranted departure from the most basic industry practices regarding proper options valuation." Specifically, McCann found that: (a) SBB's abandonment of the risk-free framework for option valuation and substituting in the *mu* drift term – representing expected market returns – was an "abomination" that deviated from five decades of industry use of the "risk neutral framework," and that "substantially inflated the value of the component options underlying SBB's structured notes over what an industry standard, risk neutral approach would generate"; (b) SBB's use of

7

historical volatility times *beta* – rather than using available implied volatility data – would "never, except in vanishingly rare instances, generate the observed prices of traded options," "appears simply designed to increase the volatility input and thereby increase SBB's estimated values of the structured notes it purchased," and "has no apparent basis in industry practice or academic literature"; (c) SBB's "linearization" input served to spread the inflated gains caused by *mu* over the term of the note and violates basic economic principles; and (d) SBB's failure to account for issuer credit risk was "another serious – and obvious – deviation from standard practice in structured note valuation" that "tends to have an inflationary effect on the value of its structured notes." (PR Ex. 8, McCann Report ¶¶ 84-110; *see also*, DSF Ex. 224, McCann Dep. 101-103, 131-34, 143-49, 154, 163-65, 171-76.)

15.    McCann reported that SBB's pricing errors "should have been obvious internally at SBB in real time" because Defendants received valuations from other market participants (*i.e.*, the issuing banks) for the notes that they purchased. (PR Ex. 8, McCann Report at 44.)

16.    SBB's valuation expert, Arun Sen, did not opine that SBB's model inputs conformed to industry standard practices. Rather, Sen testified that he: (a) did not use *mu* because using the risk-free rate was "standard practice"; (b) was not aware of any academic support or literature to support SBB's use of historical volatility times *beta*; (c) used implied volatility because he thought that was the "standard approach"; and (d) did not use linearization because he was using a "standard well-supported methodology" and linearization is "not part of the process." Sen further testified that he regarded it as "[n]ot in dispute" that SBB's Model was not consistent with industry practice. (PAF Ex. 6, Sen Dep. 26, 28, 31, 33, 79.)

8

17.     RSM never: (a) shared the model analysis performed by its valuation consultant, Aaron Temple, with SBB or (b) advised SBB that its model complied with ASC § 820. (DSF Ex. 230, Temple Dep. 233-34; PAF Ex. 7, Droege Dep. 302-03.)

18.     At his deposition, Temple was read many of the excerpts of the testimony of Navalgund and Aven identified in ¶¶ 3-6 above. In response to hearing that testimony, Temple testified under oath that: (a) it was always his assumption going into an analysis that RSM's clients were attempting to comply with ASC § 820; (b) had he known that SBB had no experience with ASC § 820 and had not considered (or read) ASC § 820 that would have affected his analysis in 2014 and 2015; (c) it would have been important for him to know in conducting his analysis in 2014 and 2015 that SBB officers knew it was deviating from industry standard inputs in certain instances and was biased toward higher valuations; (d) it would have "raise[d] a little bit of a flag" had he known that SBB did not take into account the practices of market participants in creating certain inputs in its model; (e) SBB's use of *mu* instead of the risk-free rate as a drift term was "concerning" because using the risk-free rate was "just what practitioners did. We really didn't see many people deviating or critiquing kind of like acceptable valuation methodologies"; (f) SBB's basing of valuations on the assumption that investors would hold onto their investment was not consistent with ASC § 820; and (g) if he had known that SBB had made that assumption, it would have affected his analysis of the Model in 2014 and 2015.  (DSF Ex. 230, Temple Dep. 233-34, 239, 242-43, 246-48.)

**Defendants Ignored Warnings Regarding Their Model's Deficiencies**:

19.     Shortly after conducting field interviews at SBB, SEC Exam Staff conducted a phone conference with several SBB officers including Navalgund, Barnett, and Aven to

9

discuss SBB's Model. In that call, the SEC Exam Staff shared questions and concerns regarding the Model and discussed the requirements of ASC § 820 related to using the Model to determine "fair value." Specifically, SEC Exam Staff: (a) indicated that they were concerned about SBB's use of *mu* to simulate future prices, which Staff informed SBB appeared to abandon the risk-neutral framework of Black-Scholes; (b) SBB had deviated from standard option theory by not accounting for issuer credit risk; (c) ASC § 820 emphasizes that implied volatility should be used (while SBB's custom volatility measure appeared to lack any basis in industry practice); and (d) the Model did not appear to be designed to reach a market price. (PR Ex. 19, SEC-SBB Exam Telephone Call Notes, SEC-0002081 to 2085; DSF Ex. 219, Gillman Dep 229-239; DSF Ex. 216, Chan Dep. 42-43, 120-123, 147-154, 158, 170, 173-174; DSF Ex. 226, Navalgund Dep. 173-179; PAF Ex. 8, Oct. 30, 2014 SBB Minutes of SEC-SBB Exam Telephone Call at 4.)

20.     Defendants did not implement an updated structed note valuation model until May 2016. (Dkt. #51, Def. Ans. ¶ 74.)

21.     Unlike SBB's Model, IHS Markit ("Markit") used a valuation model that: (a) used the risk neutral framework; (b) used implied volatility; (c) accounted for issuer credit risk; and (d) did not include SBB's bespoke inputs of *mu*, *beta*, or linearization. (PAF Ex. 1, SBB Resp. to RFAs ¶¶ 182-84; DSF Ex. 224, McCann Dep. 11-13; PAF Ex. 9, 2017 Markit Equity Valuation Service at 19, 23-15.)

**Facts Concerning Materiality**:

22.     SBB's placement agent, Alan Handler, testified that: (a) a prospective investor had informed him that "he [, the investor,] would never invest with [SBB] unless [SBB] hired a third-party valuation firm"; (b) Handler suggested to Aven that SBB hire a third-

party valuation firm "a few months" before December 2016; and (c) "I was aware that investors were probably very interested in having a third-party valuation firm, a TPV, to be involved as opposed to [SBB]." (DSF Ex. 220, Handler SEC Tr. 134-35; *see also* DSF Ex. 212, Aven Dep. 201-04.)

23.     At his deposition, Matt Aven testified as follows in relation to the communications in ¶ 22 above:

> **Q.** …Did you agree with that concept, that a third-party pricing service would be important to outside investors?
> **A.** Made sense.

(DSF Ex. 212, Aven Dep. 201-04.)

24.     SEC valuation expert Craig McCann concluded that: (a) SBB's Model (including the non-industry standard variables of *mu* and implied volatility times *beta* that SBB adopted for its valuation model, and its failure to account for issuer credit risk) had the effect of increasing note values; (b) SBB's Model, nearly universally, increased note values when compared to an industry standard approach; (c) the increase in note values caused by SBB's Model was statistically significant using the approach of SBB's valuation expert (with errors in data selection corrected); and (d) the increases in note value created by SBB's Model were, in the vast majority of cases, above the estimated range of reasonable values, which McCann estimated at approximately +/- 1 to 1.5%. (PR Ex. 8, McCann Report ¶¶ 84-110, 114-117, Appendix 2; PAF Ex. 10, McCann Reb. Report ¶¶ 28-42; DSF Ex. 224, McCann Dep. 43-46, 52, 194.)

25.     McCann also has testified that: (a) 60-80% of SBB's note values were outside of the "reasonable range" of values suggested by SBB's valuation expert Arun Sen (without correcting Sen's errors in applying the Heston model and choice of correlation); (b) when

Sen's errors in applying the Heston model and choice of correlation are corrected, close to 100% of SBB's valuations are outside the "reasonable range" Sen calculated; and (c) the range of reasonable values for valuation of structured notes is closer to plus or minus 1 to 1 ½% (rather than the plus or minus 4-5 % that Sen's report suggests). (DSF Ex. 224, McCann Dep. 43-46, 96-97, 103-106, 110-11.)

26. SEC accounting expert Andrew Mintzer has opined that – in evaluating whether a variation in valuation outcomes is due to estimation uncertainty (as opposed to other factors) – an auditor must consider evidence that variation can be attributed to management bias. Pursuant to calculations made by Defendants' valuation expert, Gene Deetz – and summarized by Mintzer – approximately 93% of Deetz's presumed misstatements of end-of-year note value under SBB's Model were overstatements (when compared to the Markit model SBB switched to). For the Polysight I Fund, 100% of the presumed misstatements that Deetz calculated were overstatements. (PAF Ex. 11, Mintzer Reb. Rep. at 8-9, 33, 35-36; PAF Ex. 12, Mintzer Dep. 413-414.)

27. The structured note values generated by SBB's Model almost always exceeded the prices that issuing banks and brokers recorded in monthly statements provided to SBB. (PAF Ex. 1, SBB Resp. to RFAs ¶ 102; PR Ex. 8, McCann Report at Appendix 2, pp. 53-54; DSF Ex. 224, McCann Dep. at 193-94.)

28. In analyzing qualitative materiality factors identified in SAB 99, Mintzer opined, among other things, that:

- "For all of the SBB Funds, the misstatements mask a change in earnings for at least one year of operations. For the CPS XI Fund, Investor II Fund, Investor III Fund, and the Polysight I Fund, the misstatements masked a change in earnings for all relevant years of operations at issue";

- "For all of the SBB Funds, except the CPS X1 Fund, the misstatements change a loss into income or vice versa, for at least one year of operation at issue. For the Polysight I Fund, the misstatements change income into a loss for all years of operation at issue";

- "The misstatements had the effect of increasing SBB's fees …";

- "The misstatements were pervasive and recurring. In this regard, they indicate SBB's recurring failure to apply GAAP";

- "… Management's valuation methodology was not designed to comply with GAAP and may have been a "results oriented" model (and therefore, further indicative of management bias). In this regard, the misstatements under the iron-curtain method reflect overstatements of the aggregate investment values and related operating results for each of the Funds' financial statements for sixteen of the nineteen misstatements presented"; and,

- "The misstatements have a significant effect relative to a reasonable user's needs in so much as they directly affected the Funds' investment portfolio's reported earnings and related disclosures."

(PAF Ex. 11, Mintzer Reb. Rep. at 47.)

29.     Alan Handler testified that a fund's cumulative return from a fund's inception

is important to investors (and that the cumulative return for SBB's funds went down when

SBB abandoned its Model and retained Markit). Specifically, Handler testified as follows:

**Q**. And you said Matt told you that there was going to be new numbers?
**A**. Yeah.

**Q**. And did you have any discussion as to what those numbers were going to be?
**A**. Yeah. At some point, sure. I don't recall –

**Q**. Were they higher or lower than the old numbers?
**A**. Oh, they were lower. Yeah. They were lower.

**Q**. And do you recall how much lower they were?
**A**. All I was really focused on was the annualized, what we call the compound annual growth rate. CAGR, which is just kind the arithmetic return of the fund from inception, which went down from like -- I don't remember what it was before it was revalued, but it went down about a hundred basis points, maybe about 150 basis points, which is a lot, you know. The compound return went down.

13

**Q**. Why were you focused on that?
**A**. That's one of the things that I saw. Compound return. That's what investors really, really are focused on.
…

**Q**. Okay. So, when you're advised by Matt Amen (sic) that the model was going to change and that the new numbers were coming out, what -- what was your reaction?
**A**. I was dismayed.

(DSF Ex. 220, Handler SEC Tr. 138-139, 141.)

30.     In discussing SBB's downward revision of fund Net Asset Values ("NAVs") after switching to the Markit model, Handler testified at his investigative testimony as follows:

**Q**. Were you ever advised in 2016 that SBB was revising its NAVs?
**A**. Yes.

**Q**. Okay. Its prior NAVs?
**A**. Yes.

**Q**. What impact would that have on your work as placement manager?
**A**. It would be negative. That was my first reaction. This would be a negative thing.

**Q**. Negative in what sense?
**A**. More difficult for me to raise money.

**Q**. Why is that?
**A**. Because it speaks to the credibility of the firm.

(DSF Ex. 220, Handler SEC Tr. 150-51.)

31.     According to calculations by SBB, the lifetime returns as of 12/31/2015 for several individual investors declined with the abandonment of SBB's old Model (by comparison to SBB's May 2016 model) as follows:

| INVESTOR ID | "OLD" Lifetime Performance | "NEW" Lifetime Performance | DIFFERENCE |
|---|---|---|---|
| 4 | 9.98% | -1.72% | -11.70% |
| 9 | 9.99% | -1.61% | -11.59% |
| 10 | 9.99% | -1.61% | -11.60% |
| 13 | 10.0% | -1.58% | -11.57% |
| 15 | 9.99% | -1.61% | -11.59% |
| 18 | 9.98% | -1.60% | -11.58% |
| 19 | 9.98% | -1.85% | -11.83% |
| 21 | 9.99% | -1.61% | -11.59% |
| 25 | 9.98% | -1.58% | -11.56% |
| 23 | 9.98% | -4.24% | -14.22% |

(*See* PAF Ex. 13, Excerpt from SBB Excel Spreadsheet, "New model results_2016.05.16v1_poly return comparison-BATES STAMPED" at CONFIDENTIAL – F.O.I.A. Treatment Requested by SBB Research Group LLC 007302.)

32.     Alan Handler testified about the significance of declines in cumulative investment returns as follows:

> **Q.** Okay. In -- in your 30 years of experience, would a negative 11 percent difference in lifetime return for an investor be important to them?
> MR. ROSENBURG: Object to the form and foundation.
> THE WITNESS: I believe most us would be concerned about it, the difference in those return figures.
>
> BY MR. WISNIEWSKI:
> **Q.** Going from a positive 10 percent to a negative 1.7 percent, that would be important?

**A.** Yes.

(DSF Ex. 221, Handler Dep. 200:15-201:1.)

33.     By the calculations of SBB's accounting expert, Gene Deetz – summarized by

Mintzer – SBB's Model (when compared to Markit's Model) caused an increase in annual

net income for the Funds as follows:

### Percent Overstatement in Change in Net Income (SBB Model vs.Markit)

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|
| CPS 1 - Rollover | N/A | N/A | 5.4% | 25.3% | 190.5% |
| CPS 1 - Iron Curtain | N/A | N/A | 5.4% | 32.3% | 1047.1% |
| CPS X1 - Rollover | N/A | N/A | 15.0% | 31.8% | 894.0% |
| CPS X1 - Iron Curtain | N/A | N/A | 15.0% | 41.0% | 291.7% |
| Investor II - Rollover | 2934.6% | 44.1% | (15.0%) | 46.2% | (39.3%) |
| Investor II - Iron Curtain | 2934.6% | 127.0% | 40.9% | 242.8% | 295.1% |
| Investor III - Rollover | N/A | N/A | 8.5% | 83.5% | 13.8% |
| Investor III - Iron Curtain | N/A | N/A | 8.5% | 105.7% | 1425.6% |
| Investor IV - Rollover | N/A | N/A | 9.0% | 101.4% | 17.6% |
| Investor IV - Iron Curtain | N/A | N/A | 9.0% | 131.7% | 404.7% |
| Polysight I - Rollover | N/A | N/A | N/A | 1209.2% | 124.0% |
| Polysight I - Iron Curtain | N/A | N/A | N/A | 1209.2% | 304.6% |

(PAF Ex. 11, Mintzer Rebuttal Report at 42.)

### Professionals Did Not Advise SBB on the Inputs of its Valuation Model or Whether the Model Complied With GAAP:

35.     SBB did not ask for and did not receive advice from any third-party

accountant, auditor or valuation expert related to the inputs of its Model or whether SBB's

Model complied with GAAP. Specifically, SBB did not ask for and did not receive third-

party professional advice from Israel Nelkin, Simon Compliance, RSM, Woodfield Fund

Administration, or Steve Mareta regarding its decision: (a) to create and use the *mu* drift

term instead of the risk-free rate of a high-quality government security; (b) to create and use

45-day historical volatility instead of implied volatility; (c) to create and use a beta volatility

multiplier; (d) to create and use the linearization smoothing mechanism; and (e) to not

include a discount in its Model to account for issuer credit risk. (PAF Ex. 1, SBB Resp. to RFAs ¶¶ 68, 108, 111-13, 115-23, 125-27; PR Ex. 17, Aven Resp. to RFAs ¶¶ 19-20, 23-25; DSF Ex. 226, Navalgund Dep. 92-95, 106, 116, 135-36, 140-41, 144, 149; DSF Ex. 212, Aven Dep. 58, 66-68, 71-72, 75, 83-85, 128; DSF Ex. 223, Kiefer Dep. 48, 56, 62, 69; PR Ex. 16, Simon Decl. ¶¶ 10-11; DSF Ex. 210, Aven SEC Tr. (Jan. 11, 2018) 248-49.)

36.    Mareta & Associates, Inc. was retained by SBB to perform bookkeeping services and compile financial statements for SBB. Mareta & Associates, Inc.'s January 2016 retention letter with SBB (countersigned by Matt Aven) provides that its work cannot be relied upon as assurance that SBB is complying with GAAP, stating, among other things that:

- "None of the services can be relied on to disclose errors, fraud, or illegal acts."

- "We will utilize information that is your representation without undertaking to obtain or provide any assurance that there are no material modifications that should be made to the financial statements in order for the statements to be in conformity with accounting principles generally accepted in the United States of America."

- SBB is responsible for "the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America."

- "We will not express an opinion or provide any assurance regarding the financial statements being compiled."

(PAF Ex. 14, Jan. 1, 2016 Mareta Engagement Letter at 1-3; PAF Ex. 15, Richards Dep. 172-76.)

37.    Topel Foreman was retained by SBB solely to prepare financial statements for six of SBB's funds; it did not: (a) validate SBB's valuation methods or Model; (b) determine whether SBB was complying with GAAP; or (c) otherwise provide any assurances about the

accuracy of the financial information provided by SBB. Specifically, in its retention letter,

Topel Foreman stated that:

> "We are not required to, and will not, verify the accuracy or completeness of the information you provide to us for the engagement or otherwise gather evidence for the purpose of expressing an opinion or a conclusion. Accordingly, we will not express an opinion or a conclusion or provide any assurance of the financial statements.
>
> Our engagement cannot be relied upon to identify or disclose any financial statement misstatements, including those caused by fraud or error, or to identify or disclose any wrongdoing within the entity or noncompliance with laws and regulations."

(PAF Ex. 16, Jan. 15, 2015 Topel Foreman Engagement Letter at SEC-SEC-E-0011396 and

SEC-SEC-E-0011396-97; PAF Ex. 15, Richards Dep. 166-171.)

38.     Woodfield Fund Administration LLC ("Woodfield") was not retained by

SBB to: (a) validate SBB's valuation methods or Model; (b) determine whether SBB was

complying with GAAP; or (c) otherwise provide any assurances about the accuracy of the

financial information provided by SBB. Woodfield's Fund Administration Services

Agreement with the Funds states that "the Funds specifically acknowledge that Woodfield

is not a fiduciary or a public accounting firm and does not provide auditing services or

advice." (PAF Ex. 17, Oct. 6, 2014 Woodfield Fund Administration Services Agreement at

p. 2, ¶ 5; PAF Ex. 15, Richards Dep. 184-87.)

39.     RSM was not retained to (and did not): (a) provide advice about the

composition of SBB's valuation Model; (b) validate SBB's valuation model; or (c) provide

advice to SBB about whether SBB's valuation methods complied with the requirements of

ASC § 820. (DSF Ex. 217, Davisson Dep. (Jan. 20, 2023) 253-54; PAF Ex. 18, Whetstone

Dep. 261-62; DSF Ex. 231, Weil Dep. (Jan. 24, 2023) 319.)

40.     SBB management was responsible for ensuring that the Funds' financial statements – which SBB submitted to RSM for auditing – complied with GAAP and that investments were recorded at "fair value." An auditor cannot assume that responsibility under GAAS as it would violate the principle of auditor independence. (PAF Ex. 18, Whetstone Dep. 263, 267-68; DSF Ex. 231, Weil Dep. (Jan. 24, 2023) 319-320; DSF Ex. 210, Aven SEC Tr. (Jan. 11, 2018) at 36-37.)

41.     Simon Compliance did not provide advice to SBB as to whether SBB's Model complied with the requirements of ASC § 820. (PR Ex. 16, Simon Decl. ¶¶ 10-11; PR Ex. 17, Aven Resp. to RFAs ¶ 24.)

**Third-Party Valuation and Consulting Firms Express Concerns Regarding SBB's Model and Valuation Practices**:

42.     Subsequent to receiving an April 17, 2015 email from third-party valuation firm Valuation Research Company ("VRC"), in which VRC explained it could not validate the Model, SBB did not have further discussions with VRC regarding its concerns about the Model, and did not mention VRC's inability to validate the Model to RSM. (DSF Ex. 212, Aven Dep. 204-05; DSF Ex. 223, Kiefer Dep. 161-64; DSF Ex. 155, RSM Resignation Letter; PAF Ex. 7, Droege Dep. 323-325; PAF Ex. 231, Weil Dep. (Jan. 24, 2023) 322-23.)

43.     In the Summer of 2016, SBB retained the consulting firm Price Waterhouse Coopers ("PwC") to assess SBB's procedures and policies related to development of the Model and valuation of securities. In its initial report to SBB – after reviewing SBB's valuation policies – PwC found that: (a) SBB's Model is exposed to challenges, including that SBB's Model "may be incompatible with fair valuation for financial reporting"; (b) "evidence supporting validation of valuation estimates is limited"; and (c) "financial instruments held under investment company accounting should be reported at fair value as

19

defined under the relevant accounting literature (currently ASC 820) as amended by industry specific guidance" while "expectations of investment performance based on factors that do not meet the criteria considered within relevant accounting literature should not be included in the valuation of the financial instruments." (PAF 19, Aug. 2016 PWC Report at 11, 17, 19; PAF Ex. 4, Keane Dep. 80.)

44.     PwC's Justin Keane – who was responsible for evaluating whether SBB's Model complied with GAAP – testified that: (a) "we believed that [SBB's] valuation model was not suitable for fair valuation purposes" meaning that "there were elements of the valuation model that were not consistent with what we would typically see as being approaches to develop fair value estimates"; (b) SBB's model was providing "economic assessments and not a fair value estimation"; (c) SBB's model was not using the risk-neutral framework and that using the risk neutral framework is important because that framework is "typically what we see as the valuation approaches applied by market participants"; (d) SBB's Model "contain[ed] assumptions that were not consistent [with] ASC § 820"; and (e) one would expect an ASC § 820 model to account for credit risk, use implied volatility rather than historical volatility, and use the risk-neutral framework. (PAF Ex. 4, Keane Dep. 63-64, 89-90, 113, 115-116.)

45.     With regard to SBB's policies governing valuation and risk governance, PWC concluded that: (a) SBB's policies and procedures related to "valuation governance" and "Model Risk Governance" were "immature" when compared to those of other asset managers, banks, and other market participants; (b) SBB's Model Risk management governance structure is "lacking and is not memorialized," (c) "valuation model documentation limited compared to industry standards," and (d) "valuation model not

subject to independent validation." (PAF Ex. 19, Aug. 2016 PWC Report at 4, 6, 11, 17, 19, 25; PAF Ex. 4, Keane Dep. 78-79, 85-86.)

46.     In regard to SBB's policies regarding valuation and risk governance, PwC's Justin Keene testified that SBB did not have: (1) sufficient policies and procedures to ensure that SBB would value assets consistent with ASC § 820; (2) an internal "control check" or "challenge" function which market participants commonly have to make sure valuations were at "fair value"; or (3) "important" internal processes to compare valuations to an alternative market participant source (such as from the issuing bank). (PAF Ex. 4, Keane Dep. 60, 68, 96, 100-01, 103-04, 156-57.)

47.     SBB did not inform RSM about its retention of PwC or about any of the conclusions that PwC had expressed in its report to SBB regarding the Model or SBB's valuation policies. (DSF Ex. 231, Weil Dep. Tr. (Jan. 24, 2023) 332-33; PAF Ex. 7, Droege Dep. 325-30.)

**SBB Withholds Information From RSM and RSM Subsequently Resigns**:

48.     The SEC exam staff sent SBB a formal Deficiency Letter on March 16, 2016. The Deficiency Letter identified several defects in SBB's Model, including those that had previously been identified by the SEC's exam staff in October 2014. Among other things, the SEC exam staff's letter explained that SBB's Model was deficient because SBB: (a) had created and used the *mu* drift term and abandoned the generally accepted risk-neutral framework; (b) used the unobservable input of historical volatility multiplied by SBB's *beta* factor (rather than the observable input of implied volatility); and (c) smoothed returns using linearization. The SEC exam staff's Deficiency Letter warned SBB that the *mu*, *beta*, and linearization inputs had no basis in industry practice, valuation principles, or published

21

academic research. The letter also pointed out that: (1) SBB's Model failed to adjust for illiquidity or credit risk; (2) the Model had improperly overstated the value of the Funds' structured notes; and, thus, (3) SBB had potentially misstated performance data in marketing materials and overcharged investors for fees from 2011 through 2015. (DSF Ex. 151, Mar. 16, 2016 SEC Deficiency Letter to SBB, Exhibit A at pp. 1-6.)

49.     The Deficiency Letter further notified SBB that: (a) its failure to value securities in accordance with GAAP constituted potential "deceptive valuation practices"; (b) SBB's Model lacked "sufficient theoretical or academic justification and support by industry practices"; (c) SBB's Model appeared inconsistent with the "fair value" requirements of ASC § 820; (d) SBB's Model appeared to inflate note values and was not valuing notes at "fair value," and (e) SBB's reporting of performance data generated by the Model constituted potential violations of the antifraud provisions of the Investment Advisers Act of 1940. (DSF Ex. 151, Mar. 16, 2016 SEC Deficiency Letter to SBB, Exhibit A at pp. 1-6.)

50.     While SBB told RSM that the SEC was conducting a "routine" examination of SBB (SBB's word, not the SEC's), it did not inform RSM that the SEC had raised concerns regarding the Model in October 2014 prior to sharing the SEC's Deficiency Letter with RSM in December 2016.  (PAF Ex. 18, Whetstone Dep. 267, 278-79; PAF Ex. 7, Droege Dep. 309-310; DSF Ex. 231, Weil Dep. (Jan. 24, 2023) 328-330.)

51.     SBB sent two management representation letters to RSM after the SEC exam Staff had expressed concerns regarding SBB's Model – both signed by Barnett and Aven. The first was sent on April 30, 2015, in connection with RSM's audit of the Funds' 2014

financial statements. The April 30, 2015 management representation letter represented to RSM that:

- "We have no knowledge of noncompliance or suspected noncompliance with laws and regulations whose effects should be considered when preparing financial statements"; and

- "There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices."

The management representation letter did not mention that the SEC exam Staff had raised concerns about the Model in phone conversations with SBB management in October and November 2014, or that SBB management had responded to those concerns by stating that it had created a "new model" that purportedly addressed those concerns. (PR Ex. 10, 2014 SBB Management Rep. Letter, RSM-SBB-00002471 at 2473.)

52.    SBB sent another management representation letter to RSM on April 28, 2016 in connection with RSM's audit of the Funds' 2015 financial statements. In that April 28, 2016 management representation letter – signed by Barnett and Aven – SBB represented to RSM that: (a) "We have no knowledge of allegations of fraud or suspected fraud affecting the Funds'/Company's financial statements received in communications from … regulators…"; (b) "We have no knowledge of noncompliance or suspected noncompliance with laws and regulations whose effects should be considered when preparing financial statements"; and (c) "There have been no communications from regulatory agencies concerning noncompliance with, or deficiencies in, financial reporting practices." The April 28, 2016 management representation letter did not mention the SEC's Deficiency Letter. (PR Ex. 11, 2015 SBB Management Rep. Letter, RSM-SBB-00004010 at 4012.)

53.    SBB did not send the Deficiency Letter to RSM until December 2016. (Dkt. #51, Answer ¶ 70.)

23

54.    RSM witnesses – including Rich Davisson who made the final resignation decision for RSM – have testified that RSM's resignation decision was based on a review of the testimony summaries that were provided by RSM's counsel, a comparison of that summarized testimony to the information that was conveyed to RSM in the course of the audits (including in management representation letters and in oral communications to RSM audit staff), and a review of those facts in the context of the applicable audit standards related to auditor resignation (including AU-C § 580.25). No RSM witness has testified that the SEC's potential charging decisions factored into RSM's decision to resign. (DSF Ex. 217, Davisson Dep. (Jan. 20, 2023) 229-231, 348-49; DSF Ex. 231, Weil Dep. (Jan. 24, 2023) 227, 229-231, 235.)

55.    RSM witnesses – including Rich Davisson – have testified that, had they known the information contained in the testimony summaries when the audits were being conducted, it would have affected RSM's materiality analysis conducted in RSM's restatement review, and would likely have meant that RSM would not have taken SBB on as an audit client in the first place. (DSF Ex. 217, Davisson Dep. (Jan. 20, 2023) 254-62; PAF Ex. 7, Droege Dep. 317-330; DSF Ex. 231, Weil Dep. (Jan. 24, 2023) 323-326.)

**SBB's Marketing of the Funds' Performance**:

56.    SBB's marketing materials for Polysight I included performance data created using SBB's Model. (Dkt. #51, Answer ¶ 5; PSF Ex. 16, 11/30/15 SBB Polysight I Fact Sheet, ELK-0000385 at 386-387; PSF Ex. 17, 12/17/15 Emerging Manager Email, ELK-0095388 at 95390-95391; PSF Ex. 13, 2/9/16 Handler Polysight I Email, ELK-0012940 at 12969-12970; PSF Ex. 18, 3/9/16 Handler Polysight I Email, ELK-0015289 at 15318-15319; PSF Ex. 19, 4/8/16 Handler Polysight I Email, ELK-0018361 at 18390-18391; PSF

Ex. 14, 5/2/16 Handler Polysight I Email, ELK-0021523 at 21551-21552; PSF Ex. 13, 2/9/16 Handler Polysight I Email, ELK-0012940 at 12944, 12962, 12964; PSF Ex. 32, 3/17/16 Handler Polysight I Email, ELK-0017464 at 17469, 17487, 17489; PSF Ex. 33, 3/18/16 Handler Polysight I Email, ELK-0017896 at 17901, 17919, 17921; PSF Ex. 34, 4/8/16 Handler Polysight I Email, ELK-0018501 at 18506, 18523, 18525; PSF Ex. 35, 4/8/16 Handler Polysight I Email 2, ELK-0018255 at 18260, 18277, 18279; PSF Ex. 36, 4/8/16 Handler Polysight I Email 3, ELK-0018396 at 18401, 18418, 18420; PSF Ex. 37, 4/8/16 Handler Polysight I Email 4, ELK-0018466 at 18471, 18488, 18490; PSF Ex. 38, 4/8/16 Handler Polysight I Email 5, ELK-0018192 at 18197, 18214, 18216; PSF Ex. 39, 4/11/16 Handler Polysight I Email, ELK-0018941 at 18946, 18963, 18965; PSF Ex. 40, 4/18/16 Handler Polysight I Email, ELK-0018157, at 18162, 18179, 18181; PSF Ex. 44, SBB HedgeCo.Net Database Listing, ELK-0094211; PSF Ex. 45, SBB HFR Database Listing, ELK-0015179; PSF Ex. 54, SBB Evestment Database Listing; PSF Ex. 46, SBB Preqin Database Listing, ELK-0010976.)

**SBB's Two-Books Approach**:

57.     SBB did not inform RSM that – after its switch to the Markit Model – SBB started using two sets of valuation data: (a) one set of data using the old Model that was used to report performance to existing investors and prospective investors who had already seen the old pre-Markit performance figures, and (b) a second set of performance data that was used to report performance to prospective investors who had not previously seen the pre-Markit performance numbers. (DSF Ex. 155, RSM Resignation Letter; DSF 235, Weil Dep. (Dec. 6, 2023) 385-388; DSF Ex. 217, Davisson Dep. (Jan. 20, 2023) 231.)

58.    When Aven contacted SEC exam staff and suggested that SBB was considering using two models to value different sets of notes, the SEC staff member warned Aven that "creative math is what caused [SBB's] problems in the first place" and that what Aven "was describing would raise some serious concerns." (DSF Ex. 219, Gillman Dep. 175-177.)

Respectfully Submitted,

August 15, 2025                                         **Securities and Exchange Commission**

By:  _/s/ **Timothy S. Leiman**_
Timothy S. Leiman (leimant@sec.gov)
Robert Moye (moyer@sec.gov)
Kevin A. Wisniewski (wisniewskik@sec.gov)
Devlin N. Su (sude@sec.gov)
Securities and Exchange Commission
Chicago Regional Office
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604
(312) 353-7390

*Attorneys for Plaintiff*
*Securities and Exchange Commission*