# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | Case No. 1:19-cv-06473 |
| v. | The Honorable Sharon Johnson Coleman, United States District Judge |
| SBB RESEARCH GROUP, LLC, SAMUEL B. BARNETT, and MATTHEW LAWRENCE AVEN, | |
| Defendants. | The Honorable Keri L. Holleb Hotaling, United States Magistrate Judge |

## DEFENDANTS' OPPOSITION TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

I.      BACKGROUND ..................................................................................................5

     A.     SBB Created and Applied the Polysight Strategy to Its Closed, Pooled Funds..................................................................................................5

     B.     SBB Created An Open Pooled-Fund—Polysight I, LLC—and Made Prospective Investors Aware of the Key Terms, Which Were Also Negotiable ..................................................................................................6

     C.     SBB Sought to Use the Polysight Strategy to Create Individualized "Funds of One" or Separately Managed Accounts...........................................8

II.     LEGAL STANDARD..........................................................................................10

III.    ARGUMENT ......................................................................................................11

     A.     The SEC Is Not Entitled to Summary Judgment On Its Section 17(a) Claim ...............................................................................................11

          1.     The SEC Cannot Prove Falsity ..................................................11

               a.     The SEC Cannot Prove SBB's Statements About Polysight I, LLC's Inception Date Are False....................................12

               b.     Statements About SBB's Strategy and Negotiable Terms SBB Was Willing to Offer Cannot Be False ................................12

          2.     The SEC Cannot Prove Defendants Engaged in an Intentional Fraud ......................................................................................14

               a.     The SEC Ignores the Record Evidence that SBB Marketed Its Strategy to Institutional Investors ...............................15

               b.     The SEC Mischaracterizes the Evidence On Which It Does Rely .....................................................................................18

               c.     The SEC's Theory of Fraud Is Incoherent....................................19

               d.     Defendants Were Not Reckless ....................................................20

          3.     The SEC Cannot Prove Defendants Acted Negligently ...........................22

          4.     The SEC Cannot Prove Materiality ...........................................24

i

a. The SEC Does Not Analyze the Challenged Statements Against the Total Mix of Information Available When Making an Investment Decision ....................................25

b. The SEC Lacks Evidence of What a Reasonable Institutional Investor Would Find Material ...................28

c. None of the Three Challenged Statements—Alone or Taken Together—Were Material in Context of the Total Mix of Information ........................................................30

(1) The SEC Cannot Prove Statements About Inception Date Were Material..........................................................30

(2) The SEC Cannot Prove Statements About the Lock-Up Period Were Material ....................................32

(3) The SEC Cannot Prove SBB's Statements About a High-Water Mark Were Material.......................................34

d. The Statements at Issue Were Not "Obviously" Material ............36

B. Defendants Did Not Violate the Advisers Act Anti-Fraud Provision (Section 206(4) and Rule 206(4)-8) .........................................................38

C. SBB Did Not Violate the Marketing Rule (Advisers Act Rule 206(4)-1)............38

IV. CONCLUSION.................................................................................................40

## TABLE OF AUTHORITIES

### CASES

*Aaron v. SEC*,
446 U.S. 680 (1980) .................................................................................. 11, 14

*Antelis v. Freeman*,
2011 WL 6009609 (N.D. Ill. Nov. 30, 2011) ......................................... 15

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................. 24, 28

*CFTC v. Int'l Fin. Servs., Inc.*,
323 F. Supp. 2d 482 (S.D.N.Y. 2004)..................................................... 36

*Chang v. Accelerate Diagnostics, Inc.*,
2016 WL 3640023 (D. Ariz. Jan. 28, 2016) .......................................... 14, 33

*Compania Administradora de Recuperacion de Activos Adminstradora de Fondos
de Inbersion Sociedad Anonima v. Titan Int'l*,
533 F.3d 555 (7th Cir. 2008) ................................................................. 29, 30

*Flannery v. SEC*,
810 F.3d 1 (1st Cir. 2015)........................................................................ 15, 17, 26

*In re N. Telecom Ltd. Sec. Litig.*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000)..................................................... 20

*In the Matter of Lynn Tilton*,
Initial Decision Release No. 1182, 2017 WL 4297256 (ALJ Sept. 27, 2017).................. 24, 28

*Kuebler v. Vectren Corp.*,
13 F.4th 631 (7th Cir. 2021) ................................................................... 24

*Lane v. Structural Iron Workers Loc. No. 1 Pension Tr. Fund*,
2021 WL 6197074 (N.D. Ill. Dec. 30, 2021) ......................................... 11

*Malin v. Hospira, Inc.*,
762 F.3d 552 (7th Cir. 2014) ................................................................. 15, 17

*Modrowski v. Pigatto*,
712 F.3d 1166 (7th Cir. 2013) ............................................................... 11

*Nat'l Assoc. of Private Fund Manager v. SEC*,
2024 WL 4858589 (N.D. Tex. Nov. 21, 2024)....................................... 39

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).................................................................................. 28

iii

*Pommer v. Medtest Corp.*,
  961 F.2d 620 (7th Cir. 1992) ................................................................ 26, 27

*Ray v. Citigroup Glob. Mkts., Inc.*,
  2004 WL 1794927 (N.D. Ill. Aug. 4, 2004) ............................................ 15

*Samuelson v. LaPorte Cmty. Sch. Corp.*,
  526 F.3d 1046 (7th Cir. 2008) .............................................................. 10

*SEC v. Caine*,
  2024 WL 4382751 (N.D. Ill. Oct. 3, 2024)............................................ 14

*SEC v. Commonwealth Equity Servs., LLC*,
  133 F.4th 152 (1st Cir. 2025)........................................... 29, 33, 36, 37

*SEC v. Conrad*,
  354 F. Supp. 3d 1330 (N.D. Ga. 2019) .................................................. 32

*SEC v. Constantin*,
  939 F. Supp. 2d 288 (S.D.N.Y. 2013)............................................ 32, 37

*SEC v. Ferrone*,
  163 F. Supp. 3d 549 (N.D. Ill. 2016) .............................................. 14, 21

*SEC v. Ginder*,
  752 F.3d 569 (2d Cir. 2014)........................................................... 11, 23

*SEC v. Jacoby*,
  2022 WL 982529 (D. Md. Mar. 30, 2022)............................................ 23

*SEC v. Kirkland*,
  521 F. Supp. 2d 1281 (M.D. Fla. 2007) ................................................ 37

*SEC v. Loomis*,
  969 F. Supp. 2d 1226 (E.D. Cal. 2013).................................................. 32

*SEC v. Navellier*,
  108 F.4th 19 (1st Cir. 2024).................................................................. 29

*SEC v. Neman*,
  2015 WL 12746213 (C.D. Cal. Dec. 16, 2015) ...................................... 38

*SEC v. Shanahan*,
  646 F.3d 536 (8th Cir. 2011) ................................................................ 23

*SEC v. Steadman*,
  967 F.2d 636 (D.C. Cir. 1992) .............................................................. 40

*Slep-Tone Ent. Corp. v. Kalamata, Inc.*,
  75 F. Supp. 3d 898 (N.D. Ill. 2014) ........................................................ 6

*Temperature Serv. Co. v. Acuity*,
  2018 WL 1378345 (N.D. Ill. Mar. 15, 2018) ........................................ 11

*Tieu v. N.Y.C. Econ. Dev. Corp.*,
  717 F. Supp. 3d 305 (S.D.N.Y. 2024) ............................................. 13, 14

*Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*,
  71 F.4th 894 (11th Cir. 2023) ............................................................... 34

*TSC Indus., Inc. v. Northway*,
  426 U.S. 438 (1976) .............................................................................. 24

*United States v. Bingham*,
  992 F.2d 975 (9th Cir. 1993) .......................................................... 33, 34

*United States v. Harbour*,
  2023 WL 4237337 (D. Ariz. June 28, 2023) ........................................ 31

*United States v. Laurienti*,
  611 F.3d 530 (9th Cir. 2010) ................................................................ 34

*United States v. Litvak*,
  889 F.3d 56 (2d Cir. 2018) ............................................................. 28, 29

*United States v. Nacchio*,
  2007 WL 9723300 (D. Colo. Mar. 26, 2007) ....................................... 29

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ...................................... 38

*Von der Ruhr v. Immtech Int'l, Inc.*,
  570 F.3d 858 (7th Cir. 2009) ................................................................ 35

*Wilson-Evans v. Safeco Life Ins. Co.*,
  2005 WL 1503549 (W.D. Wis. June 23, 2005) ..................................... 22

*ZPR Inv. Mgmt. v. SEC*,
  861 F.3d 1239 (11th Cir. 2017) ............................................................ 27

## STATUTES

15 U.S.C. § 77q(a) ................................................................................... 11

15 U.S.C. § 77q(a)(1) .......................................................................... 11, 14

15 U.S.C. § 77q(a)(2) .......................................................................... 11, 22

15 U.S.C. § 77q(a)(3) ................................................................................ 11, 22

## RULES

Local Rule 56.1(a)(2) .................................................................................... 5

Local Rule 56.1(b)(3) .................................................................................... 5

## REGULATIONS

17 C.F.R. § 230.701 ................................................................................. 30, 31

17 C.F.R. § 275.206(4)-1 .................................................................. 5, 38, 39, 40

17 C.F.R. § 275.206(4)-1(b) ................................................................... 38, 40

17 C.F.R. § 275.206(4)-1(e)(1)(i) .............................................................. 40

17 C.F.R. § 275.206(4)-8 ........................................................................ 5, 38

17 C.F.R. § 275.206(4)-8(a) ........................................................................ 38

## OTHER AUTHORITIES

*Merriam-Webster Dictionary* (2025), https://www.merriam-
    webster.com/dictionary/offer ................................................................ 39

**INTRODUCTION**

The SEC's marketing materials claims are as meritless as its valuation claims. In the SEC's rendition of the facts, Defendants not only created a "fake track record" to market the fund SBB Research Group Polysight I, LLC ("Polysight I, LLC"), but also lied about whether Polysight I, LLC had a high-water mark and the length of the fund's lock-up period. The SEC asserts that Defendants cooked up fraudulent marketing materials in the hope that they could trick highly sophisticated hedge fund investors into investing in Polysight I, LLC based on a two-page information sheet and a short PowerPoint. Recognizing that its primary case is in trouble, the SEC is looking to salvage something from this action and justify the years of investigation, litigation, and discovery. But the SEC's story about the marketing materials is not true to the evidence, and it certainly is not entitled to judgment as a matter of law.

As with its valuation claims, the SEC simply ignores or mischaracterizes critical facts in its Motion for Partial Summary Judgment, most notably the following:

- The SEC never even alludes to the substantial evidence demonstrating that SBB's materials marketed its trademarked Polysight *strategy* rather than any particular vehicle like Polysight I, LLC. Indeed, extensive record evidence shows that SBB's marketing objective was to find institutional investors that would invest in an SBB-managed "fund of one" or a separately managed account ("SMA") customized to that investor's specifications. In either vehicle, SBB and the institutional investor would be expected to (and indeed did) negotiate a high-water mark, lock-up period, and other terms, and SBB stood ready to offer the terms reflected in the marketing materials. The terms of Polysight I, LLC—a specific investment fund that pooled the investments of many different investors—would be irrelevant to an institutional investor negotiating customized terms for a fund of one. And, in the event an

1

accredited investor wanted to invest in Polysight I, LLC, it too could negotiate for its own terms via a side letter with the fund. And no one could invest in Polysight I, LLC until the investor had received the Polysight I, LLC fund subscription documentation that accurately stated that fund's lock-up period and disclosed that the fund did not have a high-water mark.

- The SEC tells the Court that Defendants presented a "false track record" for Polysight I, LLC, but fails to mention that all the supposedly fraudulent fact sheets and investor presentations accurately state the track record for the Polysight strategy. On the face of the documents, SBB stated that the strategy's track record was a composite of Polysight I, LLC and another SBB-managed fund created earlier and with a similar strategy, and stated the accurate inception date for each fund. Investment advisers often present composite returns to show prospective investors how an investment strategy has historically performed—a fact reflected in the SEC's own rulemaking. Rather than address this head-on, the SEC mischaracterizes SBB's plain disclosure of the composition of the performance track record as somehow "cryptic."

- The SEC ignores the fact that SBB's Form ADV brochures prominently disclosed that SBB's funds (including Polysight I, LLC) did not have a high-water mark, and that investors would typically be subject to a two-year lock-up. Throughout the entire time that SBB distributed the marketing materials, SBB made its Form ADV brochure publicly available on the SEC's website, where it could be read by anyone considering investing with SBB. Although the SEC often stresses how important an investment adviser's brochure disclosures are to prospective investors, it failed

2

to consider SBB's Form ADV brochure disclosures before suing Defendants for fraud and moving for summary judgment on the marketing materials.

- Unwilling to let the facts get in the way of a good story, the SEC presents an internal chat between Mr. Aven and Alan Handler (SBB's then-third-party marketer) as smoking gun evidence of scienter, when it is anything but. In the SEC's telling, the chat shows Mr. Aven and Mr. Handler agreeing to use a fake inception date for Polysight I, LLC because "the longer the better" when it comes to the fund's track record. But the quoted snippet of a larger chat discussion and the SEC's characterization of the chat are highly misleading. The SEC fails to mention that Mr. Aven—in that very same chat—insisted that if SBB presented a track record dating to 2011, Mr. Handler needed to *also* include the disclosure that it was a composite return of Polysight I, LLC and an earlier fund, and stating the inception date for each. Reading the ten-line chat in its entirety, it is actually smoking gun evidence *in Defendants' favor*, as it demonstrates Mr. Aven's commitment to accurate disclosures and complying with the law.

In sum, the SEC has taken liberties with the record to dress up what is, at its core, an incoherent fraud theory regarding SBB's marketing materials. It is illogical to find a scheme to distribute marketing materials touting a "fake track record," when every challenged fact sheet and investor presentation included an accurate disclosure of the composite track record being presented. Nor does it make sense that Defendants would cook up a scheme to intentionally misstate the fund's characteristics in preliminary documents, but then accurately describe those very same characteristics in both SBB's publicly available Form ADV brochure and in the

subscription documents that all fund investors acknowledged receiving and reviewing prior to investing in the fund.

The SEC's motion should be denied for the following reasons:

*First*, the SEC cannot prove **falsity.** Defendants did not lie about the terms of Polysight I, LLC or the track record for SBB's investment strategy. SBB's statements about the investment terms concerned items that SBB was expecting to negotiate in the future with an institutional investor interested in an investment on their own individual terms. Further, the track record accurately stated the composite returns for SBB's investment strategy.

*Second*, the SEC cannot prove Defendants' **mental state.** The SEC spins a tale of intentional or reckless fraud by mischaracterizing evidence and omitting documents and testimony undercutting its theory. Nor can the SEC prove negligence, as it has no evidence of what a reasonably careful person would do when marketing a complex investment strategy to institutional investors who can dictate the terms of their own investment, who would read all of the investment documentation, and who would carefully diligence SBB and its strategy. The SEC cannot prove that Defendants violated such a standard in any event.

*Third*, the SEC cannot prove any of the challenged disclosures were **material** to sophisticated investors. The terms of Polysight I, LLC would be irrelevant to a prospective client considering an investment vehicle customized to that investor's specifications, and any investor wishing to invest in Polysight I, LLC received accurate information about the fund's terms before investing. At the same time, investors considering an investment in Polysight I, LLC could (and did) negotiate their own terms through a side letter with the Polysight I, LLC fund. In a case about purportedly misleading investors, the SEC did not depose a single investor. And once the SEC lost its materiality expert, Peter Hickey, it pivoted to Defendants' lay testimony—but that fares no

4

better.  Lacking the goods on materiality, the SEC's last-ditch effort is a theory that the alleged misrepresentations were *per se* material, which is not the standard here.  Indeed, the Court already rejected the SEC's attempt to prove materiality by using its "so-called" expert's say-so.

**Fourth**, the SEC's **Advisers Act Rule 206(4)-8** claim fails along with its other claims— or at a minimum presents a material dispute.

**Finally**, the SEC's **Advisers Act Rule 206(4)-1** claim fails because it cannot prove online marketing database submissions are false or constitute "advertisements" under the Rule and cannot prove negligence.

The SEC's Motion for Partial Summary Judgment should be denied in full.

## I.  BACKGROUND

### A.    SBB Created and Applied the Polysight Strategy to Its Closed, Pooled Funds

SBB is an investment adviser to several private investment funds.  SEC SUMF ¶ 1.[1]  Dr. Barnett founded SBB in 2010 while an undergraduate at the California Institute of Technology, majoring in Applied Computational Mathematics and Business Economics and Management. SUMF ¶ 4; SAMF ¶ 1.  In February 2011, Dr. Barnett hired Matthew Aven, who had worked for financial services firms, as SBB's Director of Operations and ultimately the Chief Compliance Officer.  SAMF ¶ 2; SEC SUMF ¶ 3.  SBB manages private funds available only to "accredited investors," meaning investors who have a net worth exceeding $1 million, meet certain annual income requirements, or satisfy at least one "financial sophistication criterion."  SAMF ¶¶ 3, 10.

---

[1] "Mot." refers to the SEC's memorandum in support of its motion for partial summary judgment (Dkt. 258). "SEC SUMF" refers to the SEC's Local Rule 56.1(a)(2) statement of undisputed material facts (Dkt. 259); "SEC Ex." refers to exhibits to SEC SUMF (Dkts. 260-1 to 260-55); "Resp. to SUMF" refers to Defendants' Local Rule 56.1(b)(2) response to the SEC SUMF; and "SAMF" refers to Defendants' Local Rule 56.1(b)(3) statement of additional material facts.

The first SBB fund to apply SBB's proprietary investment strategy was "Investors II," which SBB formed in May 2011. *Id.* ¶ 4. Investors II was a $10 million fund open only to Dr. Barnett's family and friends. *Id.* For structured notes, Investors II followed a strategy with an objective of achieving conservative long-term returns while offering downside protection. *Id.* ¶ 7. SBB applied this strategy to other closed funds, including Investors III and Investors IV. *Id.* ¶ 8.

After its strategy had produced several years of returns in the Investors II fund, SBB officially branded the strategy "Polysight," trademarked the term "Polysight," and used the term Polysight "umbrella" for the SBB investment vehicles employing the strategy. *Id.* ¶¶ 5-7. In its May 2014 trademark application, SBB stated that it intended to use "Polysight" to identify the following services:

> Hedge fund investment services; hedge fund services; financial services, namely, operation and management of hedge funds; investment management funds; investment advisory and management services; management and sponsorship of investment funds; investing for others; investment consulting services.

*Id.* ¶ 5.[2]

### B. SBB Created An Open Pooled-Fund—Polysight I, LLC—and Made Prospective Investors Aware of the Key Terms, Which Were Also Negotiable

In June 2014, SBB created Polysight I, LLC, a pooled fund under the Polysight umbrella. *Id.* ¶ 8; *see also* SEC SUMF ¶ 11. Polysight I, LLC followed the same investment strategy as the other funds under the umbrella. SAMF ¶ 8. At the time SBB formed Polysight I, LLC, it was the only SBB fund under the Polysight umbrella open to investors who were *not* family or friends— though only family and friends in fact invested in the fund. Resp. to SUMF ¶ 9; *see also* SAMF ¶

---

[2] "The Court may properly take judicial notice of official records of the United States Patent and Trademark Office." *Slep-Tone Ent. Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 904 (N.D. Ill. 2014).

9. On July 29, 2014, SBB "publicly acknowledged the then-recent creation of the Polysight I fund" in the financial trade press. SEC SUMF ¶ 13.

While Polysight I, LLC was open to new investors, it would accept only those investors who confirmed they were accredited and were aware of multiple risks related to investing in the fund, including that an investment was suitable only for sophisticated investors of substantial means who had no need for short-term liquidity. SAMF ¶¶ 10-13. The Polysight I, LLC subscription package likewise required prospective investors to confirm they had all the information necessary to evaluate their investments. *Id.* ¶ 13. SBB disclosed in the subscription package that the fund "does not employ the concept of a high-water mark" and that an investment "is subject to a lock-up period of two years." *Id.*; *see also* SEC SUMF ¶ 18. Likewise, in SBB's Form ADV brochure filed annually with the SEC and available on its website to investors,[3] SBB disclosed: (i) SBB may reduce, waive, or negotiate management fees; (ii) "[p]erformance allocations are not subject to a 'high watermark … and [SBB] may be paid performance-based compensation for performance gains even though the overall performance of the Fund or account is flat or negative," and (iii) "typically, Fund contributions cannot be withdrawn until the December 31 of any fiscal year that follows the second anniversary of the date that the contribution was made." SAMF ¶ 14.

Although the Polysight I, LLC fund documents set forth the fund's standard terms, investors could negotiate Polysight I, LLC's terms, with any bespoke terms laid out in a "side letter" between the investor and Polysight I, LLC. *Id.* ¶ 15. The record includes numerous

_____

[3] *See* Amendments to Form ADV, Investment Advisers Act of 1940, Release No. 3060 (2010), 2010 WL 2957506, at *1 (Aug. 12, 2010) ("Advisers must file their brochures with [the Commission] electronically and [the Commission] will make them available to the public through [its] Web site.").

examples of prospective Polysight I, LLC investors negotiating their own terms and memorializing those terms in a side letter to the Polysight I, LLC Operating Agreement. *Id.*

### C. SBB Sought to Use the Polysight Strategy to Create Individualized "Funds of One" or Separately Managed Accounts

Beginning in 2015, SBB decided to market the Polysight strategy to institutional investors that might be interested in creating an SBB-managed "fund of one" or SMA. SEC SUMF ¶ 21; SAMF ¶¶ 18, 30, 32. A "fund of one" is a vehicle that consists solely of a single investor's assets and has features that are customized for that investor. *Id.* ¶ 19. An SMA is likewise distinct from a pooled investment vehicle and is managed on terms unique to a single investor. *Id.* ¶ 20. SBB understood at the time that institutional investors generally preferred to have their own account with an investment manager rather than investing in pooled vehicles like Polysight I, LLC that commingled the assets of numerous investors. *Id.* ¶ 33. SBB's efforts to market itself to institutional investors in this time frame ultimately proved unsuccessful. *Id.* ¶ 49.

In October 2015, SBB retained E.L.K. Capital Advisors, LLC ("ELK"), an SEC-registered broker-dealer firm that employed Alan Handler to assist with SBB's marketing efforts. *See* SEC SUMF ¶¶ 21, 22; SAMF ¶ 30. Throughout Mr. Handler's SBB engagement, he focused his marketing efforts on prospective institutional investors—*e.g.*, pension funds, endowments, foundations, sovereign wealth funds, large investment management firms, funds of funds, family offices, and high-net-worth individuals with at least $25 million in investable assets. SAMF ¶ 32. The high-net-worth individuals SBB marketed to had sufficient wealth and sophistication to rely on institutional-level managers or intermediaries. *Id.* ¶ 34. Indeed, the fact sheets on which the SEC focuses expressly stated that they were for "sophisticated investors" only. *Id.* ¶ 46. And Mr. Handler confirmed that the institutional investors to whom SBB marketed custom funds were

"extremely sophisticated," "very financially literate" and had "read hundreds and hundreds of these documents and hundreds of operating agreements." *Id.* ¶ 38.

To show the benefits of SBB's Polysight strategy, the marketing materials disclosed a "composite return," which combined the performance of Polysight I, LLC and Investors II, two SBB-managed funds following substantially the same strategy. *Id.* ¶¶ 8, 17, 44. A composite return aggregates the returns of portfolios managed using similar strategies. Investment Adviser Marketing, Investment Advisers Act of 1940, Release No. 5653, 2021 WL 826149, at *12076 n.649 (Mar. 5, 2021). SBB added Investors II returns to the composite because it was SBB's "longest running vehicle" and thus "best demonstrate[d] the high, long-term value of [SBB's] investment approach." *Id.* ¶ 28. Every challenged fact sheet provided to prospective investors included this disclosure about the SBB's track record:

> Historical Performance represents a composite return of SBB Research Group Investors II LLC, which began trading in September 2011, and Polysight, which began trading in June 2014, and is net of all fees and expenses . . .

*Id.* ¶ 44 (the "Composite Disclosure"). Under the header "Firm and Program Information" (shown below), SBB featured examples of terms that an investor could obtain if it established an SBB-managed fund of one with a minimum investment of $5 million (distinct from Polysight I, LLC's minimum investment of $1 million). Resp. to SUMF ¶¶ 27, 37, 40, 45, 67; SAMF ¶ 13.

| Firm and Program Information | |
|---|---|
| Firm AUM | $200 Million |
| Polysight® AUM | $54 Million |
| Polysight® Inception[1] | Sept 2011 |
| Management Fee | 2% |
| Incentive Fee | 20% |
| High Watermark | Yes |
| Minimum Acct Size | $5,000,000 |
| Lock Up | 1 year |

*E.g.*, SEC Ex. 19 at ELK-0018390. After April 2016, SBB distributed fact sheets (attached with investor presentations) that stated: "numerous hedge funds" are "based on Polysight, a proprietary

quantitative investment *platform*," and listed the funds using the platform, including "SBB Research Group Polysight I LLC (inception: June 2014)." SAMF ¶ 45.

SBB's marketing materials presented investors with a high-level snapshot of the Polysight strategy and the returns SBB had achieved by employing the strategy. *See id.* ¶¶ 17, 28, 31. SBB intended for the marketing materials to prompt a conversation with a prospective institutional investor about possibly forming a bespoke SBB-managed "fund of one" or SMA customized to the specifications of the institutional investor. *Id.* ¶¶ 18-25, 29, 35-38. But nobody could invest solely based on the marketing materials—investors could invest only after receiving and signing copious documentation regarding SBB and the investor's preferred investment vehicle. *Id.* ¶¶ 10-13. If a prospective client expressed preliminary interest, Mr. Handler would follow up with the brass tacks documentation for whichever option the prospect preferred—*i.e.*, a fund of one, SMA, or Polysight I, LLC, which was the only fund open to new investors at the time. *Id.* ¶ 39.

Investors could negotiate their own terms for a fund of one or SMA. *Id.* ¶¶ 15, 35-37. In this context of proposing custom funds of one or SMA, SBB—and particularly Mr. Handler—discussed with investors the terms at issue, including a high-water mark and the lock-up period. *Id.* ¶¶ 35-36. The eventual custom vehicle would have its own custom operating agreement. *Id.* ¶ 37. SBB's JM I Fund was one such example: it had only one investor, *id.* ¶ 29, and unlike Polysight I, LLC or Investors II, JM I's operating agreement made it clear that the investor had no lock-up and could withdraw his capital at any time—exactly the type of bespoke term that Defendants were envisioning with funds of one for institutional investors. *Id.* ¶¶ 29, 35-37.

## II.    LEGAL STANDARD

On cross-motions for summary judgment, the Court construes and facts and draws inferences in favor of the party against whom the pertinent motion is made. *See Samuelson v.*

10

*LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008).[4]  The Court "will enter summary judgment against a party who does not 'come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question.'"  *Lane v. Structural Iron Workers Loc. No. 1 Pension Tr. Fund*, 2021 WL 6197074, at *5 (N.D. Ill. Dec. 30, 2021) (quoting *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013)).  The SEC is thus entitled to summary judgment "only if a reasonable jury could not return a verdict for [Defendants]."  *Temperature Serv. Co. v. Acuity*, 2018 WL 1378345, at *3 (N.D. Ill. Mar. 15, 2018).

## III.   ARGUMENT

The SEC has no business seeking summary judgment given the evidentiary record regarding SBB's marketing materials.  Contrary to the SEC's assertion that this is a "cut-and-dried" fraud case, the record is bereft of evidence of falsity, intentional or reckless fraud, negligence, or materiality.

### A.   The SEC Is Not Entitled to Summary Judgment On Its Section 17(a) Claim

As the SEC acknowledges, to prove its Section 17(a) claim, it must establish that Defendants made a materially false statement or omission in the marketing materials.  Mot. at 11-12; 15 U.S.C. § 77q(a).  The SEC must also prove scienter for its Section 17(a)(1) claim and negligence for its Section 17(a)(2) and (a)(3) claims.  *Aaron v. SEC*, 446 U.S. 680, 697 (1980); *SEC v. Ginder*, 752 F.3d 569, 574 (2d Cir. 2014).  The SEC cannot prove any of these elements.

#### 1.   The SEC Cannot Prove Falsity

The SEC asserts its claim "involves three cut-and-dried misrepresentations," yet these statements are anything but.  Mot. at 12.  The first—Polysight I, LLC's inception date—is not even

---

[4] Unless otherwise stated, all internal quotations and citations have been omitted.

false. And the SEC has no *undisputed* facts showing the "one-year lock-up period," "high-water mark," or online materials were false when considered in their context.

a. *The SEC Cannot Prove SBB's Statements About Polysight I, LLC's Inception Date Are False*

The SEC's primary falsity claim centers on Polysight I, LLC's inception date and so-called fake track record. *See* Mot. at 13. But Defendants did not misrepresent the fund's inception date or track record. Far from it: SBB's fact sheets said, in no uncertain terms, that Polysight I, LLC "began trading in 2014." SAMF ¶ 44; *see also id.* ¶ 45 (listing "inception date: June 2014"). And the challenged fact sheets included the Composite Disclosure that the historical performance displayed "represents a composite" of Investors II and Polysight I, LLC. *Id.* ¶ 44. And Defendants always distributed the fact sheets with the challenged investor presentations. *Id*.

Indeed, SBB's use of composite returns in the marketing materials signaled to prospective investors that SBB was marketing a strategy and not Polysight I, LLC. As the SEC recognized in its recent amendment to the Advisers Act Marketing Rule, for performance reporting, "a composite is an aggregation of portfolios managed according to a similar investment mandate, objective, or strategy." Investment Adviser Marketing, 2021 WL 826149, at *12076 n.649.

b. *Statements About SBB's Strategy and Negotiable Terms SBB Was Willing to Offer Cannot Be False*

The SEC ignores two key facts about SBB's marketing materials: (1) SBB marketed its Polysight strategy (not a particular fund) and (2) investors could and did negotiate their own terms for an SBB-managed investment vehicle. *See supra* Section I. SBB viewed the references to a high-water mark and one-year lock-up period as terms on offer for an "aspirational" fund of one, as SBB understood it would negotiate the precise terms of an investment vehicle with an institutional investor. SAMF ¶¶ 15, 35-37; *see supra* Section I; *infra* Section III(A)(2); Resp. to SUMF ¶¶ 37, 40. With this context, the SEC is not entitled to summary judgment as to the falsity

of the lock-up period, high-water mark, the inception date, and track record.[5] *Tieu v. N.Y.C. Econ. Dev. Corp.*, 717 F. Supp. 3d 305, 330 (S.D.N.Y. 2024) (court will not credit "a conflict between sworn testimony and conjecture" on summary judgment).

The SEC's own exhibits prove SBB's marketing approach. For instance, in every cited fact sheet, SBB discussed the lock-up period and high-water mark in the section captioned *firm and program* information, not *fund* information. *See* Resp. to SUMF ¶¶ 27, 37, 40, 45-46, 66-67. The SEC does not even challenge fact sheets dated April 2016 or later—likely because those state that SBB's "numerous hedge funds" are "based on Polysight, a proprietary quantitative investment *platform*" and list the funds (including Polysight I, LLC) using the platform. SAMF ¶ 45. Likewise, the SEC attaches an email thread between Mr. Handler and a potential investor in which Mr. Handler explains, "we are open-minded about the fee structure that we would propose to you and would welcome a dialogue about that." SEC Ex. 12 (Dkt. 260-12). And in another exhibit, Mr. Handler confirms he was inputting "platform" data rather than a specific fund to industry databases. *See* SEC Ex. 49 (Dkt. 260-49); *see also* SAMF ¶ 40. The SEC mentions none of this.

The SEC similarly ignores that SBB witnesses repeatedly confirmed their approach to marketing and the materials at issue (SAMF ¶¶ 22-27). The SEC offers *no* testimony from investors supporting the SEC's gloss on SBB's marketing materials or even showing that investors were confused (let alone misled) by the fact sheets. Instead, the SEC cherry-picks soundbites from SBB witnesses' testimony to construct its story. *See, e.g.*, SEC SUMF ¶¶ 38-39, 41-42, 49, 58-

---

[5] In trying to make its case seem bigger than it is, the SEC claims that "Defendants spread these false statements far and wide" and cite "at least four Online Marketing Platforms." Mot. at 13. The SEC omits, however, that these databases were available only to accredited users with a paid subscription. SAMF ¶ 40. In fact, the statements that Defendants spread far and wide were those available on the SEC's website in SBB's Form ADV brochure, which explicitly stated that SBB's funds typically had no high-water mark and had a two-year lock-up. *Id.* ¶ 14.

61, 66, 68-70. That ploy does not work: the "flaw in the SEC's argument is that it fails to acknowledge evidence that creates material disputes, which prevents summary judgment." *SEC v. Caine*, 2024 WL 4382751, at *6 (N.D. Ill. Oct. 3, 2024); *see also Tieu*, 717 F. Supp. 3d at 330 (rejecting party's speculative interpretation of a document in light of witness's sworn testimony about the interpretation).

To be sure, the SEC may argue that SBB's marketing materials should have expressly stated they pertained to a hypothetical fund of one or SMA instead of an existing fund, or that the terms of Polysight I, LLC were negotiable. But a "possibility for confusion, or a lack of sufficient detail, cannot be equated with Defendants purposefully making a false or misleading statement." *Chang v. Accelerate Diagnostics, Inc.*, 2016 WL 3640023, at *8 (D. Ariz. Jan. 28, 2016) (rejecting plaintiff's urging "to read a few isolated terms" and find falsity given the "context of all of the materials provided by Defendants"). Rather, the SEC must prove a *false or misleading* statement. And because at the very least a genuine dispute exists as to whether SBB's marketing materials and online materials specifically represented only Polysight I, LLC the fund or SBB's general "Polysight" strategy, summary judgment is inappropriate. *Caine*, 2024 WL 4382751, at *4 (finding a "factual dispute" as to falsity of statements and denying summary judgment).

The negotiability of the terms of a fund of one, SMA, and Polysight I, LLC precludes the SEC from proving falsity. Misrepresentation cases are built on misstatements of fact, not statements about what terms two parties can negotiate in the future.

### 2. The SEC Cannot Prove Defendants Engaged in an Intentional Fraud

To prevail on its Section 17(a)(1) claim, the SEC must prove not only that they made misstatements to prospective investors but also that Defendants made such statements with scienter. *Aaron*, 446 U.S. at 697. To establish scienter, the SEC must prove an "intent to deceive, manipulate or defraud" or reckless disregard. *SEC v. Ferrone*, 163 F. Supp. 3d 549, 569 (N.D. Ill.

14

2016). "The standard for recklessness in this context is the functional equivalent of intent to deceive." *Ray v. Citigroup Glob. Mkts., Inc.*, 2004 WL 1794927, at *2 (N.D. Ill. Aug. 4, 2004). Reckless disregard amounts to "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or was so obvious that the defendant must have been aware of it." *Antelis v. Freeman*, 2011 WL 6009609, at *5 (N.D. Ill. Nov. 30, 2011).

The SEC comes nowhere near meeting this high bar.[6]  Instead, the SEC pretends that it is "so plain" that Defendants acted with scienter that this is a "cut-and-dried" fraud case. Mot. at 12, 24. Part of the SEC's pretending is omitting any discussion of the true context of the marketing materials, and part is mischaracterizing evidence that actually cuts against its fraud theory. The sum of the parts is a flimsy cover for an incoherent fraud theory on which the SEC cannot prevail as a matter of law.

a.  *The SEC Ignores the Record Evidence that SBB Marketed Its Strategy to Institutional Investors*

For starters, the SEC's scienter theory inaccurately frames the context of the marketing materials by misstating SBB's marketing objective. The SEC would have the Court believe that SBB prepared the marketing materials solely for the purpose of soliciting investments in Polysight I, LLC and simply lied to potential investors about the fund's track record and terms, in the hopes that investors would heedlessly subscribe to Polysight I, LLC without reading the subscription documentation and signing off on it. Not only is this theory illogical, it relies on the SEC omitting any mention of SBB's true marketing objective. *Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th

---

[6] Moreover, "[q]uestions of materiality and scienter are connected … If it is questionable whether a fact is material or its materiality is marginal, that tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact." *Flannery v. SEC*, 810 F.3d 1, 9 (1st Cir. 2015). Because the SEC cannot prove materiality, *see infra*, its scienter argument necessarily fails as well.

Cir. 2014) (admonishing movant who "cherry-picked" evidence and whose "presentation of the evidence amounted to nothing more than selectively quoting deposition language it likes and ignoring deposition language it does not like").

There is copious evidence that SBB's objective was to find institutional investors who wanted a customized fund of one or SMA managed by SBB using its Polysight strategy, rather than investors in a pooled vehicle like the Polysight I, LLC fund. SAMF ¶¶ 10-25, 35-38. For example: Mr. Aven testified that SBB retained Mr. Handler to "make introductions to institutions that would be interested in our investment strategy." Mr. Handler likewise understood his role was to speak with prospective investors about investing in "Separately Managed Accounts," or "Funds of One," and to market a concept on SBB's behalf—namely, that an "investor could open an account with [SBB], either an SMA or a Fund of One, and [SBB] would employ [the Polysight] strategy inside that vehicle." *Id.* ¶¶ 18, 30-31. He testified that his "goal was to speak to investors who would create funds of one," and he "wasn't trying to get people to invest" in "the commingled vehicle, Polysight I LLC." *Id.* ¶ 18. He added that his "intent was not to convince these large institutions to invest in Polysight I," but rather use "Polysight I as an example of what we could do for these large institutional investors in a Fund of One or an SMA structure." *Id.* ¶ 21.

Mr. Aven confirmed SBB was not soliciting into a "particular fund," because "the institutional investors that we typically would be talking to typically are looking for their own vehicle." *Id.* ¶ 23. Dr. Barnett confirmed the same, explaining SBB was marketing "the fund of one concept," so when discussing "our existing track fund, we are saying that this is the kind of thing that we can set up for you as your own vehicle." *Id.* ¶ 25. And SBB employee Dan Kiefer likewise confirmed that SBB's "marketing aims were mostly for funds of one." *Id.* ¶ 27. The SEC does not address any of this evidence.

"Context makes a difference" in analyzing scienter. *Flannery v. SEC*, 810 F.3d 1, 11 (1st Cir. 2015). Considering the true context of the marketing materials, the SEC's scienter theory falls apart. SBB's marketing materials presented a composite return of two funds managed using its proprietary strategy so that it could demonstrate to institutional investors its ability to manage a fund of one or SMA over the long run. As Defendants testified, SBB included terms like a high-water mark and one-year lock-up period in the marketing materials as terms that an investor could obtain in a custom fund for a minimum investment of $5 million, or even in Polysight I, LLC via a side letter. Resp. to SUMF ¶¶ 37, 40, 42, 45, 47-48, 50, 54-55, 67, 71; *see also* SAMF ¶¶ 23-24, 29, 49. Indeed, the fact sheets reference those very terms in a section captioned "Firm and Program Information," *not* Polysight I, LLC fund information. Resp. to SUMF ¶¶ 27, 37, 40, 45-46, 66-67. Defendants could not knowingly lie about terms that SBB stood ready to negotiate if an investor expressed an interest in forming a customized fund of one or SMA, or investing in Polysight I, LLC the fund but with different terms.

Scienter being all about Defendants' state of mind, it is remarkable that the SEC never once mentions the many lines of testimony in which Dr. Barnett, Mr. Aven, Mr. Handler, and Mr. Kiefer explained what they were thinking when SBB launched its marketing efforts. SAMF ¶¶ 18-27. Time and again, the SBB witnesses explained that the firm's marketing priority was to find institutional investors interested in establishing a fund of one or SMA on their own terms and that SBB was willing to negotiate the Polysight I, LLC terms. *Id.* This is cherry-picking in the extreme, and sufficient reason to deny the SEC's Motion regarding its fraud claims. *Malin*, 762 F.3d at 564 (reversing grant of summary judgment to party who "seems to have based its litigation strategy on the hope that neither the district court nor this panel would take the time to check the record").

17

          b.     *The SEC Mischaracterizes the Evidence On Which It Does Rely*

The SEC resorts to taking liberties with the evidentiary record in a futile attempt to prove intentional fraud. For example, the SEC mischaracterizes the "Composite Disclosure" as "cryptic." Mot. at 6 n.3. The Composite Disclosure is not "cryptic," as it accurately states what makes up the composite return track record, and accurately states the respective years of inception for Polysight I, LLC and Investors II. *See* SAMF ¶ 44 (Composite Disclosure is in every challenged fact sheet).

In the most glaring example of this tactic, the SEC cites to an SBB internal chat as "smoking gun" evidence of knowing deceit, when the chat instead establishes the opposite.

First from the SEC's brief: "Aven and Handler exchanged emails in which they discussed the fact that the Polysight I inception date was 'really [J]une 2014,' but they nevertheless agreed to use the fake September 2011 start date because, when it came to the fund's track record, 'the longer the better.'" Mot. at 23.

Next, the conversation in its entirety:

[11/05/2015 05:07:28 PM UTC] Matt Aven: you have poly inception of Sept 2011. but it's really june 2014
[11/05/2015 05:07:37 PM UTC] Matt Aven: if you want to go wtih Sept 2011, we need to add the * again. what do you think?

[11/05/2015 05:09:06 PM UTC] alan handler: we shoudl definitley use the Sep '11 start date. i think the disclaimer you wrote covers our legal risk on that, don't you?
[11/05/2015 05:09:30 PM UTC] alan handler: the **longer** the better, as far as track record is concerned
[11/05/2015 05:10:29 PM UTC] Matt Aven: agreed
[11/05/2015 05:10:36 PM UTC] alan handler: ok

SEC Ex. 48. The "*" refers to the following Composite Disclosure, which SBB included in all of its challenged fact sheets:

Historical Performance represents a composite return of SBB Research Group Investors II LLC, which began trading in September 2011, and Polysight, which began trading in June 2014, and is net of all fees and expenses.

SAMF ¶ 44.

The brief chat between Mr. Handler and Mr. Aven demonstrates an intent to follow the law, not break it. Mr. Aven wanted to be sure the marketing materials disclosed to prospective investors that the returns presented were a composite of Polysight I, LLC and the earlier fund that employed the same strategy, and to state the respective inception date for each fund. Mr. Handler acknowledged that Mr. Aven himself (whom the SEC accuses of intentional fraud) wrote the Composite Disclosure—which is the work of a law-follower, not a law-breaker. When Mr. Handler says he believes the Composite Disclosure "covers our legal risk," he is saying that he and Mr. Aven are trying to conform their conduct to what the law requires.

The SEC also implies some sort of sinister intent from Mr. Handler's comment that a longer track record is better, but that ignores the record evidence the SEC itself cites where Mr. Handler explains that the longer track record "best demonstrate[d] the high, long-term value of [SBB's] investment approach." *Id.* ¶ 28. In other words, Handler was not trying to trick investors by including a longer track record but rather provide investors with the "most representative return stream." *Id.*

This chat shows that no reasonable jury could conclude that Defendants acted with scienter.

c. *The SEC's Theory of Fraud Is Incoherent*

Cutting through the SEC's cherry-picking and distortion of the record exposes the biggest flaw in the SEC's case: its fraud theory is illogical. The SEC's claim that the Defendants lied about Polysight I, LLC's track record and fund terms so that they could trick highly sophisticated investors into investing in the fund raises a number of obvious questions that the SEC cannot answer:

- Why would Defendants brazenly lie about Polysight I, LLC in documents investors could not invest on, only to provide fully accurate information about the fund in the subscription documents that investors had to review and sign prior to investing in the fund?  And why would Defendants' publicly available Form ADV brochure include a plain English disclosure of the SBB funds' lack of a high-water mark and the two-year lock-up, if Defendants wanted to mislead Polysight I, LLC investors about these terms?

- Why would Defendants market their services to institutional investors?  Defendants knew the marketing materials would go to the most sophisticated investors in the market, all of whom would be expected to conduct careful diligence prior to making an investment.

- If Defendants intended to present a false track record for Polysight I, LLC, why would they prominently and accurately disclose the makeup of the track record in all of the challenged fact sheets?

SAMF ¶¶ 10-14, 38, 44.

These unanswerable questions show the incoherence of the SEC's fraud theory regarding the marketing materials.  Without a coherent fraud theory that is supported by the evidence, the SEC has no realistic chance of prevailing on its marketing materials claims before a jury, and is nowhere near being able to prevail as a matter of law.  *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462, 468 (S.D.N.Y. 2000) (granting summary judgment where "the evidence shows unequivocally that defendants lacked any such motive [to commit fraud]").

### d.    *Defendants Were Not Reckless*

The SEC similarly fails in its attempt to make out a case for recklessness.  The "quantum of proof required to establish a defendant was reckless is quite high in the Seventh Circuit."

*Ferrone*, 163 F. Supp. 3d at 569. It should be "viewed as the functional equivalent of intent because it requires something more egregious than even 'white heart/empty head' good faith." *Id.* The SEC claims that Defendants acted recklessly by ignoring certain "red flags" that supposedly alerted them that prospective investors were "receiving false information." Mot. at 22. What the SEC characterizes as red flags are no such thing and come nowhere close to being the functional equivalent of fraudulent intent.

The SEC first points to an August 2015 email exchange in which Mr. Aven and a prospective Polysight I, LLC investor discussed the lock-up period for the fund. Mot. at 22-23. This prospective investor had reviewed Polysight I, LLC's Operating Agreement and seen that the fund had a two-year lock-up period. Mr. Aven promptly acknowledged that he misspoke when he originally told the investor that Polysight I, LLC had a one-year lock-up. *Id.* (citing SEC SUMF ¶ 62). The SEC asks the Court to stop there and conclude that this exchange shows that Mr. Aven had a red flag that SBB was providing investors with "false information." But this exchange supports no inference of recklessness. Notably, the email exchange occurred months *before* SBB began distributing its marketing materials, so it is unconnected to the SEC's marketing materials claims. *Id.* at 5 ("Starting in late November 2015, SBB distributed fact sheets [and] investor presentations."). Further, reading the exchange in its entirety highlights that the SEC ignores record evidence showing even Polysight I, LLC's terms were negotiable. After the prospective investor asked about Polysight I, LLC's lock-up period, Mr. Aven said: "We can accommodate your request to reduce the lockup period to 6 months[.]" *See* Resp. to SUMF ¶ 63. Mr. Aven even offered to memorialize a six-month lock-up period for the investor in a "side letter" to Polysight I, LLC's operating agreement—a shorter lock-up period than the one-year period that the SEC claims was a misrepresentation in the marketing materials. *Id.*

21

The SEC next claims that the previously discussed November 2015 chat between Mr. Handler and Mr. Aven is evidence that Defendants ignored red flags that investors were being deceived. Mot. at 23. But as discussed above, the November 2015 chat is no evidence of a culpable state of mind for Mr. Aven or any Defendants. *Supra* Section III(A)(2)(b). Further, evidence that the SEC did not submit to the Court shows that days after the November 2015 chat, Mr. Handler revised the draft fact sheet to add the "*" and the Composite Disclosure. SAMF ¶ 52. The November 2015 chat and follow-up from the chat do not demonstrate recklessness, but rather show that Defendants acted in good faith by adding appropriate disclosure regarding the performance track record included in the fact sheets.

The SEC's effort to find a red flag in investigative testimony—where the staff "confronted" Mr. Aven with Mr. Handler's alleged "false statements" about the lock-up period and high-water mark—fares no better. Mot. at 23. Mr. Handler did not lie when he sent an investor presentation that referred to a one-year lock-up period and a high-water mark, as SBB was prepared to offer those terms to any institutional investor looking to invest at least $5 million in an SBB-managed vehicle. SAMF ¶¶ 15, 35-36; *see Wilson-Evans v. Safeco Life Ins. Co.*, 2005 WL 1503549, at *1 (W.D. Wis. June 23, 2005) (denying summary judgment where movant "cherry-picks" evidence and "points to a narrow selection of evidence that provides a misleading picture of the record as a whole").

### 3.    The SEC Cannot Prove Defendants Acted Negligently

For its Section 17(a)(2) and (a)(3) claims, the SEC cannot meet the standard for negligence. The SEC presents its negligence-based claims as indistinct from its fraud claims, asserting that Defendants acted negligently because they made false statements. But the SEC cannot prove negligence any more than it can prove fraud.

22

The SEC is required to show that Defendants failed to use the "degree of care that a reasonably careful person would use under like circumstances," *Nutmeg*, 162 F. Supp. 3d at 775 (Mot. at 24), that requires the SEC to establish an applicable standard of reasonable care. *See SEC v. Shanahan*, 646 F.3d 536, 546 (8th Cir. 2011). That is particularly important here, considering the "federal securities law does not establish a uniform standard of care." *SEC v. Jacoby*, 2022 WL 982529, at *2 (D. Md. Mar. 30, 2022). For that reason, expert testimony is "helpful, if not indeed essential" for the finder of fact to "understand the standard of care." *Id.* Yet the SEC presents no such evidence—let alone expert testimony. With the SEC unable to show the standard of care, a jury would be lost trying to determine what a reasonably careful person would do when marketing a complex investment strategy to institutional investors who are expected to choose their preferred investment vehicle and negotiate their own investment terms, read and sign all of the subscription documents, and conduct careful due diligence. The SEC's failure on this front alone requires denial of its Motion. *See* SBB MSJ (Dkt. 261) at 34-35; *Ginder*, 752 F.3d at 576 (reversing judgment for the SEC where "the jury could not find negligence in these circumstances without evidence as to an appropriate standard of care").

Despite an absence of proof on the appropriate standard of care, the SEC asks the Court to find that there is no dispute that Defendants, "at a bare minimum, acted negligently" because they "knew, or should have known," that representations in the Polysight marketing materials "were false." Mot. at 24. But that argument is just a restatement of the SEC's fraud theory, which it cannot prove. Even if the SEC could prove falsity (it cannot), it cannot rely on its purported scienter evidence to make out a negligence case. *Ginder*, 752 F.3d at 576 (reversing judgment for SEC where it failed to articulate a theory of negligence liability that differed from its jury-rejected theory of intentional misconduct). Moreover, the SEC's claim that Defendants "should have

known" their actions were improper is overblown, considering that their actions were not improper at all. The evidence shows Defendants believed the marketing materials would open the door to discussions with institutional investors about forming a bespoke fund of one or SMA, but regardless of the vehicle, Defendants understood that all the terms would be negotiated to the satisfaction of the investor. *See* SAMF ¶¶ 15, 17-27, 35-37. The SEC's negligence theory fails.

4.     The SEC Cannot Prove Materiality

Nor can the SEC prove that any of the alleged misstatements were material. *See* SBB MSJ (Dkt. 261) at 21-25. The materiality standard "requires courts to look at all available information in determining the materiality of a challenged omission or misstatement." *Kuebler v. Vectren Corp.*, 13 F.4th 631, 639 (7th Cir. 2021). To prove materiality, the SEC must show there is a substantial likelihood that the misstatement or omission "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Materiality is measured by whether a particular fact would have been significant to an investor making a decision such as whether to invest in a securities offering or how to vote as a shareholder. *See TSC Indus., Inc. v. Northway*, 426 U.S. 438, 448-49 (1976) ("An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."); *In the Matter of Lynn Tilton*, Initial Decision Release No. 1182, 2017 WL 4297256, at *41 (ALJ Sept. 27, 2017), *finality order*, Investment Advisers Act of 1940, Release No. 4815 (Nov. 28, 2017) ("The standard of materiality is whether or not a reasonable investor or prospective investor would have considered the information important in making an investment decision.").

The SEC cannot meet this standard. First, the SEC analyzes the challenged statements against a partial mix of available information rather than the total mix. Second, the SEC lacks

24

evidence that highly sophisticated investors would consider any of the statements significant in light of the total mix. Third, the challenged statements fall far short of being "obviously" material.

### a. *The SEC Does Not Analyze the Challenged Statements Against the Total Mix of Information Available When Making an Investment Decision*

The SEC's argument that the challenged statements are material incorrectly analyzes the marketing materials in a vacuum. The total mix of information made available to investors would include not just the marketing materials, but also SBB's Form ADV (including its brochure)— which was always available on the SEC's own website—as well as the stack of documents that SBB would make available to any prospective investor that expressed an interest in investing in an SBB-managed vehicle. SAMF ¶¶ 10-14, 38-39. The SEC advocates for reading the marketing materials as standalone documents because it cannot dispute that the Polysight I, LLC subscription documentation accurately describes the history of the fund and the terms of an investment in the fund. *See* SEC SUMF ¶ 18. The SEC's position is inconsistent with the law.

A sophisticated, accredited and institutional hedge fund investor considering an investment in an SBB-managed fund of one, SMA, or Polysight I, LLC would first go to the SEC's website and download SBB's Form ADV brochure. Institutional investors know that an adviser's brochure on the SEC's website describes in plain English the features of the investment vehicles managed by the adviser, the adviser's fees and any conflicts of interest. Indeed, the SEC itself has recognized that an adviser can use its Form ADV brochure to satisfy its disclosure obligations as a fiduciary. Amendments to Form ADV, Investment Advisers Act of 1940, Release No. 3060 (2010), 2010 WL 2957506, at *3 (Aug. 12, 2010). But even more fundamentally, all of SBB's investors are required to confirm that they received and reviewed the subscription documentation prior to investing in the fund. SAMF ¶ 13. The subscription documentation and Form ADV brochure are not just a part of the total mix of information, they are the most important part. SBB

25

and the relevant investment market regarded the marketing materials as starting points to a conversation with the investor. *Id.* ¶¶ 21-27. The marketing materials were not actionable, as no investor could invest based on such high-level and introductory documents. If an institutional investor expressed interest in an SBB-managed vehicle like Polysight I, LLC, SBB would provide the investor with voluminous and accurate documentation regarding the fund, and engage with the investor in its due diligence regarding the fund. *Id.* ¶¶ 38-39, 47-48; *Flannery*, 810 F.3d at 11 (fact that pre-prepared documents containing alleged misstatement were "not intended to present a complete picture of the fund, but rather serve as starting points, after which due diligence is performed" weighed against any conclusion that alleged misrepresentation "significantly altered the total mix of information made available"). As a result, the total mix of information available to an investor considering whether to invest in an SBB-managed vehicle necessarily included the Form ADV brochure and subscription documentation.

Stuck with a record of SBB's transparent disclosures regarding Polysight I, LLC's fund terms, the SEC makes a confusing argument about corrective disclosure. The SEC claims that the fact that investors would have "later seen the correct terms in Polysight I subscription packages" does not matter because the securities laws approach matters from an *ex ante* perspective. Mot. at 25. But SBB did not need to (and in fact did not) make any "corrective disclosure" about Polysight I, LLC's terms because those disclosures were always part of the total mix of information available to investors that committed their capital to the fund.

The cases cited by the SEC cites to support its argument that the subscription documentation is irrelevant "corrective disclosure" only add to the confusion and do not help its cause. In *Pommer v. Medtest Corp.*, 961 F.2d 620 (7th Cir. 1992), the defendant's statement that the company had a patent was false when made, and it only became true two years later when the

company in fact obtained the patent. *Id.* at 623. More to the point, however, is the Seventh Circuit's "recast[ing]" of the district court's conclusion; as the Seventh Circuit explained, "An issuer that utters a mix of truth and falsehood may have furnished the information necessary for an accurate appreciation of the securities' value[.]" *Id*. at 624. And as the court emphasized, "an issuer needs to disclose the truth clearly before a lie becomes immaterial." *Id.* But the *Pommer* defendants "never told the truth," and the "boilerplate warning" in an agreement to investors did nothing to "enlighten investors about the status of [its] patent applications." *Id.* at 624-25.

*Pommer* is inapposite here. Defendants did not lie about the high-water mark and lock-up terms only for them to later come true. SBB always stated those terms accurately in the Polysight I, LLC subscription documentation and in its Form ADV brochure, which pre-dated the marketing materials. *See* SAMF ¶¶ 13-14; SEC SUMF ¶ 18. The fact sheets similarly (and indisputably) included the fund's accurate inception date. SAMF ¶¶ 44-45.

Also inapposite is *ZPR Investment Management v. SEC*, 861 F.3d 1239 (11th Cir. 2017). The *ZPR* defendant distributed materials claiming that it had complied with Global Investment Performance Standards ("GIPS") despite knowing that assertion was not true. *Id.* at 1245-47. The defendants' materials were false on their face, and the defendant "claimed it was presenting the actual, complete set of performance returns required by GIPS" and "signaled to investors there was no need to look any further for the performance data GIPS requires." *Id.* at 1251. SBB's marketing materials, by contrast, were not false on their face. They were true on their face, as all the fact sheets accurately described the track record presented and the "program" terms were what SBB stood ready to offer an institutional investor interested in a fund of one or SMA and did not relate to a specific fund. *See supra* Section III(A)(1). Nor did SBB signal to prospective investors that they need not look beyond the marketing materials; its fact sheets stated that they were "not

an offer or solicitation" and did not guarantee "completeness." SAMF ¶ 46. SBB also welcomed prospective investors to negotiate terms and conduct the extensive diligence typical of institutional investors sophisticated enough to invest in hedge funds. *Id.* ¶¶ 15, 17-27, 32-33, 35-38.

> b. *The SEC Lacks Evidence of What a Reasonable Institutional Investor Would Find Material*

"Materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic*, 485 U.S. at 240. An investor reads each statement in its "full context," taking "into account the customs and practices of the relevant industry." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). The "reasonable investor" standard, moreover, varies with the nature of the "particular market" or circumstances confronting the investor. *United States v. Litvak*, 889 F.3d 56, 64-65 (2d Cir. 2018). What a reasonable institutional investor finds material may differ from what a retail investor would find material. *See Tilton*, 2017 WL 4297256, at *41 ("Investor sophistication may influence whether an allegedly misleading or omitted fact would have assumed actual significance in the deliberations of the reasonable investor."). Indeed, when the SEC adopted amendments to the Form ADV brochure rule, it permitted investment advisers that provided their brochures only to highly sophisticated investors to omit their table of standard fees. Amendments to Form ADV, 2010 WL 2957506, at *8. As the SEC stated in the Adopting Release, "brochure fee information is likely not useful to institutional and large, sophisticated clients who are often in a position to negotiate fee arrangements with their adviser and for whom, therefore, a fee table would have little utility." *Id.* Here, the relevant reasonable investor answers to that very description, as SBB marketed to investors such as university endowments, sovereign wealth funds, and individuals with a minimum of $25 million in investable assets. SAMF ¶ 32.

The SEC has no evidence of whether an investor occupying this rarefied space in the investing world would attach any significance to the statements that the SEC here challenges as false and misleading. *Litvak*, 889 F.3d at 64-65; *see also SEC v. Commonwealth Equity Servs., LLC*, 133 F.4th 152, 170 (1st Cir. 2025) (reversing summary judgment for SEC where SEC "did not provide testimony from any Commonwealth clients or representatives describing the significance they attributed to the omitted information"). In fact, despite having many to choose from, the SEC did not depose a single SBB investor.

To be sure, the SEC does cite testimony from Defendants and Mr. Handler. Mot. at 15-19. But these lay witnesses are not substitutes for the reasonable investor standard. *See, e.g.*, *United States v. Nacchio*, 2007 WL 9723300, at *3 (D. Colo. Mar. 26, 2007) ("information a financial analyst personally finds important is irrelevant to whether the information would be important to a reasonable investor in deciding whether to buy or sell stock"); *see also* Resp. to SUMF ¶¶ 38, 41-42, 44, 49. In fact, the SEC's own authority shows an adviser's testimony on materiality can speak only to how they "presented the information" to potential investors, "not how those potential [investors] themselves considered the statements at issue" when deciding whether to invest. *SEC v. Navellier*, 108 F.4th 19, 38 (1st Cir. 2024) (Mot. at 18).

Nor can the SEC swap in Mr. Handler for the now-excluded Peter Hickey (Dkt. 238 at 15-18) by citing to Mr. Handler's "over 30 years of experience in the securities industry." SEC SUMF ¶¶ 24, 44. The SEC did not disclose him as an expert, so Mr. Handler's testimony is "limited" to his personal observations. [7] *See Compania Administradora de Recuperacion de Activos*

---

[7] Even Mr. Hickey declined to review Mr. Handler's testimony because he did not believe that the testimony was "important to [his] opinion in this case." Defs.' Mot. to Exclude Expert Ops. & Test. of Peter C. Hickey (Dkt. 215) at 19 n.5.

*Adminstradora de Fondos de Inbersion Sociedad Anonima v. Titan Int'l*, 533 F.3d 555, 560 (7th Cir. 2008) (rejecting lay witness opinion testimony that was "essentially the same as that of [defendant's] originally retained valuation expert," who was "excluded by the district court"). The SEC offers no testimony from Mr. Handler about his personal observations when marketing SBB's strategy; the SEC did not ask him over two days of investigative and deposition testimony whether any investors ever expressed to him that the allegedly misstated terms were important to them.

<blockquote>

c. *None of the Three Challenged Statements—Alone or Taken Together—Were Material in Context of the Total Mix of Information*

</blockquote>

When considering the total mix of information available to prospective investors in an SBB-managed vehicle, it is clear that none of the challenged statements was material. Nor can the SEC prove materiality even taking all three together.

<blockquote>

(1) The SEC Cannot Prove Statements About Inception Date Were Material

</blockquote>

The SEC claims that a "fake inception date (and a lengthy positive track record for a period where the fund did not exist) would be important to reasonable investors." Mot. at 17. The SEC cites Mr. Handler and Mr. Aven's testimony and communications, but it leaves one glaring hole: the rest of the total mix of information made available to prospective investors. *Every* challenged fact sheet included the Composite Disclosure stating the Polysight I, LLC fund's inception date of 2014. SAMF ¶ 44. And *every* investor presentation Defendants sent to investors likewise attached a fact sheet that included Polysight I, LLC's inception date. *Id*. ¶¶ 44-45. And *every* investor presentation that included historical performance data had this same disclosure. *Id.* ¶ 44.

The SEC's reliance on Mr. Handler's testimony that investors consider a "fund's historical performance" important fails for several reasons. First, Handler is neither an expert nor an investor. *See Titan*, 533 F.3d at 561 (Rule 701 was designed to "prevent parties from proffering

any expert in lay witness clothing"). Second, even if qualified to speak to what is important to "investors," the SEC failed to ask Mr. Handler whether fund performance was important to institutional investors like SBB's. SEC SUMF ¶ 44. Third, the SEC likewise failed to ask him whether the specific alleged misrepresentation—the inception date—was "important" to investors. *Id.* And finally, his lay testimony is speculative at best, since he cannot offer actual investor testimony—which, again, the SEC lacks. *Cf. United States v. Harbour*, 2023 WL 4237337, at *2 (D. Ariz. June 28, 2023) (government's materiality argument "rest[ed] on speculation" because "[n]o expert testified that the [g]overnment's asserted omissions … would have been material" and government failed to elicit testimony from victim at issue).

The SEC again cites the same cherry-picked piece of a chat discussed above to support that Mr. Handler told Mr. Aven "how important a fund's inception date was" and that "Aven agreed to use the fake 2011 start date for Polysight I." Mot. at 19; *see supra* Section III(A)(2). Repeating this inaccurate claim, without acknowledging Mr. Aven's insistence that the fact sheets include the Composite Disclosure, does not make it any more convincing.

The SEC likewise mischaracterizes a July 2016 conversation in which Mr. Handler told Mr. Aven that "marketing Polysight I without a track record" would be "very difficult." Mot. at 19 (citing SEC SUMF ¶ 65). This conversation had nothing to do with the marketing materials or even Polysight I, LLC. Rather, Mr. Handler was emailing Mr. Aven about his idea to potentially market a then-closed fund (CPS I) to high-net-worth investors, *not* to market Polysight I, LLC. Indeed, Mr. Handler made clear in his write-up that SBB had been marketing a strategy, not a fund, to institutional investors. *See* SEC SUMF ¶ 65.

        (2)     The SEC Cannot Prove Statements About the Lock-Up Period Were Material

The SEC asserts that the alleged lock-up misrepresentation (one year versus two) is material because a reasonable investor "would find it important whether their investment is liquid" or whether they must "keep their money locked in a fund." Mot. at 15. The lock-up period for Polysight I, LLC investors would not be important to investors establishing a fund of one or SMA, as they could negotiate for a shorter lock-up or no lock-up at all. As the record shows, certain investors even negotiated for a side letter regarding the lock-up for Polysight I, LLC. SAMF ¶ 15.

In addition, the SEC does not and cannot dispute that Defendants communicated the existence of a lock-up period to every Polysight I, LLC investor in Polysight I, LLC's subscription documents. *See* SEC SUMF ¶¶ 18, 45. Nor can the SEC dispute that Defendants, including in its Form ADV brochure, made clear to investors that an investment in any Fund was illiquid. *See* SAMF ¶¶ 11-14. Indeed, the Polysight strategy marketed by SBB involved multiyear investments, meaning the payout on the note would not be paid until the note matured—typically years after their purchase and years after the lock-up period. *Id.* ¶ 7. Defendants' clear communications to potential investors distinguishes each of the SEC's cited cases, all of which involve misrepresentations of the liquidity of an investment. *See SEC v. Constantin*, 939 F. Supp. 2d 288, 307 (S.D.N.Y. 2013) (defendants told clients they could make short-term investments that could be liquidated after a few months when in reality they were unable to recover funds after several years); *SEC v. Loomis*, 969 F. Supp. 2d 1226, 1230-31 (E.D. Cal. 2013) (defendants told investors "they would be able to retrieve their investments on short notice" even though funds were undercapitalized); *SEC v. Conrad*, 354 F. Supp. 3d 1330, 1358 (N.D. Ga. 2019) (defendants repeatedly told investors redemption would be possible with a month's notice even though redemptions were frozen or impossible).

Although the SEC's materiality claim hinges on its ability to prove institutional investors would find a one-year lock-up period materially different from a two-year lock-up period, they have no such proof. Instead, the SEC cites Mr. Handler's testimony that "most investors would consider [a fund's lock-up period] to be important information" because "investors need to have an understanding of how long a time period of that before they can get access to their money." Mot. at 15-16. But again, Mr. Handler cannot plug the hole in the SEC's materiality case. *See supra* pp. 30-31. Investors also understood that they could negotiate custom terms, including liquidity, and the operating agreement would reflect the agreed-upon terms. SAMF ¶¶ 36-37.

The SEC's reliance on Mr. Handler's statement that the lock-up period "would be confusing and *potentially* misleading" likewise fails. Mot. at 16 (emphasis added). That Defendants' statements "may cause confusion" does not alter the "total mix of information" available to investors. *Chang*, 2016 WL 3640023, at *8 n.17 (noting that defendants' statements "may cause confusion" but finding the "total mix of information would be same" in light of defendants' disclosures). In any event, Mr. Handler's speculation as a marketer about investors' views is not a substitute for investor testimony—let alone institutional investor testimony. *See Commonwealth*, 133 F.4th at 170 n.13 ("[I]t is not obvious that the omitted facts from Commonwealth's conflict of interest would have changed the investors' perceptions, given their use of the investment advice of sophisticated intermediaries").

The SEC also cites Defendants' materiality expert, Gene Deetz, testifying that the lock-up period "would be important to an investor." Mot. at 16. Again, this cherry-picked testimony does not speak to the difference between a one-year and two-year period. *See* Resp. to SUMF ¶ 39; *United States v. Bingham*, 992 F.2d 975, 976 (9th Cir. 1993) (government failed to prove materiality where it introduced evidence about what is "always material" instead of what was

material in that case). And even if Deetz's testimony were on point, the SEC cannot rely on a rebuttal witness's testimony to satisfy its burden of proof. *See Travelers Prop. Cas. Co. of Am. v. Ocean Reef Charters LLC*, 71 F.4th 894, 908 (11th Cir. 2023) (party "cannot rely on potential testimony" from rebuttal expert). The SEC thus has no evidence—let alone undisputed evidence sufficient for summary judgment—that the lock-up period difference would be material to a sophisticated hedge fund investor—the type of investor that SBB marketed to.

(3)     The SEC Cannot Prove SBB's Statements About a High-<br>Water Mark Were Material

The SEC likewise cannot establish that SBB's statements about the existence of a high-water mark were material in the "total mix" of information available to SBB investors. To start, the SEC's own authority refutes its assertion that an investment fee structure is "obviously important." Mot. at 16. In *United States v. Laurienti*, 611 F.3d 530, 535, 541-42 (9th Cir. 2010), the court held that a commission-based fee—with regular commission being $50 and undisclosed bonus commission amounting to thousands of dollars—was material. But the court clarified: "Our holding today does not mean that *all* compensation arrangements are necessarily 'material' even within a trust relationship and therefore could lead to criminal (and civil) liability." *Id.* at 542. That is the case here.

The SEC again resorts to Mr. Handler, who spoke only to what he believed "most industry professionals" would consider important, not an investor. Mot. at 17 (citing SEC SUMF ¶ 41). Moreover, the SEC did not ask him the relevant question: whether the existence of a high-water mark would be important to *institutional investors like SBB's investors*. SAMF ¶¶ 10, 16, 35-38, 54. Mr. Handler did not even say whether it would be important to SBB's actual investors. *Id.* ¶ 54; *see Bingham*, 992 F.2d at 976 (government failed to prove materiality where broker testimony was "far too abstract to satisfy the materiality requirement in a particular case" and

34

failed to introduce evidence that investor would have found information "significant in light of other information available"). In fact, the SEC's own citation to record evidence undermines the SEC's claim, highlighting why Mr. Handler is not a substitute for a materiality expert. As the SEC admits, the subscription agreement disclosed that Polysight I, LLC (the fund) did not have a high-water mark. SEC SUMF ¶ 18. And what the SEC does not acknowledge, but cannot dispute, is that SBB's Form ADV brochure disclosed that SBB did not use a high-water mark, and that SBB "may be paid performance-based compensation for performance gains even though the overall performance of the Fund or account is flat or negative." SAMF ¶ 14. Despite these up-front disclosures, the SEC's own exhibit shows multiple sophisticated investors invested in Polysight I, LLC before Defendants ever distributed marketing materials, meaning the high-water mark was not as "obviously" material as the SEC claims. *See* Resp. to SUMF ¶ 19.

Lacking any investor or expert testimony, the SEC relies instead on Defendants' testimony. That fails, too. The SEC claims Mr. Aven "admitted that Handler had communicated to him that a high-water mark was needed to 'attract investors.'" Mot. at 17. But the SEC's citation to that conversation represents, at best, another attempt to backdoor Mr. Handler's testimony as evidence of materiality, which fails for the reasons stated above. It certainly was not needed to attract those who invested in Polysight I, LLC before the creation of the marketing materials. As for Dr. Barnett's testimony that "sophisticated investors expect fact sheets to be accurate and correct," SEC did not specifically ask whether sophisticated investors viewed the high-water mark as material. SEC SUMF ¶ 49. In any event, neither Dr. Barnett nor Mr. Aven—nor any other cited witness—"claim[s] to have had any conversation" about the high-water mark with any prospective investors and thus would be unqualified to testify how they "would have responded." *Von der*

*Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 863 (7th Cir. 2009) (affirming exclusion of lay witness testimony from witness unqualified to "testify to how investment bankers would have responded").

Finally, the SEC ignores the total mix of information available to these institutional investors about the high-water mark, including SBB's Form ADV brochure, the operating agreement (which investors must agree to in writing before investing) and side letters with negotiated, accurate terms. SAMF ¶¶ 11-15, 35-37.

      d.    *The Statements at Issue Were Not "Obviously" Material*

Recognizing the evidentiary hole on materiality, the SEC tries an attorney argument that the alleged misstatements were "obviously" important. Mot. at 14. The SEC has already tried a similar approach, relying on now-excluded expert Mr. Hickey to claim without support that all the alleged misrepresentations in this case were material. While he testified repeatedly about what is "important to investors," he offered no proof other than his own say-so: when asked the basis for his opinion that SBB's representations to investors are "important," he answered only "[m]y experience as both an expert and also an investor"—and nothing else. SAMF ¶ 53. That failed once. *See* Dkt. 238 at 17-18 (excluding Hickey's testimony on what is material to investors as *ipse dixit*). The SEC's second attempt—with even less support—likewise fails. *Commonwealth*, 133 F.4th at 168, 170-71 (rejecting "generalized per se conclusion" for materiality).

Every case the SEC cites to support its "obviousness" argument is easily distinguishable. To start, no case involves sophisticated, accredited investors like those with whom SBB was dealing. SAMF ¶¶ 10-13, 32, 38. Moreover, the SEC's cases involve frauds so flagrant that the court could readily find the challenged statements material. In one, the defendants duped unsophisticated investors into opening foreign currency futures accounts by lying about returns and the risk of loss, forging investment documentation, and stealing customer money (*CFTC v. Int'l Fin. Servs., Inc.*, 323 F. Supp. 2d 482, 409-501 (S.D.N.Y. 2004)). In another, a broker-dealer

36

defrauded clients by lying about expected returns, issuing phony account statements and misappropriating client funds (*SEC v. Constantin*, 939 F. Supp. 2d 288, 307-08 (S.D.N.Y. 2013)). In another, defendant falsified leases to induce investors to buy "sure thing" investments in failing senior triplexes (*SEC v. Kirkland*, 521 F. Supp. 2d 1281, 1287, 1303 (M.D. Fla. 2007)). And in another, the defendant marketed another adviser's performance even though he had concluded the adviser's track record was "just made up and pure FRAUD" (*Navellier*, 108 F.4th at 31).

This case is nothing like those cases. Thus, even if the SEC could prove falsity, the statements at issue would amount to nothing more than a few typos in a handful of marketing documents that SBB used in a fruitless effort to find institutional investors for SBB-managed vehicles. The SEC grudgingly acknowledges that the challenged fact sheets included the Composite Disclosure, which is part of the total mix of information, and thus precludes a finding of materiality as to the track record representations. Mot. at 6 n.3. And for the challenged terms, even if those were stated incorrectly in the marketing materials, the total mix of information available to investors included the fund subscription documentation that accurately described the fund terms. SAMF ¶¶ 11-13. While the SEC does not address the plain English disclosures in the Form ADV brochure (*id.* ¶ 14), those disclosures are likewise a key part of the total mix of information that SBB made available to prospective investors. *See Commonwealth*, 133 F. 4th at 158 (court focused materiality analysis solely on the disclosures made in the defendant's Form ADV brochure). Materiality here is far from "obvious." Indeed, Defendants have cross-moved for summary judgment on the materiality of these statements. SBB MSJ (Dkt. 261) at 21-25.

Lastly, the SEC resorts to counting up the number of purported "misstatements" in cover emails, investor presentations, and online portal submissions. The SEC also asserts that it is entitled to a federal injunction against the Defendants if it prevails on just one misrepresentation

claim. Mot. at 12 n.4. The SEC appears to be telling the Court, "we only need one proven misrepresentation to prevail, and look we have 23 of them." But an immaterial statement does not become material simply because it is made more than once. *See Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *15 (S.D.N.Y. Sept. 21, 2021) ("the repetition of puffery"—an immaterial statement—"does not, by itself, render it actionable").

### B. Defendants Did Not Violate the Advisers Act Anti-Fraud Provision (Section 206(4) and Rule 206(4)-8)

The SEC fails to prove that Rule 206(4)-8 applies. As the Motion acknowledges, this Rule only applies to "pooled investment vehicles." Mot. at 27; *see also* 17 C.F.R. § 275.206(4)-8(a). But as explained above, at a minimum a genuine dispute exists as to whether marketing materials pertained to Polysight I, LLC—a pooled investment—or, rather, to a custom fund of one, which by definition, is not a pooled investment. And as a result, a genuine dispute exists as to whether Rule 206(4)-8 applies at all. *SEC v. Neman*, 2015 WL 12746213, at *8-9 (C.D. Cal. Dec. 16, 2015) (SEC "failed to carry its burden to establish the existence of an actual pooled investment vehicle" on summary judgment).

Even if the Rule applies, the SEC's claim fails because the SEC fails to prove falsity, *supra* Section III(A)(1), materiality, *supra* Section III(A)(4), and negligence, *supra* Section III(A)(3).

### C. SBB Did Not Violate the Marketing Rule (Advisers Act Rule 206(4)-1)

The SEC's Rule 206(4)-1 claim fails because it cannot prove the "four Online Marketing Platform submissions" were "advertisements." Mot. at 29. Under the version of Rule 206(4)-1 in effect at the time of the relevant conduct, "advertisements" were "any notice, circular, letter or other written communication addressed to more than one person, or any notice or other announcement in any publication or by radio or television, which offers ... any other investment advisory service with regard to securities." 17 C.F.R. § 275.206(4)-1(b) (1961).

Because SBB's submissions to the online databases do not "offer" investment advisory services, the Rule does not apply to those submissions. *See Nat'l Assoc. of Private Fund Manager v. SEC*, 2024 WL 4858589, at *4-6 (N.D. Tex. Nov. 21, 2024) (interpreting Rule in context of interpreting plain language of statute). Merriam-Webster defines the verb "offer" in seven different ways. *See* "Offer," *Merriam-Webster Dictionary* (2025), https://www.merriam-webster.com/dictionary/offer. Most relevant to the SEC's Rule 206(4)-1 claim are the following definitions: "to present for acceptance or rejection," "propose, suggest," and "to make available." *Id.* SBB's submissions to the online databases do none of these things: they do not present advisory services for acceptance or rejection, do not propose or suggest any advisory services, and do not make advisory services available. *See, e.g.*, SEC Ex. 44 (HedgeCo.Net Database Listing). The databases instead provided prospective investors the opportunity to connect with SBB, whom SBB could then contact and begin a discussion about investing in an SBB-managed vehicle. Resp. to SUMF ¶ 34. Even the SEC acknowledges as much. SEC SUMF ¶ 34 ("[The] marketing portals [] could potentially match SBB with institutional investors and high net worth individuals."

Consistent with this context, two of the SEC's own exhibits showed the online databases to which SBB submitted information expressly disclaimed that information therein qualified as offers. The HFR disclaimer stated: "**No information in this publication constitutes or should be construed as a solicitation in any investment product.**" SAMF ¶ 41. And the eVestment disclaimer stated: "**This performance report is for preliminary informational purposes only and is not an offering.** Such offer may only be made to qualified offeree by means of a Confidential Private Placement Memorandum together with the Limited Partnership Agreement and Subscription Agreement." *Id.* ¶ 42.

The SEC's entire argument that SBB's materials are advertisements is a quote of the Rule. Mot. at 29 ("The four Online Marketing Platform submissions by SBB (an SEC-registered investment adviser) qualify as 'advertisements' under the Advisers Act because they were 'direct or indirect communication[s] an investment adviser makes to more than one person … that offers the investment adviser's investment advisory services with regard to securities to prospective clients or investors in a private fund advised by the investment adviser.'") (quoting Rule 206(4)-1(e)(1)(i) (2020)). The SEC cites no case law or other support, nor does it attempt to explain how SBB's materials are an "offer" of "any other investment advisory service with regard to securities." 17 C.F.R. § 275.206(4)-1(b) (1961).[8]

Even if the online materials constitute "advertisements," the SEC must still establish negligence—which it cannot do for the reasons stated above. *See SEC v. Steadman*, 967 F.2d 636, 643, 647 (D.C. Cir. 1992); *supra* Section III(A)(3). Moreover, the SEC cannot prove the statements were materially false or misleading. *See supra* Sections III(A)(1), (4). The Court should deny the SEC's Motion as to its Rule 206(4)-1 claim.

## IV. CONCLUSION

With the SEC's valuation claim—its whole basis for bringing a case—in serious jeopardy, the SEC is looking to find itself a lifeline, and a distraction, in the secondary marketing materials claims. But there is no lifeline to be found, and efforts to distract the Court are bound to fail. For the foregoing reasons, Defendants respectfully request that the Court deny the SEC's Motion for Partial Summary Judgment.

---

[8] To the extent the SEC contends that the Rule has been interpreted broadly, at bottom, the SEC must show that the Rule has been interpreted so broadly as to cover materials that merely "match SBB with institutional investors and high net worth individuals," SEC SUMF ¶ 34, and that themselves disclaim that they are offers. SAMF ¶¶ 41-43. The SEC does not carry that burden.

Dated: August 15, 2025

Respectfully submitted,

By: /s/ *Heather A. Waller*
Heather A. Waller (6302537)
John J. Sikora, Jr. (6217330)
Renatta A. Gorski (6332737)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Tel. (312) 876-7700
heather.waller@lw.com
john.sikora@lw.com
renatta.gorski@lw.com

Howard J. Rosenburg (6256596)
KOPECKY SCHUMACHER
ROSENBURG LLC
120 N. LaSalle, Street, Suite 2000
Chicago, IL 60602
Tel. (312) 380-6631
hrosenburg@ksrlaw.com

H. Gregory Baker (*pro hac vice*)
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
Tel. (212) 336-2871
hbaker@pbwt.com

*Attorneys for Defendants*
*SBB Research Group, LLC, Samuel B.*
*Barnett, and Matthew L. Aven*