**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) | |
| | ) | Case No. 19-cv-6473 |
| Plaintiff, | ) | |
| | ) | Judge Sharon Johnson Coleman |
| v. | ) | |
| | ) | |
| SBB RESEARCH GROUP, LLC, | ) | |
| SAMUEL B. BARNETT, and | ) | |
| MATTHEW LAWRENCE AVEN | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The Securities and Exchange Commission ("SEC") brings this action against SBB Research Group, LLC ("SBB"), Samuel B. Barnett ("Barnett"), and Matthew Lawrence Aven ("Aven" and, together with SBB and Barnett, "Defendants"), accusing Defendants of using a rigged valuation model to intentionally inflate the reported values of structured notes of certain private funds; misrepresenting the terms and historical performance of their flagship fund; failing to issue financial statements prepared in alignment with proper accounting principles; and failing to have policies and procedures protecting against such violations.

Before the Court are cross-motions for summary judgment: one filed by Defendants for summary judgment dismissing the complaint, and one filed by the SEC for partial summary judgment on its claims concerning SBB's marketing materials. For the reasons set forth in this Opinion, Defendants' motion for summary judgment is granted in part and denied in part; and the SEC's motion for partial summary judgment is denied.

1

I.      **Rule 56.1**

Local Rule ("LR") 56.1(a)(2) requires a party moving for summary judgment to file a statement of material facts with citations to the record and attach the cited evidence.  LR 56.1(b)(2) requires the opposing party to file a response attaching "any cited evidentiary materials not attached" to the moving party's statement.  The responding party must admit, dispute, or admit in part and dispute in part each asserted fact.  LR 56.1(e)(2).  To assert new facts, the nonmoving party may file a statement of additional material facts, attaching any cited evidentiary material not yet in the record.  LR 56.1(b)(3).

The Court need not list each instance of deficiency in the parties' LR 56.1 statements, but notes that rather than submitting concise statements of fact, both parties submitted large narrative paragraphs packing in a myriad of facts.  The Court will not consider any argumentation embedded in these "undisputed" facts.  Additionally, where a party disputes a fact but fails to cite evidence supporting the disputation, the fact is deemed admitted.  The Court will rely on the parties' facts to the extent that are supported by the record and comply with LR 56.1.  *See Othman v. City of Chicago*, 2014 WL 6566357, at *2 (N.D. Ill. Nov. 20, 2014) (Dow, J.) ("[A]ny statements or responses that contain legal conclusions or argument, are evasive, contain hearsay or are not based on personal knowledge, are irrelevant, or are not supported by evidence in the record will not be considered by the Court in ruling on the summary judgment motion.").

*A. Evidentiary Objections*

At the summary judgment stage, the Court "may consider any material that would be admissible or usable at trial, including properly authenticated and admissible documents or exhibits." *Smith v. City of Chicago*, 242 F.3d 737, 741 (7th Cir. 2001) (citations and quotations omitted)); *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000) (noting that court may consider "properly authenticated and admissible documents or exhibits" in evaluating a motion for summary judgment).

First, Defendants object to several witness' testimony, claiming that the SEC is attempting to offer them as undisclosed and unqualified experts in specialized areas within the scope of Federal Rule of Evidence 702 (such as Generally Accepted Accounting Principles ("GAAP"), valuation, materiality, and investment adviser policies and procedures). The Court acknowledges that the only expert the parties may rely upon are those who have been disclosed and deemed qualified in their area of expertise. The Court will not consider testimony from nonexpert witnesses as to the various specialized areas of knowledge involved in this case.

Both parties also object to certain proposed facts on the basis that they cite testimony and documents that are inadmissible hearsay and/or "premised on hearsay and not personal knowledge." *See Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713 (7th Cir. 2002). To the extent out-of-court statements are offered as evidence for summary judgment, the Court will only consider them to the extent that they are excluded from the definition of hearsay and/or fall within an exception to the rule against inadmissible hearsay, and where testimony is based upon sufficient personal knowledge. Additionally, any declaration offered to support a motion for summary judgment that is not made upon personal knowledge, fails to set out admissible facts, or fails to show that the declarant is competent to testify on the matters stated shall not be considered in resolving the present motions for summary judgment. *See* Fed. R. Civ. P. 56(c)(4).

The Court specifically addresses one objection due to its import. Defendants aver that the expert reports of Dr. Craig J. McCann and Mr. Andrew M. Mintzer are inadmissible hearsay and may not be considered at summary judgment because they are "unaccompanied by an affidavit verifying its authenticity." Federal Rule of Evidence 901(a) requires a proponent of evidence to authenticate it by offering "evidence sufficient to support a finding that the item is what the proponent claims it is." Testimony from a witness with knowledge "that an item is what it is claimed to be" satisfies the authentication requirement. Fed. R. Evid. 901(b)(1). Contrary to Defendants' assertion, that

3

testimony is not strictly required in the form of an affidavit. Both McCann and Mintzer identified their expert reports during their depositions and under oath testified that the expert reports are, in fact, the very reports they authored. *See Clara v. City of Chicago,* 2002 WL 1553419, at *8 (N.D. Ill. July 15, 2002) (Hart, J.) (holding that an expert report must be "supported by a sworn statement" such as "deposition testimony" to be admissible) (citing *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996)). Because the reports are authenticated and the opinions therein were reaffirmed by McCann's and Mintzer's sworn deposition testimony, the Court may consider them at summary judgment.

## II.     Facts

The Court refers to the parties' LR 56.1 statements of material facts and the record evidence in considering the parties' motions for summary judgment. The following facts have been deemed admitted and undisputed.

SBB Research Group is an Illinois limited liability company and an SEC-registered investment adviser to a series of private investment funds. Barnett founded SBB in 2010 and has continuously served as SBB's CEO, managing member, and sole owner. Barnett brought on Aven as SBB's Director of Operations and Chief Compliance Officer ("CCO") in 2011.

*A.  SBB's Private Funds*

SBB established its private funds (the "Funds") between 2011 and 2019, several of which invest primarily in structured notes. Structured notes are debt instruments issued by investment banks with structured payouts, containing a bond component and an embedded derivative component (deriving value from underlying assets such as options on underlying indices). The structured notes were negotiated between SBB and the issuing bank and generally had payout structures driven by the performance of the S&P 500 Index and Russell 2000 Index. Nearly all SBB's funds' structured notes were "worst of," meaning the notes paid off based on the performance of the lesser performing index. The structured notes were generally not "paid" until the note matured.

Barnett and Aven managed the Funds' portfolio of securities on behalf of SBB, including by structuring and negotiating the terms of the investments. In exchange for managing the Funds, most investors paid SBB up to 5% in management fees. Investors also paid SBB a performance-based "incentive fee" of 20% of the annual aggregate net profits to that investor's account. As a result, the better the performance of the Fund, the higher the fees SBB would receive. Along with the management fee and incentive fees, investors were also responsible for trading and investment-related expenses, legal, and accounting service costs.

As of June 2014, most investors in the Funds were SBB officers and their friends and family. Before subscribing, all investors were required to confirm their "accredited investor" status and affirm that they had all information necessary to evaluate their investments. The subscription packages for the Funds instructed prospective investors to review all the information in the subscription package, including the listed risks and disclosures about the Funds, before investing. The risk disclosures included, for example, that investment in the Funds are "highly speculative and involves a high degree of risk," that "[SBB]'s investment strategy and the techniques … will not be disclosed to potential investors," and that "structured notes and other assets and liabilities shall be valued in the good faith discretion of [SBB], including assets and liabilities for which there is no readily identifiable market value." The subscription packages also required investors to confirm they were aware of and understood: (i) the risks set forth in the respective subscription agreement; (ii) the fact that no market existed for units in the SBB funds; and (iii) that an investment in the SBB funds was suitable only for sophisticated investors "of substantial means" who had no need for short-term liquidity.

*B. Polysight I*

SBB's "flagship fund" was Polysight I, LLC ("Polysight I"), a pooled investment vehicle created in June 2014. The fund began receiving new investments by July 2014, and from November 2015 through May 2016, it was the only SBB fund open to investors that were not friends or family.

By the end of 2015, Polysight I had more assets under management than any of SBB's other Funds. As with SBB's other Funds, the Polysight I subscription packages required investors to confirm that they received and read the accompanying risk disclosures and possessed all information necessary to make their investment decisions. Among the risk disclosures in the subscription package were that:

> [SBB]'s investment strategy and the techniques it will employ to attempt to reach the [Fund's] goals are proprietary and will not be disclosed to potential investors (or to [Investors]). As a result, a potential investor's decision to invest in the [Fund] must be made without the benefit of being able to review and analyze [SBB]'s strategy and techniques. Additionally, annual reports furnished to [Investors] will not specifically identify individual investments and may not be prepared in accordance with generally accepted accounting principles.
>
> …
>
> [SBB] may be subject to certain conflicts of interest in managing the [Fund] at the same time as they are managing their other business enterprises as well as personal and client portfolios.
>
> …
>
> All structured notes and other assets and liabilities shall be valued in the good faith discretion of [SBB], including assets and liabilities for which there is no readily identifiable market value.

The subscription package also stated that Polysight I had a "lock-up period" [1] of two years and did not employ a "high-water mark." [2]

> a. Marketing and Advertising

After forming Polysight I, SBB endeavored to expand its investor base through marketing its Funds. SBB retained E.L.K. Capital Advisors, LLC ("ELK") in October 2015 as placement agent to solicit investments in its Funds. The primary ELK employee SBB was Alan Handler, a professional with extensive experience in the securities industry. Barnett and Aven provided Handler with information to include in SBB marketing materials, which they would approve before distribution.

---

[1] A "lock-up period" is a period during which investors could not withdraw any of their funds.
[2] A "high-water mark" provision sets a threshold that the fund's investment returns must exceed before fees accrue, limiting the circumstances in which a manager can earn incentive fees.

Aven also reviewed the materials before they were circulated as part of his responsibilities as CCO to ensure they did not contain any false or misleading statements.

Handler issued a variety of marketing materials, focusing efforts on institutional investors. He published information about SBB's Funds on online portals that could match SBB with such investors, inputting monthly updates based on the information SBB provided. The listings on the online portals described "SBB Research Group Polysight I LLC" as a "Quantitative Directional Equity Hedge Fund" that "employs systematically driven investment strategies." Contrary to Polysight I's subscription packages, the listings stated that Polysight I's incentive fee was subject to a high-water mark, had a "lock-up period" of one year, and showed the Fund's "Historic Returns" dated back to 2011.

SBB circulated investor presentations to sophisticated investors, which were "qualified investors that fully understand the risks of such an investment." Barnett's statement in the presentations said that "SBB Research Group Polysight® I LLC" would be "a natural fit" for investors seeking "strong long-term investment performance" and "reduced volatility." The presentations included a section titled "Polysight Overview" with the same description of "SBB Research Group Polysight I, LLC" as a "quantitative directional equity hedge fund employing systematically driven investment strategies." The "Polysight Facts & Terms" portion of the presentation provided that the "Fund Formation" date was June 2014.

From February 2016 to January 2017 Handler also distributed fact sheets to prospective investors, some of which did not contain the "quantitative directional equity hedge fund" description but stated that "Polysight® is a quantitative directional investment platform that invests in custom designed equity-linked structured products." A section of the fact sheet labeled "Firm and Program Information" indicated that the "Polysight™ Inception" date was September 2011, that there was a "High Watermark," and that there was a "Lock Up" of one year.

7

The presentations and fact sheets provided "Historical Performance" and data on returns for "the Fund" and "the Firm," dating back to September 2011. In these materials, this data was accompanied by a footnote specifying that "Historical Performance represents a composite return of SBB Research Group Investors II LLC, which began training in September 2011, and Polysight, which began trading in June 2014."

*C. SBB's Valuation Model*

SBB was required to estimate the "fair value" of the Funds' structured notes included in the Funds' financial statements under Generally Accepted Accounting Principles—specifically Accounting Standards Codification 820 ("ASC 820"). SBB represented to investors that it adhered to these principles:

> The Fund follows Generally Accepted Accounting Principles (GAAP), as established by the Financial Accounting Standards Board (the FASB), to ensure consistent reporting of financial condition, results of operations and cash flows.

At certain times the valuation of structured notes involves some judgment as to their "fair value," such as when there is no established market price. This was the case for the Funds. The structured notes were not listed on a public market and had yet to be sold in a secondary market. To estimate the value of the structured notes, SBB developed its own model (the "Valuation Model"), believing that other pricing models were "unfair and unrealistic." Sandeep Navalgund, SBB's principal engineer, was primarily responsible for writing the software code for the Valuation Model, but Aven and Barnett decided the inputs and components that went into the Valuation Model.

Between December 2011 and April 2013, SBB modified the Valuation Model to arrive at valuations that were "in line" with what Barnett and Aven believed the notes were worth. The Valuation Model utilized certain inputs varying from industry standards: the "drift term," "volatility," and a process termed "linearization." Rather than using standard "risk-free" rate as the "drift term" (the average rate of expected growth of an asset's price over time), SBB's Valuation Model utilized a

8

rate termed "*mu*," calculated by weighing the average daily returns of the assets. SBB also did not use the available market data for "volatility," which measures how much the value of the structured notes was expected to fluctuate over time. Instead, SBB used its own volatility input, which it calculated by using its own historical data, multiplied by a factor known as "*beta*" to account for the time until the structured notes' maturity dates. Finally, in 2013, SBB implemented a mechanism termed "linearization" in the Valuation Model. Linearization operated by time-weighting the simulated value of the structured notes, averaged with its present value. SBB described linearization as a "bulwark against the effect of the increased volatility from implementing the *beta* multiplicative factor." In some cases, linearization caused a decrease in the valuation of certain structured notes.

In addition to disclosures in subscription packages and marketing materials, SBB's financial statements for the Funds and public filings with the SEC disclosed to investors the investment risks and uncertainty surrounding its valuation estimates. Defendants included disclosures regarding the valuation of the Funds' notes in its financial statements from 2013 to 2017:

> The Fund records its investments at fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The Fund utilizes valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs.
>
> …
>
> The fair value of structured products is estimated using pricing models.
>
> …
>
> The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

And the following disclosure in its Form ADVs for 2013 through 2015:

> Investments in difficult-to-value securities present a potential conflict of interest because [SBB] uses its own models to value these securities (rather than bank models or other third party models). [SBB] believes its proprietary models are effective valuation tools, and their

9

consistent use should mitigate conflicts of interest. Since management and performance-based fees are based on the value and performance of investments, there is an incentive to select valuation methods that would yield higher values for the assets, as these would temporarily increase [SBB's] compensation. Furthermore, models for valuation are often based on mathematical calculations (dependent on abstract and technical factors) and may not reflect the price that would be obtained if the relevant securities were purchased and sold in a market transaction between unrelated parties.

### D. SBB's Audits and Compliance Program

#### a. Audits

Between 2011 and 2018, SBB engaged third-party professionals to compile and audit its Funds' financial statements. Financial statements for Investors II (the only fund in existence at the time that invested in structured notes) for the years 2011, 2012, and 2013 were prepared and audited by the certified public accounting firm Stephen D. Mareta P.C. ("Mareta"), to whom Aven provided a "Structured Notes Memo" with its "Structured Note Pricing Methodology." For 2014 and 2015, SBB engaged Topel Forman LLC, a certified public accounting firm registered with the Public Company Accounting Oversight Board ("PCAOB"), to prepare financial statements for the Funds (except Polysight I) in accordance with GAAP. However, Topel Forman expressed that it "[was] not required to, and [would] not, verify the accuracy or completeness of the information [provided by SBB]" and "[would] not express an opinion or a conclusion or provide any assurance" on the financial statements.

In 2014, SBB engaged the accounting firm RSM US LLP ("RSM") to audit the financial statements of then-existing Funds for each of its fiscal years 2013 through 2017 in accordance with Generally Accepted Auditing Standards ("GAAS"). Lynne Weil, a partner at RSM with experience auditing hedge funds, led the audits for SBB. Aware that SBB's management lacked accounting experience and used outside accountants to assist in preparing the Funds' financial statements, RSM reviewed draft financial statements and provided feedback to SBB. In connection with its audits in 2014 and 2015, RSM also consulted with a third-party valuation specialist, Interactive Data Corporation ("IDC"), to determine whether there was "a material difference between the

management's assertions reflected in the financial statements and the valuation specialist's findings." IDC used their own model to estimate the value of the Funds' structured notes. RSM found the assumptions and the model used by IDC to be "reasonable" and noted no "material difference" in IDC's findings with SBB management's assertions.

b. Investment Adviser Compliance Program

In 2013, before registering with the SEC, SBB engaged Simon Compliance to assist with building out a compliance program. The firm was founded by Lindsey Smon, a former attorney in the SEC's Division of Enforcement, who consulted directly with SBB. Simon Compliance advised SBB, among other matters, on the preparation and revision of SBB's policies and procedures. It also assisted SBB in developing a written compliance manual after it registered as an Investment Adviser. The compliance manual contained sections on investor communications, codes of ethics, books-and-records procedures, and a separate valuation policy. After registering with the SEC in 2014, SBB updated the manual in 2016 and reviewed its policies and procedures on at least an annual basis.

E. SEC's Examination of SBB

In August 2014, after SBB registered with the SEC as an investment adviser, the SEC began an examination to assess SBB's compliance with federal securities laws.[3] SBB provided the SEC with documents and information in response to the SEC's requests including its Valuation Model and an explanation of how the model was modified. The SEC requested additional information about the Valuation Model, including how "[SBB]'s use of a drift term based upon historical index returns" was consistent with the common "framework of risk-neutrality" and how "[SBB]'s use of historical volatility instead of implied volatility … is consistent with ASC 820." SBB responded that it was

---

[3] SEC examination materials explain that an entity may be examined for one of many reasons, including the entity's risk profile, review of a particular compliance risk area, or by random selection.

"investigating" and "considering the feasibility of" modifying inputs to its Valuation Model to be more consistent with the standard frameworks and "to comply with ASC 820."

The SEC's examination occurred contemporaneously during RSM's engagement with SBB. In April 2015, SBB provided its consent for the SEC examiners to contact RSM. The SEC informed RSM that it was "currently in the process of completing an examination" of SBB, and asked to discuss RSM's "independent confirmation of assets" of SBB and "testing of SBB Research Group, LLC's valuation process." When RSM began its audit process for fiscal year 2016, SBB informed auditors that its Valuation Model was not finalized and that it was "completely dependent upon … SEC correspondence."

During this time SBB also sent RSM two management representation letters in connection with its audits: one dated April 30, 2015 and one dated April 28, 2016, both signed by Barnett and Aven. The letters represented to RSM that SBB had "fulfilled [its] obligations … for the preparation and fair presentation of the financial statements referred to above in accordance with GAAP." In connection with the April 28, 2016 letter, SBB represented to RSM that there were no "communications for regulators and/or governing agencies"; that "hadn't already been identified," that SBB had not "received … feedback [from the SEC] as of yet" regarding the examination; and that there were generally "no subsequent events" to raise to RSM's awareness.

 a. *SEC's Examination Findings and SBB's Response*

The SEC sent SBB a letter in March 2016 outlining its findings as to SBB's "deficiencies and weaknesses" (the "Letter). Under the subheading "Deceptive Valuation Practices," the Letter stated that SBB's Valuation Model "appear[ed] to deviate" from GAAP, specifically ASC 820's requirement to estimate the "fair value" of the structured notes for the Funds' financial statements, prioritizing certain assumptions.

The examiners found that:

[SBB] used unobservable inputs (i.e., historical volatility along with a multiplier that amplified historical volatility) instead of utilizing observable inputs (i.e., implied volatility derived from long dated index options), which is inconsistent with the Fair Value Hierarchy under ASC 820, which requires maximizing the use of relevant observable inputs and minimizing the use of unobservable inputs to meet the objective of a fair value measurement.

The Letter stated the SEC's conclusion that, as a result, SBB's model "may have caused note valuations to be misstated."

The Letter further detailed that, after discussing with the SEC, SBB indicated it implemented corrective actions, including adopting changes to the Valuation Model (such as changing inputs and assumptions to address the SEC's concerns) and consulting third-party valuation experts to verify the accuracy of the model. For example, in 2015 SBB reached out to third-party consultants Valuation Research Corporation ("VRC") and Numerix regarding its Valuation Model. The Letter further directed SBB to "respond in writing to each of the matters" discussed in the letter, "describing any steps you have taken or intend to take with respect to each deficiency identified." SBB shared the Letter with Simon Compliance, which reviewed SBB's responses before they were sent to the SEC.

SBB's response to the SEC on April 15, 2016 averred that its financial statements were prepared in accordance with GAAP and explained its reasoning for using historical volatility rather than implied volatility as a model input. One reason was that "ASC 820 does not prescribe a specific methodology or provide guidance for the calculation or measurement of historical volatility, implied volatility, or the implementation of either." SBB also stated that its "opinion was supported by the unqualified audits of [its] PCAOB accounting firm." In further response on May 13, 2016, SBB sent the SEC a "new pricing model" which was updated based on the Letter. It also informed the SEC that it would credit investors management and incentive fees for 2011 and 2015 based on the difference in fees between the updated model and SBB's prior model. SBB again asserted to the SEC in its later responses that both its previous model and its proposed new model "are reasonable

13

estimations of value," that the models "reflect refinements based on ongoing research, bringing our valuation process further in-line with industry practice and standards." SBB affirmed its efforts to "assess [its] valuation process to ensure it is in accordance with GAAP and industry practice, and will improve on that process where necessary."

Also in August 2016, SBB retained the consulting firm PriceWaterhouse Coopers ("PwC") to evaluate and improve SBB's governance structure and valuation procedures. PwC's initial report stated its findings that the Valuation Model "may be incompatible with fair valuation for financial reporting," that "evidence supporting validation of valuation estimates is limited," and that "financial instruments held under investment company accounting should be reported at fair value as defined under the relevant accounting literature (currently ASC 820) ...." With regard to SBB's valuation and risk governance policies, PwC concluded that (i) SBB's policies and procedures for "valuation governance" and "Model Risk Governance" were "immature" as compared to other market participants; (ii) SBB's Model Risk management governance structure was "lacking and [was] not memorialized," (iii) SBB's "valuation model documentation [was] limited compared to industry standards," and (iv) SBB's "valuation model [was] not subject to independent validation."

In December 2016, SBB switched to a third party, IHS Markit ("Markit"), to value the Funds' structured notes going forward, and subsequently disclosed in its February 2017 investor statements that SBB was using a "third party service to provide an independent valuation of the portfolio assets." Based on the difference in calculations between the Markit model and SBB's original Valuation Model, SBB credited investors approximately $1.4 million dollars in management fees and performance fees in January 2017. However, SBB did not update the net asset values ("NAVs") generated by its old Valuation Model for the Funds for years 2011 through 2015.

*F. RSM's Resignation*

After its initial examination, on October 26, 2016 the SEC notified SBB that it was pursuing an investigation. SBB received a subpoena for all documents related to RSM's audits and all communications between RSM and SBB concerning SBB's valuation policy and "fair value" process. SBB shared the SEC's Letter with RSM in late 2016 after RSM had completed its audits. Soon after SBB received Markit's valuations, in 2017 RSM analyzed whether the change in valuation methodology was a correction of error and examined the materiality of any such potential error. However, RSM reaccepted SBB in 2018 to audit the Funds for the 2017 fiscal year. RSM's intake form noted that the "engagement team has participated fully with the SEC's investigation" and was in the process of completing the 2016 audit "with this knowledge." It further noted that RSM had "not identified any reason to question management's integrity and ethics" and that SBB's "[a]ccounting estimates have historically been reasonable."

Counsel for RSM sent a letter to the SEC in 2018 in connection with its investigation detailing RSM's position that "structured notes at issue are difficult to value – level 3 – investments for which there is no ready market and whose values cannot be determined by … any over-the-counter valuation process" and that "[t]o the best of RSM's knowledge … there have been no complaints or alleged harm by any SBB investors, and the differences between the values generated by SBB's proprietary model and those generated by other third party pricing firms [were] minimal at best."

Nevertheless, in April 2019 RSM resigned as SBB's auditor based on information gathered during the SEC's investigation. RSM also recalled its audit reports on SBB's financial statements for the years 2013 through 2017 (but did not provide any indication that the Funds' financial statements had to be restated under GAAP). RSM's resignation came after the SEC issued Wells Notices[4] to

---

[4] A "Wells Notice" is a communication from the staff to a person involved in an investigation that (1) informs the person the SEC has made a preliminary determination to recommend the Commission file an action or institute a proceeding against them; (2) identifies the securities laws violations that the

15

RSM and Weil in early 2019, in the final months leading up to this enforcement action. The SEC's Wells Notice to RSM notified RSM that the SEC intended to recommend action against RSM for "improper professional conduct." After receiving the Wells Notices, RSM and Weil submitted a joint Wells submission to the SEC stating their position that SBB misled RSM, which prompted RSM to "terminate SBB and to recall all previously issued audit opinions."

## III. Procedural History

The SEC initiated this action on September 30, 2019 with an eleven-count complaint alleging a fraudulent scheme to artificially inflate the Funds' performance record and several misstatements in SBB's financial statements and marketing materials. Upon Defendants' motion, the Court dismissed the SEC's aiding and abetting claims against Barnett and Aven, but permitted the SEC to proceed with its remaining claims.

After more than two years of extensive fact and expert discovery, the Court denied motions to exclude or limit the expert opinions of Dr. Arun Sen, Mr. Gene Deetz, Mr. Steven Richards, and Dr. Craig McCann, but granted in part the motions as to certain opinions of Mr. Andrew M. Mintzer and the opinion of Mr. Peter Hickey.

Defendants now move for summary judgment on each of the SEC's remaining claims, and the SEC moves for partial summary judgment as to its claims concerning SBB's statements in its marketing materials.

## IV. Legal Standard

Summary judgment is the "put up or shut up" time in litigation. *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

SEC has preliminarily determined to include in the recommendation; and (3) provides notice that the person may make a submission concerning the proposed recommendation.

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and … draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). In the context of cross-motions for summary judgment, courts "construe all inferences in favor of the party against whom the motion … is made." *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation omitted).

## V.      Discussion

### A.  Defendants' Motion for Summary Judgment

Beginning with Defendants' motion for summary judgment, the Court construes the facts in the light most favorable to the SEC.

#### 1.  Fraud Claims

In Counts I and II the SEC alleges violations of the Securities Act §§ 17(a)(1)–(2) and Securities Exchange Act § 10(b) and Rule 10b-5(a)–(c) promulgated thereunder.

Section 17(a) provides:

It shall be unlawful for any person in the offer or sale of any securities …

(1)  to employ any device, scheme, or artifice to defraud, or

(2)  to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Section 10(b) likewise provides:

> It shall be unlawful for any person, directly or indirectly …
>
> ….
>
> > (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

> Lastly, pursuant to its rulemaking authority under § 10(b), the SEC adopted Rule 10b–5, which

provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud, [or]
> >
> > ….
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Liability under Rule 10b–5 "does not extend beyond conduct encompassed by § 10(b)'s prohibition." *U.S. v. O'Hagan,* 521 U.S. 642, 651 (1997).

The primary distinction between these laws is that § 10(b) and Rule 10b-5 apply to acts committed in connection with a *purchase or sale of* securities, while § 17(a) applies to acts committed in connection with an *offer or sale* of securities.[5] 15 U.S.C. §§ 77q(a), 78j(b). Other than this distinction,

---

[5] Unlike private plaintiffs, the SEC need not show reliance or loss to prevail on its fraud claims. *See McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 931 (7th Cir. 2011) ("[T]he SEC can bring an enforcement action

the elements of a claim under § 10(b) and § 17(a) of the Exchange Act are "identical." *S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). Thus, the SEC's claims in Counts I and II rise and fall together and the Court will analyze them jointly.

### 2. Fraudulent Scheme

Defendants begin by arguing that the SEC's scheme allegations are "incoherent" and that the Court may dispose of such allegations before they reach a jury. They maintain that it would have been unreasonable to engage in a fraudulent scheme "in which [Barnett] and his family would have been the chief victims," and that they would not have freely shared information with RSM and the SEC.

The distribution of allegedly false or misleading statements can constitute both a fraudulent scheme and a fraudulent misrepresentation. *See Lorenzo v. SEC*, 587 U.S. 71, 78–80 (2019). The unreasonableness of a defendant's alleged fraudulent scheme may be evaluated by "what that [defendant] might have had to gain" from the scheme. *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990). The SEC is not required to prove a defendant's motive for making a material misstatement, but courts do consider whether an alleged scheme would have required a defendant to behave irrationally. Courts dismissing cases for failing to prove a fraudulent scheme often do so because the scheme is "irrational" to the defendant economically or personally. *See Antelis v. Freeman*, 2011 WL 6009609, at *6 (N.D. Ill. Nov. 30, 2011) (Nolan, J.) (finding an alleged scheme "irrational" where defendant stood suffer substantial losses and defraud a "life-long friend"). A scheme is "irrational" if it would render no economic benefit to defendants and/or would result in a significant loss. *See, e.g., In re Peregrine Sys., Inc. Sec. Litig.,* 2005 WL 8158825, at *67 (S.D. Cal. Mar. 30, 2005) (concluding that it would be irrational for an auditor to participate in a fraudulent scheme that did not increase the amount of fees it already received from a client and posed an immense risk to the auditor's reputation).

---

for a 'violation' of federal securities law … without anyone having relied on a misrepresentation or misleading omission to his detriment.").

Viewing the facts in the light most favorable to the SEC, a jury could find that Defendants potentially stood to gain by "rigging" their Valuation Model and by marketing the Funds with more attractive terms. A jury may find that any fraud would not only impact close friends and family because Defendants marketed SBB and its Funds to outside institutional investors. It might also find that Defendants were motivated to inflate the performance of the Funds to increase their compensation. As discussed further below, the SEC proffered evidence creating a dispute as to how much information Defendants "freely" shared with their auditors, and the extent to which they followed through with the actions recommended by their consultants to comply with securities laws. Thus, the SEC has adequately shown that Defendants' alleged scheme would not be wholly irrational and needs only present evidence to prove material false statements made with a culpable mental state.

### 3. *False or Misleading Statements*

SBB's alleged misstatements fall into two categories: misstatements regarding the reported "fair value" of the Funds' structured notes (the "Valuation Statements") and misstatements in SBB's marketing materials regarding specific terms of Polysight I (the "Marketing Statements"). The Court analyzes each category of statements in turn.

### a. *Valuation Statements*

Defendants maintain that no reasonable jury could find that the Valuation Statements were false or misleading without expert testimony explaining the technical requirements of GAAP (specifically, the application of certain ASC 820 requirements), which the SEC admittedly lacks after the Court excluded Hickey's testimony. As explained below, there is a genuine issue as to the falsity of Defendants' statements about their method of arriving at a "fair value" and the NAVs of the Funds' notes, and their assurances that their financials were prepared in accordance with GAAP.

The SEC alleges that the Valuation Statements contain the following misrepresentations:

1. The Funds' 2014 and 2015 financial statements falsely represented that the Funds "record [their] investments at fair value," as defined by ASC 820.

20

2. The NAVs in the 2014 and 2015 financial statements for each Fund were materially misstated.

3. Management representation letters to RSM falsely stated that SBB prepared the Funds' financial statements "in accordance with U.S. GAAP" and that "[p]ortfolio securities are stated at fair value."

4. From 2014 through 2016, SBB's Forms ADV falsely stated that the Funds' financial statements were prepared in accordance with GAAP.

5. Management Agreements between SBB and the Funds falsely stated that "Valuation of the Account shall be determined in accordance with [GAAP]."

6. The Funds' Operating Agreements misrepresented that the Funds' books of account would be maintained in accordance with GAAP.

The first alleged misrepresentation, that SBB falsely claimed that the Funds recorded their investments at "'fair value' as defined by ASC 820," requires an explanation of how ASC 820 operates and why the Funds' reported investment values were false from an accounting perspective. In evaluating the falsity of the "fair value" statement in an accounting context, a jury would be tasked with applying GAAP standards themselves. In other words, a jury would be required to draw an *accounting* conclusion (rather than a conclusion about the Valuation Model and NAVs themselves). Evaluating the Valuation Model from an accounting perspective to find that its "fair value" calculations were outside the bounds of GAAP, without expert testimony explaining how accountants apply those standards, is outside the experience of a lay juror.

However, the Court disagrees that excluding Hickey's testimony was a lethal blow to the SEC's entire case. Courts' analyses adhere to the statute to determine what the SEC must prove: materially misleading statements or omissions made with scienter. *S.E.C. v. Seghers*, 298 F. App'x 319, 331 (5th Cir. 2008). Expert testimony regarding GAAP is not required where an actual violation of GAAP is not an element of the claim that the SEC must prove.

While the Seventh Circuit has not to the Court's knowledge encountered a similar issue, the Second and Fifth Circuits have found that securities fraud may be proven without showing violations

21

of GAAP even where improper accounting is alleged. *See United States v. Rigas,* 490 F.3d 208, 221 (2d Cir. 2007); *United States v. Ebbers,* 458 F.3d 110, 125–26 (2d Cir. 2006). In *Rigas*, the Second Circuit ruled that a jury could find that the defendants committed fraud even if they complied with GAAP where alleged debt reclassifications were "specifically designed to mislead investors" as to how much cash was infused into a company. 490 F.3d at 221. The court remarked that "GAAP rules d[id] not govern whether [disclosures] … were false and fraudulent" in that case, and "an actual violation of GAAP [was] not an element of the offenses charged." Because whether the accounting method "was actually permitted under GAAP" was not an issue, even if the defendants "technically complied with GAAP, a jury could have found that Defendants intentionally misled investors." *Id.*[6]

The Fifth Circuit also came to that conclusion in *S.E.C. v. Seghers* in the context of valuation. In *Seghers,* a jury found that the defendant misled investors about accounting errors that affected the valuation of certain funds' assets. The defendant argued the SEC impermissibly relied on a theory that the accounting method employed violated GAAP because they failed to show an actual violation of GAAP through expert testimony. 298 F. at 331. The court explained that GAAP violations "are neither necessary nor sufficient to prove securities fraud" and focused strictly on the statutory requirements for securities fraud. *Id.* (citing *Lovelace v. Software Spectrum,* 78 F.3d 1015, 1020 (5th Cir. 1996); *Fine v. Amer. Solar King,* 919 F.2d 290, 297 (5th Cir. 1990)).

Here, the Funds' financial statements included the following disclosure (emphasis added):

The Fund records its investments at fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The Fund utilizes valuation techniques to maximize the use of observable inputs and minimize the use of unobservable inputs. Assets and liabilities recorded at fair value are categorized within the fair value hierarchy based upon the level of judgment associated with the inputs used to measure their value. The fair value hierarchy gives the highest priority to quoted prices in active markets for identical assets or liabilities (Level 1)

---

[6] Similarly in *Ebbers,* the Second Circuit rejected the defendants' argument that the district court should have required expert witnesses to testify regarding GAAP, because in that case the SEC was not required "to prevail in a battle of expert witnesses over the application of individual GAAP rules" to prove a material misstatement. 458 F.3d at 125–26.

22

and the lowest priority to unobservable inputs (Level 3). <u>Inputs are broadly defined as assumptions market participants would use in pricing an asset or liability.</u>

Defendants warranted to investors that SBB "records its investments at fair value" and defined their "valuation techniques," including the inputs that it prioritized to do so, without mention of GAAP nor ASC 820. The SEC does not need to prove that Defendants both made a material misstatement about its valuation inputs *and* violated GAAP to proceed with its case. Defendants may testify as to the inputs they chose to include their own model (such as *mu*, *beta*, and linearization). Aven testified to the SEC that he understood that *mu* was an "unobservable" rather than "observable" input. Barnett also told the SEC that he believed "you … would prefer to use an observable input instead of unobservable input," but that "even if implied volatility is an observable input, you can still use an unobservable input if the unobservable input provides a better measure of volatility." Defendants' testimony reflects an understanding of the inputs they claimed to "maximize" and "minimize," just not in the context of their ASC 820 and GAAP implications.

In sum, the jury need only look to Defendants' financial statements for the alleged false statement about SBB's "fair value" method, not to ASC 820. The SEC presented evidence that Defendants' Valuation Model was inconsistent with how Defendants themselves claimed they valued the Funds' structured notes. Evaluating that discrete misstatement is distinct from evaluating the valuation method from a GAAP perspective, and a reasonable jury could find SBB's statements about "maximizing" and "minimizing" certain inputs false or misleading. Thus, while its case may be substantially limited, the SEC may proceed with its claim without offering technical expert testimony on GAAP, insofar as the alleged misstatement does not require proving that SBB's method of calculating "fair value" was improper under the specific fair value hierarchy provided by ASC 820.

Similarly, the alleged misstatement that the NAVs were inflated also does not require showing an actual violation of GAAP. While valuing assets at "fair value" is a requirement of ASC 820, and the valuation of the Funds' notes required some judgment, whether Defendants' valuation method

was designed to inflate NAVs is not a matter of accounting. Defendants established that the assumptions used in the Valuation Model were intended to arrive at a price they subjectively believed the assets were worth. The SEC proffered the opinion of Dr. McCann to explain how SBB's methodology overpriced the Funds' structured notes, and that the departure was statistically significant as applied to bank values. Further, the difference in NAV calculations between the Markit model and SBB's original Valuation Model resulted in over a million dollars of fees being returned to investors. Defendants may testify as to why they believed their Valuation Model arrived at more reasonable NAVs than generally accepted models, but evaluating that testimony requires a credibility determination inappropriate for summary judgment. Accordingly, there is evidence from which a jury could find that Defendants reported values higher than those which investors would consider the "fair value" using standard methodology, and a genuine issue of fact as to Defendants' "fair value" claim and alleged inflated NAVs.

Next, Defendants assert that statements regarding their compliance with GAAP and "fair value" in their management representation letters to RSM,[7] public filings, management agreements, and the Funds' operating agreements are "inactionable opinion statements." But opinions are not categorically inactionable. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). If a jury finds that Defendants issued an opinion "without a genuine belief or reasonable basis," the opinion is "an 'untrue' statement which, if made knowingly or recklessly, is culpable conduct actionable under [the securities laws]." *See S.E.C. v. Ustian*, 2019 WL 7486835, at *30 (N.D. Ill. Dec. 13, 2019) (Ellis, J.) (internal citation omitted). Some omissions may be relatively

---

[7] Defendants argue that statements made in management representation letters to RSM, rather than directly to investors, do not meet the "in connection with" requirement under § 17(a) and § 10(b). However, Defendants' statements to RSM were germane to its statements to investors, especially because RSM used the statements in auditing the financial information SBB ultimately disclosed. This is sufficient to meet the "in connection with" element for securities fraud. *See Sec. & Exch. Comm'n v. Wilcox*, 663 F. Supp. 3d 146, 161 (D. Mass. 2023) (finding scheme claim adequately alleged where officer signed a false representation letter to the auditor).

small such that they would not "make the statement of opinion misleading." *See Omnicare,* 575 U.S. at 190. But a jury must evaluate the evidence as to SBB's "inquiry into or knowledge concerning" the GAAP compliance opinions and whether "those facts conflict with what a reasonable investor would take from the statement itself." Even if these were opinions, the SEC put forth evidence such that a jury could find Defendants had no "reasonable basis" to believe SBB's financial statements were prepared "in accordance with GAAP."

Defendants argue that they "had a reasonable basis to believe that SBB's financial statements (including the presentation of values generated by its model) were consistent with GAAP" because they hired accountants to prepare their financial statements and to issue audit opinions on whether SBB's financials complied with GAAP. Topel Forman specifically denied that it would verify the "accuracy or completeness of the information [provided by SBB]" and that it "[would] not express an opinion or a conclusion or provide any assurance on the financial statements." RSM relied on information provided in SBB's management representation letters and evaluated SBB's financials based on a third-party valuation model, not SBB's. Lynne Weil testified about what she considered to be misleading omissions by management, causing her to decide to withdraw RSM's audit opinions.

Additionally, the SEC's expert Andrew M. Mintzer opined that SBB was ultimately responsible for presenting its Funds' financial statements under GAAP, a responsibility which Defendants affirmatively acknowledged. He also concluded that, had SBB represented that they were relying upon its auditors to meet its obligations, "any reasonable auditor … would have had to have reevaluated whether it was 'independent' from management." Again, the SEC must prove that Defendants misled investors by claiming without sufficient basis that the Funds' financial statements were prepared in accordance with GAAP, not whether they ultimately ended up GAAP-compliant. *In re Glob. Crossing, Ltd. Sec. Litig.,* 322 F. Supp. 2d 319, 340 (S.D.N.Y. 2004) (holding that whether or not "[a defendant's]

accounting … was arguably consistent with the terms of certain specific accounting standards, this would not insulate [the defendant] … as a matter of law from liability under the securities laws").

Defendants must have formed a basis to reasonably believe that SBB's Valuation Model and reported NAVs complied with GAAP to represent that the Funds' financial statements were prepared "in accordance with GAAP." *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 709 (3d Cir. 1996) (finding that defendants "should have been concerned with whether" statement of loan loss reserves "complied with GAAP"). Defendants testified that they had no accounting expertise and that they did not consider GAAP when developing their valuation model. Aven and Navalgund each testified that Defendants' objective in building SBB's Valuation Model was to build an "economic model" that reflected an SBB-specific measurement of value, *not* to use a model that complied with accounting standards or the practices of market participants. Courts have held that such statements are actionable. *See Westinghouse*, 90 F.3d at 709 (finding actionable misstatements where allegations established that defendants "could not reasonably and in good faith have opined that the financial statements as a whole fairly presented the [company's] financial condition … in accordance with GAAP"). A jury could reasonably conclude that those statements are susceptible to another interpretation by investors, creating a false impression, thereby supporting the SEC's claim for securities fraud. *See Plumbers & Pipefitters Local Union No. 630 Pension–Annuity Trust Fund v. Allscripts–Misys Healthcare Solutions, Inc.,* 778 F.Supp.2d 858, 878 (N.D. Ill. 2011) (Castillo, J.); *Phillips v. LCI Intern., Inc.,* 190 F.3d 609, 613 (4th Cir. 1999); *McMahan & Co. v. Wherehouse Entm't, Inc.,* 900 F.2d 576, 579 (2d Cir. 1990)).

Because the SEC has no expert testimony on GAAP, to the extent an alleged misstatement relies upon an actual violation of GAAP by Defendants, there is insufficient evidence to find such a violation. But there is sufficient evidence from which a jury could reasonably find that Defendants' statements and omissions about their "fair value" model inputs, structured notes' NAVs, and

26

Defendants' assurances that SBB's financial statements were prepared in accordance with GAAP were false or misleading to investors.

### b. Marketing Statements

The SEC asserts Defendants made the following misrepresentations to investors in SBB's marketing materials:

1. Polysight I marketing materials falsely represented that the Fund had a high-water mark.

2. Polysight I marketing materials falsely stated that the Fund had a one-year lockup period.

3. Polysight I marketing materials misrepresented that the Fund was created in 2011.

4. Polysight I marketing materials reflected the artificially inflated note and Fund values generated by the Valuation Model.

Taking these statements one by one and beginning with the last misstatement, the Court has already concluded that a jury could reasonably find SBB's reported note values misleading such that Defendants are not entitled to summary judgment. The same holds where that information was reflected in SBB's marketing materials. There is therefore a genuine dispute of material fact as to the falsity of Polysight I's structured note values.

Turning to the high-water mark and one-year lockup statements, Defendants claim they are entitled to summary judgment because SBB's marketing materials advertised the "Polysight strategy" rather than just the Polysight I fund itself, providing those terms merely as examples of terms a bespoke fund might include. However, several of its marketing materials warrant that the terms apply to Polysight I specifically. Barnett contacted a prospective investor with a "Fact sheet for [SBB's] flagship fund, Polysight," which claimed the fund had a high-water mark and a one-year lockup. Defendants ask the Court to interpret all of SBB's marketing materials as advertising the "Polysight strategy" and not Polysight I as several of them expressly warrant. Even if Defendants were willing to negotiate terms of future funds with investors, that intention does not negate alleged misstatements that pertained to specifically to Polysight I and not a hypothetical fund.

The evidence also shows that some, but not all, Polysight I marketing materials represented that the Fund had an inception date of 2011. Most materials, including SBB's fact sheets and presentations, included a footnote clarifying that the "historical performance … represents a composite return" of multiple SBB Funds. However, the online listings for Polysight I, e-mails Handler sent to prospective investors, and at least one fact sheet contain no such specification and claim to represent the historic returns for Polysight I. For example, Handler wrote in 2016 that "[o]ver the past 4 1/2 years Polysight I – our main vehicle – has delivered consistent, risk-adjusted returns …" when Polysight I had only been created two years before. He included a table with the "Historical Net Performance (%)" for Polysight I dating back to 2012. The SEC has shown a genuine dispute as to the falsity of the Marketing Statements which must go to a jury.

### 4. *Materiality*

The SEC must next provide evidence such that a jury could find the alleged misstatements were material to investors. To prove materiality, there must be a substantial likelihood that a misrepresentation "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231– 32 (1988). The standard for materiality does not vary according to the type of investor involved. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976). ("The question of materiality … is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor."). Thus, while true that SBB's investors were required to affirm their institutional investor status, that does not alter the standard by which a jury must evaluate the question of materiality.

Because materiality requires fact-specific assessments of how a reasonable investor would interpret facts and how significant that understanding would be to the investor, materiality is "rarely appropriate at the summary judgment stage." *S.E.C. v. Buntrock*, 2004 WL 1179423, at *4–5 (N.D. Ill. May 25, 2004) (Andersen, J.) (collecting cases); *see also TSC Indus.*, 426 U.S. at 450 (materiality questions

are "peculiarly ones for the trier of fact"). Defendants argue that the SEC must present evidence of what would be "material" specifically to institutional investors. According to Defendants, because a "reasonable investor" in the Funds would have been sophisticated, their investors would not have been misled by SBB's alleged misrepresentations.

It is undisputed that investors in the Funds were institutional investors, all of whom were required to affirm "accredited investor" status before investing, and that SBB stated that its investment program was "intended only for sophisticated investors who are able to bear economic risk of the loss of their investment and who have limited need for liquidity." But the Valuation Statements are not "so obviously unimportant to an investor that reasonable minds would not differ on the question of materiality." *See United States Sec. & Exch. Comm'n v. Bluepoint Inv. Couns., LLC*, 2021 WL 719647, at *19 (W.D. Wis. Feb. 24, 2021) (*citing TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, (1976)). Courts in this District have found that a "flawed valuation system," "assessment of fees based on overstated asset valuations," and "the dissemination of investor statements with inflated performance values" were all material misstatements. *Sec. & Exch. Comm'n v. Goulding*, 2020 WL 1445619, at *4 (N.D. Ill. Mar. 25, 2020) (Gilbert, M.J.), *aff'd*, 40 F.4th 558 (7th Cir. 2022). This is the case even where investors are sophisticated institutional investors. *See S.E.C. v. Lauer*, 2008 WL 4372896, at *20 (S.D. Fla. Sept. 24, 2008), *aff'd*, 478 F. App'x 550 (11th Cir. 2012) (finding that "artificially inflating the Funds' portfolios" and "misrepresenting the value" of investments were material misrepresentations to institutional investors because they "expected [defendant] to represent NAVs that were truthful and accurate"). Furthermore, the Funds' performance determined the amount in management and incentive fees that investors had to pay to SBB (and SBB credited investors over a million dollars in those fees for 2011 through 2015 for the difference between its prior model and its "new" model). A jury could reasonably conclude that an allegedly inflated valuation resulting in such a difference in fees would be material to investors.

29

The SEC's alleged misstatements that SBB prepared and maintained its financial statements, "Valuation of the Account," and books of account "in accordance with GAAP" are also not "so obviously unimportant" such that a jury could not find them material. The "single unified purpose" of GAAP is "to increase investor confidence by ensuring transparency and accuracy in financial reporting." *In re WorldCom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 478 (S.D.N.Y. 2005) (internal citation omitted). Investors could reasonably understand the statement that SBB adhered to GAAP standards to mean that Defendants accounted for those standards when valuing assets and verified that their own Valuation Model (not a third party's) was compliant. Using a common standardized framework to prepare and report financial statements allows investors to confidently interpret the company's financials (and make investment decisions accordingly). *See Ebbers*, 458 F.3d at 125 (observing that "[g]ood faith compliance" with GAAP enables investors "to accurately assess the financial condition of the company … even when the question of whether a particular accounting practice complies with GAAP may be subject to reasonable differences of opinion."). Given the purpose of GAAP, SBB's assurances about proper accounting could be reasonably viewed as material to SBB's investors. *See Westinghouse,* 90 F.3d at 709 (finding that whether loan loss reserves were "established in compliance with GAAP … would have assumed actual significance to a reasonable investor contemplating the purchase of securities").

The SEC has also shown a dispute as to the materiality of the Marketing Statements. The specific terms of a fund—e.g., those that restrict when investors may withdraw funds and set a minimum threshold for performance before fees accrue—along with the fund's historic returns are the sorts of information a reasonable investor would look to when evaluating a fund. Additionally, the lock-up period and high-water mark were among the few terms SBB chose to highlight in its marketing materials. *See, e.g., SEC v. Nadel*, 97 F. Supp. 3d 117, 124 (E.D.N.Y. 2015) (granting summary judgment to the SEC, holding that the defendants "demonstrated the importance they

attached to the [false statements]" by "highlighting" them in their marketing materials); *see also SEC v. Caine*, 2024 WL 4382751, *5 (N.D. Ill. Oct. 3, 2024) (Harjani, J.) (information included in diligence materials sent to investors indicates that "the [d]efendants understood this information was important to investors"). Particularly where the advertised terms could be considered to downplay the risk of Polysight I, a jury could reasonably find those terms material. The inception date of Polysight I is similarly not so unimportant; a reasonable investor would likely find it material that Polysight I had three fewer years of returns than advertised. In fact, the evidence shows that at least one such investor reached out to Aven regarding the incongruency between SBB's marketing materials and subscription package as to the lockup period.

Defendants again claim that marketing materials "regarding SBB's investment strategy" would not have been material to investors. As discussed, SBB's marketing materials recurrently represented that the terms applied to Polysight I, not a "strategy" nor just potential terms that an investor may negotiate. Defendants also argue that the SEC cannot prove the Marketing Statements were material because accurate information about the Funds' terms was included in the subscription packages for the Funds and SBB's Forms ADV. But in the context of securities regulation, "[a]vailability elsewhere of truthful information cannot excuse untruths[.]" *See Dale v. Rosenfeld*, 229 F.2d 855, 858 (2d Cir. 1956); *see also SEC v. Mozilo*, 2010 WL 3656068, at *9 (C.D. Cal. Sept. 16, 2010) ("[T]hat truthful information is available elsewhere does not relieve a defendant from liability for misrepresentations in a given filing or statement.") (internal citation omitted). As a result, Defendants are not automatically excused from liability by arguing that misleading information is immaterial if disclosed elsewhere. Further, materiality of alleged misstatements must be assessed at the time the statements are made. *Pommer v. Medtest Corp.*, 961 F.2d 620, 625 (7th Cir. 1992). The fact that subscription documents that SBB would make available to investors at a later time specified the true terms of Polysight I does not render the Marketing Statements immaterial when made.

Defendants' cases establish that a jury may in some cases rely on expert and investor testimony as to the materiality of alleged misstatements, not that such testimony is required for a jury to make that determination. The SEC proffered the testimony of Handler, who may testify based on his extensive personal experience in the securities industry as to his understandings and opinions as to what would be material to investors. *See United States v. Smith*, 150 F.4th 832, 847 (7th Cir. 2025) (citing *United States v. Winbush*, 580 F.3d 503, 512 (7th Cir. 2009)). To the extent that the SEC lacks expert testimony on GAAP, that does not preclude a finding that the misstatements not relying on an actual GAAP violation are material. As such, there is a genuine dispute of fact as to whether SBB's alleged misstatements were material to investors.

5. *Culpable Mental State* [8]

a. *Scienter & Negligence (Counts I–V)*

Defendants contend that they are entitled to summary judgment on the SEC's claims under Rule 10b-5 and § 17(a)(1) because the SEC lacks sufficient evidence that Defendants acted with scienter. Scienter contemplates an "intent to deceive, manipulate, or defraud," or a "reckless disregard of the truth." *S.E.C. v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008). The SEC must show that Defendants knew they were publishing materially false information or were "severely reckless in publishing such information." *Seghers*, 298 F. App'x at 331. Typically, "scienter is a question of fact and is therefore usually best decided by the trier of fact." *SEC v. Kameli*, 2020 WL 2542154, at *16 (N.D. Ill. May 19, 2020) (Gottschall, J.).

In the context of securities fraud, a "reckless disregard for the truth" means "conscious recklessness," or "a state of mind approximating actual intent, and not merely a heightened form of negligence." *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal

---

[8] The SEC is not required to prove a requisite state of mind to prevail on its Advisers Act Rule 206(4)-1 claim (Count VI).

citation omitted).  Recklessness is shown where defendants either (1) knew facts or had access to facts contradicting their statements or (2) failed to review or check information they had a duty to monitor. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).  The alleged misstatements must "present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."  *See S.E.C. v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999) (Andersen, J.) (quoting *Meadows v. S.E.C.*, 119 F.3d 1219, 1226 (5th Cir. 1997)).

Defendants argue the SEC cannot establish scienter because Defendants lack a coherent motive, but the SEC need not prove motive to establish scienter.  *See Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 325 (2007) (holding that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference … the absence of a motive allegation is not fatal").  As discussed with respect to the SEC's alleged scheme, viewing the facts in a light most favorable to the SEC, a reasonable jury could conclude that Defendants possessed an economic motive in seeking to expand their investor base and raise capital.

Beginning with the Valuation Statements, SBB witnesses denied an intent to inflate the structured notes' NAVs through using a nonstandard Valuation Model.  However, testimony from the SEC's valuation expert Dr. McCann shows that the Valuation Model diverged from industry standards, and Defendants testified that their model was intended to produce NAVs they subjectively believed were "reasonable."  And while Defendants maintain that the Valuation Model was fair, they recognized that it was standard to prioritize "observable" inputs over "unobservable" inputs when measuring the fair value of SBB's structured notes.  SBB's Forms ADV stated that they did so, but Defendants actually used "unobservable" inputs over "observable" inputs (such as their own volatility calculated with *beta,* rather than implied volatility).  Defendants' decision to switch to the Markit model from their own Valuation Model after the SEC formally began an investigation is also up for a jury, not the Court, to interpret.

33

Defendants also argue that they lacked scienter because they believed their Valuation Model and financial disclosures complied with GAAP. SBB stated that this belief "was supported by the unqualified audits of [its] PCAOB accounting firm" (*i.e.*, RSM). Noncompliance with GAAP, "without more, does not establish scienter." *Seghers*, 298 F. App'x at 331. But if Defendants knew that (or were reckless as to whether) a disclosure or accounting was false or misleading, the mere fact that they hired auditors would not necessarily defeat the SEC's scienter allegations. *See Silverman v. Motorola, Inc.,* 798 F. Supp. 2d 954, 969 (N.D. Ill. 2011) (St. Eve, J.) (citing *United States v. Erickson*, 601 F.2d 296, 305 (7th Cir.), *cert. denied,* 444 U.S. 979 (1979) ("If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance."); *see also S.E.C. v. Jakubowski*, 150 F.3d 675, 681–82 (7th Cir. 1998) ("Deliberate ignorance … is a form of knowledge.").

There is conflicting evidence as to whether Defendants could reasonably rely on third-party professionals and their "clean" audits. First, there is a dispute as to whether RSM validated the GAAP compliance of the Valuation Model in the course of its audits. While none raised any concern that the model or resulting note values deviated from GAAP, evidence shows RSM validated the third-party valuation specialist IDC's model, not Defendants'. While Defendants were not accountants and may not have known or had reason to suspect that the Valuation Model was noncompliant with ASC 820, evidence from the SEC investigation shows that the SEC raised and extensively discussed potential GAAP violations to Defendants. Further, it is undisputed that SBB did not share the SEC's Letter with RSM before December 2016. The Letter identified potential issues with SBB's Valuation Model which had not been raised to RSM before it completed its audit. RSM ultimately withdrew each of their audit opinions after discovering what they regarded as misrepresentations by SBB management. This creates a dispute as to whether Defendants withheld important information from

34

RSM, and the interpretation of Defendants' interactions with their auditors should be left to a jury. Where Defendants had no knowledge as to what the requirements of GAAP were, nor consider any of those requirements when creating the Valuation Model, nor had their model validated by RSM auditors, a juror may conclude that Defendants acted at least recklessly by claiming they were following GAAP's procedures. *See, e.g., SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998) (finding "deliberate ignorance" and recklessness where attorney made misrepresentations to prospective investors without reading documents central to the transaction that reflected the true terms).

As for the Marketing Statements, Defendants reiterate their claim that those statements cannot be false because SBB was marketing a "strategy" rather than the Polysight I fund. The parties do not dispute that Barnett and Aven were responsible for the content included in SBB's marketing materials, reviewed those materials before they were circulated to prospective investors, and were aware of the actual terms of Polysight I. The SEC points to evidence that at least one prospective investor in 2015 understood that Polysight I had a one-year lockup while the Operating Agreement provided for a two-year lockup, to which Aven replied that SBB had "misspoke." Yet, after that exchange, certain marketing materials SBB disseminated still stated that the lockup period for Polysight I was one year. Also in November 2015, early in SBB's marketing efforts, Aven and Handler agreed that "[t]he longer the better, as far as the track record is concerned Barnett and Aven may testify as to the true intent of SBB's marketing efforts—to advertise the "Polysight strategy"—but a reasonable jury could conclude that Defendants were aware of misleading statements as to the terms of Polysight I and published inaccurate marketing materials nonetheless. The consistency of the evidence with Defendants' claims that they advertised the "Polysight strategy" must also be left to a jury to evaluate.

Because there are genuine disputes of material fact as to falsity, materiality, and scienter, summary judgment is inappropriate on each of the SEC's claims in Counts I–V. The Court therefore

35

need not reach the issue of whether there is evidence that Defendants acted with negligence, a lesser state of mind than knowledge or recklessness, for the SEC's claims in Counts II, IV, and V.[9]

### b.  Willfulness (Count XI)

Section 207 of the Advisers Act makes it unlawful for "any person to willfully make" material misstatements or omissions in reports filed with the SEC.  15 U.S.C. § 80b-7.  The "willful" standard requires that a defendant "subjectively intended" to make material misstatements or omissions.  *Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 479 (D.C. Cir. 2019).  In this case, the SEC must produce evidence that Aven and SBB willfully made material misstatements by stating in Forms ADV that Funds' "financial statements were prepared in accordance with GAAP."

Defendants argue the SEC lacks evidence that SBB and Aven "subjectively intended" to falsely state that SBB had prepared the funds' financial statements in accordance with GAAP, and that Aven only "drafted, reviewed, and signed the Forms ADV" with alleged misrepresentations.  The SEC did not address this argument in its response brief to show evidence creating a genuine dispute of material fact as to the requisite "subjective intent" of Aven.  Arguments not raised in response to the moving party's motion for summary judgment are waived.  *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014).  Accordingly, any issues raised in the summary judgment motion that are not responded to by the nonmoving party are deemed abandoned.  *See* Fed. R. Civ. P. 56(e)(2); *Palmer v. Marion County,* 327 F.3d 588, 597–98 (7th Cir. 2003).  Therefore, Defendants are entitled to summary judgment in their favor on Count XI.

---

[9] While the SEC must provide evidence sufficient to establish the relevant standard of care should it have to prove a negligent state of mind, *see SEC v. Ginder*, 752 F.3d 569, 576 (2d Cir. 2014), such evidence is not required if the SEC shows that Defendants acted with scienter.

6.  *Rule-Based Claims*

a.  *Rule 206(4)-2 (Count VII)*

Section 206(4) of the Advisers Act authorizes the SEC to "define" and "prescribe" means that are "reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4). Rule 206(4)-2, promulgated thereunder and known as the "Custody Rule," proscribes investment firms having "custody of client funds or securities" unless such funds and securities are "verified by actual examination at least once during each calendar year … by an independent public accountant … at a time that is chosen by the accountant without prior notice or announcement … and that is irregular from year to year." 17 C.F.R. § 275.206(4)-2. Alternatively, investment advisers are deemed to have complied with the Custody Rule with respect to a pooled investment vehicle if they distribute "audited financial statements prepared in accordance with generally accepted accounting principles" by an independent public accountant. *Id.*

To prove a violation of Rule 260(4)-2, the SEC must proffer evidence that Defendants failed to distribute "audited financial statements prepared in accordance with generally accepted accounting principles." There is no dispute that RSM audited SBB's financial statements for the years 2013 through 2017. But a violation of the Custody Rule requires financial statements that were not prepared in accordance with GAAP. The SEC argues that the specific GAAP violation is a failure to value the Funds' notes at "fair value" within the meaning and application of ASC 820. The Court agrees that this effectively boils down to an attempt to enforce a "valuation" rule. In any event, while a "valuation" misstatement is not necessarily required to be argued in the context and terms of GAAP, proving a Rule 206(4)-2 violation requires proving that Defendants actually violated ASC 820. Because the Court excluded Hickey's testimony as to the GAAP compliance of SBB's valuations, the SEC has

37

insufficient evidence that would enable a jury to apply GAAP for themselves and reasonably find such a violation. Thus, summary judgment in favor of Defendants is appropriate as to Count VII.[10]

### b. *Rule 206(4)-7 (Count VIII)*

#### 1. *Rule 206(4)-7 Does Not Exceed the SEC's Statutory Authority*

Defendants assert that Rule 206(4)-7, known as the "Compliance Rule," exceeds the SEC's statutory authority. The Compliance Rule requires investment advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation[s] … of the [Advisers] Act and the rules that the Commission has adopted [thereunder]." 17 C.F.R. § 275.206(4)-7. Defendants argue that the Compliance Rule fails to "define" unlawful conduct and to "prescribe means reasonably designed" to prevent such conduct, instead using "vague" assertions tantamount to regulation by applying an "I know it when I see it" standard.

The Court finds that the Compliance Rule adequately specifies the "conduct" it prescribes and the "means" to prevent it. The Rule could not possibly list all the ways that an adviser might violate the Advisers Act. Just as it would be impossible to contemplate every action violating the Advisers Act, the Rule "does not enumerate specific elements that advisers must include in their policies and procedures" because "funds and advisers are too varied in their operations for the rules to impose of a single set of universally applicable required elements." 75 Fed. Reg. 1456. Instead, the SEC advised that "[e]ach adviser … should first identify conflicts and other compliance factors creating risk exposure … in light of the firm's particular operations, and then design policies and procedures that address those risks." 68 Fed. Reg. at *74714-01. The SEC listed the types of issues the policies and procedures should address "to the extent they are relevant to that adviser," *see id.* at *74716, providing

---

[10] Defendants argue that the SEC exceeded its statutory authority in bringing its Custody Claim against Defendants. The Court does not reach this issue.

further guidance as to the nature of the conduct and procedures that the Rule was designed to address. Thus, Rule 206(4)-7 does not exceed the SEC's statutory authority as "vague" and indefinite.

### 2. *SBB's Compliance with Rule 206(4)-7*

SBB's adherence to the Compliance Rule does not depend upon showing that its Valuation Model was GAAP-compliant. The issue is whether SBB adopted and implemented adequate written policies and procedures designed to address risks, in particular regarding its "[p]rocesses to value client holdings and assess fees based on those valuations," an issue that pertained to SBB and one that the Rule directs investment advisers to address. *See* 68 Fed. Reg. at \*74716.

Evidence shows that prior to its engagement with Simon Compliance, SBB had no compliance program, written valuation policy, or written compliance guidelines. Lindsey Simon, SBB's compliance consultant, attested to having no experience in asset valuation or accounting matters. She also stated that she had "concerns about whether SBB was committed to developing and implementing policies and procedures reasonably designed to ensure compliance with the securities laws" over the course of Simon Compliance's engagement, and that SBB "did not implement other measures [she] recommended as necessary to comply with applicable legal requirements." A jury may evaluate SBB's policies and procedures given the context of its engagement with Simon and reasonably conclude that its compliance program was not sufficient.

The jury may also consider evidence of PwC's initial observations and assessment[11] as to SBB's "valuation governance" policies and procedures (such as an applicable governance structure, sufficient documentation, and a delineated "responsibility for the management and oversight of control and valuation policies and procedures"). While PwC's observations concern SBB's "new" valuation model

---

[11] Defendants maintain that "the SEC cannot use PwC as an undisclosed expert to prove the standard of care under the Compliance Rule or that SBB's policies did not meet that standard." However, they provide no support for the presupposition that the SEC is required to establish a "standard of care" or any industry standard under the Compliance Rule.

from 2016, a jury may reasonably find a violation of the Compliance Rule separate from finding a deficiency in SBB's Valuation Model. *See, e.g., Sec. & Exch. Comm'n v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F. Supp. 3d 932, 959 (C.D. Cal. 2022) (observing that advisers can violate the Compliance Rule "independent of any other securities law violation").

Because there is sufficient evidence to create a factual dispute regarding the adequacy of SBB's risk management policies and procedures regarding the valuation of investments, summary judgment is denied as to the SEC's Compliance Rule claim.

B. *The SEC's Motion for Partial Summary Judgment*

Moving on to the SEC's motion for partial summary judgment, the SEC moves on its fraud claims in Counts II, V, and VI specifically as to three of the Marketing Statements: (1) the existence of a high-water mark, (2) the one-year lockup period, and (3) the fund's inception date. Because the SEC bears the burden of proof, it must prove every element of its fraud claims to obtain summary judgment. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015). The Court construes the facts in the light most favorable to Defendants.

The Court cannot grant the SEC's motion for summary judgment because a reasonable jury might find Defendants lacked a culpable mental state. Barnett and Aven, among other SBB employees, testified that their objective in creating marketing materials was to advertise SBB's Polysight investment *strategy* rather than solely to solicit investments for Polysight I. Defendants stated that they intended to market an *example* of the type of fund SBB could create for investors, which could include a one-year lockup and high-water mark, and that they in fact stood ready and willing to negotiate "funds of one." Handler also stated that by including a longer track record for Investors II, differentiated from Polysight I, SBB's intent was to provide investors with the "most representative return stream" and demonstrate the "long-term value of [SBB's] investment approach."

40

This testimony creates a genuine dispute inappropriate for resolution at summary judgment. It is the role of a jury to assess the credibility of SBB officers' testimony as to whether they intended to market a "strategy" and simply "misspoke," and whether they knew or should have known that their statements would mislead investors. Defendants point to Aven's comment to Handler in 2015 that the marketing materials had to include the "composite return" if SBB used a September 2011 inception date, suggesting Defendants' intent to provide accurate information. Further, not every marketing material represented that Polysight's "Firm and Program Information" pertained strictly to the Polysight I fund. The evidence suggests that the materials were changed at some point to apply to the Polysight "platform" generally. A jury could regard unintended misstatements and vagaries as simple oversight and could believe that Defendants did not intend to mislead investors nor know that their marketing materials would be misleading. The genuine dispute of fact as to whether Defendants had the requisite state of mind in making any misleading statements, standing alone, is reason enough to deny the SEC's motion.[12]

Before concluding, the Court will address the parties' arguments as to the applicability of Rules 206(4)-8 and 206(4)-1. The SEC argues that Defendants meet the definitional requirements necessary for the provisions of Advisers Act Rules 206(4) (Count VI) to apply. It is undisputed that SBB was an SEC-registered investment adviser, and that Barnett and Aven meet the Advisers Act's definition of investment adviser. *See* 15 U.S.C. § 80b-2(a)(11). However, Defendants take exception to two definitional requirements: (1) whether SBB's marketing materials applied to a "pooled investment vehicle" or a "custom fund of one," and (2) whether SBB's online marketing submissions were "advertisements" within the definition in the Rule.

---

[12] For the reasons explained in analyzing Defendants' motion, the Court does not reach the question of whether a genuine dispute of fact exists as to Defendants' negligence. *See supra* note 9.

41

With respect to whether SBB intended to market a strategy to create a "custom fund of one" or to market Polysight I itself, the SEC has shown that SBB circulated materials specifically marketing Polysight I, a "pooled investment vehicle." And as to whether submissions to online marketing platforms constitute "advertisements" as defined by Rule 206(1)-1, the Court finds that they do. An "advertisement" is a communication that "offers" an adviser's "investment advisory services with regard to securities." 17 C.F.R. § 275.206(4)-1(e)(1)(i). Citing dictionary definitions of "offer" (including "to present for acceptance or rejection" and "to make available"), Defendants assert that SBB's online database listings do not "offer" investment advisory services. Instead, they characterize the listings as simply having "provided prospective investors the opportunity to connect with SBB, whom SBB could then contact and begin a discussion about investing in an SBB-managed vehicle." The Court disagrees that "provid[ing] … the opportunity to connect … and begin a discussion about investing" is not "presenting for acceptance or rejection" nor "making available" advisory services. And although certain listings disclaimed that they were "a solicitation in any investment product," that is not a disclaimer of any offer for advisory services. Therefore, Rules 204(6)-1 and 204(6)-8 apply as to the marketing materials and online listings for Polysight I, allowing the SEC's claims to proceed.

## VI.    Conclusion

For the foregoing reasons, the Court grants in part Defendants' motion for summary judgment as to the SEC's Custody Rule claim (Count VII) and § 207 claim (Count XI) and limits the SEC's Counts I–VI to claims for which it can show fraud without a GAAP violation. The Court otherwise denies the motion [261]. The Court denies the SEC's motion for partial summary judgment [257].

**IT IS SO ORDERED.**

_____

Sharon Johnson Coleman
United States District Judge

DATED: 7/13/2026

42